| | |
|---|---|
| ZANGRILLO | Mm-hmm. |
| CW-1 | --they get to the [USC undergraduate] advisor, and the advisor say[s], "By the way, you were admitted through athletics. Are you competing in a sport?" And, and we know that-- and we don't-- what I don't want her to say, or anything like this, is that she got in through athletics-- she got in because of a payment to athletics, which I know-- |
| ZANGRILLO | Right. |
| CW-1 | --that she won't-- right? |
| ZANGRILLO | Right.  No, she won't say that. |
| CW-1 | Okay.  And then we should be fine. |

### N.  JOHN B. WILSON

287.    Defendant JOHN B. WILSON is a resident of Lynnfield, Massachusetts. WILSON is the founder and CEO of a private equity and real estate development firm.

288.    As set forth below, WILSON conspired to bribe Jovan Vavic, the USC water polo coach, to designate his son as a purported recruit to the USC men's water polo team, thereby facilitating his admission to USC.  WILSON also sought to use bribes to obtain the admission of his two daughters to Stanford University and Harvard University as recruited athletes.

289.    CW-1 has advised law enforcement agents that he first began working with WILSON in or about 2012, and that WILSON agreed to make a purported contribution to KWF to facilitate a bribe to Vavic to designate WILSON's son as a purported water polo recruit.

290.    On or about February 10, 2013, WILSON e-mailed CW-1 and asked for the "deadline to decide on side door for USC or BC or Georgetown etc. this year" and to "confirm for which schools is side door option really viable."  CW-1 responded that the deadline for USC and Boston College was "mid July."  When WILSON replied that he thought the deadline for

USC was earlier, CW-1 explained: "Jovan [Vavic] is giving me 1 boys slot and as of yet no one has stepped up to commit that is why it is later."

291.    On or about February 28, 2013, WILSON's spouse, who was copied on the earlier e-mail chain, replied to CW-1 and WILSON and asked, "Is this spot still available for USC[?]" CW-1 responded that the spot was still available. WILSON's spouse replied to CW-1 and WILSON and asked, in substance, whether another candidate was looking at USC such that she and WILSON should "be pushing [their son] to decide if that's his number 1 choice." WILSON's spouse indicated that their son "is unaware of this arrangement."

292.    On or about March 26, 2013, WILSON e-mailed CW-1 and asked, "Would the other kids know [my son] was a bench warmer side door person?" In a follow-up e-mail the next day, WILSON added: "So it sounds like even if [my son] practices all the time etc it will be known that he is a bench warming candidate? Obviously his skill level may be below the other freshmen. In your view will he be so weak as to be a clear misfit at practice etc?"

293.    CW-1 advised WILSON that his son would not actually be expected to play water polo for USC. On or about March 27, 2013, in response to an e-mail from WILSON about his son's commitment to the team "if he did the side door at USC," CW-1 replied: "Travel is only if he is playing so No- the commitment is to be on the roster not attend all practices but he will have to attend drug tests and other mandatory functions for 1 year then walk away/frankly after the 1st semester he can move on."

294.    In an e-mail to CW-1 on or about August 24, 2013, WILSON inquired about the timing of his payments to Vavic to secure his son's admission as a purported water polo recruit. WILSON wrote: "What does Jovan need by [S]ept 20? Do u have what we need? Do I make the first payment to u then?" CW-1 responded, in substance, that he had everything he needed to

send to Vavic "so he can add [your son] to his recruit list and present him to admissions in October." WILSON replied: "Great - let me know when u have verified u have it all completed and into Jovan. Also when and where to wire money."

295.   In an e-mail exchange on or about October 3, 2013, Vavic advised CW-1 that he needed an athletic profile for WILSON's son and that it "needs to be a good resume." CW-1 subsequently provided Vavic with a falsified profile that included fabricated swimming times and awards.

296.   In an e-mail exchange on or about January 21, 2014, Vavic asked CW-1 to confirm that WILSON's son was still interested in attending USC. CW-1 confirmed that WILSON's son was still interested and that the "family is ready to help." Vavic replied that he would present WILSON's son to the USC subcommittee for athletic admissions with his "top walkons."

297.   On or about February 26, 2014, Vavic e-mailed a USC athletics administrator that WILSON's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly." CW-1 has advised that this purported performance figure, which was derived from the falsified athletic profile CW-1 provided Vavic, was fabricated.

298.   WILSON's son was granted admission to USC as water polo recruit on or about February 28, 2014. USC mailed him a formal offer letter on or about March 26, 2014.

299.   On or about March 1, 2014—one day after the admissions decision—WILSON e-mailed CW-1 under the subject line "USC fees." WILSON wrote:

> Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account ?

CW-1 replied that he could make the invoice for business consulting fees, so that WILSON could "write off as an expense." WILSON replied, "Awesome!"

300.   On or about April 7, 2014, WILSON's company wired $100,000 to KWF, as well as $100,000 to The Key, CW-1's for-profit entity, and $20,000 to CW-1 directly.

301.   On or about April 16, 2014, CW-1 withdrew a $100,000 cashier's check, made out to "USC Men's Water Polo," from The Key's account. The "Purpose/Remitter" identified on the check was "Wilson Family."

302.   On or about July 28, 2014, USC sent WILSON and his spouse a gift receipt for their $100,000 donation to USC Athletics.

303.   WILSON's son withdrew from the USC water polo team after his first semester at USC.

304.   During a call with CW-1 on or about September 29, 2018, WILSON inquired about potential "side door" opportunities for his daughters. CW-1 explained, in substance, that he could get WILSON's daughters into college through the athletic recruitment scheme even if they did not play the sport for which they were purportedly recruited. The following is an excerpt from the call:

WILSON          And what were the schools in that, if you did the side door? And I'm
                interested about the side door and that stuff--

CW-1            So the side door is gonna be-- gonna happen where you want 'em to
                happen. [inaudible]

WILSON          It can happen anywhere? Does it have to be a sports side door? I wasn't
                clear on that.

CW-1            Well, so that's the-- that's the easiest way to approach it, right--

WILSON          Yeah.

| CW-1 | --because all of the coaches have -- you know, they have guaranteed spots, and you've done a good job, you got athletic girls who got great size, they're in the right sports, so, you know, potentially there's a sailing option, and potentially there's a crew option. I mean, I don't know how good of athletes they are. They may be good enough to be able to compete at some of these schools, and then who knows what we have to do, depending on where, where the spots [inaudible]. |
|---|---|
| WILSON | Mm-hmm. Yeah, so they-- |
| CW-1 | So you have-- |
| WILSON | --have to get that sports. What if they're not really that good? I mean, they can do some crew, but I don't know they're gonna be good. [One daughter's] not even that good competitively at sailing. She just taught sailing and did sailing in, you know [inaudible] |
| CW-1 | Right, so-- |
| WILSON | --yacht club. |
| CW-1 | But at the end of the day, by the side door, I may be able to go to the sailing coach and say, "Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit. So are you will-- are you interested in doing that?" |

305.    During a call on or about October 15, 2018, CW-1, acting at the direction of law enforcement agents, listed various "side door" options for WILSON's daughters and noted that for any of those options, WILSON's daughters "don't have to play. They just-- that's the path I'm gonna get 'em in on." WILSON responded, "Gotcha." WILSON asked CW-1 what would happen if his daughters "don't actually get in?" CW-1 replied, "Oh, no, no, no. Y-you don't have to worry about it. They're re-- it's g-- it's a done deal." WILSON subsequently advised CW-1 that he wanted to pursue "side doors" for his daughters at Stanford and Harvard.

306.    During the same call, CW-1 explained that if WILSON were to deposit $500,000 into KWF immediately, he would give WILSON first priority on any admission spots he secured,

126

because CW-1 had to give spots to "whoever's gonna ante up."  The following is an excerpt from

the call, which was consensually recorded.

CW-1                         So if anybody asks me for, like, [the] Stanford spot and we're not sure yet,
                             then I can call you and say, "Hey, somebody wants that spot and I only
                             have one," or "I'm gonna get a second one," or whatever. But having the
                             money already, in advance, makes it much easier. Because I gotta go with
                             whoever's gonna ante up.

    307.    WILSON responded, "Yeah," and asked CW-1 for his wire information.  On or

about October 17, 2018, WILSON's company wired $500,000 to an account in the name of

KWF in the District of Massachusetts.  Unbeknownst to WILSON, the account had been opened

by CW-1 at the direction of federal agents.

    308.    Thereafter, on or about October 27, 2018, CW-1, at the direction of law

enforcement agents, advised WILSON that he had secured a "side door" deal for one of

WILSON's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with

Vandemoer was hidden from Stanford.[21]  The following is an excerpt from the call, which was

consensually recorded.

CW-1                         So I had a conversation with the Stanford sailing coach and, so I just gave
                             the Stanford sailing coach [$]160,000 for his program and while we were
                             having that conversation I said, "Hey, I'm hoping that this 160 that I'm
                             helping you with helps secure a spot for next year. Can I be guaranteed a
                             spot for next year?" And he said, "Yes."

WILSON                       [inaudible] all it takes?

CW-1                         So-- no, no, no, no. That's not all it takes.

WILSON                       Okay. (Laughter)

CW-1                         This is not TJ Maxx or Marshall's or something like that. So--

---

[21] Vandemoer has agreed to plead guilty, in the United States District Court for the
District of Massachusetts, to a charge of racketeering conspiracy, in violation of Title 18, United
States Code, Section 1962(d).

| | |
|---|---|
| WILSON | Right. |
| CW-1 | So essentially if you're-- I want you to have first dibs, like I told you. So if you want I can provide John Vandemoer-- which I'm going to essentially send John directly the check, to the coach. I can send him your [$]500,000 that you wired into my account to secure the spot for one of your girls. I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors so that Stanford doesn't-- |
| WILSON | (Laughter) |
| CW-1 | --catch on. |
| WILSON | Right. |
| CW-1 | Okay. So-- |
| WILSON | Yeah, no. He's got to-- |
| CW-1 | --Stanford-- |
| WILSON | -- actually have some sailors. Yeah. |
| CW-1 | Yeah.  So that Stanford doesn't catch on to what he's doing. |
| WILSON | Right. |
| CW-1 | So-- and I-- that doesn't mean I'm not going to pursue other Stanford coaches, and to be frank with you, it doesn't matter if it's one of the girls who's not a sailor. I can still put her as a sailor. Or, obviously, the one that is, I can-- I'll mark that she's a sailor because she is, but not at the level in which she can sail at Stanford. |
| WILSON | Right, right. |

309.    In a call on or about November 29, 2018, CW-1, at the direction of law enforcement agents, told WILSON that he had secured an admissions spot at Harvard through a fictitious "senior women's administrator," and that, in exchange for a $500,000 payment to her, the administrator would designate one of WILSON's daughters as an athletic recruit.  The following is an excerpt from the call, which was consensually recorded.

128

| CW-1 | So I got the senior women's administrator at Harvard is going to give us a spot. What we have to do is we'll have to give her $500,000. That money, obviously, like the others, will go through my foundation and then I will fund the senior women's administrator at Harvard. And then in the spring, since I've already paid John Vandemoer the 500 and now we'll give the senior women's administrator 500, so I got another deal for you. Is-- your total's going to be 1.5. 250 will come in the spring for Stanford and 250 for Harvard in the spring and we'll ha-- and we'll be solid. We'll be done. We'll apply like a normal student but we'll know that we're getting in in the late fall of next year. |
|---|---|
| WILSON | Okay, great. So what is that going to be? This is the senior women's-- what does she have, no team or anything like that or-- |
| CW-1 | She'll figure it out. So it won't mean-- it doesn't matter the sport at this point. She will figure it out and get it done. So-- and the same thing for-- maybe she won't have to sail but we're going to put her through sailing and John Vandemoer. This is actually a better play at Harvard because she will just get her in through athletics in one of the sports but it won't matter. It won't matter at all. |

310.    During the call, CW-1 told WILSON he would need another $500,000 payment to secure the spot at Harvard. Thereafter, on or about December 11, 2018, WILSON's company wired another $500,000 to the Massachusetts account in the name of KWF.

O.    DEVIN SLOANE

311.    Defendant DEVIN SLOANE is a resident of Los Angeles, California. SLOANE is the founder and CEO a Los Angeles-based provider of drinking water and wastewater systems, among other businesses.

312.    As set forth below, SLOANE conspired to bribe USC's Heinel to designate SLOANE's son as a recruit to the USC men's water polo team, thereby facilitating his admission to USC.

313.    On or about January 4, 2017, SLOANE e-mailed CW-1: "Should we start thinking of a short list of schools to tour now?" CW-1 responded, in substance, that a short list typically required "SAT and Subject test scores," but that SLOANE could begin to create a list if

"you are ready to commit to the notion of the financial side door. Your thoughts?" SLOANE replied three minutes later that he and his son would "come up with schools to visit."

314.    CW-1 has advised law enforcement agents that he agreed with SLOANE to secure his son's admission to USC as a purported water polo recruit, even though SLOANE's son did not play water polo competitively.

315.    Records obtained from Amazon.com indicate that, on or about June 5, 2017 and June 16, 2017, SLOANE purchased water polo gear, including a ball and a cap.

316.    Thereafter, on or about June 26, 2017, SLOANE received an e-mail from a graphic designer bearing the subject line, "Water Polo Photo – 06/26/17." The designer wrote:

> We researched a few water polo athlete images and the majority are cropped against a background so they can use them in promotional materials (and it takes out undesirable elements from the crowd etc). We were able to adjust the color and complete a clean extraction to mimic this look (attached).

317.    SLOANE responded, "OK, but any chance to put him in a setting that looks like an outdoor [polo] pool?" The graphic designer replied:

> We looked for a few shots yesterday but could not find one that was a solid fit (we're looking within istockphoto for the pool BG scene). We'll keep looking and should have a few final examples today.

318.    On or about June 27, 2017, SLOANE e-mailed CW-1 a photograph of his son purporting to play water polo, with his right arm and upper torso exposed above the water line. In the e-mail, SLOANE asked, "Does this work??" CW-1 responded: "Yes but a little high out of the water- no one gets that high."

On or about the following day, June 28, 2017, SLOANE sent CW-1 a photograph in which his son appeared to be lower in the water, with his torso and arm now mostly submerged. SLOANE wrote, "Hope this works . . ." CW-1 replied, "perfect." In both photographs, SLOANE's son appears to be using the items SLOANE purchased from Amazon.com a few weeks earlier.

319.    On or about July 14, 2017, CW-1 e-mailed Janke and directed her to create a water polo profile for SLOANE's son.  Two days later, Janke wrote, "Ok sounds good.  Please send me the pertinent information and I will get started."

320.    On or about July 16, 2017, CW-1 e-mailed SLOANE to request biographical details for the profile.  CW-1 indicated that the profile would falsely present SLOANE's son as a "Perimeter Player" who played for the "Italian Junior National Team" and the "LA Water Polo" team.  The following day, SLOANE replied with the personal information for the profile.

321.    Heinel presented SLOANE's son to the USC subcommittee for athletic admissions in or about November 2017.  On or about November 16, 2017, Heinel e-mailed CW-1 a conditional acceptance letter for SLOANE's son, indicating that his admission was premised upon "records [that] indicate that you have the potential to make a significant contribution to the intercollegiate athletic program."

322.    Less than two weeks later, on or about November 29, 2017, CW-1 e-mailed SLOANE the following:

> Devin can you send a 50K check to USC and the address is below.  Additionally the rest of the 200K will be paid to our foundation a 501 3C [sic] after [your son] receives his final letter in March.
>
> Made Payable to:
>
> USC Women's Athletics
>
> Send to:
>
> Donna Heinel
> Senior Women's Athletic Director
> 3501 Watt Way
> Los Angeles, California 90089-0602
>
> Please confirm when sent[.]

323.    That same day, SLOANE sent Heinel, by FedEx, a $50,000 check payable to "USC Women[']s Athletics."

324.    On or about January 29, 2018, one of CW-1's employees e-mailed SLOANE an invoice from KWF in the amount of $200,000 and wrote, "Thank you for your generous donation." SLOANE forwarded the e-mail to CW-1 and asked, "Hi [CW-1]: I believe you mentioned this would be due after we received the official letter from USC in March. Is that correct or did something change?" CW-1 responded: "We are getting everyone ready – I am trying to get money in so there is no delay as [U]SC will call the markers in very soon thereafter."

325.    On or about March 22, 2018, USC mailed SLOANE's son a formal acceptance letter. On or about April 11, 2018, SLOANE wired $200,000 to KWF.

326.    On or about April 1, 2018, a guidance counselor at SLOANE's son's high school e-mailed SLOANE and his son for an update on what schools had accepted SLOANE's son. SLOANE forwarded the request to CW-1 with the note: "What do you think we should do? Either we can list all the non-USC acceptances and not include USC or include everything or do nothing?" CW-1 responded as follows:

> They know about USC. One of the counselors questioned [your son] getting in as Water Polo player this week. My folks at [U]SC called me so we could restate [your son] playing in Italy as [his high school] does not have a team.

SLOANE replied, "Any concerns?" Three minutes later SLOANE responded again, as follows:

> The more I think about this, it is outrageous! They have no business or legal right considering all the students privacy issues to be calling and challenging/question [my son's]'s application.

327.    On or about April 11, 2018, Heinel e-mailed the USC Director of Admissions as follows:

Wanted to complete the loop. [SLOANE's son] doesn't play on the men's water polo team at [his high school] because they do not sponsor water polo at his school. He plays at LA Water Polo Club during the year and travels international during the summer with the youth junior team in Italy. I don't know if the people at [his high school] are unaware of his participation. He participates in tournaments in Greece, Serbia (how he met Jovan [Vavic]) and Portugal. I believe the parents do have money since he is enrolled in [his high school] plus is able to travel so extensively during the summer. He is small but he has a long torso but short strong legs plus he is fast which helps him win the draws to start play after goals are scored. He is an attack perimeter player. Thanks for bring to my attention.

The information in Heinel's e-mail was fabricated. The USC Director of Admissions replied as

follows:

Thanks, for this. If you don't mind, I'll pass an edited/paraphrased version of your note along to the school, to assure them we're looking at this stuff. They seemed unusually skeptical. I think they do have a water polo team, but I wouldn't expect it to be competitive. It's a small school; I read a good deal about tennis, some basketball, but not much else in the way of athletics.

CW-1 forwarded SLOANE this e-mail chain at approximately 10:41 p.m. that same day.

328.    Approximately two hours later, CW-1 sent SLOANE the following e-mail, which

CW-1 has advised investigators contained fabricated information for SLOANE to use as a script

if questioned by his son's high school:

I received a call from Coach Vavic last night asking why [my son's high school] is pushing back on my decision to take [my son] as a member of my team - WHY?

[My son] is strong enough student to compete as a student-athlete and be a postive role model for our program throughout USC - again WHY are they questioning??

Head Water Polo Coach-- Jovan Vavic and Lisa his wife have become family friend for several years since [my son] has participated in Water Polo in the summers while we were in Italy[.]

Coach Vavic goes to Serbia, Greece, Italy, Spain and Portugal with his college teams to train and recruit players to bring to the US; consequently, we have created a close relationship.

133

Coach Vavic knows [my son] very well and realizes he is not at the National Level of USC as a water polo player but he encouraged us to have [him] consider attending USC and being a part of his team[.]

Coach Vavic stated to us that he has 40-50 guys on his team annually. Only a couple handful play but he needs practice players and great teammates plus he knows we are a generous family.

329.   Later that day, Heinel left CW-1 the voicemail referenced in paragraph 218 above, in which she told him, among other things, "I just don't want anybody going into [SLOANE's son's high school] or [GIANNULLI's daughter's high school], you know, yelling at counselors. That'll shut everything -- that'll shut everything down."

330.   In a call with CW-1 on or about August 30, 2018, SLOANE described how he had misled a representative of the USC advancement office about the reason for his $50,000 payment. The following is an excerpt from the call, which was intercepted pursuant to the Court-authorized wiretap.

| | |
|---|---|
| SLOANE | I got reached out to by the main development people at, at, [USC's senior vice president for university advancement]-- |
| CW-1 | Yup. |
| SLOANE | --at university advancement. But he had an underling reach out to me and then I told the underling, "Hey, I got a letter from [USC's senior vice president for university advancement] himself." She's like, "Oh, oh, okay, well maybe I need to involve him now." I don't know. But she understood it was-- but she knew we made the donation to women's sports, and she's like, "Well, I was curious-- you know, how, how did you come up with that?" I said "Well you know, my mom, my mother was an Olympic athlete and she just passed away last year, and we as a family decided that we wanted to support women's--" |
| CW-1 | You're the greatest. |
| SLOANE | "--women's sports, and my, my son had done a big essay, a big, big interview with an Olympic hockey-- female hockey player. The subject was, you know, about women in sports and how they need more access, and all that stuff. So we thought it was a good |

way." And I said, "I knew it would get your guys's attention. You know, I'm a pretty subtle guy, but I knew I'd get on your radar quickly and we want to part of the community," and all that.

CW-1        That's great. You are-- you are slick.

SLOANE      So that was good.

331.   On or about October 25, 2018, CW-1 called SLOANE from Boston at the direction of law enforcement agents. On the call, CW-1 told SLOANE that the IRS was auditing KWF. SLOANE expressed concern about speaking over the telephone. The following are two excerpts from the call, which was consensually recorded.

CW-1        So I just want to let you know so my foundation right now--

SLOANE      Mm-hmm.

CW-1        --is being audited.

SLOANE      Uh-huh.

CW-1        Like everybody on the planet, right?

SLOANE      Sure.

CW-1        And so, they're looking at all of our payments so they, w-- you know, we have hundreds and hundreds of them. So one of them they asked about was the 200K that-- that you paid.

SLOANE      Yeah.

CW-1        So I just want to make sure that, [inaudible], so when the IRS talks to me, but what I'm-- what I'm not going to tell the IRS obviously is that the 2-- the 250 which was the total and 200 that went to our foundation went to get [your son] into USC through Donna Heinel for-- for men's water polo. So I'm not going to do that but I just was-- I just want to make sure we're on the same page.

SLOANE      Uh-huh, yeah.

                        ….

CW-1        So what I'm going to tell the IRS is that your donation--

| | |
|---|---|
| SLOANE | Mm-hmm. |
| CW-1 | --to our foundation essentially went-- |
| SLOANE | Wait [inaudible], wait, [CW-1], let me ask you a question, shouldn't we get together for a coffee over this as opposed to over the phone? |
| CW-1 | Whatever you want to do I'm fine. |
| SLOANE | No, no, might be-- might be-- I think m-- better. |
| CW-1 | Okay, okay, so-- |
| SLOANE | [inaudible] but-- but yeah, I think [inaudible]. |
| CW-1 | [inaudible] I'm in Boston now. |
| SLOANE | Oh, okay. |
| CW-1 | I'm in Boston now. So I mean whatever you want you tell me. |
| SLOANE | Well, you know what the best thing would be, I'm sure you got some materials on your foundation, do you have any like marketing materials about what the foundation d-- |
| CW-1 | Well, we don't. |
| SLOANE | Okay. |
| CW-1 | We don't, we have a website and all that stuff.  Other than that-- |
| SLOANE | Will you send me the link to the website? |
| CW-1 | Yes. |
| SLOANE | And then, maybe I can brush up on that and then—then-- then be consistent like that. |
| CW-1 | Yeah, because essentially what-- all I'm going to tell the IRS is that you made donation to our foundation for underserved kids, that's it. |
| SLOANE | Yeah, yeah, yeah. |

CW-1                    And I'll leave it at that.

SLOANE                  Okay. Yeah. Yeah, yeah.

      P.  <u>MARCI PALATELLA</u>

332.     Defendant MARCI PALATELLA is a resident of Hillsborough, California. PALATELLA is the CEO of a liquor distribution company in Burlingame, California.

333.     As set forth below, PALATELLA took part in both the college entrance exam cheating scheme and the athletic recruitment scheme, including by conspiring to bribe USC's Heinel to designate her son as a football recruit in order to facilitate his admission to USC.

334.     In or about 2016, CW-1 arranged for PALATELLA's son to be evaluated by a psychologist with whom CW-1 was acquainted, in order to obtain the medical documentation necessary to qualify for extended time on his college entrance exams.

335.     On or about September 26, 2016, after receiving the psychologist's evaluation, PALATELLA e-mailed CW-1 to inquire whether she should apply for extended time on both the SAT and the ACT. CW-1 replied: "Do both that way if one says no we have the other."

336.     On or about February 27, 2017, after her son was granted extended time on the SAT, PALATELLA e-mailed her son's high school that he would be "taking his SAT test at [the West Hollywood Test Center] in Los Angeles on March 11 and 12, 2017." PALATELLA explained that "[w]e are taking [our son] to LA that weekend to look at schools and his outside college advisor recommended he take his test at that facility."

337.     On or about March 7, 2017, PALATELLA wired $75,000 to one of the KWF charitable accounts.

338.    On or about March 10, 2017, CW-2 flew from Tampa to Los Angeles for
PALATELLA's son's SAT exam.  CW-2 purported to proctor the exam the following day and
returned to Tampa on or about March 12, 2017.

339.    PALATELLA's son received a score of 1410 out of a possible 1600 on the SAT.

340.    At or about the same time that PALATELLA made arrangements with CW-1 to
facilitate cheating on her son's college entrance exams, she also inquired about the college
recruitement scheme.  In an e-mail exchange on or about March 13, 2016, PALATELLA asked
CW-1 for advice on how to "position" her son for his college applications.  In response, CW-1
asked, "Are you willing to make a contribution of several hundred thousand as a donation to get
him in as a participant in someone's program."  PALATELLA replied: "Money, for the right
environment, Yes.  But he can never know."

341.    On or about the following day, CW-1 provided PALATELLA with a price list,
which he described as "the number it would take to get admitted even with the fudging of the
scores."  For USC, he advised that there was a 75 percent chance of getting her son admitted
with a "large but not significant" donation.  PALATELLA asked for "the approximate number it
would take to get in there," and added, "[w]hen we spoke $300-400 was one level, and the
second level was $750-1m.  Can you clarify?"  CW-1 answered: "Georgetown BC may be over
1m others as stated."

342.    In an e-mail exchange on or about October 3, 2016, PALATELLA asked CW-1
whether certain schools would be "realistic" for her son assuming he "had a B average, and SAT
scores that you can guess at (I'm assuming fairly accurately) . . . if we were also 'generous?'"
CW-1 replied:

> Several of the school's besides being very difficult to get in are a grind and there
> are no easy classes. . . .  No matter the board member you know the grades and

138

very good/solid scores will not get him in unless you anti [sic] in the many millions. The only way in is through athletics due to the leeway given athletes.

PALATELLA responded that her son was not a realistic football recruit, noting:

> You know that [my son] took a year off football this year and says he just needed a break and will play next year. So given that, and they he's [sic] not the team's star but a good solid player, would he really still have an athletic edge? [My son] is a natural but he's gotten the message that he is not big enough for college football. I think that's one of the reasons he dropped out. . . . How would he have an athletic edge at a bigger named school given the other players are huge?

CW-1 answered:

> He needs to get in through Football so my relationship at that levels gives [him] a shot since that is the sport with the lowest grades. Notre Dame and Vandy lowest football players are 3.4 and have to be big time players. Cannot hide him there.

PALATELLA responded, "Ok. Got it," and asked if her son should "go back now this season or can he go back as a senior??" CW-1 replied: "I got it covered no worries on the story for [your son]." PALATELLA responded with four heart emojis.

343.   On or about July 27, 2017, approximately four months after engaging in the SAT cheating scheme, PALATELLA e-mailed CW-1 a photo of her son in his football uniform and asked, "Will this work?" CW-1 forwarded the photo to Janke, together with PALATELLA's son's grades and test scores, which included the fraudulently obtained SAT score. Janke created a football profile for PALATELLA's son that falsely described him, among other things, as an active player on his high school football team as a member of the "defensive line" and a "long snapper" and as a member of several local and statewide championship teams between 2015 and 2017.

344.   Heinel presented PALATELLA's son to the USC subcommittee for athletic admissions as a purported football recruit on or about November 16, 2017, falsely describing him as a long snapper.

139

345.    On or about November 30, 2017, Heinel e-mailed CW-1 a conditional acceptance letter for PALATELLA's son. The letter stated that he had the "potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university." CW-1 forwarded the letter to PALATELLA.

346.    On or about the next day PALATELLA mailed Heinel a $100,000 check, payable to the USC Women's Athletic Board, with a note that said, "Our son ... is beyond thrilled at the prospect of attending USC as a freshman this fall."

347.    USC mailed PALATELLA's son his formal acceptance letter on or about March 22, 2018. Six days later, CW-1 instructed a KWF employee to send PALATELLA an invoice in the amount of $400,000. PALATELLA wired the money to KWF on or about April 1, 2018.

348.    On or about October 24, 2018, CW-1 called PALATELLA from Boston at the direction of law enforcement agents, and told her that the IRS was conducting an audit of KWF. The following are two excerpts from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | My foundation is being audited, which is typical, right? You know, we're all-- |
| PALATELLA | Okay. |
| CW-1 | --businesspeople. |
| PALATELLA | Right. |
| CW-1 | So they're, they're looking at all my payments. |
| PALATELLA | Mm-mmm. |
| CW-1 | And they asked about your payment, which was for [CW-2] taking the test for [your son], which we know happened at [the West Hollywood Test Center], and that whole thing happened, and [CW-2] took it. And of course when I talk to the IRS, I'm definitely not saying anything about that. I'm just saying that your payment for-- that $75,000 payment was essentially for helping-- going to our foundation to help underserved kids. |

PALATELLA          Oh, yeah, totally. Everything we've done is.

CW-1               Absolutely.  And then the, the additional money, the 400K-plus,
                   was-- that we get through Donna-- to help [your son] get into USC,
                   through football.  That's essentially [the] same thing I've told the
                   IRS, just money's gone to our foundation, and is essentially to help
                   underserved kids in the programs that we're doing.  So essentially
                   what I want to do is make sure that our stories are the same.

PALATELLA          Well, here's-- I think they are, but I think there's even more to it.
                   So hold on a second.  Just one sec.  Let me go into-- I'm in a big
                   environment here.  I think the other thing is that we don't come
                   from this, and we are so grateful for the educational opportunities
                   our own kids have gotten, and we feel like we want to give to
                   something that can support these kids and give other kids the same
                   chance that our son had.

CW-1               Absolutely.  Absolutely.

PALATELLA          Are you comfortable with that?

CW-1               Absolutely.  Absolutely.  So the other question I just want to ask is
                   for the sale of-- are you or did you take a write-off-- because
                   they've asked me that question, and I just want to make sure that I
                   know the answer to the question.

PALATELLA          Yes, because you're a nonprofit, correct?

CW-1               Right absolutely.  Yeah, 501(3)(c) [sic].

PALATELLA          Oh yeah.  No, no.  Yeah, no, no, no, we took the write-off, and we
                   are-- but our-- yeah.  I mean, I love the work you're doing, and
                   love the fact that you help take care of these kids and inspire them
                   and go out into the communities.  It was a year we could afford to
                   do it.  That's-- which is not even true, but--  (laughs).  We made
                   sure it was.

                                   ....

PALATELLA          What are they looking for?

CW-1               They're just looking for to figure out, this money-- because what's
                   happened, Marci, is our foundation has grown significantly . . . .
                   So what's happened now people are focused on, okay, where's all
                   this money going?  Who are you really helping?  Is this money,
                   you know, being used for the appropriate reason?  So we-- my

                                   141

|  | books are solid.  We've proven it.  And I just want to make sure that if anybody comes to you, that your stories are the same, that essentially that first 75 [$75,000], essentially, which we know is for [CW-2] taking the test for [your son], but-- |
|---|---|
| PALATELLA | No, no, no, it's-- no, that was also for the same thing. |
| CW-1 | Absolutely. |
| PALATELLA | I don't think, I don't think we have to involve [CW-2]. |
| CW-1 | Okay, got it.  Got it.  Okay. |
| PALATELLA | I don't think-- I, I think eliminate [CW-2], that we, we did it.  We were really happy with the work you were doing.  We know people at Goldman Sachs who have, you know, recommended you highly, and we were looking for a place to-- we'd already donated to our schools, and we were, you know, looking for a place where we could really help kids, not just in our own neighborhood, but elsewhere, and we felt really good about everything you were doing.  And you were involved in athletics, and my husband was a professional athlete, and-- you know. |
| CW-1 | Terrific.  Terrific.  [Inaudible]. |
| PALATELLA | [inaudible]. |
| CW-1 | I just want to make sure that all the payments made-- we're on the same page, that's all.  I just want to give you a heads-up-- |
| PALATELLA | I don't think you-- I don't even think you should go down the [CW-2] road.  Or did, did you? |
| CW-1 | No, we haven't-- no, not at all. |
| PALATELLA | Don't even-- I just think that was our first one, and then we felt really good about you, and-- |
| CW-1 | They, they, they know nothing about [CW-2].  They know nothing about any of it.  I have just said that all the money went to our foundation to help underserved kids.  That's it. |

349.   On or about January 10, 2019, PALATELLA called CW-1 to tell him about a

"disturbing call" that she had had with a neighbor whom she had told, in confidence, that she had

142

paid CW-1 $200,000 to secure her son's admission to USC—although, in fact, she had paid CW-1 and Heinel two-and-a-half times that amount. According to PALATELLA, her neighbor had told PALATELLA's son that we "basically paid off to get in," after promising that "she wouldn't say anything." PALATELLA told CW-1 that she and her spouse "laugh every day" about how grateful they were for CW-1's services, telling him, "We're like, 'it was worth every cent.'"

### Q. ELISABETH KIMMEL

350. Defendant ELISABETH KIMMEL is a resident of Las Vegas, Nevada and La Jolla, California. KIMMEL is the owner and president of a media company.

351. As set forth below, KIMMEL participated in the college recruitment scheme by conspiring to use bribery to facilitate her daughter's admission to Georgetown as a purported tennis recruit, and her son's admission to USC as a purported track recruit.

352. KIMMEL's daughter's application to Georgetown stated that she played "Southern California Junior Tennis" throughout high school and was a "ranked player." In fact, the United States Tennis Association, which operates the Southern California Junior Tennis program, has no record of KIMMEL's daughter's participation in that program.

353. On or about November 26, 2012, an admissions administrator at Georgetown e-mailed KIMMEL's daughter, copying Ernst, that "[i]n order to send you your likely letter, your application needs to be complete. Although Coach Ernst has shared with me your unofficial SAT score report, we have not received the scores officially from the College Board and this is a requirement for admission." On or about December 12, 2012, KIMMEL's spouse responded to the e-mail on behalf of his daughter, copying KIMMEL, Ernst and CW-1, that he had ordered his daughter's official score report to be sent to Georgetown.

354.    Eight days later, on or about December 20, 2012, the Georgetown admissions department sent KIMMEL's daughter a letter stating that the "Committee on Admissions has conducted an initial review of your application to the Class of 2017 at the request of Mr. Gordie Ernst, Tennis Coach.  I am pleased to report that the Committee has rated your admission as 'likely.'"

355.    KIMMEL's daughter matriculated at Georgetown in the fall of 2013 and graduated in or about May 2017.  She was not a member of the tennis team during her four years at Georgetown.

356.    On or about April 2, 2013, Masera e-mailed KIMMEL: "I understand you have received a [Georgetown University] acceptance letter.  Would you like me to revise the Foundation letter to reflect the full $200,000.00 payment?"

357.    Upon receipt of Masera' e-mail, KIMMEL e-mailed CW-1: "Thank you, again, for making Georgetown possible for [my daughter]."  She added: "Steve [Masera] sent me a letter to get the process going on our donation, but had $200K as the amount.  My memory was that the amount was $275K over two payments.  Do I have it right?"  CW-1 replied, copying Masera: "Please make the payment as it works with your foundation calendar- I believe it was one amount now and one in June?"

358.    On or about April 15, 2013, the Meyer Charitable Foundation, a family foundation on which KIMMEL and her spouse serve as officers, issued a check, payable to KWF, in the amount of $100,000.  The check was signed by KIMMEL.  Masera therafter sent a letter to the Meyer Charitable Foundation falsely confirming that "no goods or services were exchanged" for the purported donation.  On or about June 27, 2013, the Meyer Charitable Foundation issued a second check to KWF in the amount of $170,000 to KWF.  On or about July

16, 2013, the Meyer Charitable Foundation issued a third check to KWF in the amount of $5,000. The June and July checks were also signed by KIMMEL.

359.    Between on or about September 5, 2012 and on or about September 6, 2013, CW-1 caused The Key, and later KWF, to pay Ernst, the Georgetown tennis coach, $244,000, in monthly installments of between $11,000 and $24,000.

360.    The Meyer Charitable Foundation filed a tax return on or about September 25, 2013, for the period June 1, 2012 to May 31, 2013, listing a purported charitable donation to KWF of $100,000. The Meyer Charitable Foundation filed a tax return on or about September 18, 2014, for the period June 1, 2013 to May 31, 2014, listing a purported charitable donation of $175,000 to KWF.

361.    On or about August 10, 2017, CW-1 directed Janke to create an athletic profile for KIMMEL's son. Janke inquired, via e-mail, what sport the profile should be for and whether there are "pictures or do I need to find one." CW-1 responded: "pole vaulter" and asked her to find "pole vaulter pics."

362.    Janke prepared an athletic profile falsely describing KIMMEL's son as an elite high school pole vaulter and including the following photograph purporting to be of KIMMEL's son, but which, in fact, depicts another individual.



363.    The high school attended by KIMMEL's son has no record that he ever participated in pole vaulting or track and field.

364.    On or about August 18, 2017, CW-1 forwarded the false profile to Heinel, writing in the subject line, "per our discussion today thanks."

365.    In or about early October 2017, Heinel presented KIMMEL's son to the USC subcommittee for athletic admissions as a purported track and field recruit.  On or about October 10, 2017, Heinel forwarded to CW-1 a conditional letter of admission, addressed to KIMMEL's son, stating that his admission to USC had been approved, and that his records indicated he had the "potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university."  Among the conditions was the requirement that he register with the NCAA Eligibility Center.

366.    CW-1 forwarded the letter to to KIMMEL and her spouse.  KIMMEL responded, "Thanks," and inquired:  "[W]hat does it mean in point 3, where it says he must register with the NCAA Eligibility Center?"  CW-1 responded:  "I have to register him as an athlete in case he

wants to compete – no one sees the registration but me, you and USC – we did the same for [your daughter] too."

367.    On or about October 23, 2017, the Meyer Charitable Foundation made a $50,000 payment to the USC's Women's Athletics Board.  The check was signed by KIMMEL's spouse.

368.    On or about November 28, 2017, KIMMEL e-mailed CW-1 that she had received her son's formal USC application from Mikaela Sanford, CW-1's employee, to review prior to its submission.  KIMMEL noted: "I wasn't sure about telling her to submit because the application didn't have the activity you were going to include."  CW-1 replied to KIMMEL, copying Sanford, directing Sanford to "please wait to submit [the application to] USC.  I have one activity to add- track and field- pole vaulter."

369.    The application ultimately submitted to USC falsely described KIMMEL's son as a "3 year Varsity Letterman" in track and field and "one of the top pole vaulters in the state of California."

370.    On or about February 23, 2018, the Meyer Charitable Foundation issued a check to KWF in the amount of $200,000.  The check was signed by KIMMEL.

371.    USC formally admitted KIMMEL's son on or about March 22, 2018.

372.    On or about March 24, 2018, KIMMEL e-mailed CW-1 that one of the letters in her son's acceptance packet indicated that he needed to register with the NCAA and asked whether "we need to do anything re the NCAA?"  CW-1 responded that her son's test scores and final transcript needed to be sent to the NCAA.  KIMMEL replied that she did not recall "doing it for [her daughter]."

373.    On or about May 26, 2018, KIMMEL e-mailed Sanford to ask if the transcript needed "to be submitted to the NCAA if [her son is] not going to participate in a college sport?"

147

Sanford replied the following day: "Even though he will not play a sport, he was admitted as an athlete so he has to abide by the NCAA regulations for entering into the university." KIMMEL responded by asking if the transcript needed to come from her son's school, or if she could send it to the NCAA herself because she was "concerned that asking [her son's] counselor to submit his transcript to NCAA will raise questions, particularly since [his counselor] knows him well and is familiar with all of his activities/extra-curriculars." Sanford provided KIMMEL with instructions on how to submit an official copy of the transcript to the NCAA herself without alerting her son's high school counselor.

374.    In a call on or about July 26, 2018, KIMMEL and her spouse told CW-1 that their son's advisor at USC had inquired about his status as a track athlete, and noted that their son believed this to be a mistake because he was unaware that he had been admitted to USC as a recruited athlete. The following are two excerpts from the call, which was intercepted pursuant to a Court-authorized wiretap.

| SPOUSE | It's-- [spouse] and Elizabeth are here. |
| KIMMEL | Hey [CW-1], how are you? |
| CW-1 | Okay.  Hi there. |
| SPOUSE | So I want to-- hold on just a second [CW-1]. |
| CW-1 | Okay. |
| SPOUSE | So [my son] and I just got back from [U]SC Orientation. It went great. The only kind of glitch was, and I-- he didn't-- [my son] didn't tell me this at the time-- but yesterday when he went to meet with his advisor, he stayed after a little bit, and the-- apparently the advisor said something to the effect of, "Oh, so you're a track athlete?"  And [my son] said, "No." 'Cause, so [my son] has no idea, and that's what-- the way we want to keep it. |
| CW-1 | Right. |

| | |
|---|---|
| SPOUSE | So he said, "No, I'm not." So she goes, "It has it down that you're a track athlete." And he said, "Well I'm not." She goes, "Oh, okay, well I have to look into that." |

….

| | |
|---|---|
| KIMMEL | So why is he still, why was he flagged by this advisor as being a track athlete? |
| CW-1 | He was flagged as an athlete getting in. |
| KIMMEL | So does that just follow him around? On all of his records? |
| CW-1 | I have no idea ELISABETH, but it doesn't matter because every other kid who's gone through the same process will be having the same thing and it doesn't matter 'cause he gets no priority over anybody. I'm sure on his application he's flagged as ev-- as all the kids as they got in-- like there's a water polo kid who's not gonna be a water polo kid, there's the baseball kid who's not gonna be a baseball kid and they just-- they're not being recruited. They're not on the [athlete] priority [registration list] to get any priority stuff, so I would just go about your business and let it be as it [is] and not even pay attention to it 'cause it's the first time as anybody's ever [said] anything. |
| KIMMEL | I will-- so we have to hope this advisor doesn't start poking around? |
| CW-1 | Well if the advisor does, she's gonna call the person who's responsible for all of this, that's the person who got [your son] admitted, and she'll just say he decided not-- to not compete. |
| KIMMEL | She won't call the track coach? Does he know about it? |
| CW-1 | Doesn't matter, she has to go [to] the senior women's administrator. |
| KIMMEL | Okay. |
| CW-1 | It wouldn't make sense for an advisor to call anybody. So I'll [let] Donna know it-- that's the way it is. |

375.    On or about August 2, 2018, KIMMEL forwarded CW-1 an e-mail from her son's advisor at USC about scheduling times for track practice. KIMMEL noted that her son "told me about this e-mail (see below), which he assumed was a mistake," adding: "[P]erhaps you already spoke to your contact about this, but has [my son] been taken off 'the list' so he doesn't continue

149

to receive notifications about practice times (or missed practices), athletics meetings, etc." CW-1 forwarded the e-mail to Heinel who responded: "I will take care of tmw."

376.    In a call on or about October 26, 2018, CW-1, at the direction of law enforcement agents, told KIMMEL that KWF was being audited by the IRS. The following is an excerpt from the call, which was consensually recorded.

| CW-1 | So they-- they've asked a couple questions about the-- you know, because essentially over $450,000 has been donated by your guys' family foundation. |
|---|---|
| KIMMEL | Uh-huh. |
| CW-1 | So, of course, I'm not going to tell the IRS that-- I'm not going to say anything about the payments-- the first group of payments for [your daughter] going to Gordie Ernst at Georgetown, nor am I going to say anything about the-- 200,000-- well, 250 total going for [your son] to Donna Heinel at USC for his admission as a pole vaulter. So I just want to make sure that you and I are on the same page, so that nothing-- you know, I'm going to-- essentially what I'm going to tell the IRS is that your donations were made to my foundation to fund underserved kids, which is the mission of our foundation. So I just wanted to make sure that we were on the same page. |
| KIMMEL | Oh, well, as far as I know, I don't know what you've done with the money I gave your foundation. I mean, I-- you never really told me. |
| CW-1 | Okay, that's-- that's perfect. |

377.    In a call on or about January 3, 2019, CW-1, at the direction of law enforcement agents, told KIMMEL that the USC admissions department was asking questions about a number of students who had been recruited but did not show up for practice. The following is an excerpt from the call, which was consensually recorded.

| CW-1 | Several of my families-- I was told through Donna, may get some phone calls because they went through the side door, through Donna, and they-- admissions is asking, "So how come these kids didn't show up for practice?" And so she had to talk to admissions about why the kids haven't shown up for practice. |
|---|---|

| | |
|---|---|
| KIMMEL | Oh. |
| CW-1 | So, so I-- I just wanted you to know in case you get a phone call from anybody, 'cause so far all this stuff-- [your son] was taken off the list-- |
| KIMMEL | Uh-huh. |
| CW-1 | -- so I don't think it'll ever happen. |
| KIMMEL | Were the other kids not taken off the list? |
| CW-1 | They didn't have any issue with advising, so we did not take them off any list, 'cause we've -- |
| KIMMEL | Oh. |
| CW-1 | --never had to. |
| KIMMEL | Huh.  And they didn't have issues with the coaches saying, "Why aren't you at practice?" (Laughs) |
| CW-1 | No, not at all, because their boss, who's Donna Heinel, essentially put 'em on the recruited walk-on list, which happens all the time, and they just don't show up for practice, and that's fine.  Coaches are okay with that because, essentially, donations are going to help their programs, and they know that. |
| KIMMEL | Hmm.  Okay. |
| CW-1 | So what I wanted you to know is that you may get a phone call from admissions, just asking why [your son] didn't show up for practice, which I don't believe will happen, because he's not on anybody's list-- |
| KIMMEL | Mm-hmm. |
| CW-1 | --but I wanted you to be aware. |
| KIMMEL | So what do you recommend I say? |
| CW-1 | I would say that if they do ask you, which I doubt they will, that [your son] had an injury over the summer, to his shoulder, and so he stopped vaulting. |
| KIMMEL | Mmm.  Okay. |

378.    Shortly after that call ended, KIMMEL called CW-1 back to confirm that no one

would be contacting her son about the issue because he was unaware of the circumstances

surrounding his admission to USC.  The following is an excerpt from the call.

| | |
|---|---|
| CW-1 | Elisabeth. |
| KIMMEL | Hey [CW-1].  I just had a follow-up question regarding our earlier conversation. |
| CW-1 | Okay. |
| KIMMEL | Are the kids getting called, also? |
| CW-1 | No, no and no.  And nobody has even called anybody at this point, but we're just getting [a] heads up, and the-- what Donna said to me is if anybody were to-- it would be-- they would call the family, the parent.  They wouldn't talk to the kids. |
| KIMMEL | Oh. So-- but they've called her. |
| CW-1 | [inaudible] And so she's helped a bunch of kids get into the [inaudible] them why they didn't come for practice. And so she's-- in each case, she's told them a reason why they haven't come. And it's predominantly all injury, which is the typical thing for most kids. |
| KIMMEL | Okay. So admissions is not in on what she's been doing. |
| CW-1 | That is correct. Admissions is in on that she brings athletes, or potential athletes, or VIPs, to admissions, and then admissions does admission based on if athletics wants 'em, just like if Jim Ellis from the Business School has a VIP list, and he puts kids on the VIP list, and says to admissions, "I want these families to get in," and then those families are making donations to the Business School. |
| KIMMEL | Oh, okay. |
| | .... |
| KIMMEL | Why didn't [the other students] get e-mails about, "Why aren't you at practice?" and a practice schedule, like [my son] got? |
| CW-1 | I have no idea. |
| KIMMEL | 'Cause that was the first thing that happened to him is he got an e-mail, "Here's your practice," and I guess track had fall practices. |

| CW-1 | Yeah, I have no idea at all, but I know that she-- you know, you told me, and I got Donna to squash the whole thing. |
|---|---|
| KIMMEL | Why, why didn't she squash everyone else?  Just 'cause it would look too weird? |
| CW-1 | Just w-w-- and-- yeah, nobody said anything, so-- and she did-- and we've been doing this for years. |
| KIMMEL | Oh. |
| CW-1 | So-- |
| KIMMEL | So why poke the bear? |
| CW-1 | Yes. |
| KIMMEL | Okay. All right. Then I won't say anything to [my son], 'cause he's (laughs)-- |
| CW-1 | No, don't say anything. |
| KIMMEL | -- still in the dark. |

### R. MICHELLE JANAVS

379.    Defendant MICHELLE JANAVS is a resident of Newport Coast, California.

JANAVS is a former executive at a large food manufacturer formerly owned by members of her

family.

380.    As set forth below, JANAVS participated in both the college entrance exam

scheme and the athletic recruitment scheme, including by conspiring to use bribery to facilitate

her daughter's admission to USC as a purported beach volleyball recruit.

381.    On or about August 11, 2017, JANAVS forwarded CW-1 correspondence from

ACT, Inc. indicating that her daughter had been approved for extended time on the ACT.  CW-1

replied: "Awesome news.  It works."

382.    On or about August 31, 2017, JANAVS received an e-mail from ACT, Inc. with instructions on how to register her daughter to take the ACT, with extended time, at her high school. JANAVS forwarded the e-mail to CW-1 and asked, "Do I sent this info/form requested to [my daughter's high school] or directly to you?" CW-1 responded: "Normally your school then we request the test to move."

383.    On or about October 27, 2017, CW-2 flew from Tampa to Los Angeles. On or about October 28, 2017, JANAVS' daughter took the ACT at the West Hollywood Test Center, with CW-2 serving as the purported proctor. CW-2 returned to Tampa the following day. JANAVS' daughter received a score of 32 out of a possible 36 on the exam.

384.    On or about October 29, 2017, the day after the test, CW-1 directed a KWF employee to send an invoice to JANAVS in the amount of $50,000. CW-1 also caused KWF to pay $18,000 to CW-2 and $13,000 to Dvorskiy for helping JANAVS' daughter and another student cheat on the ACT.

385.    On or about November 30, 2017, JANAVS sent a check for $50,000 from her foundation to KWF.

386.    In or about the fall of 2018, the falsified ACT scores were included as part of JANAVS' daughter's application for admission to USC, and JANAVS provided information to CW-1 for use in facilitating her daughter's admission to the university as a purported beach volleyball recruit. In fact, while JANAVS' daughter played volleyball in high school, she did not play competitive beach volleyball.

387.    For example, on or about August 24, 2018, CW-1 e-mailed JANAVS to request that she send him "an action volleyball indoor and beach photo of [your daughter] as soon as

154

possible." Two days later, JANAVS e-mailed CW-1 photos of her daughter playing beach and indoor volleyball.

388.   On or about September 4, 2018, CW-1 e-mailed Heinel an athletic profile of JANAVS' daughter that included two of the photos and falsely described her as the winner of multiple beach volleyball tournaments in California.

389.   In a call on or about October 1, 2018, CW-1 told JANAVS that Heinel planned to present her daughter to the USC admissions committee as a beach volleyball player, and explained where to send the bribe payments. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | So she's gonna go through on Thursday, so I just want to confirm the process, the next pro-- part of the process, which would be soon thereafter I will get a letter from USC stating-- like a likely letter-- that she has been in-- admitted under these conditions, which is doing an NCAA clearinghouse, finishing her semester, blah, blah, blah, and at that point you guys would send a $50,000 check to USC Athletics, in care of Women's Athletics-- |
| JANAVS | Okay. |
| CW-1 | --at that point. Are you okay with that? |
| JANAVS | Yes. |
| CW-1 | Okay, and-- |
| JANAVS | [inaudible] that's fine. |
| CW-1 | Okay, and then when she gets her final, final letter, which will happen around March 25th, then you would send the rest of the money. So, I just-- |
| JANAVS | To USC or to you? |
| CW-1 | To our foundation. |
| JANAVS | Yeah, so the first $50,000 goes to USC? |

155

CW-1            Right, correct.

JANAVS         Okay.

390.    Heinel presented JANAVS' daughter to the USC subcommittee for athletic admissions as a purported beach volleyball recruit on or about October 3, 2018.

391.    On or about October 17, 2018, at the direction of law enforcement agents, CW-1 forwarded to JANAVS a letter noting that her daughter had been conditionally admitted to USC. The letter stated: "Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university." JANAVS replied, "Thank you. Let me know about next steps."

392.    On or about October 26, 2018, CW-1, at the direction of law enforcement, e-mailed JANAVS instructing her to mail a $50,000 check to Heinel payable to the USC Women's Athletics Fund. JANAVS advised CW-1 that she mailed the check to Heinel later that same day.

393.    One month later, on or about November 26, 2018, JANAVS called CW-1 to discuss plans to engage in the college entrance exam scheme for her younger daughter. The following is an excerpt from the call, which was consensually recorded.

JANAVS         [CW-1], I had a question for you. So I was able to get [my younger daughter] the multiday ACT.

CW-1            Okay, you got her extended time multiple days, got it.

JANAVS         Yes, so I got that, the only thing is h-- [my younger daughter] is not like [my older daughter]. I'm not [inaudible] works. She's not stupid. So if I said to her, "Oh, well, we're going to take it up at [CW-1]'s," she's going to wonder why. How do you do this without telling the kids what you're doing?

CW-1            Oh, in most cases, Michelle, none of the kids know.

JANAVS         No, I know that.

CW-1            Essentially what happens is they take the test with a proctor like they normally do and w--, and then so they take the test, they leave, and then the

156

|  | proctor looks at what she's already done and then whatever number that we're trying to get, that's what he works to get. So she doesn't even know. |
|---|---|
| JANAVS | Right, but how-- no, I understand, she won't even know. But how do you explain [it] to her? Because I got the letter from the school and they said, "You know, you need to take it at the school." Because remember last time they gave [inaudible] little bit of a hard time? How do you-- how do they work around that? |
| CW-1 | So one of the ways you could do it is to say, "Listen, we're going to take it on the weekend. And we don't want you to miss any school." Because it's difficult when [inaudible] much class time. And we need to take this over a Saturday-Sunday. So we're going to do [it] up there because they'll administer the test over multiple days.  But the school-- but-- but-- hold-- let's go back. It doesn't matter about the school at all. The issue is [your daughter]. The school-- school wants to be able to give it, but they don't have to give it. So you don't really have to say anything. For the school you could say that weekend you guys are going to be up in L.A. and [inaudible]. |
| JANAVS | That's what we did last time. Yeah, so when-- well, [my daughter] is the issue. There's two issues. Yeah. One is, you know-- I mean [my daughter] is more the issue because she's going to say to me, "You know, well, why am I taking it up there?" |
| CW-1 | And you're just going to say, "We don't want you to miss any school so we're going to do this on a weekend up here because we g-- [inaudible] because it's really easy, it's convenient, and we can get it done over the weekend, you won't miss any school." |
| JANAVS | So do you-- so I would actually have her go Saturday and Sunday to pretend like she's taking it over multiple days. |
| CW-1 | Well, if you want to do that, because she's-- |
| JANAVS | She's smart, she's going to figure this out.  Yeah, she's going to say to me-- she already thinks I'm up to, like, no good. |
| CW-1 | I got it.  So let's, yeah, so that's what we would have to do is over multiple days. |
| JANAVS | Okay. So then the other question is, if I want to sign her up-- or I've already signed her up for February. Or can I sign her up in December and not have it go through [her high school] at all? |
| CW-1 | Well, no matter what it goes through. Because it's her home school [inaudible] what we have to do is redirect the test to be-- to be given at |

157

| | |
|---|---|
| | [inaudible] site. So [inaudible] so stick with where you are. We'll just redirect. She's already signed up. We just have to redirect the materials to be sent like we did for [your older daughter]. |
| JANAVS | Okay. Okay. Right, I see. Okay. Okay. Okay. Yeah, they're not stupid either, but whatever, I don't care. They can't say anything to me. I mean they're going to be suspicious that every kid I have does so well somewhere else, but that's okay. So we'll, I just didn't-- I just didn't want to have this conversation with [my younger daughter]. |
| CW-1 | No, no, totally get it, yeah. No, I totally get it. |
| JANAVS | She's totally different than [my older daughter]. Like she needs to really think she d-- [my older daughter] is like, "This test is such bullshit. I don't really care. I don't ever want to take it." But [my younger daughter] is like actually studying to try and get a 34. |
| CW-1 | Got it. Got it. |
| JANAVS | So it would-- it would actually be a great boost to her. And [my older daughter] came to me and she says, "You're not going to tell [my sister], are you?" I was like, "No." Weird-- weird family dynamics, but every kid is different. |
| CW-1 | Cool. |
| JANAVS | Okay. Okay, so we'll just stick with February and now I know we're just trying to get it done on the weekend. You'll just go up too. And she doesn't see you at all. |
| CW-1 | No. |
| JANAVS | So we'll just say there's a proctor. I don't even have to say anything about you. |
| CW-1 | Yeah. No, not at all. |

394.    In a call on or about January 3, 2019, JANAVS discussed the cost of the exam

bribery scheme with CW-1. The following is an excerpt from the call, which was consensually

recorded.

| | |
|---|---|
| JANAVS | Yeah, so it helped that you mentioned it to [my daughter]. You could tell, she was like, "Well I should just do it at school." I'm like, "Oh my god, no." Yeah, let's just go ahead and I'll just come up with something for her. Let's |

take it over there.  But the thing [is], I need her to do the full thing and take it over two days-- like as if she is really doing it.  She's not stupid.

CW-1            No, I got you. She's, she's, you know, she's taking the test anyways on her own [inaudible] as if she is really doing it.  We'll just split it in half.  And then [CW 2] will clean it up so we can get the score we need to get, afterwards.  So I'll just tell him he has to do it for two days.  And we'll do half a day, half of that time on Saturday and half the time on Sunday.

JANAVS        Yeah, how much is that still?

CW-1            I think it's like $50,000.

JANAVS        Yeah, that's what we did last time.  Okay.

       395.    During the same call, CW-1 told JANAVS that Heinel had been questioned about

why JANAVS' older daughter was on the volleyball recruit list at USC.  The following is an

excerpt from the call.

CW-1            I got a call from Donna Heinel, at USC.

JANAVS        Uh-huh.

CW-1            And so the sa-- 'cause we went through sand volleyball, which we know she's really not a-- you know, I -- I couldn't put her through as a 6-person volleyball, indoor volleyball--

JANAVS        Ri—

CW-1            --because they're-- they're so awesome. So the sand volleyball coach was asking Donna-- 'cause she saw her list of student athletes that they recruited. So she asked about [your daughter]. And so I doubt it but you may get a call from the staff, at USC sand volleyball.

JANAVS        Okay.

CW-1            And if you do, you're ju-- they may just ask you, "Is [your daughter] preparing for the fall?" And, of course, you will say--

JANAVS        Yes.

CW-1            "Yes. And we live in Newport. And w-- she'll play tournaments over the
                summer." And then, if they do call you, let me know. And then I will call
                Donna, to squash this thing.

JANAVS          Okay.

      396.      On or about January 14, 2019, JANAVS sent CW-1 the following text message:

"Spoke with [my younger daughter].  We are set to take up in LA."  Later that same day,

JANAVS spoke with CW-1 about the exam scheme by telephone.  The following are two

excerpts from the call, which was consensually recorded.

JANAVS          So I have a question for you. I'm trying to figure out how best to deal with
                [my younger daughter] on this. So [my daughter] has said to me, "I'm gonna
                get a 34 on this ACT," or "I'm gonna keep taking it till I get a 34." And I'm
                like,  "[Daughter], what if you got like a 32 or a 33?" She's like, "W-- no. I
                would take it till I get a 34." I don't know if that's true, but she's fucking
                driving me nuts. But what I don't want to happen is us to say-- she gets a 33
                and her go, "I'm gonna take it again."

CW-1            I gotcha. Oh, I totally get that.

JANAVS          I'm like-- you know, I just want this one done. And I don't know if she's
                serious. Because she's not scoring that well on these.

CW-1            Right.

JANAVS          So I don't know if she's serious that she would take it again. I mean, I think
                a 34 might be a little high. But at the same time, maybe it's like, screw it,
                just give her the damn 40-- 34, so that we don't have to worry about her
                saying, "I'm taking it again."

CW-1            Totally agree.

                                            ....

CW-1            She may end up with a 35, just because there could be a question here or a
                question there that sh-- I mean, 'cause it's like missing hardly any questions
                at all. So it depends on the curve of the day. So, you know. And it may end
                up-- again, it could be a 35, it could be a 34, it could be a 33. It could be
                within one question.  You don't know, for that day.

JANAVS          I see. Okay. So do you--

160

| CW-1 | Because she's sco-- she's scored against everybody else in the country that's takin' the test. |
|------|------|
| JANAVS | Right. Right, right. So it's not like a guarantee. But it'll be a guarantee between a 33 and a 35. |
| CW-1 | Correct. |
| JANAVS | Okay. And if she gets a 33 and tells me she's gotta take it again, then you deal with her. |
| CW-1 | I know. |
| JANAVS | Then she's your problem. |
| CW-1 | I totally gotcha. So here's one thing. I'm waiting for [CW-2], who's our proctor/test-taker. He just had a baby, so I'm waiting to confirm that he can do it on that weekend. So once I get that back, I'll let you know. But we're ready to do all the paperwork and all that stuff, but as soon as I know. I'm hoping he'll tell me in the next couple days. |
| JANAVS | Okay. |

397.     On or about February 5, 2019, JANAVS mailed KWF a check in the amount of $25,000.

398.     On or about February 9, 2019, JANAVS' younger daughter took the ACT at the West Hollywood Test Center. Law enforcement agents conducting surveillance observed Dvorskiy, the test center administrator, arrive at the school at approximately 7:10 a.m. CW-2 arrived two minutes later. At approximately 7:49 a.m., JANAVS and her daughter met Dvorskiy in the front of the building, and then went inside together. JANAVS left the building approximately three minutes later. Agents observed JANAVS return to the test center at approximately 12:41 p.m. JANAVS' daughter left the building approximately fifteen minutes later and drove away with her mother. CW-2 left the test center approximately two hours later.

399.    JANAVS wired $25,000 to a Boston, Massachusetts account in the name of KWF

on or about February 12, 2019. JANAVS was unaware that the account had been opened by

CW-1 at the direction of federal agents.

### S.   DOUGLAS HODGE

400.    Defendant DOUGLAS HODGE is a resident of Laguna Beach, California.

HODGE is the former CEO of a large investment management company based in Newport

Beach, California.

401.    As set forth below, HODGE agreed to use bribery to facilitate the admission of

two of his children to USC as purported athletic recruits, and sought to enlist CW-1 to secure the

admission of a third child to college through bribery as well.

402.    In an e-mail to HODGE and his spouse on or about February 4, 2008, CW-1

wrote: "I spoke to my connection at Georgetown and he will work with us.  He helped me get

two girls in last week." HODGE responded that his eldest daughter "had a great experience at

Georgetown.  So, who knows?  This may prove the defining piece in the college puzzle." CW-1

replied, in substance, that HODGE's daughter had only a 50 percent chance "at best" of getting

into Georgetown based on her academic record, but that "there may be an Olympic Sports angle

we can use."

403.    HODGE's daughter's application to Georgetown, submitted on or about

November 4, 2008, indicated, among other things, that she won multiple United States Tennis

Association tournaments.  In fact, USTA records indicate that HODGE's daughter never played

in a USTA match.

404.    On or about December 23, 2008, Georgetown mailed HODGE's daughter a

conditional acceptance letter noting that "[t]he Committee on Admissions has conducted an

initial review of your application to the Class of 2013 at the request of Mr. Gordie Ernst, Tennis

Coach. I am pleased to report that the Committee has rated your admission as 'likely.'"

405.    HODGE's eldest daughter did not play tennis at Georgetown.

406.    On or about September 28, 2012, HODGE e-mailed his younger daughter's high

school transcripts and class schedule to CW-1 and wrote: "I think this is what you were looking

for. Sorry for the delay."

407.    On or about October 15, 2012, CW-1 directed a payment of $50,000 from CW-1's

for-profit business account to a bank account in the name of a private soccer club controlled by

Khosroshahin, then the head coach of women's soccer at USC, and Janke, then an assistant

coach of women's soccer at USC.

408.    HODGE's daughter's application to USC, submitted on or about December 16,

2012, stated that she was a co-captain of a Japanese national soccer team, and an "All American"

midfielder on a prestigious club soccer team in the United States.

409.    On or about February 12, 2013, CW-1 directed another $50,000 payment from his

for-profit business to the private soccer club controlled by Janke and Khosroshahin.

410.    On or about February 13, 2013, Khosroshahin e-mailed Heinel an athletic profile

falsely describing HODGE's daughter as, among other things, a "TOP DRAWER ESTIMATED

# 3 RECRUTING CLASS IN NATION," "All Ex Patriot Japan National Select Team Player,"

and a member of the "All National Championship Tournament Team."

411.    Heinel presented HODGE's daughter to the USC subcommittee for athletic

admissions as a purported soccer recruit on or about February 14, 2013. On or about March 26,

2013, USC mailed HODGE's daughter a formal acceptance letter.

163

412.    Less than two weeks later, on or about April 3, 2013, CW-1 e-mailed HODGE that he "wanted to follow up on next steps for [your daughter] and USC. At your convenience please give me a call?"

413.    On or about April 5, 2013, CW-1 e-mailed HODGE instructions to direct a $150,000 payment to The Key, CW-1's for-profit entity, and a $50,000 payment to KWF as a purported contribution. HODGE wired the money as directed four days later. The following day, Masera sent HODGE a letter falsely indicating that "no goods or services were exchanged" for the $50,000 payment to KWF.

414.    On or about May 10, 2013, CW-1 registered HODGE's daughter for the NCAA Eligibility Center. CW-1 sent an e-mail to HODGE the following day requesting that her official high school transcript be mailed "either to my office" or to the NCAA directly. On or about May 12, 2013, in an e-mail titled "transcript," HODGE asked CW-1: "What's the question here? I do not want to raise any suspicion at [my daughter's high school]."

415.    On or about May 15, 2013, CW-1 directed another $50,000 payment from KWF to the private soccer club controlled by Janke and Khosroshahin.

416.    HODGE's daughter matriculated at USC in or about the fall of 2013. She did not join the USC soccer team.

417.    On or about July 28, 2013, HODGE e-mailed CW-1, "Need to start discussion about the next one. [My son] is at [high school] in New Hampshire and entering his junior year."

418.    In an e-mail to CW-1 on or about December 20, 2014, HODGE inquired whether his son was "really qualified" for USC, noting, "He would go there in a heartbeat!!" CW-1 responded: "No but I can try to work a deal. . . . maybe Basketball or Football will give me a

164

spot since their kids are not that strong." HODGE responded: "Understood. I will talk with [my son] tomorrow."

419.   On or about January 28, 2015, HODGE's spouse e-mailed CW-1, with a copy to HODGE, noting that she had not been able to find photos of the son who was applying to USC playing football, but had found photos of his brother playing football. CW-1 forwarded the e-mail to Janke and wrote: "See below—I am sure there is a tennis one too. The boys look alike so I thought a football one would help too?"

420.   On or about January 30, 2015, HODGE e-mailed Heinel: "Thanks so much for your time yesterday. We are preparing [my son's] 'sports resume' as you requested and should be ready to send it on to you early next week." Heinel responded: "Great, looking forward to it...you should concentrate on his primary sport with accolades and achievement, then" add his secondary sport. HODGE forwarded the e-mail chain to CW-1.

421.   Later that same day, Janke e-mailed two falsified athletic profiles of HODGE's son—one relating to football, the other relating to tennis—to CW-1. The football profile included various fabricated football achievements, including "Varsity Football Sophomore – Senior Year," "Team Captain – Senior Year," and "NH Independent Schools All-American Selection 2013, 2014." In fact, records from the HODGE's son's school indicate that he did not play football in high school other than during his freshman year. The tennis profile included fabricated or exaggerated tennis achievements, including that, while in high school, HODGE's son was a member of the First Team Lakes Region League. In fact, while HODGE's son did play tennis on his high school's team, the school has no record of his involvement on the First Team Lakes Region League. CW-1 forwarded the profiles to HODGE and wrote:

> Doug I have provided t[w]o profiles from Laura. Please download and send to
> Donna [Heinel] and ask her to use whichever one she likes. Obviously we have

stretched the truth but this is what is done for all kids.  Admissions just needs something to work with to show he is an athlete.  They do not follow up after Donna presents. Please confirm receipt and when you send to Donna.

422.    On or about February 2, 2015, Janke e-mailed Heinel that HODGE "is on his way to Japan for work so he asked me to send these over to you as he did not have your email on him but wanted to get these to you ASAP."  Attached to the e-mail were the two falsified athletic profiles.  Heinel replied with the athletic profile of a different student with a note that said "an example of football."  In a separate e-mail, bearing the subject line "Suggestions," Heinel provided handwritten edits to the football profile and indicated that the photograph included on the profile should be exchanged for a "better picture" that was "more athletic."

423.    Heinel presented HODGE's son to the USC subcommittee for athletic admissions as a purported football recruit on or about February 12, 2015.

424.    On or about March 17, 2015, Janke e-mailed CW-1 the following:

I just got this message from Donna [Heinel]:  [HODGE's son]'s admission packet will be mailed on March 24th.  After the the [sic] packet is received please let the father know to send the check directly to me at USC, make out to what we had discussed before.  Thank you!

425.    CW-1 forwarded the message to HODGE and wrote:

Doug one of the folks helping us at USC sent the message below that [your son's] Admit Packet will be sent on March 24.  I will need to take care of the different parties separately, which I will accomplish to finalize all the dealings.  Once you receive the Acceptance please let me know so we can move forward financially.

HODGE replied, "Fanstatic!!  Will do."

426.    USC mailed HODGE's son a formal acceptance letter on or about March 24, 2015.  Exactly one week later, HODGE mailed Heinel a $75,000 check payable to the USC "Womens Athletic Board."  On or about April 1, 2015, HODGE wired $125,000 to The Key, and $125,000 to KWF.  CW-1, in turn, directed a payment of $50,000 from KWF to a bank account controlled, in part, by Janke in the name of "SC Futbol Academy," a private soccer team.

166

427.    On or about April 10, 2015, KWF issued a letter to HODGE falsely representing that "no goods or services were exchanged" for his purported contribution of $125,000.

428.    HODGE's son deferred his admission to USC, ultimately matriculating there in 2017. He did not join the football team.

429.    On or about August 10, 2018, HODGE called CW-1 to discuss the possibility of pursuing the college recruitment scheme to facilitate his youngest son's admission to Loyola Marymount University ("LMU"). The following is an excerpt from the call, which was intercepted pursuant to a Court-authorized wiretap.

| HODGE | So LMU, when we went down this past the last time-- and this is where, you know, this is the [CW-1] magic at work. You sa-- I remember you saying well, listen, if you want LMU, and you want to commit to LMU, let me know because, you know, this is one of the schools where you have developed relationships. |
| --- | --- |
| CW-1: | And we can get it done. |
| HODGE | And-- |
| CW-1: | Done. |
| HODGE | Yeah, so-- and I know how this works. I you know we, we, we don't have to talk in code. We know how this works. |
| CW-1: | Right. |
| HODGE | So if, if, if LMU, I mean, this requires him to commit, like LMU is my first choice. Because once, once you go to bat for him it's, that's pretty much a done deal right? |
| CW-1: | Correct, yeah. |

430.    In a call on or about November 30, 2018, CW-1, at the direction of law enforcement agents, told HODGE that the IRS was conducting an audit of KWF. The following is an excerpt from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | We had the discussion about us being audited. |
| HODGE | Yes. |
| CW-1 | Now they've decided that they are going to make phone calls to all the USC kids' donations. |
| HODGE | Okay. |
| CW-1 | So there's-- there's 25, 30, 35 kids total. I don't know who they're going to call and who they're not but I-- you know, what I've told them is, you know, there was $200,000 for [your daughter], 250[,000] for [your son], that they both got in, and that we both know they both got in through athletics. [Your daughter] got in even though she wasn't a-- a legit soccer player and [your son] not a legit-- I think we did football for [him]. |
| HODGE | Right. |
| CW-1 | But we didn't go in there. We didn't even discuss that. What I said to them is that your monies essentially went to our foundation to help fund underserved kids and that's how we left it. But I think that they're going to call some of the USC families that we've gone [inaudible] the years. So I just wanted you to have a heads-up. |
| HODGE | So with [my daughter]-- [my son] I'm fine. I'm complete-- and I'm first of all, I will-- I-- what you just described is exactly-- would be my words, okay. So you don't have to worry. I'm not going to-- I'm not-- I'm not going off script here. One thing to remember is, I had a conversation. You set me up with this woman, who I think was like the-- not-- she wasn't the soccer coach but she was in the athletics department. |
| CW-1 | So it might have been with Donna Heinel that you guys-- |
| HODGE | Yeah. |
| CW-1 | Okay. |
| HODGE | But we talked on the phone and she said, you know, "Thank you very much," and I said, "Well, we want to support USC athletics and looking forward to [my daughter]," and, you know, all this-- all that stuff. So that conversation sort of pierces that story of, I made a donation into the foundation, because she was like basically, "Well, thank you, Mr. HODGE, for your-- I'll call it |

168

support." We didn't talk about money. There was no conversation about-- there was not dollars discussed on that phone call. But, you know, we're kind of talking in code here.

CW-1        Right.

HODGE       So that's out there.

CW-1        Yeah.

HODGE        I don't know if they talked to her, what she might say, but I-- I know what I did, which is I donated to your foundation. That foundation has-- its stated mission is to help underserved kids basically get into-- you know, through-- get through college. And that's all I'm going to say.

### T. TODD BLAKE and DIANE BLAKE

431.    Defendants TODD BLAKE and DIANE BLAKE, a married couple (together, "the BLAKES"), are residents of Ross, California. TODD BLAKE is an entrepreneur and investor. DIANE BLAKE is an executive at a retail merchandising firm.

432.    As set forth below, the BLAKES agreed to bribe Heinel to facilitate their daughter's admission to USC as a purported volleyball recruit.

433.    On or about January 29, 2017, DIANE BLAKE e-mailed CW-1, copying TODD BLAKE, noting that their daughter was interested in attending USC but that DIANE BLAKE assumed the school was "in the reach stretch category." CW-1 responded: "There is a way to garner a guarantee at USC if that is first choice but best to discuss without [your daughter] being present." DIANE BLAKE replied, copying TODD BLAKE: "Look forward to discussing."

434.    On or about February 1, 2017, DIANE BLAKE e-mailed CW-1, copying TODD BLAKE, noting that only she and TODD BLAKE would be on a call they had planned for that evening.

169

435.     On or about June 28, 2017, DIANE BLAKE e-mailed CW-1, copying TODD
BLAKE: "We are fully committed to the USC plan. Is there anything else you need from us at
this point?" CW-1 responded: "I am meeting with USC July 10th. If I can have an unofficial
transcript and a PDF of best test scores- each set that would be the first step." The next day,
DIANE BLAKE e-mailed CW-1, copying TODD BLAKE, "the info for USC," including their
daughter's high school transcript.

436.     On or about August 7, 2017, Janke e-mailed CW-1 a volleyball profile for the
BLAKES' daughter. Approximately one week later, CW-1 forwarded the profile to Heinel,
writing, "[BLAKES's daughter] - Volleyball and Lacrosse . . . I provided info in the past." The
profile sent to Heinel contained falsified information regarding the BLAKES' daughter's
volleyball experience, including that she had received a number of honors and played on two
club volleyball teams, one of which qualified for the junior nationals three years in a row.

437.     On or about August 26, 2017, DIANE BLAKE e-mailed CW-1, copying TODD
BLAKE: "We wanted to double check that you have everything you need, and reconnect on
next steps regarding the USC plan and the overall application process. We love the USC plan
and hope it will work out!" CW-1 responded that USC had everything they needed but he did
not yet know when the BLAKES' daughter would be presented to the admissions committee.

438.     Heinel presented the BLAKES' daughter to the USC subcommittee for athletic
admissions as a purported volleyball recruit on or about September 7, 2017. Approximately one
week later, on or about September 14, 2017, Heinel e-mailed CW-1 a letter, addressed to the
BLAKES' daughter, notifying her of her conditional admission to USC as a student athlete. The
letter stated: "Your records indicate that you have the potential to make a significant contribution
to the intercollegiate athletic program as well as to the academic life of the university." CW-1

forwarded the letter to to TODD BLAKE and DIANE BLAKE that same day. TODD BLAKE responded by thanking CW-1 and stating that he would register his daughter with the NCAA Eligibility Center as instructed in the letter.

439.    Two days later, CW-1 e-mailed TODD BLAKE: "I will send you the person and address to send the first 50k check to today." Later that day, CW-1 instructed TODD BLAKE to send the check to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel." TODD BLAKE responded by asking CW-1 to "provide [him] with the exact wording for the check's 'Payable To' line." CW-1 replied that the check should be made payable to "USC Women's Athletics." That same day, TODD BLAKE mailed a $50,000 check to USC Women's Athletics.

440.    On or about October 7, 2017, a KWF employee e-mailed CW-1 regarding the BLAKES' daughter's college applications. The employee wrote: "Met with [the BLAKES' daughter] and DIANE BLAKE and they asked me to run schools and EA plan by you. Her list is below[.]" The list, which included several colleges, noted, "USC-First choice (Side door)." CW-1 responded: "Why are we mak[ing] such a huge effort? [The daughter] does not know this but parents do that she has been admitted to USC already." The KWF employee replied, in part, "Ok, so just go through the motions . . . ?"

441.    Later that same day, the KWF employee e-mailed DIANE BLAKE: "Do you have a moment for a quick chat sometime today . . . This is regarding Side door, so no need to involve [your daughter]." DIANE BLAKE responded: "Yes! I just saw your email. I can talk now if you are still available."

442.    On or about January 26, 2018, CW-1 instructed a KWF employee to send the BLAKES an invoice in the amount of $200,000.  On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts.

443.    On or about March 19, 2018, TODD BLAKE e-mailed CW-1, copying DIANE BLAKE, to ask whether their daughter would "receive a [formal admission] letter from USC when letters are mailed on Friday."  TODD BLAKE also noted that "we will want to engage with you to get our son [ ] started on the college process."

444.    The BLAKES' daughter was formally admitted to USC on or about March 22, 2018.  Although currently enrolled at the university, she is not listed on the roster for the women's volleyball team.

445.    On or about October 25, 2018, CW-1 called TODD BLAKE at the direction of law enforcement agents and told him that KWF was being audited by the IRS.  The following is an excerpt from the call, which was consensually recorded.

| CW-1 | And so they-- they look into all our payments and they s-- saw your guys' 250 payment-- |
|---|---|
| T. BLAKE | Okay. |
| CW-1 | --of many.  And they asked me -- |
| T. BLAKE | Okay. |
| CW-1 | --so, you know, "What's that all about." And so of course I'm not going to tell the IRS that essentially we got [your daughter] in-- |
| T. BLAKE | Right. |
| CW-1 | --through Donna Heinel with women's volleyball. |
| T. BLAKE | Right. |
| CW-1 | So I'm not going to do that but I'll tell you [inaudible] |

| T. BLAKE | It was-- it was basketball, wasn't it? |
|---|---|
| CW-1 | No, it wasn't basketball [inaudible]. It was volleyball. |
| T. BLAKE | Oh. So USC applied my payment to women's basketball. |
| CW-1 | Oh, y-- the reason why is because Donna is the senior women's administrator. |
| T. BLAKE | Okay. |
| CW-1 | So sh-- the money went towards her and she gets to decide where it goes within the department. |
| T. BLAKE | I see. Okay, great. |
| CW-1 | So that's probably why you got credit from women's basketball. |

446. During the call, TODD BLAKE told CW-1 that USC had approached him in the wake of his payment to USC Women's Athletics, and asked him to donate additional money to women's basketball. TODD BLAKE explained that he misled USC about his reasons for giving the money. The following is an excerpt from the conversation.

| T. BLAKE | And, to let you know, USC has approached me because they see the dollar amount and they've approached me from a fundraising perspective twice already, one from the Annenberg School of Communications which is [my daughter's] school, and then another from the athletics fund. |
|---|---|
| CW-1 | Okay. |
| T. BLAKE | And what I've told them essentially is I've been-- I've been very, like, evasive, haven't told them anything. I said that basically in-- in the first situation I said that, you know, I felt for equity reasons it was-- it would be great to give money to a nonrevenue sport, that football, basketball, on the men's side get a-- they get a ton of money. And it'd be nice to donate money to a program that was, you know, not as-- funded as strongly. And then when the athletics department guy, guy named Brent, really nice guy, followed up by e-mail, he basically, you know, said, "You know, I've noticed you give money to women's basketball, we'd love to get you down for a game, and so forth." And I said, "Well, it's probably just going to be a one-time donation. If I donate it'll be probably to Annenberg resident athletics fund." |