UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
                                                    )
UNITED STATES OF AMERICA                             )
                                                    )
            v.                                       )
                                                    )          CRIMINAL NO. 19-10080
DAVID SIDOO, et al                                   )
                 Defendants                          )
                                                    )
_____)

**DEFENDANT ROBERT ZANGRILLO'S RESPONSE IN OPPOSITION TO NONPARTY
UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO QUASH**

Now comes the Defendant Robert Zangrillo, by and through undersigned counsel, and

hereby respectfully submits this Response in Opposition to Nonparty University of Southern

California's ("USC") Motion to Quash Mr. Zangrillo's Rule 17(c) Subpoena. This Court has

already, at least preliminarily, found that Mr. Zangrillo's document requests satisfy the applicable

standard of relevancy, admissibility, and specificity in its having issued the document subpoena.

USC's Motion to Quash, which is heavily predicated upon factual assertions directly contradicted by

discovery documents, provides no compelling reason to alter that result.

## MEMORANDUM OF LAW

A.      **Introduction**

The documents being subpoenaed (in addition to certain documents already acquired by the

defense and attached to this filing) will prove the existence of a university-wide program at USC (the

"special interest" and/or "VIP" program) where past donations, pledges of future donations, or

1

expectation of future donations based on the university's belief in a parent's resources deeply affects the chances for a prospective student's admission as does a variety of factors other than just grades and test scores, including recommendations on the prospective student's behalf by persons of power, wealth, or position in the USC community, past or present.  The notion that Robert Zangrillo's $50,000 check to USC, made after his daughter's admission, was a "bribe" is legally wrong – there was no *quid pro quo* corrupt agreement between Mr. Zangrillo and USC that brought this relatively ordinary gift to a university into the orbit of the federal criminal law.  It was a donation indistinguishable from the vast numbers of other donations by parents of students made to USC and apparently to other universities and colleges nationwide.  The documents being sought will help demonstrate how the practice of making donations was welcomed and tracked at USC and how such donations had a significant effect on improving a prospective student's chances for admission.  The defendant reasonably believes that, as demonstrated below, the documents will further show that the tagging of students as "VIP" or "special interest" and the correlation of such tagging with past or the pledge or expectation of future donations from wealthy or "well-connected" parents was not in any way limited to the Athletics Department; instead, the practice was university-wide, employed by the heads of other schools or departments or programs within USC other than Athletics, and known to and approved by the head of Admissions as well as other high-ranking officials at USC.  The documents will further show that USC was not a "victim" of any fraud, that it lost no money or property, and that the employee or employees who tagged Mr. Zangrillo's daughter as a "VIP" or with a "special interest" code, thereby helping to facilitate her admission, acted within the scope of their duties and were not compromised or disloyal to USC, *i.e.* Mr. Zangrillo did not cause any

breach of honest services.  To the contrary, Ms. Zangrillo's application had the support of influential members of the USC community, her family members were already students at USC, and she was never "fronted" or presented to USC Admissions as an athlete by anyone in USC Athletics.

On June 21, 2019, Mr. Zangrillo moved this Court for a Rule 17(c) pre-trial subpoena *duces tecum* directed to USC.  In his motion, Mr. Zangrillo asserted that the seven proposed document requests sought "records and information maintained by USC in its regular course of business that relate to other . . . students," similarly situated to Mr. Zangrillo's daughter, "applying for admission in close proximity to a financial donation from a parent."  Dkt. 432 at 1-2.  He proceeded to discuss and attach certain discovery documents produced by the government supporting the contention that high-level university officials tracked admission files of prospective students whose families contributed to USC.  On the strength of Mr. Zangrillo's representations, this Court granted the Motion for Rule 17(c) Subpoena on July 10, 2019, *see* Dkt. 458, and the subpoena was served on USC the following day.

On August 22, 2019, USC moved to quash the subpoena.  *See* Dkt. 532.  The university balked at producing any documents regarding students "unrelated to the charges."  Dkt. 532-1 at 1.  It expressed a willingness to partially respond to only one of the requests by providing communications "specifically regarding Defendant Zangrillo's daughter" exchanged by certain unidentified "senior employees in the Athletics Department and the Office of Admission," *id.* at 2., carefully omitting from that offer additional documents reflecting communications or reviews of the application of Ms. Zangrillo by anyone at the President's Office or the university's development offices.

The factual predicate relied on by USC, supported largely by Dean of Admission Tim

3

Brunold's Declaration, is both misleading and contradicted by discovery documents. First, contrary

to the statement that USC Admissions "does not track donations by an applicant's family" or

"specifically track the percentage of special interest students who are admitted," Dkt. 532-3 at ¶¶ 3,

6, Brunold himself maintained a "university-wide VIP spreadsheet," Exhibit 3, and repeatedly told

Heinel that he would "track" the students flagged as special interest by the athletics department.

Exhibit 4; Exhibit 6.[1] Moreover, while Brunold represents (without suggesting a basis for his

conclusion) that "the majority of students who receive a special interest tag are not admitted," Dkt.

532-3 at ¶ 3, the admission rate of special interest students designated by the athletics department

was consistently far greater than 50% during the time period at issue in Mr. Zangrillo's requests, *see*

Exhibit 7 (83% in 2014); Exhibit 8 (82% in 2015); Exhibit 9 (91% in 2016); Exhibit 10 (80% in

2017); Exhibit 11 (68% in 2018). It may be true that USC "does not possess any documents

containing a ***complete*** list of students who received a special interest tag," Dkt. 532-3 at ¶ 4

(emphasis added),[2] but it is clear beyond dispute that USC did maintain multiple tracking documents,

including spreadsheets, reflecting the identities of many of the students who received the special

interest tag and their treatment over the course of multiple years. ***A review of Exhibit 1 (document***

***entitled "Cumulative Special Interest 2012-2015") would alone reflect the tracking of***

---

[1] All citations to "Exhibits" refer to exhibits attached to this Response in Opposition. Several of these exhibits have been redacted, in an abundance of caution and consistent with this Court's protective order, *see* Dkt. 377, to omit the names and other personally identifiable information of students. *See, e.g.*, Exhibits 1-11. Other exhibits have been redacted to remove references to USC employees who the government has identified as unindicted co-conspirators. *See* Exhibits 1, 11, and 18. Again, these redactions are intended to ensure maximum compliance with the protective order. Unredacted copies of the exhibits have been provided to the Court under seal.

[2] If, however, such a document does exist, Mr. Zangrillo requests it.

***hundreds of applicants with specific reference to which USC employee designated the applicant as a special interest candidate and often with notes reflecting donations, pledges to donate, or opinions that the family of the applicant could be solicited for specific donations in the future***. Contrary to Brunold's representation that "[t]here is no possible way to ***consistently*** determine which employees issued special interest tags to which students," Dkt. 532-3 at ¶ 5 (emphasis added), multiple relevant documents produced to-date expressly list the USC employee that applied the designation to each student. Exhibits 1 and 2.[3] Finally, while USC claimed, based on Brunold's declaration, that its admissions office "does not know how much the family of an applicant has donated," Dkt. 532-1 at 4, the discovery documents make clear that Heinel consistently apprised Brunold of such donations at the time he was called upon to make admission decisions. Exhibit 4 (2014 email from Heinel listing "VIP" students with notes including "Galen Center donor," "long time donors," and "Dean interview"); Exhibit 5 (similar list for 2015 including notes "potential donor," "$3 mil to Men's Golf-Thailand, has met w/ Tim," "$250,000," "1 mil pledge," "$15 mil," "Max Nikias [then-President of USC]," "Previously donated $25k to Heritage Hall," and "Donated $15k," among others); Exhibit 6 (2016 list including note

---

[3] The Brunold Declaration inserts words like "consistently" in paragraph 5, or "containing a complete list" in paragraph 4 to suggest that no documents matching the subpoena request exist when in fact documents provably exist that would often and meaningfully identify the employee who issued a special interest tag or significant lists of students who received special interest tags and why. The issue is not whether USC has "specific documents identifying ***all*** of the students who are tagged [or] who applied the tags [or] why the tags were applied, Dkt. 532-1 at 3 (emphasis added), but whether it has documents that meet the production requests of the subpoena that are not framed as "all or nothing" or "complete or nothing" requests.

"pledged 1 million, interview w/Tim").[4]  In short, contrary to USC's claims, the discovery

suggests that money – whether in the form of prior donations, promised or pledged donations, or the

expectation of donations from a targeted parent – matters deeply to the admission process at USC.

It is important to note what USC does not contest from Mr. Zangrillo's Rule 17(c)

Motion.  The university acknowledges that it regularly designates prospective students as

"special interest" during the admission process.  Dkt. 532-3 at ¶ 3.[5]  It is indisputable that this tag

is frequently (though not always) applied as a result of donations made on behalf of the prospective

student.  *See, e.g.*, Exhibit 1 (document entitled "Cumulative Special Interest 2012-2015" with

"Notes" column reflecting several pledged or anticipated donations, including "500,000 for Galen,"

"potential donor," "next year pledge," "Donor-met with Tim," "25−50,000−no ask as of yet,"

"donors," "long time donors," "Donated to Utengsyu," "500,000 pledge," "50−100,000−no ask as of

yet," "Galen Center donor," "50,000 in trade," "100,000−no ask yet," "50,000 ask," "Donated $15k,"

"100,000 dive tower," "150,000 for sand/no reply," "75,000 ask--Slight match,"

---

[4] Other notations clearly indicate that certain students were labeled as special interest or VIP because they or their parents were associated with or promoted by wealthy alumni or powerful associates of leaders of USC such as former Athletic Director Pat Haden, Trustee Lisa Barkett, or even former President Max Nikias.

[5] While USC expresses confusion regarding Mr. Zangrillo's use of the term "VIP admission process," the "VIP" label was taken directly from university documents, not invented by Mr. Zangrillo.  *See, e.g.*, Exhibit 2 (spreadsheet with heading "VIP/Subco"); Exhibit 3 (email from Brunold referencing a "university-wide VIP spreadsheet").  To the extent that VIP was used as a sub-category of special interest, as appears to be the case based on discovery documents like Exhibits 1 and 2, and given that Amber Zangrillo was coded as a "VIP" according to an email sent by Donna Heinel to Rick Singer, Dkt. 432-6, Mr. Zangrillo is entitled to information regarding the percentage of students within that sub-category that were admitted to USC.  The declarations attached to USC's motion do not address this issue.

"25,000 check and more later," "1 mil pledge," "Pledge 10,000," "scholarship club, long

time donors," "$15 mil," "Potential donor⁻ . . . need help from  Max Nikias,"

"$3 mil to Men's Golf-Thailand, has met w/ Tim," "150,000 Heritage," "Previously donated $25k

to Heritage Hall," "$100k gift," "given 2 million already," "Potential Donor,

Met with Tim Brunold," and "250,000 signed pledge").[6]  Of course, there would be no evident need

to track special interest or VIP students like Amber Zangrillo unless the tag improved the prospects

of admission.  USC appears to acknowledge as much by representing that, although it "does not

specifically track the percentage of special interest students who are admitted, the majority of

students who receive a special interest tag are not admitted."  Dkt. 532-3 at ¶ 3.  USC does not

provide any explicit basis for this conclusion nor any indication as to whether Mr. Brunold would

opine the rate of admission of special interest students is closer to 49% than, *e.g.*, 25%, nor does it

explain why over 80% of the special interest students identified in the documents attached to this

opposition were admitted.  *See* Exhibits 1 and 7-11.  Nevertheless, even taking the declaration at face

value, a chance of admission approaching 50% is a great improvement over the university's overall

acceptance rate, which currently stands at a mere 11%.  *See* Daily Trojan, *USC fall acceptance rate*

*drops to 11 percent, record low* (Mar. 28, 2019), *available at* http://dailytrojan.com/2019/03/28/usc-

fall-acceptance-rate-drops-to-11-percent-record-low/ (noting a 2% decrease since 2018, the year Mr.

---

[6] Other notations on the same document reflect additional reasons why a prospective student is coded
special interest including that they are being promoted, *e.g.*, as friends or on a list submitted by
Athletic Director Pat Haden or by other past or present members of the "Trojan family" of powerful
alumni and leaders.

Zangrillo's daughter was admitted).[7]  Finally, USC concedes that Mr. Zangrillo's daughter was admitted through this special interest admission process, having been tagged by the athletics department but never presented for admission as a prospective student-athlete.  *See* Dkt. 432-6, June 26, 2018 email from Heinel to Singer (explaining that Mr. Zangrillo's daughter Amber "***was not presented as an athlete[,] we just advocated for her with Tim and Kirk as a transfer.  She went over on our VIP list for transfers***." (emphasis added)).

Despite the foregoing uncontested or incontestable facts, USC nonetheless moves to quash the subpoena, almost in full, by misconstruing Mr. Zangrillo's document requests and defense theories.  Contrary to USC's suggestion, the subpoena clearly requests the production of documents maintained in the regular course of business by the university.  This fact undermines USC's argument that the subpoena requires it to compile information, as well as its contention that any resulting documents would constitute inadmissible hearsay.  Moreover, despite USC's attempt to characterize the requests as overly broad, they represent good-faith, targeted attempts to obtain relevant information based on the discovery produced to-date.  In short, the discovery documents attached as exhibits to this opposition make clear that Mr. Zangrillo's requests are not based on conjecture or speculation, but rather firmly rooted in fact, as reflected in USC's own documents.

---

[7] USC attacks a straw man by accusing Mr. Zangrillo of incorrectly assuming that the special interest tag results in "guaranteed admission."  Dkt. 532-1 at 4.  There are, of course, no guarantees when applying to a highly selective institution such as USC.  A four-fold increase in the chance of admission, however, holds great significance.  Moreover, the defendant contends that the requested documents once produced will demonstrate an acceptance rate far greater than 50%.

**B.**     **Argument**

As set out in Mr. Zangrillo's initial motion, a party seeking a pre-trial Rule 17(c) subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974). The right to obtain pre-trial production of evidence upon making this threshold showing "has constitutional dimensions." *Id.* at 711. Indeed, in order to "vindicate" the guarantees of the Fifth and Sixth Amendments, "it is essential that all relevant and admissible evidence be produced." *Id.* Accordingly, "[a] subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' ***but not otherwise***." *Id.* at 698 (emphasis added). Here, in his Motion for Rule 17(c) Subpoena, Mr. Zangrillo explained in detail why the *Nixon* requirements were satisfied, and the Court, based on that showing, granted his motion. None of the arguments offered by USC provides a compelling reason to alter this result.

> 1.  *The requests target pre-existing documents, maintained in USC's regular course of business and likely to be admissible at trial*

USC's leading argument for quashing the subpoena rests on a strained reading of Mr. Zangrillo's requests, which should be easily rejected by the Court. The very first sentence of Mr. Zangrillo's Rule 17(c) Motion made clear that he was requesting "the issuance of a subpoena *duces tecum* returnable pre-trial . . . and seeking the production of ***documents*** listed in Exhibit 1." Dkt. 432 at 1 (emphasis added). USC nonetheless insists that "[n]one of the seven requests calls for production of a specific document" and that "the first four requests" instead "ask USC to compile information and statistical data not contained in any preexisting document." Dkt. 532-1 at 9. It is true that Mr. Zangrillo's first four requests target specific pieces of information,

namely the number of prospective students designated VIP, special interest, and/or university advancement during the relevant timeframe; the names, departments, and titles of the USC personnel responsible for each such designation; the amounts of any donations made by those prospective students' parents around the time of the students' admission; and the percentage of designated students accepted for admission.  The implication of these requests, in the context of a subpoena expressly calling for the production of documents, is clear: USC must produce documents in its possession that reflect the information sought.  Similar requests have been upheld by federal courts.  *See United States v. Rajaratnam*, 753 F. Supp. 2d 317, 323 (S.D.N.Y. 2011) (denying motion to quash request for production of "[d]ocuments sufficient to show" specified information (alteration in original)).[8]  USC's complaint about the manner in which these requests are framed stands in significant tension with its subsequent argument that two other requests, which call for the production of "all" documents or communications related to the specified subjects, are overbroad.

Once USC's misreading of the requests is exposed, its argument regarding admissibility collapses.  The university's contention on this point is entirely dependent upon the proposition that, "[b]ecause USC would have to compile [the requested] information for purposes of responding to the Subpoena, it would likely not meet any traditional hearsay exception such as the business records exception."  Dkt. 532-1 at 11.  However, properly understood as requesting

---

[8] To the extent the Court prefers to make the clear implication of Mr. Zangrillo's requests explicit, it may alternatively modify the requests to call for production of "documents sufficient to show" the targeted information.  *See United States v. Libby*, 432 F. Supp. 2d 26, 38 n.14 (D.D.C. 2006) ("Even if this Court could conclude that the defendant failed to satisfy the specificity requirement, the Court has discretion to modify the subpoena.").

production of documents sufficient to show the enumerated pieces of information, the requests target university records maintained in the regular course of business. Because the documents will likely indicate that the VIP admission process was endorsed by high-level university officials, and because USC was therefore deprived of neither honest services nor property, the documents will almost certainly satisfy Fed. R. Evid. 401's standard of relevance. Moreover, such relevance does not depend on the truth of any matters asserted in the documents. Instead, admissibility lies in the very fact of the communications (*e.g.*, high-level university personnel tracking and discussing special interest and VIP students, Heinel and others informing Admissions of donations made on behalf of prospective students, and Brunold in turn admitting the vast majority of the flagged applicants). *See, e.g.*, *Franchina v. City of Providence*, 881 F.3d 32, 50 (1st Cir. 2018) ("Out-of-court statements are considered 'nonhearsay' when they are offered not for the truth of the matter but for some other purpose."); *United States v. Murphy*, 193 F.3d 1, 5 n.2 (1st Cir. 1999) (explaining that out-of-court statements may be introduced to "show that the declarant had certain information, or entertained a specific belief . . . ; or . . . to show the effect of the words spoken on the listener"). Alternatively, even assuming that some of the requested documents constitute hearsay, they are records of a regularly conducted business activity highly likely to be admissible under the business records exception. *See* Fed. R. Evid. 803(6); *United States v. Nachamie*, 91 F. Supp. 2d 552, 564 (S.D.N.Y. 2000). ("Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial."). To the extent there is any doubt on this point, it is important to note that Mr. Zangrillo, who has yet to obtain the documents at issue, currently need only make a "sufficient preliminary

11

showing" of admissibility.  *Nixon*, 418 U.S. at 700-01 (finding admissibility requirement

satisfied where "*most* of the tapes ***apparently*** contain[ed] conversations to which one or more of

the defendants named in the indictment were party" (emphasis added)); *see also United States v.*

*Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) ("[I]t will often be difficult at the pretrial stage to

determine with precision the admissibility of certain documents; therefore, if a document is

arguably relevant and admissible under the Rules of Evidence, the *Nixon* 'evidentiary'

requirement is likely satisfied.").

      USC's repeated suggestion that compliance with the requests would be unduly

burdensome is equally unconvincing.  The university is actively cooperating with the

government in this matter.  Additionally, it announced in March 2019 – more than five months

ago – that it had launched an internal investigation into the conduct at issue.  *See* Daily Trojan,

*USC launches internal investigation into alleged admissions bribery case* (Mar. 14, 2019),

*available at* http://dailytrojan.com/2019/03/14/usc-launches-internal-investigation-into-alleged-

admissions-bribery-case/.  Debra Wong Yang, counsel for USC in the present case, is the Chair

of Gibson, Dunn & Crutcher's Crisis Management Practice Group.  Attorney Yang is a former

U.S. Attorney with a wealth of experience conducting internal investigations.  Given her

expertise, the defense is confident that USC has already gathered, or at least is in the process of

gathering, the very documents requested by the subpoena at issue.[9]

_____

[9] If, as USC contends, Mr. Zangrillo were truly seeking discovery comparable to that available in
civil litigation, he would almost certainly have requested all files generated by the ongoing
internal investigation.  *Cf. United States v. Skylar Ariel Phoenix*, No. 14-CR-00318, 2015 WL
6094882, at *2 (N.D. Cal. Oct. 16, 2015) (subpoena seeking "documents that were 'requested,'

2.  *The requests are more than sufficiently specific to permit USC to respond, and USC's denial that responsive documents exist is not credible*

While USC correctly points out that Rule 17(c) is not "a discovery device to examine documents for whatever might turn up," ***neither is the provision a mere "mechanism to obtain documents that a defendant can identify in advance."*** *Rajaratnam*, 753 F. Supp. 2d at 320 n.1 (emphasis added).  Indeed, it will rarely be possible for a defendant to identify relevant documents with complete precision before the documents have been produced to him.  Rule 17(c) therefore provides "a way for a defendant to examine documents he believes to exist that would be relevant to, and therefore presumptively admissible in, his defense." *Id.*; *see also Libby*, 432 F. Supp. 2d at 31 (explaining that "exquisite specificity is not required" (citation omitted)).  The specificity requirement aims to ensure that the subpoenaed party has "enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility." *Libby*, 432 F. Supp. 2d at 32 (citation omitted).  USC's detailed eighteen-page motion to quash the subpoena makes clear that the requests at issue here provided sufficient notice.

In light of the foregoing, USC's insistence that Mr. Zangrillo's requests are infirm for failure to "identify any specific document by name" misses the mark.  Dkt. 532-1 at 10.  As an initial matter, Request E does identify the document sought by name, the University Advancement database, but USC objects to that request for other reasons.  Request A calls for the number of prospective students designated as "VIP," "special interest," and/or "university

---

'reviewed,' or 'obtained' during" internal investigation).  Mr. Zangrillo has instead set forth seven requests specifically targeted at information relevant to his pending criminal case.

advancement" during an approximately four-year time period.  The three designations come directly from USC documents produced by the government in discovery, and the specified time period falls squarely within the conspiracy charged in the indictment.  USC would have little difficulty identifying relevant documents by running the three search terms ("VIP," "special interest," and "university advancement") in the email records of relevant custodians.  Notably, upon being served with the subpoena, USC made no offer to engage in discussions with undersigned counsel regarding the process of identifying search terms and custodians for purposes of responding to the subpoena.

Requests B, C, and D all build upon Request A and cover the same relevant time period. With respect to Request B, any documents (*e.g.*, emails or instant messages) in which USC employees direct that certain students be designated as VIP or special interest fall squarely within the scope of Mr. Zangrillo's request.  USC certainly maintains documents that reflect who designated a prospective student as "special interest."  *See, e.g.*, Exhibits 1 and 2.  If the purported burden cited by USC relates to the title of the employee, or to the request for the overall number of "tags," the appropriate response is to identify and produce the documents that respond at least in part to Request B while representing that there is no document available that fully responds to the entirety of the request.

Request C, which calls for information regarding donations to USC by VIP/special interest students' parents within twelve months of the students' admission, could likely be satisfied by production of the documents responsive to Request A in combination with the University Advancement database at issue in Request E.  To the extent USC believes the request

for the entire database is overbroad, Mr. Zangrillo would accept production of a database reflecting donations dating back to January 1, 2013.  The defense team will subsequently do the work of matching prospective students to donations and will do so under seal to protect student identities.  Mr. Zangrillo may not be able to identify all relevant donations (*e.g.*, where a student and his or her parent or grandparent have different last names), but he expects to be able to demonstrate that money matters – and matters deeply – in the USC admission process.  To the extent that, as USC represents, there is no version of the database available that is current as of June 17, 2018 (the date Mr. Zangrillo's daughter was notified of her admission), the defense will accept the closest version of the document available.  Request D, calling for the percentage of tagged students accepted for admission to USC, could be satisfied in a number of ways.  As an initial matter, Mr. Zangrillo is entitled to any documents expressly referring to the percentage of tagged students accepted.  Even if no such documents exist, in some instances, the VIP/special interest tracking documents also note the corresponding admission decision as to each student. *See* Exhibit 1.  To the extent additional documents are required for some students, the request could be satisfied by simply producing the acceptance or rejection letter sent to each designated student (which would be received and maintained under seal) or production of any database reflecting all admission decisions made in a given year.

If, as USC repeatedly represents, there are no documents responsive to some or all of these requests, it should be required to so certify in response to the subpoena.  As described below, the discovery provides substantial reason to doubt the credibility of USC's assertions regarding the availability of relevant documents.  USC represented in its motion to quash that it

15

"has neither official procedures nor specific documents identifying *all* of the students who are

tagged, who applied the tags, why the tags were applied, or when they were applied." Dkt. 532-1

at 3 (emphasis added).  USC cannot avoid producing documents identifying large numbers of

students for whom the tag was applied along with the reasons why and the source of the

designation by claiming that not "*all*" of the specially coded students are within the available

documents.  USC went on to claim that "[t]he Office of Admission has no role with respect to

donations – it does not track donations; it does not know how much the family of an applicant

has donated; and it does not focus on donations in deciding whether to admit an applicant."  *Id.*

at 4.  USC's Dean of Admission Tim Brunold echoed these points in a declaration submitted

"under the penalty of perjury" and attached to the university's motion.  *See* Dkt. 532-3 at ¶ 3

("Although USC does not specifically track the percentage of special interest students who are

admitted, the majority of students who receive a special interest tag are not admitted."); *id.* at ¶ 4

("USC does not possess any documents containing a *complete* list of students who received a

special interest tag." (emphasis added));[10] *id.* at ¶ 5 ("There is no possible way to consistently

determine which employees issued special interest tags to which students, or how many special

interest tags were issued by a particular employee.  There are no documents that contain such

information, and no realistic way to identify and compile such information."); *id.* at ¶ 6 ("The

Admission Department has no involvement with respect to donations or potential donations.  The

---

[10] Again, USC cannot redefine the request to limit production only to a list that contains all the
students – a "complete list" – rather than multiple documents containing separate lists from, *e.g.*,
different sources like Athletics, Admissions, and the Deans of different schools or departments
or programs.

Admission Department does not track donations by an applicant's family. . . .  If I had known

that a prospective student's family had donated $50,000 to $100,000 to USC, it would not have

affected the Admission Department's decision whether to admit the student.").

USC and Dean Brunold's claims are exposed, at minimum, as seriously misleading, by a

review of documents received to-date.  For example, in September 2015, Donna Heinel received

a spreadsheet entitled "Cumulative Special Interest 2012-2015."  Exhibit 1. The document lists

prospective students tagged as special interest, the names of the USC employees who

recommended them, the status (including "VIP") of each student, and the resulting admission

decisions, among other things.  The spreadsheet has a "Notes" column reflecting several pledged

or anticipated donations on behalf of the special interest students.  These notes include "500,000

for Galen," "potential donor," "next year pledge," "Donor-met with Tim," "25−50,000−

no ask as of yet," "donors," "long time donors," "Donated to Utengsyu," "500,000 pledge," "50−

100,000−no ask as of  yet," "Galen Center donor," "50,000 in trade," "100,000−no ask yet,"

"50,000 ask," "Donated $15k," "100,000 dive tower," "150,000 for sand/no reply," "75,000 ask−−

Slight match," "25,000 check and more later," "1 mil pledge," "Pledge 10,000,"

"scholarship club, long time donors," "$15 mil," "Potential donor− . . . need help from  Max Nikias,"

"$3 mil to Men's Golf-Thailand, has met w/ Tim," "150,000 Heritage," "Previously donated $25k

to Heritage Hall," "$100k gift," "given 2 million already," "Potential Donor,

Met with Tim Brunold," and "250,000 signed pledge," among others.[11]  While the document appears

to have been produced at the request of Donna Heinel, an athletics department employee, it reflects

the involvement of admissions personnel, most notably Brunold, in the VIP admission process.

Many entries indicate that the applicant "met with Tim" and two even specify Brunold's last name.

The "Sport" column is frequently left blank, and, in other instances, it includes entries such as "Met

w/ Tim," "Donor," "Development," or "Scholarship Club."  The document includes a list of

recommenders, which reflects the involvement of high-level athletics personnel (*e.g.*, then-Athletic

Director Pat Haden), but also individuals affiliated with other departments.  These individuals

include Teresa Verbeck, who works for USC's Alumni Association, and Scott Brittingham, the Chair

of the Marshall School of Business's Advisory Board.  One entry expressly reflects the involvement

of USC's then-President noting, "need help from Max Nikias."  The spreadsheet also supports Mr.

Zangrillo's argument regarding the benefit accorded to students whose parents donate money to the

school.  ***Of the 218 "special interest" students reflected in the chart, only twenty-two were denied***

***and only six of those are said to have been donors or potential donors***.  Another twenty-one

students did not end up applying, had applications pending, or had non-definitive notes (*e.g.*, "on

track" or blank) in the file.  Even assuming that none of these students were accepted for admission,

the document indicates that a whopping 175 out of 218 special interest students (about 80%) were

---

[11] Several of the donations reflected in the document are in the range of $25-50,000, with the lowest being $10,000.  This fact seriously undermines USC's assertion that "the government's charges . . . rest on the assumption that $50,000 would be insufficient to secure admission to USC."  Dkt. 532-1 at 4 n.3.  While some donations on behalf of prospective students amounted to multiple millions of dollars, others were comparable to, or lower than, the amount allegedly paid by Mr. Zangrillo.

admitted to USC from 2012 through 2015.[12]  Another similar document maintained by Heinel lists special interest students, with a column that has a heading "VIP/Subco."  Exhibit 2.  This heading alone refutes USC's suggestion that VIP applicant files were not tracked.  The document indicates that many of the students listed are "potential donor[s]" and provides the names of the USC employees who served as "references" for each student. The suggestion that there is no tracking of special interest applicants or that there is a wall between the schools, departments, and programs and Admissions so Admissions does not learn of donations or potential donors is implausible:  why would Athletics maintain such a detailed spreadsheet if not to assist in its communications with Admissions?

Other discovery documents provide further detail about the role played by USC admissions personnel, and in particular Brunold, in tracking special interest and VIP students.  ***In one email, Brunold explicitly referenced his maintenance of a "university-wide VIP spreadsheet."***  Exhibit 3 (emphasis added).  Aside from maintaining his own VIP applicant lists, Brunold appears to have been the USC employee primarily responsible for receiving special interest designations from various USC departments and making decisions to admit or deny the students.  ***For example, Donna Heinel submitted a list of "VIP" students "from Athletics" in February 2014.***  Exhibit 4 (emphasis added).  ***Notes reflected in the chart she provided include "Galen Center donor," "long time donors," and "Dean interview."***  *Id.* (emphasis added); *see also* Exhibit 5 (***similar list for 2015 including notes "potential donor," "$3 mil to Men's Golf-Thailand, has met w/ Tim," "$250,000,"***

_____

[12] Many of these students were admitted immediately for the upcoming fall, while others were conditionally admitted for future terms.

19

*"1 mil pledge," "$15 mil," and "Max Nikias," among others* (emphasis added)); Exhibit 6 (***2016***

***list including note "pledged 1 million, interview w/Tim"*** (emphasis added)).   ***Brunold responded to***

***Heinel, "we'll be sure to track these and handle them with care."***   Exhibit 4 (emphasis added); *see*

*also* Exhibit 6 (2016 Brunold response saying, "we will track these and give each one every

consideration").  About a month later, Brunold responded with admission decisions for the special

interest students.  Of eighteen applicants, fifteen were admitted, reflecting an impressive

approximately 83% admission rate.  Exhibit 7.  The athletics department's recommendations fared

almost as well (or even better) in subsequent years, with Brunold admitting thirty-nine out of forty-

seven special interest students in 2015 (about 82%), Exhibit 8, sixty-three out of sixty-nine in 2016

(about 91%), Exhibit 9, thirty-four out of forty-two in 2017 (about 80%), Exhibit 10, and twenty-six

out of thirty-eight in 2018 (about 68%), Exhibit 11.

      The foregoing constitutes direct evidence that Dean Brunold regularly received information

regarding VIP prospective students from Heinel, that Heinel often included information regarding

donations, and that Brunold in turn routinely admitted the vast majority of Heinel's designated

applicants.  If, as Brunold has represented to this Court, donations made on behalf of a prospective

student did not affect USC's admission decisions, then there would be no evident reason for Heinel

to have consistently advised Brunold of the donations.  Moreover, there is no indication that Brunold

instructed Heinel not to provide the information or indicated that it was unnecessary to his decision-

making process.  To the contrary, he responded with favorable decisions, admitting the VIP students

at an exponentially higher rate than those in USC's general pool of applicants.  This pattern

constitutes powerful circumstantial evidence that, contrary to the representations made in Brunold's

declaration, money played a key role in the admission process.

While the information currently available to Mr. Zangrillo on these topics focuses on the athletics department, the defense believes that this is merely a result of the limits placed on the government's productions and not reflective of any unique relationship between Athletics and Admissions.  To the contrary, Mr. Zangrillo's Rule 17(c) Subpoena is designed to demonstrate a university-wide practice.  And the discovery documents do suggest the existence of such a widespread culture.  Again, Brunold admitted in an email that he maintained a "university-wide VIP spreadsheet."  Exhibit 3.  Another email from the Associate Director of Admission to a group of USC admissions counselors indicates that "Tim is beginning his meetings with various campus constituencies about VIP files," Exhibit 12, further evidence that the "VIP" status accorded to Amber Zangrillo was not a code made up by Donna Heinel but one used regularly by the Dean of Admissions and the admissions department.  Additionally, as noted above, even in the spreadsheets maintained by Heinel, the USC personnel responsible for the special interest designation were not always employees of the athletics department.  Discovery documents indicate that Heinel openly discussed potential donations from prospective students with personnel from other university departments.  Exhibit 13, Feb. 21, 2014 email (University Advancement employee writes to Heinel, other athletics department employees, and an official at the Marshall School, indicating that prospective student had "1-5M potential" and proposing that Marshall and athletics split the gift).   Upon information and belief, the Deans of all USC Schools maintained their own VIP or special interest lists during the relevant timeframe.  Thus, individuals likely to have been in possession of such lists include Katharine Harrington (Vice

21

President of Admissions and Planning), Elizabeth Daley (Dean of USC's School of Cinematic Arts), James Ellis (Dean of USC's Marshall School of Business), Willow Bay (Dean of USC's Annenberg School for Communication and Journalism), Ernest Wilson (former Dean of Annenberg School), Albert Checcio (Senior Vice President, University Advancement),[13] Erica Muhl (Dean of USC's Iovine and Young Academy for Arts, Technology, and the Business of Innovation), Jack Knott (Dean of USC's Sol Price School of Public Policy), Suzanne Wenzel (Dean of USC's Dworak-Peck School of Social Work), Marilyn Flynn (former Dean of Dworak-Peck School), and Ron Orr (Senior Associate Athletic Director).

There can be no credible claim that Request F is lacking in specificity.  It calls for "[a]ny and all documents indicating that the President of USC received and/or reviewed applications from students flagged as 'VIP,' 'special interest,' and/or 'university advancement.'"  The first step in identifying responsive documents would be as simple as running these three search terms in the emails of custodians working in the President's Office.  Again, USC did not engage in any discussions with undersigned counsel to identify a suitable set of custodians, but instead refused to agree to produce any documents in response to any request other than Request G.  Moreover, like all of Mr. Zangrillo's requests, the existence of responsive documents is not speculative or conjectural, but rather strongly supported by references in documents produced to-date.  *See*

---

[13] Mr. Checcio is more senior than Tracey Vranich, the affiant offered by USC on issues relating to University Advancement.  While Ms. Vranich professes that she is "not aware of any document containing or tracking the amount of donations made by the parents of prospective students who received a special interest tag," it is unclear whether USC consulted Mr. Checcio on this issue (and if not, why) or other members of the University Advancement group.  Dkt. 532-4 at ¶ 2.

Exhibit 14, Dec. 16, 2014 email (***Heinel writes to Brunold regarding a potential transfer
student whose father endowed USC's "community service position for 5 mil," "I believe there
is interest from the President's office"; Brunold responds, "I have just been directed to admit
this student"*** (emphasis added)); Exhibit 15, Jan. 26, 2015 email (Heinel writes to Brunold
noting, "I believe there is presidential interest" with respect to three prospective students);
Exhibit 3 (Brunold notes that one applicant was "approved for spring by the president"); Exhibit 2
(listing status of one applicant as "Steve Sample [former USC President]/trustee").  One former
President of USC was in direct contact with Rick Singer.  *See* Exhibit 16.  In yet another misleading
factual representation, USC stated in its motion that it had "no reason to believe that any responsive
documents exist" with respect to this request.  Dkt. 532-1 at 16.  The mere fact that the request calls
for production of "any and all documents" related to a specific, targeted subject-matter does not,
of course, render it invalid.  *See Libby*, 432 F. Supp. 2d at 38 ("Although these requests seek
'[a]ll documents,' each request provides a narrow subcategory of documents being sought, which
cover a discrete topic and typically limit the pertinent time frame." (alteration in original)).  The
cases relied upon by USC, by contrast, lacked any semblance of targeting.  *See, e.g.*, *United
States v. Pereira*, 353 F. Supp. 3d 158, 161 (D.P.R. 2019) (requesting "all pertinent
documentation, rules, [and] regulations" regarding charged offense).

Request G relates to "[a]ll communications . . . sent or received by any USC personnel
relating to Amber Zangrillo."  USC has offered to make a partial production in response to this
request, thus conceding the relevance of the documents, but insists that any production should be
limited to emails involving "senior employees in the Athletics Department" and "senior

employees in the Office of Admission." Dkt. 532-1 at 17. USC's attempt to focus its production on the athletics department is misguided in light of its express admission that Mr. Zangrillo's daughter was not admitted as a prospective student-athlete. Dkt. 532-1 at 3 n.1. The undefined reference to "senior employees in the Office of Admission" is vague. To the extent USC is willing to produce all relevant communications, including text messages and instant messages in addition to emails, involving employees of its admissions office, as well as all relevant University Advancement personnel and the President's Office itself, the parties may be able to reach agreement on this issue as undisputed in contrast to the other requests of the subpoena.

 3. *The requested documents are essential to Mr. Zangrillo's trial defenses*

Mr. Zangrillo's requests clearly represent "a good-faith effort . . . to obtain evidence" for use in his defense. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). Indeed, the materials sought are essential to a number of defenses that Mr. Zangrillo may pursue at trial.

First, they will likely demonstrate that the charged conspiracy did not seek to deprive USC of the "honest services" of its employees. *See United States v. Sawyer*, 85 F.3d 713, 729 n.12 (1st Cir. 1996) ("[T]he government must . . . show the intent to *harm* (in this case, to deprive of honest services)."). It is clear from the documents obtained and reviewed to-date that high-level USC employees, including but not limited to the Dean of Admission, knew and approved of those working beneath them tagging prospective students as special interest, a coding based on factors that included family wealth, prior donations, pledged donations, the probability of future donations, and the relationship of a prospective student and his family with people of power or wealth who made either prior financial contributions to USC or would be

24

expected to make future donations.  Indeed, the high-level officials appear to have even encouraged the practice.  For example, Pat Haden, USC's former Athletic Director and Heinel's boss, was responsible for tagging several students.  Exhibit 1.  Heinel sometimes told Brunold that the VIP lists she provided had come directly from Haden.  Exhibit 5 ("Pat would like to humbly submit his requests for admissions.  He personally knows and highly recommends all of these individuals for Fall admission to USC.").  The 2015 chart entitled "Pat VIP List" indicates that several of the students were tagged special interest because of past or anticipated donations. *See id.*  Brunold similarly endorsed the process by consistently admitting far greater than 50% (and up to 90%) of the athletics department's recommended students.  Indeed, the documents indicate that even the President of the university occasionally called for the admission of a particular VIP student.  These facts undermine any claim that the $50,000 donation from Mr. Zangrillo after the acceptance of his daughter Amber was made with the intent to cause Heinel to act disloyally or deprive USC of her honest services.  To the contrary, all participants involved appeared to view the donation as part of an accepted practice and to view Heinel's role as being consistent with the university-wide practices and within the scope of her long-time duties at USC.  The documents requested by Mr. Zangrillo are relevant to further establishing the pervasiveness of the VIP admission process and its acceptance by the university which will help undermine the mythology that a donation to a USC athletic department somehow is proof of any element of a federal crime.[14]

_____

[14] *Cf. 'Heritage Initiative' Campaign Concludes, Transforming USC Athletics* (Mar. 6, 2019), *available at* https://usctrojans.com/news/2019/3/5/usc-trojans-athletics-heritage-initiative-trojan-

Second, the requested documents will allow Mr. Zangrillo to counter the government's alternative theory of conspiracy to commit a fraud involving money or property.  Mr. Zangrillo's daughter paid full tuition to USC, and Mr. Zangrillo is a large donor to a needy program at the university.  Mr. Zangrillo is nonetheless alleged to have sought to deprive USC of property in the form of "admission to the Universit[y]."  Dkt. 314 at ¶ 323a.  The requested documents will likely allow Mr. Zangrillo to prove that his payment did not deprive the school of "money or property."  Indeed, had he not made the payment, his daughter's place in the incoming USC class could well have gone to another special interest student whose family had donated or would donate to the school.[15]  University officials, including Brunold and Director of Admission Kirk Brennan, were keenly aware that VIP applicants did not have to be admitted based on merit.  *See* Exhibit 17 (email in which Brunold and Brennan joke about improper grammar used by prospective student; Brunold quips, "[c]learly a well-qualified lad," to which Brennan responds, "[g]ood enough to shag balls for the tennis team anyway").  In short, USC is far from the crime "victim" that it claims to be.  Dkt. 532-1 at 1; *see also* Exhibit 18, Jan. 8, 2014 email (Ron Orr sends Heinel an "admissions wish list," with notes including "Scholarship Club member daughter," "Committee Member grandson," and "Dad Major Donor"; Heinel responds with

---

athletic-fund-donating.aspx (noting that "USC Athletics' *Heritage Initiative* raised $748 million for athletic facilities, student-athlete scholarships, student-athlete academic support and programming, and community outreach as part of the eight-year-long Campaign," in which over 29,000 donors contributed); *see also id.* (indicating that $7.16 billion was raised for the university since 2011).

[15] Mr. Zangrillo also disputes whether admission to a university falls within the "traditional concepts of property" protected by the mail and wire fraud statutes.  *Cleveland v. United States*, 531 U.S. 12, 24 (2000).

respect to two applicants, "I will code both as MFOO so they will not get evaluate[d] through the regular process").

Third, the requested documents will likely permit Mr. Zangrillo to show that any allegedly false statements made in his daughter's application to USC, including falsified athletic credentials apparently added to her application by Singer and/or grades allegedly obtained by someone else, were immaterial. Mr. Zangrillo's daughter's academic performance and application materials, in combination with the special interest tag, would likely have been sufficient to obtain her admission to the university irrespective of any such misstatement. At the time of her application to USC, Ms. Zangrillo had family members matriculating to the university. Her application was also supported by at least two prominent sources. Relationships such as these, in addition to simple dollars and cents, were widely considered by USC in its admission process. *See* Exhibit 1 (notes in special interest spreadsheet include "Friend of Bashor," "friend of Mueller/donor?," "Trustee Romona Capello," "LOR from Denise Austin," "Connie Matthew's rec," "Andy Enfield friend," "friend of Steve Lopes-no ask," "close friend of Pat," "Brittingham recommendation," "Friends with Jim Ellis," "Wintraub recommendation," and "Trustee referral−Lisa Barkett"). While USC represents that Mr. Zangrillo's daughter was tagged special interest by the athletics department, it appears likely that she would also have been so-designated by someone else at the university, irrespective of any involvement by Rick Singer. Indeed, based on the documents produced in discovery, the defense cannot be certain whether or not any other department at USC did in fact so flag Ms. Zangrillo's file. In any event, if, for example, Mr. Zangrillo can establish that 50-90% of special interest students are admitted

to USC university-wide, the government would be unable to prove beyond a reasonable doubt the materiality of any allegedly false statements in connection with his daughter's application.

Fourth and finally, the requested documents will likely provide circumstantial evidence of Mr. Zangrillo's good-faith and lack of criminal intent.  Mr. Zangrillo was in contact with several persons associated with USC prior to and during the application process, and understood that donations by wealthy parents to help their children secure admission was a widely accepted practice at the school.  While USC would understandably prefer for this case to be tried in a silo, focusing only on Mr. Zangrillo's payment, the defense is entitled to place the alleged conduct in the proper context.  The fact that the $50,000 check from Mr. Zangrillo appears to have been provided as part of a regular university-wide practice of accepting donations from families of prospective students and conferring a corresponding benefit upon those students in the admission process supports an argument that the payment was merely a donation, not an illicit bribe and that Mr. Zangrillo had neither the intent nor motive to bribe anyone, nor the intent to deprive USC of money or property, nor the understanding that his conduct at issue caused any employee of USC to breach his or her loyalty to USC.

## C.    Conclusion

For the foregoing reasons, Mr. Zangrillo respectfully requests that this Honorable Court deny USC's Motion to Quash.

Respectfully Submitted,
Robert Zangrillo
By His Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg

Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Nicholas Theodorou**
Nicholas Theodorou
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1163
ntheodorou@foleyhoag.com

**/s/ Matthew L. Schwartz**
Matthew L. Schwartz
Boies Schiller Flexner
55 Hudson Yards, 20th Floor
New York, NY 1001
(212) 303-3646
mlschwartz@bsfllp.com

Dated: September 3, 2019

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, September 3, 2019, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**