UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Number 1:19-cr-10080-NMG |
| | ) | |
| DAVID SIDOO, et al. | ) | |
| | ) | |

**NONPARTY UNIVERSITY OF SOUTHERN CALIFORNIA'S REPLY TO DEFENDANT ROBERT ZANGRILLO'S RESPONSE IN OPPOSITION TO NONPARTY UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO QUASH**

Nonparty University of Southern California ("USC" or "the University"), by and through undersigned counsel, hereby respectfully submits this Reply to Defendant Robert Zangrillo's ("Zangrillo") Response in Opposition to Nonparty University of Southern California's Motion to Quash.  On its face, Zangrillo's overly broad subpoena seeks compilations of information and extensive categories of documents, and clearly lacks the specificity required under Rule 17(c). Zangrillo now improperly attempts to rewrite his subpoena in his Opposition brief, seeking documents not originally requested and reams of raw data that are neither relevant nor tethered to any valid defense to the charges he faces.  Rather, he has proposed an expensive, unnecessary fishing expedition into USC's records.  Zangrillo defends this new version of his subpoena by contending he is seeking documents "sufficient to show" specific categories of information. However, this amounts to an attempted evasion of the carefully defined limits of Rule 17(c).  In fact, Zangrillo is seeking to conduct a widespread investigation of USC's special interest process by attempting to force USC to harvest, search and review hundreds of email boxes and produce a vast database because he hopes to find information that will lend support to his baseless claim that a $50,000 payment can buy admission to USC.

Aside from the intensive manpower and prohibitive costs associated with complying with such an extraordinary and sweeping pre-trial subpoena in a criminal case, Zangrillo's claim—even if it could be supported by the information he seeks (and it cannot)—is a complete red herring. Zangrillo is not charged with making a donation in exchange for a special interest tag, but rather **conspiring with Singer and Heinel to submit false athletic and academic information** to USC's Office of Admission. This is the heart of the government's charges, and it is Zangrillo's actions and intent connected to the submission of those false statements that is the critical issue. An order requiring USC to comply with his overly broad request for information that very well would not even be admitted at trial would force third-party USC to incur huge costs on top of what it has already incurred as a result of this scheme.

In an attempt to be reasonable, USC made a good-faith effort to compromise with Zangrillo. USC offered to produce all documents regarding Zangrillo's daughter found in an email review of all senior employees in the Athletics Department and the Office of Admission. USC also offered to point Zangrillo to the Heinel charts that USC produced to the government and that are at the center of his Opposition. Zangrillo rejected these offers and made no counterproposal. Only now that his subpoena has been shown to be unreasonable and inconsistent with Rule 17(c) does Zangrillo offer any compromise.[1] However, his updated requests, such as asking for USC to produce its entire University Advancement database, seek a tremendous amount of sensitive data that is not proper, is incredibly burdensome to compile, and has nothing to do with Zangrillo's criminal case. For all of these reasons, the subpoena should be quashed.

---

[1] The fact that Defendant Zangrillo complained USC did not offer to engage in discussions regarding search terms and custodians for purposes of responding to the subpoena demonstrates that Zangrillo is attempting to use Rule 17(c) as a civil discovery-like device.

## ARGUMENT

**I.     Zangrillo seeks information that is not relevant to any valid defense he may present.**

Zangrillo asserts, as he must, that the information he seeks through the subpoena is essential to his defense, claiming that it will demonstrate that high-level USC employees knew and approved of the process of tagging students as special interest, that the practice was not limited to the Athletics Department, and that the families of some special interest students also made donations to USC. *See* Opp. at 24-28. USC does not dispute these facts, but they are inapposite to the limited question at issue – whether Zangrillo conspired with Singer to bribe Heinel to present his daughter for admission to USC based on falsified athletic and academic credentials. Zangrillo makes four equally unavailing arguments to the contrary.

First, Zangrillo contends that information reflecting that tagging students as special interest was an accepted University-wide practice will demonstrate that Heinel acted within the scope of her duties and, thus, the charged conspiracy did not seek to deprive USC of her honest services. *See* Opp. at 24-25. Again, it is not disputed that tagging students as special interest was a practice. But whether it may have been within the scope of Heinel's duties to tag students has nothing to do with the conspiracy as charged. And the fact that other families of special interest students may have made donations to USC without any *quid pro quo* agreement does not make it any more or less likely that Zangrillo engaged in the charged conduct.

Second, Zangrillo asserts that the requested information will allow him to show that he did not seek to deprive USC of property in the form of admission to the University because it would demonstrate that "had he not made the payment, his daughter's place in the incoming USC class could well have gone to another special interest student whose family had donated or would donate to the school." *See* Opp. at 26. Again, this confuses and obfuscates the issue. The government alleges that Zangrillo sought to gain his daughter's admission to USC by having her

presented as a fake rower using fake grades, and that this is what Zangrillo believed he was paying Heinel to do.  *See* Affidavit in support of Criminal Complaint at ¶¶ 274-280.  This theory cannot be undermined by information showing that other students were tagged as special interest or that some of their families made donations to the University.

Third, Zangrillo contends that the requested information will allow him to show that the allegedly false athletic and academic credentials included in his daughter's application were immaterial to her admission.  This, too, is misguided.  Although Zangrillo claims that the admission rate for students tagged special interest is higher than the overall admission rate, he admits that a special interest tag does not guarantee admission.  Rather, it is one factor in a holistic review of a candidate's credentials, including their academic and extracurricular achievements.  Brunold Decl. at ¶ 8.  Thus, information about the admission of other special interest candidates would shed no light on how the components of Zangrillo's daughter's application were weighed and whether the allegedly false credentials were material to the decision to admit her.

Finally, Zangrillo asserts that the requested information will provide circumstantial evidence of his good faith by showing that his $50,000 check was "part of a regular university-wide practice of accepting donations from families of prospective students and conferring a corresponding benefit upon those students in the admission process…."  Opp. at 28.  Plain and simple, the government alleges that Zangrillo's $50,000 check was a payment to Heinel in exchange for agreeing to present Zangrillo's daughter as a fake crew recruit.  This has nothing to do with a special interest tag.  Neither the fact that other families of special interest students may have made donations to USC nor the rate of admission of those students says anything about whether the alleged agreement among Zangrillo, Singer, and Heinel existed.  And even if it were

true that pure, no-strings-attached donations had the potential to positively influence admissions decisions, that would be no defense to an allegation of bribing a college official to present a student for admission based on fraudulent academic and athletic credentials.   Moreover, as a purely practical matter, Zangrillo knew he could not secure his daughter's admission to USC with a donation or he would not have hired Singer and utilized Singer's "side door" to get his daughter admitted to USC based on fake athletic and academic credentials as alleged in the indictment.   The shocking details of the plan hatched between Singer and Zangrillo were captured in wiretapped conversations and detailed in the government's affidavit in support of the criminal complaint.   Zangrillo and Singer were recorded discussing plans to "overturn [Amber Zangrillo's] art history [grade]" and to "put her [through USC admissions] as though she's been sculling and rowing."   And after Zangrillo's daughter was admitted, Zangrillo asks Singer, "What was [my daughter's] payment for?  Just so I know, so we have the story straight."

## II.     Zangrillo's requests are overly burdensome, seek documents and information that do not exist and are not possible to identify, and are not permissible under Rule 17(c).

Rule 17(c) allows a party to subpoena a witness for specific documents.  Fed. R. Crim. P. 17; *see, e.g., United States v. Weisberg*, No. 08-CR-347 NGG RML, 2010 WL 5027537, at \*2 (E.D.N.Y. Dec. 3, 2010) (Granting a Motion to Quash because "Defendant's requests do not identify specific documents or sufficiently narrow categories of specific documents as required to survive a motion to quash.").  In an effort to circumvent this narrow rule, Zangrillo now phrases his request as calling for "documents sufficient to show" various topics and cites *Rajaratnam* for the claim that "similar requests have been upheld."  *See* Opp. at 10.  This comparison is grossly misleading.  In *Rajaratnam*, the court upheld a request to the defendant's employer for "documents sufficient to show" the defendant's compensation at that company. *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 323 (S.D.N.Y. 2011).  The request in

*Rajaratnam* required a single document that could easily be located and was necessarily in existence.  *Id.*  That is hardly akin to Zangrillo's overbroad, oppressive and irrelevant requests at issue here.

Zangrillo also cites *Libby* for the proposition that "exquisite specificity is not required," but he conveniently leaves out the primary clause of the sentence.  *See* Opp. at 13.  "While 'exquisite specificity' is not required, courts will not approve a subpoena for documents based upon requests for disclosure from broad categories of documents."  *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006).  Zangrillo requests "broad categories of documents" and thus *Libby* actually provides that his requests must be denied for lack of specificity.

Not only has Zangrillo requested broad categories of documents, he also insouciantly brushes aside the voluminous email and document harvesting that would be required in order to respond to his subpoena, assuming incorrectly that USC has already pulled the email and other documents from the numerous custodians that would be implicated by his request.  He further assumes that the vast databases of information he seeks can be produced to him without any effort.  He is incorrect on all counts.

### Request A

The plain language of Request A seeks *the number* of prospective students designated as "VIP", "special interest" and/or "university advancement" from January 1, 2015 to February 28, 2019.  Zangrillo concedes that he cannot use Rule 17(c) to force USC to compile this information.  *See* Opp. at 9-10.  Moreover, there are no documents specifying the total number of special interest applicants for any time period, whether it be a particular admissions year or the entire 50-month period sought by Defendant.  Brunold Decl. at ¶¶ 4-5.  The Court should quash Request A on this basis alone.

In an attempt to salvage his subpoena, Zangrillo improperly seeks to rewrite Request A, contending he is entitled to all documents reflecting lists of special interest students. *See* Opp. at 13-14. He speculates that these documents must exist by pointing to (1) a reference by Dean of Admission Tim Brunold in a March 2016 email to his "university-wide VIP spreadsheet," and (2) charts utilized by Zangrillo's co-conspirator, Donna Heinel, which contain the names of prospective students that the Athletics Department wanted to designate as special interest, the name of the employee responsible for the designation, and fragments of information explaining the basis for the designation. *See* Opp. at 4-5; 17-20. Zangrillo is incorrect.

Mr. Brunold's comment concerning his "university-wide VIP spreadsheet" referred to a document that he had the ability to create from information in USC's student information database. Brunold Decl. at ¶ 4. To the extent this document was created in March 2016, it was not maintained in either electronic or hard copy form and does not exist. *Id.* And, as Zangrillo has conceded, USC cannot now be compelled to create this document or others like it pursuant to Rule 17(c). *See United States v. Skylar Ariel Phoenix*, 2015 WL 6094882, at *2 (N.D. Cal. Oct. 16, 2015) (quashing subpoena that would require the subpoenaed party "to compile documents…")

Zangrillo fares no better with respect to the Heinel charts. He speculates that because Heinel included information concerning the person in the Athletics Department responsible for the designation, and a few words concerning the basis for the designation (including, in some instances, general references to donations), Mr. Brunold necessarily wanted and valued that information. *See* Opp. at 19-20. Zangrillo makes the further inferential leap that because Mr. Brunold allegedly valued that information, other people throughout the University must have submitted similar charts to Mr. Brunold. *See* Opp. at 4-5; 19-20. Zangrillo's assumptions are

baseless, as are his personal attacks on Mr. Brunold which appear to be designed to get headlines as opposed to advancing his purported arguments for production of relevant, admissible evidence at trial.

To be clear, Mr. Brunold did not request or rely on the information provided by Heinel, nor did he even want it.  Brunold Decl. at ¶ 7.  The only relevant information Mr. Brunold wanted was the name of the applicant being designated as a special interest candidate so a tag could be applied.  *Id.*  This is what Mr. Brunold meant when he responded to Heinel that he would "track" the students on her list.  *Id.*  All of the other information provided by Heinel was disregarded.[2]  *Id.*

Because Mr. Brunold did not request, want, or rely on the additional information provided by Heinel, Mr. Brunold does not recall anyone else providing information in the form in which Heinel did.  Brunold Decl. at ¶ 5.  It follows that there is no reason to believe there are other documents similar to the charts provided by Heinel, and under the strict limitations of Rule 17(c), USC should not have to turn the University upside down on a fishing expedition for documents that were not properly requested, likely do not exist, and, as discussed in detail above, are not remotely relevant.

Finally, Zangrillo is mistaken in suggesting that USC "would have little difficulty identifying relevant documents by running the three search terms ('VIP,' 'special interest' and 'university advancement') in the email records of relevant custodians."  Opp. at 14.  Underlying Zangrillo's requests is the unfounded, and incorrect, assumption that USC has already gathered

---

[2]  Zangrillo further speculates by asking why Heinel would provide the information unless Mr. Brunold wanted it. There are several potential explanations, including that Heinel maintained the information for her own purposes as she was fielding names from her colleagues in Athletics and culling her list before sending it to Admissions. It is also possible that she may have mistakenly believed Mr. Brunold wanted the information.  Regardless, Mr. Brunold has stated in no uncertain terms that he did not request, want, or rely on the information.  Brunold Decl. at ¶ 7.

documents and harvested emails from individuals throughout the University who have the ability to apply a special interest tag. *See* Opp. at 12. This has not been done because the government investigation which resulted in the charges brought here was focused on the packaging of prospective students as fake athletes to deceive USC's Office of Admission in return for money and other benefits. The government's search warrant and subpoena were tailored to that end and did not have anything to do with special interest tags – a practice that is commonplace at universities and colleges across the United States. Likewise, USC's internal investigation is focused on the same issues. Zangrillo is in essence seeking to conduct his own personal investigation of USC and the use of special interest tags unrelated to the government's case, which would require USC to gather millions of additional documents from numerous potential custodians. Zangrillo would then have USC weed through the search results for these three fairly generic terms in the hope that USC stumbles upon communications identifying each student receiving a special interest tag – a staggering expenditure of time, labor, and money with no prospect of yielding the number of special interest students over a 50-month period that Zangrillo is seeking. This is the very definition of an unreasonable and oppressive request that is precluded by Rule 17(c).[3] *See, e.g., Skylar Ariel Phoenix, 2015 WL 6094882, at \*2* (quashing a subpoena that requested e-mail communications with "no limits on document custodians" as unduly burdensome).

---

[3]  Zangrillo is, of course, free to run his own searches on his own time and at his own expense. He has been provided all emails sent or received by Heinel, the individual who allegedly conspired with Singer and Zangrillo, and, unbeknownst to them, issued the special interest tag to Zangrillo's daughter. Zangrillo is fully capable of searching Heinel's emails using the three search terms identified above. *See United States v. Woodner*, 24 F.R.D. 33, 35 (S.D.N.Y. 1959) ("The purpose of…[Rule] 17(c) is to give defendant access to material which the Government has in its possession which is not available to him….If such material is available to the defendant…there is no ground for relief under [the] rule.")

### Request B

In Request B, Zangrillo seeks the name, department, and title of every USC employee

who designated a prospective student a special interest candidate, as well as the total number of

prospective students they designated over the same 50-month period. In his Opposition,

Zangrillo grudgingly acknowledges that there may be no one document containing all of this

information, and that the title of the person making the designation and the information

concerning the total number of designations may be too burdensome. *See* Opp. at 14. However,

Zangrillo insists that "USC certainly maintains documents that reflect who designated a

prospective student as 'special interest,'" citing as support the same charts reflecting special

interest candidates designated by the Athletics Department and utilized by Heinel. *Id.*

This argument fails for the same reasons discussed above. The charts prepared and relied

on by Heinel were unique, and Zangrillo already has them because USC produced them to the

government in the investigation. Brunold Decl. at ¶ 5. There is no reason to believe that any

other charts like Heinel's containing the names of the USC personnel responsible for special

interest designations exist. *Id.* As a result, Zangrillo should not be allowed to send USC on an

improper fishing expedition through the huge volume of emails of the large number of

custodians at USC who could designate a special interest candidate, and Request B should be

quashed.

### Requests C, D, and E

In Request C, Zangrillo seeks to discover the amount of money donated by the parents of

the students identified in Request A in the 12 months before and after they were admitted to

USC. Recognizing as he must that under Rule 17, USC cannot be compelled to compile this

information for him, Zangrillo casually suggests that USC simply turn over its *entire*

Advancement database. *See* Opp. at 14-15. In an attempt to justify his outlandish proposal,

Zangrillo disingenuously claims that the Advancement database is a single document. *Id.* Of course, it is not. Rather is it is a collection of millions of pages of discrete pieces of information that is not discoverable under Rule 17. *See Skylar Ariel Phoenix, supra.* In addition, the vast majority of information in the database does not concern donations by parents of special interest applicants and contains incredibly sensitive data. Zangrillo provides no support justifying an intrusion of this magnitude on the privacy of scores of innocent people. The idea that USC should provide Zangrillo with millions of pages of intensely private data to fish through with the hope of stumbling upon a comparable situation to his is beyond absurd. Zangrillo's offer to "compromise," and accept a copy of the Advancement database going back to January 1, 2013, is a hardly a compromise. *See* Opp. at 14-15. Not only is that two years before the date range in the subpoena, it is a distinction without a difference. As such, Request C should be quashed.

Request E is indistinguishable from Request C. In Request E, Zangrillo is now requesting a copy of the entire Advancement database as of the closest date possible to June 17, 2018. *See* Opp. at 15. This poses the same problem as Request C. Request E does not seek specific information identified by Zangrillo but rather a huge volume of data. It also implicates the same privacy concerns and calls for the production of largely irrelevant information even under Zangrillo's flawed theory of relevance discussed above. It follows that Request E should be quashed as well.

Zangrillo also seems to have modified Request D, as he now appears to seek only the percentage of special interest applicants who were admitted. *See* Opp. at 15. USC does not maintain or possess any specific document calculating the acceptance rate of students who received special interest tags. Brunold Decl. at ¶¶ 5-6. Moreover, there is no basis to believe that emails like those created and relied on by Heinel, and reflecting whether a special interest

11

candidate was admitted, exist anywhere else at the University.  Brunold Decl. at ¶ 5.  Apparently recognizing that the subpoena does not request any specific or identifiable documents, Zangrillo now requests USC "simply produc[e] the acceptance or rejection letter sent to each designated student."  Opp. at 15.  What Zangrillo describes as a "simple" production would require USC to search for and locate a significant number of admission decisions for each student who received a special interest tag since 2015, an extremely burdensome, expensive, and time-consuming process.  Zangrillo alternatively requests that USC "produc[e] any database reflecting all admission decisions made in a given year."  *Id.*  Rule 17 simply cannot be used by Zangrillo to force a non-party victim like USC to search for and produce highly sensitive admission decisions for hundreds of thousands of students so that Zangrillo can sift through swaths of data to find favorable data points.  It follows that Request E should be quashed.

### Request F

In Request F, Zangrillo requested "all documents indicating that the President of USC *received and/or reviewed applications*" of students who received special interest tags.  (Emphasis added).  Zangrillo provides no support for the proposition that any President of USC received and/or reviewed an application, and USC is aware of none.  Brunold Decl. at ¶ 10.  Instead, Zangrillo relies on a handful of documents that at most suggest that USC Presidents may have been interested in a few applicants.  Opp. at 22-23.  Most of these documents are from before the time period at issue in the subpoena, and it is not clear that each of the prospective students was a special interest candidate.  *Id.*  In any event, it should come as no surprise that a university President may be interested in students who are applying to the school he or she oversees.

Based on this and nothing more, Zangrillo now contends that USC should run the three search terms ("VIP," "special interest," and "university advancement") in the emails of the

custodians working in the President's Office over a 50-month time period. *See* Opp. at 22. This investigative undertaking on Zangrillo's behalf would be onerous, time-consuming, and expensive, and there is no reason to believe it would uncover any documents establishing that the President of USC received or reviewed any applications, which is what Request F calls for. Moreover, even if these documents existed, they would be completely irrelevant to the underlying charges or any plausible defense. In short, Zangrillo's proposal is a classic fishing expedition precluded by Rule 17.

### Request G

In response to Zangrillo's overbroad request to produce "all communications including emails, text messages, and instant messages sent or received by any USC personnel relating to Amber Zangrillo," USC reasonably offered to produce all emails specifically related to Amber Zangrillo sent or received by all senior employees in the Office of Admission and the Athletics Department prior to her admission. Not satisfied with this reasonable and good faith offer, Zangrillo's response is to criticize "senior employees in the Office of Admission" as too "vague" a category of persons and claim that the focus on the Athletics Department is "misguided" because Amber Zangrillo was not admitted as a student athlete. Opp. at 24. In so doing, Zangrillo conveniently ignores that Heinel alone was responsible for designating his daughter as a special interest candidate and that Heinel worked as a Senior Athletic Director in the Athletics Department. Moreover, Zangrillo's $50,000 donation was to USC's Athletics Department, specifically to the Women's Athletic Board, an account controlled by Heinel, and there is no reason to believe anyone else at USC was aware that Zangrillo made this donation. Consequently, it is entirely reasonable to cabin the records at issue to the Athletics Department.

It is also important to remember that Zangrillo has all of Heinel's emails, which were produced by USC to the government and made available to Zangrillo in discovery. If he finds

13

any evidence that Heinel discussed Amber Zangrillo's admission with anyone else at USC, USC will consider searching that specific custodian's emails. But USC will not agree to undertake the gargantuan task of reviewing every email, instant message, and text message of every employee in the Office of Admission, the President's Office, and University Advancement when all evidence indicates that only Heinel was responsible for facilitating Zangrillo's daughter's admission to USC.

## CONCLUSION

USC is not a party in this case. Zangrillo is accused of academic fraud and conspiring to falsely present his daughter as a recruited athlete in order to facilitate her chances of admission. Nothing about the charges concerns USC's practice of issuing special interest tags. Zangrillo wants to muddy the waters by putting USC's admission process on trial, and by accusing Mr. Brunold of lying in his affidavit, but this is all an obvious red herring. Zangrillo is free to argue his case as he pleases, but Rule 17(c) does not entitle him to force a non-party to conduct unreasonable and overly burdensome searches or produce databases with large swaths of highly sensitive information that are wholly irrelevant to this case.

<div style="margin-left: 40%;">

Respectfully submitted,
UNIVERSITY OF SOUTHERN CALIFORNIA,
By its attorneys,

*/s/ Debra Wong Yang*
Debra Wong Yang (Admitted *Pro Hac Vice*)
Douglas M. Fuchs (Admitted *Pro Hac Vice*)
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213)229-7000
dwongyang@gibsondunn.com
dfuchs@gibsondunn.com

</div>

*/s/ Anthony E. Fuller*
Anthony E. Fuller (BBO #633246)
Elizabeth C. Pignatelli (BBO #677923)
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA  02110
(617) 371-1000
anthony.fuller@hoganlovells.com
elizabeth.pignatelli@hoganlovells.com

Dated: September 13, 2019