UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | CRIMINAL NO. 19-10080 |
| DAVID SIDOO, et al<br>Defendants | ) ) ) ) ) | |

**DEFENDANT ROBERT ZANGRILLO'S SUR-REPLY REGARDING NONPARTY UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO QUASH**

Now comes the Defendant Robert Zangrillo, by and through undersigned counsel, and hereby respectfully submits this Sur-Reply regarding Nonparty University of Southern California's ("USC") Motion to Quash Mr. Zangrillo's Rule 17(c) Subpoena. In its reply in support of the motion to quash, USC fails to provide any trustworthy basis for its denial of the existence of documents responsive to Mr. Zangrillo's requests. Rather, it continues to resist making any meaningful production by (1) seeking to redefine the requests as limited to individual documents containing ***all*** of the information sought; and (2) offering a substantially revised Declaration from Dean of Admission Tim Brunold, inconsistent in a number of respects with both the prior declaration submitted by Brunold just weeks ago and with the exhibits appended to Mr. Zangrillo's opposition. *See* Dkt. 546. As made clear in Mr. Zangrillo's response in opposition to USC's motion, the subpoena demands production of any and all documents containing responsive information, and is not limited to individual documents containing a complete set of information. Moreover, the

1

documents sought are clearly relevant to Mr. Zangrillo's trial defenses, *see* Dkt. 546 at 24-28, as will be further explained at oral argument on Wednesday.  Mr. Zangrillo submits this Sur-Reply primarily to address why this Court should not rely upon the revised Brunold Declaration, as well as the representations made by USC based on that document, to deny the defendant access to documents that are relevant, admissible, and accessible to the USC keeper of records.

On August 22, 2019, in support of USC's motion to quash, Brunold submitted his first declaration in this case.  Among other things, Brunold unequivocally stated that "the majority of students who receive a special interest tag are not admitted" to USC.  Dkt. 532-3 at ¶ 3.  He went on to assert that "[t]he Admission Department has ***no involvement*** with respect to donations or potential donations."  *Id.* at ¶ 6 (emphasis added).  Citing Brunold, USC categorically represented to the Court that its admissions office "***does not know how much the family of an applicant has donated***."  Dkt. 532-1 at 4 (emphasis added).

As Mr. Zangrillo has already laid out in great detail, these representations were inaccurate and/or misleading.  Students designated as special interest by the athletics department (the only USC department for which Mr. Zangrillo currently possesses relevant documents) were admitted at a staggering rate of approximately 80% over the time period at issue in the subpoena, with the admission rate for one year exceeding 90%.  *See* Dkt. 546 at 4.  Similarly, when Donna Heinel sent Brunold athletics' list of tagged students, including the "Pat VIP List" referring to then-Athletic Director Pat Haden, *see* Dkt. 546-5, she consistently provided detailed information regarding past or potential future donations by the applicants' families, often with the amounts of such donations made in the past or promised or expected in the future, *see* Dkt. 546 at 5-6.  Unsurprisingly, Brunold now

2

offers a substantially revised declaration, walking back his prior unequivocal representations on these issues. When he "previously stated that a majority of students who receive special interest tags are not admitted," Brunold now clarifies that he "was focused on freshmen fall admission." Dkt. 557-2 at ¶ 6. Many of the admitted freshmen VIPs were specifically admitted for the spring semester; other VIPs were admitted as transfer students. *See, e.g.*, Dkt. 546-1. Brunold's initial declaration did not hint at any such limitation, one that presumably is material to whether or not 50% of special interest students get admitted. Similarly, Brunold now acknowledges (as he must) that he received information regarding donations but insists that he "did not want, request, or rely upon" that information. Dkt. 557-2 at ¶ 7. Despite Heinel's consistent practice of sending this information to Brunold over the course of multiple years, there is no indication that Brunold ever told her that he did not want to know about donations or that he asked her to stop including the notes in her lists. Instead, he simply thanked her for the information and circled back about a month later with extremely favorable admission decisions.

While Brunold's new declaration walks back certain demonstrably inaccurate statements contained in his original submission, it also stands by other attestations that Mr. Zangrillo has already exposed as highly implausible and/or misleading:

- Brunold maintains that "USC does not possess any documents containing a complete list of students who received a special interest tag." Dkt. 557-2 at ¶ 3. Of course, it is clear that USC certainly maintained lists of special interest students. *See* Dkt. 546-1, 546-2, 546-4, 546-5, 546-6. And, what's more, some of those lists spanned multiple years. *See* Dkt. 546-1 (document entitled "Cumulative Special Interest 2012-2015") .

- Brunold proceeds to specifically address Exhibit 3 to Mr. Zangrillo's opposition, explaining that, when he "referenced a 'university-wide VIP spreadsheet' in a March 10, 2016 email," he "was referring to a document that ***could be created*** through compiling data maintained in our internal application processing system." Dkt. 557-2

3

at ¶ 4 (emphasis added).  Here is Brunold's quote from 2016: "I have just gone back through today's subco docket and cross-referenced it with my university-wide VIP spreadsheet."  Dkt. 546-3.  Brunold then provides a list of students who he describes as "on my VIP spreadsheet as 'wait for subco'."  *Id.*  He adds, "I haven't cross-referenced these with the docket spreadsheet (sorry), so perhaps we've already decided on them.  If so, please report our decision back to me so that I can update the VIP spreadsheet."  *Id.*  Respectfully, the notion that Brunold was referring to some hypothetical not-yet-existent document strains credulity.

- Along similar lines, Brunold next represents, "I have reviewed the charts related to special interest students that appear to have been created and maintained by Donna Heinel . . . .  The Office of Admission does not maintain any comparable document listing special interest students, their sponsors, and information relating to why they may have been designated."  Dkt. 557-2 at ¶ 5.  This denial is difficult to square with Brunold's express admission that he maintained a "university-wide VIP spreadsheet."  Moreover, Brunold repeatedly indicated that there were multiple "interested parties" advocating for the students designated by athletics.  Dkt. 546-7, 546-9, 546-10.

- Brunold asserts that "[s]tudents who receive a special interest tag are evaluated in the same pool with the same criteria as students without a special interest tag.  Receiving a special interest tag primarily helps the University monitor applications for prospective students for whom there is a unique interest.  If an applicant is on the cusp of admission, having a special interest tag might garner a second review of their application."  Dkt. 557-2 at ¶ 8.  While it may be true that the special interest tag did not result in guaranteed admission, it did consistently provide a roughly 80% chance of admission (or at minimum an over 50% chance of admission), which stands in sharp contrast to USC's 11% overall admission rate.  There is no basis to surmise that 69% of the admitted students from the Haden/Heinel VIP lists were all "on the cusp."

- Finally, Brunold states, "I do not recall ever sending, giving, or transmitting any prospective student's application to the President of USC for review."  Dkt. 557-2 at ¶ 10.  The suggestion that USC's President did not review student applications is implausible in light of the fact that, on at least one occasion, he appears to have expressly "directed" Brunold to admit a student whose family had donated millions to USC.  *See* Dkt. 546-14 (Brunold writing, "I have just been directed to admit this student to the spring semester").

Brunold also makes representations that are apparently designed to cabin the facts established by Mr. Zangrillo's opposition to USC's athletics department.  He, for example, states, "I do not recall

4

anyone other than Heinel providing me with the names of special interest students in th[e] format" of the documents attached to Mr. Zangrillo's opposition. Dkt. 557-2 at ¶ 5. Brunold continues by noting that "[t]he students listed in Ms. Heinel's internal charts only represent a subset of the overall number of applicants who receive special interest tags, and extrapolating percentages based on Ms. Heinel's internal charts is not an accurate representation of the number of students who receive a special interest tag and are admitted." *Id.* at ¶ 6. While Mr. Zangrillo does not presently have access to similar documents relating to other USC departments, given the consistency of the practice with respect to athletics and the conceded "university-wide" nature of the VIP program, and given the many exhibits indicating that multiple sources – not just Heinel or Haden – were advocating for students, *see, e.g.*, Dkt. 546-1, 546-2, Mr. Zangrillo has established a sufficient likelihood that responsive documents exist to satisfy Rule 17(c) and document that the practices of the athletics department were fully consistent with those of many other departments. *See United States v. Rajaratnam*, 753 F. Supp. 2d 317, 320 n.1 (S.D.N.Y. 2011) (describing Rule 17(c) as "a way for a defendant to examine documents he believes to exist that would be relevant to, and therefore presumptively admissible in, his defense").

Simply put, Brunold's representations are not sufficiently corroborated or independently trustworthy to be fully relied upon by this Court. USC repeatedly cites Brunold to assert that "there is no reason to believe" responsive documents exist. *See* Dkt. 559 at 8, 10, 13. In short, there is "reason to believe" responsive documents exist and such indefinite and unsupported conclusions are no substitute for a university having its IT department search its servers – something done every day in corporate civil litigation or while responding to government subpoenas – to provide the Court with

certitude that documents (whether multiple or singular) either in fact exist or a certification that they do not.

For the foregoing reasons, as well as those set forth in his opposition, and those that will be presented during the argument on September 18, Mr. Zangrillo respectfully requests that this Honorable Court deny USC's Motion to Quash.

Respectfully Submitted,
Robert Zangrillo
By His Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Nicholas Theodorou**
Nicholas Theodorou
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1163
ntheodorou@foleyhoag.com

**/s/ Matthew L. Schwartz**
Matthew L. Schwartz
Boies Schiller Flexner
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 303-3646
mlschwartz@bsfllp.com

Dated: September 17, 2019

## **CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this date, September 17, 2019, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**