UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>(1)  DAVID SIDOO, )<br>(2)  GREGORY COLBURN, )<br>(3)  AMY COLBURN, )<br>(4)  GAMAL ABDELAZIZ, )<br>(5)  DIANE BLAKE, )<br>(6)  TODD BLAKE, )<br>(7)  I-HSIN "JOEY" CHEN, )<br>(8)  MOSSIMO GIANNULLI, )<br>(13) ELISABETH KIMMEL, )<br>(14) LORI LOUGHLIN, )<br>(15) WILLIAM McGLASHAN, Jr., )<br>(16) MARCI PALATELLA, )<br>(17) JOHN WILSON, )<br>(18) HOMAYOUN ZADEH, and )<br>(19) ROBERT ZANGRILLO )<br><br>            Defendants )<br><br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> ) | Criminal No.: 19-10080-NMG<br><br>Violations:<br><br>Count One: Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud (18 U.S.C. § 1349)<br><br>Count Two: Conspiracy to Commit Federal Programs Bribery (18 U.S.C. § 371)<br><br>Count Three: Money Laundering Conspiracy (18 U.S.C. § 1956(h))<br><br>Counts Four to Ten: Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting (18 U.S.C. §§ 1343, 1346 and 2)<br><br>Counts Eleven and Twelve: Federal Programs Bribery; Aiding and Abetting (18 U.S.C. §§ 666(a)(2) and 2)<br><br>Forfeiture Allegations: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)<br><br>Money Laundering Forfeiture Allegations: (18 U.S.C. § 982(a)(1)) |

## THIRD SUPERSEDING INDICTMENT

At all times relevant to this Third Superseding Indictment:

### General Allegations

1.    Defendant DAVID SIDOO was a resident of Vancouver, Canada.

2.    Defendant GREGORY COLBURN was a resident of Palo Alto, California.

3.    Defendant AMY COLBURN was a resident of Palo Alto, California.

4.     GREGORY COLBURN and AMY COLBURN (together, "the COLBURNS") were a married couple.

5.     Defendant GAMAL ABDELAZIZ, also known as "Gamal Aziz," was a resident of Las Vegas, Nevada.

6.     Defendant DIANE BLAKE was a resident of Ross, California.

7.     Defendant TODD BLAKE was a resident of Ross, California.

8.     DIANE BLAKE and TODD BLAKE (together, "the BLAKES") were a married couple.

9.     Defendant I-HSIN "JOEY" CHEN was a resident of Newport Beach, California.

10.     Defendant MOSSIMO GIANNULLI was a resident of Los Angeles, California.

11.     Defendant LORI LOUGHLIN was a resident of Los Angeles, California.

12.     MOSSIMO GIANNULLI and LORI LOUGHLIN (together, "the GIANNULLIS") were a married couple.

13.     Defendant ELISABETH KIMMEL was a resident of Las Vegas, Nevada and La Jolla, California.

14.     Defendant WILLIAM McGLASHAN, Jr. was a resident of Mill Valley, California.

15.     Defendant MARCI PALATELLA was a resident of Hillsborough, California.

16.     Defendant JOHN WILSON was a resident of Lynnfield, Massachusetts.

17.     Defendant HOMAYOUN ZADEH was a resident of Calabasas, California.

18.     Defendant ROBERT ZANGRILLO was a resident of Miami, Florida.

Other Relevant Persons and Entities

19.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

20.     The Key Worldwide Foundation ("KWF") was a non-profit corporation founded in or about 2012 and based in Newport Beach, California.   In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax, and that individuals who contributed to KWF could deduct those contributions from their taxable income, subject to certain limitations.

21.     ACT, Inc. was a non-profit organization headquartered in Iowa City, Iowa that administered the ACT, a standardized test that is widely used as part of the college admissions process in the United States.

22.     The College Board was a non-profit organization headquartered in New York, New York.   Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board developed and administered the SAT, a standardized test that, like the ACT, is widely used as part of the college admissions process in the United States.   The College Board and ETS (together, the "College Board") also developed and administered SAT subject tests, which are also used as part of the college admissions process.

23.     Georgetown University ("Georgetown") was a highly selective private university located in Washington, D.C.   Georgetown received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

3

24.     Stanford University ("Stanford") was a highly selective private university located in Palo Alto, California.   Stanford received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

25.     The University of California at Los Angeles ("UCLA") was a highly selective public university located in Los Angeles, California.   UCLA received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

26.     The University of Southern California ("USC") was a highly selective private university located in Los Angeles, California.   USC received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

27.     Harvard University ("Harvard") was a highly selective private university located in Cambridge, Massachusetts.   Harvard received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

28.     The athletic teams of Georgetown, Stanford, UCLA, USC, and Harvard (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

29.     The Universities are commercial enterprises that, among other things, charge tuition for their services.

30.     William "Rick" Singer was a resident, variously, of Sacramento and Newport Beach, California. Singer founded and, together with others, operated The Key and KWF.

4

31.     Mark Riddell was a resident of Palmetto, Florida. Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

32.     Igor Dvorskiy was a resident of Sherman Oaks, California.   Dvorskiy was employed as the director of a private elementary and high school located in West Hollywood, California (the "West Hollywood Test Center").   Dvorskiy also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

33.     Niki Williams was a resident of Houston, Texas. Williams was employed as an assistant teacher at a public high school in Houston (the "Houston Test Center").   Williams also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

34.     Gordon Ernst was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts.   Until January 2018, Ernst was employed as the head coach of men's and women's tennis at Georgetown.

35.     Martin Fox was a resident of Houston, Texas.   Fox was employed as the president of a private tennis academy and camp in Houston.

36.     Steven Masera was a resident of Folsom, California.   Masera was employed as an accountant and financial officer for The Key and KWF.

37.     Mikaela Sanford was a resident of Sacramento, California. Sanford was employed in various capacities for The Key and KWF.

38.     Donna Heinel was a resident of Long Beach, California.   Heinel was employed as the senior associate athletic director at USC.

39.     Ali Khosroshahin was a resident of Fountain Valley, California.   Until on or about November 8, 2013, Khosroshahin was employed as the head coach of women's soccer at USC.

40.     Laura Janke was a resident of North Hollywood, California.   Until on or about January 10, 2014, Janke was employed as an assistant coach of women's soccer at USC.   Janke reported to Khosroshahin until his departure from the university.

41.     Jovan Vavic was a resident of Rancho Palos Verdes, California.   Vavic was employed as the water polo coach at USC.

42.     Jorge Salcedo was a resident of Los Angeles, California.   Salcedo was employed as the head coach of men's soccer at UCLA.

43.     John Vandemoer was a resident of Palo Alto, California.   Vandemoer was employed as the head sailing coach at Stanford.

<u>General Background on Standardized Testing and the College Admissions Process</u>

44.     Most selective colleges and universities in the United States require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages.   When submitted, standardized test scores are a material part of the admissions process.

45.     The ACT includes sections on English, mathematics, reading, and science, and is scored on a scale of 1 to 36.

46.     The SAT includes sections on writing, critical reading, and mathematics.   Between 2005 and January 2016, the SAT was scored on a scale of 600 to 2400.   As of March 2016, the SAT has been scored on a scale of 400 to 1600.

47.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits.   In some instances, however, students with certain learning or other disabilities may qualify for testing accommodations, including extended time,

6

and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc or the College Board.

48.     ACT and SAT administrators are agents of ACT and the College Board, respectively, and owe a duty of honest services to those organizations.

49.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and that they will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

50.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

51.     The ACT tests are typically sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

52.     The SAT tests are typically sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

53.     The ACT and SAT tests, and the scores students earn on those tests, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

54.     Many selective colleges and universities in the United States, including all of the Universities, recruit students with demonstrated athletic abilities, and typically apply different criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Universities' athletic teams once enrolled.   Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach

7

of a sport for that coach's recruited athletes.   At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

55.     Athletic coaches and administrators are employees and agents of the universities that employ them, and owe a duty of honest services to their employers.

56.     At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University.

### The Fraud Conspiracy

57.     From in or about 2007 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere.

### Objects and Purposes of the Fraud Conspiracy

58.     The principal objects of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.   The principal purposes of the conspiracy included:   (1) securing the admission of the defendants' children to selective colleges using fraudulently obtained test scores, bogus academic and athletic credentials, falsified applications, and bribes; (2) enriching Singer and the recipients of the bribes and other payments; and (3) concealing the fraud and honest services fraud scheme.

### Manner and Means of the Fraud Conspiracy

59.     Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

      a.  Seeking extended time for their children on college entrance exams, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time;

      b.  Changing the location of the exams to one of two test centers: the Houston Test Center or the West Hollywood Test Center;

      c.  Bribing college entrance exam administrators at the Houston Test Center and the West Hollywood Test Center to permit cheating, in violation of the administrators' duty of honest services to ACT and the College Board;

      d.  Paying Riddell or another third party to pose as an exam proctor or as a student taking the exam, so that he could secretly provide students with answers during the exam, replace the students' exam responses with his own, or take the exam in place of the students;

      e.  Having a third party take classes in place of the defendants' children, with the understanding that grades earned in those classes would be submitted as part of the students' college applications;

      f.  Bribing athletic coaches and university administrators to designate students as purported athletic recruits—with little or no regard for their athletic abilities and, in some cases, even though they did not play the sport they were purportedly recruited to play—and as members of other favored

admissions categories, in violation of the coaches' and administrators' duties of honest services to their employers;

g. Fabricating athletic "profiles" containing falsified athletic credentials— including fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' college applications;

h. Submitting falsified applications for admission to colleges and universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained standardized test scores and class grades, fake awards, athletic activities, and fabricated essays;

i. Explaining to clients and prospective clients of The Key that these fraudulent schemes were tried-and-true methods of improving exam scores and gaining admission to college that had been successfully employed by many other clients; and

j. Concealing the fraud to prevent the scheme from being discovered, including by the Universities and standardized testing entities.

Acts in Furtherance of the Fraud Conspiracy

60.    On various dates from in or about 2007 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the fraud conspiracy:

## DAVID SIDOO

61.     In or about the fall of 2011, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's older son.

62.     On or about September 16, 2011, SIDOO e-mailed Singer copies of his older son's driver's license and student identification card for the purpose of creating a falsified identification card for Riddell.

63.     Singer used the documents to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's older son.

64.     On or about December 1, 2011, Singer sent the falsified identification bearing Riddell's likeness and the name of SIDOO's older son by UPS from California to a hotel in Vancouver, Canada.

65.     On or about December 2, 2011, Riddell flew from Tampa, Florida to Vancouver, Canada to take the SAT in place of SIDOO's older son.   After he arrived, Riddell collected the falsified identification in the name of SIDOO's older son that Singer had sent to the hotel.

66.     In order to minimize suspicion and reduce the chance of getting caught, Singer directed Riddell not to obtain too high a score, because SIDOO's older son had previously taken the exam himself and obtained a total score of 1460 out of a possible 2400.

67.     On or about December 3, 2011, Riddell used the falsified identification card to pose as SIDOO's older son in order to secretly take the SAT in his place.   Riddell earned a total score of 1670 out of a possible 2400.

68.     On or about December 7, 2011, Singer e-mailed Masera a number of receipts from Riddell's trip to Vancouver.   Singer told Masera that the receipts were "[e]xpenses to pay back

mark riddell" and that he should "bill david sidoo" for the expenses as well as for Riddell's airfare from Tampa, Florida to Vancouver, Canada.

69.     On or about December 23, 2011, Singer e-mailed a copy of the SAT score Riddell secretly obtained to an administrator at Chapman University, a private university in Orange, California, on behalf of SIDOO's older son.

70.     SIDOO paid Singer $100,000, as agreed, for having Riddell take the SAT for SIDOO's older son.

71.     In or about 2012, SIDOO agreed to pay Singer to have Riddell secretly take a Canadian high school graduation exam in place of SIDOO's older son.

72.     On or about May 15, 2012, Singer purchased plane tickets for Riddell to fly from Tampa, Florida to Vancouver, Canada on June 8, 2012, and to return to Tampa shortly thereafter.

73.     On or about June 9, 2012, Riddell posed as SIDOO's older son in order to secretly take the Canadian high school graduation exam in his place.

74.     In or about the fall of 2012, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's younger son.

75.     On or about October 31, 2012, SIDOO e-mailed Singer a document listing his younger son's address and other biographical information for the purpose of creating a falsified identification card for Riddell.

76.     Singer used the information to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's younger son.

77.     On or about November 22, 2012, Singer purchased a plane ticket for Riddell to fly from Tampa, Florida to Los Angeles, California on November 29, 2012, in order to take the SAT for SIDOO's younger son.

12

78.     Singer directed Riddell to obtain a high score because SIDOO's younger son had not previously taken the SAT.

79.     On or about December 1, 2012, Riddell used a falsified identification card to pose as SIDOO's younger son in order to secretly take the SAT in his place at a high school in Orange County, California.   Riddell earned a total score of 2280 out of a possible 2400.

80.     On or about January 21, 2013, SIDOO e-mailed Singer asking for wire transfer instructions.

81.     On or about January 22, 2013, an employee of The Key provided SIDOO with wire instructions for a company bank account in California.

82.     On or about January 23, 2013, SIDOO wired $100,000 to the account, as agreed, for having Riddell take the SAT for SIDOO's younger son.

83.     In 2013 and 2014, the SAT scores Riddell secretly obtained on behalf of SIDOO's younger son were submitted as part of his applications to colleges and universities in the United States, including on or about March 12, 2014 to Georgetown in Washington, D.C.

84.     Singer paid Riddell approximately $5,000 plus travel expenses for each of the three exams Riddell took in place of SIDOO's children.

85.     In or about October 2013, Singer drafted a falsified application essay describing SIDOO's younger son's purported internship with an organization that worked to combat violence among Los Angeles-based gangs.   The essay falsely claimed that SIDOO's younger son had been held up at gun point by gang members in Los Angeles.   Singer e-mailed the essay to SIDOO.   SIDOO wrote back with minor changes to the essay, and asked, "can we lessen the interaction with the gangs.   Guns ...?   That's scary stuff.   Your call you know what they look for."   The

essay, without the reference to guns, was later submitted as part of SIDOO's younger son's application for admission to multiple universities.

86.     Beginning in approximately 2015, SIDOO asked Singer if he could have Riddell take either the Graduate Management Admission Test ("GMAT"), a standardized test that is widely used as part of the business school admissions process, or the Law School Admission Test ("LSAT") on behalf of his oldest son.   In exchange for taking one of the exams, Sidoo agreed to pay Singer a sum of money, and Singer, in turn, agreed to pay Riddell approximately $100,000.

87.     Singer and Riddell researched the security measures in place for both exams.   On or about April 28, 2015, Singer told SIDOO that their plan to have Riddell take the LSAT in place of SIDOO's son was "[n]ot happening due to fingerprinting," requirements on the exam.

88.     On or about December 15, 2016, Riddell used Western Union to wire $520 to China to pay for fraudulent drivers' licenses that he intended to use to pose as SIDOO's older son for the GMAT.   Riddell had the identifications mailed to Singer.   The false identifications were not of high quality, and Riddell ultimately decided not to take the exam on behalf of SIDOO's son.

89.     On or about October 25, 2018, Singer called SIDOO from Boston, Massachusetts. During the call, SIDOO noted that his older son was applying to business school, adding, "I thought you were gonna call me and say I got a 2100 on my GMAT."   In fact, the GMAT is scored on a scale of 200 to 800.   Singer responded, "They don't have a 2100 for the GMAT. But I would do my best to get it for ya."   SIDOO replied, "I know."

### GREGORY COLBURN and AMY COLBURN

90.     In or about the fall of 2017, GREGORY COLBURN and AMY COLBURN agreed with Singer to pay $25,000 to have Riddell pose as a proctor for their son's SAT exam and secretly correct his answers.

14

91.    On or about October 10, 2017, AMY COLBURN e-mailed Singer that she was waiting to hear back from the College Board about whether her son would be granted extended time to take the SAT.

92.    On or about November 17, 2017, AMY COLBURN e-mailed Singer to tell him that she "got the [extended time] accommodations we wanted for SAT" for her son.

93.    On or about December 31, 2017, Singer e-mailed AMY COLBURN an admission ticket for the COLBURNS' son for an SAT exam with extended time to be administered on or about March 10, 2018.

94.    On or about December 31, 2017, AMY COLBURN reserved a hotel room for the night of March 9, 2018 in West Hollywood, California for two adults and one child.

95.    On or about March 9, 2018, Riddell flew from Tampa, Florida to Los Angeles, California to purport to proctor the SAT for the COLBURNS' son and another student who took the test at the West Hollywood Test Center the same day.

96.    Singer directed Riddell not to obtain too high a score on the COLBURNS' son's SAT, so that the child would not be alerted to the cheating on his behalf.

97.    On or about March 10, 2018, after the students had completed the exam, Riddell reviewed and corrected their answers.

98.    Riddell earned a total score of 1190 out of a possible 1600 for the COLBURNS' son.

99.    On or about March 12, 2018, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

100.    On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Dvorskiy for facilitating Riddell's cheating on behalf of the COLBURNS' son and another student.

101.    On or about March 23, 2018, Singer caused KWF to issue a payment of $20,000 to Riddell for correcting the SAT answers for the COLBURNS' son and another student.

102.    In or about 2018, the SAT score Riddell secretly obtained on behalf of the COLBURNS' son was submitted as part of his applications to various colleges and universities.

### GAMAL ABDELAZIZ

103.    Beginning in or about the summer of 2017, GAMAL ABDELAZIZ agreed with Singer to pay an amount, ultimately totaling $300,000, for facilitating his daughter's admission to USC as a purported basketball recruit.

104.    On or about July 16, 2017, in an e-mail bearing the subject line "For Me to complete USC athletic profile," Singer asked ABDELAZIZ to send biographical information about his daughter.    The e-mail indicated that the profile would include falsified honors related to basketball.

105.    On or about July 27, 2017, Singer requested that ABDELAZIZ provide an action photo of his daughter to be used in the athletic profile.    ABDELAZIZ e-mailed the photo that same day.

106.    On or about August 7, 2017, Janke e-mailed Singer a draft of the profile, which falsely described ABDELAZIZ's daughter as having received numerous athletic honors.    In the cover e-mail, Janke wrote: "Profile for [ABDELAZIZ's daughter]. . . . Let me know if you want me to add any other awards to her profile or if you think that is enough."    Singer forwarded Janke's e-mail and false profile to ABDELAZIZ.

107.    On or about October 5, 2017, Heinel presented ABDELAZIZ's daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a basketball recruit.

108.   On or about December 4, 2017, Heinel instructed Singer that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs.   Subsequently, Heinel and Singer agreed that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.

109.   On or about March 26, 2018, after USC mailed ABDELAZIZ's daughter a formal acceptance letter, ABDELAZIZ wired $300,000 to KWF.

110.   In or about July 2018, KWF began paying Heinel $20,000 per month in exchange for facilitating the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.   The payments included at least one check that Singer mailed from Massachusetts to Heinel in California on or about January 3, 2019.

111.   On or about January 3, 2019, Singer called ABDELAZIZ from Boston, Massachusetts.   During the call, Singer told ABDELAZIZ, in substance, that Heinel, when asked why ADBELAZIZ's daughter was not playing basketball for USC, had responded that she had suffered an injury.   ADBELAZIZ confirmed that he would provide the same cover story if questioned.

### DIANE BLAKE and TODD BLAKE

112.   Beginning in or about 2017, DIANE BLAKE and TODD BLAKE agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate their daughter's admission to USC as a purported volleyball recruit.

113.   On or about January 29, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE, noting that their daughter was interested in attending USC but that DIANE BLAKE

17

assumed the school was "in the reach stretch category."  Singer responded: "There is a way to garner a guarantee at USC if that is first choice but best to discuss without [your daughter] being present."  DIANE BLAKE replied, copying TODD BLAKE: "Look forward to discussing."

114.  On or about June 28, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE: "We are fully committed to the USC plan."

115.  On or about August 7, 2017, Janke e-mailed Singer a falsified volleyball profile for the BLAKES' daughter.   Approximately one week later, Singer forwarded the profile to Heinel.

116.  Heinel presented the BLAKES' daughter to the USC subcommittee for athletic admissions as a purported volleyball recruit on or about September 7, 2017.

117.  On or about September 14, 2017, Heinel e-mailed Singer a letter, addressed to the BLAKES' daughter, notifying her of her conditional admission to USC as a student athlete. Singer forwarded the letter to the BLAKES that same day.  TODD BLAKE responded by thanking Singer and stating that he would register his daughter with the NCAA Eligibility Center as instructed in the letter.

118.  On or about September 16, 2017, Singer instructed TODD BLAKE to send a check for $50,000 to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel." TODD BLAKE mailed a $50,000 check to USC Women's Athletics that same day.

119.  On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts.

120.  In a call on or about February 22, 2019, Singer told DIANE BLAKE that USC had received a subpoena for athletic records for the past 12 years.  Singer said he wanted to let DIANE BLAKE know about the subpoena "since [the BLAKES' daughter] was accepted through

volleyball, but wasn't really a volleyball player in reality at [the] USC level[.]"   DIANE BLAKE responded: "Yeah."

<div align="center">I-HSIN "JOEY" CHEN</div>

121.   In or about the spring of 2018, CHEN agreed with Singer to pay $75,000 to have Riddell pose as a proctor for his son's ACT exam and secretly correct his answers.

122.   On or about April 13, 2018, Riddell flew from Tampa, Florida to Los Angeles, California.

123.   The following day, on or about April 14, 2018, CHEN's son took the ACT at the West Hollywood Test Center.   Riddell purported to proctor the exam and, after CHEN's son had completed it, corrected his answers.

124.   On or about April 16, 2018, CHEN's company wired $75,000 to The Key in exchange for having Riddell cheat on Chen's son's ACT.

125.   On or about April 17, 2018, Singer caused KWF to pay Dvorskiy $20,000 for facilitating Riddell's cheating on behalf of CHEN's son and another student.

126.   On or about April 18, 2018, Dvorskiy sent the completed exams, via Federal Express, to ACT, Inc. in Iowa City.

127.   On or about May 14, 2018, Singer caused KWF to pay Riddell $20,000 for correcting the ACT answers for CHEN's son and another student.

128.   In or about 2018, the ACT score Riddell secretly obtained on behalf of CHEN's son was submitted via interstate wire communication to various colleges and universities, including, on or about October 8, 2018, to Emerson College in Boston, Massachusetts.

129.   On or about February 21, 2019, Singer called CHEN and asked: "[W]e both agree that Mark took the test for [your son], right?" CHEN responded: "Yeah."

## MOSSIMO GIANNULLI and LORI LOUGHLIN

130.    In or about 2016 and 2017, GIANNULLI and LOUGHLIN agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate the admission of their two daughters to USC as purported crew recruits.  GIANNULLI had previously been introduced to Singer by an unindicted co-conspirator.

131.    On or about April 22, 2016, GIANNULLI, copying LOUGHLIN, sent an e-mail to Singer, noting, "I have some concerns and want to fully understand the game plan and make sure we have a roadmap for success as it relates to [our older daughter] and getting her into a school other than ASU!"  Singer responded: "If you want [U]SC I have the game plan ready to go into motion. Call me to discuss."

132.    On or about August 18, 2016, Singer sent an e-mail to GIANNULLI and LOUGHLIN stating that he needed a copy of their older daughter's transcript and test scores "very soon while I create a coxswain portfolio for her.  It would probably help to get a picture of her on an ERG in workout clothes like a real athlete too."  GIANNULLI replied:  "Fantastic. Will get all."

133.    On or about September 7, 2016, GIANNULLI sent Singer an e-mail attaching a photograph of his older daughter on an ergometer.

134.    On or about October 27, 2016, Heinel presented the GIANNULLIS' older daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a crew recruit.

135.    On or about October 29, 2016, Singer e-mailed GIANNULLI:  "Please send $50K payment to the person below[:] Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]"

136.    On or about November 1, 2016, GIANNULLI told Singer "I told biz mgr to Fed Ex [the payment] today."

137.    On or about March 30, 2017, Singer's accountant e-mailed a $200,000 invoice to GIANNULLI and LOUGHLIN.   The invoice thanked GIANNULLI and LOUGHLIN for their pledge to KWF and further stated that their "private contribution" of $200,000 was now due.

138.    On or about April 2, 2017, in response to the e-mail attaching the $200,000 invoice, GIANNULLI e-mailed Singer's accountant and LOUGHLIN:   "We are currently on holiday in the Bahamas but will gladly handle this when home next week."

139.    On or about April 10, 2017, GIANNULLI forwarded the $200,000 invoice to his own accountant for payment, writing "Good news my daughter . . . is in [U]SC . . . bad is I had to work the system."

140.    On or about the same day, after the GIANNULLIS' daughter received a formal acceptance letter from USC, GIANNULLI wired $200,000 to KWF.

141.    On or about April 10, 2017, GIANNULLI e-mailed Singer, copying LOUGHLIN: "I want to thank you again for your great work with [our older daughter], she is very excited and both Lori and I are very appreciative of your efforts and end result!"   When Singer responded by asking if there was a "similar need anywhere so we do not lose a spot" for their younger daughter, LOUGHLIN replied:   "Yes USC for [our younger daughter]!"

142.    On or about July 14, 2017, Singer directed Janke to prepare a falsified crew profile for the GIANNULLIS' younger daughter.

143.    On or about July 16, 2017, Singer e-mailed GIANNULLI and LOUGHLIN requesting that they send an "action picture" for the crew profile.   Singer indicated that the profile would present their younger daughter, falsely, as a crew coxswain for the L.A. Marina Club team.

21

144. On or about July 28, 2017, GIANNULLI, copying LOUGHLIN, e-mailed Singer a photograph of their younger daughter on an ergometer.

145. On or about November 2, 2017, Heinel presented the GIANNULLIS' younger daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a crew recruit.

146. On or about November 29, 2017, Singer directed GIANNULLI and LOUGHLIN to "send a 50K check to USC and the address is below. Additionally the rest of the 200k will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives his [sic] final letter in March."

147. On or about December 5, 2017, GIANNULLI directed his business manager to send a $50,000 check to Heinel.

148. On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

149. On or about October 25, 2018, Singer called GIANNULLI from Boston, Massachusetts. During that call, Singer told GIANNULLI: "Donna called me couple weeks ago and says, 'Hey, uh,' you know, 'going forward, can you use the same format you used for [the GIANNULLIS' older daughter] and [their younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?' So it's funny how-- I thought I was just makin' stuff up." GIANNULLI replied: "Uh, right."

150. On or about November 29, 2018, Singer called LOUGHLIN from Boston, Massachusetts. During the call, Singer said, in sum and substance, that KWF was being audited by the IRS, which was asking about the two payments of $200,000 by the GIANNULLIS. Singer added: "So I just want to make sure that you know that, one, that you're probably going to get a call and that I have not told them anything about the girls going through the side door, through

crew, even though they didn't do crew to get into USC. So I—that is—all I told them was that you guys made a donation to our foundation to help underserved kids." LOUGHLIN replied, "Um-hmm."

## ELISABETH KIMMEL

151.    Beginning in or about 2012, KIMMEL agreed to pay Singer an amount, ultimately totaling $275,000, to facilitate her daughter's admission to Georgetown as a purported tennis recruit.

152.    In or about September 2012, KIMMEL asked Singer for Ernst's contact information.

153.    On or about November 26, 2012, a Georgetown admissions director e-mailed KIMMEL's daughter, copying Ernst, that, "[i]n order to send you your likely letter, your application needs to be complete. Although Coach Ernst has shared with me your unofficial SAT score report, we have not received the scores officially from the College Board and this is a requirement for admission." Singer forwarded this e-mail to KIMMEL.

154.    On or about December 20, 2012, the Georgetown admissions department sent KIMMEL's daughter a letter stating that the "Committee on Admissions ha[d] conducted an initial review of [her] application to the Class of 2017 at the request of Mr. Gordie Ernst, Tennis Coach" and "had rated [her] admission as 'likely.'"

155.    On or about April 15, 2013, KIMMEL caused the Meyer Charitable Foundation, a family foundation on which KIMMEL and her spouse served as officers, to issue a check to KWF in the amount of $100,000.

156.    On or about June 27, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a second check to KWF in the amount of $170,000.

157.    On or about July 16, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a third check to KWF in the amount of $5,000.

158.    Between on or about September 5, 2012 and on or about September 6, 2013, Singer caused The Key, and later KWF, to pay Ernst $244,000 in monthly installments.

159.    Beginning in or about 2017, KIMMEL agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate her son's admission to USC as a purported track and field recruit.

160.    On or about August 10, 2017, Singer directed Janke to create a falsified athletic profile for KIMMEL's son.   The profile falsely described KIMMEL's son as an elite high school pole vaulter and included a photograph purporting to be of KIMMEL's son pole vaulting but which, in fact, depicted another individual.

161.    On or about October 5, 2017, Heinel presented KIMMEL's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a track and field recruit.

162.    On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.   The check was signed by KIMMEL's spouse.

163.    On or about February 23, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

164.    On or about July 26, 2018, KIMMEL and her spouse called Singer to explain that their son's advisor at USC had inquired about his status as a track athlete.   KIMMEL asked Singer: "[S]o we have to hope this advisor doesn't start poking around?"

## WILLIAM McGLASHAN, Jr.

165.    In or about the fall of 2017, McGLASHAN agreed to pay Singer $50,000 to arrange for Riddell to purport to proctor his son's ACT exam and secretly correct his son's answers.

166.    On or about November 28, 2017, McGLASHAN e-mailed a counselor at his son's high school: "I am in LA with [my son] on Dec 9, and Rick ([my son's councilor [sic]) has arranged for [my son] to take the ACT test at a school while we are there over the weekend." The school counselor asked if the school should cancel his ACT exam that was scheduled to take place at his high school on December 20, 2017 and December 21, 2017. McGLASHAN replied: "That is correct. . . . Just decided on this alternative strategy today."

167.    On or about December 6, 2017, McGLASHAN made a purported donation of $50,000 to KWF from his personal charitable donation fund.

168.    On or about December 8, 2017, Riddell traveled from Tampa, Florida to Los Angeles, California to purport to proctor the ACT exam for McGLASHAN's son and two other students.

169.    On or about December 9, 2017, McGLASHAN's son took the ACT exam at the West Hollywood Test Center. After McGLASHAN's son completed the exam, Riddell corrected his answers.

170.    On or about December 13, 2017, Dvorskiy sent McGLASHAN's son's completed ACT exam, via Federal Express, to ACT, Inc. in Iowa City.

171.    On or about December 19, 2017, Singer caused KWF to pay Dvorskiy $40,000.

172.    On or about December 27, 2017, Singer caused KWF to pay Riddell $35,000.

173. Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his son's admission to USC as a purported football recruit.

174. In a call on or about August 22, 2018, Singer told McGLASHAN that he would create a fake football profile for McGLASHAN's son and would need "pictures of him playing multiple sports, or something where you can kind of see his face a little bit in action" so that he could "Photoshop him onto a kicker."

175. On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, his high school transcript, and photos. Singer forwarded the information to Janke with instructions to create a falsified profile of McGLASHAN's son as a "punter/kicker."

176. On or about September 8, 2018, Singer forwarded Heinel a profile that falsely depicted McGLASHAN's son as a football place kicker and punter.

177. On or about September 29, 2018, McGLASHAN sent a text message to Singer asking: "So when will we know definitively on USC?" Singer replied: "They had their first Subco last week – football has a while before going through Subco – later in the fall as it is in season."

178. On or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGLASHAN's son was submitted to various colleges and universities, via interstate wire communication, including Northeastern University in Boston, Massachusetts.

## MARCI PALATELLA

179. Beginning in or about 2016, PALATELLA agreed to pay Singer $75,000 to arrange for Riddell to pose as a proctor for her son's SAT exam and secretly correct his answers.

PALATELLA also agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate her son's admission to USC as a purported football recruit.

180.    On or about February 27, 2017, after her son was granted extended time on the SAT, PALATELLA e-mailed her son's high school that he would be "taking his SAT test at [the West Hollywood Test Center] in Los Angeles on March 11 and 12, 2017."

181.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF.

182.    On or about March 8, 2017, Singer caused KWF to issue a payment of $25,000 to Dvorskiy for facilitating Riddell's cheating on behalf of PALATELLA's son.

183.    On or about March 10, 2017, Riddell flew from Tampa, Florida to Los Angeles, California to purport to proctor the SAT for PALATELLA's son at the West Hollywood Test Center.

184.    On or about March 11, 2017, after PALATELLA's son completed the SAT exam at the West Hollywood Test Center, Riddell reviewed and corrected his answers.

185.    On or about March 13, 2017, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

186.    On or about March 27, 2017, Singer caused KWF to issue a payment of $10,000 to Riddell for correcting the SAT answers for PALATELLA's son.

187.    On or about July 27, 2017, PALATELLA e-mailed Singer a photo of her son in his football uniform and asked: "Will this do?"   Singer forwarded the photo to Janke, together with PALATELLA's son's grades and the fraudulently obtained SAT score.   Janke created an athletic profile for PALATELLA's son that included falsified football credentials.

188.    On or about November 16, 2017, Heinel presented PALATELLA's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a football recruit.

189.    On or about December 1, 2017, PALATELLA mailed Heinel a check in the amount of $100,000.

190.    On or about May 1, 2018—after PALATELLA's son received a formal acceptance letter from USC—PALATELLA's company wired $400,000 to KWF.

191.    On or about October 24, 2018, Singer called PALATELLA from Boston, Massachusetts.   During the call, PALATELLA agreed to mislead the IRS if anyone inquired about her payments to KWF.

192.    On or about January 9, 2019, PALATELLA exchanged text messages with a friend regarding the money PALATELLA paid to KWF for her son's admission to USC.   Her friend stated:   "I can only think the money was spent wisely for school or else wise," to which PALATELLA replied:   "I don't think most of it went to the school between us only.   Please never ever repeat anything."

## JOHN WILSON

193.    Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate his son's admission to USC as a purported water polo recruit. Beginning in or about 2018, WILSON agreed to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his daughters' admissions to Stanford and Harvard as purported athletic recruits.

194.    On or about February 10, 2013, WILSON e-mailed Singer and asked for the "deadline to decide on side door for USC or BC or Georgetown etc. this year" and to "confirm for

which schools is side door option really viable." Singer responded that the deadline for USC and Boston College was "mid July."

195.    On or about August 24, 2013, WILSON e-mailed Singer about the timing of his payments to Vavic, the USC water polo coach, to secure his son's admission as a purported water polo recruit.   WILSON wrote:   "What does Jovan need by [S]ept 20?   Do u have what we need? Do I make the first payment to u then?"

196.    On or about October 3, 2013, Vavic advised Singer that he needed an athletic profile for WILSON's son and that it "needs to be a good resume."   Singer subsequently provided Vavic with a falsified profile that included fabricated swimming times and awards.

197.    On or about February 26, 2014, Vavic e-mailed a USC athletics administrator that WILSON's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly."

198.    On or about February 28, 2014, the USC subcommittee for athletic admissions approved the admission of WILSON's son as a water polo recruit based on the falsified athletic credentials.

199.    On or about March 1, 2014, WILSON e-mailed Singer under the subject line "USC fees."   WILSON wrote:

> Thanks again for making this happen!   Pls give me the invoice.   What are the options for the payment?   Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?

Singer replied that he could make the invoice for business consulting fees, so that WILSON could "write [it] off as an expense."

200.    On or about April 7, 2014, after USC mailed WILSON's son a formal acceptance letter, WILSON's company wired a total of $220,000 to Singer, including $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer directly.

201.    On or about April 16, 2014, Singer withdrew a $100,000 cashier's check, made out to "USC Men's Water Polo," from The Key's account.    The "Purpose/Remitter" identified on the check was "Wilson Family."

202.    On or about September 29, 2018, WILSON asked Singer about "side door" opportunities for his daughters.    Singer explained, in sum and substance, that "by the side door" he may be able to tell the sailing coach:    "'Hey, this family's willing to make the contributions. She could be on your team.    She is a sailor.    She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit.'"

203.    On or about October 15, 2018, Singer called WILSON to discuss various "side door" options for WILSON's daughters and noted that for any of those options, WILSON's daughters "don't have to play.    They just-- that's the path I'm gonna get 'em in on."    WILSON responded:    "Gotcha."

204.    On or about October 17, 2018, WILSON's executive assistant e-mailed him:    "I just received a text with Bank info for The Key Worldwide Foundation, what is this for?" WILSON replied:    "It's a 500k donation I am going to make this year.    Tax write off and help getting into colleges."

205.    On or about the same day, WILSON's company wired $500,000 to an account in the name of KWF in the District of Massachusetts.

206.    On or about October 27, 2018, Singer, who was located in the District of Massachusetts, told WILSON that he had secured a "side door" deal for one of WILSON's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with Vandemoer was hidden from Stanford.

207.    On or about November 29, 2018, Singer, who was located in the District of Massachusetts, told WILSON that he had secured an admissions spot at Harvard through a purported "senior women's administrator" at the university, and that, in exchange for an initial $500,000 payment to her, as well as a subsequent payment, the administrator would designate one of WILSON's daughters as an athletic recruit.

208.    On or about December 11, 2018, WILSON's company wired another $500,000 to the Massachusetts account in the name of KWF.

## HOMAYOUN ZADEH

209.    Beginning in or about 2016, Zadeh agreed with Singer to pay an amount, ultimately totaling $150,000, to facilitate his daughter's admission to USC as a purported lacrosse recruit.

210.    On or about December 16, 2016, ZADEH provided Singer with a photograph of his daughter cheerleading. Singer forwarded the photograph to Janke and directed her to fabricate a lacrosse profile for ZADEH's daughter.

211.    On or about March 15, 2017, Heinel presented ZADEH's daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a lacrosse recruit.

212.    In a text message on or about March 20, 2017, ZADEH told Singer that his daughter was concerned that "she did not get in on her own merits.  I have not shared anything about our arrangement but she somehow senses it."

213.    During the same text exchange, Singer told ZADEH that he could "make the 100k payment over the next 6 months starting April 1st.  You can send to my foundation as a donation/write off or if you have your own company we can invoice you as a business consulting fee from our profit business and you write off as an expense."

31

214.   On or about March 27, 2017, after USC mailed ZADEH's daughter her formal acceptance letter, KWF sent $50,000 to the USC Women's Athletics Board.

215.   Between May 30, 2017 and September 7, 2018, ZADEH made the following payments to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

216.   On or about October 25, 2018, Singer called ZADEH from Boston, Massachusetts. During the call, Singer told ZADEH, in sum and substance, that KWF was being audited by the IRS. Singer said:   "I'm not going to tell the IRS that we got [your daughter] in through lacrosse." ZADEH responded:   "Right."   Singer continued:   "And Donna Heinel at USC."   ZADEH replied:   "Right."   Singer also said:   "[Y]ou know, we created a profile that wasn't real." ZADEH responded:   "Right."

ROBERT ZANGRILLO

217.   Beginning in or about 2017, ZANGRILLO agreed with Singer to pay for a third party to complete online high school courses for his daughter, with the understanding that credits earned in those classes would be submitted to colleges on his daughter's behalf, either as part of her application or to serve as proof of her high school graduation.   ZANGRILLO also agreed with Singer to pay for a third party to complete online college courses for his daughter, with the understanding that grades earned in those classes would be submitted as part of his daughter's college applications.

32

218.    In or about March 2017, even though she ultimately did not attend the university, ZANGRILLO's daughter was admitted to Boston University for the fall of 2017.   At the time, ZANGRILLO's daughter was enrolled in an online high school.

219.    In or about the spring of 2017, ZANGRILLO's daughter was enrolled in five courses through her online high school, all of which, once completed, would fulfill credits she needed to graduate.   ZANGRILLO's daughter had only partially completed each of these courses.

220.    On or about June 14, 2017, Sanford sent an e-mail to another individual, Co-Conspirator 1 ("CC-1"), containing the log-in information for ZANGRILLO's daughter's online high school.   Sanford and CC-1 used this log-in information to complete four of the outstanding courses for ZANGRILLO's daughter.

221.    On or about July 18, 2017, Masera e-mailed an invoice to ZANGRILLO and his assistant, copying Singer.   The e-mail stated, "Attached is a new invoice seeking reimbursement for course completion for [ZANGRILLO's daughter]."   The invoice listed four courses and billed ZANGRILLO for the coursework that Sanford and CC-1 completed on behalf of ZANGRILLO's daughter.

222.    On or about July 20, 2017, ZANGRILLO's assistant replied to Masera's e-mail: "Wire has been sent."   On or about the same day, ZANGRILLO wired $3,109.50 to The Key.

223.    On or about July 28, 2017, Sanford e-mailed ZANGRILLO's daughter's online high school and requested that her transcript be sent to Boston University.

224.    On or about the same day, a member of the counseling department at ZANGRILLO's daughter's high school e-mailed her that she needed complete a course, Fitness Fundamentals, to fulfill her graduation requirements.

225.    Sanford subsequently completed the "Fitness Fundamentals" course for ZANGRILLO's daughter.    Thereafter, on or about August 23, 2017, Sanford e-mailed ZANGRILLO's daughter's high school and again requested that her transcript "with proof of graduation" be e-mailed to Boston University.

226.    On or about August 24, 2017, ZANGRILLO's daughter's high school e-mailed her transcript to Boston University in the District of Massachusetts.    The transcript reflected credits earned by Sanford and CC-1 on behalf of ZANGRILLO's daughter.

227.    On or about January 19, 2018, ZANGRILLO's assistant e-mailed ZANGRILLO and his daughter an invoice from The Key, dated August 23, 2017, in the amount of $2,500.    The invoice was for "Course Completion by Mikaela Sanford – Fitness Fundamentals 2." ZANGRILLO's assistant asked him to "please approve and confirm this payment for $2500 that they show as outstanding."

228.    On or about January 22, 2018, ZANGRILLO wired $2,500 to The Key.    The reference on the wire was ZANGRILLO's daughter's name.

229.    Beginning in or about 2018, ZANGRILLO agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his daughter's transfer to USC as a purported crew recruit.

230.    On or about February 1, 2018, ZANGRILLO's daughter's transfer application was submitted to USC. The application included falsified athletic credentials.

231.    In a call with ZANGRILLO, ZANGRILLO's daughter and Sanford, on or about June 11, 2018, Singer explained, in sum and substance, that he had asked members of the USC athletics department to facilitate ZANGRILLO's daughter's admission "as though she's been

sculling and rowing," and that the crew coach had agreed to designate her as a purported crew recruit, provided that "[y]ou guys help us."

232.  During the same call, ZANGRILLO directed Sanford to take a biology and an art history class for his daughter.   By that time, Sanford had already taken additional online courses for ZANGRILLO's daughter through multiple colleges.

233.  For example, on or about April 5, 2018, ZANGRILLO's assistant forwarded ZANGRILLO invoices from The Key for "Course completion PSY 101 – Intro to Psychology – Rio Salado" as well as the balance of an online pre-calculus class that had been previously underbilled, and for course materials for the art history class that were shipped to Sanford's home address, and asked him to approve "charges for online college courses for [his daughter]." ZANGRILLO replied "Approved."

234.  On or about April 19, 2018, ZANGRILLO wired $11,528.60 to The Key.   The reference on the wire was ZANGRILLO's daughter's name.

235.  Singer's bookkeeper sent additional invoices to ZANGRILLO and his assistant for Sanford's completion of other courses on behalf of ZANGRILLO's daughter.   When these invoices went unpaid, Singer, in an e-mail on or about June 12, 2018, asked ZANGRILLO to "get this handled ASAP" or "Mikaela [Sanford] will suspend working on anything as of tomorrow if not taken care of."   In response, ZANGRILLO asked his assistant to "make sure this is taken care of this a[.]m[.]"   ZANGRILLO wired $10,800.26 on or about the same day.

236.  As another example, on or about August 15, 2018, Singer's bookkeeper e-mailed ZANGRILLO and his assistant an invoice for "course completion" for the biology course discussed in the June 11, 2018 call.   ZANGRILLO replied, "Approved."

237.    Transcripts reflecting the completion of these online courses were submitted to USC on behalf of ZANGRILLO's daughter.

238.    On or about September 20, 2018, after USC mailed ZANGRILLO's daughter an acceptance letter, ZANGRILLO wired $200,000 to one of the KWF charitable accounts.

239.    On or about that same day, ZANGRILLO mailed a check in the amount of $50,000 to "USC Women's Athletics."

240.    On or about October 25, 2018, Singer, who was located in the District of Massachusetts, called ZANGRILLO and told him that KWF was being audited.  Singer told ZANGRILLO that he would not tell the IRS that the $200,000 ZANGRILLO paid to KWF "went to go pay Donna Heinel for USC to get her [i.e., ZANGRILLO's daughter] in."  ZANGRILLO then asked what he should tell the IRS regarding the purpose of the payment "just so I know so we have the story straight."  Singer responded that ZANGRILLO should say that all the money paid to KWF, including the money paid for Singer's assistant to take classes for ZANGRILLO's daughter, were for "our programs that handle underserved kids."  ZANGRILLO replied:  "Okay, great, perfect."

241.    On or about January 3, 2019, Singer, who was located in the District of Massachusetts, called ZANGRILLO, who confirmed that his daughter would not say anything to her USC advisor about being admitted through athletics.

### Other Co-Conspirators

242.    In addition to the exams Singer paid Riddell to take for the children of the defendants, Singer likewise paid Riddell to cheat on the SAT and ACT for the children of other

co-conspirators known and unknown to the Grand Jury and, in many of those instances, bribed exam administrators, including Dvorskiy and Williams, to permit Riddell to do so.

243. Singer likewise bribed athletic coaches and university administrators on behalf of other co-conspirators known and unknown to the Grand Jury to designate the children of those co-conspirators as athletic recruits.

244. Singer also agreed with other co-conspirators known and unknown to the Grand Jury to arrange for Sanford and others to take courses on behalf of the children of these other co-conspirators with the understanding that grades earned in those classes would be submitted as part of the students' college applications.

### The USC Federal Programs Bribery Conspiracy

245. From in or about 2007 through in or about February 2019, the defendants identified below conspired with others known and unknown to the Grand Jury to bribe agents of USC to secure their children's admission to that university.

### Objects and Purposes of the USC Federal Programs Bribery Conspiracy

246. The principal object of the USC federal programs bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666. The principal purposes of the conspiracy included, among other things: (1) securing the admission of the defendants' children to USC; (2) enriching Singer and the recipients of the bribes personally; and (3) concealing the bribery scheme.

### Manner and Means of the USC Federal Programs Bribery Conspiracy

247. Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the USC federal programs bribery conspiracy were the following:

37

a. Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' applications to USC;

b. Paying bribes via KWF, The Key, and/or Singer to USC athletic coaches and administrators in exchange for designating the defendants' children as purported athletic recruits—with little or no regard for their athletic abilities and, in some cases, even though they did not play the sport they were purportedly recruited to play—and as members of other favored admissions categories; and

c. Explaining to clients and prospective clients of The Key that the bribes were a tried-and-true method of gaining admission to USC and other colleges and universities that had been successfully employed by many other clients.

<u>Overt Acts in Furtherance of the USC Federal Programs Bribery Conspiracy</u>

248.    On various dates from in or about 2007 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the USC federal programs bribery conspiracy:

## GAMAL ABDELAZIZ

249.    On or about March 26, 2018, ABDELAZIZ wired $300,000 to KWF.

250.    In or about July 2018, Singer began paying Heinel $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.

## TODD AND DIANE BLAKE

251.    On or about September 16, 2017, TODD BLAKE mailed a $50,000 check made payable to USC Women's Athletics, an account controlled by Heinel.

252.    On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts.

## MOSSIMO GIANNULLI AND LORI LOUGHLIN

253.    On or about November 1, 2016, GIANNULLI directed his business manager to send a $50,000 check, made payable to USC Women's Athletics, to Heinel.

254.    On or about April 10, 2017, GIANNULLI wired $200,000 to KWF.

255.    On or about November 30, 2017, GIANNULLI directed his business manager to send a $50,000 check, made payable to USC Women's Athletics, to Heinel.

256.    On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

## ELISABETH KIMMEL

257.    On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.   The check was signed by KIMMEL's spouse.

258..   On or about February 23, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

### WILLIAM McGLASHAN, Jr.

259.    Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to bribe USC athletic coaches and administrators to to facilitate his son's admission to USC as a purported football recruit.

260.    On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, his high school transcript, and photos of his son in a football uniform.

### MARCI PALATELLA

261.    On or about December 1, 2017, PALATELLA mailed Heinel a $100,000 check, made payable to USC Women's Athletic Board.

262.    On or about May 1, 2018—after PALATELLA's son received a formal acceptance letter from USC—PALATELLA caused her company to wire $400,000 to KWF.

### JOHN WILSON

263.    On or about April 7, 2014, WILSON caused his company to wire a total of $220,000 to Singer, comprised of $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

264.    On or about April 16, 2014, Singer caused KWF to issue a $100,000 cashier's check, made payable to USC Men's Water Polo, to Vavic.

### HOMAYOUN ZADEH

265.    On or about March 27, 2017, after USC mailed ZADEH's daughter her formal acceptance letter, Singer caused KWF to issue a $50,000 check, made payable to USC Women's Athletics Board, to Heinel.

266.    Between on or about May 30, 2017 and on or about September 7, 2018, ZADEH made or caused the following payments to be made to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

ROBERT ZANGRILLO

267.    On or about September 20, 2018, ZANGRILLO wired $200,000 to one of the KWF charitable accounts.

268.    On or about that same day, ZANGRILLO mailed a check in the amount of $50,000 to "USC Women's Athletics."

The Money Laundering Conspiracy

269.    The defendants conspired with others known and unknown to the Grand Jury to conceal their fraud scheme by funneling bribe and other payments through The Key or KWF, including via payments to and from accounts in the District of Massachusetts, and to promote their fraud scheme via payments to The Key and KWF from outside the United States.

Objects and Purposes of the Money Laundering Conspiracy

270.    The principal objects and purposes of the money laundering conspiracy were: (a) to conceal and disguise the nature, location, source, ownership, and control of bribe and other payments in furtherance of the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and, (b) to transport, transmit, and transfer funds to a place in the United States

from and through a place outside the United States, with the intent to promote the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

### Manner and Means of the Money Laundering Conspiracy

271.   Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the money laundering conspiracy were the following:

    a.   Making purported charitable donations to KWF or payments to The Key to fund the bribe and other payments in furtherance of the fraud scheme;

    b.   Having KWF issue letters falsely attesting that the purported donations would help "provide educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged" for the money;

    c.   Having The Key issue falsified "consulting" agreements and invoices stating that payments were for legitimate services, when in fact the payments were made in furtherance of the fraud and bribery schemes; and

    d.   Issuing bribe and other payments in furtherance of the fraud and bribery schemes from accounts in the name of The Key and KWF.

### Acts in Furtherance of the Money Laundering Conspiracy

272.   On various dates from in or about 2011 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the money laundering conspiracy:

## DAVID SIDOO

273.     On or about January 23, 2013, SIDOO wired $100,000 from an account in Canada to an account in California in the name of The Key, to pay for the SAT cheating scheme for SIDOO's younger son.

## GREGORY COLBURN and AMY COLBURN

274.     In or about December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of $24,443.50, to pay for the SAT cheating scheme for the COLBURNS' son.

275.     GREGORY COLBURN subsequently issued an additional check in the amount of $547.45 to KWF, and wrote "charitable donation" in the memo line.

276.     On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for the purported donation.

277.     In a call on or about October 24, 2018, Singer told AMY COLBURN, "So what I've stated to the IRS, [is] that your payment went to our foundation to help underserved kids." AMY COLBURN responded, "Okay."

278.     During the same call on or about October 24, 2018, Singer told GREGORY COLBURN, "I just wanted to make sure that we don't-- we're all on the same page." GREGORY COLBURN replied, "Right.   It was to help underserved kids. . . . Got it. No problem."

## GAMAL ABDELAZIZ

279.     On or about March 26, 2018, ABDELAZIZ wired a payment of $300,000 to KWF to pay for the scheme to admit his daughter to USC as a purported basketball recruit.

280.     On or about March 26, 2018, KWF issued a letter to ABDELAZIZ falsely indicating that "no goods or services were exchanged" for the purported donation.

### DIANE BLAKE and TODD BLAKE

281.   On or about September 16, 2017, TODD BLAKE mailed a $50,000 check to Heinel, payable to USC Women's Athletics, to pay for the scheme to admit his daughter to USC as a purported volleyball recruit.

282.   On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts as a further payment for the recruitment scheme.

283.   In call on or about October 25, 2018, TODD BLAKE asked Singer: "[W]ill I get contacted [by the IRS], and if so how would you like me to answer?" Singer responded: "[W]hat I want you to say is that your money went to our foundation, which it did." TODD BLAKE replied: "Yeah. Okay." Singer then said, "You made a donation to help underserved kids." TODD BLAKE responded: "Right. Okay, good."

284.   In a call on or about February 22, 2019, Singer told DIANE BLAKE that her daughter "got in with you guys making a payment, you know for $50,000 to USC Women's Athletics directly and then $200[,000] to my foundation." DIANE BLAKE responded "right," and further acknowledged that "that was the payment to get her in."

### I-HSIN "JOEY" CHEN

285.   On or about April 10, 2018, Singer's accountant e-mailed Chen a falsified invoice from The Key in the amount of $100,000 for purported "consulting services."

286.   On or about April 13, 2018, Chen e-mailed Signer's accountant to ask for this invoice to be reduced to $75,000, which was the amount Chen had agreed to pay Singer for participating in the ACT cheating scheme.

287.   On or about April 16, 2018, CHEN caused his company to wire $75,000 to The Key.

## MOSSIMO GIANNULLI and LORI LOUGHLIN

288.    On or about April 10, 2017, GIANNULLI wired $200,000 to KWF to pay for the scheme to admit his older daughter to USC as a purported crew recruit.

289.    On or about March 26, 2018, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

290.    On or about February 6, 2018, GIANNULLI wired $200,000 to KWF to pay for the scheme to admit his younger daughter to USC as a purported crew recruit.

291.    On or about February 7, 2018, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

## ELISABETH KIMMEL

292.    On or about April 15, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $100,000 to pay for the scheme to admit her daughter to Georgetown as a purported tennis recruit.

293.    Masera thereafter sent a letter to the Meyer Charitable Foundation falsely indicating that "no goods or services were exchanged" for the purported donation.

294.    On or about June 27, 2013, KIMMEL caused the Meyer Charitable Foundation to issue an additional check to KWF in the amount of $170,000.

295.    On or about July 16, 2013, KIMMEL caused the Meyer Charitable Foundation to issue an additional check to KWF in the amount of $5,000.

296.    On or about February 23, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000 to pay for the scheme to admit her son to USC as a purported track and field recruit.

### WILLIAM McGLASHAN, Jr.

297.    On or about December 6, 2017, McGLASHAN sent $50,000 to KWF from his personal charitable donation fund to pay for the ACT cheating scheme for McGLASHAN's son.

### MARCI PALATELLA

298.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF to pay for the SAT cheating scheme for PALATELLA's son.

299.    On or about May 1, 2018, PALATELLA's company wired $400,000 to KWF to pay for the scheme to admit her son to USC as a purported football recruit.

### JOHN WILSON

300.    On or about March 1, 2014, WILSON asked Singer, in substance, whether he could pay Singer from his corporate account for the scheme to admit WILSON's son's to USC as a purported water polo recruit, so that the payment would be deductible as a purported consulting fee.

301.    On or about April 7, 2014, WILSON caused his company to wire $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

302.    On or about April 16, 2014, Singer caused KWF to issue a $100,000 cashier's check, made payable to USC Men's Water Polo, to Vavic.   This check stated that the "purpose/remitter" was the "Wilson Family."

303.    On or about July 28, 2014, USC sent WILSON and his spouse a gift receipt for their purported $100,000 charitable contribution to USC Men's Water Polo.   USC issued this

letter without knowing that WILSON's payment was made in exchange for facilitating his son's fraudulent admission to USC as a purported recruit.

## HOMAYOUN ZADEH

304.  On or about March 27, 2017, after USC mailed ZADEH's daughter her formal acceptance letter, Singer caused KWF to issue a $50,000 check, made payable to USC Women's Athletics Board, to Heinel.

305.  On or about April 5, 2017, Masera e-mailed an invoice to ZADEH and his spouse for their purported "pledge" to KWF of $100,000, which was in fact a payment for facilitating ZADEH's daughter's fraudulent admission to USC as a purported lacrosse recruit.

306.  Between on or about May 30, 2017 and September 7, 2018, ZADEH made eight payments totaling $55,000 to KWF.

307.  On or about December 27, 2017, KWF issued a letter to ZADEH and his spouse falsely attesting that "no goods or services were exchanged" for their purported donations.

308.  On or about March 6, 2019, ZADEH's spouse e-mailed Singer, copying ZADEH, noting that she had sent an additional $5,000 to KWF and requesting a tax receipt for the money ZADEH and his spouse had purportedly contributed to KWF in 2018.

## ROBERT ZANGRILLO

309.  On or about September 20, 2018, ZANGRILLO wired $200,000 to one of the KWF charitable accounts to pay for the scheme to admit his daughter to USC as a purported crew recruit.

310.  In a call from Boston, Massachusetts on or about October 25, 2018, Singer told ZANGRILLO, in sum and substance, that the IRS was auditing KWF.  ZANGRILLO asked: "What was [my daughter's] payment for? Just so I know, so we have the story straight."  Singer

responded, in substance, that the payments would appear to be "for our programs that handle underserved kids." ZANGRILLO replied: "Okay, great, perfect."

### Other Co-Conspirators

311. Singer likewise funneled bribes through KWF and The Key to athletic coaches and university administrators in the District of Massachusetts and elsewhere, on behalf of other co-conspirators known and unknown to the Grand Jury, in order to conceal and disguise the nature, location, source, ownership, and control of bribe money and other payments in furtherance of the fraud scheme.

312. Other co-conspirators known and unknown to the Grand Jury also transported, transmitted, and transferred monetary instruments and funds from a place outside the United States to and through KWF and The Key accounts inside the United States in furtherance of the fraud scheme.

COUNT ONE
Conspiracy to Commit Mail and Wire Fraud
and Honest Services Mail and Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

313.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-244 of this

Third Superseding Indictment.

314.    From in or about 2007 through in or about February 2019, in the District of

Massachusetts, and elsewhere, the defendants,

> (1)   DAVID SIDOO,
> (2)   GREGORY COLBURN,
> (3)   AMY COLBURN,
> (4)   GAMAL ABDELAZIZ,
> (5)   DIANE BLAKE,
> (6)   TODD BLAKE,
> (7)   I-HSIN "JOEY" CHEN,
> (8)   MOSSIMO GIANNULLI,
> (13)  ELISABETH KIMMEL,
> (14)  LORI LOUGHLIN,
> (15)  WILLIAM McGLASHAN, Jr.,
> (16)  MARCI PALATELLA,
> (17)  JOHN WILSON,
> (18)  HOMAYOUN ZADEH, and
> (19)  ROBERT ZANGRILLO

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  mail fraud and honest services mail fraud, that is, having devised and intending to

devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT,

SAT and other standardized tests and test scores, and admission to the Universities, by

means of materially false and fraudulent pretenses, representations, and promises, and

to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities

of their right to the honest and faithful services of their test administrators, athletic

coaches and university administrators, through bribes and kickbacks, did, for the

purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346; and,

b.  wire fraud and honest services wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

315.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-268 of this

Third Superseding Indictment.

316.    From in or about 2007 through in or about February 2019, in the District of

Massachusetts, and elsewhere, the defendants,

> (4)    GAMAL ABDELAZIZ,
> (5)    DIANE BLAKE
> (6)     TODD BLAKE,
> (8)     MOSSIMO GIANNULLI,
> (13)   ELISABETH KIMMEL,
> (14)   LORI LOUGHLIN,
> (15)   WILLIAM McGLASHAN, Jr.,
> (16)   MARCI PALATELLA,
> (17)   JOHN WILSON,
> (18)   HOMAYOUN ZADEH, and
> (19)   ROBERT ZANGRILLO

conspired with others known and unknown to the Grand Jury to commit federal programs bribery,

that is, to corruptly give, offer and agree to give anything of value to any person, with intent to

influence and reward an agent of an organization, to wit, agents of USC, in connection with any

business, transaction and series of transactions of USC involving anything of value of $5,000 or

more, that is, in exchange for facilitating the admission to USC for the defendants' children, where

USC received benefits in excess of $10,000 under federal programs involving grants, contracts,

subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period,

in violation of Title 18, United States Code, Section 666(a)(2).

All in violation of Title 18, United States Code, Section 371.

51

<u>COUNT THREE</u>
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The Grand Jury further charges:

317.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-312 of this

Third Superseding Indictment.

318.    From in or about 2011 through in or about February 2019, in the District of

Massachusetts, and elsewhere, the defendants,

|     |     |
| --- | --- |
| (1)  | DAVID SIDOO, |
| (2)  | GREGORY COLBURN, |
| (3)  | AMY COLBURN, |
| (4)  | GAMAL ABDELAZIZ, |
| (5)  | DIANE BLAKE, |
| (6)  | TODD BLAKE, |
| (7)  | I-HSIN "JOEY" CHEN, |
| (8)  | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  to conduct and attempt to conduct financial transactions, to wit, bribe payments and

other payments funneled through a purported charitable organization and a for-profit

corporation, knowing that that the property involved in such transactions represented

the proceeds of some form of unlawful activity and which, in fact, involved the

proceeds of specified unlawful activity, that is, mail and wire fraud and honest services

mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343

and 1346, and knowing that the transactions were designed, in whole and in part, to

52

conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds, to wit, bribes and other payments, to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

COUNTS FOUR THROUGH TEN
Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341 and 1346 and 2)

The Grand Jury further charges:

319.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-244 of this Third Superseding Indictment.

320.     On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendants set forth below, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property, to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud, as follows:

| COUNT | DEFENDANT(S) | APPROXIMATE DATE | WIRE |
|-------|--------------|------------------|------|
| 4 | ROBERT ZANGRILLO | August 24, 2017 | High school transcript sent to Boston University |
| 5 | JOEY CHEN | October 8, 2018 | ACT scores sent to Emerson College |
| 6 | JOHN WILSON | October 17, 2018 | $500,000 wire transfer to KWF |
| 7 | WILLIAM McGLASHAN JR. | October 24, 2018 | ACT scores sent to Northeastern University |
| 8 | JOHN WILSON | October 27, 2018 | Telephone call with Singer |
| 9 | JOHN WILSON | December 11, 2018 | $500,000 wire transfer to KWF |

| 10 | ROBERT ZANGRILLO | January 3, 2019 | Telephone call with Singer |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

<u>COUNTS ELEVEN AND TWELVE</u>
Federal Programs Bribery; Aiding and Abetting
(18 U.S.C. §§ 666(a)(2) and 2)

The Grand Jury further charges:

321.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-268 of this Third Superseding Indictment.

322.    On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

(17)   JOHN WILSON

corruptly gave, offered and agreed to give anything of value to any person, with intent to influence and reward an agent of an organization, as set forth below, in connection with any business, transaction and series of transactions of such organization involving anything of value of $5,000 or more, where such organization received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, as follows:

| COUNT | AGENT AND ORGANIZATION | APPROXIMATE DATE | PAYMENT |
|-------|------------------------|------------------|---------|
| 11 | Sailing coach of Stanford | October 17, 2018 | $500,000 wire transfer to KWF |
| 12 | Senior women's administrator of Harvard | December 11, 2018 | $500,000 wire transfer to KWF |

All in violation of Title 18, United States Code, Sections 666(a)(2) and (2).

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

323.    Upon conviction of the offenses in violation of Title 18, United States Code,

Sections 371, 666, 1341, 1346, 1349 and 2, set forth in Counts One through Two and Four through

Twelve of this Third Superseding Indictment, the defendants,

| | |
|---|---|
| (1) | DAVID SIDOO, |
| (2) | GREGORY COLBURN, |
| (3) | AMY COLBURN, |
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE, |
| (6) | TODD BLAKE, |
| (7) | I-HSIN "JOEY" CHEN, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses.

324.    If any of the property described in Paragraph 323 above as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants --

  a.  cannot be located upon the exercise of due diligence;

  b.  has been transferred or sold to, or deposited with, a third party;

  c.  has been placed beyond the jurisdiction of the Court;

  d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 323 above.

    All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

## MONEY LAUDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

325.    Upon conviction of the offense in violation of Title 18, United States Code, Section

1956(h), set forth in Count Three of this Third Superseding Indictment, the defendants,

<div style="margin-left:2em">

(1)    DAVID SIDOO,
(2)    GREGORY COLBURN,
(3)    AMY COLBURN,
(4)    GAMAL ABDELAZIZ,
(5)    DIANE BLAKE,
(6)    TODD BLAKE,
(7)    I-HSIN "JOEY" CHEN,
(8)    MOSSIMO GIANNULLI,
(13)   ELISABETH KIMMEL,
(14)   LORI LOUGHLIN,
(15)   WILLIAM McGLASHAN, Jr.,
(16)   MARCI PALATELLA,
(17)   JOHN WILSON,
(18)   HOMAYOUN ZADEH, and
(19)   ROBERT ZANGRILLO

</div>

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, and any property traceable to such property.

326.    If any of the property described in Paragraph 325 above as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without
     difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 325 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL,

_____
FOREPERSON

_____
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant United States Attorneys
District of Massachusetts

District of Massachusetts: OCTOBER 22, 2019
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

10-22-19
1:14 pm

60