SEALED PORTION REMOVED

1                    UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

2

                            )

3  UNITED STATES OF AMERICA,     )
                            )

4        Plaintiff,      )
                            )  Criminal Action

5  v.                    )  Nos. 1:19-cr-10080-NMG-19
                            )

6  ROBERT ZANGRILLO,          )
                            )

7        Defendant.      )
                            )

8

9
          BEFORE THE HONORABLE M. PAGE KELLEY

10         UNITED STATES MAGISTRATE JUDGE

11

                  MOTION HEARING

12          SEALED PORTION REMOVED

13

14          November 26, 2019

15

16     John J. Moakley United States Courthouse
              Courtroom No. 24

17          One Courthouse Way
         Boston, Massachusetts 02210

18

19
           Linda Walsh, RPR, CRR

20         Official Court Reporter
     John J. Moakley United States Courthouse

21      One Courthouse Way, Room 5205
        Boston, Massachusetts 02210

22        lwalshsteno@gmail.com

23

24

25

─SEALED PORTION REMOVED─

1 | APPEARANCES:

2 | On Behalf of the Government:

3 |     UNITED STATES ATTORNEY'S OFFICE
    By: AUSA Justin D. O'Connell
4 |     One Courthouse Way
    Boston, Massachusetts 02210
5 |     617-748-3412
    eric.rosen@usdoj.gov

6 |

On Behalf of the Movant University of Southern California:

7 |

    HOGAN LOVELLS US LLP
8 |     By: Anthony E. Fuller, Esq.
    125 High Street, Suite 2010
9 |     Boston, Massachusetts 02110
    617-371-1000
10 |     anthony.fuller@hoganlovells.com

11 |     GIBSON DUNN
    By: Douglas Fuchs, Esq.
12 |        Debra Wong Yang, Esq.
    333 South Grand Avenue
13 |     Los Angeles, California 90071

14 | On Behalf of the Defendant Robert Zangrillo:

15 |     MARTIN G. WEINBERG, PC
    By: Martin G. Weinberg, Esq.
16 |     20 Park Plaza, Suite 1000
    Boston, Massachusetts 02116
17 |     617-227-3700
    owlmcb@att.net
18 |

On Behalf of the Defendant Mossimo Giannulli:

19 |

    DONNELLY, CONROY & GELHAAR, LLP
20 |     By: George W. Vien, Esq.
    260 Franklin Street
21 |     Boston, Massachusetts 02110
    617-720-2880
22 |     gwv@dcglaw.com

23 |

24 | (Appearances continued on next page.)

25 |

————————————————————SEALED PORTION REMOVED————————————————————

1    APPEARANCES (Continued):

2    On Behalf of the Defendant John Wilson:

3         WHITE & CASE, LLP
          By: Michael Kendall, Esq.
4         75 State Street
          Boston, Massachusetts 02109
5         617-939-9310
          michael.kendall@whitecase.com
6

7
              Proceedings recorded by sound recording and
8                produced by computer-aided stenography

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

─────SEALED PORTION REMOVED─────

1               P R O C E E D I N G S

2          THE CLERK:  November 26th, 2019, and we are on the

3     record in Criminal Case Number 19-10080, the *United States*

4     *versus Robert Zangrillo*, the Honorable M. Page Kelley

5     presiding.

6          Would counsel please identify themselves for the

7     record.

8          MR. FULLER:  Good morning, Your Honor -- or afternoon.

9     Tony Fuller on behalf of U.S.C., and with me is Doug Fuchs and

10    Deborah Wong Yang.

11         THE COURT:  Okay.  Good afternoon.

12         MR. FUCHS:  Good afternoon, Your Honor.

13         MS. YANG:  Good afternoon, Your Honor.

14         MR. WEINBERG:  Good afternoon.  Martin Weinberg on

15    behalf of Robert Zangrillo.

16         THE COURT:  All right.

17         MR. VIEN:  Good afternoon, Your Honor.  I don't mean

18    to be presumptuous because we are not a moving partner but --

19    party, but George Vien on behalf of Mossimo Giannulli, and with

20    me is Michael Kendall who represents Mr. Wilson and -- I don't

21    want to take over the hearing or get out of order, but really

22    we're here for two reasons.  One, we would just like the

23    hearing to be open; and two, and perhaps more importantly,

24    whatever is directed to Mr. Weinberg, we have a simple request

25    that all of the co-defendants get the same information and the

1    same material.  And we'll sign whatever protective order that

2    the Court issues or requires.  I just don't want to be in a

3    position of if Mr. Weinberg does obtain documents, that he

4    can't give them to the co-defendant.  And as I understand,

5    U.S.C. would give them to the Government, but then we would

6    have to deal with the Government to get them.  And we've

7    already filed a *Brady* letter, and I expect litigation on that.

8    So we are trying to cut to the chase and be efficient, and

9    that's why Mr. Kendall and I are here on behalf of the

10   defendants -- our defendants, at least, to make that request.

11            THE COURT:  Mr. Fuller?

12            MR. FULLER:  I always welcome Mr. Vien's input, as he

13   knows, and I think -- well, two things.  One is -- we'll have

14   to talk to the client, but I think it's a reasonable request

15   that they get the same information pursuant to the same

16   confidentiality order that we negotiated with Mr. Zangrillo's

17   counsel.

18            However, that protective order itself I think is the

19   reason why U.S.C. would like to have the hearing, at least a

20   portion, where we discuss the stuff that's been turned over and

21   the e-mails at issue, that we have that in camera because the

22   parties have agreed at least that they're -- the documents and

23   what the information contain are of a sensitive nature, and

24   they are subject to the protective order.  So if they were to

25   be used, they would be filed under seal in a pretrial

────────────SEALED PORTION REMOVED────────────

1    proceeding.  So the parameters of that order itself I think

2    contemplate -- if we're going to be talking about these things

3    in a scenario where a disagreement with one of the parties

4    about what should be turned over, it should be done in camera.

5    So that's our position on that.

6          But in terms of, I think, getting the other defendants

7    the same information, I think that's a reasonable request.

8    We'd have to talk to the client, but on the same terms as were

9    negotiated, I don't think that would be a problem, but I defer

10   to co-counsel if they think it might be.

11         MS. YANG:  Yes, Your Honor.  Debra Yang.  I think

12   that, first of all, I think we want to discuss it with the

13   client and also do at least some sort of visual analysis of it.

14   I think everything, you know, as is requested, has to be

15   tethered under 17(c).  I haven't looked at all the different

16   charges for every specific defendant.  They are all

17   very -- even though they are the same kind of thing, they are

18   very unique as far as the process at which folks went to and

19   how they ultimately got admitted.  So I think we would want to

20   just take a look at that and do some analysis.  In good faith I

21   need to do that for the client and have that conversation.

22         But I hear what counsel is saying as far as efficiency

23   and being willing to execute on the protective order; I take

24   that to heart.  So if we could report back to the Court or, you

25   know, work that out with counsel, we'll do that.

SEALED PORTION REMOVED

1      THE COURT:  Sure, okay.  So I'm not going to make any

2  ruling now on the general discoverability of the information

3  for other defendants.  I assume there will be some overlap

4  about that, but I just think, for purposes of this hearing

5  today, I'll just hear from Mr. Weinberg, and I'll let you,

6  Mr. Vien and Mr. Kendall, work things out as best you can with

7  U.S.C. and perhaps the Government, if the Government is in

8  possession of certain things, and then if you have a problem,

9  to file something.  And I think it should be more abbreviated

10  than these proceedings have been because I'll have set some

11  parameters on what U.S.C.'s obligations are.

12      So I do wonder if we do seal part of this hearing if

13  it ought to be -- if the co-counsel ought to be excluded as

14  well.  I was thinking the Government would not be excluded.

15  But what's your view on that, Mr. Fuller?

16      MR. FULLER:  Your Honor, the Government, I agree,

17  should not be excluded, although I don't believe they're here.

18  Oh, sorry.

19      MR. O'CONNELL:  Your Honor, Justin O'Connell on behalf

20  of the Government.

21      THE COURT:  The Government is always here.

22      MR. FULLER:  The Government is here.  They are

23  everywhere.  But, yeah, we agree that the Government should be

24  here.  Obviously certain materials -- I'm sorry.  I should

25  stand.

—————————————— SEALED PORTION REMOVED ——————————————

1          THE COURT:  It's all right.

2          MR. FULLER:  -- that were submitted ex parte, the

3     Government hasn't, I believe, had seen those.  But to the

4     extent that we're going to be talking about what's been

5     produced and what's at issue in our papers, they are welcome

6     to -- we agree they should be there.

7          THE COURT:  Okay.  And what about other counsel in the

8     case?

9          Mr. Fuchs?

10         MR. FUCHS:  Just a moment, Your Honor.  I can speak or

11    I can -- I would say that they're not yet parties to the

12    protective order that we signed, and therefore, we would not be

13    comfortable at this point having them present for any

14    discussion --

15         THE COURT:  Sure, okay.

16         MR. FUCHS:  -- of confidential information.

17         THE COURT:  Yes, Mr. Vien?

18         MR. VIEN:  Your Honor, Mr. Kendall and I will sign the

19    protective order right now, and we think we should be privy to

20    these discussions in part because our entire analysis is --

21    there's one conspiracy charge, so if it's relevant to a member

22    of the conspiracy, it's relevant to all the members of the

23    conspiracy.

24         THE COURT:  Sure.  I mean, I'm not quite sure that

25    we're going to need to do the ex parte or the sealed hearing.

SEALED PORTION REMOVED

1    I don't know, Mr. Fuller, what you've prepared as far as your

2    argument goes.  Why don't we just go ahead and get started with

3    argument, and I'll try not to speak specifically about the

4    materials and give away -- at this point, I've read so much,

5    I'm not -- I don't trust myself not to say things that were in

6    an ex parte filing, but I'll try to ask general questions.  And

7    let's see how far we can get, and then if we need to exclude

8    the public, we'll do that.  And -- yes?

9            MR. WEINBERG:  Thank you, Your Honor.

10           MR. FUCHS:  Your Honor, sorry.  I just want to say

11   that I was going to be taking the lead on the argument

12   responding to defendant Zangrillo's remaining outstanding

13   issues and everything about those issues involves what has

14   already been produced to defendant Zangrillo and which is

15   subject to the protective order.  So it's almost impossible to

16   make any argument to discuss his outstanding requests without

17   referring back to the information that --

18           THE COURT:  That you provided.

19           MR. FUCHS:  -- the comprehensive information that we

20   produced subject to the protective order.

21           MR. WEINBERG:  I simply don't agree.  We had a public

22   hearing on the original motion to quash by U.S.C. that related

23   to filings we made that are highly relevant to the

24   decision-making today.  There are general disagreements between

25   U.S.C. and myself regarding, you know, the 17(c), the Nixon

—————————SEALED PORTION REMOVED—————————

1    test, whether we should superimpose some civil test and allow,

2    you know, U.S.C. to argue things accumulative, or prejudice

3    outweighs relevance, or concepts that are far into the Nixon

4    tests.  We can certainly address the generic issues.

5           I also wanted to just say one more thing since the

6    Government is here, which is that pursuant to the

7    confidentiality agreement, which I signed with U.S.C. in order

8    to expedite the production and minimize the litigation, I have

9    given to the Government as part of reciprocal discovery every

10   page, 242 pages to be precise, at least about 242, that I

11   received from U.S.C.  So the Government has it.  You know, they

12   need to evaluate whether or not that triggers their *Brady* or

13   Rule 16 obligations.  I certainly have a strong opinion whether

14   it does or not, but it's a second waif to try to cut through

15   the understandable issues that have been raised by Mr. Vien,

16   Mr. Kendall, and others who have offered to sign the protective

17   order with U.S.C., as well as the ordinary protective order.

18          I've communicated their willingness to sign the U.S.C.

19   confidentiality agreement in which case I could have provided

20   the documents directly to them but didn't because of the

21   conditions that I received them.  So I think U.S.C. can decide

22   whether to reconsider its communication to me telling me no,

23   you know, you can't give those documents even when people sign

24   the protective order; or two, the Government being here should

25   seriously think about whether or not in the next Rule 16

─────────SEALED PORTION REMOVED─────────

1    discovery to produce those documents to co-counsel.

2            THE COURT:  Well, okay.  So how about if you argue,

3    Mr. Weinberg, and Mr. Fuchs, if you find the argument is

4    encroaching on what you consider to be protected information,

5    I'll just count on you to object.  Yes?

6            MR. FUCHS:  That's fine, Your Honor.  I think that

7    when we have the opportunity to present our side in rebuttal,

8    if you are going to allow Mr. Weinberg to speak first, that we

9    would request that that be in camera because I know we're going

10   to want to refer to the protected material --

11           THE COURT:  Okay.

12           MR. FUCHS:  -- that we produced.  If Your Honor

13   then -- I just think it would be -- enable a more seamless

14   presentation of the issues, a discussion of all of the issues,

15   and then if Your Honor wants to come back out and issue

16   findings on the record that don't touch on the protected

17   material, that's of course your prerogative.

18           THE COURT:  Okay.  All right.  So I think I will let

19   Mr. Weinberg go ahead with the caution that we're taking a

20   narrow view of what's protected here, so.

21           MR. WEINBERG:  Thank you, Your Honor.

22           First, the context.  I think, you know, we have worked

23   with U.S.C. to try to avoid restarting the subpoena process

24   following the last hearing and issuing an amended subpoena if

25   it would, you know, build on our new and evolving knowledge of

─────────────SEALED PORTION REMOVED─────────────

1    how the U.S.C. program and practices work.  We've worked

2    together to narrow the disputes.  We've -- I've narrowed a

3    four-year subpoena to one year.  There's no need to search 22

4    different, you know, e-mail boxes for the deans of each of the

5    schools at U.S.C.  We've narrowed it down to Mr. Brunold and

6    Mr. Brennan, and we've signed the confidentiality agreement.

7         What's left is the three areas of dispute.  One being

8    the advocacy e-mails; two being U.S.C.'s desire to either

9    continue to broadly redact the documents that they've produced

10   to me or to superimpose the designations of the people whose

11   names they want to redact.  In other words, instead of having

12   an authentic document that says X donated money.  Please let

13   his student in, they want to eliminate X and say alumni or

14   parent or dean is advocating for parent, et cetera.  I'll

15   address that second.

16        The second part of the context is what U.S.C. produced

17   to the Government.  You know, they are represented by some of

18   the biggest and best law firms in the United States.  It's

19   simply implausible to me that with the argument they made they

20   didn't realize the Government would be producing to defense

21   counsel of indicted defendants what U.S.C. produced to the

22   Government, but they produced to the Government 250,000 pages.

23   It did not redact donors' names.  It did not redact sponsors'

24   names.  It did not redact anything.  It didn't redact students'

25   names.  And it provided the bases for the opposition that I

SEALED PORTION REMOVED

1    provided the Court that led to our original hearing.

2            They are taking a dramatically different position

3    regarding the 17(c) subpoena, and they're taking it, with all

4    due respect, you know, with what I think is an insensitivity to

5    the needs of a criminal defendant.  They don't get to decide,

6    you know, when I have enough evidence if the evidence matches

7    the Nixon test.  They don't get to argue, well, this might

8    embarrass, you know, a sponsor or donor.  They do get to raise

9    privileges, but they don't get to withhold documents because

10   they can argue I've got a list so I don't need an advocacy

11   e-mail, or they get to redact business records because they

12   don't want to have a name of a sponsor or a promoter or an

13   alumni or whoever is pushing for a particular student to be

14   part of the production when in the context I have precisely

15   that kind of evidence from the Government through Rule 16 but

16   narrowed to the athletic department.

17           And so I've made the argument that I need, for a whole

18   host of reasons, to detoxify the likely Government argument

19   that athletics and Donna Heinel and the athletic subco and all

20   of the athletic programs are different than the rest of the

21   university.  And the university shouldn't be defined by its

22   athletic department.

23           What I've tried to do in the original opposition

24   is -- and what I've received in exhibits, which we can discuss

25   in camera, is evidence that I think helps that detoxification.

─────────────────── SEALED PORTION REMOVED ───────────────────

1    It broadens the practices of the university, and that's

2    essential to my defenses.  So when you drill down to why these

3    documents that are in dispute are needed, first, they match the

4    Nixon test.  They're all admissible.  The unredacted list is

5    more admissible than a redacted list because it's an authentic

6    business record rather than a record that U.S.C. unilaterally

7    changed.

8          Second, it's specific.  We've negotiated specificity.

9    We've narrowed it to Brunold and Brennan.  We've narrowed it to

10   the year surrounding Amber Zangrillo's admission.

11         So the only third issue is relevance and materiality.

12   The principal overriding reason why the documents are necessary

13   is that Amber Zangrillo was advocated for by athletics as a

14   VIP, not as an athlete.  In other words, it may be

15   counterintuitive, but athletics, as we now know, advocates for

16   many students through the VIP process knowing that these are

17   not athletes.  Amber Zangrillo is particularly, you know,

18   emblematic of that because she suffered medical issues, that

19   she provided essays, character references.  Her entire

20   application was saturated with information that would

21   demonstrate to any admissions department this is not a world

22   class athlete.

23         So I want to show with the advocacy e-mails that are

24   being withheld, with the unredacted lists, that the other 22

25   departments advocate for their special interest students, not

————————————— SEALED PORTION REMOVED —————————————

1    necessarily say the history department because this is the

2    smartest high school historian or the film department because

3    this is the most talented future film director, but because

4    these are lucky students that have family or friends or

5    neighbors or sponsors or advocates that either have donated or

6    are perceived as likely to donate to U.S.C.  This is not unique

7    to U.S.C.  This is a --

8          THE COURT:  So don't the spreadsheets that you've been

9    given, even if they were further unredacted -- I know they're

10   heavily redacted -- demonstrate that?

11          MR. WEINBERG:  Yes, they demonstrate that.  And if

12   they're unredacted, they would demonstrate that better and

13   they'd be admissible, and I wouldn't have to trust U.S.C. what

14   to redact and what not to redact and what to give and what not

15   to give.  I don't think there's a privilege to anything that

16   they're redacting.  Putting that aside, yes, the list --

17          THE COURT:  I agree with what you say so far, as far

18   as the law concerning the restrictions on the information that

19   you should be receiving, but, you know, Nixon is very clear

20   that I have discretion to limit requests that are unreasonable

21   or oppressive, and I haven't found too much explication of that

22   in the case law.  But one way that your request might be deemed

23   unreasonable or oppressive is if you already have enough

24   information to make your point, and I hear you that you never

25   have enough evidence in your client's support, but if you can

—————————————SEALED PORTION REMOVED—————————————

1   make the point ably at trial that it could be unreasonable or

2   oppressive to kind of expose the inner workings of the

3   university when they find that to be either proprietary

4   information -- we know college admissions is a very hot topic

5   these days, and I don't know that U.S.C. should be made to lay

6   bare all of its admissions secrets when your client already can

7   cover his bases.

8           MR. WEINBERG:  I have strained to accommodate those

9   legitimate interests on U.S.C.'s behalf.  If Your Honor looks

10  at the lists, 30 columns are completely redacted.  We're

11  fighting about Column 31 and the "Notes and Comments" section.

12  So all of the --

13          THE COURT:  Well, I do want them to unredact some of

14  those columns for you even if they replace it with like a

15  generic description.  But with regard --

16          MR. FUCHS:  Your Honor, I'm sorry to interrupt --

17          THE COURT:  Yes?

18          MR. FUCHS:  -- but I did want to just pick up on

19  something Mr. Weinberg said.  We redacted information in the

20  spreadsheet that we're talking about either because it was

21  necessary to protect student privacy under FERPA, which

22  Mr. Weinberg agreed with, or alternatively, it reflected

23  proprietary information.  He's not arguing about that here

24  today.  The only thing that's at issue are the redactions of

25  individual names in the "Comment" section of that chart.  So

SEALED PORTION REMOVED

1    the chart itself as redacted is fine per agreement of the

2    parties.  The only thing at issue are the names in that last

3    column.

4                THE COURT:  Okay.  So in his brief he pointed out his

5    Exhibit 11, which -- do they have your Exhibit 11?

6                MR. WEINBERG:  Yes.  These are -- they certainly do

7    have everything, Your Honor.

8                THE COURT:  Okay.  So in Exhibit 11, for example, the

9    column titles are redacted, and I understand that you may be

10   referring to proprietary information because those are

11   admission criteria.

12               MR. FUCHS:  Yes, Your Honor, different than I think

13   what's in 11, although I need a moment to look at 11.

14               THE COURT:  Sure, but I just wonder -- so in Exhibit

15   11, the titles of columns are -- a lot of them are redacted and

16   the referral source is redacted, which I think could be, at the

17   very least, generically described.  But -- so I want you to

18   continue with your presentation, Mr. Weinberg, but I'm

19   interested in the question that U.S.C. raises which is why are

20   documents showing influential people lobbied Mr. Brunold, the

21   director of admission, for admission of particular people

22   relevant when no one did that for Ms. Zangrillo?

23               MR. WEINBERG:  And the answer is three or four reasons

24   why it is relevant.

25               THE COURT:  So one could be your client's state of

─────SEALED PORTION REMOVED─────

1  mind, right?

2          MR. WEINBERG:  Correct.

3          THE COURT:  And his understanding of how the process

4  worked?

5          MR. WEINBERG:  Yes.  He's in part a Los Angeles

6  businessman, although he spends time in Miami, and it is -- I

7  will be able to prove that it is widespread knowledge that

8  having a powerful person who's part of the, quote, Trojan

9  family advocate for you radically increases your chances for

10  admission.

11          THE COURT:  Well, sure.  And that actually seems -- I

12  think everyone probably assumes that to be true.  So I just

13  wonder, directing my question to U.S.C., is there some way to

14  admit this and then you don't have to turn over all these

15  documents, but you're -- Mr. Weinberg just knows at trial

16  you're going to answer that question yes?

17          MR. FUCHS:  To make the general point, Your Honor,

18  acknowledge the general point -- let me talk about the

19  compromise we have offered, which I think actually gets to the

20  issue that Mr. Weinberg is trying to prove much more cleanly

21  and crisply, and that is, rather than have names of people who

22  are meaningless to a Boston jury, an unknown to Mr. Weinberg,

23  we have offered to put in labels which define these people's

24  role or title in society which immediately demonstrate that

25  they are or are not people of influence.

─────────────SEALED PORTION REMOVED─────────────

1          THE COURT:  And people of -- and that would be

2    attested to -- I mean, one of the problems he raises is how

3    will I know that that's accurate, but you could have someone

4    attest that they have so designated these people and that

5    that's an accurate designation.

6          MR. FUCHS:  Yeah, in fact -- exactly, Your Honor, that

7    we have -- unfortunately we were unable to complete the

8    exercise prior to this hearing because it is -- it takes a

9    tremendous amount of work to check all the names in the

10   spreadsheet and in good faith to try to demonstrate who all

11   these people are.  But we would have someone who could do that,

12   if necessary, that they were -- they gathered information from

13   a variety of sources similar to the declarations that we

14   voluntarily put together and provided to Mr. Weinberg relating

15   to other information that we provided that I think Your Honor

16   is aware of that I'd prefer not to get into right now.

17         THE COURT:  Sure.  So let me just let Mr. Weinberg

18   continue.  Okay.

19         MR. WEINBERG:  In terms of why I would want more of

20   dividing up the advocacy e-mail, which I'll address secondly,

21   20 or so e-mails that have been provided ex parte from the

22   redaction issue:  One, it remains an inauthentic document.

23   It's a business record of U.S.C. that U.S.C. is unilaterally

24   changing.  I have no assurance from the Government that they

25   would not object and say what is this, it's not a business

─────────── SEALED PORTION REMOVED ───────────

1    record.

2              THE COURT:  Well, obviously if the Government refused

3    to admit such a document because it was redacted, it would have

4    to be unredacted, so.

5              MR. WEINBERG:  I have a second issue which is a jury

6    looking at what would obviously be something other than a

7    business record.  We have a "Notes and Comments" section or,

8    you know, "Referral" section or "Source," dean or trustee,

9    rather than a human being.  It would require an explanation to

10   the jury that U.S.C. made this objection and, you know, was

11   allowed to substitute, you know, labels for people.

12             THE COURT:  Sure.  I think these are the kind of

13   arguments that perhaps would be made to the trial judge about

14   the efficacy of using certain things and whether -- I mean, I

15   think that's something you could raise just for purposes of

16   discovering it and letting you prepare your defense.

17             MR. WEINBERG:  Third, if I could --

18             THE COURT:  Yes?

19             MR. WEINBERG:  -- you know, intervene before Your

20   Honor makes a preliminary decision?

21             THE COURT:  Sure, sure.

22             MR. WEINBERG:  I think I have a right to interview

23   some of the people.  Obviously I'm not going to interview 100

24   people.  Obviously I'm not going to try to call 100 people as

25   witnesses, but if I could find witnesses whose experience

─SEALED PORTION REMOVED─

1  matches Mr. Zangrillo's experience, I at least could, you know,

2  attempt to produce that witness and have them testify.  Jurors

3  need --

4          THE COURT:  So why is that admissible?

5          MR. WEINBERG:  It would be admissible, A, to show the

6  general knowledge of how the admissions process works from the

7  perspective of sponsors and donors as well as parents.  And,

8  you know, I would -- I'm going to try to legitimize -- despite

9  this kind of public passion that's played out in the media,

10 I've got a burden to legitimize donations, to demonstrate to

11 the jury they're not criminal.

12         THE COURT:  Sure.  I don't think you have much of an

13 uphill battle convincing a jury that if you give donations to a

14 school, you would improve your chances of getting in.  I mean,

15 I don't for a second believe Mr. Brunold's affidavit that he

16 submitted here, and I think it's belied by many of the

17 documents that we've received.  I mean, part of the problem

18 we're facing here is that I think you have a very basic fact

19 that you need to get across to a jury to support your defense

20 that I think jurors would have no problem accepting as true,

21 and U.S.C. has gone on the record saying that's not true.  So

22 you're digging assiduously for documents showing that donations

23 affected a person's chance of getting in, and U.S.C. is denying

24 that's true.  And I think it's caused U.S.C. a lot of trouble

25 here unnecessarily.  Even if the parting line there, which I

─────────────── SEALED PORTION REMOVED ───────────────

1  know may be we don't admit people because they make donations,

2  I just think that's not credible.

3        MR. WEINBERG:  But it's not credible given reality,

4  but to jurors who will come to the jury and believe that their

5  kids' chances to get in have, you know, have been minimized,

6  inequitably minimized or trivialized by a system, I've got an

7  uphill battle.

8        Mr. Zangrillo is presumed innocent, but from what I've

9  seen in the public media and in responses of the public media,

10  there is a passion against the wealthy or the influential

11  having any advantage, you know, in the system.  People may

12  recognize it but, you know, the line between what Mr. Rosen and

13  Mr. O'Connell, their team, will be arguing are appealing to

14  this sense that it is illegal not to have a meritocracy.  I've

15  got to prove that it is not only not illegal but that U.S.C. is

16  not a victim, and they made a victim impact statement and the

17  Government claims they're a victim.  They are not a victim.

18  They welcome people like Mr. Zangrillo.  They reward people who

19  are like Mr. Zangrillo who gave donations in the past, and they

20  welcome the students of the people that advancement targets for

21  potential donations in the future.

22        And this is the antithesis of being a victim of fraud

23  to claim that they've been denied money or property or that

24  their admissions slot is some wire fraud when so many people

25  similarly situated to Mr. Zangrillo, donors, people that know

SEALED PORTION REMOVED

1    donors, people that know past donors, people who might donate

2    in the future, are admitted.  But I've got to fully embrace a

3    practical burden despite the principles that the burden rests

4    exclusively on the Government.  I'm fighting a tidal wave of

5    negative and toxic publicity that doesn't make distinctions,

6    you know, other than anything that doesn't demonstrate

7    meritocracy is wrong, and jurors tend to have a shorter route

8    from feeling morally wrong to feeling like a crime than they

9    would if they felt the donation process was moral.  And so I'm

10   seeking, therefore, different categories of information.  I've

11   received the statistics through the declarations.

12        MR. FUCHS:  Your Honor, this is exactly what I wanted

13   to avoid having.

14        MR. WEINBERG:  I'm not naming the statistics.

15        THE COURT:  Okay.  All right.  So thank you for

16   objecting.  All right.  So why don't we -- you just address --

17   well, how much more do you have to say?

18        MR. WEINBERG:  Just one other area --

19        THE COURT:  Okay.

20        MR. WEINBERG:  -- which is that the relevance, and I

21   will not get into the specific documents, but why do I need the

22   advocacy e-mails?  Because I want to show that those e-mails

23   that the Government gave me, that they received from U.S.C.

24   that were Donna Heinel's e-mails to Tim Brunold, which are in

25   the -- which were not within our confidentiality agreement, are

SEALED PORTION REMOVED

1    not aberrational, that athletics was not an aberration, that

2    just like athletics urged -- not just by having lists but urged

3    through advocacy.  Whether it's on the phone I can't prove

4    without testimony, but if they did it by e-mail saying pick a

5    student from the list and urge his admission, I want to show

6    that was done by the Marshall School of Business, I want to

7    show that was done by the Annenberg School of Communications, I

8    want to show the development was involved.

9              THE COURT:  So you have the spreadsheets from those?

10             MR. WEINBERG:  I have the spreadsheet that shows --

11             THE COURT:  Advocacy.

12             MR. WEINBERG:  I have a spreadsheet that has the

13    "Notes and Comments" section that's heavily redacted, but I

14    have e-mails from Ms. Heinel to Mr. Brunold that I want to

15    match by showing that in the U.S.C. practice more was done than

16    just simply tagging students through lists.

17             THE COURT:  Okay.

18             MR. WEINBERG:  That individuals on that list got

19    special advocacy on one-to-one e-mails from people of power to

20    admissions and that Mr. Brunold's, you know, expected testimony

21    that he didn't want that and didn't consider that was

22    contradicted by the frequency that people sent him lists that

23    mentioned donations or sent him advocacy e-mails that explained

24    why a certain student, not because they were the best high

25    school theater person but because they were the daughter of a

SEALED PORTION REMOVED

1  wealthy donor or the daughter of a friend of a wealthy donor.

2  I need those individual e-mails because that's something the

3  jury can relate to.  That's something that matches what Heinel

4  did from the athletic special VIPs, and it's within Nixon.

5  They're relevant to my defenses.  They're relevant to the

6  defense that Donna Heinel was doing what the university

7  approved.

8          She didn't breach her honor services by reaching out

9  to Tim Brunold to support certain students.  She was doing

10  exactly what Pat Haden asked her to do and what the university

11  welcomed that she did.

12          THE COURT:  And right now the e-mails you're talking

13  about are the 20 e-mails that you were not given?

14          MR. WEINBERG:  Yes.

15          THE COURT:  Okay.

16          MR. WEINBERG:  I haven't seen them.  I can only

17  predict that they are para -- that if U.S.C. is fighting so

18  hard to withhold them that they in some respects further prove

19  by overriding case that U.S.C. is not a victim and Donna Heinel

20  did not violate 1346, at least in the way that she advocated

21  for Amber Zangrillo.  Mr. Zangrillo's state of mind was

22  accurate and circumstantially supported by the business records

23  of U.S.C., and in essence, athletics could advocate for

24  nonathletes, just like the history department, to name one of

25  22, who predictively have advocated for people not just because

SEALED PORTION REMOVED

1    of his skills as a future historian.  Thank you.

2            THE COURT:  Okay.  Okay.  So I think I will seal the

3    hearing, and I think the Government may stay but I'm not going

4    to have other defendants stay at this time.  And this is all

5    being recorded, Mr. Vein.  I know this displeases you, but

6    you'll be able -- you are not participating anyway.  There will

7    be a record of the hearing.  So -- and I think -- I'm happy to

8    entertain motions for transcripts of it in the future after the

9    parties have sorted out the protective order issue.

10            MR. VEIN:  Your Honor, I understand your ruling.  I'm

11    not going to belabor it and take your time.  I object to it,

12    but I want to move on.

13            Regarding the issue that brought us here, whether

14    U.S.C. will agree to give us, the rest of the defendants or at

15    least Mr. Wilson's attorney and me, whatever they give to

16    Mr. Weinberg, I was wondering if you could -- it seems like

17    it's a yes or no answer.  Could they tell us by Monday?

18            THE COURT:  Yeah, I'm no going to rule on that now.

19    U.S.C. hasn't had a chance to -- I don't know.  Did you talk to

20    them about this before today?  I'm not going to be hearing

21    argument on this, Mr. Vien.  That's not the purpose of this

22    hearing.

23            MR. VIEN:  I know.  I just wanted an answer so I don't

24    waste anybody's time.

25            THE COURT:  I know you do, but you're not going to get

SEALED PORTION REMOVED

1    one from me right now.  So -- okay.  So we'll just ask everyone

2    to step out, and I'll hear you argue, Mr. Fuchs.

3            MR. KENDALL:  Just so I can make my record, Your

4    Honor, I just want to note my objection that the Government is

5    going to hear things that I'm not going to hear, and that's

6    really my point.  We're all one conspiracy.  It's all one

7    prosecution team.

8            THE COURT:  So because we're talking -- the reason I'm

9    doing this, Mr. Kendall, is because you've had months to join

10   in this effort.  You show up at the hearing today unannounced,

11   take a seat at counsel table, stand up and address the Court as

12   if you're part of the hearing, which you are not.  And I think

13   I'm being very polite to you actually, and you can file

14   something.  This is being recorded.  You're not being shut out

15   permanently.  You can certainly get a transcript of it once

16   you're entitled by joining a protective order or whatever it is

17   you wish to do to hear the information that is presently

18   protected.  So I don't doubt that you are going to have a right

19   to this, but I'm just not going to rule on it right now.

20           MR. KENDALL:  Okay.  Thank you, Your Honor.

21           THE COURT:  Okay.

22           (All parties exit the courtroom.)

23                        *  *  *  *  *

24     (Recording and transcript is sealed from 12:44:49 to 1:46:13)

25                   SEALED PORTION REMOVED

─────────────────SEALED PORTION REMOVED─────────────────

1                      *  *  *  *  *

2              (On the public record.  Recording begins at 1:54:26)

3          THE CLERK:  Today is Tuesday, November 26th, 2019, and

4    we are back on the record in Criminal Case Number 19-10080, the

5    *United States versus Robert Zangrillo*, the Honorable M. Page

6    Kelley presiding.

7          THE COURT:  Okay.  And can we just have counsel

8    identify themselves again.

9          MR. FULLER:  Good afternoon, Your Honor.  Tony Fuller

10   along with Doug Fuchs and Deborah Wang for U.S.C.

11         MR. WEINBERG:  Martin Weinberg for Zangrillo.

12         THE COURT:  Okay.  So we have had a very lengthy ex

13   parte -- well, not ex parte, but under seal argument concerning

14   the issues that are still remaining with regard to the 17(c)

15   subpoena.  The Government, I will note for the record, was

16   present.

17             We are now back on the public record, and in the

18   interest of moving things along, I'm not going to enter a

19   written order.  I'm going to rule from the bench here.  So I'm

20   guided by *United States versus Nixon*, which I find to be the

21   leading case concerning 17(c) subpoenas.  And most relevant

22   here to my analysis is that in *Nixon* the Supreme Court said

23   that a 17(c) subpoena can be modified by the Court if

24   compliance would be unreasonable or oppressive, and I am -- I

25   agree with Mr. Weinberg in his filings concerning the

1    good-faith basis that he has for seeking certain information

2    from U.S.C., but I am balancing that against the trouble that

3    U.S.C. has to go to to produce the information.  And also, I do

4    credit U.S.C.'s representations concerning that it's

5    proprietary information about its admissions process and also

6    concerning the -- just the importance of keeping information

7    concerning donors and other friends of the university's actions

8    private.

9         So I also find that no one has suggested that any

10   information about individual students should be produced by

11   U.S.C.  These are prospective students, many of them are high

12   school students, some of them are minor, they have rights under

13   FERPA, and also, I find that they have a privacy interest.  The

14   information about them is extremely sensitive.  It involves

15   their test scores, their academic achievement, other people's

16   assessment of their abilities, et cetera, and so that is just,

17   I think, off the table, and I don't think anyone is seeking

18   that information but I would not allow it.

19        So with regard to the specific disputes here, I will

20   allow U.S.C. to produce the tables that were discussed with the

21   names of people redacted and the replacement of those names

22   with the person's role or a description of the person's

23   occupation as in the sample table that was handed up to me

24   during the hearing.  But I do want to caution U.S.C. that I'm

25   allowing its request for redactions, but I don't want to

SEALED PORTION REMOVED

1    disadvantage defendant in preparing for trial or especially, if

2    there is a trial, at the trial.  And so, for example -- an

3    example might be if the defendant wanted to establish that

4    deans involved in the communications at issue were from

5    different schools or departments across the university and a

6    witness said, oh, I can't tell because it's been redacted, then

7    that would be a problem and that should not happen.  Or if a

8    defendant cannot link -- if defendant cannot link different

9    e-mails to the same person because of the redactions, that's

10   going to be a problem.  So in other words, I want U.S.C. to

11   work with defendant to clarify matters and assist him in

12   working around the redactions if he has questions or if the

13   redactions make things unclear.

14        And if, as Mr. Weinberg has suggested, the Government

15   takes the position that redacted documents are not admissible

16   as business records or otherwise not usable at trial and they

17   otherwise would be admissible, then the documents may have to

18   be unredacted.  And my intention is not to render documents

19   inadmissible, and I think that would be patently unfair.

20        Mr. Weinberg also complains that he has no means of

21   checking the accuracy of the redaction of names and replacement

22   of those names with the description of the person's role, and

23   so, to ameliorate this, the redactions need to be accompanied

24   by an attestation, some kind of sworn statement from the person

25   who did the redactions.

1          So with regard to the 20 items that U.S.C. attached to

2    its filing and requested it not have to give to the defendant,

3    I do find that those are relevant but only the e-mails to

4    Mr. Brunold or where he's copied on them, and I will permit

5    U.S.C. to redact the names of the persons involved and replace

6    them with descriptions as you do in the table that was handed

7    up.  And I'm going to -- I want to make sure that these

8    materials are protected and they're not used without seeking

9    permission from the Judge.

10          So with regard to the additional donor information,

11   I'm going to find that it's in a balancing consideration, it's

12   troublesome for the school and not that relevant, and I'm also

13   not going to force U.S.C. to run additional search terms

14   through its system at this time.  Okay.

15          Any questions?

16          MR. FUCHS:  One question, Your Honor, with regard to

17   the 20 e-mails, there's also proprietary information reflected

18   in those.  Are we able to redact that information?

19          THE COURT:  So the proprietary information I think

20   you're referring to has to do with the admissions process

21   itself?

22          MR. FUCHS:  Yes.

23          THE COURT:  And I couldn't really understand what it

24   was while I was looking at it, and I wonder if you could file

25   something ex parte explaining what that is.

1          MR. FUCHS:  Yes.

2          THE COURT:  I noticed there were terms being used, but

3    I don't know what their significance is.  And I think I'll take

4    a look at that and rule further on that.

5          MR. FUCHS:  Thank you, Your Honor.

6          MR. WEINBERG:  Just the last thing, I'm sure U.S.C.

7    tends to preserve the original documents just in case we need

8    them at trial, and I would ask the Court to -- I would ask

9    U.S.C. to agree that any document that they provided redacted

10   form pursuant to Your Honor's orders, they would preserve the

11   unredacted documents so if needed it's available.

12         THE COURT:  Okay.  Any problem with that?

13         MR. FUCHS:  No, Your Honor.  I would just, though,

14   pick up on one thing you mentioned about seeking leave of Court

15   before these documents were to be used, these 20 e-mails, I

16   think you mentioned seeking leave of the District Court, we've

17   entered into a protective order with Mr. Weinberg, and I'm

18   wondering, Your Honor, if you would order that the protections

19   in that protective order govern the documents that were

20   produced to Mr. Weinberg so as to not limit them somehow --

21   limit the protection to the agreement between us and

22   Mr. Weinberg but actually protect the documents themselves.

23         MR. WEINBERG:  I don't know what Mr. Fuchs is relating

24   to.  We have two different means of protected documents in the

25   case, one is the protective order which is between all the

─────────────SEALED PORTION REMOVED─────────────

1   defendants and the U.S. Attorney's Office that prevents

2   dissemination and set for litigation purposes.  We have a

3   second confidentiality agreement between U.S.C. and myself that

4   prohibits me from using or in any way filing any of the

5   documents that I received from U.S.C. litigation, and I

6   consider that to include both anything I received as a result

7   of today's decisions as well as what I received several weeks

8   ago.  That protects U.S.C. against pretrial use except under

9   seal, absent the Court not wanting it under seal and I have to

10  give U.S.C. notice.  At trial there's an exhibit list, and to

11  the extent I would want to use any of the 20 exhibits, I would

12  be identifying them by date of e-mail but not by content on the

13  exhibit list.  The Government could object, and I'm glad to be

14  required to give U.S.C. notice as to the 20 e-mails about --

15          THE COURT:  Sure, I think the use of trial is one

16  thing, but I guess what is new here is that the documents are

17  being given to you, you're giving them to the Government, and

18  then they're governed by this much less strict rule.

19          MR. FUCHS:  Exactly, Your Honor.  And in order to

20  facilitate the distribution of the documents, which apparently

21  at least two of the defense counsel want, having a protection

22  over the documents that is no different than what Mr. Weinberg

23  has agreed to is what we're requesting.

24          THE COURT:  So, in other words, you -- I mean, I'm --

25          MR. FUCHS:  There can't be an end run around the

SEALED PORTION REMOVED

1    protective order.  In other words, they go to the Government

2    and then the Government is under some other obligation to do

3    something with those documents, and now they're no longer

4    protected.  We want the protections to run with the documents,

5    the same protections he's already agreed to.

6            THE COURT:  So I think it's hard if the documents run

7    to the Government and the Government isn't part of the

8    protective order for them to just magically be governed by a

9    protective order that they haven't acknowledged.

10           So I don't know -- here's what I would like you to do:

11   With -- let me just ask the Government since they're here.

12   Have you already distributed any of the materials that you got?

13           MR. O'CONNELL:  No, I don't think at this point.  I

14   think we only got the materials from Mr. Weinberg --

15           THE COURT:  Last week.

16           MR. O'CONNELL:  -- in the last week or so, and they

17   haven't gone out.

18           THE COURT:  Let me do this:  Let's have U.S.C. talk to

19   the Government about what you're going to do with documents

20   that you're given -- that defendants share with you because

21   they also have reciprocal discovery obligations that may

22   obligate them to give over certain of the documents they get

23   from you.  So let's have the Government either enter into

24   protective orders with defendants or U.S.C. or someone.  Let's

25   make sure those documents are still protected if U.S.C. wants

SEALED PORTION REMOVED

1    them to be, okay?

2         MR. O'CONNELL:  Your Honor, I think from the

3    Government's perspective, we concur with U.S.C.'s position and

4    Mr. Weinberg's position.  I think, if we've learned anything

5    from the last time in trying to negotiate a protective order,

6    the defense counsel sometimes does not, so I think it kind of

7    puts us in a little bit of a bind.  We do have those discovery

8    obligations.  We do have to produce that, but we can raise

9    those when they come up.  I heard Mr. Vien and Mr. Kendall say

10   today that they would enter an order.  I saw Mr. Kelly in the

11   back of the room.  I don't know what his position is.  But

12   we're open to those conversations.

13        THE COURT:  Well, I think this all gets complicated by

14   the fact that these documents may have absolutely no relevance

15   to some defendants who weren't involved at U.S.C., and also,

16   we've got -- this is such a big case that we've got a lot of

17   people potentially, even with that limitation, who might want

18   these documents.  So I'm going to just leave it up to the

19   parties to work together and figure out a way to protect these,

20   and I'm happy to sign off on anything you agree to.  And if you

21   can't agree, then we'll have a hearing on it.

22        MR. O'CONNELL:  Just for context purposes, Your Honor,

23   not to belabor the point, but most of the remaining defendants

24   do have a U.S.C. connection.  Some are purely testing, but most

25   of them are U.S.C.  So to the extent that these documents have

─────────────── SEALED PORTION REMOVED ───────────────

1    any relevance, which I know Marty and I have a respectful

2    disagreement on, for anybody, I think that they would be

3    pertinent if you assume the relevance of those documents.

4         MR. FUCHS:  And we will try to work with Mr. Weinberg.

5    He's offered to before to help in this regard, and we'll work

6    with the Government as well to try to get everyone who has a

7    U.S.C. connection or who otherwise might get these documents to

8    sign off on the same protective order that Mr. Weinberg signed

9    off on.

10        THE COURT:  Okay.  And if you're encountering problems

11   with that, let's not let time go by because I think time -- the

12   time is getting narrower here in this case, and we'll -- I'm

13   happy to hear you by phone.  You don't have to come all the way

14   from California or local counsel or whatever, and we'll try to

15   work through those issues, okay.

16        MR. FUCHS:  Thank you, Your Honor.

17        MR. WEINBERG:  Thank you, Your Honor.

18        MS. WANG:  Your Honor, thank you for hearing us during

19   the week of Thanksgiving, too.

20        THE COURT:  No problem.

21        (Recording ends at 2:09:11)

22

23

24

25

SEALED PORTION REMOVED

1              CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the audio recorded proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9              Dated this 3rd day of December, 2019.

10

11

12          /s/ Linda Walsh_____

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25