UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) |
| v. | ) ) No. 19-CR-10080-NMG |
| DAVID SIDOO, *et al.*, | ) ) ) |
| Defendants | ) ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR PRODUCTION OF PURPORTEDLY EXCULPATORY EVIDENCE REGARDING
<u>WIRETAP AND CONSENSUAL RECORDINGS</u>**

The government respectfully files this response in opposition to the defendants' motion to compel the production of non-pertinent Title III interceptions and consensual recordings. Although styled as a motion to compel the production of exculpatory evidence, the defendants' motion amounts to little more than an impermissible fishing expedition and demand for the early disclosure of Jencks Act and *Giglio* material, and should therefore be denied.

**BACKGROUND**

As part of the investigation leading to the filing of charges in this case, the government initiated a Court-authorized wiretap of William "Rick" Singer's cellular telephone on or about June 5, 2018. The wiretap lasted until late September 2018, at which point government agents approached Singer, who thereafter consented to the monitoring of his phone. This consensual monitoring continued until on or about March 14, 2019.

In the wake of the defendants' indictment, the government began producing Rule 16 discovery in or about May 2019. To date, the government has produced over 4,000 intercepted communications, including every substantive call between Singer and the defendants, and every call between Singer and coaches or parents that includes a discussion of college admissions or the

crimes charged in this case and *United States v. Ernst, et al.*, No 19-CR-10081-IT. In addition, the government has produced line sheets and monitoring logs—which include call synopses—for <u>all</u> Title III interceptions, whether those calls were deemed pertinent or non-pertinent. In short, the government's discovery productions have far exceeded the requirements of Rule 16.

The defendants' contention that the government has withheld 7,825 intercepted Title III communications is incorrect. Close to half of the 7,040 unproduced Title III communications have no content because the telephones never connected or there was no answer, as the call logs the government has produced make clear. In total, only 856 completed calls and 951 text messages with readable content—all of which were reviewed and deemed non-pertinent by the monitoring agents—have not been produced, as set forth in the table below. (As noted, the defendants have received line sheets summarizing each of the non-produced calls.)

| Title III Interceptions (classifications by monitoring agents) ||
|---|---|
| No Audio/Content | 3,420 |
| SMS Non-Pertinent | 2,615[1] |
| Pertinent [Calls] | 1,473 |
| Non-Pertinent [Calls] | 858[2] |
| SMS Pertinent | 775 |
| Duplicate Session | 93 |
| Privileged | 53 |

---

[1] Of the 2,615 text messages classified as non-pertinent, 1,664 have no content, contain system messages such as "voicemail waiting," or contain only unreadable application data/MMS content.

[2] Two of these interceptions are in fact text messages, not calls.

| | |
|---|---|
| Not Monitored | 1 |
| Total | 9,288 |

The defendants' contention that the government has withheld 6,512 intercepted consensual communications is also mistaken. More than half of the 6,566 unproduced consensual sessions have no content. In total, only 892 calls and, at most, 727 text messages with readable content have been deemed non-pertinent and not produced, as set forth below.

| Consensual Interceptions (classifications by monitoring agents) | |
|---|---|
| No Audio/Content | 3,659 |
| SMS Non-Pertinent | 1,727[3] |
| Pertinent [Calls] | 1,402 |
| Non-Pertinent [Calls] | 895[4] |
| SMS Pertinent | 647 |
| Unknown | 77 |
| Duplicate Session | 155 |
| SMS Review | 38 |
| Privileged | 11 |
| Malfunction | 3 |
| Administrative | 1 |

---

[3] Of the 1,727 text messages classified as non-pertinent, at least 1,000 have no content, contain system messages such as "voicemail waiting," or contain only unreadable application data/MMS content.

[4] Two of these interceptions are in fact text messages, not calls, and one has no content.

3

|  |  |
|---|---|
| Total | 8,615 |

Many of the communications that were deemed non-pertinent are personal in nature. For example, of the approximately 30 hours of Title III recordings that agents deemed non-pertinent,[5] nearly six hours' worth are calls between Singer and members of his family, including his parents, son, brother, and ex-wife. At least four-and-a-half hours' worth are calls between Singer and women he dated. More than four hours' worth are calls between Singer and airlines or other travel providers.

Likewise, of the approximately 52 hours of consensual recordings agents deemed non-pertinent,[6] over 30 hours are calls between Singer and members of his family or women he dated, as are hundreds of the non-pertinent text messages the government intercepted, either consensually or pursuant to Title III.

Government attorneys are currently re-reviewing <u>all</u> of the calls and text messages that agents previously reviewed and deemed non-pertinent. The government expects this second review to be completed no later than February 28, and will produce any communications discoverable pursuant to *Brady*, the Jencks Act, or *Giglio* as required by the Local Rules.

## ARGUMENT

The defendants' motion seeking the production of all non-minimized Title III interceptions and all consensual recordings and text messages—in other words, *all* interceptions that have not been produced to date—should be denied for two reasons. <u>First</u>, the defendants have not articulated

---

[5] The total duration of the non-pertinent Title III calls is 29:34:33. More than half of the calls are less than one minute long.

[6] The total duration of the non-pertinent consensual calls is 52:17:10. Nearly half of the calls are less than one minute long.

with particularity how any of the materials they seek are exculpatory, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Second, to the extent these materials may become discoverable as *Giglio*, impeachment information, or pursuant to the Jencks Act, 18 U.S.C. § 3500, the defendants' motion is premature.

### A. Applicable Law

*Brady* and its progeny do not create a general right to criminal discovery. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1997) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."). Rather, *Brady* obligates the government "to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011). A *Brady* request "cannot consist of mere speculation," and a defendant "should be able to articulate with some specificity what evidence he hopes to find in the requested materials, why he thinks the materials contain this evidence, and finally, why this evidence would be both favorable to him and material." *Id*.

### B. The Defendants Fail To Articulate How the Materials They Seek Are Exculpatory.

The defendants fail to articulate how any of the materials they seek are exculpatory, as required by *Brady* and its progeny. Indeed, the sweeping nature of their request—which seeks *all* consensual and non-minimized Title III interceptions—lays bare that their motion is little more than an impermissible fishing expedition.

1. *Title III Interceptions*

First, the defendants have failed to identify *a single* call or text message intercepted pursuant to Title III that they contend is exculpatory, despite the fact that the government has produced the line sheets and monitoring logs for *all* such communications. The materials the government has produced contain sufficient information for the defendants to assess the relevance

5

of the communications, to conduct a minimization analysis, and to satisfy themselves that the non-pertinent communications do not contain exculpatory information.[7] The defendants' failure renders this prong of their motion fatally deficient, and makes clear that their demand for "[t]he full set of audios," D.E. 681 at 6, is simply an effort to troll through all of Singer's communications in the hope that something will turn up. That is not permitted. *See United States v. Caro-Muniz*, 406 F.3d 22, 29 (1st Cir. 2005) ("*Brady* does not permit a defendant to conduct an *in camera* fishing expedition through the government's files") (internal quotation omitted).

The defendants acknowledge that, in many instances, the information they seek is simply "the presence or absence of a particular communication"—including, for example, whether Singer was telling the truth (in recordings that have been produced) about his relationships with certain high-profile clients and university athletic coaches. *See* D.E. 681 at 5, 6. Such information, however, is not exculpatory, because it is neither favorable to the defendants nor material to their guilt. Even if, as they contend, Singer made false claims to "foster[] trust and boost[] his perceived legitimacy," *id.* at 5, that has no bearing on whether the *defendants* had the requisite intent to commit the charged crimes, and are guilty of those crimes.[8] In any event, the logs the government has produced contain the information the defendants seek. To the extent they do not reflect a particular communication, it does not exist. To the extent they do reflect a particular

---

[7] To the extent the defendants review the line sheets and identify specific communications that they believe contain exculpatory information, the government will address such requests on a case-by-case basis.

[8] For example, whether Singer had a relationship with ▮▮▮▮▮▮ at the time of his call with Sidoo in 2018 is irrelevant to whether Sidoo intended to engage in the college entrance exam cheating scheme on behalf of his two sons years earlier. Similarly, whether Singer actually spoke to the USC crew coach regarding Zangrillo's daughter is irrelevant to whether Zangrillo agreed to pay $250,000 to bribe the coach to facilitate his daughter's admission to USC as a purported crew recruit.

communication that has not been produced—and that the defendants contend is exculpatory—the defendants can ask for it.

Second, to the extent the defendants seek Singer's unproduced communications to prepare for his possible testimony at trial—pursuant to Section 3500, to demonstrate bias, or, as they suggest, to "undermine [Singer's] credibility," D.E. 681 at 6—their motion is premature. No trial date has even been set in this case. Local Rule 116.2(b)(2) requires only that Giglio and impeachment information be produced no later than 21 days before trial. And the law is clear that the Court may not compel the disclosure of statements pursuant to the Jencks Act before the conclusion of a witness's testimony on direct examination. *See, e.g., United States v. Grandmont*, 680 F.2d 867, 874 (1st Cir. 1982) (courts "may not compel the disclosure of statements before the conclusion of [the witnesses'] direct testimony"); *United States v. Owens*, 933 F. Supp. 76, 81 (D. Mass. 1996) (Young, J.) ("[D]istrict Court judges may not, over the government's objection, compel pretrial disclosure of nonexculpatory Jencks Act material earlier than the close of a witness's testimony on direct examination.").

   2. *Consensual Interceptions*

The defendants' request for all consensual interceptions is equally unavailing.

First, as with their request for non-pertinent Title III intercepts, the defendants do not even attempt to meet their burden of articulating with specificity what evidence they hope to find and why it would be exculpatory. Instead, they simply assert, without more, that "[t]he mere fact that the consensual recordings were made while Singer was cooperating with the government strongly suggests that the communications are exculpatory in nature." D.E. 681 at 4. This bare assertion— which makes no logical sense—fails to meet the standard set forth in *Prochilo* and makes clear

7

that the defendants are improperly attempting to use *Brady* as a discovery device.[9]

Second, as with the Title III interceptions, the defendants effectively concede that they seek the non-pertinent consensual interceptions as *Giglio*, Jencks, or impeachment information, asserting "that any and all such communications *have the potential* to demonstrate Singer's bias and interest in favor of furthering the government's investigation." D.E. 681 at 4 (emphasis added). But the defendants' unsupported contention that consensual recordings deemed non-pertinent may *potentially* demonstrate bias on the part of a *possible* witness does not entitle them to early discovery of 21-day material.

Similarly speculative is the defendants' assertion that the non-pertinent interceptions are likely to include evidence of Singer's attempts to impede the government's investigation, his attempts to broaden his legitimate business interests (which the defendants argue is indicative of Singer's subjective belief that he will not be incarcerated), and false statements to prospective clients. Indeed, the defendants' contention, in back-to-back sentences, that the recordings will likely include *both* information demonstrating Singer's "bias and interest in favor of furthering the government's investigation" *and* "evidence of Singer's attempts to impede the government's investigation," *id*., reveals the extent to which their motion is simply a fishing expedition. In any event, neither category of evidence constitutes *Brady*, and the defendants do not, because they cannot, articulate with specificity how the evidence they seek is favorable to them and material.

---

[9] The defendants contend that because there is no log of the unproduced consensual interceptions, there is no way for them to identify any particular relevant communication. But the lack of a log does not entitle the defendants to circumvent their burden under *Brady* and its progeny. Moreover, Title III does not apply to consensual recordings, *see* 18 U.S.C. § 2511(c)(2), and neither log sheets nor logs are required for consensual recordings. To the extent there are any notes concerning such recordings, Fed. R. Crim. P. 16(a)(2) provides that they are not subject to disclosure. In any event, defendants *do* have a log for the Title III recordings and have nevertheless failed to specifically identify any exculpatory calls.

### C. Production of Any Discoverable Interceptions in Accordance with the Local Rules Will Not Result in Delay.

As the government has noted, attorneys are currently re-reviewing the unproduced Title III and consensual communications and will produce any discoverable materials in compliance with the Local Rules. Contrary to the defendants' argument, this should not result in any delay of the proceedings.

As set forth above, there are a limited number of calls and texts that have not been produced, and the government is currently conducting a second review of all of them—a process that, despite the small size of the government team, will be completed no later than February 28. Nearly all of the communications are in English. To date, over 40 attorneys have entered notices of appearance on behalf of the remaining defendants—many from large firms. Accordingly, the defendants' claim that they will be prejudiced by an "eve of trial" production is premature and implausible. Consistent with its practice, the government will produce any discoverable materials in compliance with the Local Rules and in ample time for the defendants to review them prior to trial.

### CONCLUSION

For the foregoing reasons, the defendants' motion should be denied.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

Dated: January 14, 2020          By:   */s/ Leslie A. Wright*
                                       ERIC S. ROSEN
                                       JUSTIN D. O'CONNELL
                                       LESLIE A. WRIGHT
                                       KRISTEN A. KEARNEY
                                       Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

Dated: January 14, 2020        By:    */s/ Leslie A. Wright*
                                                                LESLIE A. WRIGHT
                                                                Assistant United States Attorney