UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL**

The government respectfully files this consolidated response in opposition to the motions

by defendants Lori Loughlin, Mossimo Giannulli, William McGlashan, Jr., and John Wilson

seeking to compel the production of purported *Brady* and Rule 16 material.  The defendants'

motions are little more than an attempt to force the early disclosure of FBI interview reports of

potential witnesses to which the defendants are not entitled at this stage of the proceedings.   Their

efforts to recast core 21-day material as "exculpatory evidence," even as they assert that they are

entitled to the *inculpatory* statements of potential trial witnesses under Rule 16, are without merit

and should be rejected.

The reality is that the government has scrupulously adhered to its discovery obligations in

this case, and gone well beyond those requirements, by producing an extraordinary volume of

evidence.   To date, those productions have included more than 1.5 million pages of e-mails seized

pursuant to search warrants, nearly 500,000 other documents, more than 2,000 pages of legal

process, and over 4,000 intercepted or consensually recorded telephone calls and text messages.[1]

---

[1] By contrast, only two of the defendants have produced any reciprocal discovery.
Defendant McGlashan has produced a single document—an ACT score report from an exam
administered six months after his arrest—while defendant Robert Zangrillo has produced materials
he received in response to a subpoena to the University of Southern California ("USC").

The government has also re-examined numerous FBI interview reports in response to the defendants' discovery demands, and has made additional disclosures from those reports, notwithstanding its disagreement that the information has any exculpatory value.[2]   And the government is likely to make supplemental disclosures as additional witnesses are interviewed, and will produce supplemental discovery as required by the rules and applicable law.

In short, notwithstanding the defendants' hyperbolic and unsupported claims, the government is not withholding any exculpatory evidence.   For that reason, and the reasons set forth below, the defendants' motions should be denied.

## INTRODUCTION

The defendants are charged with conspiring to commit wire fraud, honest services fraud, and federal programs bribery, and related substantive crimes, in connection with their involvement in a sprawling scheme to secure the admission of their children to elite colleges and universities through bribery and deception.   The alleged conspiracy involved fabricating the children's athletic credentials and paying off corrupt university employees—including through contributions to university funds over which the employees exercised discretion, or which otherwise benefited them professionally—to facilitate the children's admission as purported athletic recruits, in breach of the employees' duty of honest services to their employers.   Defendant McGlashan is also charged with participating in a second prong of the conspiracy:   cheating on his son's college

---

[2] Together with this filing, the government is providing the Court, on an *ex parte* basis, copies of all FBI reports completed thus far that relate to substantive statements by William "Rick" Singer, as well as copies of the government's letters to the defendants disclosing certain information from those reports, so that the Court can review those materials *in camera*. The government anticipates making supplemental disclosures to the defendants in the next few days after this brief is filed concerning the most recent interview reports, and will likewise provide those disclosures to the Court.   In addition, the government will file all exhibits referenced herein on the docket with redactions in accordance with the protective order, dated May 2, 2019.

entrance exam by bribing a corrupt test center administrator to permit a purported proctor to secretly correct the exam answers.

Although the defendants have advanced various arguments in their motions, their principal contention is that, absent an understanding that their money was going to university employees *personally*—that is, into the employees' pockets—they cannot be guilty of federal programs bribery or honest services fraud.[3]   They thus seek, *inter alia*, evidence about what the conspiracy's architect, William "Rick" Singer, told them about how their money would be used—such as whether it would go to a university program, or to a coach personally—and what "the university" knew about those funds.[4]   They also seek, variously, evidence of:   Singer's other bad acts; any promises, rewards, or inducements Singer (or other potential witnesses) received; and how Singer built his business through referrals.   In addition, defendant McGlashan seeks evidence concerning his purported decision not to pursue the "side door" scheme, and a purported entrapment defense.

The defendants accurately note the government's disagreement that the evidence they seek is exculpatory.   That disagreement, however, is not the basis for the instant discovery dispute, as they contend.   To the contrary, as set forth in greater detail below, the facts are these:

- The government has produced e-mails, financial records, audio recordings, and other documentary evidence in its possession, custody or control pertaining to each of the categories of information the defendants seek.   The government has not withheld any such evidence based on its disagreement about the merits of the

---

[3] *See, e.g.*, Dkt. 693 at 9 ("*even if* Giannulli and Loughlin believed that KWF was using their payments to make these sorts of legitimate donations to USC—and not to bribe Heinel in her personal capacity—they lacked the requisite *mens rea* for bribery"); Dkt. 697 at 23 ("in explaining the 'side door' scheme, Singer never explained that the money would be going to any individual, much less to facilitate a fraud as part of a quid pro quo.  He explained only that the money would be going to a USC department—a financial transaction that could be a legitimate donation.").

[4] *See, e.g.*, Dkt. 693 at 7 ("Also highly relevant is what USC knew about Singer's alleged college-admissions operation. If, for example, USC knew of Singer's operation and accepted donations to the university from Singer's clients as legitimate, then not only was there no bribery at USC, but also no fraud conspiracy at all.").

defendants' requests. These materials include voluminous evidence of what Singer said to the defendants, and other clients, about his business, his scheme, and how their money would be allocated, as well as evidence of where the money actually went. The materials also include evidence of USC's admissions and development policies and practices, its employees' interactions with Singer, and its reaction to learning of possible irregularities in the applications of several students Singer advised (which included unwittingly designating a co-conspirator, USC athletics administrator Donna Heinel, to investigate).

- The government has reviewed the FBI 302 reports of interviews with Singer, and has disclosed or will soon disclose *any* potentially exculpatory statements reflecting Singer's memory of what he told the defendants about where their money should be sent and how it would be used.

- The government has likewise reviewed the FBI 302s of its interviews with USC employees, but has found no evidence that anyone in the USC admissions or development offices, or anyone senior to Heinel in the athletics department, was aware of the alleged scheme.

Accordingly, virtually all the evidence the defendants seek either does not exist or has already been produced. The instant dispute is about the fact that the government has declined the defendants' demand to produce the full FBI 302s and notes of its interviews with potential witnesses—notably, Singer and various employees of USC. But those are materials to which the defendants are simply not entitled at this stage of the proceedings.

## RELEVANT FACTUAL BACKGROUND

The defendants ground their motions on a description of themselves as unsuspecting participants in what they understood to be a "legitimate admissions process," who sought "to advance their children's prospects of admission" by making donations they hoped would "have a material effect on admissions decisions." Dkt. 693 at 8. Relying on a sanitized rendition of the facts—which, among other things, ignores the defendants' knowing fabrication of their children's credentials as part of the effort to have them admitted to college as fake athletic recruits—they accuse the government of withholding evidence that they acted in good faith, were duped by Singer, or that the university was fully aware of what they were doing. But that is not what

4

happened, as an accurate overview of the facts makes clear, which is why the "exculpatory evidence" the defendants purport to seek simply does not exist.

## I.    Lori Loughlin and Mossimo Giannulli

Defendants Loughlin and Giannulli (collectively, the "Giannullis") began working with Singer in the summer of 2015.   By April 2016, Giannulli and Singer discussed a "game plan" to secure the admission of the Giannullis' older daughter to USC.   *See* Ex. A (Apr. 22, 2016 e-mail chain).   In August 2016, Singer told the Giannullis that he would "create a coxswain profile" for their daughter, and noted that "[i]t would probably help to get a picture with her on an ERG in workout clothes *like a real athlete* too."   *See* Ex. B (Aug. 18, 2016 e-mail chain) (emphasis added).   In fact, the Giannullis' daughter did not row crew, and was not a coxswain.   Yet, Giannulli, copying Loughlin, replied, "Fantastic. Will get all."   *Id*.   Giannulli later e-mailed Singer a picture of his daughter posing on an ergometer.[5]   *See* Ex. C (Sept. 7, 2016 e-mail); Ex. D (Oct. 7, 2016 e-mail chain).

While the Giannullis contend that "universities—*as part of their legitimate admissions process*—regularly solicit donations from the families of prospective students, and . . . such donations can have a material effect on admissions decisions," the Giannullis specifically *rejected* this "legitimate" approach.   Dkt. 693 at 8.   For example, just days after Singer updated the Giannullis that their daughter's "[p]rofile is being made as a coxswain and USC is awaiting my packet with the transcript, test scores and profile," Ex. E (Sept. 21, 2016 e-mail chain), Giannulli rebuffed a USC development official's offer to "flag" her application, writing, "I think we are

---

[5] Singer sent Heinel a falsified athletic profile that included this picture of the Giannullis' older daughter.   However, unbeknownst to the Giannullis, Heinel later asked Singer to update the profile with a picture of someone actually on a boat.

squared away." *See* Ex. F (Sept. 27, 2016 e-mail chain). Giannulli forwarded the e-mail to Loughlin, adding, "The nicest I've been at blowing off somebody." *Id*.

In October 2016, after Heinel secured the Giannullis' daughter's conditional admission as a recruited crew coxswain—without telling the subcommittee on athletic admissions that she had done so in exchange for a payment to a fund she had designated, or that the applicant was not, in fact, a coxswain—Singer instructed Giannulli to send Heinel a check in the amount of $50,000, payable to "USC Athletics." *See* Ex. G (Oct. 29, 2016 e-mail); Ex. H (coxswain profile).[6]

That same day, Giannulli told Singer that he was going to play golf with then-USC Athletics Director Pat Haden and planned on "saying nothing" about his daughter's admission to USC. *See* Ex. I (Nov. 1, 2016 e-mail chain). Singer replied, "Best to keep Pat out of it. When I met with him a year ago about [your older daughter] he felt you were good for a million plus." *Id.* Giannulli responded, "HAH!!" *Id.*

In March 2017, USC mailed the Giannullis' daughter a formal admissions packet, and her high school counselor had a call with a USC admissions officer. As the counselor's notes reflect, the USC admissions officer indicated that the Giannullis' daughter was "flagged" as an "admitted recruit for the crew team." Ex. J (Mar. 10, 2017 notes). The counselor responded that he had "no knowledge of [her] involvement in crew and based on what I knew of her doubted she was

---

[6] The Giannullis contend that the government's disclosure about Singer's direction to them is "affirmatively misleading." Dkt. 693 at 15 n.4. In that disclosure, the government advised the Giannullis of Singer's statement to investigators that he told the Giannullis that "in exchange for getting [their older daughter] admitted to the University of Southern California ('USC') as a recruited coxswain, they would need to write a $50,000 check to Donna Heinel at USC and pay an additional $200,000 through the KWF." The statement is not misleading. Nevertheless, to the extent the Giannullis believe it "is false and plainly exculpatory insofar as it impugns the 'credibility' and 'accuracy' of Singer's account more generally," *id*., they now have it—along with Singer's e-mail directing them how to make out the check, and the check itself—and can seek to impeach Singer with it should he testify at trial.

involved in crew." *Id.* Approximately one week later, Singer's bookkeeper e-mailed the Giannullis an invoice for a purported $200,000 contribution to Singer's charitable organization, the Key Worldwide Foundation ("KWF"). *See* Ex. K (Apr. 10, 2017 e-mail chain and invoice). Giannulli forwarded the invoice to his financial advisor, writing, "Good news my [older] daughter [ ] is in [U]SC . . . bad [news] is I had to work the system." *Id.* That day, the Giannullis wired $200,000 to KWF, and agreed to re-engage Singer to pursue their younger daughter's admission to USC. *See* Ex. L (Apr. 10, 2017 e-mail chain).

In July 2017, Singer e-mailed the Giannullis to request a photograph for their younger daughter's fake athletic profile, writing, "[i]f we want USC I will need a transcript, test scores and picture on the ERG." *See* Ex. M (Jul. 20, 2017 e-mail chain); *see also* Ex. M-1 (Aug. 6, 2017 e-mail chain and picture). In August 2017, after co-conspirator Laura Janke, who prepared the falsified profile, told Singer she needed additional information to "finish her resume and add a rowing club based off where she lives," Singer forwarded the request to Giannulli, who forwarded it to Loughlin. *See* Ex. N (Aug. 7, 2017 e-mail chain).

In November 2017, after Heinel secured the Giannullis' younger daughter's conditional admission as a recruited coxswain—again without telling the admissions subcommittee that she had done so in exchange for a payment to a fund she had designated, or that the applicant was not actually a coxswain—Singer forwarded the conditional acceptance letter to the Giannullis and asked them to "keep hush hush till March." *See* Ex. O (Nov. 16, 2017 e-mail chain and letter). Approximately two weeks later, Singer instructed the Giannullis to send a $50,000 check, payable to "USC Womens [sic] Athletics," to Heinel's attention at USC, noting that "the rest of the 200k

will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives h[er] final letter in March." Ex. P (Nov. 29, 2017 e-mail chain); *see also* Ex. Q (Dec. 5, 2017 check).[7]

In January 2018, Singer's bookkeeper e-mailed the Giannullis a $200,000 invoice from KWF. *See* Ex. R (Jan. 30, 2018 e-mail chain and invoice). Giannulli forwarded the invoice to his financial advisor, writing, "the last college 'donation' for [my younger daughter]. Can't I write this off?" Ex. S (Feb. 5, 2018 e-mail chain).

In October 2018, Singer—who by this point was cooperating with the government's investigation—called Giannulli at the direction of government agents. In the call, which was consensually recorded, Giannulli confirmed his understanding that his two $200,000 payments to KWF were "goin[g] to Donna Heinel at USC to get the girls into USC, through crew;" that the rowing information on his daughters' athletic profiles was fabricated; and that Singer would falsely tell the IRS that the $400,000 was to "help underserved kids." *See* Ex. T (Oct. 25, 2018 transcript). Loughlin subsequently made similar admissions. *See* Ex. U (Nov. 29, 2018 transcript).

## II.    William McGlashan Jr.

Defendant McGlashan first engaged Singer to provide counseling services for his children in or about April 2017. Prior to that time, a psychologist had recommended that McGlashan's son receive a testing accommodation of "time and one half." *See* Ex. V (June 2015 report). In September 2017, however—after engaging Singer—McGlashan's son e-mailed the psychologist to ask if he "could possibly get double time for the ACT/SAT tests," which would allow him to take the exam over two days. *See* Ex. W (Sept. 8, 2017 e-mail chain). The psychologist issued

---

[7] After receiving new instructions from Heinel, Singer directed Giannulli to make the $50,000 check payable to the "Galen Center," a USC arena for which Heinel was responsible.

the requested recommendation later that month, and in October 2017 the ACT granted the double-time accommodation for the exam.  *See* Ex. X (Oct. 21, 2017 e-mail and attachment).[8]

In November 2017, McGlashan's wife advised her son's high school that he would take the ACT exam at his school, which is located in the San Francisco area, on December 20 and 21. *See* Ex. Y (Nov. 13, 2017 e-mail chain).   One week later, however, McGlashan moved the exam to Singer's West Hollywood Test Center, hundreds of miles away.   McGlashan e-mailed his son's learning specialist the following explanation, "I am in LA with [my son] on Dec 9, and Rick ([my son]'s college councilor [sic]) has arranged for [him] to take the ACT test at a school while we are there over the weekend."  Ex. Z (Nov. 28, 2017 e-mail chain).

Two days later, Singer forwarded his bookkeeper the following message from McGlashan: "Can you send me details when I send the 50 payment and who I make it out to etc?"  Ex. AA (Nov. 30, 2017 text message).   The bookkeeper e-mailed McGlashan a $50,000 invoice from KWF for "payment regarding West Hollywood Prep."   *See* Ex. BB (Nov. 30, 2017 e-mail.

The following week, McGlashan directed his assistant to book a hotel room for the night of Friday, December 8, 2017, at the Waldorf Astoria in Beverly Hills, and to "make sure they fedexed the check to Key Foundation."  Ex. CC (Dec. 4, 2017, e-mail chain from 12:20 PM). McGlashan further directed the assistant to book a flight from San Francisco to Los Angeles leaving Friday at 6:30 p.m., and returning the next day in the early afternoon.  *See* Ex. DD (Dec. 4, 2014 e-mail chain from 10:00 PM).

---

[8]  McGlashan notes that in September 2019—six months after McGlashan was charged—his son retook the ACT and received a score of 33.  Although this fact is irrelevant to McGlashan's state of mind two years earlier, at the time of the charged fraud, McGlashan omits to note that immediately before the cheating scheme, his son received a score of 1190 on the Preliminary SAT, equivalent to an ACT score of approximately 24.

McGlashan and his son flew to Los Angeles via private jet on the evening of December 8, 2017. *See* Ex. EE (Dec. 8, 2017 flight details). Co-conspirator Mark Riddell purported to proctor the ACT exam for McGlashan's son the next morning. Despite having sought approval to take the test over two days, McGlashan's son completed it in a few hours, joining his father that same afternoon for the pre-arranged return flight to San Francisco. *See* Ex. FF (Dec. 9, 2017 flight details). Riddell thereafter corrected his answers, earning McGlashan's son a near-perfect score of 34, and co-conspirator Igor Dvorskiy, the West Hollywood Test Center's corrupt administrator, submitted paperwork to ACT, Inc. falsely indicating that the test had been administered over two days. *See* Ex. GG (ACT Administration and Payment Report). In January 2018, after learning his son's score, McGlashan sent a text to Singer that he was "[v]ery grateful." Ex. HH (Jan. 10, 2018 text messages).[9]

In the spring and summer of 2018, McGlashan's son sought to obtain 100 percent extended time for the SAT II subject tests. *See* Ex. II (Aug. 1, 2018 e-mail). The College Board denied the request, but allotted him 50 percent extended time. *Id.* In an August 2018 text to Singer, McGlashan inquired whether the reduced accommodation would allow his son to "take a test at one of your sites?" *See* Ex. JJ (Aug. 25, 2018 text message).

---

[9] McGlashan incorrectly contends that there is no evidence that Riddell corrected the exam answers. In fact, both Riddell and Dvorskiy have acknowledged the cheating under oath, in public proceedings of which McGlashan is undoubtedly aware. *See* Riddell Rule 11 Tr. at 17-18 (Apr. 12, 2019) ("in December of 2017, Riddell flew to Los Angeles where he proctored the ACT exam of the son of charged defendant Bill McGlashan. Riddell corrected the student's exam answers after the ACT test, earning the student a 34, which is a score in the top one or two percent in the nation."); Dvorskiy Rule 11 Tr. at 22 (Nov. 13, 2019) ("on December 9, 2017, the defendant administered the exam to a student from the San Francisco area as part of the cheating scam where Riddell corrected the students' answers after the exam. The father of this student paid Singer $50,000, and Singer, in turn, paid the defendant $40,000, which included the fees for this particular student and other students also participating in the testing scheme.").

McGlashan also discussed with Singer the accommodations that would be required for his two younger children to take their tests at one of Singer's "centers."  *See* Ex. KK (Jul. 30, 2018 transcript).  McGlashan asked, "And if they get time and a half, can they use your facility to take the test?"  *Id.* at 16.  Singer replied, "No, not unless it's multiple days."  *Id.*  McGlashan responded, "So as long as it's multiple days, we're in."  *Id.*  Singer explained that the doctor needed to "come up with stuff, discrepancies to show why he needs multiple days."  *Id.*  McGlashan replied, "Perfect," and Singer added that if the children received accommodations permitting them to take their exams over multiple days, "then I can control the center."  *Id.*  McGlashan, said:   "Got it, okay, I'll make sure [my wife] goes to work."  *Id.*

On the same call, Singer explained his side-door scheme for admission to USC.  Singer told McGlashan that although his older son would likely be accepted to USC if he were included on a VIP list, this route did not provide a guarantee.  *See generally id.* at 8-13 ("You haven't really sat in front of Tim [Brunold] and said, it's done.").  He explained that, by contrast, the "side door" would enable McGlashan's son to be admitted "before he even applies."  *Id.* at 10.  The process, he explained, would involve a fake athletic profile.  Singer said:

> I have to do a profile for him in a sport, which is fine, I'll create it.  You know, I just need him-- I'll pick a sport and we'll do a picture of him, or he can, we'll put his face on the picture whatever.  Just so that he plays whatever.  I've already done that a million times.

*Id.* at 11.  Singer also instructed McGlashan that, if they were to pursue the scheme, McGlashan should not ask his personal contacts at USC to lobby for his son's admission.  He explained:

> The quieter this is, the better it is, so people don't say, "Well, okay, this guy, why are all these people calling us? The kid's already been accepted.  He's coming here as an athlete.  He's already in."

*Id.* at 12.   Singer advised McGlashan to tell his son that he had "friends in athletics" and that,

"because [his son] is an athlete, and they're going to help us."   *Id.*   McGlashan rejected this idea,

noting, "I can't say that in front of [my son], 'cause he knows he's not."   *Id.*

Singer told McGlashan that the "side door" would cost $250,000, adding that McGlashan's

son would first receive an "unofficial" acceptance letter, at which point "they expect just a $50,000

check, and it goes to Women's Athletics. . . .   And then the other 200 comes in March, after you

get your official, official letter."   *Id.* at 10.   McGlashan replied, "I love it."   *Id.*

Three weeks later, Singer left McGlashan a voicemail explaining that, after meeting with

a USC employee, he planned to create a fake football profile for McGlashan's son.   He said:

> Because the [high school your son attends] does not have a football team, *I'm gonna
> make him a kicker/punter and they're gonna walk him through with football, and
> I'll get a picture and figure out how to Photoshop and stuff,* so it looks like it and
> the guy who runs the biggest kicking camp is a good friend, so we'll put a bunch
> of stuff about that on his profile, and we should be in pretty good shape to get that
> done.   It's just a matter of, when I get the profile done, get it to them and figure
> out when they're gonna have a sub-committee meeting, so I'll let you know.

Ex. LL (Aug. 22, 2018 voice-mail transcript).   McGlashan returned the call minutes later, and the

two men further discussed the scheme:

| Singer: | You got an NFL punter? |
|---|---|
| McGlashan: | I did.   That's just totally hilarious.   So he-- so this is for, so, the one part you were garbled at the beginning is, the school doesn't have a football team, meaning, obviously [USC] does. What does that mean? |
| Singer: | Your high school. |
| McGlashan: | Oh, the high school.   Yes, of course. Got it. |
| Singer: | So they asked me, "What sport could we put him through?" And I said, "Well, I don't want, you know," 'cause your school doesn't have football it's easy, because I can say, because they have all these kicking camps and these kickers always get picked up outside of the school-- |

| McGlashan: | Yeah perfect.   Perfect. |
|---|---|
| Singer: | So I'm gonna make him a kicker. |
| McGlashan: | (laughing) He does have really strong legs. |

Ex. MM at 1 (Aug. 22, 2018 transcript).   McGlashan then asked to confirm, "Just remind me again, we get all these done and the, the obvious deal you and I talked about, the 50K and the 200K.   And—and then, do we know he's in?   You and I at least know he's in?"   *Id.*

Two days later, Singer asked McGlashan to provide "an unofficial transcript, pdf of test scores and an action sports photo of [your son]?"   Ex. NN (Aug. 24, 2018 e-mail).   McGlashan e-mailed Singer his son's high school transcript and a copy of his fraudulent ACT score the next day.   *See* Ex. OO (Aug. 25, 2018 e-mail chain).   McGlashan later sent Singer multiple pictures of his son running and posing.   *See* Ex. PP (Aug. 26, 2018 e-mail).

Law enforcement agents approached Singer approximately four weeks later. On September 27, 2018, Singer told agents that he believed McGlashan would not be pursuing the "side door." That same day, however, McGlashan texted Singer, "How are you feeling on USC?" Ex. QQ (Sept. 27, 2018 text message). Singer replied, "No change [from] our conversations." *Id.* Two days later, McGlashan texted again, "So when will we know definitively on USC?" Ex. RR (Sept. 29, 2018 text messages).  Singer replied, "They had their [subcommittee] last week—football has a while before going through [subcommittee]—later in the fall as it is in season." *Id.*

After initially agreeing to cooperate with the government's investigation, Singer secretly approached McGlashan and several other subjects of the government's investigation.   Singer later acknowledged to investigators that he had called McGlashan (on an unmonitored line) and told him, in substance, that they should meet at the Santa Monica airport because Singer believed his

phone was "wired."   Singer further advised agents that he did not, ultimately, meet with McGlashan at the airport.

On October 24, 2018, after acknowledging his attempted obstruction and agreeing to plead guilty to an additional charge of obstruction of justice, Singer spoke with McGlashan by telephone again, this time at the government's direction.   *See* Ex. SS (Oct. 24, 2018 transcript).   In the call, which was consensually recorded, Singer told McGlashan that Riddell had been approached by IRS agents regarding payments he received from KWF.   *Id.* at 3-6.   During the call, McGlashan did not dispute that Riddell had taken the ACT for his son and acknowledged that he still intended to pursue the "side door" scheme once things "cleared up."   *Id.* at 6.   McGlashan said:

> I mean, the good news is – I mean, from my personal perspective, is, is, uh, you know, we, we s—sorta haven't done anything yet, which I'd prefer not to do in the context – *just till it's all cleared up exactly*, you know, what the dynamic is of the foundation. *I'd rather just sorta lay low.*

*Id.* at 5-6.

### III.   John Wilson

Defendant Wilson and his wife began working with Singer to gain entrance to USC through the "side door" in the spring of 2013.   Although Wilson's son was an accomplished water polo player, the communications between Wilson and Singer make clear that USC's water polo coach, Jovan Vavic, would purport to recruit him only in exchange for a payment, and required that his credentials be falsified.   In August 2013, for example, Wilson e-mailed Singer to ask, "What does Jovan need by sept 20? . . .   Do I make the first payment then?"   *See* Ex. TT (Aug. 24, 2013 e-mail chain).   Likewise, in October 2013, Singer advised Wilson, "Jovan has [your son]'s stuff and asked me to embellish his profile more, which I am doing." Ex. UU (Oct. 13, 2013 e-mail chain). Wilson responded, "When is Jovan going to be able to give us decision on USC?   And when do I pay u?   Was it 50% in nov?   50% in feb when we get final official notice?"   *Id.*   Singer replied,

"No payment of money till he gets a verbal and written from admissions and then 50 percent to a savings account I set up.  Then the remainder upon an acceptance letter in March with everyone else."  *Id*.  Later in October 2013, Singer sent Wilson the embellished profile, which included fabricated awards.  *See* Ex. VV (Oct. 19, 2013 e-mail and profile).  Just days later, Singer confirmed to Wilson that this "approach" would not require his son to actually "get in the pool."  *See* Ex. WW (Oct. 23, 2013 e-mail chain).

In February 2014, Vavic used the falsified profile to secure the admission of Wilson's son to USC, advising the admissions subcommittee, "This kid would be the fastest player on our team . . . this kid can fly, he was the captain of his [high school] team as sophomore, great work ethic, was ALL CCS, he is a legi[t] walk on who could end up playing for us very soon."  *See* Ex. XX (Feb. 26, 2014 e-mail chain).   Days later, Wilson sent Singer an e-mail with the subject line "USC fee," writing, "Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the key so that I can pay it from the corporate account?"  Ex. YY (Mar. 1, 2014 e-mail chain).   Singer replied, copying his bookkeeper, "Yes we can send you an invoice for business consulting fees and you may write off as an expense.   What is the name address etc you want the invoice to be made out to?"  *Id*.  Wilson responded with the name and address of his business, Hyannis Port Capital.  *Id*.

In March 2014, after Wilson's son received a formal admission letter, Wilson instructed his bookkeeper to wire $250,000 from Hyannis Port Capital to Singer's for-profit entity, The Key, and to ensure that the invoice reflected "Business Consulting."[10]   *See* Ex. ZZ (Mar. 29, 2014 e-mail chain).   Ultimately, Wilson's company paid Singer $220,000, comprised of a purported

---

[10] Wilson later corrected himself, noting that the payment would be for $200,000, not $250,000.

$100,000 donation to KWF, a $100,000 payment to The Key for purported "Business Consulting – August through June 2014," and a $20,000 payment to Singer personally.[11]  *See, e.g.*, Ex. AAA (Apr. 2, 2014 e-mail and attachments); *see also* Ex. BBB (Apr. 1, 2014 e-mail chain).   Wilson deducted the payments from his taxes as purported business expenses and a charitable donation. In April 2014, The Key issued an anonymous $100,000 cashier's check to USC Men's Water Polo, listing the "purpose/remitter" as "Wilson Family."  Ex. CCC (check).  Thereafter, USC athletics staff expressed puzzlement over the payment, which one employee described as the "mysterious $100,000 cashier check for water polo."   Ex. DDD (Jul. 22, 2014 e-mail chain).

In the fall of 2018, at approximately the same time that Singer began cooperating with investigators, Wilson inquired about potential "side door" opportunities for his twin daughters.[12] *See* Ex. EEE (Sept. 29, 2018 transcript).  In September 2018, Wilson asked, "Does it have to be a sports side door?"  *Id.* at 4.  Singer explained, "that's the easiest way to approach it, right . . . because all of the coaches have-- you know, they have guaranteed spots."  *Id.* at 4-5.  Wilson replied:

> What if they're not really that good?   I mean, they can do some crew, but I don't know they're gonna be good.   [One daughter's] not even that good competitively at sailing.   She just taught sailing and did sailing in, you know . . . yacht club.

*Id.* at 5.   Singer replied:

> At the end of the day, by the side door, I may be able to go to the sailing coach and say, "Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you

---

[11] The $20,000 payment was initially invoiced as "Special Consulting Income, Planning and Consulting August through June 2014," but the invoice was revised to "Special Consulting Income[.]  Concept design and implementation of Professional Development program for Hyannis Port Capital associates," after Wilson's bookkeeper expressed concern that it was insufficiently detailed to pass muster in an audit.   *See* Ex. AAA.

[12] The government believes that every conversation between Wilson and Singer in this timeframe was recorded.

know, you're gonna get a benefit, and the family's gonna get benefit. So are you will-- are you interested in doing that?"

*Id.* at 5-6.

In October 2018, Wilson confirmed that he wanted to pursue "side doors" for his daughters at Stanford and Harvard.   *See* Ex. FFF (Oct. 15, 2018 transcript).   At the direction of law enforcement, Singer told Wilson that his daughters "don't have to play.   They just-- that's the path I'm gonna get 'em in on."   *Id.* at 4.   Wilson replied, "Gotcha."   *Id.*

Two days later, Wilson's company wired $500,000 to KWF.   *See* Ex. GGG (Oct. 17, 2018 wire transfer).   Wilson e-mailed his bookkeeper, writing that the payment was a "$500k donation I am going to make this year.   Tax write off and help getting into colleges."   Ex. HHH (Oct. 17, 2018 e-mail chain).

In October 2018, Singer advised Wilson that he had secured a "side door" for one of Wilson's daughters at Stanford, and that the Stanford sailing coach, John Vandemoer, had hidden the deal from the university.   *See* Ex. III (Oct. 27, 2018 transcript).   Singer told Wilson that he had already paid "the Stanford sailing coach [$]160,000," and that, as a result, Singer was "guaranteed a spot for next year."   *Id.* at 1-2. Wilson inquired whether that was "all it takes?"   *Id.* at 2.   Singer responded, "That's not all it takes. . . .   This is not TJ Maxx or Marshall's or something like that."   *Id.*   He explained:

> I want you to have first dibs, like I told you. So if you want I can provide John Vandemoer-- which *I'm going to essentially send John directly the check, to the coach. I can send him your [$]500,000 that you wired into my account to secure the spot for one of your girls*.   I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors *so that Stanford doesn't catch on*.

*Id.* (emphasis added).   Wilson, laughing, responded, "Right."   *Id.*

In November 2018, Singer told Wilson he had secured an admissions spot at Harvard through a (fictitious) "senior women's administrator," and that, in exchange for $500,000, the administrator would designate one of Wilson's daughters as an athletic recruit to secure her admission.   *See* Ex. JJJ at 2-3 (Nov. 29, 2018 transcript).   Singer told Wilson that the total cost of both "side doors" would be $1.5 million:   $1 million to be paid in the fall and "250 will come in the spring for Stanford and 250 for Harvard in the spring."   *Id.* at 2.   Wilson asked whether this would involve a "team or anything like that," and Singer replied, "She'll figure it out. . . .   It doesn't matter the sport at this time. . . .   This is actually a better play at Harvard because she will just get her in through athletics in one of the sports but it won't matter."   *Id.* at 3.   In December 2018, Wilson's company wired another $500,000 to KWF.   *See* Ex. KKK (Dec. 11, 2018 wire transfer).

## ARGUMENT

The defendants' motions are premised on two remarkable claims:   <u>first</u>, that classic impeachment information and statements of potential witnesses that are inconsistent with the *defendants'* purported memory of events are "exculpatory," and thus must be produced pursuant to *Brady*; and <u>second</u>, that inculpatory statements of potential witnesses are "material to the defense," and thus need to be produced pursuant to Rule 16.   Those contentions are contrary to black-letter law, and would eviscerate the Jencks Act and the Local Rules, which set forth a clear and well-established timetable for the disclosure of witness statements.

### I.    Applicable Law

Local Rule 116.1 provides that, within 28 days of arraignment, the government must produce certain, specific materials to which defendants are entitled under FED. R. CRIM. P. 16, including documents that are material to preparing the defense or that the government intends to use at trial.   Rule 16, however, specifically *exempts* from discovery interview reports and notes

of government agents except as provided under the Jencks Act, 18 U.S.C. § 3500, which itself mandates only that the government turn over "written statements" of trial witnesses, or substantially verbatim recitals of oral statements by such witnesses, *after* they have testified on direct examination at trial.   Courts may not, over the government's objection, compel the pretrial disclosure of non-exculpatory Jencks Act material.  *See United States v. Grandmont,* 680 F.2d 867, 874 (1st Cir. 1982) ("A court may not compel the disclosure of statements of government witnesses before the conclusion of their direct testimony."); *United States v. Neal,* 36 F.3d 1190, 1197 (1st Cir. 1994).

*Brady* and its progeny likewise do not create a general right to criminal discovery.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one.").  Rather, *Brady* obligates the government "to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment."  *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011).  *Brady* requests "cannot consist of mere speculation," and a defendant "should be able to articulate with some specificity what evidence he hopes to find in the requested materials, why he thinks the materials contain this evidence, and finally, why this evidence would be both favorable to him and material."  *Id*.

Local Rule 116.2, in turn, distinguishes between different categories of "exculpatory information," and sets forth a timetable for their disclosure.  Certain categories of exculpatory information must be produced within 28 days of arraignment "or by any alternative date established by the Court."  L.R. 116.2(b)(1).  Those categories include, notably, "[i]nformation that would tend *directly to negate the defendant's guilt* concerning any count in the indictment or information," L.R. 116.2(b)(1)(A) (emphasis added), as well as information that would "cast doubt

on the admissibility of evidence that the government anticipates using in its case-in-chief and that could be subject to a motion to suppress or exclude;" information about promises, rewards or inducements to anticipated trial witnesses; criminal records of anticipated trial witnesses; a "written description of any criminal cases pending against a witness;" and "[a] written description of the failure of any percipient witness to make a positive identification of a defendant." L.R. 116.2(b)(B)-(F).

Other categories of "exculpatory information" must be disclosed not later than 21 days before trial. *See* L.R. 116.2(b)(2). Such "21-day material" includes, as relevant here, "[a]ny information that tends to cast doubt on the *credibility or accuracy of any witness or evidence* that the government anticipates calling or offering in its case-in-chief," L.R. 116.2(b)(2)(A) (emphasis added), as well as inconsistent statements of anticipated trial witnesses. *See* L.R. 116.2(b)(2). In this District, the government's frequent practice is to disclose Jencks Act material together with 21-day material, although the government sometimes elects to produce such material earlier where the volume is unusually large.

## II.    The Giannullis' Motion to Compel

The Giannullis seek to compel the production of "the full 302 Reports from [the government's] interviews with Singer, along with the underlying interview notes," Dkt. 693 at 25—information to which they are clearly not entitled under the plain language of Rule 16 and the Jencks Act.   They focus their motion on two specific categories of information: (1) what Singer told the Giannullis, and his other clients, about how their payments would be directed; and (2) what USC knew about those payments, and about Singer, and when.   While the government has already produced voluminous information on both of these topics, the Giannullis are not now entitled to inculpatory witness statements or statements concerning Singer's statements to third

parties, which are neither favorable to them nor material to their guilt. Accordingly, the Giannullis' motion should be denied.

> A. Singer's representations to the Giannullis and other clients regarding their payments

The defendants seek FBI 302 reports reflecting Singer's statements to the Giannullis, "about precisely how Singer would direct their KWF donations—and whether they would be used to benefit USC or Heinel or underprivileged children," Dkt. 693 at 14, as well as similar information about what Singer told other clients. The government disputes that this information is exculpatory, but has, in any event, already produced the relevant evidence in its original form, together with Singer's statements to government investigators about what he told the Giannullis concerning their money.

First, the government has produced all of Singer's e-mails with the Giannullis, which show that Singer directed them to send two $50,000 payments to Heinel at USC, shortly after their daughters were conditionally admitted to the university, as well as two additional $200,000 payments to KWF.[13] The government has likewise produced all of the Giannullis' e-mails in its possession, custody and control (including Mossimo Giannulli's e-mail to his financial advisor acknowledging, in connection with one of the $200,000 payments to KWF, that he had to "work the system" at USC.[14]

-----

[13] Search warrants were executed on certain defendants' e-mail accounts, and, while relevant materials from those accounts will be produced at the end of the month, the majority of this upcoming production are duplicative of items already produced to the defendants.

[14] Contrary to the defendants' suggestion, the government has never contended that Singer told the Giannullis that their money would be directed to Heinel personally. Rather, the Giannullis are charged with conspiring to bribe Heinel to facilitate their daughters' admission to USC as fraudulent athletic recruits in exchange for a contribution to a USC fund that benefited Heinel, in breach of her duty of honest services to USC. While the defendants may challenge the government's theory of the case as "legally flawed," Dkt. 693 at 170—notwithstanding the fact that 10 parents have already pled guilty to participating in the same scheme—they do not, because

Second, the government has produced copies of the checks the Giannullis sent to Heinel, which were made out to "USC Athletics" and "Galen Center Gift," as well as their wire transfers to KWF and the related invoices.

Third, the government has produced copies of all audio recordings of the Giannullis' calls with Singer, including the call during which Giannulli did not dispute Singer's statement that the money they paid to KWF was "goin[g] to Donna Heinel at USC to get the girls into USC, through crew." *See* Ex. T (Oct. 25, 2018 transcript).

Fourth, the government has likewise produced audio recordings and e-mails—obtained pursuant to Title III, search warrants, and consensually—of Singer's interactions with other clients, both charged and uncharged. Those interactions, while neither favorable *to the Giannullis* nor material to their guilt, are directly responsive to their request for evidence of what Singer said to *other* clients about where their money was going and what it was for. For example:

- In a call with McGlashan explaining the "side-door" scheme, Singer said that the deal cost $250,000, with the first $50,000 paid to Women's Athletics and the remaining $200,000 paid after McGlashan's son received his "official letter" of admission to USC. *See* Ex. KK at 10 (Jul. 30, 2018 transcript).

- In a call with Agustin Huneeus, Singer said that after Huneeus's daughter was conditionally admitted to USC as a purported water polo recruit, Huneeus

_____

they cannot, cite any case law suggesting that a bribe is permissible so long as it is not paid to an employee personally. To the contrary, the Supreme Court made clear in *Skilling v. United States* that a corporation can be deprived of the honest services of its employee even though the corporation benefits financially from the scheme. 561 U.S. 358, 400 (2010) ("Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's 'honest services.'"). Likewise, it is black-letter law that "money, property, services, or any other act which advances [an] official's personal *or* business interests" may constitute bribes. Third Cir. Jury Instruction for 18 USC §201(b)(1) (emphasis added). *Cf. United States v. Crozier*, 987 F.2d 893, 901 (2d Cir.1993) ("[A]s we have held in connection with § 201, any payment that the defendant subjectively believes has value . . . constitutes a thing 'of value' within the meaning of § 666(c)"). In any event, to the extent the Giannullis wish to argue that they acted in good faith because they believed their payments would go to a USC fund Heinel controlled—instead of into Heinel's pocket—the government has produced the relevant evidence to them.

would "write a check for $50,000 that will, I'll give you the address, and exactly who—it will go to Donna Heinel and for Senior Women's Athletic Director. It will be made out to USC Women's Athletics." Singer also told Huneeus to make a $200,000 payment to KWF, which would be used as directed by Vavic, since Vavic gave Singer a recruitment "spot." *See* Ex. LLL at 1-3 (Aug. 30, 2018 transcript).

- In a call with Zangrillo, Singer explained that, although Zangrillo's daughter had previously been denied admission to USC despite the fact that her application had received a "VIP" tag, Singer had struck a deal with the USC crew coach whereby "you guys help us, we'll help you." To accomplish that, Singer said he would "put her [through admissions] as though [she had] been sculling and rowing." Ex. MMM at 2 (June 11, 2018 transcript). In later e-mails, Singer directed Zangrillo's assistant to have Zangrillo send $50,000 to Heinel at USC (payable to USC Women's Athletics) and $200,000 to KWF. *See* Ex. NNN (Sept. 20, 2018 e-mail chain).

- In a call with Gordon Caplan, Singer explained the scheme as follows: "So I did 761 what I would call, side doors. There is a front door which means you get in on your own. The back door is through institutional advancement, which is ten times as much money. And I've created this side door in. Because the back door, when you go through institutional advancement, as you know, everybody's got a friend of a friend, who knows somebody who knows somebody but there's no guarantee, they're just gonna give you a second look. My families want a guarantee. So, if you said to me 'here's our grades, here's our scores, here's our ability, and we want to go to X school' and you give me one or two schools, and then I'll go after those schools and try to get a guarantee done. So that, by the time, the summer of her senior year, before her senior year, hopefully we can have this thing done, so that in the fall, before December 15th, you already know she's in. Done. And you make a financial commitment. It depends on what school you want, may determine how much that actually is." Ex. OOO at 1 (Jun. 15, 2018 transcript).

- In a call two days prior to being approached by law enforcement, Singer explained the "side door" to a parent who decided not to participate in the scheme. Singer told the parent: "Let's say if it's USC, then I'll probably use athletics to help them get in, and I'll go to one of the coaches, because we've already done six at USC already. I'll go to one of the coaches who has a guaranteed spot in a sport, and ask them if they'll give me that spot. And in turn we will help their program, and then the kid gets in. We apply usually early, and then the kid gets in early action if it's a place like USC. They don't hear until March 25 but I hear months before." Singer continued: "So what I normally have to do is I have to create a profile of that kid in that particular sport. And then the athletic liaison takes that person to admissions when they have what they call sub-committee meetings, which happen usually every other Thursday, at most schools. And then they walk the kid through with whatever

23

sport it is. And they make decisions right then and there if the kids are getting in, or they may say I need to see one more set of grades, or I need to see a progress report and then we'll admit. And it's done. Families don't pay anything until after it's done. I take the risk, and I take the responsibility."   Ex. PPP at 2 (Sept. 19, 2018 transcript).

- In an e-mail, Singer told another parent: "If we have a desire I can start to lay the groundwork for [a USC coach] to consider helping [your son] get into USC and possibly have a spot on the roster if he works hard- may never [pl]ay but be a part of the program for a donation.  This year was 200k."  *See* Ex. QQQ (Apr. 15, 2014 e-mail chain).

- In an e-mail, Singer told yet another parent: "First in doing this for 24 years no side door has even been 100k nor would I ever say that. Secondly, the donation is 250k and is paid to our foundation which I explained to [a business manager] already as several groups with Northeastern receive the monies for supporting the process.  Monies have already been funded on your behalf as I always must fund immediately after admission.  *See* Ex. RRR (Feb. 24, 2017 e-mail).

- In an e-mail to a parent who said she did not want to "do anything improper," Singer replied: "Ok side door is not improper nor is back door both are how all schools fund their special programs or needs.  *See* Ex. SSS (Feb. 5, 2014 e-mail chain).

<u>Fifth</u>, the government has disclosed, during the plea colloquies of multiple parents who have pled guilty to the charged scheme, that Singer told them their money would be directed to specific coaches' athletic programs in exchange for the coaches' fraudulent designation of their children as recruited athletes.  *See* Hodge Rule 11 Tr. at 12 (Oct. 21, 2019) ("Hodge understood that some of the money would then be sent to specific programs at USC as a *quid pro quo* inducement to the employees responsible for managing those programs to facilitate his daughter's admission through the soccer team"); Elizabeth Henriquez Rule 11 Tr. at 13 (Oct. 21, 2019) ("Henriquez also agreed with Singer that she would pay $400,000 as a purported donation to Georgetown's tennis program as a *quid pro quo* for Ernst agreeing to facilitate Henriquez's older daughter's admission to Georgetown by allocating one of his admission slots to her"); Janavs Rule 11 Tr. at 12 (Oct. 21, 2019) ("Janavs agreed to pay [$]200,000 as a purported donation to USC

Athletics as a *quid pro quo* for Donna Heinel agreeing to facilitate Janavs' older daughter's admission to USC as a purported beach volleyball recruit.").

Sixth, the government disclosed to the Giannullis, in a letter dated November 27, 2019, that Singer had advised the government, in sum and substance, that he had told them they would need to write a $50,000 check to Heinel at USC and pay an additional $200,000 through his foundation, in exchange for getting their older daughter admitted to USC as a recruited coxswain. *See* Ex. TTT (Nov. 27, 2019 Letter).   The government further disclosed that Singer had advised that he did not have to explain how the side door scheme would work with the Giannullis' younger daughter, since they were already familiar with the scheme.   These disclosures accurately set forth the relevant information from the FBI 302 report of the interview.[15]   While the government believes that Singer's statements to investigators are *inculpatory* rather than exculpatory—and therefore not subject to disclosure at this time—there is simply no basis to require that the government, having made the disclosures, produce the underlying report itself.   Likewise, to the extent Singer makes additional statements to agents about what he told the Giannullis about the allocation of their payments, the government intends to supplement its disclosures.   To the extent Singer has, however, also made statements to investigators about what he told *other* clients, such statements are neither favorable nor material to the Giannullis' guilt, and are not subject to disclosure under *Brady* or Rule 16.   Rather, as the Giannullis themselves acknowledge, what is

---

[15] The defense's contention that the government's account is "sanitized" and "plainly incomplete" because it "provides no quotations, no context, and no way for defense counsel to assess the information and its import," is silly.  Dkt. 693 at 20.  The letter does not purport to be a transcript.  It is a disclosure of information set forth in a summary report that counsel is undoubtedly aware, based on long experience, is also not a transcript.  The defense correctly points out that the information in the disclosure "has virtually no use as exculpatory or impeachment evidence at trial," *id.*, but that is not because it is contained in a letter rather than the underlying 302—it is because the information is not, in fact, exculpatory.  Nor, in any event, is the defense entitled to "impeachment evidence" at this time.

relevant is *their* state of mind—what *they* knew, and what *they* intended. What Singer told investigators about what he told other parents does not "directly negate" the Giannullis' guilt, nor could it do so.[16]   It is, accordingly, not subject to disclosure at this time.

      B.     <u>USC's Knowledge of Singer's Fraudulent Scheme</u>

The Giannullis further contend that there is "good reason to believe that numerous USC officials were aware of Singer's operation and that the government is withholding materially exculpatory evidence on this point," Dkt. 693 at 16, and seek information about what USC knew about their payments, and about Singer, and when.  The Giannullis' "good reason" appears to be based on little more than speculation and press clippings—including a self-serving interview by Heinel's lawyer after her arrest—and therefore does not satisfy *Prochilo*'s requirement that it be based on more than "mere speculation."  629 F.3d at 268.  Their contentions are, in any event, without merit.

    <u>First</u>, the government has disclosed all of the relevant USC e-mails and other records in its possession, custody and control.  These materials include records of payments by KWF, the Giannullis, and other Singer clients to USC, as well as internal USC documents concerning those payments.  *See* Ex. UUU (Jul. 6, 2015 e-mail); Ex. VVV (Mar. 29, 2018 e-mail chain).[17]

    <u>Second</u>, as the Court is aware, Zangrillo has subpoenaed USC for additional information concerning its admissions and development policies.  Zangrillo has produced these materials to the government, and the government has produced them to the remaining defendants.

---

[16] It is also cumulative of the information the government has already disclosed.

[17] The records also include an e-mail to Heinel from USC's Dean of Admissions advising her to "steer clear" of Singer, *see* Ex. UUU, as well as documents concerning the investigation USC launched after learning that the Giannullis' younger daughter and several other applicants might not have been legitimate athletic recruits. Heinel, who was designated to lead that investigation by unwitting USC officials, misled the admissions office about the students' qualifications in communications that the government has also produced.  *See* Ex. VVV.

Third, the government is not in possession of any evidence that anyone in the USC admissions office, any of Heinel's or the complicit coaches' supervisors in the athletic department, or anyone outside the athletic department was aware that Singer and his clients had agreed with Heinel and the complicit coaches to recruit students as purported athletes in exchange for payments to their USC programs.  As part of its investigation, the government has interviewed several USC admissions officers, including members of the subcommittee for athletic admissions, none of whom provided exculpatory information. To be sure, others at USC understood that Singer existed, and were plainly aware of the <u>fact</u> of his purported donations and those of the defendants, insofar as they provided the "gift receipts" that the government produced and that the Giannullis cite in their brief, Dkt. 693 at 17.   But the government has not interviewed *any* current or former USC employee who knew that the payments were a *quid pro quo* for the admission of the Giannullis' children or the children of other Singer clients, save for cooperating witnesses who have pled guilty to their involvement in the charged crimes.   The defendants are not now entitled to the statements of those cooperating witnesses, which are inculpatory.   In the event that the government discovers evidence indicating that admissions officers or other administrators senior to Heinel and the coaches were, in fact, aware of the scheme, the government will promptly disclose that information to the defense.

### III.      McGlashan's Motion to Compel

McGlashan's motion seeks five categories information: (1) evidence that he did not understand the test cheating or side door schemes to involve bribery; (2) evidence that he did not participate in the side door scheme; (3) evidence relating to entrapment; (4) evidence that USC was not defrauded; and (5) grand jury transcripts.   As with the Giannullis' motion, McGlashan's

motion should be denied because the government has either already produced the information he seeks, to the extent it exists, or because he is not entitled to it.

   A.   Evidence Concerning McGlashan's Knowledge of the Bribery Schemes

   McGlashan contends that he is entitled to FBI 302 reports summarizing interviews with Singer and Riddell because, to the extent the government relied on them in its complaint or they describe what Singer told McGlashan, they constitute Rule 16 materials, and because, to the extent they demonstrate that Singer misled McGlashan, they constitute *Brady*.   Remarkably, he contends that statements Singer made to the government "that are inconsistent *with McGlashan's recollection* and other evidence would constitute *Giglio* impeachment information."   Dkt. 697 at 25 (emphasis added).   And he invokes *Brady* to seek documents confirming that his son had a legitimate need for a testing accommodation, as well as the original version of his son's altered ACT.   In support of his arguments, McGlashan contends that the government has produced "no evidence" indicating that Singer told him, prior to his son's December 2017 ACT exam, that his $50,000 payment to KWF would be used to bribe a test administrator and pay Riddell, or that Riddell would correct his son's test after the exam.   Likewise, he contends that the Singer "never explained" that his side-door payment would be used to "facilitate a fraud as part of a *quid pro quo*."   *Id.* at 23.   McGlashan's factual contentions are untrue and his legal claims are without merit.

   First, McGlashan does not, because he cannot, cite any law for the proposition that *inculpatory* witness statements—whether or not relied upon by an agent in a complaint affidavit— are "material to preparing the defense" and therefore discoverable under Rule 16.   They are not, and Rule 16 says nothing of the sort.   To the contrary, it specifically *exempts* from disclosure "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." FED. R. CRIM. P. 16(a)(2).

_Second_, McGlashan's contention that statements by Singer that are inconsistent with _McGlashan's_ purported recollection constitute _Giglio_ merits little discussion.   By this logic, any _inculpatory_ witness statement is _Giglio_ where the defendant denies committing the crime.   That is absurd.   In any event, even if such statements were _Giglio_—which they are not—McGlashan would not be entitled to them until 21 days before trial, as Local Rule 116.2(b)(2) makes clear.

_Third_, assuming, _arguendo_, that McGlashan's son had a legitimate need for a testing accommodation, evidence of that fact would not constitute _Brady_, both because it is known to the defendant and because it is not exculpatory. _See United States v. Bender_, 304 F.3d 161, 164 (1st Cir. 2002) ("_Brady_ applies to material that was known to the prosecution but unknown to the defense"); _United States v. Rose_, 11-10062-NMG, 2012 WL 1744757, at *4 (May 16, 2012) (holding that a "defendant must make some showing that the [purported _Brady_] material in question could contain favorable, material evidence," and "[t]hat showing cannot be based on speculation") (internal quotations omitted). In any event, the government has produced the relevant evidence in its possession, custody or control, including records from McGlashan's son's school and from his son's psychologist. In addition, the government advised McGlashan that Singer told agents McGlashan's son had a learning difference and would have received a score of around 1200 on the SAT had he taken the test on his own. _See_ Ex. WWW (Nov. 27, 2019 letter). The government is not in possession of the unaltered version of the ACT exam that McGlashan seeks.

_Fourth_, McGlashan's contention that the government has not produced evidence of what Singer told him and what McGlashan understood about the bribery schemes is untrue.   In the November 27th letter, the government advised McGlashan of Singer's statement to agents that McGlashan "knew that someone would be taking the ACT for [his son] and getting a good score,

but . . . did not want the full details of how the cheating scheme would work." *Id*.  Riddell has also testified, under oath, in a public Rule 11 proceeding that he corrected McGlashan's son's ACT score.[18]  Likewise, Dvorskiy confirmed at his Rule 11 proceeding that cheating had, in fact, occurred at the West Hollywood center where McGlashan's son took the exam.[19]  The government has also produced a consensually recorded call in which McGlashan did not dispute that Riddell had taken the ACT for his son in exchange for a payment, and acknowledged that he still intended to pursue the "side door" scheme once things "cleared up."  *See* Ex. SS at 3-6.  The government has likewise produced calls, intercepted pursuant to Title III, in which McGlashan sought to obtain testing accommodations for his two younger children so that Singer could "control the center" and his daughter could take the test "one time and be done."  *See* Ex. KK at 16.  And the government has produced other e-mails, text messages, and documents laying out McGlashan's knowledge of and involvement in the scheme, including, among other things:  e-mails indicating that McGlashan changed the location of the exam from his son's high school in Northern California to Singer's test center in West Hollywood; bank records indicating that McGlashan made a payment of $50,000 to KWF just days before the exam, in response to an invoice indicating that it was for the West Hollywood test center; an ACT report purporting to indicate that McGlashan's son took the exam over two days, as well as flight records indicating that McGlashan and his son were, in fact, hundreds of miles from the test site on the second of those days.  Likewise, the government

---

[18]  *See* Riddell Rule 11 Tr. at 17-18 (Apr. 12, 2019) ("in December of 2017, Riddell . . . proctored the ACT exam of the son of charged Defendant Bill McGlashan. Riddell corrected the student's exam answers after the ACT test, earning the student a 34, which is a score in the top one or two percent in the nation.").

[19]  *See* Dvorskiy Rule 11 Tr. at 22 (Nov. 13, 2019) ("on December 9, 2017, the defendant administered the exam to a student from the San Francisco area as part of the cheating scam where Riddell corrected the students' answers after the exam.  The father of this student paid Singer $50,000, and Singer, in turn, paid the defendant $40,000, which included the fees for this particular student and other students also participating in the testing scheme.").

has produced Title III intercepts of Singer's discussions with McGlashan concerning the "side door" scheme, which the government believes represent *all* of Singer's conversations with McGlashan about that scheme, save for a single call in or about October 2018, in which Singer attempted to obstruct the government's investigation, as set forth above.[20]

Accordingly, the government has met its discovery obligations with respect to McGlashan's knowledge of the bribery schemes.  Nevertheless, to the extent Singer makes additional statements to agents about what he told McGlashan about the allocation of his bribe payments, the government will supplement its disclosures.

B.     Evidence that McGlashan Did Not Participate in the Side Door Scheme

McGlashan next seeks "additional evidence reflecting the fact that he did not participate in the side door scheme," Dkt. 697 at 26, by which he appears principally to mean (1) the October 2018 communication in which Singer attempted to obstruct the FBI's investigation by advising McGlashan that Singer's calls were being monitored, and (2) the full FBI 302 report of the interview in which Singer advised agents of his belief that McGlashan would no longer be pursuing the side door.[21]

McGlashan's suggestion that the government must be in possession of other, unproduced communications in which he "conveyed his plans [not to proceed with the side door] to Singer," *id.* at 27, is not true.  The government has produced all text messages, e-mails, and calls in its possession, custody or control between McGlashan and Singer.  Singer's conversation with

---

[20] That call was, as noted, neither intercepted nor consensually recorded.

[21] Notably, this occurred after McGlashan had already agreed to pursue the side door and committed overt acts in furtherance of the agreement, thereby satisfying the elements of the charged crimes, and before McGlashan reaffirmed his commitment to pursue the scheme once things "cleared up."

McGlashan in which he attempted to obstruct the investigation occurred without the government's knowledge, and was neither intercepted nor consensually recorded.

McGlashan is also not entitled to the full 302 report of the interview in which Singer advised the government of his belief that McGlashan would no longer pursue the side door.   The government has disclosed the relevant information from that report.   The rest comprises Jencks material to which McGlashan is not now entitled.

      C.      <u>Evidence Relevant to an Entrapment Defense</u>

McGlashan next seeks information concerning when the government first began using Singer as an agent or when Singer first suspected that he was being investigated, in furtherance of a potential entrapment defense.  The government first approached Singer on or about September 21, 2018, and did not obtain his authorization to consensually monitor his communications until on or about September 27, 2018.[22]  The government has no information suggesting that Singer was aware of the government's investigation prior to September 21, 2018. Notably, McGlashan engaged in the ACT cheating scheme ten months before that date, and committed overt acts in furtherance of the side door scheme approximately one month before Singer began cooperating. Accordingly, the government has no information supporting an entrapment defense.

      D.      <u>Evidence Concerning Whether USC Was a Victim of McGlashan's Scheme</u>

McGlashan next seeks evidence that "USC was familiar with Singer and his method of getting students admitted to USC, or that McGlashan believed as much."   Dkt. 697 at 28.  As set forth above, the government has no evidence that the USC admissions office, any of Heinel's or

---

[22] Notwithstanding McGlashan's contention that he lacks this information, the government disclosed in the complaint affidavit that Singer began cooperating with its investigation in or about late September 2018.  *See* 19-MJ-06087-MPK Dkt. 3 (Criminal Complaint) at 6 n.1.

the complicit coaches' supervisors, or anyone else outside the USC athletic department was familiar with Singer's "method of getting students admitted to USC." And, as noted, the government has produced all the communications in which Singer discussed the side door with McGlashan.

      E.      <u>Grand Jury Transcripts</u>

McGlashan's demand for production, or an *in camera* inspection, of the grand jury transcripts should be denied because it does not come close to meeting his burden of making a "strong showing" of particularized need for such materials. *See United States v. R. Enterprises*, 498 U.S. 292, 300-301 (1991) ("the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority"); *United States v. Capozzi*, 486 F.3d 711, 727 (1st Cir. 2007) ("[T]he indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity" and "[t]he burden of showing particularized need rests squarely on the defendant.") (internal quotations omitted).

McGlashan first contends that the evidence is insufficient to warrant the grand jury's decision to indict him on bribery and wire fraud charges. This contention merits little discussion, and is contrary to well-settled principle that a "court should not inquire into the sufficiency of the evidence before the indicting grand jury, because the grand jury proceeding is a preliminary phase of the criminal justice process and all constitutional protections will be afforded during the trial." *United States v. Maceo,* 873 F.2d 1, 3 (1st Cir. 1989). In any event, McGlashan's self-serving description of the evidence is misleading, and altogether ignores the fact that he agreed to have his son's face Photoshopped onto the body of another person as part of a bogus athletic profile—a fraud that McGlashan described as "hilarious" and "perfect," before reminding Singer of "the obvious deal you and I talked about, the 50K and the 200K."

Likewise, McGlashan's contention that there is no evidence he was "aware of—let alone responsible for—submitting his son's application" to Northeastern University in Boston, as alleged in the substantive wire fraud count, is meritless. It is black-letter law that a defendant need not personally know about or approve of a charged wire, provided that "such use was a *reasonably foreseeable* part of the scheme in which [he] participated." *United States v. Appolon*, 715 F.3d 362, 370 (1st Cir. 2013); *United States v. Tum*, 707 F.3d 68, 72 (1st Cir. 2013); *United States v. Woodward*, 149 F.3d 46, 63 (1st Cir. 1998). Here, abundant evidence demonstrates McGlashan's participation in a scheme to obtain a fraudulent ACT score that would be submitted as part of his son's college applications. And McGlashan tellingly omits to mention the e-mails he received from his son's high school guidance counselor suggesting Northeastern as a possible college, *see* Ex. XXX (Apr. 27, 2018 e-mail), or the recorded phone call with Singer in which it was McGlashan's son who first raised the possibility of applying to Northeastern. *See* Ex. YYY (Oct. 21, 2018 audio).[23]

Finally, McGlashan's contention that a scrivener's error in the Third Superseding Indictment is an "irregularity" entitling him to the grand jury minutes is frivolous and has, in any event, been rendered moot by the grand jury's return of a Fourth Superseding Indictment that does not include the description of his son in a football uniform.

## IV.    Wilson's Motion to Compel

Wilson's motion should be denied because, among other things, it is almost entirely devoted to seeking to compel the production of evidence that has already been produced.

---

[23] Contrary to McGlashan's contention, Singer did not encourage McGlashan's son to apply to Northeastern at the government's direction in order to establish venue. But even if he had done so, the First Circuit has affirmatively rejected "venue entrapment" as a defense. *See United States v. Valenzuela*, 849 F.3d 477, 488 (1st Cir. 2017).

A.    Singer's Description of the "Side Door" as Legitimate

Wilson requests that the government be ordered to produce "any evidence arising from" statements by Singer to government agents about the "legitimacy of side door donations."   Dkt. 699 at 4.   In support of this request, Wilson argues that "it is impossible to believe that the government did discuss this topic with Singer," and that representations that the side door was legitimate would "directly rebut the government's allegations that [Singer's clients] acted 'with bad purpose, either to disobey or disregard the law,' and in a 'wrongful, immoral, depraved, or evil' manner."   *Id.*   Wilson's request should be denied.

First, Wilson's premise—that it is "impossible to believe" the government did not discuss the "legitimacy of side door donations" with Singer—is unfounded speculation, and should be denied on that basis alone.   *See Prochilo*, 629 F.3d at 268 (*Brady* requests "cannot consist of mere speculation").   In any event, Singer has never advised investigators that the "side door" was legitimate because it was not.   The government has also reviewed its reports of interviews with Singer for any statement suggesting that he advised Wilson that this scheme was legitimate. There is none.[24]   Nevertheless, the government has, in an abundance of caution, disclosed other potentially relevant information from its witness interviews to Wilson: that Singer advised agents that Wilson's son actually played water polo; and that another witness advised the government of

---

[24] In Wilson's sanitized account, "Singer believed that the staff responsible for smaller teams and programs were more likely than the university-wide development office to advocate for the admission of an applicant related to a team-specific donor." Dkt. 699 at 3. Leaving aside the question of how Wilson purports to know what Singer believed, Wilson is not charged with making a "relatively modest donation" to "specific college programs and teams" in the hope that they "would be more appreciative . . . than centralized development offices." *Id.* He is charged with conspiring to secure his son's admission to USC as a purported athletic recruit by means of falsified athletic credentials and a *quid pro quo* payment to a fund designated by USC's corrupt water polo coach in exchange a for designating Wilson's son as a recruit to the water polo team.

his belief that Wilson's son attended the first day of water polo practice at USC.  *See* Ex. ZZZ (Nov. 27, 2019 Letter).

Second, the government has produced Singer's actual descriptions of the side door to Wilson, as contained in multiple e-mails and audio recordings in which Singer described the scheme to him.   In addition, while Singer's statements to third parties, which were unknown to Wilson, cannot possibly be relevant to Wilson's state of mind, the government has produced all e-mails and audio recordings in its possession in which Singer made representations about the "side door" to others.   These materials provide first-hand evidence of precisely how Singer described the "side door" to his clients—and Wilson himself quotes two such statements in his brief.   At the same time, to the extent Singer has made additional statements in interviews with investigators about what he told other clients, unbeknownst to Wilson, such statements are neither favorable to Wilson nor material to his guilt, and are not subject to disclosure at this time under *Brady* or the applicable rules.

B.   Singer's Referral Sources

Wilson next seeks "evidence about Singer's efforts to foster sources of referrals to his college-consulting business," contending that, to the extent these sources were "highly reputable," Singer "minimized the likelihood of clients doubting his representations regarding the legitimacy of his practices."   Dkt. 699 at 4.

Wilson, of course, knows how he was introduced to Singer.   Such information cannot, accordingly, constitute *Brady*.   *See Bender*, 304 F.3d at 164 ("*Brady* applies to material that was known to the prosecution but unknown to the defense").   Nor is the reputability of Singer's "sources of referrals" to *other* clients relevant to Wilson's state of mind.   In any event, the government has produced voluminous e-mails and audio recordings setting forth how Singer was

introduced to various clients.  Wilson concedes as much, noting that these materials "show that Singer devoted time and energy to developing relationships with his referral sources."   Dkt. 699 at 4.   To the extent there is anything exculpatory about this information, Wilson has it. Moreover, to the extent the government obtains additional evidence that individuals described Singer's side door practices as legitimate in referring Singer to Wilson or other clients, the government will disclose that information to the defense.

  C. <u>Fundraising by USC</u>

  Wilson vaguely seeks evidence concerning "USC's more general attitudes toward fundraising and admissions," contending once again that it is "not plausible" that the government has not discussed what he describes as USC's "pro-donor admissions philosophy" with witnesses from USC.  *Id*. at 6.   Wilson's request should be denied both because it is insufficiently specific and unsupported by anything other than mere speculation, and thus does not satisfy the *Prochilo* standard.

  The request also fails because the information Wilson seeks is not exculpatory.   The government's "theory" is not, as Wilson frivolously contends, that "a college employee violated fiduciary duties by fundraising for the college's benefit."   *Id*.   The government's allegation is, as noted, that Wilson conspired with Singer and others to corrupt the USC admissions process by bribing USC's water polo coach, Vavic, to falsely designate Wilson's son as a recruited athlete in exchange for a payment to an account that benefited Vavic and his team.   Wilson correctly notes that "[t]here could be no such conspiracy where the relevant USC personnel were doing exactly what USC wanted."  *Id*. at 6.  For that reason, if the government were to learn that USC admissions condoned Vavic's actions, tacitly or otherwise, the government would disclose that information.  To the extent that USC engaged in other fundraising practices, however—such as

providing information on potential donors to the admissions office so that they could be tracked—that information is *inculpatory* because it highlights the difference between the practices USC actually condoned and the corrupt process in which Wilson, Singer, Vavic and their co-conspirators engaged.

In any event, the government has already produced whatever e-mails, audio recordings, financial records, or other documents are in its possession that detail USC's practices.  For example, the government has produced all communications in its possession that Wilson purports to seek "among USC personnel, or between USC personnel and Singer, about the candidacies of Johnny Wilson or other defendants' children."  *Id*. at 6 n.5.  Accordingly, to the extent Wilson seeks these materials, his motion should be denied as moot.  However, to the extent USC employees, who may not even be called to testify at trial, have described USC's legitimate fundraising practices in interviews with the government, that information is not exculpatory, and is not subject to production at this time pursuant to *Brady* or Rule 16.

D.    Concealment of Misrepresentations

Wilson demands evidence indicating that Singer introduced factual inaccuracies into students' college applications without their parents' knowledge.  While evidence concerning what Singer did for other individuals is neither material nor exculpatory as to Wilson, to the extent such evidence is contained in e-mails or recorded telephone calls, the government has produced it.  Likewise, to the extent Singer has advised the government that a specific defendant was either unaware of the falsehoods or did not see the fraudulent applications or athletic profiles, that information has also been disclosed or will be disclosed shortly. With respect to Wilson, the government has produced evidence that Singer specifically told Wilson, on or about October 12, 2013, that Vavic had "asked me to embellish [Wilson's son's] profile more, which I am doing,"

and that on or about October 19, 2013, Singer forwarded Wilson a water polo profile for his son that included fabricated swimming times and awards.

      E.    <u>Embezzlement from Clients</u>

      Wilson seeks evidence that Singer embezzled money from his clients and sought "to prevent them from learning of the fate of that money." *Id*. at 8. In support of this request, he contends that "the charges against each defendant rely on the theory that Singer acted in harmony and concert with his clients." *Id*.

      As an initial matter, the government has never alleged that Singer's co-conspirators understood all the details of his actions, nor does the law require that they have done so, as Wilson contends. *See United States v. Ortiz-Islas*, 829 F.3d 19, 24-25 (1st Cir. 2016) ("the existence of a single conspiracy does not require the participants to know of all the other participants, understand all the details of the conspiracy, or participate in each aspect of the conspiracy") (citations omitted). Accordingly, even if, as Wilson contends, Singer "embezzled" money from his co-conspirators, that is not inconsistent with their knowing involvement in the charged conspiracy.

      In any event, as Wilson concedes, the government has already produced evidence—including bank records and e-mails between Singer and his bookkeepers—detailing precisely what Singer did with his clients' money. With respect to Wilson, for example, the records indicate that Wilson paid Singer $220,000, comprised of $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally. Out of those funds, The Key issued a $100,000 cashier's check, payable to USC Men's Water Polo, shortly after Wilson's son was admitted to USC as a purported water polo recruit. Accordingly, Wilson's request should be denied.

F.   Obstruction and Instructions from the Government

Wilson requests that the government be ordered to produce all instructions it provided to Singer during his cooperation.   This request should likewise be denied.

Wilson provides no legal basis for his contention that the government must disclose instructions that a cooperating witness followed.   There is no such requirement.   *See, e.g., United States v. Prange*, 11–10415–NMG, 2012 WL 3263606, at *2 (D. Mass. Aug. 7, 2012) (denying request for cooperator instructions since "instructions are not discoverable by virtue of their status as instructions" but noting that "the government is obligated to produce, at the appropriate times, those portions of the instructions, if any, that constitute *Brady* or *Giglio* material, especially [when] . . . the cooperator failed to follow his/her given instructions").   Nor is Wilson's demand supported by his false and unsupported contention that the evidence would "expos[e] the prosecution's manipulative efforts to ensnare innocent conduct in this case."   Dkt. 699 at 10; *see also United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994) ("It is proper (i.e., not an 'inducement') for the government to use a 'sting,' at least where it amounts to providing a defendant with an 'opportunity' to commit a crime.").   Consistent with *Prange* and Local Rule 116.2(b)(2)(A), however, the government will disclose relevant information concerning Singer's failure to follow instructions in the event that he testifies at trial.

G.   Promises, Rewards and Inducements

Wilson's contention that the government has not produced information concerning "promises, rewards, and inducements to likely witnesses," is untrue.   The government produced Singer's plea and cooperation agreements *over 8 months ago*.[25]   *See* Ex. AAAA (Apr. 25, 2019

---

[25] Moreover, contrary to Wilson's suggestion, Singer has, in fact, pled guilty to money laundering and tax fraud.

production cover letter).   The government has also produced plea and cooperation agreements for other defendants, or those agreements are posted on the public docket.   *See* Ex. BBBB (plea and cooperation agreements for Bruce Isackson, Davina Isackson, Laura Janke, Mark Riddell, Michael Center, Igor Dvorskiy, and Rudolph Meredith).

The Local Rules require the disclosure of "a statement whether any promise, reward, or inducement has been given to any witness *whom the government anticipates calling in its case-in-chief*." L.R. 116.2(b)(1)(C) (emphasis added)   No trial date has yet been set in this case, and the government has made no decisions about which witnesses it will call as part of its case-in-chief. To the extent the government provides promises, rewards or inducements to witnesses it anticipates calling at trial, it will produce that information to the defense.[26]

## CONCLUSION

For the foregoing reasons, the defendants' motions should be denied without a hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   /s/ Eric S. Rosen
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY

Date:   January 14, 2020              Assistant United States Attorneys

---

[26] Wilson's contention that USC, its employees and members of Singer's family, have criminal exposure, and that it is "not believable" that the government has not provided additional promises, rewards or inducements to them, Dkt. 699 at 10-11, is baseless and merits little response, save to note that Wilson's reliance on a January 31, 2013 e-mail for the proposition that USC and some of its employees "likely violated tax laws," *id.*, is misleading and at odds with other evidence that Wilson simply omits.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 14, 2020.

By:     */s/ Eric S. Rosen*
            ERIC S. ROSEN
            Assistant United States Attorney