UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DAVID SIDOO, et al )<br>Defendants )<br>) | CRIMINAL NO. 19-10080 |

**DEFENDANTS' REPLY TO THE GOVERNMENT'S OPPOSITION TO THEIR MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE REGARDING TITLE III INTERCEPTIONS AND CONSENSUAL RECORDINGS AND FOR OTHER APPROPRIATE RELIEF**

Now come the Defendants[1], by and through undersigned counsel, and hereby respectfully submit this reply to the government's Opposition to their Motion for Production of Exculpatory Evidence Regarding Title III Interceptions and Consensual Recordings. The defendants' motion seeks exculpatory evidence critical to their trial defenses, namely recorded conversations involving Rick Singer, the corrupt college counselor at the center of the alleged fraudulent scheme and likely government witness.

**Request for Hearing**

The defendants further respectfully request that this Court hold a hearing on their motion.

In response to the defendants' motion, the government now acknowledges its Constitutional

---

[1] Defendants David Sidoo, Robert Zangrillo, John Wilson, Homayoun Zadeh, Diane Blake, Todd Blake, Gamal Abdelaziz, Marci Palatella, William McGlashan, Jr., Mossimo Giannulli, Lori Loughlin, Amy Colburn, Gregory Colburn, Elisabeth Kimmel, and I-Hsin Chen join in this reply.

1

duty, pursuant to *Brady v. Maryland*, to review each and every one of the recorded calls and text messages and produce any exculpatory evidence contained therein. The government's Opposition, however, reflects an inappropriately narrow understanding of its *Brady* obligations, essentially limited to the disclosure of evidence directly proving factual innocence. *See* Dkt. 734 at 6 (asserting that disclosure should not be required because the exculpatory evidence requested "has no bearing on whether the *defendants* had the requisite intent to commit the charged crimes, and are guilty of those crimes").[2] This is not the law. *See United States v. Owens*, 933 F. Supp. 76, 85 (D. Mass. 1996) (rejecting government argument that *Brady* extends "only to . . . material tending to show that a defendant is innocent of the crime charged" as "far too restrictive an approach"). Rather, evidence useful for impeachment purposes readily qualifies as exculpatory under *Brady*. *See* Local Rule 116.2(a)(3) (defining "exculpatory information" to include "information that tends to . . . cast doubt on the credibility or accuracy of any evidence that the government anticipates using in its case-in-chief"); *United States v. Snell*, 899 F. Supp. 17, 23 (D. Mass. 1995) ("There is no question but that as a general matter, the *Brady* obligation includes the requirement to turn over evidence of impeachment."). The government's duty to disclose therefore encompasses, among other things, "[a]ll documents which tend to show the bias, prejudice, personal interest of any government witness to testify in favor of the government," as well as the witness's prior "bad acts of lying or failing to tell the truth." *Owens*, 933 F. Supp. at 87. Under this proper analytical framework, the defendants have

---

[2] Of course, intent is not the sole element of the charged offenses. A recorded communication would, for example, also be exculpatory if it tended to prove that USC was a willing participant in the donations made through Donna Heinel or made directly to the school rather than a victim of an honest services or money or property fraud.

sufficiently articulated the relevance of the recordings to warrant production.

The government faults the defendants for failing to specifically identify individual calls that are exculpatory in nature. Acceptance of this argument would hold the defendants, who of course are currently without access to the contents of the calls, to an impossible burden. Indeed, with respect to the more than 1,600 consensual communications that have been withheld to-date, the government concedes that the defense has not been provided a log or any information whatsoever. Accordingly, it would be impossible for the defendants to identify any specific consensual recording believed to be exculpatory without access to the calls themselves. The First Circuit, likely anticipating such a situation, does not require defendants to definitively prove the contents of exculpatory evidence as a prerequisite for obtaining access to the underlying information. Rather, it demands only that the defendant "make some showing that the materials in question *could* contain favorable, material evidence." *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011) (emphasis added).

Here, the defendants set forth several theories of relevance in their initial motion, which in combination are more than sufficient to warrant *in camera* examination in the event that the government refuses to disclose the materials after concluding its review. As an initial matter, the defendants' request is limited to non-minimized communications. The mere fact that the calls at issue were not minimized belies the government's suggestion that they are irrelevant to the issues in this case. To the extent that the government failed to minimize irrelevant calls, disclosure of those communications would provide the added benefit of allowing defendants to determine whether Title III's minimization requirements were satisfied. Moreover, the fact that the consensual recordings were made while Singer was cooperating with the government gives rise to a significant possibility

3

that the communications could be used to establish Singer's pro-government bias. It logically follows that an individual cooperating with the government in an effort to receive lenient treatment in his own criminal case is likely to zealously pursue information helpful to the government's investigation. Calls demonstrating such efforts by Singer would assist the defense in proving his bias. On the other hand, there are certain instances in which Singer impeded the government investigation by tipping off friends or associates regarding the government's surveillance of him. *See* Dkt. 736 at 13-14. Examples of this behavior are probative of Singer's truthfulness. Additionally, since Singer's obstruction was known to the government while he was cooperating, *see United States v. Singer*, No. 19-CR-10078, Dkt. 1 at ¶ 97 (D. Mass. Mar. 5, 2019), it is likely Singer was confronted about his betrayal and as a result had an even more enhanced reason to maximize his efforts to prove his productiveness to the government thus raising the risks of entrapment and the near certainty that any substantive call made during his consensual period was proof of the intensity of his bias towards the prosecution and, concomitantly, against the defendants. As noted in defendants' initial motion, the unproduced calls are also likely to contain a number of other instances in which Singer was untruthful, all of which are exculpatory within the meaning of *Brady*. This includes instances in which Singer lied about his contacts with celebrities or prominent university officials. As previously explained, the defendants are best able to prove that Singer was not, in fact, in contact with these individuals with access to all of Singer's recorded conversations. The call logs are simply not an adequate substitution for the non-minimized Title III and consensual recordings themselves.

  Contrary to the government's suggestion, Singer's communications with his family members

and women he dated are often relevant and exculpatory.  Singer repeatedly lied to prospective dates regarding his business and purported charitable work.  In just one example of Singer's deceit in communications other than those with parents or customers, he told one woman that he "created a non profit that has helped 400,000 underserved kids get into college as well as . . . another organization as an off shoot called A Better LA with [a well-known West Coast sports figure] to stop the gang violence in LA."  Sealed Exhibit 1.[3]  Singer went on to claim that he served as "life coach" to "30 or so CEO's and 24 NBA players."  *Id.*  In a long email to another apparent romantic interest, Singer laid out a largely fabricated life story, saying that he coached "collegiately at the highest level," including "Indiana U, Texas A&M and UC Berkeley."  Sealed Exhibit 2.  He also claimed to have "created a foundation to help the underserved that could not afford [his] business model" and provided "200 free scholarships to our business a year."  *Id.*  At the bottom of the email, Singer cut-and-pasted information about his business, representing that he had "counseled and mentored over 160,000 adults personally and professionally" over the course of 20 years and listing a number of celebrities and business leaders with whom Singer claimed to have worked.  *Id.*  With respect to conversations with certain family members, based on the communications produced by the government to-date, many of those conversations are business related rather than personal and Singer appears to have had discussions with family about possible criminal conduct such as tax fraud and/or money laundering.  *See* Dkt. 699 at 10-11 (quoting call with coach in which Singer said that his brother obtained "a lot of cash" in connection with offshore gambling that could not be deposited in a

---

[3] The defendants have moved for leave to file the exhibits to this reply under seal.  In the event that leave is granted, the defendants will promptly provide the exhibits to the Court.

bank and would instead be used to pay contractors for Singer's "Oakland Soldier gig").

In arguing that disclosure should not be required the government assumes that the requested materials fall into the category of evidence to be disclosed "[n]ot later than 21 days before the trial date" under Local Rule 116.2(b)(2).  But, while the recordings will almost certainly include "information that tends to cast doubt on the credibility or accuracy of any witness or evidence that the government anticipates calling or offering in its case-in-chief," it is also likely to contain other materials subject to immediate disclosure.  *See* Local Rule 116.2(b)(5) ("If an item of exculpatory information can reasonably be deemed to fall into more than one of the foregoing categories, it shall be deemed for purposes of determining when it must be produced to fall into the category which requires the earliest production.").  For example, as discussed above, the consensual recordings are likely to reflect Singer's pro-government bias and any promises, rewards, or inducements offered to him by the government.  To the extent Singer's bias led him to manufacture evidence against the defendants, or to deceive and lie to a defendant, it would "tend directly to negate [their] guilt" and communications demonstrating that fact would need to be disclosed as automatic discovery.  Local Rule 116.2(b)(1)(A).  Access to the non-pertinent calls would also assist defendants in determining whether or not the minimization requirements of 18 U.S.C. § 2518(5) were conformed with as required by statute.

Even if, contrary to the foregoing analysis, the government is correct that the requested materials fall solely into the category of information that, under the Local Rules, must be disclosed "[n]ot later than 21 days before the trial date," this Court has the discretion to set an earlier deadline in the interest of controlling its docket and preventing predictable delays.  *See Garcia-Goyco v. Law*

6

*Envtl. Consultants, Inc.*, 428 F.3d 14, 19 (1st Cir. 2005) ("While the district court does not have unbridled discretion to ignore the local rules, it enjoys a considerable latitude in applying local procedural rules . . . and in departing from them." (citation omitted)).  Here, by the government's own admission, there are more than 3,400 unproduced messages and calls, with the calls spanning a total of more than eighty hours.  While the government minimizes the burden that reviewing these communications and incorporating them into a trial defense just three weeks before opening arguments would entail, it is worth noting that the government's review was underway no later than December 9 and is not expected to be completed until February 28, more than two months later.  Review by defense counsel can be expected to take far longer than that if it is to be conducted in the days leading up to trial, when counsel will have a significant number of other trial preparation responsibilities.  Compliance with the procedures dictated by Local Rule 116.4 will also be unrealistic for this volume of communications in just three weeks.  Because Singer will predictably be a key government witness, or at the very least a hearsay declarant subject to impeachment, there is no sound reason to permit the government to withhold the thousands of recorded communications until the eve of trial.  Moreover, because the requested materials constitute exculpatory evidence under *Brady*, the Jencks Act must give way to the Constitutional disclosure requirement.  *See Owens*, 933 F. Supp. at 84 ("Despite the strictures of section 3500, a thorough reading of applicable case law indicates that a district judge has authority to order disclosure of **exculpatory** witness testimony before trial."); *Snell*, 899 F. Supp. at 21 ("[I]n seeking to harmonize the Jencks act and *Brady*, it makes no sense to indulge in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one, like Jencks.").

For the foregoing reasons, as well as those set forth in their initial motion, the Defendants respectfully request that this Honorable Court Order the government to produce all of the non-disclosed and non-minimized Title III and consensually recorded audios and text messages, or alternatively engage in an *in camera* review of those communications to determine whether they constitute exculpatory evidence.

                                        Respectfully Submitted,
                                        DAVID SIDOO and
                                        ROBERT ZANGRILLO
                                        By Their Attorney,

                                        **/s/ Martin G. Weinberg**
                                        Martin G. Weinberg, Esq.
                                        Mass. Bar No. 519480
                                        20 Park Plaza, Suite 1000
                                        Boston, MA 02116
                                        (617) 227-3700
                                        owlmgw@att.net

Dated: January 23, 2020

### CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, January 23, 2020, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

                                        **/s/ Martin G. Weinberg**
                                        Martin G. Weinberg, Esq.