UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID SIDOO, et al<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CRIMINAL NO. 19-10080 |

**DEFENDANT ROBERT ZANGRILLO'S MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE**

Now comes the Defendant Robert Zangrillo, by and through undersigned counsel, and hereby respectfully requests that this Honorable Court Order the government, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and Local Rule 116.2, to produce all exculpatory information in its possession or control, including any information, documents and/or evidence that:

1. Robert Zangrillo did not personally review or submit his daughter Amber Zangrillo's February 2018 transfer application to the University of Southern California ("USC");

2. Rick Singer, Mikaela Sanford, and/or someone working in concert with them completed and/or submitted the February 2018 application to USC and/or any prior application to Boston University or USC;

3. Rick Singer and/or someone working in concert with him had access to Amber Zangrillo's Common Application Account at the time applications were sent to Boston University and/or USC;

4. Rick Singer did not speak with the USC crew coach regarding Amber Zangrillo;

5. The USC crew coach did not assure Rick Singer that Amber Zangrillo would be admitted to USC;

1

6. Rick Singer was not informed by Donna Heinel that Amber Zangrillo would seek admission to USC as an athlete or rower;

7. Robert Zangrillo was informed by Rick Singer that some or all of the money he was asked to send to the Key in relation to Amber Zangrillo's admission would be donated to USC either directly by Singer or indirectly as directed by Donna Heinel;

8. Robert Zangrillo was never informed by Rick Singer or anyone working in concert with him that he was paying Donna Heinel a monthly sum of money;

9. USC knew that Donna Heinel and/or the Athletics Department was advocating to admit students who were not student athletes other than the documents provided to the government as reciprocal discovery; and

10. Robert Zangrillo was informed by Rick Singer or any other KWF agent or employee that KWF was a legitimate 501(c)(3).

Mr. Zangrillo requested the foregoing materials in a December 19, 2019 letter to the government. *See* Exhibit 1. The government's response took the position either that the requested information is not exculpatory, *see id.* ("Having reviewed your requests, we do not agree that the information you seek – to the extent it exists – is exculpatory"), or that it had been or would be produced. "As just one example," the government wrote, "whether Rick Singer actually spoke to the crew coach regarding Amber Zangrillo is irrelevant to the question whether your client agreed to participate in the charged conspiracies. Likewise, whether the coach in fact assured Singer that Amber Zangrillo would be admitted to USC is irrelevant to **your client's state of mind**." Exhibit 2 (emphasis added).[1] While the government represented that, notwithstanding this disagreement, it had produced most emails and documents in its possession responsive to Mr. Zangrillo's requests (with the notable exception of responsive materials from the government's search of Mr. Zangrillo's email

---

[1] In a June 11, 2018 intercepted conversation, Singer was recorded saying to Mr. Zangrillo that the USC crew coach had told Singer "ok I will take her," referring to Mr. Zangrillo's daughter.

account), its representation regarding FBI 302 reports, and in particular those of interviews with Singer, incorporated its narrow definition of exculpatory information. *See id.* (stating that the "reports do not contain exculpatory information responsive to your requests"). Because, as set forth in more detail below, all of the requested information is exculpatory, and because the proper construction of what is "exculpatory" far exceeds the narrow government view restricting it to evidence material to Mr. Zangrillo's state of mind, the defendant asks that this Court Order the government to produce any reports responsive to his requests.

      Mr. Zangrillo's factual innocence does not rest alone on his good-faith belief that Mr. Singer was not engaged in wire fraud or his belief that Ms. Heinel was not breaching her duty of honest services; instead, his defenses range from 1) USC is not a victim of any money or property fraud, having instead welcomed donations and the admission of non-athletes supported by the Athletic Department – and many other Departments – as VIPs at the highest levels of the institution, 2) any misstatements in the application of his daughter Amber as to her being an athlete were inserted, unilaterally, by Mr. Singer and his associates without the prior knowledge or approval by Mr. Zangrillo, 3) any misstatements in the application of his daughter were not material in light of USC's proven practice of admitting an extraordinarily high percentage of VIP Transfer student applicants whose families could be expected to become large donors, 4) that there was no breach of honest services agreed to by Mr. Zangrillo – or any breach of honest services that in fact resulted from any effort made by anyone in connection with the admission of his daughter Amber – because any efforts made by any USC employee on his family's behalf were consistent with approved and well-recognized university wide practices including in particular the yearly past practices of the heads of

3

the USC Athletic Department, *see, e.g.*, *United States v. Skilling*, 554 F.3d 529, 545 (5th Cir. 2009), *vacated in part on other grounds*; *United States v. Brown*, 459 F.3d 509, 522 (5th Cir. 2006), 5) that payments to USC or to Singer for payment to USC were legitimate donations from legitimate sources of income – the antithesis of money laundering, and 6) that rather than Zangrillo and Singer having a meeting of the minds or a conspiratorial agreement, Singer was deceiving Zangrillo in an attempt to have Mr. Zangrillo rely on him and pay him in the belief that his assistance was both being truthfully disclosed to Zangrillo and, further, was both legal and known to and approved by USC through its university-wide VIP program in which the Admissions Department is informed of the identities of applicants that the USC Development Office, its President, its Trustees, and countless other sources of authority at the University supported.  The requests in the *Brady* letter of December 19, 2019 were not cabined solely to a state of mind defense; instead they sought evidence which the defendant could reasonably believe was provided and/or communicated to the prosecution and/or FBI in its many interviews with Rick Singer, the cooperating lynchpin of its wire fraud and money laundering conspiracy allegations, that would not only negate the allegations of criminal intent but support one of the many other defenses being relied upon by Mr. Zangrillo to contest the prosecution's criminal accusations.

Additionally as Mr. Zangrillo and his co-defendants have made clear in a recent filing, the government erroneously reads *Brady* and its progeny as limited to disclosure of evidence directly proving factual innocence.  *See* Dkt. 773 at 2.  But that is not the law, particularly in this district where Judge Young has expressly rejected a similar understanding of *Brady* as "far too restrictive an approach." *United States v. Owens*, 933 F. Supp. 76, 85 (D. Mass. 1996).  Evidence useful for

impeachment purposes, among other things, readily qualifies as exculpatory. *See* Local Rule 116.2(a)(3) (defining "exculpatory information" to include "information that tends to . . . cast doubt on the credibility or accuracy of any evidence that the government anticipates using in its case-in-chief"); *United States v. Snell*, 899 F. Supp. 17, 23 (D. Mass. 1995) ("There is no question but that as a general matter, the *Brady* obligation includes the requirement to turn over evidence of impeachment.").

Each of the ten requests above seeks information that fits comfortably into this framework. The first three items target evidence that Mr. Zangrillo was not responsible for completing, reviewing, or submitting the two applications underlying the charges against him, and that those applications were instead submitted by Rick Singer and/or his associates. Such evidence would self-evidently undermine the government's charge that Mr. Zangrillo was involved in a conspiracy or scheme to defraud the universities. The fourth and fifth items seek evidence that Singer lied to Mr. Zangrillo on the June 11, 2018 call when he claimed to have personally spoken to the USC crew coach and received assurance that Mr. Zangrillo's daughter would be admitted to the university – a lie that was calculated by Mr. Singer to defraud Mr. Zangrillo into relying on Singer and not his own VIP contacts in the California business community to advocate for his daughter. As an initial matter, all examples of Singer's lies are relevant and exculpatory, *see* Dkt. 773 at 2 (citing *Owens*). Even more importantly, proof of this particular lie to Mr. Zangrillo supports Mr. Zangrillo's defense that he had no conspiratorial meeting of the minds with Singer as contrasted to Singer's being engaged in an effort to defraud Mr. Zangrillo in order to induce him to rely on Singer and to pay Singer/Key for unneeded services. Item six relates to another lie told to Mr. Zangrillo by Singer, namely that his

daughter was admitted to USC as a crew recruit. In fact, as the government appears to have conceded, and as the documents provided to the government compellingly and indisputably prove, Mr. Zangrillo's daughter was not admitted as an athlete but rather through the university's well-established "VIP" or "special interest" admissions process. *See* Dkt. 532-1 at 3 n.1. This Court has referred to the potential relevance of this fact. *See* Sept. 18, 2019 Hr'g Tr. at 41-42 ("[I]f the process by which [Mr. Zangrillo's daughter] was admitted was the same . . . as the process that many legitimate students went through to get admitted and if the cheating was not material to her admission and if what Donna Heinel was doing in this specific case . . . was the same as what other legitimate department heads were doing to push their candidates, then I think that is relevant to his defense."). The ninth request similarly seeks evidence that USC knew and condoned of the alleged scheme and, therefore, was not deprived of money, property, or honest services. The three remaining requests (seven, eight, and ten) all relate directly to Mr. Zangrillo's contention that he harbored a good-faith belief that the money paid to Singer's organization was a legitimate donation that would be used to support USC programs. Mr. Zangrillo respectfully submits that the foregoing is more than sufficient to satisfy his initial burden of making "some showing that the materials in question ***could*** contain favorable, material evidence." *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011) (emphasis added).

       The suggestion in the government's letter that the requests relate solely to "impeachment evidence" that need not be produced now is incorrect. First, as set forth in detail above, while certain of the requests do relate to lies told by Singer, none constitutes pure impeachment evidence because each of the requests also supports one or more substantive trial defenses. *See* Local Rule 116.2(b)(5)

("If an item of exculpatory information can reasonably be deemed to fall into more than one of the foregoing categories, it shall be deemed for purposes of determining when it must be produced to fall into the category which requires the earliest production.")  Second, because the requested materials are exculpatory, the government may not rely on the Jencks Act to delay disclosure.  *See Owens*, 933 F. Supp. at 84 ("Despite the strictures of section 3500, a thorough reading of applicable case law indicates that a district judge has authority to order disclosure of **exculpatory** witness testimony before trial."); *Snell*, 899 F. Supp. at 21 ("[I]n seeking to harmonize the Jencks act and *Brady*, it makes no sense to indulge in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one, like Jencks.").

For the foregoing reasons, Mr. Zangrillo respectfully requests that the government be required to immediately produce any 302 reports responsive to the ten requests set forth above, or, alternatively, provide those reports to the Court for *in camera* examination to determine whether they contain exculpatory information.

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Undersigned counsel conferred through his exchange of discovery letters with counsel for the government and the government opposed the defendant's requested relief.

Respectfully Submitted,
ROBERT ZANGRILLO
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116

(617) 227-3700  
owlmgw@att.net

Dated: January 30, 2020

## **CERTIFICATE OF SERVICE**

    I, Martin G. Weinberg, hereby certify that on this date, January 30, 2020, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**  
Martin G. Weinberg, Esq.