<pre>
 1                     UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        )
 3     UNITED STATES OF AMERICA,        )
                                        )
 4            Plaintiff,                )
                                        )   Criminal Action
 5     v.                               )   Nos. 1:19-cr-10080-NMG-19
                                        )
 6     ROBERT ZANGRILLO,                )
                                        )
 7            Defendant.                )
                                        )
 8

 9
                    BEFORE THE HONORABLE M. PAGE KELLEY
10                    UNITED STATES MAGISTRATE JUDGE

11

12                              HEARING

13

14
                          December 18, 2019
15

16

17              John J. Moakley United States Courthouse
                         Courtroom No. 24
                         One Courthouse Way
18                  Boston, Massachusetts 02210

19

20

21

22                    Linda Walsh, RPR, CRR
                       Official Court Reporter
23          John J. Moakley United States Courthouse
                 One Courthouse Way, Room 5205
24                  Boston, Massachusetts 02210
                       lwalshsteno@gmail.com
25
</pre>

1    APPEARANCES:

2    On Behalf of the Movant University of Southern California:

3         HOGAN LOVELLS US LLP
          By: Anthony E. Fuller, Esq.
4         125 High Street, Suite 2010
          Boston, Massachusetts 02110
5         617-371-1000
          anthony.fuller@hoganlovells.com
6
     (Appearing Via Telephone:)
7         GIBSON DUNN
          By: Douglas Fuchs, Esq.
8         333 South Grand Avenue
          Los Angeles, California 90071
9
     On Behalf of the Defendant Robert Zangrillo:
10
          MARTIN G. WEINBERG, PC
11        By: Martin G. Weinberg, Esq.
          20 Park Plaza, Suite 1000
12        Boston, Massachusetts 02116
          617-227-3700
13        owlmcb@att.net

14

15

16            Proceedings recorded by sound recording and
               produced by computer-aided stenography
17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S
 2          THE CLERK:  Wednesday, December 18, 2019, and we are
 3    on the record in Criminal Case Number 19-10080, the *United*
 4    *States versus Robert Zangrillo,* the Honorable M. Page Kelley
 5    presiding.
 6          And would counsel please identify themselves for the
 7    record.
 8          MR. FULLER:  Good afternoon, Your Honor.  Tony Fuller
 9    on behalf of U.S.C.  And on the telephone is Doug Fuchs, also
10    for U.S.C.
11          THE COURT:  Okay.  Good afternoon.
12          Good afternoon, Mr. Fuchs.
13          MR. FUCHS:  Good afternoon.
14          MR. WEINBERG:  Mark Weinberg on behalf of
15    Mr. Zangrillo.
16          THE COURT:  Okay.  And, Mr. Fuchs, can you hear us?
17          MR. FUCHS:  Yes.  Thank you, Your Honor.
18          THE COURT:  Great.  Okay.  All right.  And I'll just
19    note for the record the Government is also present in the
20    courtroom.
21          So I wanted to talk to the parties because after the
22    last hearing that we had on November 26th, I had asked -- I
23    think I -- it amounts to an order for some things to be done
24    that were not done.  So at the hearing on November 26, one of
25    the issues was a batch of e-mails, about 20 of them, that were
</pre>

1    responsive to Mr. Zangrillo's request but that U.S.C. did not

2    want to have to turn over, and they submitted those ex parte.

3    And at the end of the hearing I said that Mr. Zangrillo would

4    get them, but that they would need to be redacted.  And I've

5    been over the transcript of the hearing.  And U.S.C. asked if

6    they could redact some of the terms having to do with their

7    admissions criteria, and I said I don't know what the terms

8    mean and I don't -- so I don't know their significance, and you

9    should file something ex parte explaining what the terms mean

10    and then I'll rule on your request.

11         And after the hearing I went back and reread the

12    e-mails and realized that I think they are relevant to

13    Mr. Zangrillo's defense, and Mr. Zangrillo had made an argument

14    at the hearing having to do with why the individual e-mails

15    would be more useful to him than the lists which had already

16    been provided to him.

17         And so on the docket I then ordered, and I'm quoting

18    from the docket, "The Court now further orders U.S.C., in

19    addition to explaining what terms they would like to redact and

20    why, to submit to the Court all proposed redactions concerning

21    these e-mails by December 10th, 2019."  And what I meant by

22    that is I would -- I wanted to see the redactions in all the

23    e-mails before they were given to counsel, that is, to

24    Mr. Weinberg.  So December 10th came and went.  I received

25    nothing.  So I think it was about December 14th I asked

1    Ms. Belmont to contact U.S.C. what's happening, and I received

2    an ex parte filing from U.S.C. that states "U.S.C. intended to

3    produce the additional documents discussed in the November 26th

4    hearing to Mr. Zangrillo without involving the Court."

5         And that was not my intention.  My intention was to

6    see what the redactions were -- what redactions were made to

7    those e-mails before they were given to Mr. Zangrillo because

8    I'm concerned about Mr. Zangrillo not understanding the import

9    of the e-mails, and my intention was to allow U.S.C. to protect

10   the identities of the students.  Obviously no one has ever

11   suggested that the prospective students would not be -- their

12   information would not be protected, but I just wanted to see

13   them to make sure that they were redacted in the manner in

14   which I had intended for them to be redacted.

15        So I am now going to ask Mr. Weinberg to provide me

16   with what he has received from U.S.C., including, I asked for

17   an affidavit attesting that the redactions, insofar as they

18   explained the role of people or sort of who people were, were

19   accurate.  And I note now I recently received from U.S.C. a

20   request to redact proprietary information about admissions

21   policies from those e-mails, certain of those e-mails.  And,

22   again, I don't know what those terms mean, and I was not

23   provided with a definition of those terms.  I know the words

24   that you want to redact, but I don't know what they signify.

25        So I need -- I would like to have the redactions

1    that -- the redacted materials that were provided to

2    Mr. Weinberg, and I would like to have something ex parte

3    explaining the meaning of the proprietary terms.  There's -- I

4    have no idea what they mean.  I can guess from their context,

5    but I just don't know what the definition or the significance

6    of those terms is.

7            So, Mr. Weinberg, how much longer would you like

8    to -- how long would you like to get me that?

9            MR. WEINBERG:  I could have them for you tomorrow

10   morning, Your Honor, or I've got a bunch of stickies on the set

11   I've got here that I can take off and give it to you this

12   afternoon.

13           THE COURT:  Well, sure, as you wish.  Tomorrow is fine

14   or today is fine, too.  So did in fact U.S.C. explain who

15   people were?

16           MR. WEINBERG:  No.  What Mr. Fuchs did provide me by

17   phone was two pieces of information.  You know, one, the date

18   that I would receive the redacted copies of both what I call

19   the individual e-mails, the advocacy e-mails, and the redacted

20   checklists or lists or charts that had previously been provided

21   with a complete redaction with the substitution of a title or a

22   description of the person, in other words, the descriptions.  I

23   just started going through them.  I got them Monday, and I was

24   in court all day with Judge Talwani yesterday.  Some of the

25   descriptions are descriptions that are so broad, like

1    "university official," or they provide very little guidance in

2    terms of a more detailed description:  Is he the president, is

3    he a dean, is he a trustee, is he the vice-president, is he a

4    professor.  So I will be -- I was intending to put together a

5    list of pages that have descriptions that are not descriptive

6    enough in terms of, you know, my belief as to what's material

7    to Mr. Zangrillo's defense.

8           The second thing that Mr. Fuchs told me is that, and I

9    appreciate his telling me, is that there were redactions beyond

10   the names of the people in some of the 20 or 22 e-mails, and he

11   has said that despite his earlier belief that they wouldn't

12   need any redactions beyond the names, they decided, you know,

13   between Gibson and Dunn and the university and their counsel,

14   to seek additional redactions and that they had or were

15   providing them to the Court for the Court's review.  And now

16   from reviewing them for the first time, a few hours ago, it's

17   pretty clear that there are -- some of these e-mails have

18   redactions of systems or descriptions of lists that go beyond

19   the names of the persons that, you know, were clearly intended

20   to be redacted.  So that's my report in terms of the update

21   from U.S.C.'s production and U.S.C.'s description of what

22   remains from their perspective.

23          THE COURT:  Okay.

24          MR. WEINBERG:  So, I guess, to be clear, U.S.C. wants

25   the Court to okay additional redactions on certain of the

1    e-mails, and I am going to be seeking some further -- some

2    further particularization, not the name of a person, but

3    something beyond "university official" to assist me in, you

4    know, in understanding exactly how the system works and be able

5    to present these documents that I believed to be highly

6    exculpatory to Mr. Zangrillo to a jury, again, assuming, hoping

7    that the Government agrees that these altered business records

8    are altered in a way that both parties can use before a jury

9    with some description and some declarant, as Your Honor

10   ordered, to be an affiant to the accuracy of the descriptions.

11        THE COURT:  Okay.  So I know the Government is sitting

12   here now.  I mean, just to take a step back -- and Mr. Fuchs or

13   Mr. Fuller, I'm happy to hear from you in a minute, but what

14   I'm trying to do is balance Mr. Zangrillo's constitutional

15   right to obtain evidence to use in his defense with what I

16   think is a valid concern -- concerns -- what I think are valid

17   concerns that U.S.C. has raised about kind of overdoing it and

18   giving Mr. Zangrillo more information than he really requires

19   or kind of piling on information when he has enough information

20   to make his point, and the reason I'm taking into consideration

21   U.S.C.'s arguments is I think they do have some -- I think I

22   should be balancing how intrusive this is under *Nixon*, and I

23   just feel that I have an obligation to do that.

24        However, I do think that Mr. Zangrillo's defense in

25   many respects kind of trumps a lot of the concerns that U.S.C.

1    has raised.  And I do appreciate that U.S.C. has gone to quite

2    a lot of trouble to try to sort of delicately step through this

3    minefield.  So that's what I'm trying to do, but in

4    re-reviewing everything in preparation for today, I think one

5    problem here is that -- and in reading Mr. Brunold's original

6    affidavit in which he says "The admissions department has no

7    involvement with respect to donations or potential donations.

8    The admissions department does not track donations by an

9    applicant's family.  Information concerning donations by an

10   applicant's family is not included in an applicant's file.  If

11   I had known that a prospective student's family had donated

12   $50,000 or $100,000 to U.S.C., it would not have affected the

13   admissions department's decision whether to admit the student."

14          So I feel, having read this through many times now and

15   reading the parties' filings, some of which are ex parte, so I

16   have to be very careful what I say here, but I think this is

17   very, very carefully worded.  And that perhaps the problem is

18   from the University's perspective, sure, someone who donated 50

19   or $100,000 may not be helping themselves get into the

20   university, but someone who donates a much larger amount may

21   well be helping themselves, and so this is sort of technically

22   true.

23          But when it comes to Mr. Zangrillo's intent and his

24   state of mind, if he thought that being a donor, period,

25   without understanding what the ceiling or the floor of that

1  donation needed to be, if he thought giving a donation would

2  help him get into the university, and he's just wrong about the

3  amount, then I think he's entitled to know that giving a

4  donation helps you get into the university, even if it's not

5  precisely the amount he gave.

6        And I think saying, well, just because we let -- we

7  may give bigger donors consideration, but we wouldn't give such

8  a little donor consideration, I think that needs to be made

9  explicit to him because that -- I think that is a point in his

10  defense.  It goes to his intent and what he thought was the

11  truth.  So that's why I think the 20 e-mails may be -- he may

12  need to get the import of those e-mails.  Yes?

13        MR. FULLER:  Your Honor, Mr. Fuchs can address, I

14  think, some of the specific points, and I think he can explain

15  those redactions, probably he could do it over the phone but

16  probably would prefer to do it in camera due to the proprietary

17  nature.  But I do want to apologize or actually express my own

18  personal misunderstanding of the order that the Court entered.

19  I think our understanding was that after your hearing we

20  were -- well, you issued a ruling, and I think Mr. Fuchs said

21  in addition to the names we have some proprietary information

22  we might want to redact, and you had said then I want that by

23  December 10th.

24        And I think our understanding was if we were just

25  going to produce it without redacting proprietary materials, we

1   wouldn't need to bother the Court by reviewing them.  And so I

2   think there was an intent to do that with Mr. Weinberg.  Then

3   they realized no, we do have these five e-mails out of the 22

4   where we are now going to redact more than the name and a title

5   or student information, and that's why we didn't send

6   everything to you.  I think there was a misunderstanding, and I

7   definitely had that understanding.  So I apologize to you for

8   that issue.

9          But, you know, I'll let Mr. Fuchs address some of the

10  broader things that Mr. Weinberg has raised in terms of, you

11  know, whether it's an effective, I guess, replacement of

12  nomenclature for somebody's -- you know, whether it's

13  "university official," but I'll let him address that to the

14  extent he can.  And then if you want to discuss the proprietary

15  concepts, he can do that as well.

16         THE COURT:  Okay.  Yes, Mr. Fuchs?

17         MR. FUCHS:  Yes, Your Honor, I, too, want to express

18  my apologies to the Court because I also misread your order.  I

19  didn't think your order was any different than what we had

20  discussed in Court.  And, in fact, I talked with Mr. Weinberg

21  about that, too, and he agreed that if we were not going to

22  seek to redact any proprietary information, the documents

23  should just come directly to him, and we wouldn't involve the

24  Court further.  So what happened was we initially intended only

25  to redact student names and then -- or student information,

1    excuse me, and then replace the names of the handful of

2    individuals in those e-mails with their titles.  And very late

3    in the game we decided to redact two terms from five e-mails.

4    It's the same two terms, and they appear in five of the 22

5    documents.  We provided an explanation to the Court in the ex

6    parte filing both as to why the information is proprietary and

7    sensitive and fits with the Court's concern about laying

8    their -- laying the admissions process bare and the need not to

9    have to do that, and also why they're not relevant to

10   Mr. Zangrillo's client because her factual -- well, his

11   daughter's factual situation doesn't implicate these two terms,

12   but I will provide an additional filing to further explain to

13   the Court what these two terms mean in the scheme of the

14   admissions process.  I'm happy to do that.

15          And I apologize if I misread the Court order -- well,

16   I did misread the order.  Apologies for misreading the order.

17          In terms of the labels and redacting the names, you

18   know, there are hundreds and hundreds of names.  They've been

19   replaced with labels which are obvious on their face, and

20   frankly, much more clearly communicate the significance of a

21   person than their actual name would.  There are maybe a handful

22   of labels like "university official," or put another way,

23   "university official" may be used a handful of times, but I'm

24   happy to hear from Mr. Weinberg about that term.  And I will

25   look back to the list, and I will see who the individual is who

1   was labeled "university official," and I'll see whether or not

2   there is a better way to describe that person.

3          Again, we get to diminishing returns.  He's got, you

4   know, dozens and dozens of examples of people, like trustees

5   and others, who are on those lists.  That will communicate the

6   point he wants to make.  The notion that we have to have the

7   700th name defined by a clear label, I think anyone would

8   agree, is overkill.  But I'm happy to work with him to try to

9   bring more clarity to the extent it's possible.

10         THE COURT:  Okay.  And with regard to the 20 e-mails,

11  have those people been defined by their -- who they are?

12         MR. FUCHS:  Yes.  There are very few redactions of

13  people's names.  I mean, there are more than the two terms that

14  were redacted as proprietary.  I'm working on -- and there are

15  a lot of names, Your Honor, and it's going to take a little bit

16  of time to verify -- well, to have someone verify and then

17  declare that all of the labels correspond to all of the names

18  in all of these chalks.  However, with regard to these 22

19  documents, I can more quickly get a separate declaration

20  together for Mr. Weinberg, but my understanding of the

21  declaration is essentially I looked at the name, I applied the

22  label, and the label accurately reflects the position of the

23  person whose name is redacted.

24         THE COURT:  So, for example, I'm looking at one where

25  you've -- you have trustee and then you've -- I'm looking at

1    the 21 e-mails, and you have one where you have a particular

2    student's name and then their U.S.C. ID, trustee blank,

3    contacted Al Checchio and then --

4              MR. FUCHS:  Yes.

5              THE COURT:  So there's -- you're not going to identify

6    who the student is in any way, like if there's some famous

7    person or if their parent is a famous person or anything like

8    that?  You're just only going to identify the college, the

9    university people but not who --

10             MR. FUCHS:  Correct.

11             THE COURT:  Yeah.

12             MR. FUCHS:  Correct.  We never -- at no point in time

13   in my discussions with Mr. Weinberg or with the Court did we

14   indicate, nor was there ever a need to describe the student.  I

15   mean, the student redactions are required by FERPA, and there

16   was never a discussion or an understanding or anyone ever

17   envisioned a need to describe who the students are.

18             THE COURT:  Okay.

19             MR. WEINBERG:  I mean, there may be mistakes in the

20   redactions, but I look at U.S.C. 273 as an example --

21             THE COURT:  Okay.  Mine --

22             MR. WEINBERG:  -- which is one of the 21.

23             THE COURT:  Mine aren't numbered, but okay.

24             MR. WEINBERG:  May I show it to the Court?

25             THE COURT:  Yes.

 1            MR. FUCHS:  And, Your Honor, all these documents are

 2     under seal so I'm not sure this would be the appropriate forum

 3     to now start picking apart the individual documents and

 4     revealing their content on the record.

 5            THE COURT:  Okay.  I agree with you because we are not

 6     under seal and the courtroom is open, although there's no press

 7     here because, I think, this was on such short notice.

 8            MR. WEINBERG:  Other than the Government, there's one

 9     additional person.

10            THE COURT:  There's a person from U.S. Probation here

11     for the next hearing, so.

12            MR. WEINBERG:  I have got three or four examples that

13     look like they go beyond the systems and are blanks.  Blank is

14     the --

15            THE COURT:  Sure.

16            MR. WEINBERG:  And there's a letter of recommendation

17     blank.  There's no description at all as to any of these three

18     blanks that are the names of people --

19            MR. FUCHS:  I can't hear anything he said.

20            THE COURT:  You're not standing near enough.  You can

21     stand near the microphone.

22            So here's what I would like to do:  I would like to

23     see the redactions to the 21 documents, and I'd like U.S.C. to

24     file, perhaps by next Monday, an explanation of the

25     so-called -- what we're calling the proprietary admissions

1    terms that you don't want to reveal, and I'll just say --

2              MR. FUCHS:  Okay.

3              THE COURT:  -- what I think Mr. Weinberg has expressed

4    is important to his defense is his client's understanding that

5    having important people advocate for your child to get in or

6    influential people somehow and donating money gave you a leg up

7    in the admissions process, which honestly, to me, is -- does

8    not sound like it should be very controversial, and especially

9    having read these unredacted e-mails, it seems like it should

10   not be controversial.  I mean, I have no way of looking at

11   these and knowing whether people got in or not, but the

12   admissions department seems interested.  It seems like a

13   relevant data point.  So what I would like you to do is talk to

14   him about that and see if he's able to satisfy his need for

15   that information with what you have given him.

16             MR. FUCHS:  Your Honor --

17             THE COURT:  Yes.

18             MR. FUCHS:  -- I'm happy to do that, but we're talking

19   about these documents like it's a vacuum.  We produced to him

20   statistical information that gives him everything he needs.

21   Why he wanted these -- why he wanted these 22 documents was

22   because of examples of individual advocacy, and he's now got

23   it.  He's got situations where, although it's 22 documents out

24   of millions of documents that might be in existence, so I don't

25   know that we want to blow these out of proportion in terms of

1     their significance, but nonetheless, he's got 22 documents

2     which demonstrate that people within the university were

3     e-mailing and advocating on behalf of individuals.  I mean, I

4     just don't know what the mystery here is.  He's got what he

5     asked for times ten.

6               THE COURT:  Okay.

7               MR. WEINBERG:  Well, the mystery, in case Mr. Fuchs

8     really legitimately thinks it's a mystery, is if there were 22

9     people that individuals at the university were separately

10    advocating for with the admissions department, some of the

11    advocates being in development, despite Mr. Brunold's

12    affidavits declaring his complete disinterest in that kind of

13    information, the interest is whether 22, 21, 20 or none of

14    these people were admitted.

15              I have, you know, overall charts, and I've got from

16    athletics, that, you know, that Brunold would tell Pat Haden

17    through Donna Heinel who got in and who didn't get in; that's

18    in the public record.  But I don't have the effect of this

19    individual advocacy.  And my guess is it was a profound effect

20    that went beyond the statistics which were statistics generally

21    for what does a flag mean to an applicant, what multiple of 11

22    percent advantage did an applicant get when they were flagged

23    by development or athletics or anybody else.  And the --

24              MR. FUCHS:  I just -- you know, Your Honor, he has the

25    documents now, and I'm not going to let him misrepresent the

1    documents.  We know one of the documents is an appeal by a

2    parent who donated $1 million to the university, and admissions

3    said we're not changing our decision.  Okay.  That doesn't help

4    him.  In fact, that cuts against the heart of his case.  In

5    addition, we know from these documents that many of them are

6    situations where people are appealing denials or appealing

7    getting in as a spring admit as opposed to a fall admit.

8    They're being denied altogether, and they're trying to get

9    in -- trying to scrape their way into the spring.  Some of them

10   have nothing to do with their admission and none of them

11   reflect Tim Brunold acknowledging that he is going to now admit

12   someone.  So these documents have been greatly exaggerated.

13          But most importantly, Your Honor, we've had this

14   argument now two or three times.  What he wanted was individual

15   advocacy.  He's got 22 documents.  They concern applicants, and

16   in a few instances there are people who have been -- their

17   labels have been made clear to Mr. Weinberg who they are

18   advocating, and in other instances it's advancement.  I mean,

19   he's got it.  We're back to the same old argument of does he

20   need the actual names of the person advocating.

21          MR. WEINBERG:  I'm not seeking the names.

22          MR. FUCHS:  In some instances he has that, too.

23          THE COURT:  Okay.  All right.  Okay.  So here's what

24   I'm going to do:  You're saying, oh, he's got it, and et

25   cetera.  That's why I wanted to see it.  I wanted to see what

1    he got.  So he's going to provide that to me, and I would like

2    the parties to further negotiate the -- what Mr. Weinberg

3    earlier brought up about "university official" not being

4    specific enough with regard to the charts and those redactions.

5    And I think I will take the information from Mr. Weinberg.  On

6    Monday I'll get something from U.S.C. about the -- about the

7    proprietary terms and what they mean specifically, and then

8    let's just take it from there.

9             MR. WEINBERG:  If I could just say one more thing --

10            THE COURT:  Yes, you can.

11            MR. WEINBERG:  -- because I don't like lawyers not

12   here saying I misrepresent things to judges.

13            I didn't make any statements of fact.  I said I don't

14   know how many of these the 22 students, whose names I've never

15   requested, got in as a result of these e-mails, whether as

16   transfers, springs, appeals, et cetera.  Mr. Fuchs said one of

17   them didn't.  Fine, the 21 out of 22 get in.  That's all I was

18   asking.  I made no representation of fact, and, you know, I

19   won't go further regarding Mr. Fuchs' rhetoric.

20            THE COURT:  Okay.  So I think we'll just leave it

21   there today, and I'll get the parties' further filings, and

22   then if I still have questions, I think we may take this up

23   again after the holidays with longer notice to the parties.

24            Okay.  Thank you very much.

25            MR. FUCHS:  Thank you.

1          MR. FULLER:  Thank you, Your Honor.

2          (Recording ends at 4:01:33)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3             I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the audio recorded proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9             Dated this 22nd day of December, 2019.

10

11

12             /s/ Linda Walsh_____

13             Linda Walsh, RPR, CRR

14             Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25