UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT ROBERT ZANGRILLO'S
MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE**

Defendant Robert Zangrillo, following on the heels of his co-defendants, seeks early disclosure of FBI interview reports of potential witnesses concerning 10 categories of information. Zangrillo notes that the government has already produced "*most* emails and documents in its possession responsive to" his requests.  *See* Dkt. 801 ("Zangrillo Br.") at 2 (emphasis added).   In fact, the government has produced *all* such materials.[1]   He further concedes that at least some of the information he seeks is impeachment evidence – to which he is not entitled at this time under the Local Rules.   Nevertheless, he contends that *all* of what he seeks is also core *Brady* material, because it tends to directly exculpate him of the charged crimes.   That is not true.   Nevertheless, to the extent the government is in possession of information responsive to Zangrillo's requests, it has produced that evidence.   There is, accordingly, no need for the Court to intervene, and Zangrillo's motion should be denied as moot.[2]

---

[1] Zangrillo contends that the government did not produce "responsive materials from the government's search of Mr. Zangrillo's email account."   Zangrillo Br. at 2-3.   That is incorrect. The government sent a production of those materials, via overnight mail, on January 29, 2020, the day before Zangrillo's motion was filed, and alerted counsel via e-mail that day to expect delivery on January 30, 2020.

[2] In connection with the Government's Consolidated Response in Opposition to Defendants' Motions to Compel (Dkt. 736), the government provided the Court, on an *ex parte* basis, copies of all FBI reports completed thus far that relate to substantive statements by William

## RELEVANT FACTUAL BACKGROUND

The government provides a brief factual background because it is relevant to understanding why the information Zangrillo seeks either does not exist or is not, in fact, exculpatory.

In 2013, Zangrillo reached out to Singer about pursuing "four potential side doors" for Zangrillo's eldest daughter.  *See* Ex. A (Nov. 18, 2013 e-mail chain).[3]  Zangrillo's daughter was ultimately admitted to New York University ("NYU"), and Zangrillo paid Singer $250,000, structured as a purported contribution to Singer's sham charity, the Key Worldwide Foundation ("KWF").

Zangrillo's second daughter applied to USC.  For that application, Singer contacted the university's former assistant coach of women's soccer, Laura Janke, in March 2015, stating, "parent will do 100K to Donna [Heinel] 25[K] to you," and proposed using a 1% soccer scholarship to secure her admission.  *See* Ex. B (Mar. 20, 2015 e-mail chain); Ex. C (Mar. 20, 2015 e-mail chain).  Singer's efforts were too late, however, as USC had already rejected the application before Zangrillo's daughter could be designated as an athletic recruit.  *See* Ex. D (Mar. 24, 2015 e-mail chain).

Zangrillo thereafter sought help from a business partner who served on the university's President's Leadership Council, while Singer reached out to former USC women's soccer coach Ali Khosroshahin about securing a spring admission "with [D]onna [Heinel] or Soccer- 100k to SC [Futbol Academy, a private soccer team run by Khosroshahin and Janke] or program."  *See* Ex. E (Mar. 27, 2015 e-mail chain); Ex. F (Mar. 28, 2015 e-mail chain); Ex. G (Apr. 17, 2015 e-

---

"Rick" Singer, as well as copies of the government's letters to the defendants disclosing certain information from those reports, for *in camera* inspection.

[3] The government will file all exhibits referenced herein on the docket with redactions in accordance with the May 2, 2019 Protective Order.

mail chain).   Ultimately, Zangrillo's daughter's appeal of her denial was successful, and she was admitted to USC.   Following her admission, Zangrillo sought Singer's help securing preferred housing.   Ex. H (Aug. 20, 2015 e-mail chain).   Singer replied, "Since you went the path with institutional advancement they have to help.   *My contacts only help those who are helping them*." *Id.* (emphasis added).

In the summer of 2016, Zangrillo's eldest daughter sought to transfer from NYU to USC. Zangrillo again reached out to USC Advancement.   USC's head of Advancement ultimately directed a colleague to "get this kid in for me," but told Zangrillo's friend on the President's Leadership Council to "please tell this guy to back off," adding:

> He's way over the line and I'm beginning to resent his pressure…. These slots aren't for sale, they go to the most qualified.   I don't care who he is or what he might do, it[']s up to the admissions office[,] not me…. Seriously, it borders on harassment.   And he wants to send another one here?   I won't be involved with that one, just so you know.

Ex. I (June 22, 2016 e-mail chain).   Zangrillo's eldest daughter was later admitted to USC.

During her senior year of high school, Zangrillo's youngest daughter, Amber, applied to Boston University ("BU") and USC, among other schools.   In the spring of 2017, BU offered her admission while USC denied her application.   *See* Ex. J (Apr. 21, 2017 e-mail from USC head of Advancement noting that application was denied "[a]nd it will stay that way too").

As a condition of her admission to BU, Amber needed to provide BU with proof of her high school graduation.   Zangrillo paid Singer to have Mikaela Sanford and an unindicted co-conspirator complete five classes for Amber at the online high school in which she was enrolled, so that she could graduate.   Ex. K (Invoices and e-mails concerning payment of same).

Ultimately, Amber Zangrillo attended a different university for the 2017-2018 academic year, but sought to transfer to USC with Singer's help.   Once again, Zangrillo turned to Singer

and Sanford to complete online courses to submit with Amber's application.  *See, e.g.*, Ex. L (Invoices and e-mails from Zangrillo approving payment).

In a call on or about June 11, 2018 that was intercepted pursuant to a court-ordered wiretap, Zangrillo discussed the scheme with Amber, Singer, and Sanford.  *See* Ex. M (Audio recording and transcript of June 11, 2018 call).   During the call, Singer explained that Sanford was retaking an art history class on Amber's behalf in an attempt to raise the grade; Sanford had previously taken that same class on Amber's behalf but had received a failing grade.  *Id.*  Zangrillo asked Sanford to take a biology class for Amber as well.  *Id.*; *see also* Ex. N (Invoice for biology class and Zangrillo's approval of same).

On the call, Singer also explained that they were putting Amber through the USC admission process "as though she's been sculling and rowing," and that the USC crew coach had agreed to designate her as a purported recruit, provided that "[y]ou guys help us."   Ex. M.   Singer explained that the athletics route was necessary because even though Amber was marked a "VIP" in her first USC application, "you weren't even close.   They denied you on the first read even with her— even with [a USC trustee's] letter [of recommendation]."   *Id.*   When Zangrillo's daughter asked about the timing of her transfer application, Singer reminded her, "remember that- that you're going in under athletics and not under the regular admission."   *Id*.

Days later, Amber was admitted to USC on the condition that she "earn a GPA of 3.3 or higher in at least 12 transferable units in the Fall 2018 semester."   Ex. O (June 14, 2018 USC Letter).   Accordingly, Zangrillo enlisted Sanford to complete additional courses for Amber in the fall of 2018.   Ex. P (Invoices for Psychology 240, Race & Ethnicity, Women & World Religions, and Spanish 101).

Following Amber's admission, Singer asked Heinel whether Amber had, in fact, been "accepted through athletics." Ex. Q (June 26, 2018 e-mail chain). Heinel responded, "Yes," and Singer forwarded Heinel's e-mail to Zangrillo. *Id.* Later that day, however, Heinel clarified that Amber had not actually been "presented as an athlete," but had instead been admitted on the athletics department's "VIP list for transfers." Ex. R (June 26, 2018 e-mail chain). Singer did not forward this second e-mail to Zangrillo. In September, Zangrillo wired $200,000 to KWF and sent a $50,000 check to USC Women's Athletics the same day.

In a series of calls with Singer, Zangrillo agreed to mislead the IRS if asked about his payments to Heinel and KWF to secure Amber's admission, and further agreed that Amber would not say anything about having been admitted to USC through athletics. For example, the following is an excerpt from a call on October 25, 2018, in which Singer told Zangrillo that the IRS was auditing KWF. *See* Ex. S (Audio recording and transcript of Oct. 25, 2018 call).

| | |
|---|---|
| Singer | I won't say that the, the moneys went to go pay Heinel for USC to get her in. And the other part is when [inaudible] audit-- |
| ZANGRILLO | What-- what-- what-- what-- what will be the thing -- what was [my daughter's] payment for? Just so I know, so we have the story straight. |
| Singer | So [your daughter's] payment is all the same thing. All your moneys, including the classes that Mikaela took for-- |
| ZANGRILLO | Yeah, yeah. |
| Singer | --[your daughter], all will show they're to our foundation. |
| ZANGRILLO | Yeah. |

The following is an excerpt from a call on January 3, 2019, which was consensually recorded. *See* Ex. T (Audio recording and transcript of Jan. 3, 2019 call).

| | |
|---|---|
| Singer | All right, but one thing I want to make sure is when she-- if the-- 'cause this has happened with other kids is-- |

| | |
|---|---|
| ZANGRILLO | Mm-hmm. |
| Singer | --they get to the [USC undergraduate] advisor, and the advisor say[s], "By the way, you were admitted through athletics. Are you competing in a sport?" And, and we know that-- and we don't-- what I don't want her to say, or anything like this, is that she got in through athletics-- she got in because of a payment to athletics, which I know-- |
| ZANGRILLO | Right. |
| Singer | --that she won't-- right? |
| ZANGRILLO | Right.   No, she won't say that. |
| Singer | And will all show that she, that they were given to-- for our programs that handle underserved kids. |
| ZANGRILLO | Okay, great, perfect. |
| Singer | Okay? |
| ZANGRILLO | Okay, I got it. |

## ARGUMENT

Zangrillo's motion should be denied as moot because, to the extent the information he seeks exists, the government has disclosed it, notwithstanding its disagreement that the material is exculpatory, or otherwise subject to production at this time.

### I.   Applicable Law

FED. R. CRIM. P. 16 exempts from discovery interview reports and notes of government agents except as provided under the Jencks Act, 18 U.S.C. § 3500.   Courts may not, over the government's objection, compel the pretrial disclosure of non-exculpatory Jencks Act material.   *See United States v. Grandmont*, 680 F.2d 867, 874 (1st Cir. 1982) ("A court may not compel the disclosure of statements of government witnesses before the conclusion of their direct testimony."); *United States v. Neal*, 36 F.3d 1190, 1197 (1st Cir. 1994) ("[T]he Act provide[s] that prior statements are not subject to disclosure until the witness has testified on direct examination

and are available only to the extent the statements relate 'to the subject matter as to which the witness has testified.'") (internal citations omitted).

Local Rule 116.2, in turn, distinguishes between different categories of "exculpatory information," and sets forth a timetable for their disclosure.   Certain categories of exculpatory information must be produced within 28 days of arraignment "or by any alternative date established by the Court." L.R. 116.2(b)(1). Those categories include, notably, "[i]nformation that would tend directly to negate the defendant's guilt concerning any count in the indictment or information."   L.R. 116.2(b)(1)(A).   Other categories of "exculpatory information" must be disclosed not later than 21 days before trial. *See* L.R. 116.2(b)(2). Such "21-day material" includes, as relevant here, "[a]ny information that tends to cast doubt on the credibility or accuracy of any witness or evidence that the government anticipates calling or offering in its case-in-chief," as well as inconsistent statements of anticipated trial witnesses. *See* L.R. 116.2(b)(2).

## II.   The Evidence Zangrillo Seeks, While Not Exculpatory, Has Been Disclosed to the Extent It Exists

The government sets forth below its responses to the specific categories of information Zangrillo seeks.   As the responses make clear, the government does not agree that the information Zangrillo seeks is exculpatory, because it does not tend directly to negate his guilt of the charged crimes.   But the government's disagreement is beside the point because, to the extent the information Zangrillo seeks exists, the government has disclosed it.   Notably, however, most of the information Zangrillo seeks is so-called "negative" exculpatory information:  things that he contends did *not* happen, or that he was *not* told.   It is, accordingly, unsurprising that such evidence does not exist.

A.      Evidence Concerning Zangrillo's Involvement in the Misstatements on His
        Daughter's Applications (Requests 1-3)

Zangrillo's first three requests seek an order compelling the government to produce (1)

evidence that Zangrillo was "not responsible for completing, reviewing, or submitting" Amber

Zangrillo's applications to BU or USC, as well as (2) evidence that Singer, Sanford, or someone

acting in concert with them completed or submitted Amber Zangrillo's applications to USC or BU,

or (3) had access to her Common Application account at the time her applications were submitted

to USC or BU.   (Zangrillo Br. at 1, 5).

        The information Zangrillo seeks is not exculpatory because neither Zangrillo nor his

daughter needed to personally complete, review or submit fraudulent applications to be guilty of

the charged conspiratorial agreement – and, indeed, the government has never alleged that

Zangrillo personally did so.   To the contrary, that is precisely what Zangrillo engaged Singer,

Sanford and others to do.   Notwithstanding its disagreement as to the exculpatory value of such

information, however, the government has produced all of the documents and recordings in its

possession, custody or control responsive to Zangrillo's first three requests, including the

recording of the June 11, 2018 call in which Zangrillo, his daughter, Singer, and Sanford discussed

the fact that Sanford would complete online courses while posing as Amber so that the grades

Sanford earned could be included on Amber's USC application.   The government has also

reviewed the FBI 302 reports of witness interviews prepared to date.   There are none.   The

government anticipates making supplemental disclosures as additional 302 reports are prepared.

        Accordingly, the government has met its discovery obligations with respect to Zangrillo's

first three requests, and will continue to do so as additional witnesses are interviewed.   No order

of the Court is required.

B.      Evidence of Singer's Communications with the USC Crew Coach and Heinel
        Regarding Zangrillo's Daughter's Admission (Requests 4-6)

Requests 4 and 5 seek evidence of Singer's conversations with the USC crew coach regarding Amber, while Request 6 seeks evidence that Heinel did not tell Singer that Amber would be admitted as an athlete or rower.   As an initial matter – and as Zangrillo acknowledges in his motion – Requests 4 and 5 "seek evidence that Singer lied" and Request 6 "relates to another lie told to Mr. Zangrillo by Singer."   This is classic impeachment evidence, to which Zangrillo is not now entitled under the Local Rules.

The government does not agree with Zangrillo's contention that the information he seeks also tends directly to negate his guilt of the charged crimes.   For example, his contention that Singer lied to him in order "to defraud Mr. Zangrillo into relying on Singer and not his own VIP contacts" is demonstrably untrue.   As set forth above, Zangrillo turned to Singer precisely because he had *failed* to secure Amber's admission to USC using his "VIP contacts."   (And, of course, Singer's purported lies are irrelevant to Zangrillo's engagement of Singer, Sanford and others to take classes for Amber for the purpose of submitting those grades as part of her applications.)

Notwithstanding its disagreement as to the exculpatory value of such information, however, the government has produced all of the documents and recordings in its possession, custody or control responsive to Zangrillo's requests, including the August 28, 2017 e-mail from Heinel to Singer with the subject line, "These are the athletes I have from you" and listing Zangrillo's daughter (Ex. U), and the June 2018 e-mail Singer forwarded to Zangrillo in which Heinel indicated that Amber Zangrillo had been admitted through athletics (Ex. Q).   The government is not in possession of any additional evidence, in the form of documents, recordings

or witness statements, responsive to Zangrillo's requests.   Accordingly, no order of the Court is required.

### C.     What Singer Said About How Zangrillo's Money Would Be Used
            (Requests 7-8, & 10)

Requests 7 and 8 seek evidence concerning what Singer told Zangrillo about how his money would be used, and request 10 seeks evidence that Zangrillo was told KWF was a legitimate charity.   The government has previously addressed similar requests in its response to the discovery motions filed by Zangrillo's co-defendants, and it incorporates those responses by reference here.[4]   Notably, the government has produced all e-mails, financial records, audio recordings, and other documentary evidence in its possession, custody or control pertaining to these categories, and has not withheld any such evidence based on its disagreement about the merits of the requests.   The materials the government has produced include voluminous evidence of what Singer said to each of the defendants, and other clients, about his business, his scheme, and how their money would be allocated, as well as evidence of where the money actually went. The government has also reviewed the FBI 302 reports of interviews with Singer, and has disclosed any potentially exculpatory statements reflecting Singer's memory of what he told the defendants about where their money should be sent and how it would be used.   Accordingly, no order of the Court is required.

### D.     Whether USC Knew That Heinel and/or the Athletics Department
            Was Advocating To Admit Students Who Were Not Student Athletes
            (Request 9)

Zangrillo's remaining request, concerning what "USC knew," was similarly addressed in the government's response to the motions of Zangrillo's co-defendants, and the government

---

[4] *See* Dkt. 736 at 21-26.

incorporates its response by reference.[5]   As noted, the government has disclosed all of the relevant USC e-mails and other records in its possession, custody and control.   The materials include evidence of USC's admissions and development policies and practices, its employees' interactions with Singer, and its reaction to learning of possible irregularities in the applications of several students Singer advised (which included unwittingly designating Heinel, a co-conspirator, to investigate).   The government is not in possession of any evidence that anyone in the USC admissions or development offices, or any anyone senior to Heinel in the athletics department, was aware that Singer and his clients had agreed with Heinel and the complicit coaches to recruit students as purported athletes in exchange for payments to their USC programs.[6]   Nor does the government have evidence that these individuals were aware that the purported athletic recruits were not, in fact, recruitable athletes.   In the event that the government discovers evidence indicating that admissions officers or other administrators senior to Heinel and the coaches were, in fact, aware of the scheme, the government will disclose that information to the defense. Accordingly, no order of the Court is required.

---

[5] *See* Dkt. 736 at 26-27, 32-33, 37-38.

[6] The government has learned that, following her arrest, Heinel told a co-conspirator, in substance, that USC Admissions had essentially approved of her trading recruitment slots for "money for development."   There is no evidence to corroborate Heinel's self-serving statement.

CONCLUSION

For the foregoing reasons, Zangrillo's motion should be denied as moot.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Kristen A. Kearney*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Date:  February 13, 2020               Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 13, 2020.

By:   */s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant United States Attorney