UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 19-10080-NMG

UNITED STATES OF AMERICA

v.

ROBERT ZANGRILLO

## ORDER RE: 17(c) SUBPOENA

KELLEY, U.S.M.J.

I.      Introduction.

In June 2019, the court allowed a motion by Defendant Robert Zangrillo to serve a subpoena pursuant to Fed. R. Crim. P. 17(c) on the University of Southern California ("USC"), asking for materials concerning the school's admissions process. USC moved to quash. Over the next several months, the parties filed further pleadings, and the court held three hearings, in an effort to sort out what documents USC would provide. In response to USC's arguments concerning the privacy of the persons mentioned in the materials, the court allowed USC to redact the names and other information about applicants, and the names of administrators, in the materials provided to Zangrillo. By the time of the third hearing, however, in late December 2019, the court began to question whether the extensive redactions might prevent Zangrillo from understanding information that was relevant to his defense, and the court took the step of reviewing the redactions USC had made to certain documents. The court also took under advisement whether certain terms, which

USC said revealed proprietary information about its admissions practice, should be redacted from documents.

Around the time of the third hearing in this matter, in December 2019, Zangrillo and other defendants in this case began to file motions asking the court to order the government to turn over exculpatory evidence. Since then, the defendants and the government have filed pleadings almost nonstop. *See, e.g.*, ##648, 670, 678, 681, 690, 693, 696, 699, 703, 734, 736, 801, 805, 806, 807, 826, 863, 865, 866. On February 26, 2020, the government disclosed to defendants notes written by Rick Singer, who ran a college admission consulting business and is charged in a related case, *United States v. Singer*, 19-cr-10078-RWZ, and is cooperating with the government. Defendants, asserting that these materials are exculpatory and should have been provided long ago, began filing a new round of motions. *See, e.g.*, ##875, 876, 878, 881, 882, 886.

In connection with the motions for discovery, the court has received materials ex parte, including, from the government, reports memorializing government interviews of Singer.[1] In connection with its oppositions to the discovery motions, the government also released other discovery materials, including emails from administrators at USC. *See, e.g.*, #851-1, exhibit I, filed under seal.

The court delayed ruling on the issues pertaining to this matter until it could finish reviewing the voluminous materials filed in connection with the pending discovery motions. Having reviewed those materials, the court now has a better understanding of the government's evidence and the defendants' defenses. As the court continued to consider the import of the redactions in the materials USC provided to Zangrillo, the court has come to the conclusion that

---

[1] The court has also received materials ex parte from defendants other than Zangrillo, in connection with their efforts to obtain documents from USC under Rule 17(c) pertaining to USC's admissions practices.

the redactions simply are unworkable, as they prevent Zangrillo from understanding information to which he is entitled. Further, the court recognizes that the redacted materials will be unwieldy, if not impossible, to use at trial. Finally, the court revises its prior ruling because, in the course of litigating issues concerning the subpoena before this court, USC has made misleading representations about its admissions practices and the redactions to the materials. This makes it even more critical for Zangrillo, if he is to understand the documents, effectively and efficiently use them at trial, and potentially counter the government's assertions about USC's admissions process that run contrary to his defense, to see the documents without redactions.

Therefore, the court now alters its previous rulings, and orders USC to provide Zangrillo all materials produced to date, unredacted. The court also orders USC to produce to Zangrillo the approximately twenty emails attached to #657 (filed ex parte by USC), which have been provided to Zangrillo in redacted form, unredacted.

The materials will be provided to Zangrillo under the protective order already in place in this matter, *see* #604. The court's previously-stated concerns about the privacy of those mentioned in the materials, and about unnecessarily revealing details concerning the school's admissions process, remain a priority. Although the court is now firmly convinced that these concerns must give way to Zangrillo's constitutional right to mount a defense, Zangrillo, and other defendants who may gain access to the documents, are cautioned that the protective order will be strictly enforced. Zangrillo and USC shall confer with the government concerning Zangrillo's reciprocal discovery obligations and the government's dissemination of the materials to other defendants, to make sure that documents provided to the government remain protected.[2]

---

[2] The government has entered into a protective order with all defendants concerning the discovery in this case, *see* #372.

In explaining its decision, the court finds itself in the unusual position of needing to reference materials that have been provided to the court under seal, and that may well remain under seal, depending on what documents Judge Gorton, the trial judge in this matter, decides may be used at trial. In addition, the court's decision in this matter is informed by materials which the court has received from the parties ex parte. Therefore, the court will reference certain materials, but will not describe them in detail, in this order.

II.    Facts.

Robert Zangrillo is the founder and CEO of a Miami-based private investment firm focused on venture capital and real estate investments. (19-mj-6087-MPK, #3-3 ¶ 273.) He is charged with conspiracy to commit mail and wire fraud and honest services mail and wire fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit federal programs bribery, in violation of 18 U.S.C. § 371; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and aiding and abetting mail and wire fraud and honest services fraud, in violation of 18 U.S.C. §§ 1341, 1346 and 2. (#732, fourth superseding indictment, ¶¶ 369-376.)

The government's factual allegations are as follows. First, Zangrillo agreed with Singer to have Singer's employee complete online courses for Zangrillo's daughter, to aid her in applying to USC. *Id*. at ¶¶ 253, 271. Second, he conspired with Singer to include the false information from the online courses and in addition, false athletic credentials, on his daughter's application, so that she might gain admission "as a purported crew recruit." *Id*. at ¶¶ 266, 267, 271. Third, he agreed with Singer to bribe an administrator, Donna Heinel, who was the senior associate athletic director at USC, and who is charged in a related case, *United States v. Ernst*, 19-cr-10081-IT, corruptly to advocate for his daughter to be admitted. *Id.* at ¶ 274. Finally, he is alleged to have committed wire fraud and honest services fraud, and aiding and abetting wire fraud, because of a call with Singer

4

in which they allegedly discussed the scheme to have his daughter fraudulently admitted to USC. *Id*. at ¶ 376.[3]

After his daughter was admitted to USC, Zangrillo paid Singer $200,000, and, at Singer's direction, gave a $50,000 donation to "USC women's athletics." *Id*. at ¶¶ 272, 273. The government alleges that the $50,000 donation, which went to the school, nevertheless constituted a bribe to Heinel, as one of the purposes of the conspiracy was to fund "designated university accounts over which the bribe recipients exercised discretion or that otherwise benefited them professionally." *Id*. at ¶ 65. Finally, the government alleges that the payment, funneled through Singer's organization, was the proceeds of unlawful activity, that is, mail and wire fraud and honest services fraud, and that Zangrillo conspired with Singer to commit money laundering with regard to this payment. *Id*. at ¶ 374.

The twist in this story, and the foundation of Zangrillo's defense, is that it is undisputed that Heinel never presented Zangrillo's daughter to the Office of Admission at USC as a potential athlete, but instead, the Athletics Department "tagged" Zangrillo's daughter as a "VIP."[4] (#432 at 6; #532-1 at 3 n.3 (USC states that Zangrillo's daughter was "never evaluated by USC's Office of Admission as a prospective student-athlete" but was "designated by USC's Athletics Department with a special interest tag.").) As Heinel explained to Singer in an email, Zangrillo's daughter was

---

[3] The government also alleges that Zangrillo committed wire fraud and honest services fraud, and aiding and abetting wire fraud, in connection with allegedly sending his daughter's transcript to Boston University. (#732 at ¶ 376.) That charge is not relevant to the issues here.

[4] The admissions process at USC, including the "tagging" of applications by different departments or persons for a variety of reasons, which gives applicants an advantage in the admissions process, *see, e.g.,* #679 at 5-6, 25 (sealed portion of hearing), need not be discussed in detail here. Even though it is an oversimplification of USC's admissions practices, for the sake of simplicity the court will only refer to applicants' being tagged as "VIP" or "special interest" in this order.

accepted "through the transfer process. She was not presented as an athlete[,] we just advocated for her with Tim [Brunold, the dean of admission at USC] and Kirk [Brennan, director of undergraduate admission] as a transfer.  She went over on our VIP list for transfers." (#432-6 at 2.) This opens the door for Zangrillo to argue that regardless of any misrepresentations in his daughter's application, his daughter was admitted under a legitimate, accepted avenue of admission at USC:  as a VIP.

III.    The Charges and Zangrillo's Defense.

"At its core, a conspiracy is 'an agreement between two or more persons to accomplish an unlawful purpose.'" *United States v. Berroa*, 856 F.3d 141, 154 (1st Cir. 2017) (quoting *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011)).[5]  Zangrillo contends that he did not knowingly agree with Singer to commit a crime, rather, he understood in good faith that giving money to USC, along with having "persons of power, wealth, or position in the USC community" advocate for his daughter, was a legitimate and lawful way to improve her chances of being admitted. (#546 at 1-2, 28.) One of the reasons he seeks certain documents from USC is to show that the actual admissions practices of USC support his understanding of how the process worked.

Materials from USC are relevant to whether USC was the victim of mail and wire fraud or honest services fraud. "The mail- and wire-fraud statutes criminalize the use of the mails or wires in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Skilling v. United States*, 561 U.S.

---

[5] The elements of a conspiracy under 18 U.S.C. § 371 are: "1) the existence of an agreement to commit an unlawful act; 2) the defendant's voluntary and knowing participation in the conspiracy; and, 3) an overt act committed in furtherance of the conspiracy." *United States v. Acevedo-Hernandez*, 898 F.3d 150, 161 (1st Cir. 2018).

358, 369 n.1 (2010) (quoting 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud)).[6] There are

two types of mail and wire fraud, both of which are alleged here. Mail and wire fraud "may deprive

the victim of money or property, as is usually the case," or, "as may occur in some special cases,"

deprive the victim of honest services. *United States v. Gaw*, 817 F.3d 1, 6 (1st Cir. 2016) (citations

omitted); *see* 18 U.S.C. § 1346. With regard to the charge of mail and wire fraud, Zangrillo asserts

that USC was not the victim of any money or property fraud, but rather, received a donation, to its

benefit, in exchange for admitting Zangrillo's daughter. (#546 at 25-26.)[7]

A mail and wire fraud charge under an "honest services" theory applies to "offenders who,

in violation of a fiduciary duty, participate[] in bribery or kickback schemes." *Skilling*, 561 U.S.

at 407. "In an honest services mail fraud prosecution, the government must prove that an official

received something of value in exchange for being influenced in the performance of an 'official

act.'" *Gaw*, 817 F.3d at 6-7 (quoting *United States v. McDonough*, 727 F.3d 143, 152 (1st Cir.

2013)). If Zangrillo can demonstrate that USC had a practice of admitting the children of wealthy

or influential parents, not on merit, but because they were designated as special interest or VIP,

and that is how his daughter was admitted, then a jury may find that he did not cause Heinel to act

in conflict with the wishes of her employer, and she did not breach her duty to USC. (#546 at 2-3,

24.) He asserts that the VIP designation was used by departments across the school, not just by

Heinel and the Athletics Department, and was "known to and approved by the head of Admissions

---

[6] The crimes of mail and wire fraud include three elements: "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail [or wire] communications in furtherance of the scheme." *United States v. Gaw*, 817 F.3d 1, 7 (1st Cir. 2016) (internal citations and quotations omitted).

[7] Whether admission to a university is "property" under the mail or wire fraud statute is a question over which the parties already are sparring in a related case, *see United States v. Ernst*, 19-cr-10081-IT, #371 at 44-47.

as well as other high-ranking officials at USC." *Id.* at 2, 24-25. The payment to the school fund was not a bribe, because there was no quid pro quo corrupt agreement with Heinel that made his donation to the school a bribe, rather, "[i]t was a donation indistinguishable from the vast numbers of other donations by parents of students made to USC and apparently to other universities and colleges nationwide." *Id.* at 2, 25.[8]

To prove that Zangrillo engaged in a scheme with the intent to defraud, that is, to obtain property by means of fraudulent pretenses, or to deprive another of the intangible right of honest services, the government must prove that the fraudulent pretenses were material, that is, that they had a "natural tendency to influence or be capable of influencing the decision" of the decisionmaker in question. *See* 1st Cir. Pattern Jury Instruction, § 4.18.1341; *Neder v. United States,* 527 U.S. 1, 25 (1999) (holding that materiality of falsehood is an element of the federal mail fraud and wire fraud statutes); *United States v. Blastos*, 258 F.3d 25, 27 (1st Cir. 2001). Zangrillo asserts that any false statements in his daughter's application were not material to the admissions decision, because his daughter was admitted not because of those statements, but through the VIP selection process. (#432 at 6.) His daughter's "academic performance and application materials, in combination with the special interest tag, would likely have been sufficient to obtain her admission to the university irrespective of any such misstatement." (#546 at 27.)

The federal programs bribery statute, 18 U.S.C. § 666, punishes one who "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization … in connection with any business, transaction, or series of transactions

---

[8] Whether a donation to the school that does not directly enrich the employee can even constitute a bribe under an honest services theory is an open question. *See* #736 at 21 n.14.

of such organization . . . involving anything of value of $5,000 or more[.]" 18 U.S.C. § 666(a)(2).[9]
The First Circuit has held that this statute criminalizes only bribes, not gratuities. *United States v. Fernandez*, 722 F.3d 1, 6 (1st Cir. 2013). Again, Zangrillo's defense to this charge is that he did not bribe Heinel. (#546 at 2, 25.)

IV.    The 17(c) Subpoena.

In June 2019, Zangrillo filed a motion for a 17(c) subpoena directed to USC, seeking documents pertaining to the admission of Zangrillo's daughter, and also to USC's admissions practices, including the number of students designated as VIP in a certain time period, the names of the departments and employees of the university designating the applicants, and whether those students were admitted, among other things.[10] (#432 at 5-6.)

Rule 17(c) enables a defendant to exercise his constitutional rights to confrontation and compulsory process by permitting him to request subpoenas duces tecum that are returnable prior to trial. *United States v. Nixon*, 418 U.S. 683, 698-99 (1974) (the "chief innovation [of Rule 17(c)] was to expedite . . . trial by providing a time and place before trial for the inspection of subpoenaed materials.") In *Nixon*, the Supreme Court explained the constitutional underpinnings of the 17(c) subpoena:

> The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate

[9] The government must also prove that USC receives, in any one-year period, benefits in excess of $10,000 under a federal program involving a grant or other form of federal assistance. 18 U.S.C. § 666(b).

[10] It was not clear to the court at the time the motion for the subpoena was filed whether the information sought existed, or whether it would be unreasonable or oppressive for USC to provide. Therefore the court allowed the motion (#458) and then gave USC the time it requested, approximately a month, to file its motion to quash. (#532.)

those guarantees, and to accomplish that it is essential that all relevant and
admissible evidence be produced.

418 U.S. at 711.

A district court has discretion to allow a request for a 17(c) subpoena if the defendant shows
that the documents sought are relevant and evidentiary; that they are not otherwise procurable
before trial by exercise of due diligence; that the defendant cannot properly prepare for trial
without such production and inspection in advance of trial; and that the application is made in good
faith and is not a "fishing expedition." *Id*. at 699-700. In short, a party seeking a 17(c) subpoena
"must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id*. at 700; *see United
States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988) (referring to "threshold
showing of admissibility, relevancy, and specificity"). The Supreme Court has stated that "[a]
subpoena for documents may be quashed if their production would be 'unreasonable or
oppressive,' but not otherwise." *Nixon*, 418 U.S. at 699 (quoting Rule 17(c)).

There is no doubt, given Zangrillo's defenses set out above, that he is entitled to obtain
documents in the possession of USC in order to prepare for trial. First, any documents pertaining
to the admission of his daughter are presumptively admissible, relevant, and specific. Other
documents, to the extent they establish that the VIP admissions process was legitimate, was
accepted university-wide, and was endorsed by high-level administrators, and to the extent they
demonstrate that it was commonplace for applicants who donated to the school, and who had
influential persons advocating for their admission, to receive favorable consideration in the
admissions process, also meet the test of *Nixon*. These materials are relevant to Zangrillo's good-
faith state of mind defense, whether USC was defrauded, whether USC was deprived of Heinel's
honest services, whether Heinel was bribed, and whether any misrepresentations in Zangrillo's

daughter's application were material to her admission. As long as the production of these materials is not "unreasonable or oppressive," *Nixon*, 418 U.S. at 699, Zangrillo is entitled to have them.

V.       The Materials Provided and the Parties' Arguments.

After the court allowed Zangrillo's motion for the subpoena, there followed several months of legal skirmishing over the scope of it.[11] The court held a hearing on September 18, 2019, after which the parties agreed to confer about what materials USC would provide. (#564.)

On November 21, 2019, the court received a memorandum from USC listing the materials USC had provided to Zangrillo and setting out the parties' remaining disputes. (#657, filed ex parte and under seal.) Among other materials, USC had produced lists of VIP students provided to Dean of Admission Brunold by various departments. *Id.* at 2. USC asked the court if it might withhold from Zangrillo about twenty emails from the searches it had run at Zangrillo's request. *Id.* at 7.[12] USC argued that the documents did not need to be given to Zangrillo because: they were cumulative of information already provided; they were not relevant to the case, as they did not have anything to do specifically with Zangrillo's daughter; producing the emails without notifying the applicants would violate the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232; and the emails contained confidential and proprietary information about USC's admissions process. *Id.* at 10-13.

Zangrillo complained that the documents he had received from USC were too heavily redacted. (#660 at 4, filed under seal.) One list of VIP applicants provided to Dean of Admission

---

[11] USC moved to quash (#532), Zangrillo responded (#546), USC replied (#559), and Zangrillo filed a sur-reply (#562.)

[12] The twenty emails in question were attached to USC's ex parte filing, without redaction. (#657-1.)

Brunold by the office of University Advancement, for example, attached to Zangrillo's filing as exhibit 11, had twenty-four out of twenty-six columns redacted. *Id*. at 11. Zangrillo stated that "USC represents that all of the redacted columns other than those discussed in this submission represent biographical and academic information relating to particular students (which is impossible to verify based on the present production because most of the column headings have been redacted)." *Id*. He claimed that the redactions, "which are not supported by any claim of legal privilege, significantly compromise the utility of the documents produced . . . " *Id*. at 12. He was concerned that redacted documents would not be admissible at trial as business records because they had been edited. *Id*. He argued that USC had provided the government, pursuant to a grand jury subpoena, "hundreds of thousands of similar documents without making the type of redactions it now deems necessary, or any redactions at all for that matter." *Id*. at 13. Finally, he asserted that having names redacted from the documents would impinge on his right to present a defense, because the usefulness of the documents

> depends in large part on [Zangrillo's] ability to show a jury that individuals similar to those with whom Mr. Zangrillo was acquainted, i.e. wealthy and/or influential members of the USC community, were actively (and in many cases successfully) advocating for the VIP applicants. It is only with this information that he will be able to establish that many other students were admitted in similar or even nearly identical circumstances to his daughter … and to demonstrate his good-faith belief that Heinel was intending to support his daughter in a lawful way – as she did by tagging her as a VIP.

*Id*.

VI.    The Hearing on November 26, 2019.

On November 26, 2019, the court held a second hearing. (#668.) Zangrillo repeated his complaint that the materials he had been given were too heavily redacted. (#673 at 15.) When he again questioned whether he would have trouble admitting redacted documents into evidence at trial, a government attorney who was present declined to say the government would not object to such documents. (#679 at 9, sealed portion of hearing.)

The court expressed concern that some of the charts that Zangrillo had attached to his pleadings, which purported to show how certain students had been designated as VIP candidates, were too heavily redacted. *Id.* at 7.  Counsel for USC stated that he had reached an agreement with counsel for Zangrillo that the redactions were acceptable, other than one column on the chart about which the parties could not agree. *Id.* at 7-8. Counsel for Zangrillo responded that he had been informed by USC that the redacted columns only related to "test scores or grades" of the students, and so he had agreed not to object to the redactions. ("One of the problems of trying to negotiate in terms of production is that I would gladly give up those columns because Mr. Fuchs [counsel for USC] represented on behalf of U.S.C. that each of those columns was unrelated to the sponsorship donor issue . . .  but was related instead to things like test scores or grades.")  *Id.* at 8. He said what he was looking for was "the referral source," in other words, the department or person who had sponsored the person as a VIP. *Id.*

At the hearing, the court tried to strike a balance between the concerns of USC and the defendant's need for the materials to support his defense. (#673 at 29.) The court stated that it was mindful of the privacy of the applicants, and noted that Zangrillo was not seeking their names. *Id.* The court allowed USC to produce materials with the names of people redacted, replaced with a description of their role or occupation. *Id.* The court also found that the twenty emails were relevant and should be provided to Zangrillo, with the names of persons redacted. *Id.* at 31. In response to USC's request that certain terms concerning USC's admissions practices be redacted in the twenty emails,  the court said that it did not understand what the terms meant, and ordered USC to file an explanation, ex parte, explaining the terms. *Id.* at 31-32.

On the docket entry concerning the hearing, the court ordered USC "in addition to explaining what terms it would like to redact [from the twenty emails] and why, to submit to the court all proposed redactions concerning these emails, by December 10, 2019." (#668.)

VII.    The Hearing on December 18, 2019 and Subsequent Filings.

USC did not file an explanation concerning the terms it wanted to redact in the twenty emails, nor did it submit to the court all the proposed redactions to the emails, by December 10th, as ordered. On December 16, 2019, after an inquiry from the court, USC filed a memorandum ex parte, informing the court that it had hoped to provide documents to Zangrillo "without involving the Court." (#694 at 1, filed ex parte and under seal.)  USC further explained that it considered the terms used in the emails to be proprietary, because those terms described "how University Advancement organizes and prioritizes student applicants[,]" and so USC did not want to reveal those terms to Zangrillo. *Id*. at 2. Although the twenty emails with proposed redactions were attached to the memorandum, the memorandum did not explain the meaning of the allegedly proprietary terms, as the court had ordered.

On December 18, 2019, the court had a further hearing. (#700.) Zangrillo renewed his objections to the redactions. (#817 at 6-8, 15.) The court ordered USC to provide the court with an explanation of the proprietary terms, *id*. at 18-19, which USC did, in a three-page memorandum, on December 31, 2019. (#714.)

Beginning in January, the parties filed five letters under seal with the court. In the first letter, Zangrillo explained that in the discovery he had received from the government, he had found an unredacted USC VIP spreadsheet. (#787 at 1.)  When he compared it with the redacted spreadsheets he had received from USC, he concluded that he had been misled by USC about what information was being redacted from the spreadsheets given to him. *Id*. USC responded by denying

14

that it had misrepresented anything and explaining what it had done to accommodate Zangrillo's requests. (#827.) Zangrillo contested USC's assertions, and stated plainly that "there is no longer a need for any redactions in the VIP Freshmen Spreadsheet[.]" (#844 at 2.) Zangrillo further argued that FERPA does not prohibit his receiving unredacted materials. (#845.) USC responded regarding FERPA and its further negotiations with Zangrillo. (#843.)

VIII.   <u>Discussion</u>.

A.   <u>The Materials are Highly Relevant to the Defense and Cannot Effectively be Used as Redacted</u>.

There is no question that materials in the possession of USC are relevant to Zangrillo's defense and must be produced. Previously, it seemed to the court that the materials Zangrillo had obtained, even in redacted form, might be sufficient to allow him to defend against the charges. In addition, as mentioned above, the court was concerned about the privacy of applicants and others associated with the university in this highly publicized case. Thus, the court attempted to strike a balance between these concerns and Zangrillo's right to defend himself, by, for example, allowing USC to replace certain persons' names with descriptions of their roles or their occupations.

As the court's understanding of the facts of the case has deepened, however, it is apparent that the redactions are impracticable. One example is particularly instructive.  In its opposition to Zangrillo's motion for discovery, in setting out the evidence against Zangrillo, the government presents an email string from a high-level administrator in the office of University Advancement that seems clearly to rebut Zangrillo's assertion, central to his defense, that having influential persons advocate for an applicant, and being an actual or potential donor to the school, greatly improves an applicant's chances of admission. (#851 at 3, filed under seal.) The twenty emails that USC sought to give to Zangrillo in redacted form, however, directly contradict the email chain in the government's filing. The documents are under a protective order and so the court will not detail

them here, but suffice it to say that the twenty emails strongly refute the inference the government hopes to draw from the email chain included in the government's filing. *See e.g.*, #657-1, submitted ex parte, at 2, 4, 5, 7, 8, 13, 17.

This example demonstrates why the materials cannot be redacted.  Zangrillo needs to use the twenty emails to defend himself, but with names redacted, he will be hamstrung. Even though the names of administrators are not redacted in the twenty emails,[13] the redactions that are there will substantially impair Zangrillo's ability to present his defense. The redacted emails do not inform Zangrillo for whom the administrator was advocating. Zangrillo cannot follow a string of emails pertaining to the same applicant, to see what eventually happened to him or her, because he does not know the person's name. In some of the emails, which contain lists of applicants, one cannot tell how many applicants are listed. *See, e.g.*, USC-Zangrillo-000242, (provided to the court under seal). In addition, it may be relevant to Zangrillo's defense that certain trustees are more frequent recommenders than others, a fact which is obscured from the redacted documents. This example makes clear that these particular emails must be unredacted, but it also demonstrates that, given the impossibility of anticipating what documents may become important at trial, all the materials must be unredacted.

Further, the court now agrees with Zangrillo's persistent argument that redacted documents will be unwieldy, if not impossible, to use at trial. The documents may not be admissible as redacted, causing delay. It is hard to imagine a trial witness from USC looking at a redacted document and being able to answer questions as to what it means.

---

[13] While administrators' names are unredacted in these emails, the court understands that in other documents, USC has redacted administrators' names and replaced them with the names of their departments. (#827.) This is unacceptable, because if the government chose to call an administrator as a witness, Zangrillo would not know what documents pertained to that witness. Nor could Zangrillo call his own witnesses on the basis of the documents.

Concerning the "proprietary and confidential information" about its admissions process that USC requested that it be allowed to redact from the twenty emails, the court finds that those terms, too, must be unredacted. First, the terms have been revealed to Zangrillo in a chart from USC that was provided by the government in discovery, so he knows about them, anyway. (#787, filed under seal.) Second, the terms indisputably demonstrate that USC's office of University Advancement organizes and prioritizes student applicants in a way that supports Zangrillo's defense.

Finally, the court finds that for all the above reasons, under FERPA, Zangrillo has demonstrated "a genuine need for the information that outweighs the privacy interests of the students." *Rios v. Read*, 73 F.R.D. 589, 599 (E.D.N.Y. 1977); *see United States v. Pleau*, No. CR 10-184—1S, 2012 WL 4369302 (D.R.I. Sept. 24, 2012.) The court notes that FERPA does not apply to students who were not admitted to the school. *See* 20 U.S.C. § 1232g(a)(6). The court repeats that these documents will be under a strict protective order and the trial judge will have control over what information is made public at trial.

B. Issues Concerning USC.

USC has been less than forthcoming about its admissions process. For example, in support of its motion to quash, USC submitted an affidavit from Dean of Admission Brunold, in which he swore:

> The Admission Department has no involvement with respect to donations or potential donations. The Admission Department does not track donations by an applicant's family. Information concerning donations by an applicant's family is not included in an applicant's file. If I had known that a prospective student's family had donated $50,000 or $100,000 to USC, it would not have affected the Admission Department's decision whether to admit the student.

(#532-3 at 2.)

17

This statement is misleading, because while each carefully-worded sentence may be true, such as, "Information concerning donations by an applicant's family is not included in an applicant's file," the unmistakable import of the statement is that donations are not important to the decision whether to admit students. That message is belied by many facts that have come to light in the course of this litigation. *See, e.g.*, #546 at 5-7, 17-21, #660 at 6-7.[14]

In addition, Zangrillo's counsel reported in letters dated January 27 and February 7, 2020 (#787, #844) that counsel for USC made misrepresentations to him about the redactions on certain documents. As mentioned above, prior to the November 26th argument, Zangrillo's counsel stated in a filing that "USC represents that all of the redacted columns other than those discussed in this submission represent biographical and academic information relating to particular students (which is impossible to verify based on the present production because most of the column headings have been redacted.)" (#660 at 11.) Then, at the hearing, counsel for Zangrillo repeated that he had been informed by USC that the redacted columns in certain charts only related to "test scores or grades" of the students, and so he had agreed not to object to the redactions. (#679 at 7-8, sealed portion of hearing.) He said what he was looking for was "the referral source," in other words, the department or person who had sponsored the person as a VIP. *Id.* at 8. The court was later given copies of a chart, both redacted and unredacted, by USC. As Zangrillo argues, contrary to what he had been told by counsel for USC, the redacted columns relate directly to "the referral source" to which counsel for Zangrillo clearly referred at his oral argument. (#787 at 1.) The court finds USC's attempt to explain and justify this misrepresentation (#827) unpersuasive.[15]

---

[14] It was apparent that there were other misstatements in the affidavit, as well, which had to be corrected by a second affidavit. (#557-2.)

[15] USC argues that the court had allowed it to redact "proprietary information" from the materials, and so it redacted these column headings. (#827 at 2.)  First, the court never explicitly permitted

IX.   <u>Conclusion</u>.

For the reasons stated above, USC shall provide Zangrillo with all materials already produced, unredacted.


<div style="text-align:center;margin-left:40%;">

_____/s/ Page Kelley_____
PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
</div>

March 3, 2020

---

USC to do so. Second, this excuse is belied by the fact that USC later asked the court for permission to withhold certain terms, which were also mentioned in the redacted columns, from Zangrillo. Finally, the point is not merely that USC claims that it believed it was entitled to redact certain information, but that counsel for USC made misrepresentations to counsel for Zangrillo when explaining what information was redacted from the materials.