**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
----------------------------------------------------------x
                                                 :
UNITED STATES OF AMERICA,                        :
                                                 :
                         Plaintiff,              :
                                                 :      Criminal No. 1:19-cr-10080-NMG
      -against-                                  :      Filed Under Seal
                                                 :      Granted November 20, 2019,
DAVID SIDOO, ET AL,                              :      November 25, 2019 and November 26, 2019
                                                 :
                         Defendant.              :
                                                 :
                                                 :
----------------------------------------------------------x
```

**NON-PARTY UNIVERSITY OF SOUTHERN CALIFORNIA'S**
**MEMORANDUM IN SUPPORT OF OBJECTION AND MOTION TO MODIFY**
**ORDER ON DEFENDANT ZANGRILLO'S RULE 17(c) SUBPOENA**

The issue here is straightforward and the requested relief exceptionally limited. The University of Southern California (USC) merely asks this Court to safeguard the privacy of more than 1,000 innocent college applicants who have nothing to do with this case. They should not be dragged into a criminal prosecution drawing worldwide attention. At the same time, USC wants to set the record straight. The magistrate judge ordered USC to turn over unredacted documents and expose students in misplaced reliance on unsupported assertions by defendant Zangrillo's counsel that USC misled him and the Court. D.E. 913 ("Order"). That is simply untrue. Throughout months negotiating a resolution of defendant Zangrillo's Rule 17(c) subpoena, USC repeatedly made clear that while it was producing information requested by defendant Zangrillo, it was redacting those documents to protect the privacy of both its applicants and others affiliated with the University, and to safeguard its proprietary information.

In response to defendant Zangrillo's subpoena, USC produced documents that included redactions of applicants' names and other highly sensitive personal information, such as grades

and SAT scores.  After first ruling that USC's redactions were proper, the magistrate judge reversed course and ordered USC to produce unredacted documents that would reveal innocent students' identities to the defense and, inevitably, the public.  While USC disagrees with much of the magistrate judge's Order, USC simply asks this Court to modify the Order to allow the redaction of applicants' personal information.[1]

None of these student applicants, many of whom were 17 or 18 years old when they applied, should be dragged into this criminal matter.  To do so would undermine their privacy rights under federal and state law, and would sully their reputations by connecting them to the unsavory actions of the defendants alleged in the indictment.  These applicants—who, unlike the defendants in this case, are suspected of no wrongdoing and who participated honestly in the application process—reasonably expected that the great array of private information they provided in their applications would remain just that: private. USC cares deeply about its students and is here to protect their personal information and identities from public exposure.

Exposure would subject these students and families to the media circus surrounding this case and lead to unfair harassment and embarrassment.  The harm that disclosure would cause these young people is reflected in the strict requirements of The Family Educational Rights and Privacy Act (FERPA).  Under FERPA, every one of the more than 1,000 affected students could object to disclosure.  That could bring hundreds of parties before the Court, as students seek to vindicate their right to privacy.

In contrast, Zangrillo's interest in obtaining the students' personal information is non-

---

[1]  USC believes that the proprietary admission criteria information and the identities of USC officials that it redacted are not relevant to Zangrillo's defense and that Zangrillo is not entitled to that information under Rule 17.  Nevertheless, USC does not appeal the portions of the Order compelling those disclosures.  USC seeks only to modify the order to protect the identity and private information of students who are not connected to the criminal charges.

existent.  Indeed, for months his counsel disavowed any intention of obtaining it.  Zangrillo's counsel made a point of claiming, "I'm not seeking the names" of the applicants, Dec. 18, 2019 Tr. at 18, and "I'm not looking to invade privacy," Sept. 18, 2019 Tr. at 63.  Likewise, the magistrate judge noted that "no one has ever suggested that the prospective students … information would not be protected."  Dec. 18, 2019 Tr. at 5.  Only a few months ago, the magistrate judge made clear that "no one has suggested that any information about individual students should be produced by U.S.C.," and this "extremely sensitive" information was "off the table."  Nov. 26, 2019 Tr. at 29.

The applicants' personal information does not further any of Zangrillo's purported defenses.  Zangrillo has long maintained that he needs information establishing that people outside of the Athletics Department ("Athletics") designated special interest applicants and "lobbied" the Office of Admission on their behalf.  None of this is relevant to defend against the indictment.  Nonetheless, in an effort to compromise, USC produced a wealth of anonymized documents and data regarding students who received special interest "tags."

Like many universities across the country, USC uses special interest tags as part of its application process to track applicants who have been identified by individuals who have a close relationship to the University; other tags also track applicants with other important attributes, such as being the first in their family to attend college.  Every year, USC tries to build the best class possible.  In doing so, it welcomes input from the people who know and care for the University: its top administrators, Deans, Athletic Director, Trustees, and alumni.  This is not wrong; it is a common sense way to identify and gain information about worthy applicants from those closest to USC.

Zangrillo has received extensive information from USC and already has everything he

needs to pursue his purported defense. The specific identity of the students who received special interest tags, and their most private information, offers nothing to advance Zangrillo's defense. And producing this sensitive information comes at the expense of tying innocent applicants to a highly publicized criminal scheme in which they had no involvement.

Indeed, Zangrillo and his daughter are nothing like the applicants in whose identities Zangrillo, for months, claimed he had no interest or need. Zangrillo's daughter is alleged to have committed academic fraud by having one of Rick Singer's employees take courses for her. Zangrillo and his daughter are also alleged to have conspired with Singer to have her falsely presented as a recruited rower to secure her admission to USC.

USC never would have knowingly admitted any applicant who committed academic fraud or falsely claimed to be a recruited athlete. If, as Zangrillo apparently maintains, people can buy their way into USC, he would have simply written a check rather than engage in the elaborate (and well-documented) scheme to fabricate his daughter's record, as alleged in the indictment. Zangrillo's attempt to drum up irrelevant supposed evidence from USC serves no purpose other than to distract from the charges against him. But even if information about USC's use of special interest tags is relevant here (and it is not), Zangrillo has not—and cannot—show he has any legitimate need for the personal information of applicants who received special interest tags. In fact, he never claimed otherwise during months of emails and telephone calls with USC, briefing, and oral argument regarding his subpoena.

Moreover, the assertion by Zangrillo's counsel that USC misled him is false, and any reliance that the magistrate judge placed on that assertion is misplaced. USC's attorneys spoke with Zangrillo's counsel on numerous occasions and exchanged dozens of emails in a good faith effort to communicate USC's concerns clearly and to reach a settlement without the Court's

involvement.  *See* Ex. H, USC's *Sealed Ex Parte* Letter Re: Defendant Zangrillo's Request for Production of Documents (Feb. 6, 2020).  While Zangrillo now baldly asserts that USC claimed to be redacting only student names and grades, the record shows that USC explicitly told the magistrate judge and Zangrillo's counsel, and both understood, that USC sought also to protect and had redacted "proprietary information" and the identities of uninvolved USC officials.  *Infra* I.C.2.  The magistrate judge's misplaced reliance on Zangrillo's unsupported accusations further undermines the decision to order production without redaction.  The Order should be modified so that USC can redact the personal information of its applicants.

I.   <u>**Background**</u>

A.   **USC's Admission Process**

USC's admission decisions are made by the Office of Admission ("Admission") through a holistic analysis of an applicant's credentials including her grade point average, the rigor of her high school, her standardized test scores, her extracurricular activities, her personal background, and a consideration of her contribution to the diversity of the campus community.

In addition to these credentials, an applicant's file also may be marked with one or more tags highlighting particular points.  For example, Admission will include a tag in the file of students who seek to become first generation college students, or who express an interest in participating in the University's Reserve Officer Training Corps.  One tag, called a special interest (or VIP) tag, notes that the student has a connection to the University community.  A special interest tag could be issued because someone at USC knows the applicant or has reason to believe the applicant will make a positive contribution to the University community.  In some instances, a special interest tag may be issued because a student's family has a longstanding relationship with, has donated to, or has the capacity to donate to the University.  The Athletics special interest tag does not identify recruited-student athletes; it merely signals the same type of

connection to USC as a special interest tag applied by any other office.

The existence of a tag does not guarantee an applicant's admission, nor does it shift an applicant to a fast-track admission process.  Students whose files include a special interest tag are evaluated through the same rigorous process as untagged applicants.  A tag may provide a marginal benefit, essentially a second look by a senior Admission staff member, but the applicant is assessed by the same evaluators based on the same criteria as the general pool.  As the statistics already produced to Zangrillo show, admitted students whose file included a special interest tag have academic credentials roughly comparable with all admitted students.  *See* Ex. A Zangrillo 000231; Ex. B Zangrillo 000232.[2]

Neither a special interest tag nor the fact that an applicant's family has donated to the University guarantees an applicant's admission.  "Students who receive special interest tags must still satisfy a number of other criteria, including but not limited to grades, test scores, academic rigor, and extracurricular activities, in order to be admitted."  Ex. C, Brunold Decl., D.E. 532-3, ¶ 3 (Aug. 22, 2019) ("First Brunold Decl.").  An unqualified applicant, even with a special interest tag, will not be offered admission.  As an illustration, one family, now threatened with exposure by the Order, donated $1 million to the University.  Their child was denied admission because the applicant's credentials did not meet USC's rigorous admission standards.  Even after

---

[2] Five percent of applicants admitted in the 2018-19 academic year had special interest tags in their applications (523 of the 9,773).  SAT scores for all freshman admitted students had interquartile (25th and 75th percentile) ranges from 1430-1540 while the same interquartile range for admitted students with a special interest tag was 1400-1520.  Similarly, GPAs for the general population of admitted students had interquartile ranges from 3.79–4.00, while the interquartile range for admitted students with a special interest tag was 3.55–3.93.  Ex. A. The credentials of spring transfer admits with special interest tags are also roughly comparable with the credentials of the general population for spring transfers.  *See* Ex. B.

Many applicants who receive a special interest tag are not admitted.  While the admission rates for tagged applicants are higher than for the general pool, the academic credentials of tagged applicants (counting those accepted and denied) are also, on average, higher.  Comparing the credentials of admitted students with and without tags is the far more useful measure of the benefit provided by a tag than a cursory comparison of admission rates.

the family appealed, the Office of Admission upheld its decision. That gift, twenty times Zangrillo's donation, did not guarantee the applicant's admission. Dec. 18, 2019 Tr. at 18.

While those with tags proceed through the standard admissions process, a separate, distinct process exists for recruited student athletes. Applicants recruited by one of USC's 21 Division I athletic teams are considered separately by USC's Athletics Admission Subcommittee (Subco). Sept. 18, 2019 Tr. at 39–40. Subco determines whether to admit the prospective student athlete based on a holistic review that includes consideration of the applicant's academic and nonacademic credentials, including, specifically, the coach's belief in her potential to make an athletic contribution at USC. "[B]eing designated as a prospective student-athlete does not guarantee admission to USC, [but] it does enhance a prospective student's chances of admission." Ex. C, First Brunold Decl. ¶ 2. A student athlete whose academic credentials alone may not be sufficient for admission through the ordinary process may be admitted through the Subco process, which carefully considers her athletic ability as an expected contribution to the USC community. The Subco process is focused solely on recruited athletes and has no relation to special interest tags. A special interest tag, including one added by Athletics, does not identify a student as recruited athlete and does not move an applicant into the Subco process.

### B.     The Defendant's Alleged Criminal Conduct

Zangrillo was indicted as part of a wide-ranging investigation of fraudulent university admissions engineered by Rick Singer. The government alleges that after Zangrillo's daughter was rejected as a freshman applicant (despite having been recommended by a USC Trustee), Zangrillo entered a scheme with Singer and paid $200,000 to get her admitted as a transfer student. According to the government, one of Singer's employees took online courses on behalf of Zangrillo's daughter to bolster her transcripts. Singer and Zangrillo also conspired to bribe

Donna Heinel, the Athletics official responsible for presenting recruited athletes to Subco. The bribe was intended to secure Zangrillo's daughter's admission as a recruited rower. After Zangrillo's daughter was admitted, at Singer's instruction, Zangrillo mailed a $50,000 check to a USC account identified by Heinel.[3]

For reasons that are unclear, and without Zangrillo's knowledge, Heinel did not present his daughter to Subco as a recruited athlete. Instead, Heinel added an Athletics special interest tag to her application. USC extended a conditional offer of admission as a spring transfer student. USC was unaware of Singer's scheme and was unaware that this application misrepresented her academic and extracurricular qualifications. Her application stated that she was an experienced rower (spending 44 hours each week at the LA Rowing Club), which the Government alleges is false. She also submitted transcripts showing high school and college courses she had completed between her initial rejection and her reapplication to USC as a transfer student, all of which the Government alleges were completed by Singer's employee on her behalf. After her conditional admission, she submitted another transcript, which the Government also alleges was falsified. Any of these statements, if known to be false, would have caused USC to deny or revoke her offer of admission. Ex. D, Brunold Decl., D.E. 557-2, ¶ 9 (Sept. 12, 2019) ("Second Brunold Decl."). According to the government, Zangrillo remained ignorant of Heinel's last-minute switch and believed, up until his arrest and indictment, that Heinel presented his daughter to Subco as a fake recruited athlete. Sept. 18, 2019 Tr. at 70.

---

[3] The Government's wiretaps confirm Zangrillo's knowledge of the subterfuge. Zangrillo is recorded in a call with Singer trying to make sure "we have the story straight," and confirming ("Okay, great, perfect.") that Zangrillo's $200,000 payment to Singer's organization, $50,000 of which actually "went to go pay Heinel for USC to get her in" instead, would appear to be given for "programs that handle underserved kids." D.E. 3-3, at 121.

### C.      Procedural History

Zangrillo obtained a Rule 17 subpoena requiring USC to produce a broad range of information about its admission practices.  Ex. E, Rule 17(c) Subpoena (July 11, 2019).  USC moved to quash the subpoena, arguing that it was an overbroad fishing expedition.  Despite its objections, USC entered into months of negotiations with Zangrillo in a good-faith effort to resolve the subpoena.  *See* Ex. H.  As part of these efforts, USC produced numerous requested documents and generated new statistical analyses from its Admission and Advancement databases to meet Zangrillo's demands.

Among other documents, USC produced to Zangrillo:

- Statistics showing the admission rate and credentials of admitted students with a special interest tag broken into separate groups by the department that applied the tag.  Ex. A; Ex. B.

- An anonymized chart identifying donations from the families of any applicant in 2018 whose donations were comparable to the $50,000 donation Zangrillo made to USC Athletics.

- All documents found in the emails of more than 50 USC employees concerning USC's consideration of Zangrillo's daughter's application.

- Lists of special interest students submitted by five departments to the Dean of Admission.

- Four redacted spreadsheets showing all freshman and transfer applicants in 2018 who received a special interest tag (Zangrillo has never made clear why fall freshman applicant data are relevant, as his daughter was admitted as a spring transfer).  These spreadsheets contained columns of biographical and academic information, columns identifying who applied the tag, and a column with comments or notes explaining the applicant's connection to USC.  USC believes these spreadsheets are not relevant to the allegations against Zangrillo, but Zangrillo's counsel insisted these charts would "detoxify" the tag.

Throughout the entire meet-and-confer process, USC's position on student privacy was clear.  Applicants entrust a school with a tremendous amount of information about themselves, including their interests, their past achievements and their goals for the future.  This information is the heart of each application.[4]   USC takes their trust seriously, and as was always evident,

---

[4]    It is also why a representation that an applicant spent 44 hours a week on a given activity—an incredible amount of time suggesting a passionate and dedicated focus—would be so important in the evaluation of an

*(Cont'd on next page)*

USC had no intention of producing any of these applicants' personal information to the defendant.  Zangrillo knew USC's position and did not challenge it.  Indeed, **all** parties and the magistrate judge agreed that applicants' identities should be protected.

But in February 2020, Zangrillo backtracked.  He demanded for the first time that USC remove *all redactions* from the proprietary documents it had produced in a good-faith effort to reach a compromise.  That demand included removing the redactions that protected the identity of more than 1,000 applicants.  *Sealed* Letter (Feb. 7, 2020).  Zangrillo made this request based on his review of an unredacted version of one of the spreadsheets at issue.[5]  Zangrillo argued that USC had misrepresented the redactions as covering only student information even though USC had consistently explained that its redactions protected students, sponsors, and proprietary admission information.  *Infra* II.C.2.  When USC again asserted the importance of protecting the identities of students who applied honestly and innocently, Zangrillo doubled down, arguing that those innocent applicants should receive no protection, including those of federal educational privacy laws.  *Sealed* Letter (Feb. 10, 2020).  The magistrate judge then ordered USC to produce *unredacted* versions of the disputed documents.  Order at 3, 15–17.  The Order requires USC to remove all student privacy protections in the four redacted spreadsheets (one of which, Zangrillo received from the Government in unredacted form), and in twenty-two emails to Admission.  It may also require USC to unredact student names from previously produced documents.

---

*(Cont'd from previous page)*

applicant, and why the applicant would be disqualified from admission if that information were false, whether or not she had a special interest tag.

[5]  Zangrillo received from the Government (prior to requesting any documents from USC) an unredacted version of one of the spreadsheets at issue, which shows all special interest tagged transfer applicants (including Zangrillo's daughter).  In other words, Zangrillo was or should have been aware throughout this entire process of the categories of information USC redacted.  USC requests that the Court extend the same protections, via protective order, to the students named in this spreadsheet that it seeks for the students in the as-yet redacted documents.

1.   **The Court And All Parties Agreed, Until The Last Moment, That Information That Could Identify Applicants Should Not Be Disclosed**

From the time the subpoena was first issued, USC made clear that federal law required and Rule 17 permitted it to protect the identities of students who had absolutely no connection to Zangrillo's criminal conduct.  And, until only a few weeks ago, all parties and the magistrate judge agreed that there was no need to disclose information that could identify those student applicants.  As the magistrate judge observed, "no one has suggested that any information about individual students should be produced by U.S.C. . . . . [T]hat is . . . off the table [and] I would not allow it."  Nov. 26, 2019 Tr. at 29.  The magistrate judge, in an entry on the public docket, found "that the names and personal information concerning prospective students are protected and will not be produced.  The court notes that defendant is not asking for that information."  D.E. No. 668 (Nov. 26, 2019).  The magistrate judge later reiterated that "no one has ever suggested that the prospective students would not be . . . [that] their information would not be protected."  Dec. 18, 2019 Tr. at 5.

Similarly, until only a few weeks ago, Zangrillo consistently agreed that the identities of students served no valid defense purpose and that he was not seeking to discover their identities.  Sept. 18, 2019 Tr. at 63 (Zangrillo did not need identifying information and was "not looking to invade privacy").  Zangrillo's counsel reiterated that he was not seeking "the name of a person."  Dec. 18, 2019 Tr. at 8; *see also id.* at 18 (Zangrillo's counsel is "not seeking the names"); *id.* at 19 (The names redacted in the disputed e-mails are "names [counsel has] never requested.").

But now, Zangrillo has made an unexplained about-face.  His only justification for his change in position is that USC produced unredacted documents to the Government.[6]  That does

---

[6]   USC was required to produce unredacted documents for the Government, as FERPA specifically exempts grand jury subpoenas.  No such exemption covers Rule 17 subpoenas.

not explain why he is entitled to this information, or why this information, in which he has continuously disclaimed interest, is necessary to his defense.  There simply is no justification for his change in position or his attempt to distract from his own alleged misdeeds by exposing other families to tabloid attention.  Student identities are not necessary to his defense, and ordering USC to produce them would be unreasonable and oppressive in violation of Rule 17(c).

      **2.**      **USC Was Forthright With the Court and Defense Counsel, Communicating Over Many Months that USC Redacted Documents to Protect Donor, Sponsor, and Proprietary Admission Information**

The magistrate judge ordered USC to produce unredacted records based in large part on its conclusion that USC had been "less than forthcoming about its admissions process."  Order at 17.  That conclusion is based, first, on a misunderstanding of the USC Admission process and, second, on Zangrillo's misstatements about communications between counsel.

Contrary to Zangrillo's recent assertions, a special interest tag does not give an applicant near certain admission, nor does it place an applicant on a preferred admission track.  No tag would result in the admission of a student whose application misrepresented her credentials, as Zangrillo's daughter's allegedly did.  USC's declarations accurately describe these facts.  The magistrate judge concluded that evidence regarding the tag might be relevant to the defense "[i]f Zangrillo can demonstrate that USC had a practice of admitting the children of wealthy or influential parents, not on merit, but because they were designated as special interest or VIP, and that is how his daughter was admitted."  Order at 7–8.  But the factual predicate does not exist.  No one is admitted based solely on a special interest tag; Admission holistically reviews every application.  Applicants with special interest tags are considered through the same holistic process as ordinary applicants and are admitted with the same general credentials.  *Supra* II.A.

The magistrate judge's dissatisfaction with the Brunold declarations was similarly

misplaced.   As the magistrate judge acknowledged, each assertion was "true."   Order at 18.

Read in context, it is clear that the paragraph the magistrate judge found misleading is not a

general assertion that donations *never* have a connection to admission; it is a specific response to

Request d of Zangrillo's subpoena.   *See* Ex. C, First Brunold Decl. ¶ 6; Ex. E, Request d.

Zangrillo asserts that USC redacted sponsor and admission information while telling him

that all redactions involved student credentials.   But USC never made such a statement.   Just the

opposite; USC said throughout months of good faith negotiations that it would redact and protect

student   privacy,   sponsor   identities,   and   proprietary   admission   information.   *See*   Ex.   H

(summarizing months of communications).   USC sent Zangrillo edits to a letter, initially drafted

by Zangrillo's counsel, summarizing these consultations and added the express statement that the

charts would be "redacted to anonymize the student and *anyone sponsoring the student.*"   Ex. F

(attachment to e-mail of Oct. 18, 2019) (emphasis added).   Zangrillo's counsel clearly read and

understood USC's position because Zangrillo's counsel responded to this specific issue and

wrote, "As to [paragraph] 4 – I do not agree that notes, comments identifying the sponsor should

be redacted."   Ex. G (e-mail of Oct. 18, 2019).   There were no further discussions about this

issue, and USC never reversed its position.   Instead, Zangrillo's counsel, who had seen

unredacted references to donations from applicants' families in the "comments/notes" column of

similar special interest charts maintained by Athletics, negotiated to obtain the "comments/notes"

column in other special interest charts.   All subsequent discussions between Zangrillo and USC,

as well as the November 26, 2019 court hearing, focused entirely on the appropriate redactions

within this one specific "comments/notes" column.

The comment made by Zangrillo's counsel that the redacted columns only involved ██

████████████   was an offhand remark that did not, at the time, seem to raise a significant

issue.  Nov. 26, 2019 *Sealed* Tr. at 8.  ████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████.  It did not occur to USC to correct this statement, which merely

seemed to guide the Court back to the relevant issue.  The suggestion that USC would

misrepresent the contents of the unredacted special interest chart defies logic because USC knew

that both Zangrillo and the Court already had copies of unredacted versions.  In fact, it was

Zangrillo who submitted the unredacted version of this special interest chart to the Court during

the September 18, 2019 hearing, and USC provided the Court with additional special interest

charts in both redacted and unredacted form.

USC believed the magistrate judge understood that its redactions sought to protect

privacy, proprietary information, and information regarding donors and other sponsors of special

interest applicants.  In fact, at the November 26 hearing, the magistrate judge said, "I do credit

U.S.C.'s representations concerning that it [is] proprietary information about its admissions

process and also concerning the – just the importance of keeping information concerning donors

and other friends of the university's actions private."  Nov. 26, 2019 Tr. at 29.  The magistrate

judge further recognized that USC  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████  Nov. 26, 2019 *Sealed* Tr. at 11.

To be clear, USC did not mislead opposing counsel or the magistrate judge about the

contents of the charts.  Again, USC knew that the magistrate judge already had the unredacted

charts and opposing counsel had one of them.  USC only sought to protect how three categories

of information—student identities, sponsor identities, and proprietary admission data—would be

protected and used moving forward.  Now, it seeks only to protect the most important category:

the identities of more than one thousand innocent students with no connection to this matter.

## II.    Standard of Review

The Court may vacate or modify pretrial orders issued by a magistrate judge if the order is "contrary to law." 28 U.S.C. § 636(b)(1)(A). Under that standard, the Court "reviews pure questions of law *de novo*." *United States v. Aboshady*, 297 F. Supp. 3d 232, 235 (D. Mass. 2018); *see also PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010) ("for questions of law, there is no practical difference between [the] 'contrary to law' standard and [a] *de novo* standard.").[7] Questions of fact are reviewed for clear error, 28 U.S.C. § 636(b)(1)(A), but the Court is "'entitled to discount' a magistrate's conclusions where its opinion omits essential findings or analysis." *United States v. Matias*, 885 F. Supp. 2d 458, 464 (D. Mass. 2012) (quoting *Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 n.5 (1st Cir. 1989) (upholding district court's reversal of "cryptic" conclusions reached by magistrate judge).

## III.    It Is Unreasonable And Oppressive To Require USC To Disclose Information That Identifies Innocent Students

Rule 17 allows a criminal defendant, subject to the supervision of the court, to compel third parties to produce evidence in advance of trial that could otherwise be produced through trial testimony. The defendant is not entitled to force disclosure of information that "would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). "Rule 17(c) was not intended to provide an additional means of discovery." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). It is not a vehicle for "catch-all" requests and is "not intended to produce evidentiary materials" or allow "a fishing expedition to see what may turn up." *Id.* at 221.

---

[7]    The Civil and Criminal rules include the same "clearly erroneous or contrary to law" standard of review. *Compare* Fed. R. Civ. P. 72(a) *with* 28 U.S.C. § 636(b)(1)(A). Courts refer to civil and criminal cases interchangeably on this point. *See, e.g.*, *Aboshady*, 297 F. Supp. 3d at 235; *United States v. Stone*, 824 F. Supp. 2d 176, 185 (D. Me. 2011).

Rule 17 places the burden on the party seeking production to demonstrate good cause to require production of evidence prior to trial.  2 Fed. Prac. & Proc. Crim. § 275 (4th ed.).  Among other factors, the defendant must show "that the documents are evidentiary and relevant" and "that the application is made in good faith and is not intended as a general 'fishing expedition.'" *United States v. Nixon*, 418 U.S. 683, 699–700 (1974) (footnote omitted).  This requires the defense to "clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700.  And "Rule 17(c) enables district courts to quash a subpoena that intrudes gravely on significant interests outside of the scope of a recognized privilege, if compliance is likely to 'entail consequences more serious than even severe inconveniences occasioned by irrelevant or overbroad requests for records.'" *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585 (4th Cir. 2007) (quoting *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984)).

### A.    Zangrillo's Purported Need for the Students' Identities Does Not Warrant an Immense Invasion of Student Privacy

Rule 17 does not entitle Zangrillo to discover the identity of the more than one thousand applicants with special interest tags listed in the contested spreadsheets or named in the twenty-two disputed emails.  Rule 17's prohibition on "unreasonable or oppressive" requests "protect[s] against unduly encroaching upon the expectations of innocent [students] that their . . . records will be kept confidential." *In re Grand Jury Proceedings: Subpoenas Duces Tecum*, 827 F.2d 301, 306 (8th Cir. 1987); *see also In re Grand Jury Matters*, 751 F.2d at 18 (quashing subpoena that implicates "serious policy concerns").  The disclosure of more than 1,000 applicants required by the Order is a vast invasion of privacy, is contrary to the students' rights under FERPA, and ignores the privacy protections enshrined in state law.  Allowing it to go forward would be unreasonable and oppressive to the affected students, their families, and USC.

The Order erred by failing to consider the injury to the innocent applicants and their

families, making only a summary conclusion that Zangrillo's need outweighed any privacy concerns. Order at 17.  Disclosing the applicants' identities would not assist Zangrillo's defense, *infra III.B,* but it would increase the risk of public dissemination, inadvertent or otherwise, of the identities of more than one thousand innocent applicants.   The magistrate judge's cursory conclusion that Zangrillo's need outweighs these concerns is entitled to no deference.  *See Matias*, 885 F. Supp. 2d at 464.  It disregards entirely the extent to which publication of their names could expose these students and their families to unfair scrutiny, media harassment, and embarrassment.  As the Court is doubtless aware, these proceedings are the subject of constant and unrelenting press attention.  Mass disclosure of private information, injecting more than 1,000 students and their families into the fervent media scrutiny surrounding this case, would most assuredly be "unreasonable or oppressive."[8]

Federal and state laws—and common sense—recognize the importance of preserving the privacy of the innocent applicants identified in these documents.  FERPA protects students' "education records (*or personally identifiable information contained therein*)," 20 U.S.C. § 1232g(b)(1) (emphasis added), and prohibits USC from disclosing student information without notifying the affected students.  The breadth and detail of FERPA reflects Congress's decision to value student privacy above other interests, including litigation requirements.   FERPA specifically exempts grand jury subpoenas, but no part of the statute frees USC from its obligations in response to a defense subpoena.  *See* 20 U.S.C. § 1232g(b)(1)(J)(i) (permitting

---

[8]   The Order assumes, without any analysis, that the protective orders already in place will prevent dissemination of the students' identities.  But neither USC nor the students are party to the agreement between the defendants and the Government.  And USC's agreement with Zangrillo only limits his use of documents pre-trial because USC believed Zangrillo would honor his position that student information could be redacted from the documents.  It is unrealistic, to say the least, to expect that these names will remain anonymous in the media frenzy surrounding these trials.  Now is the best time to prevent disclosure of their identities.

disclosures in response to "Federal grand jury subpoena").[9]  Failure to comply with FERPA would place the University at risk of losing all federal funding.  *Id.* § 1232g(b)(1).[10]  USC could not even contemplate releasing this identifying information without notifying all of the affected students.  34 C.F.R. § 99.31.  Those students and families, numbering over 1,000, would be entitled to seek protective action, whether through intervention or a parallel proceeding.  34 C.F.R. § 99.31(a)(9)(ii).  The delay and inconvenience—to the government, the Court, the defense, and the families—that this would entail weighs heavily against the ordered disclosures.

State law reinforces the importance of student privacy.  To take but one State as an example, California, whose law presumptively governs USC's relations with its students, protects private information in its constitution, statutes, and common law.  California protects individuals from unconsenting public disclosure of their private, identifying facts.  *See Melvin v. Reid*, 297 P. 91, 93 (Cal. Ct. App. 1931) (recognizing invasion of privacy).  This protects against "public disclosure . . . of a private fact . . . which would be offensive and objectionable to the reasonable person and . . . which is not of legitimate public concern."  *Diaz v. Oakland Tribune, Inc.*, 139 Cal. App. 3d 118, 126 (1983); *see also* Restatement (Second) of Torts § 652D (collecting laws on public disclosure of private facts).

The California Constitution also enshrines the people's "inalienable righ[t]" to "privacy."  Cal. Const. art. I, § 1.  This "self-executing provision confers a right of action" for violations of privacy that extends even beyond the common law's protection of privacy.  5 Witkin, Summary

---

[9]   The Government was entitled to unredacted information because of this exemption, but there is no similar provision that would exempt USC from FERPA for a Rule 17 subpoena.

[10]   Zangrillo argues that FERPA only protects students who were admitted.  This does not help him.  He seeks *all* applicant identities, including those of admitted applicants.  Nor do these documents merely contain "directory information" as Zangrillo passingly suggested.  Directory information is information such as an email address or area of study that "would not generally be considered harmful or an invasion of privacy if disclosed."  34 C.F.R. § 99.3.  That can scarcely include standardized test scores, high school grades, and family connections, all of which could be deeply embarrassing and harmful if exposed.

11th Torts § 756(a) (2019).  It protects "informational privacy," prohibiting "the dissemination . . . of sensitive and confidential information."  *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 654 (Cal. 1994).  Information is protected "when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity."  *Id.*  "Such norms create a threshold reasonable expectation of privacy in the data at issue."  *Id.*  California statutes further prohibit USC from "disclosing personal information about students, faculty, and staff."  Cal. Educ. Code § 66093.3(a).  Taken together, these laws speak to "significant interests outside of the scope of a recognized privilege" that would be "gravely" invaded by the ordered disclosures.  *In re Grand Jury*, 478 F.3d at 585.

The student information in the disputed documents is precisely the type of information that one would expect to remain confidential.  These documents include information about the grades, test scores, and personal background of more than 1,000 applicants entirely unconnected to the defendant's alleged criminal acts.  Disclosure of the applicants' identities would reveal their academic successes and failures, details about their families, and administrators' subjective views of their future potential.  The Court should protect this information.

### B.       The Identities of Innocent Students Are Not Relevant to Any Valid Defense

Zangrillo's request for these student's identities also fails to meet Rule 17's threshold requirement of relevance.  The magistrate judge assumed that Zangrillo could escape conviction by showing that his daughter's VIP status was a gratuity no different from tags applied to other applicants.  That is mistaken.  Zangrillo's alleged defense—that his $50,000 would be sufficient to ensure his daughter's admission—is simply not credible.  As the produced documents show, even a donation of $1 million was insufficient to overcome an otherwise unqualified, much less a fraudulent, application.  Even if this argument were plausible, Zangrillo still could not show that applicants' *identities* were relevant.  He could make precisely the same argument using the

anonymized data that USC has already generated and provided comparing tagged applicants and applicants whose families made comparable donations to the general applicant pool. Identifying by name students who were not involved in Singer's conspiracy merely serves to sensationalize the proceedings and does nothing to advance Zangrillo's defense.

More fundamentally, all of the special interest tag documents are irrelevant because Zangrillo was completely unaware that his daughter had received a tag and believed she was admitted through Subco as a fake rower. As the Government explained, "[t]he VIP process has absolutely nothing to do with this case." Sept. 18, 2019 Tr. at 70. "Detoxifying" the tag, therefore, will not assist Zangrillo. In any event, the alleged agreement between Heinel, Singer, and Zangrillo to falsify Zangrillo's daughter's credentials is sufficient to support conviction even if she could have been admitted without the illicit agreement. *See United States v. McDonough*, 727 F.3d 143, 153, 160 (1st Cir. 2013) (payment intended to procure officials acts is unlawful even if official act is not taken or would have occurred absent payment).

### IV. <u>Conclusion</u>

Rule 17(c) does not permit a criminal defendant to access information which is not relevant to his defense and which would be "unreasonable or oppressive" to disclose. Zangrillo's late breaking request to remove protections for student names should be seen for what it is: an attempt to distract from the distasteful nature of his scheme by dragging into the trial the identities of applicants who are connected to this case only by the misfortune of having applied to USC in the same year as his daughter. The Court should not permit the defendant to expose these wholly innocent applicants to the media circus surrounding this case and should modify the Order to ensure that students' identities are protected.

Respectfully submitted,
UNIVERSITY OF SOUTHERN CALIFORNIA,
By its attorneys,


*/s/ Debra Wong Yang*

Debra Wong Yang (Admitted *Pro Hac Vice*)
Douglas M. Fuchs (Admitted *Pro Hac Vice*)
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213)229-7000
dwongyang@gibsondunn.com
dfuchs@gibsondunn.com


*/s/ Anthony E. Fuller*

Anthony E. Fuller (BBO #633246)
William H. Kettlewell (BBO# 270320)
Elizabeth C. Pignatelli (BBO #677923)
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA  02110
(617) 371-1000
anthony.fuller@hoganlovells.com
bill.kettlewell@hoganlovells.com
elizabeth.pignatelli@hoganlovells.com

Dated:  March 18, 2020


## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Counsel respectfully requests that the Court schedule oral argument to assist the Court in deciding the important issues presented.


*/s/ Anthony E. Fuller*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document was filed under seal and served via electronic mail on counsel for Defendant Zangrillo and the Government.

*/s/ Anthony E. Fuller*