UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
UNITED STATES OF AMERICA      )
)
       v.         )
)      CRIMINAL NO. 19-10080
DAVID SIDOO, et al      )
      Defendants    )
)
_____)

**DEFENDANT ROBERT ZANGRILLO'S RESPONSE IN OPPOSITION TO NONPARTY UNIVERSITY OF SOUTHERN CALIFORNIA'S OBJECTION AND MOTION TO MODIFY ORDER ON HIS RULE 17(c) SUBPOENA**

Now comes the Defendant Robert Zangrillo, by and through undersigned counsel, and hereby submits this Response in Opposition to Nonparty University of Southern California's ("USC") Objection and Motion to Modify Order on his Rule 17(c) Subpoena.  Magistrate Judge Kelley's Order, requiring USC to produce unredacted copies of documents previously provided to Mr. Zangrillo in redacted form pursuant to the Rule 17(c) subpoena, represents the culmination of nine months of litigation, several rounds of extensive briefing, and three hearings. In the end, Magistrate Judge Kelley ruled that the documents at issue are relevant to Mr. Zangrillo's trial defenses, that USC's redactions of those documents are "unworkable" and have the potential to compromise the utility of the documents to Mr. Zangrillo (as well as their admissibility at trial), and that any pre-trial concerns about student privacy are sufficiently addressed by the Confidentiality Order already in place.  Any trial concerns regarding student privacy may be resolved by this Honorable Court's future ability to require that exhibits going

1

into the public record be redacted similar to the way that financial information is routinely

redacted. *See* Fed. R. Crim. P. 49.1. Simply put, there is nothing "clearly erroneous or contrary

to law" about the Magistrate Judge's careful treatment of the issues implicated by Mr.

Zangrillo's subpoena. 28 U.S.C. § 636(b)(1)(A). The Court should, therefore, overrule USC's

objection and deny its motion to modify.

I.      <u>Background</u>

        a.  *The charges against Mr. Zangrillo*

        Mr. Zangrillo stands charged with conspiracy to commit mail and wire fraud and honest

services mail and wire fraud, conspiracy to commit federal programs bribery, conspiracy to

commit money laundering, and two counts of substantive wire fraud. *See generally* Dkt. 732.

The conspiracy charges are predicated in large part on a payment allegedly made by Mr.

Zangrillo "to facilitate his daughter's transfer to USC." *Id.* at ¶ 265.[1] Mr. Zangrillo is said to

have paid a total of $250,000, $200,000 to a purported non-profit organization run by Rick

Singer and $50,000 in the form of a check payable to "USC Women's Athletics." *Id.* at ¶¶ 272-

73.

        The government and USC erroneously seek to characterize Mr. Zangrillo's payment as a

bribe. In fact, it was an arms-length donation to a USC program that was welcomed and

memorialized in university documents and led to USC recognizing Mr. Zangrillo and inviting

him to various events for women's sports. In short, to Mr. Zangrillo's knowledge, not $1 went to

---

[1] Whether the additional allegations about relying on tutors to help or complete courses
constitutes a federal crime will be the subject of a separate motion to be filed on April 1 and will
not be addressed herein.

Donna Heinel, or to any USC coach, rather than to a USC program that was seeking donations to improve its facilities.  The $200,000 that Mr. Zangrillo paid to Singer's non-profit was also intended as a donation, *see* Oct. 7, 2019 *Ex Parte* Sealed Submission attaching documents relevant to Mr. Zangrillo's future good-faith defense, but Singer, after promising Zangrillo that the payment would result in separate donations to USC programs that were in need of funding, instead just retained the money rather than donating it as promised.

    b.   *USC's VIP admissions process and Mr. Zangrillo's daughter's admission*

    Mr. Zangrillo will seek to prove at trial that his payment to USC was an ordinary gift, indistinguishable from countless others made to the university each year, that Ms. Heinel's advocacy for his youngest daughter was unremarkable, not the result of a bribe, and was consistent with a university-wide practice sanctioned and utilized by the entire school hierarchy including its President, Vice Presidents, Provost, and many if not all of its Deans to "flag" a student applicant as a "VIP" – a practice that dramatically increased the student's chances for admission.[2]  As part of this effort, Mr. Zangrillo moved for a Rule 17(c) subpoena seeking documents to "demonstrate how the practice of making donations was welcomed and tracked at USC and how such donations had a significant effect on improving a prospective student's

---

[2] USC suggests that the test is whether a VIP tag guarantees admission.  No one ever contended it did.  That one parent offered a $1 million donation that did not result in admission only shows some student's application was so far below benchmarks that he or she was rejected. Nevertheless, the statistics provided by USC show that while about ███ of all freshmen applicants were admitted in 2018 (USC's acceptance rate is now down to 11%), a very high multiple of VIP applicants – between ██ and ███ – were admitted, *see infra* at 4, ████████ ████████████████████████████████████████████████████████████████████████. Being tagged as a VIP is a university-wide practice that multiplies a student's chances for admission.

chances for admission." Dkt. 546, Defendant Zangrillo's Opposition to USC's Motion to Quash, at 2. As Mr. Zangrillo has laid out in detail in prior filings, discovery documents produced by the government make clear that money matters in USC's admissions process. Indeed, the university admissions department maintains lists of so-called "special interest" or "VIP" students. Notes in these documents reflect the fact that past, pledged, or anticipated donations by individuals connected to a prospective student are often the reason for applying a special interest tag. *See* Dkt. 546-1 (document entitled "Cumulative Special Interest 2012-2015" with "Notes" column, including "500,000 for Galen," "potential donor," "next year pledge," "Donor-met with Tim [Brunold, Dean of Admissions]," "25-50,000-no ask as of yet," "donors," "long time donors," "Donated to Utengsyu," "500,000 pledge," "50-100,000-no ask as of yet," "Galen Center donor," "50,000 in trade," "100,000-no ask yet," "50,000 ask," "Donated $15k," "100,000 dive tower," "150,000 for sand/no reply," "75,000 ask--Slight match," "25,000 check and more later," "1 mil pledge," "Pledge 10,000," "scholarship club, long time donors," "$15 mil," "Potential donor- . . . need help from [then-President] Max Nikias," "$3 mil to Men's Golf-Thailand, has met w/ Tim," "150,000 Heritage," "Previously donated $25k to Heritage Hall," "$100k gift," "given 2 million already," "Potential Donor, Met with Tim Brunold," and "250,000 signed pledge"). Moreover, as USC's own statistics demonstrate, a VIP designation drastically increases an applicant's chances of admission. *See* Dkt. 951-1, Exhibits A and B (reflecting 2018 admission rates of over ▮ for VIP freshmen and ▮ for VIP transfers for the fall or spring semester, as compared to overall admission rates of approximately ▮ and ▮).

4

It is important to note that Mr. Zangrillo's daughter (the youngest of his three children), was indisputably admitted to USC through the university's VIP program, and not as a purported athlete.[3]  *See* Dkt. 532-1, USC's Memo in Support of Motion to Quash, at 3 n.3 (indicating that "[t]he government does not allege that Defendant Zangrillo's daughter was admitted on the basis of being a purported recruit student-athlete; in fact, the government and USC agree that Defendant Zangrillo's daughter . . . was never evaluated by USC's Office of Admission as a prospective student-athlete" and was never designated by USC's athletics department or in particular by Donna Heinel, its former Associate Athletic Director, as a rower or any other type of athlete); Exhibit 1 (June 26, 2018 email from Heinel to Singer explaining that Mr. Zangrillo's daughter "was not presented as an athlete we just advocated for her with Tim [Brunold, USC Dean of Admissions] and Kirk [Brennan, USC Director of Admissions] as a transfer.  She went over on our VIP list for transfers.").  While USC attempts to characterize this treatment of Mr. Zangrillo's daughter as a "last-minute switch," Dkt. 951 at 8, discovery documents make clear that her admission was always intended to occur as a non-athlete VIP.  *See* Exhibit 2 (August 28, 2017 email from Heinel to Singer listing various students and their associated sports; sport column for Mr. Zangrillo's daughter is blank; Singer responds, "▮▮▮▮ Zangrillo- transfer").  As USC readily acknowledges, "[a] special interest tag, including one added by Athletics, does not identify a student as [a] recruited athlete."  Dkt. 951 at 7.

---

[3] Mr. Zangrillo does not address the legal defenses that other defendants in this case may have. Those defenses will be the subject of motions filed by his co-defendants.

Of course, Mr. Zangrillo's daughter was never a rower.  Indeed, no mention of any involvement in such an activity was contained in her initial January 2017 application to USC.

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ This information was patently inconsistent with the representation in the same application that Mr. Zangrillo's daughter spent forty-four hours per week rowing (in USC's words, "an incredible amount of time suggesting a passionate and dedicated focus," Dkt. 951 at 9 n.4).  The representation regarding rowing was simply a fiction unilaterally created by Singer and added to Ms. Zangrillo's second USC application, and, as the documents show, it had no materiality and was not considered by USC in its admissions decision.

While discovery provided by the government contained a number of documents relating to the designation of VIP students by USC's athletics personnel, *see generally* Dkt. 546 Exhibits, Mr. Zangrillo sought by the 17(c) pre-trial subpoena to acquire similar documents from other USC schools and departments in an effort to establish a "university-wide practice," *i.e.* not one limited to athletics nor one not approved and followed at the highest levels of the university hierarchy, *see* Dkt. 546 at 21.  Mr. Zangrillo argued that the government's Rule 16 discovery documents' focus on athletics was "merely a result of the limits placed on the government's productions and not reflective of any unique relationship between Athletics and Admissions."

6

*Id.* ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████ █████████ ██████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

---

█ █████████████████████████████████████████████
█████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

      c.  *Materiality of the requested documents*

As Mr. Zangrillo has repeatedly explained, and Magistrate Judge Kelley has now found, the documents he seeks from USC are relevant to his trial defenses.  For one thing, the widespread knowledge and approval of USC's VIP program, reaching the highest levels of the institutional hierarchy, refutes any claim that Mr. Zangrillo's payment to USC deprived the university of the honest services of its employees.  *See, e.g.*, *United States v. Skilling*, 554 F.3d 529, 545 (5th Cir. 2009), *vacated in part on other grounds* ("[W]hen an employer (1) creates a particular goal, (2) aligns the employees' interests with the employer's interest in achieving that goal, and (3) has higher-level management *sanction improper conduct to reach the goal*, then lower-level employees following their boss's direction are not liable for honest-services fraud."); *United States v. Brown*, 459 F.3d 509, 522 (5th Cir. 2006) ("Enron's legitimate interests were not so clearly distinguishable from the corporate goals communicated to the Defendants . . . that the Defendants should have recognized, based on the nature of our past case law, that the 'employee services' taken to achieve those corporate goals constituted a *criminal* breach of duty to Enron.").  USC's Dean of Admissions Tim Brunold was, for example, intimately involved in the VIP process, as discussed in more detail below.  *See infra* at 25-27.  Moreover, Heinel's boss,

former Athletic Director Pat Haden, was responsible for tagging many students.  *See* Dkt. 546-1 (repeatedly naming Haden in the "Recommend" column).  Heinel sometimes told Brunold that the VIP lists she provided had come directly from Haden. *See* Dkt. 546-5 ("Pat would like to humbly submit his requests for admissions.  He personally knows and highly recommends all of these individuals for Fall admission to USC.").  The 2015 chart entitled "Pat VIP List" indicates that several of the students were tagged because of past or anticipated donations.  *See id.*  Even USC's President occasionally advocated for the admission of a particular VIP student.  *See, e.g.*, Dkt. 546-14 and 546-15.  USC's redaction of columns on its admissions VIP spreadsheets that clearly showed advocacy ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

    Similarly, the existence and operation USC's VIP admissions program undermines any claim that the university was deprived of money or property.  To the contrary, had USC not accepted Mr. Zangrillo's daughter, it would have likely offered her spot in the incoming class to another VIP applicant.[5]  The documents produced to date refute any suggestion that VIP applicants were admitted based solely on merit.  *See, e.g.*, Dkt. 546-1 (reflecting the fact that many students were tagged based on past, pledged, or anticipated donations and/or because of

---

[5] Mr. Zangrillo also disagrees with the government's position that an offer of admission to a university constitutes "money or property" within the meaning of the mail and wire fraud statutes.  The defendants anticipate filing a consolidated motion to dismiss on this basis.

recommendations by powerful members of the USC community).  They also disprove the

allegation made to this Honorable Court that being labeled a VIP had only a "marginal benefit,"

Dkt. 951 at 6 – or that it was little more than a tie-breaker.

The documents sought by Mr. Zangrillo are further expected to demonstrate that any

misrepresentations made by Singer in his daughter's application were immaterial to her eventual

admission to USC.  This is because the academic performance of Mr. Zangrillo's daughter,

coupled with her VIP designation, would very likely have been sufficient to secure her admission

without regard to Singer's falsification of her application.  *See* Dkt. 951-1, Exhibit B (indicating

that over ████ of transfer students applying in the same cycle as Mr. Zangrillo's daughter were

admitted); ███████████████████████████████████████████████

███████████████████████████████[6]

Lastly, the widely accepted VIP admissions process at USC supports a defense predicated

upon Mr. Zangrillo's good-faith belief in the legality of his actions.  USC's suggestion that Mr.

Zangrillo was unaware of the university's VIP program is false.  *See generally* Defendant

Zangrillo's Oct. 7, 2019 *Ex Parte* Sealed Submission. ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

---

[6] As explained more fully below, *see infra* at 20-21, it is, for this reason, important that USC
remove redactions of all academic performance metrics from the documents so that Mr.
Zangrillo can fully present this materiality defense in response to the government reliance on
Singer's misrepresentation that his daughter was a rower.

███████████████████████████████████

███████████████████████████████████

██████

II.   *Procedural History*

Mr. Zangrillo initially moved for a Rule 17(c) subpoena on June 19, 2019, more than nine months ago.  *See* Dkt. 426.  His motion was conditionally granted by Magistrate Judge Kelley, subject to any motion to quash filed by USC, on July 10.  *See* Dkt. 458.  USC subsequently did move to quash the subpoena, almost in full, on August 22.  Dkt. 532.  Mr. Zangrillo opposed the motion.  *See* Dkt. 546.

At a September 18, 2019 hearing, Magistrate Judge Kelley encouraged the parties to confer regarding the scope of the subpoena in hopes of narrowing the disputed issues.  Extensive negotiation ensued.  On October 25, USC made its first production, which included heavily redacted versions of several VIP tracking spreadsheets, as well as redacted emails and other documents.  *See, e.g.*, Exhibit 7.  As Mr. Zangrillo explained in a submission to the Magistrate Judge, the redactions went far beyond any conceivable need to protect student privacy and rendered the documents largely useless.  Exhibit 7, for example, appears to contain twenty-six columns, twenty-four of which were entirely redacted.  Most of the column headings were also redacted, making it impossible for Mr. Zangrillo to ascertain the nature of the information being excluded.  Moreover, the notes in the column entitled "Submission Justification" were redacted to omit not only the names of the student applicants but also the names of the donors and other individuals advocating for those students.  ███████████████████████

11

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ Mr. Zangrillo expressly recounted his understanding, based

representations made by counsel for USC (that has now been shown to be misguided), that "all

of the redacted columns other than those discussed in this submission [*i.e.*, the notes column and

another column listing the "Referral Source"] represent biographical and academic information

relating to particular students (which is impossible to verify based on the present production

because most of the column headings have been redacted)."  Dkt. 660, Defendant Zangrillo's

Sealed Response to USC's Brief regarding Request for Production, at 11. ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ The magnitude of the redactions – as

determined by the Magistrate Judge after full review of both the redacted and unredacted

versions – rendered the documents "unwieldy, if not impossible, to use at trial," Dkt. 913 at 16.[7]

---

[7] The redactions, which were never agreed to by the government, changed the documents
themselves, rendering them potentially inadmissible as business records at trial.

After Mr. Zangrillo brought the scope of the redactions to Magistrate Judge Kelley's attention, USC agreed to provide, in place of the proper names of individuals advocating for VIP students, "a description of each redacted person's role."  Dkt. 668.[8]  But USC's next production, occurring on December 16, 2019, fell well short of that promise.  Many of the descriptions inserted into the documents by USC in place of the proper names were so vague as to be essentially meaningless.  ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████  Mr. Zangrillo was forced to return to Magistrate Judge Kelley once again, who "ordered USC to provide . . . more precise descriptions."  Dkt. 700.  ███████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

<hr>

[8] As USC Exhibits F and G show, there was never an agreement regarding USC's use of redactions to hide the roles of sponsors, including those within the USC community, such as Senior Vice President of University Advancement Al Checcio or the President, from the defendant for "proprietary" reasons.  While USC expressed its desire to redact the names of "anyone sponsoring" a particular student, *see* Dkt. 951-1, Exhibit F, undersigned counsel expressly responded, "I do not agree that notes, comments identifying the sponsor should be redacted," *see id.*, Exhibit G.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

On January 27, 2020, Mr. Zangrillo discovered for the first time an unredacted copy of

the 2018 VIP Transfer Spreadsheet, one of the many lists that USC had produced to him in

heavily redacted form, in a recent government production.[9] ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████   This was a *post hoc* rationalization contrary

to representations previously made by USC in open court.  While USC had consistently

expressed a desire to redact sponsor identities in the comments or notes columns of the

---

[9] Contrary to USC's assertions a usable version of this spreadsheet was not provided to the defense until January 9, 2020.  The version of the document previously provided by Mr. Zangrillo to the Court was produced only in extracted text format and was therefore extremely difficult to read and comprehend.  For that reason, it was not until the government produced the native Excel file as part of an overlay production that Mr. Zangrillo was able to recognize it as the unredacted VIP Transfer Spreadsheet.  The prior version was provided during the September 18, 2019 hearing as a sealed exhibit – it in no way reflects the level of clarity provided by the native Excel file, as the information contained in the document does not appear in orderly columns and rows and is therefore rendered almost impossible to follow.

spreadsheets, it never suggested that similar information was contained in other redacted

columns.  *See* Dkt. 673, Nov. 26, 2019 Hr'g Tr. at 16 ("We redacted information in the

spreadsheet that we're talking about either because it was necessary to protect student privacy

under FERPA . . . or alternatively, it reflected proprietary information."). ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ It was at this point that Mr. Zangrillo turned

to Magistrate Judge Kelley for the final time, arguing that USC's production to the government

of the very same type of information sought by Mr. Zangrillo with no redactions undermined

USC's claim of privilege or confidentiality, and that the unredacted VIP Transfer Spreadsheet

precluded any claim that the redactions solely protected "academic information" or "proprietary

information," particularly when unredacted documents were provided to the government with no

assertion of any such privilege and when an examination of the headings and other information

15

on the unredacted VIP Transfer Spreadsheet belies USC's proffered justifications for its

redactions ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████

On March 3, 2020, Magistrate Judge Kelley agreed with Mr. Zangrillo and Ordered USC

to reproduce all of the documents previously provided to Mr. Zangrillo in unredacted form.  She

ruled that "[t]here is no doubt, given Zangrillo's defenses . . . , that he is entitled to obtain

documents in the possession of USC in order to prepare for trial."  Dkt. 913 at 10.  More

specifically, documents tending to "establish that the VIP admissions process was legitimate,

was accepted university-wide, and was endorsed by high-level administrators, and . . .  that it

was commonplace for applicants who donated to the school, and who had influential persons

advocating for their admission, to receive favorable consideration in the admissions process"

should be available to Mr. Zangrillo.  *Id.*  This is because such documents "are relevant to

Zangrillo's good-faith state of mind defense, whether USC was defrauded, whether USC was

deprived of Heinel's honest services, whether Heinel was bribed, and whether any

misrepresentations in Zangrillo's daughter's application were material to her admission."  *Id.* at

10-11.  Magistrate Judge Kelley concluded, based on months of litigation regarding the scope of

USC's redactions, that the "redactions simply are unworkable, as they prevent Zangrillo from

understanding information to which he is entitled."  *Id.* at 3.  The Magistrate Judge also relied on

her finding that "USC has made misleading representations about its admissions practices and

the redactions to the materials."  *Id.*; *see also id.* at 17 ("USC has been less than forthcoming

about its admissions process.").  She found USC's proffered explanation for its redaction of the

VIP Transfer Spreadsheet "unpersuasive."  *Id.* at 18.

III.     *Legal Standard*

This Court may reconsider a magistrate judge's Order on a non-dispositive motion only

upon a showing that the ruling "is clearly erroneous or contrary to law."  28 U.S.C.

§ 636(b)(1)(A).  "[A] respect for this standard is important, given the pivotal role that magistrate

judges play in overseeing the conduct of . . . complex pretrial discovery . . . ."  *Ferring Pharm.*

*Inc. v. Braintree Labs., Inc.*, 168 F. Supp. 3d 355, 358 (D. Mass. 2016) (Gorton, J.) (citation

omitted).  "The 'clearly erroneous' prong" of the statute "requires the district judge to accept the

factual findings and conclusions of the magistrate judge unless, after reviewing the entire record,

the district judge has a strong, unyielding belief that a mistake has been made."  *Id.* at 358-59

(citation omitted).  Under the "contrary to law" prong, the more fact-intensive the issue at-hand,

the more deference should be afforded to the magistrate judge's ruling.  *See id.* at 359.  "The

balancing of any burden imposed upon [a non-party from whom discovery is sought] against [a

party's] need for information is the type of fact-based discovery determination which is

particularly suited for deference to a magistrate judge."  *Green v. Cosby*, 160 F. Supp. 3d 431,

440 (D. Mass. 2016).

A party seeking a pre-trial Rule 17(c) subpoena "must clear three hurdles: (1) relevancy;

(2) admissibility; [and] (3) specificity."  *United States v. Nixon*, 418 U.S. 683, 700 (1974).  The

right to obtain pre-trial production of evidence upon making this threshold showing "has

constitutional dimensions."  *Id.* at 711.  Indeed, in order to "vindicate" the guarantees of the Fifth

and Sixth Amendments, "it is essential that all relevant and admissible evidence be produced."
*Id.*  Accordingly, "[a] subpoena for documents may be quashed if their production would be
'unreasonable or oppressive,' **but not otherwise**." *Id.* at 698 (emphasis added).

IV.     *Argument: USC's Objection to Magistrate Judge Kelley's Order Should Be Overruled*

        It is important to note at the outset the narrow scope of USC's objection to Magistrate
Judge Kelley's Order.  It requests only that the Court "modify the Order to allow the redaction of
applicants' personal information."  Dkt. 951 at 2.[10]  USC's disagreements with Magistrate Judge
Kelley's reasoning are also relatively narrow.  The university identifies no pure question of law
on which the Magistrate Judge erred.  It similarly fails to present any developed argument that
Mr. Zangrillo did not satisfy the *Nixon* standard for obtaining a Rule 17(c) subpoena.  Rather,
USC roots its objection in the contention that the Magistrate Judge's Order is "unreasonable or
oppressive" because Mr. Zangrillo's need for the unredacted documents does not outweigh the
privacy interests of the student applicants.  This is precisely the type of fact-intensive balancing
for which great deference is due to the Magistrate Judge.  *See Green*, 160 F. Supp. 3d at 440.

        a.   *Mr. Zangrillo has a substantial need for the information at issue*

        Review of Magistrate Judge Kelley's Order makes clear that she carefully considered, but
ultimately rejected, USC's argument.  First, with respect to Mr. Zangrillo's need for the
unredacted materials, she observed that the redacted emails and lists "do not inform Zangrillo for
whom the administrator was advocating.  Zangrillo cannot follow a string of emails pertaining to

---

[10] This Court has Ordered USC to reproduce all "documents that are currently redacted but are
not subject to its limited appeal" by March 24, 2020.  Dkt. 947.

the same applicant, to see what eventually happened to him or her, because he does not know the person's name.  In some of the emails, which contain lists of applicants, one cannot tell how many applicants are listed."  Dkt. 913 at 16.  The ability to collect and analyze all communications relating to a particular student, and then determine the admission decision reached for that student, is important.  This exercise will allow Mr. Zangrillo to evaluate the importance of such factors as the identity of a student's VIP sponsor(s) and the relative strength of the recommendation(s). ████████████████████████

████████████████████████████████████████

██████████████████████ ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███

      ████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

---

[11] Checcio is USC's Senior Vice President of University Advancement.  *See supra* at 10-11.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

The information available regarding the broader university-wide VIP process is, however, far less fulsome since the government's subpoena to USC focused on the athletics department and not the other departments that utilize the VIP process.  It is only by obtaining unredacted documents, disclosing the names of students in both the VIP spreadsheets and advocacy emails, that Mr. Zangrillo will be able to compile a similar data set of applicants whose institutional support and circumstances of admission match those of his daughter.[12]

Additionally, academic information, such as GPAs and standardized test scores, which is currently redacted out of the documents produced by USC, would assist Mr. Zangrillo in comparing the relative merits of the applicants.  If, as Mr. Zangrillo anticipates, many of the VIP applicants who were not admitted to USC were clearly unqualified, it will bolster Mr. Zangrillo's contention that, while a VIP tag did not result in a 100% chance of admission, it drastically increased the odds, especially for students with academic records similar to Mr. Zangrillo's daughter. ███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ *See* Exhibit 12, USC Transfer Student Profile. ██████████████████████████████████████████

---

[12] The Court will be able to fully address any privacy concerns by requiring that this information be redacted or anonymized in any trial exhibits.

████████████████████████████████████████████████████████████████

████████████████████████████████████ Assuming the currently redacted VIP lists are similar, they will allow Mr. Zangrillo to rebut USC's representation that a VIP designation merely yielded "a marginal benefit, essentially a second look by a senior Admission staff member," Dkt. 951 at 6, (a claim already substantially undermined by USC's own statistics, *see* Dkt. 951-1, Exhibits A and B) and verify the academic data provided in USC's brief, *see* Dkt. 951 at 6 n.2.[13]

Magistrate Judge Kelley also noted potential admissibility problems with respect to the use of redacted documents at trial. *See* Dkt. 913 at 16. To date, the government has not stipulated to the admissibility of the documents, and it may argue that the redactions render the business records exception to the rule against hearsay inapplicable. *See* Fed. R. Evid. 803(6). Even overlooking this threshold issue, "[i]t is hard to imagine a trial witness from USC looking at a redacted document and being able to answer questions as to what it means." Dkt. 913 at 16.

  b.  *USC's concern for student privacy is overstated*

USC significantly overstates the concern for student privacy weighing against Mr. Zangrillo's substantial need for the unredacted documents. While USC baldly asserts that, if student identities are released to the defense, they will "inevitably" become public, it provides no evidence or even an explicit rationale in support of that claim. *See* Dkt. 951 at 2; *see also id.* (suggesting that disclosure "would subject these students and families to the media circus surrounding this case and lead to unfair harassment and embarrassment"). USC has already

---

[13] USC's insistence that being tagged VIP did not "guarantee" an applicant's admission is a red herring. Mr. Zangrillo has never argued the existence of any such guarantee.

produced the unredacted VIP Transfer Spreadsheet to the government with the knowledge that

the government would be obligated under Fed. R. Crim. P. 16 to produce the document to the

defense.  USC points to no public dissemination of the information in this document in the many

months since it was originally produced in extracted text form or in the more than two months

since the production of the native Excel file.  Any further production of unredacted documents

by USC could, moreover, be subject to both the operative Protective Order with the government,

requiring that discovery documents be used solely in connection with litigation in this case and

that any "reference to a child" or "information containing academic records" be redacted or filed

under seal, *see* Dkt. 377 at 4, and the supplemental Confidentiality Order with USC requiring

that, pre-trial, any USC-produced document be filed under seal, *see* Dkt. 604 at 4.  Even trial

exhibits "derived from" protected discovery materials must contain redactions as to references to

children or academic records.  *See* Dkt. 377 at 4 n.1.

USC's reliance on the Family Educational Rights and Privacy Act ("FERPA") fails for a

number of reasons.  First, and most fundamentally, USC does not even so much as acknowledge

the statutory exception permitting disclosure of "personally identifiable information in education

records . . . in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon

condition that parents and the students are notified of all such orders or subpoenas in advance of

the compliance therewith by the educational institution or agency."  20 U.S.C. § 1232g(b)(2)(B);

*see also, e.g.*, *Rios v. Read*, 73 F.R.D. 589, 598 (E.D.N.Y. 1977) (explaining that FERPA "does

not provide a privilege against disclosure of student records" and that "a school is not subject to

sanctions because it discloses 'personally identifiable information' if it does so in compliance

with a judicial order"); *United States v. Pleau*, No. 10-CR-184, 2012 WL 4369302, at *1 (D.R.I. Sept. 24, 2012) ("FERPA . . . affords privacy protection against parties accessing an individual's educational records, absent that individual's consent, but contains an exception to this requirement when the records are obtained pursuant to a judicial order or subpoena 'upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency'" (quoting statute)).  Indeed, USC's student handbook, Part C, Section 6, IIIc, *available at* https://policy.usc.edu/files/2018/07/SCampus-2018-19.pdf, informs its students that their personally identifiable information and education records may be produced "in response to a judicial order or legally issued subpoena," making no distinction between a subpoena from the government and a defense subpoena.  There is simply nothing "unreasonable or oppressive" about requiring an institution of USC's size and resources to promptly provide a FERPA notice to approximately 1,000 students.

USC also significantly overstates the scope of FERPA.  The statute protects against disclosure of "education records," not information about students' "family connections."  Dkt. 951 at 18 n.10.  Moreover, much of the information redacted from the VIP spreadsheets constitutes so-called "directory information," which is afforded less protection by the statute and may be released so long as the institution provides "public notice" and an opportunity to object to such disclosure.  20 U.S.C. § 1232g(a)(5)(B); *see also* § 1232g(a)(5)(A) (defining directory information to include, among other things, "the student's name, . . . major field of study, participation in officially recognized activities and sports, . . . dates of attendance, degrees and

awards received, and the most recent previous educational agency or institution attended by the student").  USC provides the requisite public notice.  *See* USC, Office of Academic Records and Registrar, *available at* https://arr.usc.edu/records/ferpa/.  Lastly, FERPA is inapplicable to the names and academic information of students who were denied or refused admission.  *See* 20 U.S.C. § 1232g(a)(6) (defining "student" to "not include a person who has not been in attendance at [the] agency or institution"); USC, Office of Academic Records and Registrar, *available at* https://arr.usc.edu/records/ferpa/students.html ("A student's FERPA rights begin when the student registers and attends his or her first class.").  Accordingly, USC can remove any redactions regarding students who did not matriculate to the university without providing any notice whatsoever.

USC also purports to rely on California tort and constitutional law, but it fails to present any developed argument as to how disclosure of academic records pursuant to a Court Order and subject to multiple Protective Orders could constitute an actionable privacy invasion.  The state statute cited by USC has express exceptions (not mentioned in USC's memorandum) permitting release of information that "may legally be disclosed under state and federal privacy laws" or "in response to a judicial warrant, court order, or subpoena." Cal. Educ. Code § 66093.3(a).

c.  *The Magistrate Judge correctly found that USC made misleading representations*

While USC attempts to dismiss its misleading representations in this litigation as mere "unsupported assertions" by Mr. Zangrillo, Dkt. 951 at 1, Magistrate Judge Kelley made express findings adopting Mr. Zangrillo's arguments on this point.  *See* Dkt. 913 at 3 ("USC has made misleading representations about its admissions practices and the redactions to the materials.");

24

*id.* at 17 ("USC has been less than forthcoming about its admissions process.").  And those

findings were well-supported.  USC's Motion to Quash the Rule 17(c) Subpoena relied heavily

on a Declaration executed by Dean of Admissions Tim Brunold.  As Mr. Zangrillo subsequently

made clear, that Declaration was contradicted by discovery documents in a number of respects.

First, contrary to Brunold's statement that USC admissions "does not track donations by an

applicant's family" or "specifically track the percentage of special interest students who are

admitted," Dkt. 532-3 at ¶¶ 3, 6, Brunold himself maintained a "university-wide VIP

spreadsheet," Dkt. 546-3; *see also* Exhibit 5, 2018 VIP Transfer Spreadsheet, and repeatedly told

Heinel that he would "track" the students flagged as special interest by the athletics department,

Dkt. 546-4; Dkt. 546-6.  Moreover, while Brunold represented that "the majority of students who

receive a special interest tag are not admitted," Dkt. 532-3 at ¶ 3, the admission rate of special

interest students designated by the athletics department was consistently far greater than 50%,

*see* Dkt. 546-7 (83% in 2014); Dkt. 546-8 (82% in 2015); Dkt. 546-9 (91% in 2016); Dkt. 546-

10 (80% in 2017); Dkt. 546-11 (68% in 2018).  The statistics subsequently produced by USC

confirm that the VIP admission rate in 2018 was well over 50%, while USC's overall admission

rate was far lower (about ███ for freshmen).   Brunold also insisted that USC "does not possess

any documents containing a complete list of students who received a special interest tag," Dkt.

532-3 at ¶ 4, but it is clear beyond dispute that USC did maintain multiple tracking documents,

including spreadsheets, reflecting the identities of many of the students who received the special

interest tag and their treatment over the course of multiple years.  *See, e.g.*, Dkt. 546-1

("Cumulative Special Interest" spreadsheet for 2012-2015).  Contrary to Brunold's

representation that "[t]here is no possible way to consistently determine which employees issued special interest tags to which students," Dkt. 532-3 at ¶ 5, multiple relevant documents expressly list the USC employee that applied the designation to each student ████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *See,*

*e.g.*, Dkt. 546-1 and 546-2; Exhibit 5, 2018 VIP Transfer Spreadsheet. Finally, while USC claimed, based on Brunold's Declaration, that its admissions office "does not know how much the family of an applicant has donated," Dkt. 532-1 at 4, the discovery documents make clear that Heinel consistently apprised Brunold of such donations at the time he was called upon to make admission decisions. Dkt. 546-4 (2014 email from Heinel to Brunold listing "VIP" students with notes including "Galen Center donor," "long time donors," and "Dean interview"); Dkt. 546-5 (similar list for 2015 including notes "potential donor," "$3 mil to Men's Golf-Thailand, has met w/ Tim," "$250,000," "1 mil pledge," "$15 mil," "Max Nikias [then-President of USC]," "Previously donated $25k to Heritage Hall," and "Donated $15k," among others); Dkt. 546-6 (2016 list including note "pledged 1 million, interview w/Tim"). ████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████ The Magistrate Judge explicitly found that Brunold's representations regarding the connection between donations and admissions were "misleading." Dkt. 913 at 17-18.

As the Magistrate Judge noted, Brunold's "misstatements," after being pointed out by Mr. Zangrillo, "had to be corrected by a second affidavit." *Id.* at 18 n.14. But Brunold's second

Declaration once again contained implausible claims inconsistent with the discovery documents.[14]

USC also made misleading representations regarding the scope of its redactions.  *See* Dkt. 913 at 18 (finding USC's "attempt to explain and justify" statements made regarding the scope of its redactions "unpersuasive").  USC did nothing to correct Mr. Zangrillo's explicit understanding, based on extensive communications with counsel for USC, that redactions in the VIP spreadsheets other than the referral source and comments/notes columns solely reflected "biographical and academic information relating to particular students." Dkt. 660 at 11.  To make matters worse, at the subsequent hearing regarding redaction issues USC doubled down by expressly representing that it "redacted information in the spreadsheet that we're talking about either because it was necessary to protect student privacy under FERPA . . . or alternatively, it reflected proprietary information."  Dkt. 673, Nov. 26, 2019 Hr'g Tr. at 16.  Notably absent was any reference to a need to protect sponsor identities ████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Later

---

[14] Brunold's revised Declaration, for example, stated, "I have reviewed the charts related to special interest students that appear to have been created and maintained by Donna Heinel . . . . The Office of Admission does not maintain any comparable document listing special interest students, their sponsors, and information relating to why they may have been designated." Dkt. 557-2 at ¶ 5.  Not only is this representation inconsistent with Brunold's admission to maintaining a "university-wide VIP spreadsheet," but it is also contradicted by the unredacted VIP Transfer Spreadsheet, ███████████████████████████████████████████ ███████████████████████████████████  See Exhibit 5.  A fuller description of the misleading representations in Brunold's revised Declaration can be found in Dkt. 562.

in the hearing, undersigned counsel reiterated, "I would gladly give up" the columns other than the comments/notes "because Mr. Fuchs represented on behalf of U.S.C. that each of those columns was unrelated to the sponsorship donor issue . . . but related instead to things like test scores or grades." Dkt. 679, Nov. 26 2019 Hr'g Tr. at 8.  Mr. Fuchs never denied or corrected the accuracy of undersigned counsel's misunderstanding of USC's very explicit past representations regarding the nature of the columns/information that it had repeatedly redacted from the pivotal spreadsheets used by admissions that tracked who was sponsoring and supporting which VIP student applicant.  In short, counsel for Mr. Zangrillo made clear exactly what he was seeking, and USC nonetheless failed to disclose that ██████████████████ ███████████████████████████████████████████████ Instead, it made representations directly to the contrary.

Finally, USC's parroting of the government's allegations against Mr. Zangrillo does not immunize those allegations from challenge.  Mr. Zangrillo categorically denies the charge that he knowingly conspired to falsely present his daughter as a rower.  Ultimately, it will be up to a jury of Mr. Zangrillo's peers, not counsel for USC, to decide these issues.  In any event, there is nothing about the foregoing allegation that precludes Mr. Zangrillo from defending himself against the additional allegation that his $50,000 payment to USC Women's Athletics or the further payment of $200,000 to Singer that was fully intended for USC constituted a bribe.[15]  In

---

[15] The defendants anticipate filing a consolidated motion to suppress Singer's consensual calls, which often inaccurately characterized the payments arranged by Singer as bribes.

fact, it was not a bribe, but an ordinary donation indistinguishable from countless others made on behalf of VIP applicants hoping to improve their children's chances of admission to USC.

V.   _Conclusion_

For the foregoing reasons, Mr. Zangrillo respectfully requests that the Court overrule USC's objection and deny its motion to modify Magistrate Judge Kelley's Order.

Respectfully Submitted,
Robert Zangrillo
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: March 23, 2020

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, March 23, 2020, a copy of the foregoing document has been served via electronic mail on counsel for USC.

**/s/ Martin G. Weinberg**