UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------x
:
UNITED STATES OF AMERICA,                  :
:
Plaintiff,   :
:
-against-                 :  Criminal No. 1:19-cr-10080-NMG
:
DAVID SIDOO, ET AL,                         :  **LEAVE GRANTED ON MARCH 30, 2020**
:
Defendant.   :
:
:
---------------------------------------------------------x

### NON-PARTY UNIVERSITY OF SOUTHERN CALIFORNIA'S REPLY IN SUPPORT OF OBJECTION AND MOTION TO MODIFY ORDER ON DEFENDANT ZANGRILLO'S RULE 17(c) SUBPOENA

Only a few months ago, counsel for Defendant Robert Zangrillo told the magistrate judge "I'm not seeking the names of the applicants." Now, he claims he has a "substantial need" for the names of 17- and 18-year-old kids having nothing to do with this case. But in his twenty-nine page exposition on the moot history of litigation involving his subpoena, Zangrillo devotes less than four pages to what he concedes is the "narrow scope of USC's objection" to the magistrate judge's order, and he does not address his sudden about-face at all.

USC merely seeks to preserve and protect the privacy interests of more than 1,000 young people who entrusted their information to the school. It has provided Zangrillo with a wealth of sensitive and proprietary admissions information—everything else he has asked for. But the names and other identifying information of innocent applicants to USC should be out of bounds. Zangrillo does not need it, and he has offered no legitimate reason to smear these innocent young people by falsely equating their circumstances to his daughter's.

To be clear, that is exactly what Zangrillo intends to do. He wants to create a "data set of

\\BOS - 061612/000047 - 1230060 v1

applicants whose institutional support and circumstances of admission match those of his daughter." Opp. 20. That statement alone shows the patent irrelevance of the private applicant information that Zangrillo now seeks. If the government's allegations are true, the information at issue about other applicants cannot save Zangrillo; if they are not true, the government's case disintegrates regardless of those other applicants. It is not disputed that Zangrillo's daughter appeared to be qualified like other applicants. But that appearance is not a defense, and it did not reflect reality because her application was allegedly filled with misrepresentations and therefore was fundamentally different than the admissions of the innocent applicants whose private information he seeks. Zangrillo's daughter was admitted based on a fiction that Zangrillo himself admits at least in part, telling this Court: "Of course, Mr. Zangrillo's daughter was never a rower." *Id.* at 6. Zangrillo fails to address the recorded phone call between Zangrillo, his daughter, Rick Singer, and the woman who allegedly fraudulently took multiple classes for Zangrillo's daughter. In that call, Singer told Zangrillo and his daughter that he pursued her admission to USC "as though she's been sculling and rowing" and "going in under athletics and not under the regular admission."

     Saying Ms. Zangrillo is just like other applicants, as long as you do not consider the lies about her academic and athletic qualifications and interests, is not a legitimate comparison. Zangrillo has not, and cannot, justify forcing USC to disclose private information about its applicants beyond the reams of charts, emails, sponsor information, and other data that USC already has produced. The magistrate judge's initial view that the applicant information was "extremely sensitive" and "off the table" was proper. The order should be amended accordingly so that USC may redact applicant names and other identifying information from the handful of already-produced spreadsheets and emails at issue.

* * * * * *

This dispute involves only four spreadsheets listing the credentials of more than 1,000 applicants and 31 emails sent from USC officials to the Dean of Admission listing or advocating on behalf of various applicants. And the dispute about these documents is quite narrow. As ordered, USC has produced all of these documents to Zangrillo redacted only to protect the identities of the applicants. And, although USC disagrees that it is relevant to the defense, USC no longer seeks to protect the proprietary admissions information that was redacted in prior versions produced to Zangrillo.[1] Nor does USC seek to protect the identities of the USC officials who sponsored special interest applicants, which it had anonymized in prior versions of the documents. The *only* information at issue in this appeal are the names, private information (such as GPAs and test scores), and identifying information of the applicants themselves.

As a threshold matter, Zangrillo has not established that the *identities* of the more than 1,000 affected applicants are relevant to his defense, which is a fundamental requirement of Rule 17. See *United States v. Nixon*, 418 U.S. 683, 698 (1974); 2 Fed. Prac. & Proc. Crim. § 275 (4th ed.); *United States v. Shinderman*, 232 F.R.D. 147, 152 (D. Me. 2005) (Noting that "some *potential* of relevance and evidentiary use," and simple "[c]onclusory allegations of relevance and admissibility are insufficient." ) (quoting *United States v. Jackson*, 155 F.R.D. 664, 667 (D. Kan. 1994)).

Crucially, it is not enough merely to assert the relevance of the documents. Any potential relevance must be "weighed against the privacy interests implicated in Defendant's request."

---

[1] This proprietary information includes the tiers, Advancement notations, and various columns headings referenced in Zangrillo's opposition headings that reveal the factors that different USC officials record or that Admission considers in the decision-making process. *See* Opp. 9, 14, 16, 26. USC never represented this data as student identifying information. Rather, as the magistrate judge clearly stated, these redactions protected not just test scores and grades but also "proprietary information about [USC's] admissions process and . . . information concerning donors and other friends of the universit[y]." Nov. 26, 2019 Tr. at 29.

*United States v. Murray*, No. 3:18-cr-30018, 2019 WL 1993785, at *7 (D. Mass. May 6, 2019). And a subpoena that unduly tramples on important privacy interests is contrary to Rule 17's prohibition on "unreasonable and oppressive" requests and must be quashed. *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984). By failing to weigh adequately the vital privacy concerns of the more than 1,000 affected applicants against Zangrillo's flimsy arguments for relevance, the magistrate judge applied the wrong legal standard and erred on a question of law; as a result, the question of student privacy is subject to *de novo* review. *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010); *see United States v. Theodore*, 468 F.3d 52 (1st Cir. 2006) (application of incorrect legal standard is legal error). Even if, as Zangrillo suggests, the Order's cursory disregard for student privacy was a factual determination, it is precisely the type of "cryptic" conclusion not subject to deference, *Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 n.5 (1st Cir. 1989), and which this Court is "entitled to discount" because it "omits essential findings or analysis," *United States v. Matias*, 885 F. Supp. 2d 458, 464 (D. Mass. 2012); *see also United States v. Theodore*, 468 F.3d 52 (1st Cir. 2006) .

### 1.     **Student Identities Are Not Relevant To The Defense**.

Zangrillo fails to connect the identities of the more than 1,000 applicants named in these documents to a legally cognizable defense theory. His convoluted argument for relevance seems to be that he wants to track applicants across documents by name. But none of the information that tracking would reveal is relevant to his defense. As Zangrillo himself points out, cherry-picking individual applicants does not provide an accurate picture of Admission practices at an institution as large and diverse as USC. Opp. 3 n.2. University-wide admission statistics, such as the interquartile range of applicant test scores and GPAs, provide a much more accurate picture of USC's admission criteria. And USC has already generated those statistics and

4

provided them to Zangrillo. D.E. 951-1, Exs. A & B. These metrics allow Zangrillo to make any comparison he wishes between the credentials of the applicant pool and his daughter's credentials.[2]

But more importantly, comparing his daughter's credentials to those of other applicants cannot advance Zangrillo's defense. If Zangrillo wishes to draw comparisons to establish precisely how his daughter was admitted, the most illustrative comparison is not to other students but between the two applications Zangrillo's daughter submitted to USC. First, she applied as a fall freshman based on her actual credentials. She was denied, even though Zangrillo used his connections to secure a letter of recommendation from a Trustee. She then applied as a transfer the following year and, with no other options, Zangrillo turned to Singer's "side door."[3] With Singer's assistance, Zangrillo allegedly falsified his daughter's academic and athletic credentials by having Singer's employee take classes posing as Zangrillo's daughter and fabricating a backstory that she was an accomplished rower in order to present her to Admissions as a

---

[2] Zangrillo repeatedly mischaracterizes the significance of a special interest tag. As an initial matter, unlike the process used to consider recruited athletes, there is no special committee or different admission criteria for applicants with special interest tags. A special interest tag, like a legacy tag, an ROTC tag, or a first generation student tag, merely becomes one of many factors assessed in the holistic admission process. D.E. 951 at 6–7. There are a confluence of factors to explain why applicants with special interest tags have higher admission rates. For example, it is not surprising that those who know USC best would recommend strong applicants, who may have attended more academically rigorous high schools and had unique extracurricular opportunities. But exactly how much a special interest tag benefits an applicant does not matter. Admission would never knowingly admit a special interest applicant who lied on her application and committed academic fraud.

[3] Zangrillo asserts that he "helped one of his older daughters obtain admission to USC by relying on the school's University Advancement office to help her gain admittance without the involvement of Mr. Singer." Opp at 10. But Zangrillo knew University Advancement was not an option for his younger daughter, at issue here, because he alienated Al Checcio, Vice President of University Advancement. Checcio told Zangrillo's business associate, Stratton Sclavos, that Zangrillo's conduct in pushing for his older daughter's admission was "way over the line" and instructed him to tell Zangrillo to "back off." D.E. 851 at 3. Checcio wrote, "I'm beginning to resent his pressure…These slots aren't for sale, they go to the most qualified. I don't care who he is or what he might do, it[']s up to the admissions office, not me…. Seriously, it borders on harassment. And he wants to send another one here? I won't be involved with that one, just so you know." *Id*. Zangrillo never contacted Checcio to help his younger daughter with her admission. In fact, when Checcio learned Zangrillo's younger daughter was denied, he commented, "[a]nd it will stay that way too." *Id.*

\\BOS - 061612/000047 - 1230060 v1

recruited rower.[4] D.E. 610 at 32–36; D.E. 3-3 at 118–20. Zangrillo then used Singer's connections to purchase the corrupt support of Heinel. Zangrillo's daughter was admitted. This shows that it was not his daughter's earned credentials but the misrepresentations and illicit influence corruptly obtained from Heinel that made the difference.

The misrepresentations in the second, successful application also render irrelevant Zangrillo's effort to draw comparisons with other applicants. Zangrillo's guilt turns on the veracity of those government allegations of fraud; the information at issue concerning other applicants cannot save him. Simply put, the more than 1,000 innocent applicants cannot be compared to Zangrillo's daughter because there is no evidence (in the disputed documents or anywhere else) suggesting that the other applicants named in these documents falsified academic and athletic credentials in their applications, as Zangrillo's daughter's is accused of doing.[5] And, even with the student identities in these documents, Zangrillo still will not have the comprehensive view required to draw accurate comparisons among applicants. He will not have information about the rigor of coursework, or about an applicant's family or socioeconomic background. He will not have any information about an applicant's letters of recommendations, essays, extracurricular involvement, or leadership potential. In short, he will not have the breadth of information included in an applicant's entire file, all of which factors into the holistic admission process. Nor will "detoxifying" the special interest process in general benefit

---

[4] The government contends that the transcripts recording conversations between Singer and Zangrillo show that Zangrillo was a knowing participant in the scheme to submit an application misrepresenting his daughter's credentials. D.E. 3-3 at 120. In light of those recordings, Zangrillo cannot fairly compare his daughter's chances of admission based on a falsified transcript with the credentials of an applicant who applied based on bona fide academic credentials.

[5] Zangrillo's repeated efforts to innocently portray the payment he directed to Singer and Heinel and the alleged misrepresentations in his daughter's application are flatly contradicted by the record. Several conversations between Singer and Zangrillo establish his belief that his daughter would falsely be considered as an athlete, D.E. 851 at 4–6, and it is implausible to suggest that listing a fictitious 44-hour per week commitment to a sport would be "immaterial" to the Admission process. Opp. 10; *id.* at 6.

Zangrillo because Zangrillo had no idea that his daughter's application was receiving a special interest tag; the indictment alleges that Zangrillo believed she would be considered as a recruited athlete, not the child of a donor.[6] D.E. 610 at 34.

Zangrillo's attempt to identify innocent applicants in an effort to compare them to his daughter also misapprehends the legal elements of the charges against him. It does not matter whether his daughter would have been admitted had he merely made a donation to athletics in exchange for a special interest tag. It would not matter even if Zangrillo could show that there was a widespread practice at USC of rewarding minor donors, or that officials at USC enabled his fraudulent scheme. What matters is Zangrillo's subjective intent. If he *intended to defraud* USC by presenting his daughter as a fake athlete with falsified grades, he has committed fraud, regardless of what USC's officers did or whether he was merely one among many bad actors. *United States v. Vasilakos*, 508 F.3d 401, 409 (6th Cir. 2007) (rejecting the "manifest illogic of the argument that because 'others did it too, and besides the employer policies condoned what we did, so therefore we had no specific intent to defraud'"). Zangrillo appears to concede this point, as Zangrillo does not dispute that the case law holding that subjective intent is all that matters, and fraud does not require a victim.

And if Zangrillo seeks to impugn the purported "culture" at USC regarding donations and admissions, his defense theory would be moot because "[i]t is not necessary to establish that the intended victim was actually defrauded." *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir.

---

[6] Zangrillo cites an email in which Heinel informs Singer (but not Zangrillo) that Zangrillo's daughter was admitted with a special interest tag. Opp. 5. Significantly, this email, written *after* Zangrillo's daughter was already admitted, was the first time Singer explained that Zangrillo's daughter received a special interest tag. Moreover, Singer did not pass this information on to Zangrillo. Indeed, Zangrillo omits the email in which Heinel initially told Singer that Zangrillo's daughter was "accepted through Athletics," consistent with their plan. Critically, this email stating that Zangrillo's daughter was admitted through Subco (as a fake rower) is the email Singer forwarded to Zangrillo. According to the government, Singer never informed Zangrillo that his daughter did not go through Subco. D.E. 851 at 5.

7

1991). Mail and wire fraud require an intent to defraud, not a defrauded victim, and thus the relevant inquiry is whether the defendant intended to mislead the target of the fraud. *United States v. Martin*, 228 F.3d 1, 15 (1st Cir. 2000); *see also Sebago, Inc. v. Beazer E., Inc.*, 18 F. Supp. 2d 70, 82 (D. Mass. 1998) ("As the First Circuit has recognized, the aim of the mail and wire fraud statutes is to punish the scheme to defraud rather than the end result."). Whether the target was "pure of heart" or "effectively deceived by the charged misrepresentations" is irrelevant. *United States v. Camuti*, 78 F.3d 738, 742 (1st Cir. 1996); *see also United States v. Arif*, 897 F.3d 1, 11 (1st Cir. 2018) ("[R]eliance is not an element of wire fraud."). And even if Zangrillo does intend to impugn the admission process generally, Opp. 3–4, he could do so just as easily with anonymized documents as with documents revealing student names.

The fact is that having the names of the more than 1,000 students discussed in these documents will not make it any easier for Zangrillo to defend himself against these charges, nor will redactions to protect student privacy render the documents unusable. As to the disputed spreadsheets, Zangrillo has been most interested in viewing the notes/comments column.[7] He now has access to nearly all of the data included in those columns, save only the comments that could identify the student applicants.[8] So too with the thirty-one emails. If Zangrillo wishes to establish that USC officials occasionally mentioned special interest tagged applicants to the Dean of Admission, he can do so—although it is unclear what good this does him as there is no

---

[7] A curious focus if he is in search of a comparator as his daughter's entry on the spreadsheet has no notation in the comments/notes column.

[8] Indeed, Zangrillo has had access to a completely unredacted version of the spreadsheet listing his daughter throughout this entire process because the government produced it prior to the issuance of his Rule 17 subpoena. Had he merely looked at that document he would have been generally aware of all of the column headings and types of information that USC sought to protect as proprietary.

8

evidence that anyone contacted Admission to individually lobby on his daughter's behalf.[9] Accessing the names of the affected students does not change Zangrillo's ability to use the documents at trial.[10] The students' identities are simply irrelevant to the defense.[11]

### 2. Vital Privacy Rights Outweigh Any Illusory Defense Benefit From Public Disclosure of Applicant Identities.

Disclosing the names and identities of more than 1,000 innocent applicants would needlessly intrude on the privacy of students and their family members. All of those affected would be drawn into the intense media scrutiny surrounding this case with no justification. That exposure violates the expectation of privacy protected by federal and state law.

The Family Educational Rights and Privacy Act (FERPA) protects students from unwarranted disclosures of private information in their academic records, including information that could identify them. 20 U.S.C. § 1232g. Even though FERPA envisions the release of student information through a court order, it requires "the party seeking disclosure . . . to demonstrate a genuine need for the information that outweighs the privacy interest of the students." *Rios v. Read*, 73 F.R.D. 589, 599 (E.D.N.Y. 1977). This does not mean, of course,

---

[9] Furthermore, the documents do not, as Zangrillo suggests, Opp. 25, refute Dean Brunold's declarations. As USC explained, the paragraph of Dean Brunold's first declaration that generated much of the misunderstanding was a response to a specific request in Zangrillo's subpoena and accurately reported that Admission does not comprehensively track applicant donor information of the type comparable to Zangrillo's purported donation. *Compare* D.E. 951-1 Ex C ¶ 6 *with id.* Ex. E, request d.

[10] It is not clear that these documents are admissible at all, redacted or otherwise. The government may well assert that they are not relevant and seek to block their admission. If the government prevails, all of these student identities will have been put at risk of exposure for no purpose whatsoever.

[11] The magistrate judge's order observed that USC's first round of redactions rendered the documents difficult to use at trial. That was not a judgment on the redactions USC currently proposes. Instead, the magistrate judge was assessing the much more extensive redactions that protected USC sponsor identities in addition to student identities. Because, up until only weeks ago, Zangrillo had not sought student identities, and because the dispute between Zangrillo and USC concerned only the redaction of proprietary data and sponsor identities, the magistrate judge never had the opportunity to review redactions that *only* covered student identities. The magistrate judge's rejection of the redactions of propriety and sponsor information does not speak to Zangrillo's capacity to use at trial the redacted versions produced recently.

9

that federal privacy protections are absolute.[12]  But, while FERPA specifically exempts grand jury subpoenas from any notification or consent requirement, 20 U.S.C. § 1232g(b)(1)(J)(i), it does not lift those requirements when a defendant seeks documents through a Rule 17(c) subpoena.  Instead, *before* a university can provide identifying educational records in response to a Rule 17 subpoena, the university must notify the affected students and their parents.[13]  *Id.* § 1232g(b)(2)(B). Once they are notified, those student and parents "may seek protective action" to prevent the unwarranted disclosure of personally identifying information.[14]  34 C.F.R. § 99.31(a)(9)(ii).  Zangrillo does not even attempt to justify the delay to these proceedings that these protective actions would entail, nor does he attempt to explain how they could be avoided. Indeed, it may well be that further delaying these proceedings is precisely his objective in forcing the Court to rule (now, and again when students and parents inevitably intervene) on the availability of identities in which he disclaimed any interest for months.

Nor does FERPA stand alone.  A breadth of state constitutional, statutory, and common law protects individuals from the unwanted disclosure of private information.  D.E. 951 at 18–19.  Zangrillo has essentially nothing to say about these privacy-protecting laws.  *See* Opp. 24.

---

[12] Indeed, a different section of FERPA's implementing regulations embraces precisely the compromise position that USC seeks here, allowing universities to release "[d]e-identified records" without prior notification or consent "after the removal of all personally identifiable information" to ensure that "a student's identity is not personally identifiable, whether through single or multiple releases." 34 C.F.R. § 99.31(b)(1).

[13] Contrary to Zangrillo's characterization, Opp. 22, there is no "statutory exception" to FERPA for Rule 17 subpoenas comparable to that for grand jury subpoenas. *See* D.E. 951 at 17–18.

[14] Zangrillo's attempt to argue once again that these documents contain only directory information is frivolous. Opp. 23.  Student names receive lesser protection as directory information when the only fact being disclosed is that a student of that name attends the school or is pursuing a certain field of study.  *See* 20 U.S.C. § 1232g(a)(5)(A); 34 C.F.R. § 99.37.  But the documents here go far beyond that.  Releasing unredacted versions of these documents would disclose more than that the individual is a student; it would disclose that the student received a special interest tag and why, as well as the student's grades, test scores, high school class rank, extracurricular activities, race, and the comments of USC officials as to that student's qualifications. There can be no serious argument that these documents contain anything other than "education records," which are entitled to heightened protection and which FERPA defines broadly as "records, files, documents, and other materials which . . . contain information directly related to a student; and . . . are maintained by an educational agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

But these state laws establish the importance of privacy as a matter of public policy and prove that privacy is precisely the sort of "serious policy concern" that must be weighed in determining whether a Rule 17 subpoena is unreasonable or oppressive. *In re Grand Jury Matters*, 751 F.2d at 18; *see also In re Boston Herald, Inc.*, 321 F.3d 174, 190 (1st Cir. 2003) (examining statutory and common law to establish important public policy favoring privacy of personal information outweighed the countervailing interests seeking disclosure of personal documents).

As a final measure, Zangrillo argues that redaction is unnecessary because of the protective orders in place. Opp. 22, 24. That is untenable. The protective orders fall far short of ensuring that student identities will remain confidential. Neither USC nor the more than 1,000 affected students is party to the agreement between the government and the defendants. USC's agreement with Zangrillo extends *only* to his use of documents pre-trial, largely because Zangrillo assured USC when the agreement was drafted that he had no interest in student identities and USC believed it would be permitted to produce documents with student identities redacted.

Neither of these agreements would allow USC or the affected parents to attempt to prevent Zangrillo—or any other defendant—from publicly naming innocent applicants in open court at trial. And it is unlikely that the Court or the parties would agree to clear the court or prevent public access while Zangrillo examines USC witnesses about these documents. Nor is there any reason to believe Zangrillo would refrain from publicizing innocent students' names. His opposition is premised on the argument that *the identities* of these applicants are a vital part of this defense strategy. If he did not plan to name these students, he could hardly object to the current redactions, which do nothing more than protect student names, private information, and identifying information. And Zangrillo's counsel has not been hesitant to opine in the press on

11

the merits of this case or to compare Zangrillo's daughter with the innocent applicants threatened with exposure.[15] The surest way to protect the more than 1,000 applicants threatened with exposure and public association with this criminal conspiracy is to protect their identities now, by allowing USC to redact names and identifying information in the documents.

*   *   *   *   *   *

The more than 1,000 students listed in these documents have no connection to the Varsity Blues investigation or to the alleged misdeeds of Singer, Zangrillo, and the other defendants. They are connected to this prosecution only because they applied to USC around the same time as the defendant's daughter. Zangrillo has failed to show that the identities of these students are relevant to his defense. Zangrillo cannot show that his fanciful need outweighs the tremendous intrusion on privacy that disclosure would entail. His request is unreasonable and oppressive. The Court should modify the Order to allow USC to redact student identities and to require the parties to protect innocent student identities in documents already disclosed by the government.

---

[15] *See, e.g.*, Brian Dowling, *USC Says 'Varsity Blues' Docs Put Students in 'Media Circus'*, Law360, Mar. 18, 2020, https://www.law360.com/articles/1254806/usc-says-varsity-blues-docs-put-students-in-media-circus- (quoting Zangrillo's counsel as stating that "the withheld documents from USC are pivotal to Mr. Zangrillo's defenses that USC is not a victim here and that he, at all times, was in good faith in his attempts to make a donation and legitimately assist his daughter in her attempts to be admitted"); Matthew Ormseth, *Judge orders USC to disclose sensitive admissions records, in victory for parent accused in scandal*, LA Times, Mar. 3, 2020, https://www.latimes.com/california/story/2020-03-03/usc-must-give-documents-to-miami-investor-charged-in-admissions-scandal-judge-rules (reporting that Zangrillo's counsel "made public documents and emails he had received from the U.S. attorney's office in Boston, showing USC employees took into account donations, pledges of donations and the occupations of applicants' parents when flagging them as 'VIP' or 'special interest'"); Greta Anderson, *Admissions for Donor Children*, Inside Higher Ed, Sept. 9, 2019, https://www.insidehighered.com/admissions/article/2019/09/09/southern-california-admissions-were-determined-donations-parent (describing documents released by Zangrillo's counsel and detailing information about other applicants and their families); *see generally* https://www.martinweinberglaw.com/in-the-news/2020-press/ (collecting press coverage).

        Respectfully submitted,
        UNIVERSITY OF SOUTHERN CALIFORNIA,
        By its attorneys,

        */s/ Debra Wong Yang*
        Debra Wong Yang (Admitted *Pro Hac Vice*)
        Douglas M. Fuchs (Admitted *Pro Hac Vice*)
        GIBSON DUNN & CRUTCHER LLP
        333 South Grand Avenue
        Los Angeles, CA 90071-3197
        (213)229-7000
        dwongyang@gibsondunn.com
        dfuchs@gibsondunn.com

        */s/ Anthony E. Fuller*
        Anthony E. Fuller (BBO #633246)
        William H. Kettlewell (BBO# 270320)
        Elizabeth C. Pignatelli (BBO #677923)
        HOGAN LOVELLS US LLP
        125 High St., Suite 2010
        Boston, MA  02110
        (617) 371-1000
        anthony.fuller@hoganlovells.com
        bill.kettlewell@hoganlovells.com
        elizabeth.pignatelli@hoganlovells.com

Dated: March 30, 2020

## CERTIFICATE OF SERVICE

      I, hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent those indicated as nonregistered participants on March 30, 2020.

        */s/ Anthony E. Fuller*
        Anthony E. Fuller