**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

vs.

DAVID SIDOO, et al.,

      Defendants.

Criminal No. 19-CR-10080-NMG
(Leave to file granted 4/1/2020)

ORAL ARGUMENT REQUESTED

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO SUPPRESS**
**EVIDENCE DERIVED FROM THE GOVERNMENT'S FOUR WIRETAPS**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

DISCUSSION ....................................................................................................... 6

A.    The Government's Four Wiretap Affidavits Failed To Demonstrate
      Necessity And Evidence Obtained From The Wiretaps Should Be
      Suppressed ................................................................................................ 7

      1.    The Government Did Not "Run The Gamut Of Normal
            Investigative Procedures" Before Seeking A Wiretap ...................... 7

            a.    *Search Warrants* ..................................................................... 8

            b.    *Interviews And Cooperation* ................................................ 14

      2.    The Government Did Not Demonstrate With Specificity
            That Traditional Investigative Techniques Were Unlikely
            To Succeed ....................................................................................... 17

B.    In The Alternative, A *Franks* Hearing Should Be Ordered ................... 20

C.    The Government Failed to Timely Seal the Wiretap Recordings ........... 22

D.    Singer's Consensually Recorded Phone Calls Are "Fruit of the
      Poisonous Tree" ...................................................................................... 22

CONCLUSION ................................................................................................... 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Franks v. Delaware,*
    438 U.S. 154 (1978) ............................................................................................. 1, 6, 20

*United States v. Abou–Saada,*
    785 F.2d 1 (1st Cir. 1986) ..................................................................................... 1, 6, 7

*United States v. Arrington,*
    No. 99-1565, 2000 WL 775576 (10th Cir. June 16, 2000) ............................................. 6

*United States v. Ashley,*
    876 F.2d 1069 (1st Cir. 1989) ....................................................................................... 19

*United States v. Cartagena,*
    593 F.3d 104 (1st Cir. 2010) ......................................................................................... 20

*United States v. Colkley,*
    899 F.2d 297 (4th Cir. 1990) ......................................................................................... 22

*United States v. Collins,*
    510 F.3d 697 (7th Cir. 2007) ......................................................................................... 22

*United States v. Durham,*
    766 F.3d 672 (7th Cir. 2014) ......................................................................................... 13

*United States v. Fox,*
    790 F. Supp. 1487 (D. Nev. 1992) ................................................................................ 21

*United States v. Gonzalez, Inc.,*
    412 F.3d 1102 (9th Cir. 2005) ................................................................................. 6, 7, 13

*United States v. Hoffman,*
    832 F.2d 1299 (1st Cir. 1987) .............................................................................. 1, 6, 9, 18

*United States v. Ippolito,*
    774 F.2d 1482 (9th Cir. 1985) ....................................................................................... 16

*United States v. Kahn,*
    415 U.S. 143 (1974) ................................................................................................... 2, 6

*United States v. Lopez,*
    300 F.3d 46 (1st Cir. 2002) .................................................................................. 6, 13, 18

*United States v. Mora,*
    821 F.2d 860 (1st Cir. 1987) ......................................................................................... 22

5732866

<u>TABLE OF AUTHORITIES</u> (cont.)

<u>Page(s)</u>

*United States v. Rodrigues*,
    850 F.3d 1 (1st Cir. 2017) ................................................................................................. 22

*United States v. Roman*,
    311 F. Supp. 3d 427 (D. Mass. 2018) ............................................................................. 20

*United States v. Salemme*,
    91 F. Supp. 2d 141 (D. Mass. 1999) .............................................................................. 21

*United States v. Simpson*,
    813 F.2d 1462 (9th Cir. 1987) .................................................................................. 16, 21

*United States v. Tane*,
    329 F.2d 848 (2d Cir. 1964) ............................................................................................ 22

*United States v. Tanguay*,
    787 F.3d 44 (1st Cir. 2015) ................................................................................. 20, 21, 22

*United States v. Yeje-Cabrera*,
    430 F.3d 1 (1st Cir. 2005) ............................................................................................ 7, 20

**<u>Statutes</u>**

18 U.S.C. § 2510 ....................................................................................................................... 4

18 U.S.C. § 2515 ............................................................................................................... 1, 6, 19

18 U.S.C. § 2518 ............................................................................................................... passim

5732866

Defendants Robert Zangrillo, Amy Colburn, John Wilson, Elisabeth Kimmel, Marci Palatella, I-Hsin Chen, and William McGlashan, Jr. respectfully submit the following memorandum in support of their motion to suppress wiretap evidence pursuant to 18 U.S.C. §§ 2515 and 2518(10) or, in the alternative, for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## INTRODUCTION

Less than two months after it first learned of Rick Singer's alleged college admissions scheme, the Government obtained an order authorizing it to wiretap Singer's phone. Pursuant to that order and three subsequent renewals, the Government intercepted hundreds of Singer's calls, including calls with some Defendants. But in its wiretap applications, the Government failed to establish that a wiretap was necessary and repeatedly misrepresented or omitted material facts in order to persuade the Court that evidence sought by investigators could not be obtained through less intrusive means. The evidence obtained via those wiretaps must therefore be suppressed.

Due to the highly intrusive nature of electronic surveillance, "wiretapping is to be distinctly the exception—not the rule." *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987). To overcome the statutory presumption against wiretaps, the Government must meet numerous strict requirements, including demonstrating in each application that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried …." 18 U.S.C. § 2518(1)(c). Only where investigators have "*encountered difficulties* in penetrating a criminal enterprise or in gathering evidence" through traditional investigative techniques may wiretapping be authorized. *United States v. Abou–Saada*, 785 F.2d 1, 11 (1st Cir. 1986) (emphasis added). This "necessity" requirement exists "to assure that wiretapping is not resorted to in

situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974).

Far from "encountering difficulties" in "penetrating a criminal enterprise" through traditional investigative techniques, the investigation in this case proceeded quickly. Within a month of hearing about Singer's alleged scheme, the Government already had obtained ███████████████████████████ e-mails via search warrant—e-mails that would become a central pillar of the Government's case. Other traditional investigative techniques had proved equally fruitful: the Government already had a cooperating defendant and valuable bank records. Yet instead of reviewing its trove of e-mails and continuing to pursue traditional investigative techniques, the Government rushed into court on June 5, 2018—less than two months after the investigation had begun—and sought authorization to wiretap Singer's phone. ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████ ██.[1] The Government continued its wiretapping offensive for months, repeatedly renewing the wiretap on Singer's phone and expanding it to include wiretaps on his e-mail accounts, even though investigators had still not even reviewed all the e-mails they already had obtained via search warrants.

Ultimately, as the complaint and indictments would later reveal, the Government's primary means to identify and obtain evidence against the Defendants included e-mails obtained via search

---

[1] Exhibits refer to those in the joint appendix filed with Defendants' Motion to Suppress Title III Interceptions or Alternatively for a *Franks* Hearing.

warrant and evidence obtained from cooperating witnesses, including *Singer himself*.  Yet in each of its wiretap affidavits the Government misrepresented or omitted material facts regarding this evidence, and never even mentioned the possibility of approaching Singer to serve as a cooperator. These and other representations made to the Court to establish necessity were either intentionally or recklessly false, and, even if they had been true, were not sufficient to demonstrate necessity.

Accordingly, and for the reasons below, Defendants move to suppress evidence obtained or derived from the wiretaps in this case, or, in the alternative, for an evidentiary hearing pursuant to *Franks*.

## BACKGROUND

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ █

████████████████████████████████████████████████████████████

████████████████████████████████   ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████ ██████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████

---

[2] During the period of interception authorized under the first wiretap order, the Government intercepted calls with, among others, Defendant Zangrillo (*see* Ex. 2 ¶ 53 (Session 514, June 11, 2018)), who thus has standing to challenge the first wiretap.  *See* 18 U.S.C. §§ 2510(11), 2518(10)(a).

[3] Defendants Zangrillo, Amy Colburn, Wilson, Kimmel, Palatella, Chen, and McGlashan, Jr. have standing to challenge the second, third, and/or fourth wiretaps as they were either a named target of the wiretap and/or their communications were intercepted during a relevant wiretap period.  See 18 U.S.C. §§ 2510(11), 2518(10)(a).



The operative Fourth Superseding Indictment (the "indictment") was returned on January 14, 2020. ECF No. 732 ("FSI"). Of the 15 parents named in the indictment, the allegations against 12 relate to activity that allegedly occurred before any of the Government's four wiretaps. *See id.* ¶¶ 68-95, 97-111, 114-20, 123-30, 135-41, 144-62, 165-80, 210-22, 245-51. With respect to the other three parents, the indictment alleges activity occurring both before and after the first wiretap application. *See id.* ¶¶ 182-209, 225-44, 253-75.

5732866

## DISCUSSION

To obtain a wiretap, the Government must meet the strict requirements of 18 U.S.C. § 2518(1). Among these is "necessity," the requirement that the Government provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(1)(c). The necessity requirement is designed to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," thereby protecting the public against unnecessary invasions of privacy. *Kahn*, 415 U.S. at 153 n. 12. To demonstrate necessity, the Government must "show with specificity why ordinary means of investigation will fail; conclusory statements without factual support are not sufficient." *United States v. Lopez*, 300 F.3d 46, 53 (1st Cir. 2002). This ensures that the Government has made a "reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls." *Hoffman*, 832 F.2d at 1306-07. Only when investigators have "encountered difficulties in penetrating a criminal enterprise or in gathering evidence" may the "statutory preference for less intrusive techniques" give way to the extreme step of wiretapping. *Abou–Saada*, 785 F.2d at 11.

When the Government fails to establish necessity, the wiretap is unlawful and any evidence obtained or derived from it must be suppressed. 18 U.S.C. §§ 2515, 2518(10); *see, e.g.*, *United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005) (affirming suppression of wiretap and resulting evidence because the government failed to prove necessity); *United States v. Arrington*, No. 99-1565, 2000 WL 775576 (10th Cir. June 16, 2000) (same). When affidavits submitted in support of a wiretap "conceal or misrepresent material facts leading a judge inappropriately to find necessity," the wiretap order is invalid under the rule of *Franks v. Delaware*, 438 U.S. 154 (1978).

- 6 -

*See Gonzalez, Inc.*, 412 F.3d at 1110; *see also United States v. Yeje-Cabrera*, 430 F.3d 1, 8 (1st Cir. 2005).

### A. The Government's Four Wiretap Affidavits Failed To Demonstrate Necessity And Evidence Obtained From The Wiretaps Should Be Suppressed

Far from having "tried and failed" to obtain evidence through ordinary investigative techniques before seeking a wiretap order, the Government in this case tried and *succeeded* at obtaining evidence through traditional techniques. The Government nonetheless misrepresented, either intentionally or with reckless disregard for the truth, the status and potential probative value of these less intrusive means of investigation in order to persuade the Court that a wiretap was necessary. Moreover, even if the Government's representations had been truthful, the affidavits failed to demonstrate necessity. The resulting wiretap orders are therefore invalid, and the fruits of the wiretaps should be suppressed.

### 1. The Government Did Not "Run The Gamut Of Normal Investigative Procedures" Before Seeking A Wiretap

By early June 2018, just two months after the Government first learned of Singer, the Government's investigation was moving quickly. ███████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████ ██████████ ████

█████████████████████████████████████████████

███████████████████████████████████████████

██████ Far from having "difficulties in penetrating" Singer's network or in "gathering evidence" against him, as required to demonstrate necessity for a wiretap (*Abou–Saada*, 785 F.2d at 11), the Government was making quick progress against Singer and other alleged participants in his scheme using traditional investigative means.

On June 5, 2018, however, the Government rushed into court and requested the extraordinary measure of wiretapping Singer's phone.  *See* Ex. 1.  ████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████  This was untrue.  The Government in fact was making rapid progress in identifying and obtaining evidence regarding Singer, his network and his clients through means far less intrusive than a wiretap.  And in the months that followed, as the Government repeatedly represented to the Court that it could only obtain such evidence through continued and expanded wiretapping of Singer's phone and e-mail accounts, the Government was in fact obtaining precisely what it told the Court it could not through traditional investigative means.

a.      *Search Warrants*

In order to persuade the Court of the necessity of wiretapping Singer's phone and e-mail accounts, the Government repeatedly misrepresented and omitted material facts regarding an enormous trove of e-mail evidence that investigators obtained pursuant to multiple search warrants.  Barely a month after first learning of Singer, ████████████████████

█████████████████████████████████████████████████████████████████████

████  A month later, the Government sought to renew and expand its wiretap ████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████  Even months later, as the Government sought the third and fourth wiretap orders, ████████████████████████████████████████

███████████████████████████████████████████████████

The Government's *repeated* failure to review search warrant e-mail evidence already in its possession before seeking to initiate and renew wiretaps represents a classic failure "to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls," as required to justify a wiretap.  *Hoffman*, 832 F.2d at 1306-07. It is beyond dispute that e-mail evidence was central to this investigation. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████  ████████████████████████

████████  ████  ██████  ███  ██████  ██  ██████  ███████  ████████

████████████████████████████████████████████████████████

██████████████████████.[4]

Yet despite the central role that e-mails played in Singer's alleged scheme, and the vast number of e-mails that investigators had obtained but not reviewed, the Government repeatedly represented to the Court that a wiretap was necessary ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████  ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

_____

[4] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

These representations were untrue.  In fact, throughout the investigation, it was *Singer's e-mails*—most obtained via search warrant—and other forms of documentary evidence that allowed the Government to identify many of the coaches, parents, students and others with whom Singer worked.  For example, at the time the Government sought its first wiretap, it had already obtained via search warrant e-mails involving numerous parents later named in the indictment, including Defendants Sidoo, the Colburns, the Blakes, Palatella, Wilson, and Zadeh.  Ex. 12 (May 2, 2018 Affidavit ISO Search and Seizure Warrant, Attachment B § III.A).  Many of these e-mails are referenced in the indictment.  *See* FSI ¶¶ 69, 75-76, 82, 87, 92, 99-100, 103, 124-26, 128-29, 211, 219, 226-27, 229-31, 235, 246.[5]  Yet the Government never told the Court anything about these e-mails in *any* wiretap affidavit.  *See generally* Exs. 1-4.

Even when the Government did discuss the Search Warrant E-mails in its wiretap affidavits, it obfuscated or minimized the investigative value of this evidence.  For example, the

--------------------------------

[5] 

Government omitted any discussion of e-mails related to Defendant Kimmel until seeking the fourth wiretap (Ex. 4 ¶¶ 34-38; *see* FSI ¶¶ 167-68), and omitted any discussion of e-mails related to Defendant Zangrillo until seeking the second wiretap, despite possessing these e-mails prior to the *first* wiretap.  Ex. 2 ¶¶ 49-52; *see* FSI ¶ 257. ████████████████████

████████████████████████████████████████

██████████████████████     ████████     But when the Government indicted the case, it cited the *same e-mails* as evidence of criminal intent.  *See* FSI ¶¶ 68-95, 97-111, 114-20, 123-30, 144-162, 165-80, 210-22, 245-51; *see* ECF No. 736 at 4-16.[6]

Thus, contrary to the Government's repeated representations to the Court, the huge volume of e-mails that the Government obtained via search warrants contained *precisely* the type of information that the Government told the Court it could not obtain without a wiretap.  Indeed, it was e-mails more than wiretaps that allowed the Government to identify and obtain purported evidence against alleged participants in Singer's scheme.  This is hardly surprising given the largely historical nature of the Government's investigation.  For example, for 12 of the 15 parent Defendants, *all* of the activity alleged in the indictment occurred *before the first wiretap* (*see* FSI ¶¶ 68-95, 97-111, 114-20, 123-30, 135-41, 144-62, 165-80, 210-22, 245-51), and at least some of the conduct alleged against the remaining three parents likewise occurred before the first wiretap. *See id*. ¶¶ 182-209, 225-44, 253-75.   The central role that Singer's e-mail played in the investigation is likewise apparent from the fact that the indictment contains at least 23 references to e-mail communications with Singer (and upwards of 80 references to e-mails in total), and includes allegations relating to e-mails but *no allegations* regarding calls intercepted via wiretap

---

[6] These same e-mails were cited in earlier versions of the indictment as well. *See* ECF No.1 ¶¶ 20, 26, 35, 42; ECF No. 3 ¶¶ 133, 183-86, 188, 196-99, 201-03, 206-09, 211-12, 214, 290-96, 299, 335, 340-43, 345, 353, 357, 361, 364-66, 368, 372, 433-40, 443, 500, 526-28.

for 12 of the 15 Defendants.  *See* FSI ¶¶ 68-164 (Defendants Sidoo, Colburns, Abdelaziz, Blakes, Chen, Giannulli, and Loughlin), ¶¶ 210-52 (Defendants Palatella, Wilson, and Zadeh).

Simply put, the Government in its wiretap applications intentionally or recklessly misrepresented and omitted material facts regarding the content and investigative value e-mails it was amassing via the less intrusive means of search warrants.  Instead of revealing this to the Court, the Government offered conclusory and often inaccurate assertions that e-mail search warrants, and other highly productive investigative methods, had not been or could not be effective. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ Moreover, the notion that e-mails could not furnish what the Government's believes to be evidence of "intent" was contradicted by the indictment, which *extensively* cites e-mails involving various Defendants as proof of intent, including, for example, "defendants' knowing fabrication of their children's credentials as part of

- 12 -

the effort to have them admitted to college as fake athletic recruits." ECF No. 736 at 4; *see id*. at 5-16; FSI ¶¶ 68-95, 97-111, 114-20, 123-30, 144-162, 165-80, 210-22, 245-51.   Moreover, ███

████████████████████████████ the Government could certainly obtain evidence of "intent" by *combining* e-mail evidence with other evidence obtained via less intrusive investigative techniques.   The Government's terse, unsupported rejection of the investigative value of e-mail search warrants simply did not demonstrate that such methods had been tried and proven "unlikely to work," as required to justify a wiretap.  *See Gonzalez, Inc*., 412 F.3d at 1114; *Lopez*, 300 F.3d at 53.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ Such "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures'" are "insufficient to establish necessity."   *Gonzalez, Inc*., 412 F.3d at 1114 (citation omitted).   This was not, for example, an investigation in which the need to protect investors from an ongoing Ponzi scheme necessitated a wiretap because other methods of collecting evidence "would be too slow" to allow investigators to intercede before individuals were victimized.  *Cf. United States v. Durham*, 766 F.3d 672, 679–80 (7th Cir. 2014). ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ The affidavits did not even attempt to explain how, in light of the circumstances of this particular investigation, the Government's "ability to act" was hampered by the "inherent limitations" of e-mail obtained via search warrant.   The Government thus failed to establish any exigency or other circumstance sufficient to overcome the

- 13 -

statutory presumption against the use of electronic surveillance other than as an investigative technique of last resort.

> b.      *Interviews And Cooperation*

The wiretap affidavits also consistently misrepresented or omitted material facts regarding the Government's ability to obtain evidence through the less intrusive practice of interviews and the use of cooperating witnesses.  ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██  In seeking to wiretap Singer's phone and e-mail accounts, however, the Government repeatedly misrepresented and minimized the value of such investigative techniques, and never even mentioned that cooperation by *Singer himself* could or would be sought by the Government.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████The Government never explained how complicity in Singer's alleged "criminal activities" rendered potential interviews "impractical," a claim that is belied by ████████████████████████████████████████

████████████████████████████████████████████████The Government never offered any explanation for why investigators could not do, or at least *attempt* to do, the same with others once it identified them through e-mails, financial transactions and other investigative means.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

- 14 -

███████████████████████████████████████████████████

████████████████████████████████████ This representation was particularly

disingenuous. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ The Government was thus either intentionally or recklessly

misrepresenting to the Court its ability to identify parents who lived within the United States and

whom it would not be "impractical" to interview.   This was a critical omission regarding the

purported necessity of a wiretap.

Tellingly, in subsequent wiretap affidavits, as it became obvious that there were many other

parents the Government could attempt to interview, the Government's explanation for not doing

so became more conclusory and was eventually omitted altogether. ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ This "evolution" makes clear that the

Government's original justification for not attempting to interview any parents—individuals who

are not hardened criminals would be unlikely to resist law enforcement—was pretextual.

The Government was similarly and inexplicably dismissive regarding the use of

cooperating defendants, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

5732866

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ The necessity for a wiretap does not exist where, as here, an existing informant or cooperating witness has clear potential value for the investigation.  *See United States v. Simpson*, 813 F.2d 1462, 1472 (9th Cir. 1987) (rejecting the government's assertion "that traditional law enforcement methods could not discover the identity of all members of the alleged drug ring" because agents assumed that an informant "had no potential to win [the target's] confidence enough to learn the details of the drug enterprise" even though the informant was "'deeply involved' with the enterprise"); *United States v. Ippolito*, 774 F.2d 1482, 1486–87 (9th Cir. 1985) (concluding "necessity for the wiretap order had not been shown" because "there was an informer who was both willing to testify and had great potential for uncovering the entirety of the conspiracy under investigation").

Finally, and critically, the Government never mentioned in any wiretap affidavits the possibility of approaching *Singer* to serve as a cooperator.  *See generally* Ex. 1 ¶ 90; Ex. 2 ¶¶ 71-72; Ex. 3 ¶¶ 75-76; Ex. 4 ¶¶ 83-84. ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ ██████████████████ █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

- 16 -

███████████████████████████████████████████████████████████████████

████ But one person who clearly *did* have the ability to provide such evidence was Singer.

The Government clearly had obtained overwhelming evidence against Singer before seeking its first wiretap, █████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ *See generally supra* § A.1.  The Government thus did not need a wiretap to obtain proof beyond a reasonable doubt against Singer, the one individual who could provide all the information the Government purportedly sought in its investigation.  Yet the Government never mentioned in any affidavit the possibility or potential value of Singer's cooperation.  To the contrary, █████████████████████████████████████████

███████████████████████████████████████████████  ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████

The Government's failure to even address the possibility of Singer's cooperation is itself fatal to the showing of necessity.  Had it done so, it would have been evident that the Government's justifications for dismissing every other investigative technique were pretextual, and that necessity had not been shown.

2.    <u>The Government Did Not Demonstrate With Specificity That Traditional Investigative Techniques Were Unlikely To Succeed</u>

To make the required showing that normal investigative procedures "appear to be unlikely to succeed" (18 U.S.C. § 2518(1)(c)), the Government must demonstrate "*with specificity* why

- 17 -

ordinary means of investigation will fail." *Lopez*, 300 F.3d at 53 (emphasis added).  The Government's wiretap affidavits substituted specificity with boilerplate.  ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████  ████████████  These conclusory assertions were both inaccurate and failed to show with specificity that alternative investigative techniques were unlikely to succeed.

This case stands in stark contrast to those in which courts have found a "satisfactory showing of antecedent efforts" to use traditional investigative techniques that failed to bear fruit, thereby justifying a wiretap.  *See, e.g.*, *Hoffman*, 832 F.2d at 1307 ("antecedent efforts" to investigate a drug conspiracy included "extensive" use of confidential informants that "proved to be of limited assistance," attempted but inconclusive visual surveillance, offers of witness program protection, and "fear of physical harm" that impeded the investigation); *Lopez*, 300 F.3d at 53–54 (wiretap affidavit demonstrated that "traditional techniques employed by the DEA over the course

- 18 -

of several months had failed to establish the identity of some conspirators, particularly those at the top of the distribution chain" and that further use of other techniques "risked revealing the investigation and placing law enforcement officers in harm's way"); *United States v. Ashley*, 876 F.2d 1069, 1074-75 (1st Cir. 1989) (wiretap affidavit detailed the government's six-month narcotics investigation, including controlled purchases, use of an undercover informant who "was not in a position to discover the target sources," targets who were wary of surveillance, and the "potential danger for the undercover agents").

By contrast here, the Government had only been investigating the case for two months when it sought its first wiretap, and nearly every traditional investigative technique investigators had tried was bearing fruit. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Indeed, traditional investigative techniques including cooperators, e-mail search warrants and consensually recorded calls furnish nearly *all* the evidence alleged against the Defendants in the indictment.  The Government's claim that its case could not be proved without a wiretap was thus demonstrably false, and to the extent the Government did not realize that at the time it sought the wiretaps, it was only because the Government had rushed to seek a wiretap before even reviewing much of the evidence it was obtaining through traditional techniques.

The Government thus failed to demonstrate necessity, and the evidence obtained or derived from the wiretaps should be suppressed pursuant to 18 U.S.C. §§ 2515, 2518(10).

5732866

### B.      In The Alternative, A Franks Hearing Should Be Ordered

Even if the Court were not to order immediate suppression, an evidentiary hearing should be conducted pursuant to *Franks* in light of the substantial showing that the affidavits contain material misrepresentations or omissions relevant to necessity.   To obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that a false statement was included or material omission made in a wiretap affidavit "knowingly and intentionally, or with reckless disregard for the truth," and that a true, complete statement would have prevented a finding of necessity.  *Franks*, 438 U.S. at 155–56; *Yeje-Cabrera*, 430 F.3d at 8.   Upon such a showing, the court must hold a *Franks* hearing "to address allegations of both material omissions as well as false statements."  *United States v. Cartagena*, 593 F.3d 104, 112 (1st Cir. 2010).   "Suppression of the evidence seized is justified if, at such a hearing, the defendant proves intentional or reckless falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish" necessity under 18 U.S.C. § 2518(1)(c).  *United States v. Tanguay*, 787 F.3d 44, 48–49 (1st Cir. 2015); *see, e.g.*, *United States v. Roman*, 311 F. Supp. 3d 427, 435-41 (D. Mass. 2018) (suppressing evidence under *Franks*).

As discussed above, the Government's affidavits contain misrepresentations and omissions regarding, among other things: (1) the extent to which evidence that had been or could be obtained through traditional investigative techniques, including e-mails and other documents, allowed the Government to identify relevant individuals, and the probative value of such evidence; and (2) the potential and probative value of interviews of and cooperation by individuals allegedly involved in Singer's "network," including coaches, parents and Singer himself.   The circumstances of these omissions and misrepresentations demonstrate, at a minimum, a reckless disregard for the truth, warranting a *Franks* hearing.  *See, e.g.*, *Tanguay*, 787 F.3d at 49 ("[r]ecklessness may be inferred"

- 20 -

where information is omitted that would have been "critical" to the Court's determination); *Simpson*, 813 F.2d at 1471-72. The fact that the Government sought authority to wiretap at a time

███████████████████████████████████████████████████

████, does not relieve the Government of its statutory obligation to provide a "full and complete statement" of its investigative efforts. 18 U.S.C. § 2518(1)(c). The Government's representations dismissing the value of vast amounts of evidence it had obtained through traditional techniques but not yet reviewed when it sought wiretap authority at a minimum evinces a reckless disregard for the truth, as does the Government's failure to discover information in its possession that would contradict a finding of necessity. *See, e.g.*, *United States v. Salemme*, 91 F. Supp. 2d 141, 371 (D. Mass. 1999), *rev'd on other grounds sub nom. United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000) ("[T]he failure to discover information in the possession of a participating investigative agency has contributed to a finding of reckless disregard.").

Moreover, the Government in this case knew at the time of its first wiretap application that Singer's e-mails in particular could identify and obtain evidence against targets of the investigation (*see, e.g.*, Ex. 1 ¶ 66), and thus the Government had an "obvious reason" to doubt the accuracy of its repeated representations that a wiretap was necessary, triggering the "duty of further inquiry." *Tanguay*, 787 F.3d at 53-54 (recognizing that a *Franks* violation can "arise out of a failure to include in [an] affidavit facts not actually known to the affiant" when the affiant's "duty of further inquiry" is triggered); *accord United States v. Fox*, 790 F. Supp. 1487, 1494 (D. Nev. 1992). The Government's failure to even substantially complete reviewing the Search Warrant E-mails, despite their self-evident probative value, prior to applying for any of its wiretaps, alone evinces reckless disregard.

5732866

Because the Government's omissions and misrepresentations were either "'designed to mislead, or . . . made in reckless disregard of whether [they] would mislead" the Court, the wiretap evidence should be suppressed, or, at a minimum, a *Franks* hearing conducted. *Tanguay*, 787 F.3d at 49 (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)).

     **C.**     **The Government Failed to Timely Seal the Wiretap Recordings**

The wiretap evidence should also be suppressed because, after the expiration of each wiretap order, the Government did not "immediately" present intercepted communications for sealing as required by 18 U.S.C. § 2518(8)(a).  Here, there was a delay in sealing each wiretaps: one week for the first (Ex. 14), four days for the second (Ex. 15), four days for the third (Ex. 16), and five to six days for the fourth (Exs. 17, 18).  Delays in excess of "one or two days" are not reasonable.  *United States v. Rodrigues*, 850 F.3d 1, 11 (1st Cir. 2017).  Accordingly, unless the Government can "establish[] by clear and convincing evidence that the integrity of the tapes has not been compromised" and "prove, by a fair preponderance, that [an] explanation for the delay … is otherwise satisfactory," evidence derived from the wiretaps should be suppressed.  *United States v. Mora*, 821 F.2d 860, 867-69 (1st Cir. 1987).

     **D.**     **Singer's Consensually Recorded Phone Calls Are "Fruit of the Poisonous Tree"**

To the extent Singer's cooperation was secured in part through the use of communications intercepted via unlawful wiretaps, his subsequent consent to place calls recorded by the Government (including calls with Defendants) was tainted, and those calls should likewise be suppressed.  *See United States v. Tane*, 329 F.2d 848, 853 (2d Cir. 1964) (suppressing testimony because the witness was unwilling to testify until the government revealed it possessed an unlawful wiretap that identified him making illegal payments); *United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007) (concluding the defendant had no "real" choice whether to cooperate and consent

- 22 -

to the search of his home when his consent was sought only after police illegally entered his home in an "intimidating" way).[7]

## CONCLUSION

Accordingly, for the reasons above, the Court should suppress evidence obtained through the Government's wiretaps, and evidence derived therefrom, including Singer's consensually recorded calls.   In the alternative, the Court should conduct a *Franks* hearing to address the Government's material misrepresentations and omissions, and to determine whether suppression is warranted on that ground.

---

[7] Similarly, the Government relied on Singer's intercepted communications when it sought and obtained the June 28, 2018 search warrants and additional search warrants in July 2019. Accordingly, the evidence searched and seized pursuant to these warrants should also be suppressed as fruit of the poisonous tree.

Dated:  April 1, 2020                                   Respectfully submitted,


                                                       /s/ Jack W. Pirozzolo
John C. Hueston (pro hac vice)                         Jack W. Pirozzolo (BBO # 564879)
jhueston@hueston.com                                   jpirozzolo@sidley.com
Marshall Camp (pro hac vice)                           SIDLEY AUSTIN LLP
mcamp@hueston.com                                      60 State Street, 36th Floor
HUESTON HENNIGAN LLP                                   Boston, MA 02109
523 W. 6th Street, Suite 400                           (617) 223-0304
Los Angeles, CA 90014
(213) 788-4340                                         Joan M. Loughnane (pro hac vice)
                                                       jloughnane@sidley.com
                                                       SIDLEY AUSTIN LLP
                                                       787 7th Avenue
                                                       New York, NY 10019
                                                       (212) 839-5567


                                                       *Counsel for Defendant*
                                                       *William McGlashan, Jr.*



                                                       /s/ David S. Schumacher
                                                       David S. Schumacher (BBO #647917)
                                                       HOOPER, LUNDY & BOOKMAN, P.C.
                                                       470 Atlantic Avenue, Suite 1201
                                                       Boston, MA 02210
                                                       (617) 532-2700
                                                       (617) 345-3927 (fax)
                                                       dschumacher@health-law.com

                                                       Patric Hooper (*pro hac vice*)
                                                       HOOPER, LUNDY & BOOKMAN, P.C.
                                                       1875 Century Park East, Suite 1600
                                                       Los Angeles, California 90067-2517
                                                       (310) 551-8111
                                                       (310) 551-8181 (fax)
                                                       phooper@health-law.com

                                                       Jordan Kearney (*pro hac vice*)
                                                       HOOPER, LUNDY & BOOKMAN, P.C.
                                                       575 Market Street, Suite 2300
                                                       San Francisco, CA 94105
                                                       (415) 875-8500
                                                       (415) 875-8519 (fax)

                                                       - 24 -

jkearney@health-law.com

*Counsel for Amy Colburn*

/s/ *Reuben Camper Cahn*

Reuben Camper Cahn *(pro hac vice)*
Jennifer L. Keller *(pro hac vice)*
Chase A. Scolnick *(pro hac vice)*
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsin "Joey" Chen*

/s/ *Michael K. Loucks*

Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

/s/ *Michael Kendall*

Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com

- 25 -

5732866

yakov.malkiel@whitecase.com
Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

*/s/ Martin G. Weinberg*
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail:  mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

*/s/ R. Robert Popeo*
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

- 26 -

5732866

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2020, I filed this document through the CM/ECF system and a copy will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jack W. Pirozzolo*

Jack W. Pirozzolo

5732866