**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:19-cr-10080-NMG |
| Plaintiff, | ***Leave to File 35-Page Memorandum Granted on 3/26/2020 (ECF No. 975)*** |
| vs. | |
| DAVID SIDOO, *et al.* | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FEDERAL RULES OF CRIMINAL PROCEDURE
<u>8 AND 12(b)(3)(B)(i), (iv), AND (v)</u>**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................2

I.    Singer's College Admissions Operations. ........................................................................2

II.   The Indictment Alleges That All of the Parent-Defendants Joined a Single "Hub-and-Spoke Conspiracy" With Singer at Its Center..................................................................5

ARGUMENT .................................................................................................................................7

I.    Rule 12(b)(3) Standard for Dismissal of a Defective Indictment ...................................7

II.   Counts I-III Must Be Dismissed Because Each Purports to Charge All Defendants With Participating in a Single Conspiracy and Fails to State the Offense Charged. .......8

     A.    The Supreme Court's Decision in *Kotteakos* Expressly Prohibits the Group-Charging Tactic of a Rimless Wheel Conspiracy. ...................................................8

     B.    The Indictment Charges an Impermissible Rimless Wheel Conspiracy...............11

     C.    The Conspiracy Counts Fail to State the Offense (Single Conspiracy) Charged in Them and Would Be Duplicitous Even If They Could Be Construed to Charge Multiple Offenses..................................................................................................15

III.  The Indictment Must Be Dismissed Under Rule 12(b)(3)(B)(iv) Because the Defendants Are Improperly Joined Under Rule 8(b)...................................................17

     A.    The Rule 8(b) Joinder Standard ...........................................................................18

     B.    The Indictment Improperly Joins Fifteen Defendants in a Single Case Who Have Not Participated in the Same Act, Transaction, or Series of Acts or Transactions, Constituting an Offense or Offenses..................................................................19

     C.    Joinder of the Defendants Prejudices Their Rights More Than It Benefits the Government..........................................................................................................23

IV.   Dismissal Is the Appropriate Remedy for the Indictment's Defects. ...........................25

CONCLUSION.............................................................................................................................29

APPENDIX A ..............................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Blumenthal v. United States*,
    332 U.S. 539 (1947)..................................................................................................12

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ....................................................................................8

*Grunewald v. United States*,
    353 U.S. 391 (1957)..........................................................................................12, 13

*King* v. *United States*,
    355 F.2d 700 (1st Cir. 1966)......................................................................21, 23, 24

*Kotteakos v. United States*,
    328 U.S. 750 (1946)........................................................................................ *passim*

*PPV Connection, Inc. v. Sosa*,
    268 F.R.D. 42 (D.P.R. 2010) ...................................................................................25

*United States v. Arruda*,
    715 F.2d 671 (1st Cir. 1983).....................................................................................18

*United States v. Azor*,
    881 F.3d 1 (1st Cir. 2018)........................................................................................19

*United States v. Boylan*,
    898 F.2d 230 (1st Cir. 1990)........................................................................17, 18, 19

*United States v. Campbell Hardware, Inc.*,
    470 F. Supp. 430 (D. Mass. 1979) .................................................................17, 19

*United States v. Castro*,
    829 F.2d 1038 (11th Cir. 1987), *other portions of opinion withdrawn in part
    on other grounds on denial of reh'g*, 837 F.2d 441 (11th Cir. 1988) .....................................22

*United States v. Chandler*,
    388 F.3d 796 (11th Cir. 2004) .................................................................................11

*United States v. Charnay*,
    211 F. Supp. 904 (S.D.N.Y. 1962) .........................................................................29

*United States v. Colon*,
    549 F.3d 565 (7th Cir. 2008) ...................................................................................16

*United States v. Dellosantos*,
    649 F.3d 109 (1st Cir. 2011) ...................................................................................13

*United States v. Drougas*,
    748 F.2d 8 (1st Cir. 1984) .......................................................................................25

*United States v. Eury*,
    2015 U.S. Dist. LEXIS 53338 (M.D.N.C. Apr. 23, 2015)................................25, 28

*United States v. Evans*,
    970 F.2d 663 (10th Cir. 1992) ................................................................................11

*United States v. Gentile*,
    60 F.R.D. 686 (E.D.N.Y. 1973) ........................................................20, 21, 24, 29

*United States v. Giraldo*,
    859 F. Supp. 52 (E.D.N.Y. 1994), *aff'd in part and rev'd in part on other
    grounds*, 80 F.3d 667 (2d Cir. 1996) .........................................................13, 14, 22

*United States v. Glenn*,
    828 F.2d 855 (1st Cir. 1987)......................................................................15, 22, 23

*United States v. Hinton*,
    127 F. Supp. 2d 548 (D.N.J. 2000) ........................................................................17

*United States v. Jackson*,
    926 F. Supp. 2d 691 (D.N.C. 2013) .......................................................................28

*United States v. Josleyn*,
    99 F.3d 1182 (1st Cir. 1996)........................................................................18, 19, 25

*United States v. Lekacos*,
    151 F.2d 170 (2d Cir. 1945)............................................................................. *passim*

*United States v. Levine*,
    546 F.2d 658 (5th Cir. 1977) .....................................................................17, 20, 22

*United States v. Lugo*,
    269 F. Supp. 757 (E.D. Wis. 1967).......................................................................29

*United States v. Luna*,
    585 F.2d 1 (1st Cir. 1978).......................................................................................18

*United States v. Marionneaux*,
    514 F.2d 1244 (5th Cir. 1975) .........................................................................22, 23

*United States v. Marlinga*,
    2005 U.S. Dist. LEXIS 3156 (E.D. Mich. Feb. 28, 2005)...............................22, 29

*United States v. McCormack*,
   31 F. Supp. 2d 176 (D. Mass. 1998), *amended memorandum and order issued*,
   1998 U.S. Dist. LEXIS 21617 (Nov. 13, 1998) ....................................................................7, 8

*United States v. Miller*,
   111 F.3d 747 (10th Cir. 1997) ............................................................................................26

*United States v. Moran*,
   984 F.2d 1299 (1st Cir. 1993) ............................................................................................16

*United States v. Morrow*,
   39 F.3d 1228 (1st Cir. 1994) ..............................................................................................18

*United States v. Munoz-Franco*,
   986 F. Supp. 70 (D.P.R. 1997) ................................................................................16, 17, 28

*United States v. Natanel*,
   938 F.2d 302 (1st Cir. 1991) ......................................................................................19, 20, 29

*United States v. Newell*,
   658 F.3d 1 (1st Cir. 2011) ........................................................................................15, 16, 17

*United States v. Ngige*,
   780 F.3d 497 (1st Cir. 2015) ................................................................................................7

*United States v. Pappathanasi*,
   383 F. Supp. 2d 289 (D. Mass. 2005) .................................................................................27

*United States v. Petrozziello*,
   548 F.2d 20 (1st Cir. 1977) ...........................................................................................26, 27

*United States v. Portela*,
   167 F.3d 687 (1st Cir. 1999) ......................................................................................11, 14, 15

*United States v. Potashnik*,
   2008 U.S. Dist. LEXIS 102299 (N.D. Tex. Dec. 17, 2008) ........................................19, 20, 29

*United States v. Prange*,
   922 F. Supp. 2d 127 (D. Mass. 2013) ............................................................................18, 23

*United States v. Saleh*,
   875 F.2d 535 (6th Cir. 1989) .......................................................................................16, 22

*United States v. Serafini*,
   7 F. Supp. 2d 529 (M.D. Pa. 1998) ......................................................................20, 21, 23, 24

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ...................................................................................................22

*United States v. Sturvidant*,
244 F.3d 71 (2d Cir. 2001)........................................................................16

*United States v. Turkette*,
632 F.2d 896 (1st Cir. 1980), *rev'd on other grounds*, 452 U.S. 576 (1981) ........18, 22, 23, 24

*United States v. Velasquez*,
772 F.2d 1348 (7th Cir. 1985) ...................................................................22

*United States v. Webb*,
827 F. Supp. 840 (D. Mass. 1993) .............................................................13

*United States v. Yefsky*,
994 F.2d 885 (1st Cir. 1993)......................................................................20

**State Cases**

*People v. Luciano*,
951 N.Y.S. 2d 88, 2012 N.Y. Misc. LEXIS 1955 (N.Y. Cty. Sup. Ct. Apr. 27,
2012) ........................................................................................................26

**Rules**

Federal Rule of Civil Procedure 20 ................................................................25

Federal Rule of Criminal Procedure 8 ................................................. *passim*

Federal Rule of Criminal Procedure 12 ............................................... *passim*

Federal Rule of Evidence 801(d)(2)(E) ..........................................................27

## INTRODUCTION

The Fourth Superseding Indictment (the "Indictment") casts far too wide a net. It can link the defendants, and their alleged crimes, only by generalizing at an impermissibly high level, collapsing almost a dozen distinct relationships into a single, general "conspiracy," and at least three distinct types (or "genres") of allegedly unlawful objectives into a single conspiratorial goal. Whatever the government's purpose in adopting these blanket charging tactics, they are improper under the Federal Rules in at least two respects.

First, the government may not join several putative *offenses* into a single *count*. Here, the Indictment charges all fifteen defendants in two conspiracy counts and eleven of the fifteen in another conspiracy count. Each of these counts posits the existence of a single conspiracy, knowingly joined by all of the defendants, but the factual allegations are fatally inconsistent with this premise. They show, rather, that the individual defendants all dealt separately with the same person, but had no interactions with each other, and were not even aware of each other's interactions with that person.

Second, the government may not join several *defendants* into a single *case* unless they have engaged in the same series of acts or transactions constituting an offense or offenses. To satisfy this requirement, an indictment that joins multiple defendants by charging them with participating in a single conspiracy must necessarily tell a single story, however lengthy or complex it may be. But the factual allegations in the Indictment here are rigorously segregated into what is, at best, an anthology of independent, defendant-specific narratives, connected only by the presence in each story of a single, common character.

Indicting and trying these defendants together runs afoul of the principle that individual crimes require individual prosecutions. In our criminal justice system, guilt is "individual and

1

personal, even as respects conspiracies." *Kotteakos v. United States*, 328 U.S. 750, 772 (1946). Unless a single conspiracy is clear on the face of the factual allegations in the charging document, the dangers of transference of guilt from one allegedly "bad man" to another defendant outweigh any administrative benefit to the government. Counts I-III of the Indictment must therefore be dismissed.

## BACKGROUND

### I.    Singer's College Admissions Operations.

William ("Rick") Singer—who is not a defendant in this case—is the man in the middle of every crime charged in the Indictment. Singer founded and operated two entities: (1) The Edge College & Career Network, also known as "The Key," a for-profit college counseling and preparation business, and (2) the Key Worldwide Foundation, or "KWF," a tax-exempt, non-profit corporation. ¶¶ 19, 20, 30.[1] Singer was assisted by two employees, Steven Masera and Mikaela Sanford. ¶¶ 36, 37. According to the Indictment, Singer used The Key and KWF to conduct three distinct sorts of illegal business through three distinct sets of intermediaries.

**Test-Taking Fraud.** First, the Indictment alleges that five of the fifteen defendants—all parents of prospective college applicants—paid Singer to alter their children's scores on exams, by bribing the exam administrator and arranging for one of Singer's associates to pose as an exam proctor and secretly correct the children's answers. ¶¶ 45-54, 66(a)-(d). Singer was assisted by Mark Riddell and Igor Dvorskiy. ¶¶ 31-32. Singer and Riddell, sometimes with Dvorskiy's assistance, are alleged to have cheated on standardized admission tests known as the ACT and the SAT, on behalf of the children of I-Hsin Chen, ¶¶ 135-141; William McGlashan, ¶¶ 182-194; Marci Palatella, ¶¶ 210-218; and Gregory and Amy Colburn, ¶¶ 97-109.

---

[1] The facts recited herein are taken from the Fourth Superseding Indictment (Dkt. 732). Citations in the form "¶--" refer to the paragraphs of the Fourth Superseding Indictment.

**Class-Taking Fraud.** Second, the Indictment alleges that Singer had his employee, Sanford, and another unnamed individual take online courses, posing as the daughter of defendant Robert Zangrillo. ¶¶ 66(e), 253-271, 278. The grades from these courses were allegedly submitted as part of Zangrillo's daughter's high school transcript to a university at which she had already been admitted, but which she did not ultimately attend, and to the University of Southern California ("USC"), to which she was accepted as a transfer student. ¶¶ 254, 262, 268, 271.

**Athletic Recruitment Fraud.** Third, the Indictment alleges that, at different times, eleven of the defendants agreed to pay Singer, universities, and/or university coaches or administrators, in different amounts and in different ways, to facilitate their children's college admission through a "side door," i.e., by "[b]ribing athletic coaches and university administrators to designate students as purported athletic recruits . . . and as members of other favored admissions categories," or by "[f]abricating athletic 'profiles' containing falsified athletic credentials . . . to submit in support of the students' college applications." ¶¶ 66(f), 66(g). The government contends that Singer was assisted in this scheme by several college athletic coaches and one college administrator.

The allegations with respect to each parent charged with utilizing Singer's athletic recruitment services share a few features common to Singer's *modus operandi*, but are otherwise highly individualized. For example, the Indictment charges that: (1) Gamal Abdelaziz paid Singer to obtain his daughter's admission to USC; (2) Laura Janke, an assistant coach of women's soccer at USC who left in 2014, assisted Singer and Heinel by drafting an "athletic profile" that described the daughter as having received numerous athletic honors; (3) Singer forwarded the profile to Donna Heinel, the Senior Associate Athletic Director at USC; and (4) Heinel presented Mr.

Abdelaziz's daughter as a basketball player to the USC subcommittee for athletic admissions. ¶¶ 114-122.

The Indictment alleges that Singer and Heinel also facilitated the admission of the children of the following defendants to USC as athletic recruits: Diane and Todd Blake, by presenting their daughter as a volleyball player, ¶¶ 123-134; Mossimo Giannulli and Lori Loughlin, by presenting both of their daughters as crew recruits, in one case with the assistance of Laura Janke, ¶¶ 144-164; Elisabeth Kimmel, by presenting her son as a track and field athlete, ¶¶ 176-181; William McGlashan, by presenting his son as a football player, ¶¶ 201-209; Marci Palatella, by presenting her son as a football player, ¶¶ 210, 219-224; and Homayoun Zadeh, by presenting his daughter as a lacrosse player. ¶¶ 245-252.

The Indictment also alleges that Singer and Gordon Ernst, the tennis coach at Georgetown University, facilitated the admission of Mrs. Kimmel's daughter as a tennis recruit. ¶¶ 165-175. It alleges as well that Singer and Jovan Vavic, the water polo coach at USC, obtained the admission of defendant John Wilson's son as a water polo recruit; and that, while Singer was a government informant in late 2018, he told Mr. Wilson that the Stanford University sailing coach would arrange for Mr. Wilson's daughter to be accepted at Stanford. ¶¶ 225-244. Finally, the Indictment alleges that Mr. Zangrillo's daughter submitted a transfer application to USC that included "falsified athletic credentials," and that the USC crew coach "had agreed to designate her as a purported crew recruit." ¶¶ 266-267, 349. With respect to each defendant, the Indictment alleges different interactions with Singer and his associates (if any), different years and timelines, different payment methods and amounts, and different levels of involvement in Singer's process.

4

II.     **The Indictment Alleges That All of the Parent-Defendants Joined a Single "Hub-and-Spoke Conspiracy" With Singer at Its Center.**

With the limited exception of the three married couples—the Colburns, the Blakes, and Mossimo Giannulli and Lori Loughlin—the Indictment does not allege or support an inference that any of the defendants knew, or knew of, any of their co-defendants when the events at issue occurred, or that they knew or knew of any participants in Singer's schemes, other than those with whom they directly interacted. It alleges no coordination, cooperation, or communication among them; it does not allege that Singer's services to any parent or couple depended on or were enabled or facilitated by his services to any other parents; and it therefore could not and does not suggest that any defendants were aware of such interdependence.

The separate nature of each parent's alleged involvement is signified by the structure of the Indictment, which sets forth each defendant's "acts in furtherance of the conspiracy" in a separately-labeled section for each conspiracy count. *See, e.g.*, ¶¶ 67, 165-181 (describing Mrs. Kimmel's alleged acts in furtherance of the fraud conspiracy in a section captioned "Elisabeth Kimmel"); ¶¶ 282, 290-291 (same for federal programs bribery conspiracy); ¶¶ 310, 330-335 (same for money laundering conspiracy). Each section is strictly segregated by parent or couple; thus, the allegations that purport to describe Mrs. Kimmel's "acts in furtherance" do not even mention any of her current co-defendants, and the same is true with respect to the sections alleging the overt acts supposedly committed by each of the other parent-defendants.

Nevertheless, the Indictment alleges that all of the defendants were participants in a general conspiracy "to use bribery and other forms of fraud to facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere." ¶ 64. According to the Indictment, the "objects and purposes" of this conspiracy included "securing the admission of the defendants' children to selective colleges using [both] fraudulently obtained test scores and

5

bogus academic and athletic credentials . . . ." ¶ 65. The alleged "manner and means" of the conspiracy likewise included cheating on tests, ¶¶ 66(a)-(d), fraudulent class-taking, ¶ 66(e), and the false presentation of applicants as athletic recruits. ¶ 66(f)-(g).[2]

Singer is the only common denominator here, both among the various parent-defendants and between the three alleged schemes. Singer is the only actor named in each parent-specific collection of factual allegations, and the only characteristic shared by all of the parents is that each allegedly did some sort of business with Singer. The Indictment, then, posits only a "hub-and-spoke" conspiracy, *see Kotteakos*, 328 U.S. at 755, with Singer at its center and each parent or couple representing a separate spoke. *See* ECF No. 867 at 1 ("The defendants are charged with engaging in a *single* scheme, as part of a *single* conspiracy to use various forms of fraud to facilitate their children's admission to college").

In addition to this strict factual segregation of the alleged conspirators, the Indictment does not suggest that the alleged single conspiracy displayed any structural elements that were common to its various members. The three alleged genres of conspiratorial methods and objectives were linked only by the involvement of Singer. Aside from that, the Indictment does not describe any overlap or interdependence between the test-taking, class-taking, and athletic-recruitment operations. The alleged manner and means of the three operations were self-evidently different.

---

[2] Technically, the Indictment alleges that each defendant participated in two conspiracies (a "fraud conspiracy," ¶¶ 64-66, and a "money laundering conspiracy," ¶¶ 307-309) and that some of them also participated in a "federal program bribery conspiracy." ¶¶ 279-281. The Indictment makes clear, however, that all three conspiracies are cut from the same factual cloth, and differ only insofar as they have been conjured up to support charges under different legal theories. For example, it acknowledges that the money laundering conspiracy simply carried out an agreement "to conceal [the] fraud scheme," ¶ 307; that the "objects and purposes" of the program bribery conspiracy were essentially identical to the objects and purposes of the fraud conspiracy, *compare* ¶ 65 *and* ¶ 280; and that the "manner and means" of the federal program bribery conspiracy were the same bribes allegedly paid to Singer and to USC employees in furtherance of the fraud conspiracy. *Compare, e.g.,* ¶ 120 *and* ¶ 283.

**ARGUMENT**

The Indictment fails as a matter of law to allege that all of the defendants participated in a single conspiracy. At most, it describes individual crimes committed by individual defendants, which could be charged only in individual counts and/or cases, not in an omnibus attack. The Indictment suffers from at least two fatal flaws: (1) each conspiracy count charges a single conspiracy, but alleges facts that describe a dozen distinct relationships involving only one or two parents and Singer; and (2) it improperly joins multiple defendants in a single prosecution. Prosecuting this case on the Indictment as it stands would be prejudicial to each defendant and confusing to a jury, yet it would offer no efficiencies. The Court should therefore dismiss the conspiracy charges and require the government to re-indict in a way that comports with the Federal Rules (or, at the very least, sever the charges against each defendant to allow for individual jury trials).

## I.       Rule 12(b)(3) Standard for Dismissal of a Defective Indictment

Several kinds of defects in an indictment must be raised by pretrial motion. Fed. R. Crim. P. 12(b)(3). These include the joining of two or more offenses in the same count (duplicity), improper joinder, and failure to state an offense. When considering a motion to dismiss an indictment, courts must take the allegations in the indictment as true and ask "whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)). "An indictment is sufficient if it (a) contains the elements of the offense charged, (b) fairly informs the defendant of the charges against him, and (c) enables him to plead an acquittal or conviction to bar future prosecutions for the same offense." *United States v. McCormack*, 31 F. Supp. 2d 176, 179 (D. Mass. 1998), *amended memorandum and order issued*, 1998 U.S. Dist. LEXIS 21617 (Nov. 13, 1998). Although "it would normally be sufficient for the Government to

. . . track the language of the statute in the indictment and include enough facts to put the defendant on notice of which conduct is challenged," an indictment will be subject to more exacting review where a motion to dismiss raises questions of law. *See id.* at 180.

**II.      Counts I-III Must Be Dismissed Because Each Purports to Charge All Defendants With Participating in a Single Conspiracy and Fails to State the Offense Charged.**

The three conspiracy charges—Counts I-III of the Indictment—must be dismissed because they splice an assortment of allegedly illegitimate relationships, each involving Singer and a specific parent or couple, into a single "big conspiracy" charge. Each count purports to implicate all fifteen parent-defendants—who, counting the three married couples among them, entered into a minimum of twelve separate arrangements with Singer—in the same overarching offense, even though each parent allegedly did business only with Singer, and even though, as far as the Indictment discloses, none of them knew their current co-defendants or agreed to combine with them for any purpose. This charging tactic violates the rule against "rimless wheel" conspiracies: the prohibition against charging a single conspiracy where "defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).

**A.      The Supreme Court's Decision in *Kotteakos* Expressly Prohibits the Group-Charging Tactic of a Rimless Wheel Conspiracy.**

In *Kotteakos*, "the Supreme Court made clear that a rimless wheel conspiracy is not a single, general conspiracy," but at worst could amount "to multiple conspiracies between the common defendant and each of the other defendants." *Dickson*, 309 F.3d at 203. The "common and key figure in all of the transactions proven" in *Kotteakos* was Simon Brown. *Kotteakos*, 328 U.S. at 753. Brown had obtained bank loans under the National Housing Act. *United States v.*

*Lekacos*, 151 F.2d 170, 171 (2d Cir. 1945). This gave him "a profitable opening for acting as a broker for other borrowers, about one hundred and ten loans in all, whom he charged a commission." *Id.*

The applications submitted by Brown's brokerage clients were fraudulent in that they "proposed uses for the money which were among those prescribed by the National Housing Act, but the uses actually intended were quite different…." *Id.* at 171-72. Brown's first client (Lekacos) introduced him to Regenbogen and Kotteakos, who both obtained fraudulent loans and "acted as intermediaries" between Brown and subsequent applicants. *Id.* Ultimately, the government charged thirty-one of Brown's clients with conspiracy to make fraudulent applications, and the Second Circuit found that the defendants could "be divided into at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent." *Id.*

The trial court nevertheless instructed the jury that it could find the defendants all belonged to a single conspiracy that was "moved by a common purpose to get money by violating the law," and the jury convicted. *Id.* The Second Circuit held that the trial judge "should have dismissed the indictment." *Id.* It assumed that Lekacos, Kotteakos, and Regenbogen knew Brown was acting as a broker for other applicants, all of whom were also getting loans "in fraud of the Act . . . ." *Id.* at 173. That knowledge, however, "was not enough to make them confederates with the other applicants; it did not give them any interest in the success of any loans but their own; there was no interest, no venture, common to them and anyone else but Brown himself." *Id.* Brown's customers were like "[t]hieves who dispose of their loot to a single receiver—a single 'fence,'" and "do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a 'fence' to make them such." *Id.*

The trial judge thus committed error; in fact, according to the Second Circuit, he "was plainly wrong in supposing that upon the evidence there could be a single conspiracy . . . ." *Id.* at 172. Because the issue had not been resolved before trial, however, the Circuit applied the harmless-error doctrine and affirmed the convictions: "since guilt was so manifest," it held, "to reverse the conviction would be a miscarriage of justice." *Id.* at 174.

The Supreme Court affirmed the Circuit's ruling that the government had "made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." *Kotteakos*, 328 U.S. at 755. The pattern may have been "of separate spokes meeting in a common center," *id.*, but the case lacked an element that was essential to establish a general conspiracy: "the rim of the wheel to enclose the spokes." *Id.* The Supreme Court agreed, in other words, that it was error to let the case go forward on a single-conspiracy charge.

Unlike the Second Circuit, however, the Supreme Court did not allow the conspiracy convictions to stand. It held that the trial judge's failure to dismiss the indictment was *not* harmless error, given the nature of the charges and the fact that the "numerous participants in the different schemes were, on the whole, except for [Brown], different persons who did not know or have anything to do with one another." *Id.* at 758.

The number of defendants and of different conspiracies was "vitally important." *Id.* at 772. "Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application . . . ." *Id.* "[T]hose who join together with a . . . few, though many others may be doing the same," may act criminally, "but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions." *Id.* at 773. "The dangers of transference of guilt from one to another,

across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Id.* at 774.

The rule against "rimless wheel" conspiracies, first stated more than seventy years ago, remains the law with respect to non-RICO federal conspiracy charges. Today, courts examine three factors to determine whether a single conspiracy has properly been charged: (1) a common goal, (2) overlap among the participants, and (3) "interdependence," in the sense that "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) (quoting *United States v. Wilson*, 116 F.3d 1066, 1076 (5th Cir. 1997)). The underlying concern, however, remains the same: "The tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse." *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). Courts thus hold to the principle that "where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy . . . ." *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004).

> **B.    The Indictment Charges an Impermissible Rimless Wheel Conspiracy.**

This case is indistinguishable from *Kotteakos*. Like Simon Brown, Singer functioned as a "broker" on behalf of a number of "clients." Where Brown facilitated the submission of fraudulent documents by a series of individual loan applicants, Singer is alleged to have facilitated the submission of fraudulent test scores, class grades, and/or athletic profiles by the parents of individual college applicants. Each of Brown's clients did business with Brown, just as each of Singer's clients allegedly did business with Singer; in neither case, however, did the clients do business with each other, and in neither case did the success of any individual client's transaction depend on the success (or even the existence) of the other clients. Like *Kotteakos*, moreover, this case involves more than a dozen defendants, which increases the risk of jury confusion and

improper conviction. 328 U.S. at 766, 769, 772. If the trial court "should have dismissed the indictment" in *Kotteakos*, as the Second Circuit held, *Lekacos*, 151 F.2d at 172, then the Court should dismiss the indictment here.

Application of the three-factor test for distinguishing single conspiracies from multiple conspiracies leads to the same conclusion. *First*, as in *Kotteakos*, a "common purpose" among the defendants can be perceived only at a peak level of abstraction. The allegation that all of the parent-defendants were motivated by the prospect of "securing the admission of [their] children to selective colleges," ¶ 65, *see also* ¶ 280, is no more indicative of a general conspiracy than the fact that the defendants in *Kotteakos* were all "moved by a common purpose to get money by violating the law." *Lekacos*, 151 F.2d at 172. The fact (or allegation) that A and B both wanted to buy what X had to sell says nothing about whether or not the customers agreed to combine with both X *and each other* for the purpose of making their individual, separate purchases.

Moreover, the Indictment acknowledges that the parent-defendants allegedly used "bribery and other forms of fraud to facilitate *their children's admission* to selective colleges," ¶ 64 (emphasis added)—not to facilitate the admission of each other's children. The government has not alleged that the parents shared the collective goal of working with Singer to navigate the college process for all of their children as a group. "There was no drawing of all together in a single, over-all, comprehensive plan." *Blumenthal v. United States*, 332 U.S. 539, 558 (1947). Each parent joined the putative conspiracy only to achieve his or her personal goal, and each parent left the supposed conspiracy when his or her personal goal was achieved. The multiplicity of alleged goals is indicative of a multiplicity of alleged conspiracies, each one ending when its particular "central . . . purpose" had been accomplished. *Grunewald v. United States*, 353 U.S.

12

391, 401 (1957); *see United States v. Dellosantos*, 649 F.3d 109, 119 (1st Cir. 2011) (disparate actors working toward disparate goals indicate disparate conspiracies, not single conspiracy).

*Second*, the degree of "overlap among the participants" is inconsistent with the notion of a single conspiracy that included all the parent-defendants. Any overlap in this case occurred only on the "supply side" of the alleged transactions: Singer had a role in all of them; Masera, The Key's accountant, had a role in some of them on an administrative level (¶ 36); Riddell and Dvorskiy each assisted Singer in the test-taking schemes (¶¶ 31-32, 276); and Heinel and Janke each assisted Singer in some of the athletic-recruitment schemes (¶¶ 38, 40, 277).[3]

From the perspective of the defendants, on the other hand, each "spoke" of the alleged wheel connected only to a single "hub." For example, the Indictment alleges that Mrs. Kimmel's interactions with The Key directly involved only Singer (who may in turn have interacted with Ernst, Heinel, and Janke) and, on an administrative level, The Key's accountant, Masera. ¶¶ 167, 170-171, 174, 177-178. Singer (who is not charged in this Indictment) is the only person alleged to have dealt with all of the charged parents.

Because it alleges no interaction between the parents, the Indictment suggests no kind of *meaningful* overlap among the participants—the kind of overlap that might allow a jury to infer that each parent agreed to participate in a scheme that involved Singer *and* the other parents, and that a "rim" thus enclosed both the hub and the several spokes. *See, e.g.*, *United States v. Webb*, 827 F. Supp. 840, 841-42 (D. Mass. 1993) (granting severance where indictment charged two separate conspiracies with only one overlapping member); *United States v. Giraldo*, 859 F. Supp.

---

[3] Singer's other confederates did not "overlap." Mikaela Sanford, Gordon Ernst, Jovan Vavic, and John Vandemoer are each alleged to have played a role in only one illegal transaction referenced in the Indictment. Others named in the Indictment—such as Niki Williams and Ali Khosroshahin—do not appear in the factual allegations for any of the individual defendants.

52, 54-55 (E.D.N.Y. 1994), *aff'd in part and rev'd in part on other grounds*, 80 F.3d 667 (2d Cir. 1996).

*Finally*, the Indictment's failure to charge a single, general conspiracy is perhaps most evident with respect to the element of "interdependence." This is a two-part inquiry. First, the court must determine "whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *Portela*, 167 F.3d at 695 (quoting *United States v. Wilson*, 116 F.3d 1066, 1076 (5th Cir. 1997)). In addition, "[e]ach individual must *think* the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." *Id.* (emphasis added).

Nothing in the Indictment suggests either interdependence or any defendant's knowledge thereof. Certainly, Singer's operation bears no resemblance to the paradigm of an interdependent conspiracy: a drug-distribution scheme that depends for its success on the combined efforts of its various members and the performance of numerous actions and transactions along a chain of cultivation, importation, manufacture, and distribution. Singer's alleged activities on behalf of any one of his clients certainly weren't "necessary" to the success of his efforts on behalf of any other—e.g., Singer's alteration of an SAT score for Mr. and Mrs. Colburn's child in 2017, ¶¶ 97-113, could not in any way have been helpful, much less essential, to his efforts to improve the odds of Mr. Wilson's son's admission to a selective college, years earlier in 2014, through a donation to the school's water polo program. ¶¶ 225-237. Having multiple clients was "advantageous" only to Singer, and only in the sense that more customers generated more revenue for Singer and more feathers in his cap to pitch his services to others. In that sense, however, Singer was no different from the loan broker in *Kotteakos*, who charged a five percent commission to each of his clients without implicating them in a general conspiracy, 328 U.S. at 753, or from the receiver of stolen

14

goods, whose success may be proportional to the number of his suppliers, but whose suppliers do "not by that fact alone become confederates" with each other. *Id.* at 755; *see United States v. Glenn*, 828 F.2d 855, 858 (1st Cir. 1987) (explaining that alleged conspirator's "indifferen[ce] to the purposes of others in the enterprise" indicates lack of interdependence and lack of conspiracy).

If interdependence did not actually exist here, then of course the parent-defendants could not "think the aspects of the venture interdependent." *Portela*, 167 F.3d at 695. Unsurprisingly, the Indictment does not actually allege that any of the defendants thought the success of their dealings with Singer depended on the success of Singer's dealings with anybody else. At most, the Indictment asserts that Singer explained, to at least some of his clients, that his methods were "tried-and-true." ¶ 66(i). But such representations are not indicative of interdependence; they at most suggest that some parents knew Singer had other customers. The Second Circuit made the same inference in *Kotteakos*, "assum[ing] that Lekacos and Kotteakos and Regenbogen knew that Brown was for the time being acting as a broker for a number of other persons," but held that such awareness "was not enough to make them confederates with the other[s] . . . ." 151 F.2d at 173.

### C. The Conspiracy Counts Fail to State the Offense (Single Conspiracy) Charged in Them and Would Be Duplicitous Even If They Could Be Construed to Charge Multiple Offenses.

All of the conspiracy counts must be dismissed under Rule 12(b)(3)(B)(v) because none of them alleges an actual single conspiracy, and each thus fails to state the offense charged in it. These counts cannot be saved by reading them to mean what they do not say—i.e., to allege an assortment of "little conspiracies," each involving one or two parents and Singer. *Cf. Kotteakos*, 328 U.S. at 752 (because evidence described only a "rimless wheel," it "proved not one conspiracy but some eight or more different ones of the same sort executed through a common key figure").

Read that way, Counts I-III would be duplicitous in violation of Rule 12(b)(3)(B)(i), because each would "join in a single count . . . two or more distinct and separate offenses." *United*

*States v. Newell*, 658 F.3d 1, 23 (1st Cir. 2011) (quoting *United States v. Canas*, 595 F.2d 73, 78 (1st Cir. 1979); *see also* Fed. R. Crim. P. 8(a) (requiring that the government charge "a separate count for each offense").[4]   Allowing a duplicitous indictment to proceed to trial risks that "a jury [will] find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense." *United States v. Munoz-Franco*, 986 F. Supp. 70, 71-72 (D.P.R. 1997) (citing *United States v. Saleh*, 875 F.2d 535, 537 (6th Cir. 1989)); *Newell*, 658 F.3d at 26-27 (explaining that duplicitous indictments are "constitutionally infirm" because jurors may "disagree among themselves as to just which offenses the evidence supports" or may "agree that the evidence showed that [the defendant] committed *an* offense, even if it was ambiguous as to which one"). Proceeding on a duplicitous indictment is further problematic in that it fails to "assur[e] the defendant adequate notice, provid[e] the basis for appropriate sentencing, and protect[] against double jeopardy." *United States v. Sturvidant*, 244 F.3d 71, 75 (2d Cir. 2001).

The Indictment describes distinct sets of alleged co-conspirators, with no connection to one another, participating in distinct transactions over many years. The overt acts in furtherance of each alleged conspiracy are entirely separated as they pertain to the individual defendants, with not a single overlapping fact between any two families. The institutions involved, applications, payments, and tests vary for each defendant. These are precisely the circumstances under which courts have found that indictments are impermissibly and untenably duplicitous. *See, e.g., Munoz-*

---

[4] Read that way, moreover, Counts I-III would *still* fail to state an offense. The defendants here are alleged to have been the *customers* of a conspirator, not the working members of a conspiracy. Even in the drug-distribution context, the concept of a "chain" conspiracy does not extend down to the retail end-user: "a mere buyer-seller relationship, without more, is inadequate" to establish a conspiracy. *United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993) (quoting *United States v. Douglas*, 818 F.2d 1317, 1321 (7th Cir. 1987)); *see also United States v. Colon*, 549 F.3d 565, 566, 569 (7th Cir. 2008) (warning against "conflating sale with conspiracy" and vacating conspiracy conviction where defendant "was merely a purchaser from a conspirator").

*Franco*, 986 F.Supp. at 71-72 (dismissing conspiracy count as duplicitous where it alleged two distinct conspiracies involving distinct sets of co-conspirators, even though both conspiracies targeted the same victim, where description of overt acts was "neatly divided between two distinct sets of coconspirators," the conspiracies' participants were different except for two overlapping bank officers, the related corporate entities owned or controlled by the two sets of conspirators had "nothing to do with each other," and the transactions and loans related to one set of defendants were "totally unconnected with the transactions" involving the scheme allegedly perpetrated by the other set of defendants); *see also, e.g.*, *United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000) (dismissing duplicitous bank fraud indictment); *Newell*, 658 F.3d at 26-27.

### III.   The Indictment Must Be Dismissed Under Rule 12(b)(3)(B)(iv) Because the Defendants Are Improperly Joined Under Rule 8(b).

In addition to the defects described above in the three conspiracy counts, the Indictment as a whole violates the prohibition against improper joinder. Under Federal Rule of Criminal Procedure 12(b)(3)(B)(iv), an indictment is defective and subject to dismissal if it improperly joins two or more co-defendants.

Federal Rule of Criminal Procedure 8 sets forth the standard for improper joinder. Rule 8 aims to strike "a balanced compromise between a defendant's right to have his guilt considered separately and the systemic benefits of consolidated trials." *United States v. Boylan*, 898 F.2d 230, 245 (1st Cir. 1990). Here, the allegations demonstrate that the government has misunderstood the breadth of the joinder rule, and proceeded on an Indictment that lacks the requisite connections between defendants to pass muster as a single conspiracy. *See United States v. Campbell Hardware, Inc.*, 470 F. Supp. 430, 436 (D. Mass. 1979) (citing *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977)). Where the Indictment fails to responsibly allege that all of the defendants "participated in the same act or transaction, or in the same series of acts or transactions, constituting

an offense or offenses," Fed. R. Crim. P. 8(b), and where proving the charges against each defendant is fact-specific and will require entirely different evidence, *see United States v. Prange*, 922 F. Supp. 2d 127, 129 (D. Mass. 2013), the defendants are improperly joined.

### A.    The Rule 8(b) Joinder Standard

Under Rule 8(b), a single indictment may charge two or more defendants only "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Rule 8(b) analysis requires the court to assess first whether "the offenses in question . . . constitute a series of acts or transactions" and then whether "joining the defendants is of benefit to the government." *Prange*, 922 F. Supp. 2d at 129 (citing *United States v. Barbosa*, 666 F.2d 704, 707-08 (1st Cir. 1981)). The first prong considers "what is responsibly *alleged*, not what is ultimately proved." *United States v. Morrow*, 39 F.3d 1228, 1237 (1st Cir. 1994). A determination of what the indictment responsibly alleges is for the Court, not the jury. *See United States v. Josleyn*, 99 F.3d 1182, 1188 (1st Cir. 1996). Responsible allegations have a good faith, rational, factual basis, "discernible from the face of the indictment," "sufficient to warrant joinder." *Boylan*, 898 F.2d at 245.

A conspiracy charge can warrant joinder of multiple defendants in a single indictment, but "the inclusion of a conspiracy count will not rectify otherwise improper joinder . . . ." *United States v. Luna*, 585 F.2d 1, 4 (1st Cir. 1978); *see United States v. Arruda*, 715 F.2d 671, 678 (1st Cir. 1983) (a conspiracy count "must have a firm basis in fact"). Charging conspiracy merely for the purpose of streamlining prosecution of disconnected individuals is improper. *See United States v. Turkette*, 632 F.2d 896, 909 (1st Cir. 1980) ("By inserting the RICO conspiracy charge, the

18

government consolidated in one indictment acts and transactions which otherwise could not have been joined."), *rev'd on other grounds*, 452 U.S. 576 (1981).[5]

**B.     The Indictment Improperly Joins Fifteen Defendants in a Single Case Who Have Not Participated in the Same Act, Transaction, or Series of Acts or Transactions, Constituting an Offense or Offenses.**

Even if the Indictment could be read to allege a single conspiracy with subordinate schemes, those schemes—and the defendants' actions in furtherance of them—are not "part of the same series of acts or transactions," and are therefore improperly joined under Rule 8(b). *Josleyn*, 99 F.3d at 1188; *see United States v. Potashnik*, 2008 U.S. Dist. LEXIS 102299, at *49-51 (N.D. Tex. Dec. 17, 2008).

"[J]oinder under Rule 8(b) [is] problematic unless the criminal acts alleged *in all counts* [are] part of the *same series* of acts or transactions." *Josleyn*, 99 F.3d at 1188. Commonalities must extend across *all* defendants and *all* charges to justify joinder. *See United States v. Natanel*, 938 F.2d 302, 307 (1st Cir. 1991) ("[J]oinder is proper as long as there is some *common activity* binding the objecting defendant with *all* the other indictees and that common activity encompasses *all* the charged offenses.") (internal citations omitted) (emphasis added); *see also United States v. Azor*, 881 F.3d 1, 10 (1st Cir. 2018). The government may join parties in a single action only based on "what it reasonably anticipates proving *against all*." *Boylan*, 898 F.2d at 245 (emphasis added).

As explained above, the Indictment alleges three discrete genres of conspiracies, across three substantive conspiracy counts, and parses its factual allegations on a defendant-by-defendant basis, thereby alleging multiple schemes in single counts and in a single indictment. This

---

[5] Where it appears that the government has charged a conspiracy merely for convenience and not as a matter of legal sufficiency, and has done so in bad faith, it is appropriate to pierce the pleadings and look beyond the four corners of the Indictment to the information the government had at the time of the operative Indictment. *See Campbell Hardware*, 470 F. Supp. at 435-36.

multiplicity is exacerbated by the inclusion of ten counts levied against individual defendants based on each defendant's unique behavior and interactions with Singer and his affiliates. The First Circuit has explained that "[t]o determine if [multiple] schemes sufficiently were connected to the same series of acts to be joined, we must consider whether there is '***substantial identity*** of facts or participants' underlying the charged offenses." *United States v. Yefsky*, 994 F.2d 885, 895 (1st Cir. 1993) (quoting *Levine*, 546 F.2d at 662) (emphasis added). It is well-established that "mere similarity of acts, without more, cannot justify joinder." *Natanel*, 938 F.2d at 307. This assessment of whether the charged acts against each defendant are "substantially identical" requires consideration of the "*facts underlying the Counts*, and not solely . . . the nature or characterization of the Counts." *Potashnik*, 2008 U.S. Dist. LEXIS 102299, at *54. "[T]he government has an obligation to allege more than that the offenses are of a similar nature or that there are common participants." *United States v. Gentile*, 60 F.R.D. 686, 688 (E.D.N.Y. 1973).

The Indictment fails to satisfy the "substantial identity" standard in either way. First, there is almost no identity of participants across the schemes. Only three defendants are alleged to have engaged in both the testing/class-taking and athletic recruitment schemes, and there is almost no overlap between the non-parent co-conspirators. Riddell, Dvorskiy, and Williams allegedly supported the test-taking schemes; Sanford allegedly supported the class-taking schemes; the coaches and administrators at the various schools allegedly supported the athletic recruitment schemes; and Masera allegedly interacted with a handful of defendants regarding invoicing and payment on behalf of The Key. *See* ¶¶ 31-43, 276-278. The only person truly involved in all three schemes was Singer. A few shared participants is not enough to satisfy Rule 8(b). *See Gentile*, 60 F.R.D. at 689; *United States v. Serafini*, 7 F. Supp. 2d 529, 554 (M.D. Pa. 1998) ("[A]s noted in

*Kotteakos*, it is not appropriate to attempt to try multiple conspiracies together simply because there is a common actor in all of the conspiracies.").

Second, there is no identity in the acts charged against each defendant. The story told in the factual allegations of the Indictment is not a single story at all—it is a series of vignettes, depicting individuals who knew nothing of each other, each deciding separately and independently to hire Singer for their own purposes, each engaging in their own communications with Singer or his associates, and each making payments in different amounts and from or to different places for the services Singer provided.

Take, for example, Mr. Chen and Mrs. Kimmel. According to the allegations in the Indictment, they engaged Singer for different services, worked with or received services from different associates of Singer, took different actions in furtherance of obtaining those services, and had different interactions with the different colleges that ultimately received the alleged exam scores and athletic profiles the Indictment describes. Their only similarity is that they both did business with Singer.

The conduct alleged in the Indictment, in other words, accuses individual people of committing individual crimes. No joint conduct among the defendants has been alleged. The Indictment lacks any allegations demonstrating a "significant relationship" between the co-defendants' activities "of such a nature that they were or should have been cognizant of it." *Gentile*, 60 F.R.D. at 689. Absent such allegations, showing "affirmative acts" through which a defendant "associated himself with the others' acts," an individual defendant may not be held responsible for the conduct of others. *Id.* That the defendants are alleged to have committed the same crime independently does not justify joinder. *King* v. *United States*, 355 F.2d 700, 703 (1st Cir. 1966). This would be akin to charging together all tax evaders who use the same accountant.

*See United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985); *see also Saleh*, 875 F.2d at 538 (joinder is improper even where each defendant "violated the *same statutes* at the same time and place," if they did not "otherwise participate[] *jointly* in any proscribed *conduct*").

Even if the Indictment could be read as alleging three cohesive conspiracies—the test-taking, class-taking, and athletic recruitment schemes—such proximate but distinct conduct cannot be charged together. *See Turkette*, 632 F.2d at 909-10.[6] In *United States v. Glenn*, for example, the First Circuit reversed the convictions of a defendant convicted of a single conspiracy to import marijuana from Thailand and hashish from Pakistan, where the evidence showed that the defendant was involved only in the hashish plan and "[t]he record [did] not show how the hashish venture could have helped the marijuana venture, or vice versa." 828 F.2d at 858.

In light of the factual distinctions between schemes, between schools, and between defendants, all apparent from the face of the Indictment, the charged defendants cannot be said to have taken part in "the same series of acts or transactions," and the charges levied against these defendants cannot be said to have a "substantial identity of facts or participants." The schemes charged here, even if they share a broad overarching purpose, are thus too distinct in their

---

[6] *See also Levine*, 546 F.2d at 665-66; *United States v. Marlinga*, 2005 U.S. Dist. LEXIS 3156, at *23-25 (E.D. Mich. Feb. 28, 2005); *United States v. Shellef*, 507 F.3d 82, 100 (2d Cir. 2007) (joinder of wire fraud, conspiracy, and tax misconduct claims was improper); *United States v. Castro*, 829 F.2d 1038, 1045 (11th Cir. 1987), *other portions of opinion withdrawn in part on other grounds on denial of reh'g*, 837 F.2d 441 (11th Cir. 1988) (two separate conspiracies were improperly joined, because even though they had a "similar illegal objective," "neither depended on, was aided by or had any operational interest in the success of the other conspiracy"); *United States v. Marionneaux*, 514 F.2d 1244, 1248 (5th Cir. 1975) (indictment alleging two separate counts each charging a separate conspiracy, even though the conspiracies had a common purpose, did not satisfy the "same act or transaction" requirement, because there were insufficient links between the two conspiracies); *Giraldo*, 859 F. Supp. at 54-55 (two charged conspiracies were unrelated and improperly joined because, although the indictment alleged that all of the sales in both conspiracies were made to a single cooperating witness, there were no allegations that the defendants knew of or were involved in an overall scheme, or that there was more than one common participant).

participants and the overt actions in furtherance of them to satisfy the "same series of acts or transactions" requirement of Rule 8(b). *See, e.g.*, *Marionneaux*, 514 F.2d at 1248.

### C.     Joinder of the Defendants Prejudices Their Rights More Than It Benefits the Government.

Absent a shared "series of acts or transactions," joining the defendants in these circumstances is of no real benefit to the government. *See Prange*, 922 F. Supp. 2d at 129. Such a benefit—sufficient to justify the intrusion into a defendant's right to his own trial—may inure where there is substantial evidentiary overlap across defendants. *See id.* But "[w]here . . . there are no presumptive benefits from joint proof of facts relevant to all the acts or transactions, there is no 'series,' Rule 8(b) comes to an end, and joinder is impermissible." *King*, 355 F.2d at 704. Accordingly, where the evidence necessary to prove one set of criminal activity is "unnecessary to prove the [other] and vice versa," the defendants alleged to have engaged in the different criminal activities may not be tried together. *Turkette*, 632 F.2d at 909-10; *see Glenn*, 828 F.2d at 858.

As the Indictment itself demonstrates through its defendant-specific narrative structure, there is a complete lack of overlapping evidence here.[7] The only shared witness for all defendants is Singer, who the government has represented is unlikely to testify. Without Singer, there will be no common testimony for all defendants. And even if Singer did testify, the testimony of a single witness is not enough of a basis to try distinct conspiracies together. *See Gentile*, 60 F.R.D. at 689; *Serafini*, 7 F. Supp. 2d at 554.

---

[7] The government's own filings confirm the lack of overlapping evidence across defendants. In an opposition to several defendants' motions to compel, the government spent several pages per defendant describing the evidence it has regarding each defendant. *See* ECF No. 736. The government did not rely on any of the same documents or any consistent narrative regarding any two defendants; instead, the documents and explanation of alleged culpability were entirely unique. So too would be the evidence presented at trial.

Even within any of the genres of alleged schemes, factual distinctions abound across defendants and involved institutions. For example, within the athletic recruitment scheme, different schools engaged in different processes for advancing applicants as athletic recruits, and Singer employed different payment methods for allegedly bribing his affiliates on the inside of each school. To highlight but a few distinctions:

- The Indictment describes "the USC subcommittee for athletic admissions," which purportedly approved certain applications submitted by defendants' children and led to "conditional admission" (¶¶ 118, 127-128), but there is no such subcommittee described for Georgetown, UCLA, Stanford, or Harvard.

- The Indictment alleges that Singer paid Ernst, a Georgetown tennis coach, $244,000 in monthly installments over the course of a year, but paid Heinel, a USC administrator, $20,000 per month. *See* ¶¶ 119, 121, 175. The Indictment further alleges that some parents made payments directly to the USC Women's Athletic Board instead of to Singer, and contains no allegations of a similar direct payment model for any other college. *See* ¶¶ 129, 221, 273, 284, 286, 299. The explanation for these differing payment models will necessarily reveal different processes used by Singer at Georgetown and USC.

On such distinct facts, the government cannot show that any alleged conspiracy with Janke and Heinel to get a student into USC could have furthered a conspiracy with Ernst to get a student into Georgetown, or vice versa. *See, e.g.*, *Turkette*, 632 F.2d at 909-10.

In this case, with *no* joint proof of facts for all of the defendants, and only minimal joint proof for even a subset of the defendants, the defendant's "right to have [her] own guilt considered separately" necessarily prevails over any "practical benefit to the government and the court of a consolidated proceeding." *Martinez*, 479 F.2d at 827-28. That right is paramount here because of the risk a joint trial will pose of transference of guilt across defendants. "Because of the natural tendency to infer guilt by association, a defendant may suffer by being joined with another allegedly 'bad man.'" *King*, 355 F.2d at 704.

### IV.    Dismissal Is the Appropriate Remedy for the Indictment's Defects.

Dismissal is the proper remedy for mischarging fifteen individuals in a single prosecution. Dismissal is a permissible remedy under Rule 12(b)(3)(B) where the basis for relief is "a defect in the indictment or information." Any iteration of Rule 12(b)(3)(B)—be it failure to state an offense, duplicity, or improper joinder—warrants dismissal for the simple reason that charges against a defendant may not proceed where there is "a defect in the indictment or information."[8]

The defendants acknowledge that, generally, "whether a single or multiple conspiracy exists is a question of fact for the jury to determine." *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1984). "This generalization is only true, however, when the indictment as drawn 'permit[s] the government to prove a set of facts that would support a finding of one conspiracy.'" *United States v. Eury*, 2015 U.S. Dist. LEXIS 53338, at *13 (M.D.N.C. Apr. 23, 2015) (quoting *United States v. Berlin*, 707 F. Supp. 832, 837 (E.D. Va. 1989)). "When the indictment on its face presents more than one conspiracy in a single count, such a count is improper, as it is considered duplicitous." *Id.* It is for the Court, not the jury, to assess the sufficiency of the allegations in the Indictment in this respect. *See Josleyn*, 99 F.3d at 1187.

Dismissing facially-insufficient conspiracy charges at this stage is good practice as a matter of both form and substance. As Rule 12 states, the defects of duplicity and failure to state an offense "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits . . . ." Fed. R. Crim. P. 12(b)(3)(B)(i). It

---

[8] Improper joinder is included as a category of defect under Rule 12(b)(3)(B), which warrants dismissal of an indictment or information. In contrast, severance is separately enumerated in Rule 12(b)(3). *See* Fed. R. Crim. P. 12(b)(3)(D). Improper joinder under Rule 12(b)(3)(B)(iv) or Rule 8(b) is akin to misjoinder under Fed. R. Civ. P. 20, a proper remedy for which is dismissal. *See, e.g.*, *PPV Connection, Inc. v. Sosa*, 268 F.R.D. 42, 45 (D.P.R. 2010) (dismissing complaint under Fed. R. Civ. P. 20 because "each of the defendants are alleged to have engaged in the same *kind* of transaction, but they nevertheless do not face claims 'arising out of the same transaction, occurrence, or series of transactions or occurrences'").

would be paradoxical for the rules to require defendants to challenge defective indictments by pretrial motion if the courts reflexively defer the resolution of such challenges until trial.

As courts have recognized, moreover, reviewing single-conspiracy legal sufficiency at an early stage in the proceedings also "makes eminent sense. If this were not done, there would be no bar to improperly lumping numerous separate conspiracies into a single indictment and then obtaining all the benefits a single conspiracy prosecution enjoys up to the moment a trial sufficiency motion was determined." *People v. Luciano*, 951 N.Y.S. 2d 88, 2012 N.Y. Misc. LEXIS 1955, at *45 (N.Y. Cty. Sup. Ct. Apr. 27, 2012). "This would not only result in extreme prejudice to defendants but cause needless conviction reversals which could easily be avoided by a proper review at the outset." *Id.*

Thus, for example, the defendants intend to challenge the District of Massachusetts as an improper venue, and the appropriate venue for a criminal trial is something that—both by rule and as a matter of fairness and common sense—must be determined before trial. *See* Fed. R. Crim. P. 12(b)(3)(A)(i) (challenges to improper venue must be made before trial). The Court cannot, however, make an informed determination of the venue issue until the viability of the conspiracy counts is resolved, because it cannot know whether it would be permissible to impute any single defendant's connections with Massachusetts to the others. *See United States v. Miller*, 111 F.3d 747, 753 n.8 (10th Cir. 1997) ("For purposes of venue, the acts of any conspirator are imputed to the other conspirators.").

Deferring resolution of the Rule 12 challenges also threatens to generate prejudice—and the potential for reversible errors—from the conduct of the trial itself. Trying the case under the single-conspiracy premise stated in Counts I-III, for example, will implicate the First Circuit's holding in *United States v. Petrozziello*, 548 F.2d 20, 22-23 (1st Cir. 1977), under which the

26

District Court can admit statements that would otherwise be hearsay, pursuant to the co-conspirator exemption in Fed. R. Evid. 801(d)(2)(E), but can do so only after finding by a preponderance of the evidence "that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." Resort to *Petrozziello* would be obviated by a determination that the Indictment fails to state a single-conspiracy offense, but if the issue is not resolved before trial then the Court will expose itself to the risk of polluting the record with evidence that should never have been admitted.

This is exactly what happened in *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 297 (D. Mass. 2005). The District Court allowed trial to go forward on charges that the defendants (two executives of West Lynn Creamery) had engaged in a single conspiracy to evade taxes with a number of customers (all Dunkin' Donut franchisees). After trial, however, the District Court realized that the evidence was insufficient to establish "a single conspiracy under *Kotteakos* and its progeny." *Id.* at 296. Among other things, the evidence reflected only a single potentially-conspiratorial communication, between only one of the two defendants (Pappathanasi) and one franchisee (Foundas). *Id.* at 294. "If Pappathanasi had been charged only with conspiring with Foundas, the court would not have permitted any evidence by the other Dunkin' Donuts franchisees," but it was now too late to unring the evidentiary bell. *Id.* at 297. The jury had in fact "heard from many franchisees other than Foundas," and "[n]o limiting instruction could cure the unfair prejudice of that at this point." *Id.*

Indeed, as the Supreme Court has recognized from the outset, the prejudice resulting from a "rimless wheel" charge is virtually presumptive: "The dangers of transference of guilt from one to another, across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Kotteakos*, 328 U.S. at

27

774. Several federal courts have therefore taken this sensible approach and dismissed indictments under Rule 12(b)(3)(B)(i) when confronted with conspiracy charges that were insufficient on their face. *See, e.g.*, *Eury*, 2015 U.S. Dist. LEXIS 53338, at *23 (dismissing charge of conspiracy to defraud the United States where indictment reflected at least two distinct agreements, separated in time and by actors, methods, and goals); *United States v. Jackson*, 926 F. Supp. 2d 691, 706 (D.N.C. 2013) (dismissing conspiracy charge against two defendants); *Munoz-Franco*, 986 F. Supp. at 71-72 (dismissing two conspiracy counts charging multiple defendants with conspiracy to commit three different offenses against the United States, because each count actually alleged within it "at least two conspiracies," or two "wholly separate alleged scheme[s]," as evidenced by the fact that the indictment's "description of the overt acts [for one of the conspiracy counts] [was] neatly divided between two distinct sets of co-conspirators").

This Court should do likewise. Each of the three conspiracy counts fails to state a single-conspiracy offense because each aggregates several distinct relationships into a single charge—indeed, as the Court has seen, two of the conspiracy counts combine nearly a dozen distinct relationships into a single "big conspiracy" charge. No amount of factual development will alter that reality. Here, as in *Munoz-Franco*, 986 F. Supp. at 71, "the description of the overt acts is neatly divided" among the distinct parent-defendants, and thus the structure of the Indictment affirms the conclusion dictated by its substance, leaving no doubt that each of the conspiracy counts is a "rimless wheel" that aggregates defendants who are connected to each other only by the allegation that each did business with the same person. The Indictment, therefore, does not

permit the government to prove a set of facts that would support a finding of a single, general conspiracy, and Counts I-III should be dismissed.[9]

## CONCLUSION

The defendants respectfully request that this Court dismiss the charges against them in the Indictment and grant other such relief as this Court deems just and proper. In the alternative, the defendants request that the Court sever the charges against each defendant from those of the other defendants named in the Indictment.

DATED: April 1, 2020                          Respectfully submitted,

                                              */s/ Eóin P. Beirne*
                                              R. Robert Popeo (BBO # 403360)
                                              Mark E. Robinson (BBO # 423080)
                                              Eóin P. Beirne (BBO # 660885)
                                              Cory S. Flashner (BBO # 629205)
                                              MINTZ, LEVIN, COHN, FERRIS,
                                              GLOVSKY AND POPEO, P.C.
                                              One Financial Center
                                              Boston, MA 02111
                                              (617) 348-1605 (telephone)
                                              (617) 542-2241 (fax)
                                              rpopeo@mintz.com
                                              mrobinson@mintz.com
                                              ebeirne@mintz.com
                                              csflashner@mintz.com

                                              *Counsel for Elisabeth Kimmel*

---

[9] In the alternative, should the Court not dismiss these counts, the Court should further sever the defendants pursuant to Rule 8(b), as a result of the defects described above. Severance is a widely accepted remedy for misjoinder, and would serve the ends of justice by minimizing prejudice to each of the defendants. *See Natanel*, 938 F.2d at 306; *see also Gentile*, 60 F.R.D. at 688 (granting severance due to misjoinder under Rule 8(b)); *Potashnik*, 2008 U.S. Dist. LEXIS 102299, at *56 (same); *Marlinga*, 2005 U.S. Dist. LEXIS 3156, at *25-27 (same); *United States v. Lugo*, 269 F. Supp. 757, 757-58 (E.D. Wis. 1967) (same); *United States v. Charnay*, 211 F. Supp. 904, 907-08 (S.D.N.Y. 1962) (same).

Sean M. Berkowitz (*admitted pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Phone: 312.777.7700
Fax: 312.993.9767
sean.berkowitz@lw.com

Perry J. Viscounty (*admitted pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626
Phone: 714.540.1235
perry.viscounty@lw.com

/s/ William J. Trach
William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone: 617.948.6000
Fax: 312.993.9767
william.trach@lw.com

Roman Martinez (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Phone: 202.637.2200
roman.martinez@lw.com

*Counsel for Mossimo Giannulli and Lori Loughlin*

George W. Vien (BBO #547411)
Joshua N. Ruby (BBO #679113)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, MA 02110
Phone: 617.720.2880
Fax: 617.720.3554
gwv@dcglaw.com
jnr@dcglaw.com

David C. Scheper (*admitted pro hac vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071
Phone: 213.613.4655
Fax: 213.613.4656
dscheper@scheperkim.com

*Counsel for Lori Loughlin*

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

/s/ Brian T. Kelly
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000

/s/ David E. Meier
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA  02110
(617) 720-2626
dmeier@toddweld.com
/s/ Stephen H. Sutro
Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*

30

bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

*/s/ David S. Schumacher*
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

*/s/ Jack W. Pirozzolo*
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

*/s/ Reuben Camper Cahn*
Reuben Camper Cahn (*pro hac vice*)
Jennifer L. Keller (*pro hac vice*)
Chase A. Scolnick (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*

*/s/ Michael K. Loucks*
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

*/s/ Martin G. Weinberg*
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300

John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

*/s/ Tracy A. Miner*
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377
Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

Fax: (212) 446-2350
E-mail:  mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

*/s/ Michael Kendall*
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

## CERTIFICATE OF SERVICE

I, Eóin P. Beirne, counsel for the Defendant, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to those indicated as non-registered participants on April 1, 2020.

*/s/ Eóin P. Beirne*
Eóin P. Beirne (BBO # 660885)

32

# APPENDIX A

| Count/Defendant | I | II | III | IV | V | VI | VII | VIII | IV | X | XI | XII | XII |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (Fraud) | Conspiracy (Fed. Pr. Bribery) | (Money Laundering) | Fraud (A&A) | | | | | | | Federal Programs Bribery (A&A) | | False Tax Return |
| G. Colburn | x | | x | | | | | | | | | | |
| A. Colburn | x | | x | | | | | | | | | | |
| Abdelaziz | x | x | x | | | | | | | | | | |
| T. Blake | x | x | x | | | | | | | | | | |
| D. Blake | x | x | x | | | | | | | | | | |
| Chen | x | | x | | x | | | | | | | | |
| Giannulli | x | x | x | | | | | | | | | | |
| Loughlin | x | x | x | | | | | | | | | | |
| Kimmel | x | x | x | | | | | | | | | | |
| McGlashan | x | x | x | | | | x | | | | | | |
| Palatella | x | x | x | | | | | | | | | | |
| Wilson | x | x | x | | | x | | x | x | | x | x | x |
| Zadeh | x | x | x | | | | | | | | | | |
| Zangrillo | x | x | x | x | | | | | | x | | | |

*Defendant Sidoo has been omitted from this chart.