# D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )              Criminal Action
          Plaintiff,          )              No. 19-10222-DPW
                              )
v.                            )
                              )
JEFFREY BIZZACK,              )
                              )
          Defendant.          )
                              )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

SENTENCING

October 30, 2019

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Eric S. Rosen
 3    Kristen A. Kearney
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3412
 6    eric.rosen@usdoj.gov

 7    On Behalf of the Defendant:
      Jeremy N. Goldman
 8    Law Offices of Jeremy N. Goldman
      19200 Von Karman Avenue
 9    Suite 300
      Irvine, CA 92612
10    949-387-6670
      jeremy@goldmandefense.com
11
      Katherine Corrigan
12    Corrigan Welbourn & Stokke, APLC
      4100 NewportPlace
13    Suite 550
      Newport Beach, CA 92660
14    949-251-0330
      kate@cwsdefense.com
15
      Seth P. Berman
16    Nutter, McClennen & Fish, LLP
      155 Seaport Boulevard
17    Boston, MA 02210
      617-439-2338
18    sberman@nutter.com

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2             (The following proceedings were held in open court

 3    before the Honorable Douglas P. Woodlock, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

 7    October 30, 2019.)

 8    (Case called to order.)

 9             THE COURT:  Well, let me be sure that I have all the

10    materials that the parties want me to be looking at here.  I

11    have the Presentence Report that's revised as of October 23rd.

12    I have the government's sentencing memorandum and associated

13    appendix.  I have the defendant's sentencing memorandum, and I

14    have a memorandum purported to be filed under seal regarding

15    the victim impact statement and motion to seal in the case.

16             Are there any other written materials I should have?

17             MS. KEARNEY:  No, Your Honor.

18             MS. CORRIGAN:  No, Your Honor.

19             THE COURT:  So what this appears to turn on now in my

20    review of the Presentence Report, and you'll refine my

21    understanding, is how we characterize the conduct here and as

22    that may be framed.  That really turns on the question of

23    whether there are identifiable victims and how to characterize

24    the impact on them.  The victim statement is, at least the

25    government's position now, is that it should remain sealed, I
```

1    guess; perhaps it's not.  But I think I want to approach that

2    first by dealing with questions that of procedure.  If I

3    understand correctly, the victim's statement was submitted to

4    the government in August, addressed to government counsel.  And

5    then it was attached to the Presentence Report here.

6          Now, in the ex parte or I should say in camera

7    submission, the government notes that victim statements can be

8    kept under seal or heard in camera, but it's under Rule 32 upon

9    a party's motion or for good cause.

10          Was there any motion made by the victim with respect

11   to this?

12          MS. KEARNEY:  Your Honor, the victim has not filed a

13   motion but has requested that the government assert --

14          THE COURT:  Did the government file a motion?

15          MS. KEARNEY:  The government did not realize it needed

16   to file a motion because --

17          THE COURT:  Why would you not realize that you need to

18   file a motion?

19          MS. KEARNEY:  Because the letter at this point was

20   attached to the PSR, which the government understood was a

21   nonpublic document.

22          THE COURT:  No.  It says that under Rule 32(i)(4)(C),

23   I may receive such things for good cause.  And, you know, I

24   looked at what is purported to be an in camera under seal

25   filing that you made yesterday.  There was no motion for that,

1    was there?

2          MS. KEARNEY:  The filing that we made, I believe it

3    was this morning --

4          THE COURT:  I'm sorry.  It was this morning.

5          MS. KEARNEY:  -- was at the Court's direction, but

6    that does include in it a motion to both seal the filing as

7    well as for the court to keep the victim impact statement under

8    seal.

9          THE COURT:  Where does it say that?

10          MS. KEARNEY:  In the conclusion.

11          THE COURT:  The motion is styled, in the beginning,

12    Memorandum Regarding Victim Impact Statement, and it recites

13    the government's understanding of this.  And then in the

14    conclusion it says, "For the same reasons and because

15    disclosure of this filing would defeat the purpose of sealing

16    the victim impact statement, the government respectfully

17    requests that this brief likewise be filed."

18          MS. KEARNEY:  Correct.  And right before that, Your

19    Honor, it says, "For the reasons stated herein, the government

20    respectfully requests that the court maintain USC's victim

21    impact statement under seal."

22          THE COURT:  Okay.  So now we look at local rules.

23    Local Rule 7.2(d) requires that motions for impoundment must be

24    filed and ruled upon prior to the submission of the actual

25    materials sought to be impounded, unless the court directs

1    otherwise, orders otherwise.  You didn't file a motion for

2    impoundment, did you, ahead of time?

3              MS. KEARNEY:  That's correct, Your Honor.

4              THE COURT:  Now, the argument that you make with

5    respect to the victim here is, as I understand it, that the

6    statement is not obviously private.

7              MS. KEARNEY:  That's correct.

8              THE COURT:  All right.  But you say there are privacy

9    interests that are real.  They're obvious but not real.

10             MS. KEARNEY:  Your Honor, the victim here has asserted

11   a right to privacy.

12             THE COURT:  Well, but are you speaking for the

13   government or are you speaking for the victim?  And I want to

14   be clear about what your position is and the government's

15   position is on the privacy involved in this.  Are you simply

16   passing on what the victim wants you to pass on, or is this the

17   government's position?

18             MS. KEARNEY:  Your Honor, the government reads the

19   Crime Victims' Rights Act as requiring the government to pass

20   on the victim's position in this case and that the government

21   has to make best efforts to protect the rights the victims

22   are --

23             THE COURT:  So this is simply passing on, making an

24   argument that somebody else wants you to make.  Is that it?

25             MS. KEARNEY:  We are making our best effort to protect

1  the victim's right to privacy under the Crime Victims' Rights

2  Act.

3           THE COURT:  Now, the victim in this case was

4  identified in the indictment.

5           MS. KEARNEY:  That's correct, Your Honor.

6           THE COURT:  By name.

7           MS. KEARNEY:  Because it would have been obvious,

8  given that we were charging employees of the victim.

9           THE COURT:  So not only is this not obvious, it is

10  obvious, who the victim is.  The government files a complaint

11  in which it identifies the victim and then says that it's

12  protecting the victim's privacy rights?

13           MS. KEARNEY:  We're protecting the victim's privacy

14  right in its victim impact statement, the effect that this case

15  has had on the victim.

16           THE COURT:  But, you know, you've already disclosed

17  everything about the victim.

18           MS. KEARNEY:  We --

19           THE COURT:  Just a moment.  You did it in the

20  indictment.  You did it in the submission to Judge Talwani.

21  You did it in your list of potential harms.  You did it in

22  connection with the submission of the sentencing memorandum.

23  The sentencing memorandum itself includes it.  Right?  It

24  identifies the victim and what the victim's harm was, right?

25           MS. KEARNEY:  It's identified what the government

1   views is the victim's harm.  It does not identify what the

2   victim itself says about the impact of this case on it.

3         THE COURT:  Well, I'm not sure I understand that.  The

4   government in every step of the way undermines the privacy of

5   the victim's position by disclosing the name of the victim, and

6   the particulars of what the victim's harm could be.  I mean,

7   there's a long list of harms.  We'll go through them here.  But

8   you're telling me that in the final analysis, having done all

9   of that, the government can stand before the court and say,

10  while not obviously private, these privacy interests -- not

11  obviously private, the privacy interests are real.  Is that the

12  government's position?

13        MS. KEARNEY:  The government acknowledges that it was

14  obvious who the victim was, and so the government did not keep

15  the victim's identity secret.  The government has also looked

16  at public sources of information to analyze what the victim's

17  harm was.  However, the government has not disclosed what the

18  victim itself has said about the harm it experienced.

19        THE COURT:  I don't think that's true.  The underlying

20  documentation does disclose it to the degree that it be

21  identified, it does disclose it.  This just seems to me to be a

22  kind of odd formality that the government has gone through here

23  to defend the victim's position or at least recently asserted

24  position because the victim is aware that you've identified all

25  of this.  The victim is aware, after August, that you've

1   identified all of this material.  So I really don't find

2   anything here, that's, A, private and, B, that hasn't been

3   disclosed.  And I take it the victim doesn't want to appear?

4          MS. KEARNEY:  Correct, Your Honor.  My understanding

5   is that the victim is not intending to appear.  I would note

6   that there is at least one part of the letter that I obviously

7   don't want to disclose in open court that has not been put into

8   the public record.

9          THE COURT:  I don't see anything here that justifies

10  not being part of the public record.  What the obligation of

11  the statute is is to treat the victim with fairness and with

12  respect to the victim's dignity and privacy, and I'm not aware

13  of anything that violates that in the disclosure of what the

14  victim thinks the harm is.

15         MS. KEARNEY:  Well, Your Honor, I would just go back

16  to the fact that the government is asserting the victim's

17  position as it feels it has an obligation to do.  The court can

18  obviously decide what it wishes with respect to the --

19         THE COURT:  Yes, I think that's right, and I will.  I

20  don't find it properly to be the subject of sealing, and so it

21  becomes public in its entirety.

22         Now, becoming public in its entirety will disclose to

23  the world how innocuous this is, how little the victim says

24  about the harm and how, frankly, at odds with various positions

25  the government has made, in the sense that they don't assert

1    things that the government has asserted in this area.  But it

2    seems to me that in the interests of transparency, there should

3    be disclosure of everything submitted to the court that's

4    supposed to influence the court in some way.  So for all of

5    those reasons, I decline to treat this with a sealing or in

6    camera or anything like that.

7           But there's a larger issue that I guess I do want to

8    understand, and maybe it's a Probation issue as well as a

9    government issue.  The government has victim advocates rights

10   people who work with victims or those persons who claim to be

11   victims.  Am I correct about that?

12          MS. KEARNEY:  Correct.

13          THE COURT:  And so they help to gather whatever

14   materials the victims want to have and marshal them, whatever

15   the victim wants to provide, and then the government passes it

16   on to Probation?

17          MS. KEARNEY:  Correct.

18          THE COURT:  The government does not and has not in the

19   past made application for treatment as confidential of those

20   materials?

21          MS. KEARNEY:  Your Honor, the government has

22   understood in particular --

23          THE COURT:  Just answer my question.  You can tell me

24   why later, but is the answer no, you don't?

25          MS. KEARNEY:  I'm sorry, can you repeat the question?

1          THE COURT:  Yes.  Does the government submit the kind

2     of motions that are required under Rule 7.2 to maintain

3     impounded materials?

4          MS. KEARNEY:  No.  The government does not, at least

5     in this case, make a separate motion.

6          THE COURT:  In this case or any?

7          MS. KEARNEY:  I cannot speak to what is done in every

8     case.

9          THE COURT:  Okay.  So in some cases they do, and in

10    some cases they don't.  Is that it?  Or you just don't know

11    what the government does.

12         MS. KEARNEY:  I do not know what is the practice of

13    every single Assistant U.S. Attorney.

14         THE COURT:  You don't know what the policy is with

15    respect to that?

16         MS. KEARNEY:  I apologize, Your Honor, I do not.

17         THE COURT:  Okay.  Well, I think I'd like to have some

18    statement from someone who does know what the policy is who can

19    answer that question because what appears to be going on is

20    that the government submits to the Probation Office for

21    attachment to the Presentence Report and thereby providing a

22    kind of immunity bath for submissions by victims without any

23    analysis as is required by Rule 7.2.

24          So perhaps by, say, a week, is that enough time to get

25    an answer to that question?  Because this is a procedural

 1  question that's an important one.

 2        MS. KEARNEY:  Yes, Your Honor.

 3        THE COURT:  Now, turning then to the larger issues

 4  presented here.  That is, how do you characterize the victim.

 5  There is one victim that's alleged here, am I correct, USC?

 6        MS. KEARNEY:  So the victim with respect to this

 7  particular defendant is USC.  However, this case has been

 8  charged as a single conspiracy.

 9        THE COURT:  I understand that.  And I guess I'm not --

10  so we're clear, I'm not exploring questions of charging

11  decisions in a larger sense of whether or not this is much too

12  unwieldy a conspiracy or it involves hub and spoke but no rim.

13  Those are issues for other people.  The defendant has pled

14  guilty to the conspiracy at least as it exists between him and

15  Mr. Singer.

16        MS. KEARNEY:  Well, the information charges the larger

17  conspiracy.

18        THE COURT:  It does, but I'm trying to -- maybe you

19  want to argue about this.  Perhaps we could have a discussion

20  of the charging decision that's been made by the government and

21  whether or not that's a charging decision that, if challenged,

22  could suffice, but I don't think I have to deal with that,

23  unless you're inviting me to do that.

24        MS. KEARNEY:  No, Your Honor.

25        THE COURT:  Okay.  So we're just dealing with the

1    question of Mr. Singer's -- Mr. Bizzack's, if I pronounce it

2    correctly, involvement in the conspiracy with Mr. Singer.  Am I

3    correct?  I mean, that's the core of what his involvement is,

4    right?

5            MS. KEARNEY:  Yes, Your Honor.

6            THE COURT:  All right.  So now I want to get to this

7    question of, you know, what's the harm?

8            The government now has kind of settled, I guess --

9    maybe it's not fair to say "now."  The government has this

10   theory that this is bribery, that is the proper way to

11   characterize what's going on.  It's a mail fraud for bribery.

12   Now, I understand it's charged as a conspiracy, but the core

13   charging event is mail fraud.

14           MS. KEARNEY:  Is honest services fraud, mail fraud.

15           THE COURT:  Honest services, the statute is simply a

16   definitional statute.  It's not the charging statute.  You can

17   not charge it alone.

18           MS. KEARNEY:  Correct.

19           THE COURT:  Okay.  So we're talking about mail fraud

20   as being the underlying crime, right?

21           MS. KEARNEY:  Yes.

22           THE COURT:  Okay.  So this is supposed to be bribery.

23           MS. KEARNEY:  Yes.

24           THE COURT:  Who is being bribed?

25           MS. KEARNEY:  Here it was Donna Heinel.

1          THE COURT:  So how much did Ms. Heinel make from this

2     bribery?  What was the bribe that was paid to her?

3          MS. KEARNEY:  Personally she received approximately

4     $160,000.

5          THE COURT:  From this defendant in connection with

6     this matter?

7          MS. KEARNEY:  A portion of that was in connection with

8     this defendant.

9          THE COURT:  What portion?

10         MS. KEARNEY:  That is not specified.

11         THE COURT:  It certainly isn't.  Now, what portion is

12    it?  Does the government have a position on what portion it is?

13    Because I have to find what that is.  You want to talk about it

14    as bribery, and I understand that.  And that's a theory that is

15    at large I suppose in some fashion.  But what is the bribe

16    amount?

17         MS. KEARNEY:  Well, the bribe amount here was the

18    $250,000.

19         THE COURT:  No.  What is the bribe amount with respect

20    to this defendant?  It has to be reasonably foreseeable by this

21    defendant.  So first we're going to talk about what the amount

22    is that Ms. Heinel -- do I pronounce that correctly -- Ms.

23    Heinel received for purposes of this transaction?

24         MS. KEARNEY:  So the defendant, our understanding is

25    that he understood, and he's acknowledged this in his plea,

1  that the $250,000 amount that he agreed with Singer was going

2  to be used to bribe officials at USC to get his son admitted.

3          THE COURT:  So the amount is what he perceives would

4  be used even if it isn't used, even if that isn't the scheme

5  that Mr. Singer had?

6          MS. KEARNEY:  The government acknowledges that there

7  is some disagreement among the case law about whether --

8          THE COURT:  It's not just the case law.  I'm just

9  talking about the facts now.

10         MS. KEARNEY:  Yes, Your Honor.

11         THE COURT:  If this were tried as a mail fraud bribery

12 case, okay, honest services as a commercial bribe.  Put to one

13 side whether it fits easily into commercial bribery.  But let's

14 just say it's a commercial bribery, and the government was

15 taking this to me for an evaluation on sentencing, what's the

16 dollar amount that we're talking about here?

17         MS. KEARNEY:  So --

18         THE COURT:  You said it was $160,000, as I understand

19 it.

20         MS. KEARNEY:  Personally.  In addition there were

21 payments directly to USC but to accounts that she controlled

22 and benefited from.

23         THE COURT:  That's not a bribe, is it?  It's received

24 by USC.  Then we've got a faithless employee.  That's a

25 different issue from bribery, right?

1        MS. KEARNEY:  No, Your Honor, because in light of

2   Skilling, there has to be a bribe or kickback.

3        THE COURT:  Yes, there does, I agree.  And this is a

4   case in search of a bribe or kickback, and now I'd like to find

5   it and find it with specificity because you've got to be able

6   -- if you want to make a request for an enhanced guideline

7   range, you've got to identify it.

8        So now we're back to this question of what was the

9   bribe that she received?  Because it has to be to her, not some

10  account that she controlled, unless you say it was reasonably

11  foreseeable to him that she was going to toy with that account.

12       MS. KEARNEY:  It was reasonably foreseeable to this

13  defendant because he sent a check directly to her --

14       THE COURT:  To whom --

15       MS. KEARNEY:  -- to be deposited into a USC account.

16       THE COURT:  To whom was the check made out?

17       MS. KEARNEY:  It was made out to the Galen Center.

18       THE COURT:  Was it deposited to the Galen Center?

19       MS. KEARNEY:  It was, and that's an account that Ms.

20  Heinel oversaw.

21       THE COURT:  Right.  And now, the Galen Center, was

22  that a 501(c)(3)?

23       MS. KEARNEY:  This is a facility at USC.

24       THE COURT:  Right.  But would a payment to the Galen

25  Center, apart from machinations that she could undertake, would

1 that be a charitable contribution?

2          MS. KEARNEY:  My understanding is yes.

3          THE COURT:  Okay.  So we've got $50,000 going to the

4 Galen Center that I gather you say is, at least that's

5 identifiable bribery?

6          MS. KEARNEY:  Yes, Your Honor.

7          THE COURT:  Okay.  Anything else?

8          MS. KEARNEY:  There are also payments that Mr. Singer

9 made directly to Ms. Heinel beginning in the summer of 2018.

10 He agreed with her, given the number of students she was

11 helping him admit, including the defendant's son, to pay

12 $20,000 a month.  She would provide invoices to Mr. Singer.

13 One such invoice --

14          THE COURT:  But how do we particularize that to

15 Mr. Singer?

16          MS. KEARNEY:  To Mr. Bizzack.

17          THE COURT:  I mean Mr. Bizzack, sorry.

18          MS. KEARNEY:  She provided invoices to Mr. Singer.

19          THE COURT:  Right, but how do we --

20          MS. KEARNEY:  And one of those invoices identified the

21 defendant's son.

22          THE COURT:  How much money?

23          MS. KEARNEY:  That would have been a $20,000 invoice.

24          THE COURT:  Every time there's an invoice, it's

25 $20,000?

1        MS. KEARNEY:  Correct.

2        THE COURT:  So now we're at 70, giving the government

3   the benefit of the doubt on this.  Anything else?

4        MS. KEARNEY:  No, Your Honor.

5        THE COURT:  Okay.  So we've got a $70,000 bribe that

6   the government contends here.  Not $250,000.  $70,000.  That's

7   reasonably foreseeable by anybody in this, unless you take the

8   position that some speculation on the part of Mr. Bizzack --

9   sorry if I keep using the wrong pronunciation -- Bizzack, is

10  that the proper --

11        THE DEFENDANT:  Bizzack.

12        THE COURT:  Bizzack.  Okay.  We've got $70,000, right?

13        MS. KEARNEY:  So there was $70,000 actually received

14  by the bribe recipients.

15        THE COURT:  But that was the whole scope, isn't it,

16  from Mr. Singer's point of view?

17        MS. KEARNEY:  Well, the way Mr. Singer worked, the

18  scheme he never disclosed to parents that he was taking a --

19        THE COURT:  He was the hub on this.  And analyzing

20  this as a bribery scheme, it has to be whatever Mr. Singer was

21  prepared to pay to a faithless employee of USC.

22        MS. KEARNEY:  Well, it also involves what the

23  defendant believed his bribe was going to.

24        THE COURT:  So if the defendant believes that somebody

25  says I could get your child into USC for a million dollars,

1   doesn't tell him how; it doesn't tell him that it provides

2   Photoshop services, for example, it's a million-dollar bribe?

3          MS. KEARNEY:  If the defendant then paid the

4   million-dollar bribe with the expectation --

5          THE COURT:  Is there any case law that says something

6   like that?

7          MS. KEARNEY:  I believe there is, Your Honor.  I don't

8   have it at hand.  I can submit something to the court.

9          THE COURT:  That is reasonably foreseeable by the

10  defendant in a case like this?

11         MS. KEARNEY:  Yes, Your Honor.

12         THE COURT:  For purposes of sentencing, is that it?

13         MS. KEARNEY:  I would --

14         THE COURT:  You don't want to mix up a substantive

15  liability conspiracy with the liability that's identified for

16  purposes of the sentencing guidelines.

17         MS. KEARNEY:  Your Honor, I would have to go back and

18  look at the cases to confirm.

19         THE COURT:  So you're not familiar with any case law

20  that does it.  Another way of saying it is you're not familiar

21  with the case law in this area; is that right?

22         MS. KEARNEY:  Your Honor, I am aware that there are

23  cases.  I have not looked at them recently.  I apologize.

24         THE COURT:  Did you think that that might be important

25  for purposes of sentencing?  That is, the government bears the

 1 | burden of proving this, doesn't it?

 2 |      MS. KEARNEY:  Yes, Your Honor.

 3 |      THE COURT:  Okay.  But you're not familiar with the

 4 | cases or at least you can't call them up right now?

 5 |      MS. KEARNEY:  Not off the top of my head, Your Honor.

 6 |      THE COURT:  So we have $50,000 and $70,000, and that's

 7 | reasonably foreseeable -- that certainly is reasonably

 8 | foreseeable from your point of view as to the defendant here?

 9 |      MS. KEARNEY:  Correct.

10 |      THE COURT:  Okay.  What's the basis for saying that

11 | it's reasonably foreseeable that this defendant would have

12 | known that that was the amount of money that would go to a

13 | faithless employee?

14 |      MS. KEARNEY:  Well, the government's position is that

15 | it was reasonably foreseeable that $250,000 would be going to

16 | the faithless employee.

17 |      THE COURT:  This is not meant to be exegesis by

18 | assertion.  Give me the evidence.

19 |      MS. KEARNEY:  That the defendant understood that

20 | $70,000 was --

21 |      THE, COURT:  Yes, at least $70,000 would go.

22 |      MS. KEARNEY:  So again, Your Honor, our understanding

23 | of the evidence is that the defendant believed $250,000 --

24 |      THE COURT:  What's the basis for believing that?

25 | Mr. Singer apparently extracted from the defendant $250,000.

1    Did he tell him all $250,000 is going to go to Ms. Galen?  Did

2    he tell him $50,000 was going to Ms. Galen?  Did he tell him

3    $70,000 was going to Ms. Galen?  What did he tell him that

4    would give him some reasonable foreseeability with respect to

5    this amount?

6          MS. KEARNEY:  So what Mr. Singer told the defendant

7    and how it worked with the scheme at USC generally was that --

8          THE COURT:  I want to know about this defendant.  The

9    scheme generally is something to be taken up case by case and

10   has been taken up case by case.  I want to understand it with

11   respect to this defendant.

12         MS. KEARNEY:  So with respect to this defendant, this

13   defendant agreed that upon receipt of the conditional

14   acceptance to USC, he would send a $50,000 check directly to an

15   account designated by Donna Heinel; and then upon receipt of

16   his son's formal acceptance to USC, he would have to make a

17   $200,000 payment to Rick Singer's charity, the Key Worldwide

18   Foundation, and from that Mr. Singer would transmit the bribe

19   to USC or to the coaches that he was bribing at USC.

20   Mr. Singer did not share with the defendant that he was taking

21   a middleman fee.

22         THE COURT:  That's not in the Presentence Report as

23   such, is it?

24         MS. KEARNEY:  So in paragraph 33, it identifies that

25   the defendant participated in a scheme and conspired to pay

$250,000.

THE COURT: Right. As I said, that's a kind of summary of it. I want to get the specifics of the facts here.

MS. KEARNEY: So then -- sorry, Your Honor. In paragraph 43 it indicates that the defendant at Mr. Singer's direction issued a $50,000 check to USC's Galen Center.

THE COURT: So the Galen Center, yeah. Does it say to Ms. Heinel?

MS. KEARNEY: Yes, it does, because the voicemail that the defendant left for Mr. Singer before sending the check indicated, "Sending this check off to Donna, and I just put a note in the letter just saying, you know, it's a donation."

THE COURT: So I'm supposed to draw from that that he knew that this was going to Ms. Heinel for her own personal use?

MS. KEARNEY: Yes, because he understood that Ms. Heinel was the one directing him to send the money to this particular account as opposed to USC's general fund or another account within USC.

THE COURT: Okay. So let's go to the next part of it, which is the $20,000. Where do I see that?

MS. KEARNEY: Again, the $20,000 is specified in paragraphs 49 and 50.

THE COURT: No. That says that he's making the payments to Heinel. The question is where do I see that

 1  Mr. Bizzack was aware of that.

 2          MS. KEARNEY:  Well, Mr. Bizzack was aware, if we look

 3  at paragraph 47 that and 48, that he was paying another

 4  $200,000 upon his son's formal acceptance.

 5          THE COURT:  Right, right.  But where does it say that

 6  it's to be used for a bribe?

 7          MS. KEARNEY:  Well, in paragraph 48, one of the

 8  payments, the $100,000 check that he sent, he included a note

 9  tying the payment to his son's admission.

10          THE COURT:  Right.  But the question is payment as a

11  bribe to someone, and the someone being Ms. Heinel.  So for

12  example, one of the problems, of course, is that people,

13  particularly people whose children are awaiting admission,

14  sometimes make large payments to institutions.

15          MS. KEARNEY:  That's correct.

16          THE COURT:  They're not bribes if they're not matters

17  of concealment, are they?

18          MS. KEARNEY:  Correct, Your Honor.

19          THE COURT:  As a matter of fact, you say that in the

20  previously sealed document that the deprivations here are

21  property in the form of admissions spots.  That is, it's

22  property of USC that's been misappropriated in the form of

23  admissions spots.  So if USC decides to take money, say

24  $100,000 or $200,000, and says, "By the way, we're going to let

25  this kid in," that's not any criminal violation; is that right?

1          MS. KEARNEY:  It might be a violation of their

2     tax-exempt status.  But no, I don't believe that to be a

3     criminal violation.

4          THE COURT:  Okay.  So we're drawing the line between

5     how USC, for whatever reason, decides to deploy its property in

6     the form of admissions spots, right?

7          MS. KEARNEY:  Correct.

8          THE COURT:  Okay.  And so what do we know about Ms.

9     Heinel being the person who intercepts that ability in a way

10    that's knowledgeable to this defendant?

11         MS. KEARNEY:  Well, Your Honor, the defendant

12    understood that his son was being admitted as a fake athlete

13    and that there had to be someone at USC, which he also knew was

14    Donna Heinel, who was arranging that in exchange for his

15    payment.

16         THE COURT:  Well, we settled on Ms. Heinel for $50,000

17    for present purposes.  Now I'm talking about the other

18    $200,000.  Because you're wanting to use the guidelines to pile

19    on the amount of time that could be spent according to the

20    amount of money involved.  So looking at $200,000 more, where

21    do we have that he thought that this was or believed that this

22    was money going to Ms. Heinel as a faithless employee as

23    opposed to the institution itself or whatever it was that

24    Mr. Singer offered by way of services apart from facilitating

25    bribes?

1        MS. KEARNEY:  So we have the defendant's agreement

2   with Mr. Singer that the defendant's son was being admitted as

3   a fake athlete and that the defendant understood that all

4   $250,000 was going to be used as a bribe payment.  He did not

5   understand that Mr. Singer was taking any kind of middleman

6   fee.

7        THE COURT:  Okay.  So Mr. Singer, as I understand it,

8   is cooperating; is that right?

9        MS. KEARNEY:  That's correct.

10       THE COURT:  What does Mr. Singer say?

11       MS. KEARNEY:  Mr. Singer has told the government that

12  he did not disclose his middleman fee.

13       THE COURT:  He did not disclose his middleman fee.

14  What did he disclose?

15       MS. KEARNEY:  That --

16       THE COURT:  Did he tell Mr. Bizzack that all $200,000

17  was going to go to Ms. Heinel?

18       MS. KEARNEY:  I'm not exactly sure, Your Honor.  I

19  believe that he generally would tell parents to pay the bribe

20  amount, the full bribe amount and that it was --

21       THE COURT:  Well, you've characterized a bribe amount.

22  That's petitio pincipii.  We're begging the question by saying

23  it's the full bribe amount.  I'm trying to figure out how it's

24  a bribe.  So you say he told them to pay me $200,000, and

25  that's a bribe.  Did he tell him that's a bribe that's going to

1 | go to Donna Heinel?

2 |     MS. KEARNEY:  Mr. Singer was not as explicit, but it

3 | was understood, given the fabrications to the student's

4 | application such as --

5 |     THE COURT:  Just assuming it was understood, which is

6 | the passive voice way of expressing that there was nobody

7 | saying anything, is there something that Mr. Singer said?  For

8 | instance, did he say, "I'm doing this for free for you.  I'm

9 | not taking a finder's fee out of this.  I'm not taking any fee

10 | for doing things like Photoshopping a kid"?

11 |     MS. KEARNEY:  As Your Honor might be aware, with

12 | criminal conspiracies like this, the co-conspirators --

13 |     THE COURT:  I am aware --

14 |     MS. KEARNEY:  -- don't generally lay out every single

15 | detail.

16 |     THE COURT:  Trust me, I am aware of that.  Now, you

17 | still have a responsibility of meeting your burden of proving

18 | something like this, and I'm trying to understand what it is

19 | that you're relying on for this theory.

20 |     MS. KEARNEY:  So we're relying on the fact that the

21 | defendant had an agreement with Mr. Singer to pay $250,000 to

22 | get his son admitted as a fake athlete; that the nature of the

23 | payment connected to his son's admission as well as the fact

24 | that his son had to be admitted as a fake athlete all in total

25 | allowed the defendant to understand that the total amount was

1    being conveyed as a bribe payment.

2              THE COURT:  Okay.  So Ms. Corrigan, is it?

3              MS. CORRIGAN:  Yes, Your Honor.

4              THE COURT:  What's the defendant's position?  I

5    understand you've stipulated to all of this, or you've

6    stipulated to an amount.  Maybe the first question is why did

7    you do that?

8              MS. CORRIGAN:  Well, Your Honor, as the court is

9    aware, Mr. Bizzack and counsel had conversations with the

10   government prior to entering into a plea agreement.

11             THE COURT:  So it's an artifact of the plea agreement.

12             MS. CORRIGAN:  I'm sorry?

13             THE COURT:  It's an artifact of the plea agreement.

14             MS. CORRIGAN:  Well, it essentially -- well, what I'd

15   like to say is that what we have here --

16             THE COURT:  I tried to make clear to your sister, I'll

17   make clear to you, first answer the question I put to you.  If

18   you've got something more that you want to say, of course I'll

19   listen to it.  But it's a fairly simple question.  Is it

20   because you wanted to facilitate a plea agreement?

21             MS. CORRIGAN:  Yes.

22             THE COURT:  Okay.  What is the evidence as you

23   understand it that your client knew that $250,000 was going to

24   be paid for a bribe?

25             MS. CORRIGAN:  We don't have that information.  And in

1   listening to the government today, we don't have the

2   information that I've heard about Mr. Singer.  But what I will

3   tell the court is there's no question that $250,000 was paid.

4   The evidence of the checks and the wiring from Eco-Pivot, one

5   of the companies, is --

6           THE COURT:  But you see what I'm -- the parties can

7   agree to whatever they want.  And the parties apparently have

8   -- not the parties, but the government in particular has been a

9   little upset that the Probation Office actually looked at this

10  carefully.  As if this case begins and ends over the question

11  of what agreements was the government able to extract from

12  those who are vulnerable.  But the court makes the decision

13  about sentencing --

14          MS. CORRIGAN:  Understood.

15          THE COURT:  -- issues, and this is something that I'd

16  like to get to the bottom of rather than just process through.

17  Did your client know that $50,000 was going to be paid as a

18  bribe to Donna Heinel?

19          MS. CORRIGAN:  No.  He knew -- if I might, if we look

20  at the checks, the check was to the Galen Center, and he knew

21  that the check was going to -- that there was someone named

22  Donna that was associated with it.  But beyond that, there was

23  no indication and no conversation that I'm aware of between

24  Mr. Singer and my client that indicates at any time that my

25  client knew that the $50,000 or any amount was going to a

1  person named Donna, whether it's Donna Heinel or not, but let's

2  assume it is --

3           THE COURT:  Why did your client pay $50,000?

4           MS. CORRIGAN:  Your Honor, this case is about getting

5  admission for his son to USC.  There's no question about that.

6           THE COURT:  Right.  So there's an amount that's

7  figured out.

8           MS. CORRIGAN:  Correct.

9           THE COURT:  Is it simply, Mr. Singer says, "I can do

10  it through the side door, and it's, for you, $250,000"?  Is

11  that what it comes to?

12          MS. CORRIGAN:  Yes, it's very simple.  And if I might

13  just address -- I think the court -- I understand the court's

14  -- if I might move a little bit outside of the court's

15  question.

16          THE COURT:  We'll see, we'll see.

17          MS. CORRIGAN:  Okay.  The court has, I understand the

18  tension between what's in the PSR and what's in the plea

19  agreement.  And as the court has noted in our position, we're

20  in a little bit of a difficult position because I don't want to

21  put my client in a position of breach.  However, what I would

22  note to the court is I've read through Judge Talwani's rulings.

23  I've seen what Judge Zobel has done.  And I've read obviously

24  in very great detail what Ms. Victoria and her office has

25  produced in this case.  I think it's very well thought out.

1          THE COURT:  Wait.  You are going beyond, because I do

2    want to move through this in an orderly fashion.  It's not that

3    I'm not interested in all of that.

4          MS. CORRIGAN:  Sure.

5          THE COURT:  So what I'm faced with is the suggestion

6    that the defendant does not agree that he knew that there was

7    money to be paid to Ms. Heinel --

8          MS. CORRIGAN:  He knew that --

9          THE COURT:  -- as a bribe.

10         MS. CORRIGAN:  Correct.  The payments --

11         THE COURT:  Go ahead.  I'm sorry.

12         MS. CORRIGAN:  Sorry.  The payments --

13         THE COURT:  I'm stretching.  Not expressing nonverbal

14   communication about what I think.

15         MS. CORRIGAN:  Thank you.  The payments -- the bulk of

16   the payments go to the Key Foundation, KWF, which the court is

17   well aware of.  And that's a foundation that Mr. Singer put out

18   there, and it's been described in various pleadings and in the

19   PSR as a sham charity.  That's where the bulk of the money

20   went.  There was no idea, no direction that I'm aware of by

21   Mr. Singer or any information given to anyone of where exactly

22   that money was going to go.  He had some ideas about different

23   centers and that sort of thing, and that's all the information

24   that's before the court.

25         The $50,000 check that goes to the Galen Center, I am

1   not aware of any communications or writings between Mr. Singer

2   and my client that indicate, Oh, this particular amount is

3   going to Donna Heinel, or this particular amount is going to

4   Ms. Janke or anybody else.

5          THE COURT:  Well, Ms. Janke could not be a recipient

6   of a commercial bribe because she was not an employee.  The

7   only person who could be the recipient of a commercial bribe

8   would be Ms. Heinel, unless the government disagrees with me

9   about that.

10          MS. KEARNEY:  Right.  No, Your Honor.

11          MS. CORRIGAN:  And the only reason I bring that up is

12   because she is mentioned throughout the papers.

13          THE COURT:  So let me just go back to this question.

14   What did he think when he wrote "Donation," question mark?  Why

15   was it that, that he was concerned that his accountant would

16   get full information about the payments that he was making?

17          MS. CORRIGAN:  No, Your Honor.  In fact, he did not

18   submit this as some of the other parents did, he did not submit

19   this as a tax deduction.

20          THE COURT:  Why did he say "Donation," question mark?

21          MS. CORRIGAN:  I'm sorry?

22          THE COURT:  Why did he say, "Donation" question mark?

23          MS. CORRIGAN:  I believe that was directed by

24   Mr. Singer to write into the check.

25          THE COURT:  Okay.  So is that the state of the record,

1   that we have a dispute over whether or not there was a full

2   knowledge on the part of Mr. Bizzack?

3           MS. KEARNEY:  Your Honor, I would just note back at

4   the change of plea hearing that the defendant did agree with

5   the government's representation that his participation in the

6   scheme, he agreed --

7           THE COURT:  Could you tell me the page number.

8           MS. KEARNEY:  At page 16, lines 5 through 12 of the

9   change of plea hearing indicate that he agreed and did pay a

10  total of $250,000 to facilitate the admission of his son to USC

11  as a purported athletic recruit.

12          THE COURT:  To use a scheme to use bribery and other

13  forms of fraud to facilitate it?

14          MS. KEARNEY:  Correct.

15          THE COURT:  But of course that's not really factual.

16  He agreed to plead to that, plead guilty to the information.

17  Now we're talking about facts.  What are the underlying facts?

18          MS. KEARNEY:  Right.  And it goes on, Your Honor, on

19  that same page that he agreed to pay Singer an amount

20  ultimately totaling $250,000 to facilitate the admission of his

21  son.

22          THE COURT:  Where does it say "bribery to facilitate"?

23          MS. KEARNEY:  I'm sorry?

24          THE COURT:  Where does it say "bribery to facilitate"?

25  It's different from the language of the charge.  This is the

1    specific language of facts that you have here, and it doesn't

2    seem to say bribery.

3              MS. KEARNEY:  Well, Your Honor, while it doesn't say

4    the word "bribery," it does.

5              THE COURT:  Well, words are important, you know.

6              MS. KEARNEY:  It talks, though, about an exchange of

7    one thing for another, so it talks about that --

8              THE COURT:  But this exchange could be with

9    Mr. Singer.  If he did nothing but paid Mr. Singer $250,000 and

10   there wasn't bribery involved, then we wouldn't have a bribery

11   guideline, right?

12             MS. KEARNEY:  I'm sorry, Your Honor.  Can you say that

13   again?

14             THE COURT:  If he simply paid Mr. Singer to work his

15   magic and there was no evidence of bribery involved, then we

16   wouldn't be dealing with the bribery count, right?

17             MS. KEARNEY:  If there's no evidence of bribery, then

18   we wouldn't be dealing with bribery.

19             THE COURT:  Okay.  So now I'm looking for the places

20   where there's evidence of bribery.  You told me about the

21   clearing of the throat that the government did at the outset of

22   its recitation of the factual basis, simply to tell me first

23   what the charge was here.  Then you said then the next thing

24   that they did is the defendant agreed to pay Singer, it

25   ultimately totaled $250,000 to facilitate the admission of his

1    son.

2              MS. KEARNEY:  Correct.

3              THE COURT:  Doesn't say bribery.

4              MS. KEARNEY:  It does not, but it goes on to talk

5    about payments to Donna Heinel from the Key Worldwide

6    Foundation in the amount of $20,000 each month.

7              THE COURT:  But where does it say that the defendant

8    is aware that $20,000 each month is going to be paid to Donna

9    Heinel?

10             MS. KEARNEY:  It does not say that explicitly.

11             THE COURT:  Okay.  And if I understand the

12   government's theory, whether conveyed to the defendant or not,

13   it is that there was an invoice each month for a different

14   person, a different student.  Is this a kind of retention

15   agreement for Ms. Heinel?

16             MS. KEARNEY:  She would send invoices indicating she

17   evaluated certain students and that the total amount of her

18   time for those invoices was $20,000 a month.

19             THE COURT:  So a month in which she evaluated five

20   people, she'd get $20,000, and a month in which she evaluated

21   two, she would get $20,000?

22             MS. KEARNEY:  Correct.

23             THE COURT:  So they were not allocated to the

24   students?

25             MS. KEARNEY:  She did not divvy it up, no.

 1          THE COURT:  There's no evidence as to how it's to be

 2     divvied up?

 3          MS. KEARNEY:  Correct.

 4          THE COURT:  Okay.  So now we come back to the question

 5     of whether you've got enough evidence here to show bribery by

 6     this defendant.  I understand the parties agreed to bribery and

 7     appears to be an artifact of plea negotiations; who's got

 8     power, who doesn't have power, and who can extract what by way

 9     of agreements.  But now I'm looking for the underlying

10     evidence.  And this is it?

11          MS. KEARNEY:  Well, Your Honor, the defendant did

12     plead guilty to conspiring to commit honest services mail

13     fraud, which requires bribery or kickbacks.

14          THE COURT:  No, it doesn't.

15          MS. KEARNEY:  Under Skilling it does.

16          THE COURT:  That's a theory that you have.  You can

17     also have a form of payment that's illegal.  And no, just to

18     the contrary.  A kind of cheating that's involved -- the

19     government doesn't like this because it doesn't run up the

20     sentencing guidelines, but you can have a kind of cheating

21     misrepresentation with respect to the foundation for which this

22     student is brought in.  As a matter of fact, the government

23     takes that position, included it in its list of theories of

24     harm here.

25          MS. KEARNEY:  But without the bribe payments, Your

 1  Honor, it would not be honest services fraud.

 2          THE COURT:  I understand that.  But to say that it's

 3  honest services fraud is simply the government's theory of why

 4  there's a violation of 1346.

 5          MS. KEARNEY:  Correct, but --

 6          THE COURT:  That's all -- I mean, you have a lesser

 7  included offense of violation of mail fraud, don't you?

 8          MS. KEARNEY:  Yes, Your Honor, but the defendant pled

 9  guilty to conspiracy to commit mail fraud and honest services

10  mail fraud.

11          THE COURT:  Specifically stated, he pled guilty to a

12  violation of 1346.

13          MS. KEARNEY:  I believe it's 1349, Your Honor.

14          THE COURT:  1349.  Excuse me.  Right?

15          MS. KEARNEY:  Right, but it was --

16          THE COURT:  Does that require bribery?

17          MS. KEARNEY:  I'm sorry?

18          THE COURT:  Does that require bribery?

19          MS. KEARNEY:  Where he was charged as mail fraud and

20  honest services mail fraud, yes.

21          THE COURT:  The government cannot prove it any other

22  way?

23          MS. KEARNEY:  The government has -- the way it was

24  charged included the honest services mail fraud.

25          THE COURT:  I understand.  The government can't prove

1    it any other way?  So that if there is not proof of bribery

2    here, then the defendant pled to a -- would have been pleading

3    to an offense that he didn't commit?

4         MS. KEARNEY:  Well, Your Honor, I think the issue is

5    that he did plead to an offense he committed.

6         THE COURT:  At some point you will answer my question,

7    I assume, but go ahead and answer the question that you'd like

8    to answer before you answer mine.

9         MS. KEARNEY:  Well, Your Honor, I'll just go back to

10   the fact that there was an agreement here to pay $250,000 to

11   get his son admitted.  He understood that that money was

12   somehow being conveyed to USC.  I acknowledge, Your Honor, we

13   don't have anything explicit saying how much of that amount was

14   going to USC.  We know at least 50,000 he understood was going

15   to USC, or to an individual at USC, excuse me.

16        THE COURT:  The individual at USC was to receive a

17   check for USC.

18        MS. KEARNEY:  For an account that she controlled and

19   designated.

20        THE COURT:  All right.  But it's going to USC.

21        MS. KEARNEY:  Yes, but they had to get the son in as a

22   fake athlete, so he understood that it was not a legitimate

23   donation, that it was tied to his son's acceptance and that

24   they had to hide his son's true nature, who, his son was not a

25   division level 1 volleyball player, was not being recruited by

1  USC to play volleyball, but they had to put him in that way in

2  order to get his admission.

3        THE COURT:   Right.   I understand the government's

4  theory.   The question is the proof of the theory.   So let's

5  perhaps back away from the bribery issue for a moment and

6  analyze the memorandum that you submitted for the methodology

7  of calculating gain and loss to Judge Talwani.

8        You identified three forms of pecuniary loss.   One is

9  the value of the salaries the universities paid to the

10 employees the defendants and their co-conspirators conspired to

11 bribe.   Is that the theory?   In listening to you, you were

12 saying it was actually money paid to Donna Heinel.   It's not to

13 be calculated in terms of some evaluation of what they were

14 being paid in a kind of payroll analysis.

15       MS. KEARNEY:   So separate from the payments that Donna

16 Heinel received personally, in addition, USC was paying her for

17 her honest services.

18       THE COURT:   See, in that memo to Judge Talwani, you

19 identified three separate forms of harm, right?

20       MS. KEARNEY:   Correct.

21       THE COURT:   Those are the ones, at least as of

22 September 5, the government was offering as their theories.

23       MS. KEARNEY:   Yes.

24       THE COURT:   The first one is that the government --

25 that the universities, including USC, lost the value of their

1    corrupt employees' honest services, right?

2              MS. KEARNEY:  Correct.

3              THE COURT:  That's in theory the bribery, but it's

4    particularized.  It's said that the way you calculate this is

5    by looking to the salaries the universities paid to the

6    employees, monies the universities would not have paid had they

7    known their employees were corrupt.

8              MS. KEARNEY:  Correct.

9              THE COURT:  What you just told me was it depends upon

10   the amount of money that Mr. Bizzack knew, not the amount that

11   the universities knew.

12             MS. KEARNEY:  No, Your Honor.

13             THE COURT:  That's what it says here.  Now, maybe

14   you're reformulating it, and certainly you're entitled to do

15   whatever you want to refine and reframe the question, although

16   I will be asking some questions about the evolving explanation

17   of why it was that bribery is being charged in this case and

18   then charged much more explicitly in a statute that provides

19   specifically for bribery in the context of government

20   contracts.  But I want to take this snapshot at September 5,

21   and at September 5 you weren't arguing it this way, the way you

22   have today, right?

23             MS. KEARNEY:  I apologize, Your Honor.  I'm not sure

24   how you've interpreted the way I'm arguing it today.

25             THE COURT:  So let me give a dramatic reading and you

1    can tell me how I've misinterpreted it.  "While it is difficult
2    to calculate the value precisely, the loss can be approximated
3    by looking to the salaries the universities paid to the
4    employees the defendants and their co-conspirators conspired to
5    bribe - monies the university would not have paid had they
6    known their employees were corrupt and that they stopped paying
7    as soon as they found out."

8           MS. KEARNEY:  That's correct, Your Honor.

9           THE COURT:  So it's the salaries that they received,
10   not the amount of money that the defendant anticipated.  Is
11   that it?

12          MS. KEARNEY:  Your Honor, I think that there's two
13   separate issues here.  The first is that under the parties'
14   stipulation as well as the government's --

15          THE COURT:  You keep relying -- I can't be clearer
16   about this.  There is throughout the government's filings this
17   idea that because you can extract an agreement from a defendant
18   that I'm bound by it.  This is not a C plea.  And even in a C
19   plea, I can reject it.

20          One of the insidious aspects of all of this is the
21   suggestion that suffuses this set of discussions that the
22   government decides what the sentence is going to be.  That's
23   not the case.  It certainly wasn't the case before Judge
24   Talwani, and I assure you it's not the case before me.  So the
25   fact of an agreement is, as I've indicated before, an artifact

1    of plea negotiations, the kind of sausage-making that goes on

2    in the criminal justice system, but it does not determine this

3    matter.

4            And so now I'm asking you to justify the positions

5    that you've taken, without respect to there's an agreement.

6    And furthermore, without -- well, you can talk about it if you

7    want, if you think that the guidelines bind me in some fashion

8    on this.  I don't think you'll take that position.  But I need

9    to have evidence of this.  I'm trying to find out the evidence.

10   What I'm hearing is something that is approximated at best, and

11   the approximation that you were talking about was not the

12   approximation that you made here.

13           MS. KEARNEY:  So here, the government looked at 2B4.1,

14   which, the base offense level is 8, and then it can be enhanced

15   based on the bribe amount.

16           THE COURT:  Right.

17           MS. KEARNEY:  Before Judge Talwani, the government was

18   looking at 2B1.1, which, the base offense level is 7 and can be

19   enhanced based on --

20           THE COURT:  But didn't you have a plea agreement at

21   that time with respect to 2B1 -- the bribery one?  Didn't you

22   have a plea agreement that extended to that before Judge

23   Talwani?  Weren't those plea agreements?  So they didn't

24   include this particular plea agreement?

25           MS. KEARNEY:  That's correct, Your Honor.

1          THE COURT:  Okay.  I'm sorry.  That helps me
2     understand this a little bit better.
3          Okay.  So maybe we do go into the history of this,
4     which is, how is it that the government was taking the position
5     with respect to essentially the same case different guidelines
6     at different times were applicable.  As I understand it, let's
7     take the Abbott case, the government did not take the position
8     that there was an agreement in the Abbott case.  It didn't make
9     an argument with respect to bribery, but the bribery argument
10    was not the same as it was here.
11         Then here, I'll just use this as another point in the
12    case, here, the government took the position in the plea
13    agreement which was, whenever it was -- June was it -- I can't
14    remember when the plea agreement was.  I'll pull it out -- took
15    the position in the plea agreement and the defendant agreed to
16    it that the bribery guideline would be the proper guideline to
17    apply, right?
18         MS. KEARNEY:  Correct, Your Honor.
19         THE COURT:  Okay.  So that's that position.  I
20    understand it.  And then at some point, I see it in another
21    case I have, Sui, the government supersedes and says, by the
22    way, it's government fraud, 666 violation, bribery.  Okay.  How
23    did that evolving understanding take place?  What led to that?
24    You know, it just doesn't get pulled out of the air.  It's
25    something that the government chooses to do in its charging

 1   decisions.

 2          MS. KEARNEY:  Your Honor, with respect to the Abbott

 3   case and the plea agreements there, the government made the

 4   same mistake that you see in the PSR here that this was not a

 5   bribery case and that 2B1.1 applies.

 6          THE COURT:  This is not holding you to some admission

 7   or something, but it was a mistake or misunderstanding and not

 8   completely developed.  Do I fairly say it?

 9          MS. KEARNEY:  Correct.

10          THE COURT:  So then the mistake is clarified in this

11   case or in cases like this where you start to cite to the

12   bribery violation?

13          MS. KEARNEY:  That's correct.

14          THE COURT:  Okay.  And then when you charge 666, what

15   was the new understanding there?

16          MS. KEARNEY:  I wouldn't say it's a new understanding.

17   It's just that the charges we believed and the grand jury

18   believed were appropriate.

19          THE COURT:  But why didn't you believe it before?  I

20   mean, you know, 666 is not a new statute.

21          MS. KEARNEY:  It is not, Your Honor, but this, even

22   after it was initially charged in March, was an ongoing

23   investigation.

24          THE COURT:  Right.  But was there some new information

25   that said, by the way, we didn't know it before but USC

 1  contracts with the government in a way that makes a case like

 2  this eligible to be charged explicitly as bribery?

 3        MS. KEARNEY:  Your Honor, the U.S. Attorney has

 4  prosecutorial discretion to decide on charging decisions.

 5        THE COURT:  That's right.  Absolutely.  I'm asking why

 6  it was exercised, and maybe you just say, "None of your

 7  business, Your Honor.  It's not before you."  But I don't know.

 8  Is that your position?

 9        MS. KEARNEY:  I would defer to the prosecutorial

10  discretion of the U.S. Attorney.

11        THE COURT:  Pardon me?

12        MS. KEARNEY:  I would defer to the prosecutorial

13  discretion of the U.S. Attorney.

14        THE COURT:  You are the U.S. Attorney here in court.

15        MS. KEARNEY:  Yes, Your Honor.

16        THE COURT:  So on behalf of the U.S. Attorney, you

17  decline to answer the question?

18        MS. KEARNEY:  Your Honor, as I mentioned, this was an

19  evolving investigation.  Decisions were made not to charge 666

20  initially.  Perhaps we didn't have all the information we

21  needed.  It has been charged against some of the defendants

22  now, not this defendant.

23        THE COURT:  What information did you not have that

24  made you make the change?

25        MS. KEARNEY:  I don't believe I can disclose --

1          THE COURT:  What do you mean you can't disclose it?

2          MS. KEARNEY:  Under grand jury secrecy rules.

3          THE COURT:  You changed the charge.  You have made

4     charges of other people on the basis of 666, and that's public

5     of course.

6          MS. KEARNEY:  Yes, Your Honor, the charges are public.

7          THE COURT:  Right.  And the disclosure will have to

8     be, right?  Won't there be discovery disclosure?

9          MS. KEARNEY:  Yes, Your Honor.

10         THE COURT:  So I understand your position is you don't

11    have to answer these questions any further.  Maybe you won't

12    answer this question either.  But perhaps you're familiar with

13    Rule 83.3.1.  It's our rule with respect to release of

14    information by attorneys.

15         MS. KEARNEY:  Yes, Your Honor.

16         THE COURT:  In it, it explicitly says that those

17    persons associated with the prosecution in this case shall not

18    release any information by extrajudicial statement which a

19    reasonable person would expect to be disseminated by means of

20    public communication relating to, and it lists a series of

21    things, but number 5 is the possibility of a plea of guilty to

22    the offense charged.

23         MS. KEARNEY:  I am aware of that rule, Your Honor.

24         THE COURT:  Right.  Now, if someone associated with

25    the prosecution engaged in that public dissemination, that is,

1    a discussion of the possibilities of pleas of guilty to the

2    offense charged or the possibility, for example, of enhanced

3    sentences or enhanced charges, would that be a violation of

4    Rule 83.21?

5         MS. KEARNEY:  Your Honor, I don't believe I can answer

6    that question.  I do know in the statements with respect to

7    Mr. Bizzack that have been released by our office, I believe

8    those are in compliance with the rule.

9         THE COURT:  We're talking about the evolving

10   understanding of the United States Attorney's Office, including

11   those kinds of charges that have been subsequently made of

12   other individuals here.  And perhaps you don't want to respond

13   to that.

14        MS. KEARNEY:  Your Honor, I'm happy to convey the

15   message to the office, but as you might imagine --

16        THE COURT:  Then let's go back.  What we have is the

17   government has this evolving understanding of what can be

18   charged and what will be charged, how it will be charged and

19   how this question will be teed up.  In the Abbott case the

20   government made a mistake.  It didn't want to make the mistake

21   again.  It made it explicit and got the defendant to agree to

22   bribery here.

23        MS. KEARNEY:  Correct.

24        THE COURT:  That's where we are.  And the bribery, as

25   I understand it, is variously expressed, including the way you

1  expressed it here today, and I'm asked to draw some conclusions

2  of inferences about what the defendant knew about who was going

3  to be paid because he certainly had to know that someone who

4  was a faithless employee was going to be paid a bribe, right?

5        MS. KEARNEY:  Yes, Your Honor.

6        THE COURT:  And so the inference I'm supposed to draw

7  from the direction of a check made payable to someone, to an

8  entity that could not be bribed, it was the entity that would

9  have been the victim of the bribe or the government contends

10 it's a victim of a bribe.  Although that statement, by the way,

11 of USC doesn't say "Bribery," does it?

12       MS. KEARNEY:  Your Honor, I don't believe the letter

13 addresses that question.

14       THE COURT:  But the letter addresses how it was

15 harmed, right?

16       MS. KEARNEY:  It discusses how it was harmed, yes.

17       THE COURT:  Right.  And it doesn't say it was harmed

18 by bribery, right?

19       MS. KEARNEY:  It doesn't say how it was harmed.  It

20 identifies the harms.

21       THE COURT:  To the contrary.  It says two ways.  One

22 way is that it affected its reputational interest, and the

23 other way is they had to spend money in investigation.  Doesn't

24 say anything else, does it?

25       MS. KEARNEY:  Well, it says that the harm was by the

1    conduct alleged by the government.

2         THE COURT:  But they're talking about -- you know, a

3    victim witness statement generally, particularly by a

4    sophisticated institution, tells us what the loss is that

5    they're claiming or identifies what the harm is.  They don't

6    identify bribery as a harm, do they?

7         MS. KEARNEY:  They identify the conduct alleged by the

8    government.

9         THE COURT:  Right, again, this kind of general charge,

10   right?  Are they asking for restitution?

11        MS. KEARNEY:  No, Your Honor.

12        THE COURT:  Restitution is payment for the harm,

13   right?  Reimbursement for the harm, right?

14        MS. KEARNEY:  Yes, but it's within their discretion

15   whether they want to request it.

16        THE COURT:  No doubt it is, but it doesn't appear that

17   they view this or at least they're not asserting it, I should

18   say, as a bribery case, right?

19        MS. KEARNEY:  They have asserted this based on the

20   conduct alleged by the government.  They are not seeking

21   restitution.  There are many reasons why they might not be

22   seeking restitution, including their potential publicity around

23   it, and so I don't think that we can read anything into that.

24        THE COURT:  So we just have to deal with their actual

25   language, right?

```
 1              MS. KEARNEY:  Yes.

 2              THE COURT:  Okay.  So let's read their actual

 3    language, since it's now public.  And I've found them -- I'm

 4    not even sure they're victims, frankly, but that's a different

 5    issue.  I'll assume they're victims.  I'm going hear from them.

 6    They submitted it presumably for purposes of influencing me.

 7    And, you know, I look at the information, and they say,

 8    "Applications containing false information that misrepresent

 9    the applicant undermine public confidence in the college

10    admission process," which USC relies upon, and they hired

11    outside counsel.  Those are the harms that they refer to.  They

12    don't refer to anything else, right?

13              MS. KEARNEY:  There's a general statement, Your Honor,

14    about other resources.  But yes, that's right.

15              THE COURT:  Well, those other resources are basically

16    having to spend money in connection with cooperation with the

17    government's investigation.

18              MS. KEARNEY:  Well, it doesn't indicate that's in

19    cooperation with the government's investigation.  They say,

20    "USC has also dedicated valuable employee time and other

21    resources to this matter."

22              THE COURT:  Right.  But where does it say "bribery"?

23              MS. KEARNEY:  Again, Your Honor, it does not say

24    bribery, but it does indicate that the harm was caused by the

25    conduct alleged by the government.
```

1          THE COURT:  Okay.  It says or indicates.  Now, let's

2     look at that language.  Where does it say that, that we could

3     say that they are incorporating by reference whatever the

4     government ultimately ends up alleging?  Where does it say

5     that?

6          MS. KEARNEY:  In the first sentence of the last

7     paragraph on the first page, it references the conduct alleged

8     by the government, and I'll note at the time of this letter in

9     August that was after the information here was filed.

10          THE COURT:  But let me just see precisely the letter,

11     the language that you're alleging they've incorporated by

12     reference what the government said.

13          MS. KEARNEY:  In that first sentence of the last

14     paragraph on the first page of their letter.

15          THE COURT:  The government -- "USC's reputation has

16     been harmed by the conduct alleged."

17          MS. KEARNEY:  Correct.

18          THE COURT:  Not, "We've suffered commercial bribery,"

19     right?

20          MS. KEARNEY:  No, they don't say that.

21          THE COURT:  Okay.  So what they've said is that it

22     undermined the integrity of their process, the selection

23     process.  What you characterize as their property right in

24     admission slots.  And they've suffered some harm to their

25     reputation.  That's reputation, I suppose.  And then they hired

1   outside people, and hiring outside people in connection with

2   the investigation is not recoverable, is it?

3          MS. KEARNEY:  Not as loss, Your Honor.

4          THE COURT:  Right.  Well, that's what we're ultimately

5   talking about here.  So now we're back to what do I make of the

6   bribery here, other than its factual support is somewhat thin

7   and attributing it to the defendant is somewhat difficult under

8   these circumstances.  The short of it being I wonder how

9   reliable that is for purposes of establishing a guideline, even

10  under an evolving theory of what the case is in this case.

11         But let me be sure that I haven't missed something

12  that you've alleged here.  So apart from -- I'm going to

13  Abbott, the submission to Judge Talwani in Abbott.  The second

14  grounds is that they undertook costly internal investigations

15  separate and apart from the government's investigation, and

16  those costs were direct and foreseeable consequences of the

17  defendants.  I think we're agreed that's not a loss.

18         MS. KEARNEY:  Your Honor, I before was speaking to

19  their -- in any investigation related to helping the government

20  with its investigation.  But we would argue that these losses

21  are in fact losses.

22         THE COURT:  Is there case law that says that

23  investigations that are conducted by someone into this sort of

24  thing is a compensable loss that's taken into consideration for

25  purposes of the sentencing guidelines?

1        MS. KEARNEY:  Yes, Your Honor.  There is the Piggie

2   case, where the investigative costs into the coach's scheme to

3   deprive the university of its honest services was properly

4   included in calculating loss.

5        THE COURT:  And?

6        MS. KEARNEY:  Then the DeRosier case, where, if the

7   investigation was prompted there, it was a bank, but for the

8   university's own benefit.

9        THE COURT:  Bank investigation here.  And again, no

10  dollar figure provided by the university here?

11       MS. KEARNEY:  No, we have not received that yet.

12       THE COURT:  So here is the thrust of it, I guess, and

13  that is the guidelines attempt to monetize.  It's an illusory

14  quest and particularly here without more evidence than the

15  government has adduced in this case to monetize in that

16  fashion.  There's nothing here I can rely on to figure out what

17  the amounts are.  You know, the arguments that the government

18  has made here, we've been through I think most of them, are not

19  fully supportable.  I'm sorry.  Go ahead.

20       MS. KEARNEY:  I'm sorry, Your Honor.  That's exactly

21  what our argument was to Judge Talwani, that the loss here is

22  difficult to calculate.  And so that's why we looked to the

23  bribe amount as an alternate measure.

24       THE COURT:  Right.  But I look at the bribe amount and

25  say how much?  So I get to the bribe amount, and it does make a

1    difference, if it's bribery.  I guess we start with the base

2    offense level of 6, and then based on the discussion of

3    specificity at least from the government about the bribe

4    amount, the government would be contending it's more than

5    40,000 but less than 95,000?

6            MS. KEARNEY:  I believe the base offense level would

7    be 7.

8            THE COURT:  7, okay.  I'll take that.

9            MS. KEARNEY:  Then if we are basing it on a $50,000 or

10   $70,000 bribe, then yes, we would want to add 6.  Of course the

11   government's position has been that the bribe amount was

12   $250,000.

13           THE COURT:  I understand that, but I'm not asking you

14   to say uncle, but there hasn't been sufficient evidence about

15   anything over that.  And in fact, the $20,000 in addition to

16   the 50 is questionable but it's within the range here, so we're

17   talking about a guideline range of 13, right?

18           MS. KEARNEY:  Correct.

19           THE COURT:  Base offense level.  Okay.  And the

20   guideline range for the loss that you contended before Judge

21   Talwani, under the Judge Talwani analysis, that is basic fraud?

22           MS. KEARNEY:  Judge Talwani calculated the guideline.

23           THE COURT:  I know what she did.  But the government's

24   position with respect to that was how much?  What was the

25   guideline?

1          MS. KEARNEY:  It varied depending on the amount.

2          THE COURT:  Okay.  If the amounts were the amounts

3     here, somewhere between 40 and 95, although I understand that

4     the numbers change a little bit.

5          MS. KEARNEY:  So if it were the same amounts here,

6     then that would be the same calculation, Your Honor.

7          THE COURT:  13.

8          MS. KEARNEY:  Yes.

9          THE COURT:  Okay.  So I think maybe a way of saying

10    this is I find myself more or less in the position of Judge

11    Talwani.  We've gone through this in some ways, but it seems to

12    me that, you know, she's outlined a protocol for analyzing this

13    in the context of not just uncertainty but inability to

14    identify with the kind of specificity that loss or bribe or

15    whatever should be calculated.

16          Assume that I am coming to that opinion, that is, that

17    the characterization of this seems to be a result in search of

18    a justification, that is, a result of higher guidelines or

19    higher amounts in search of a justification that can't be found

20    in the guidelines themselves.  Is there anything about Judge

21    Talwani's analysis, that is the general analysis that she gave

22    in her preliminary memorandum -- I think it was September

23    5th -- 13th.

24          MS. CORRIGAN:  13th, Your Honor.

25          THE COURT:  13th, that the government disagrees with,

1    just the way in which she's dealt with that?  That is, if you

2    can't specify the amounts here, then you're left to look at the

3    guideline that's provided with specificity, that's 1349 or

4    1341, the underlying one if you go to 2X.  And that's to say

5    it's 0 to 6 as a guideline.  Now, I'm no slave to guidelines,

6    but I just have to make the determination accurately.  But

7    that's where I'd be, right?  With the assumption that I've just

8    built in.  I understand you don't accept the assumption, but

9    with the assumption I've built in.

10            MS. KEARNEY:  With that assumption built in, I would

11   also point out, though, that Judge Talwani did find that the

12   colleges were victims, and she did appear to acknowledge that

13   there was a loss.  It just was not calculable.  And so she left

14   it as no loss rather than looking to the gain.

15            THE COURT:  But what's the gain here?

16            MS. KEARNEY:  The gain here is --

17            THE COURT:  Monies received by Singer?

18            MS. KEARNEY:  Is both monies received by Singer as

19   well --

20            THE COURT:  But that has to be a bribe of some sort,

21   doesn't it?  Let's assume that somebody pays somebody who tells

22   him they're going to give him a terrific benefit, but you can't

23   identify that as a bribe or identify it specifically as a

24   bribe.  That's the same situation.  It's calculable against

25   Singer but not against a defendant like the defendant here or

1   the defendants in Abbott.

2         MS. KEARNEY:  Well, not where it's a conspiracy,

3   though.

4         THE COURT:  Whether it's a conspiracy or not, the

5   question of what the intent was of the conspiracy, that is, to

6   extract money from unwitting or witting victims to receive

7   money for some service that has not been established to involve

8   a bribe of a specific amount amounts to the same thing under

9   this analysis.

10         MS. KEARNEY:  No, Your Honor.  The amounts paid by the

11   defendant to both USC's account at the Galen Center as well as

12   to Mr. Singer would be gains to the conspiracy as a whole.  In

13   addition, the --

14         THE COURT:  No, but the conspiracy has to be one

15   that's violative of federal law, and what you've said is or the

16   assumption that I've dealt with -- I'm not sure you said

17   this -- but essentially, it's not a bribery that can be

18   recognized under the sentencing guidelines because it's too

19   speculative, at best too speculative.  So then we're left with

20   what do we say?  There's money sloshing around, and we should

21   use the sloshing around money as the basis for calculating a

22   guideline.

23         MS. KEARNEY:  That's one basis.  In addition, the

24   other gain here is the admission spot itself --

25         THE COURT:  What's the value of that?

1        MS. KEARNEY:  -- which is not easily valuable --

2        THE COURT:  Right.  So I can't calculate that.  See,

3   the point I'm getting to is these are -- they're not

4   comprehended by the guidelines.  These are outside of the

5   guidelines.  The guidelines, we're talking about fraud

6   guidelines which have their own problems generally, simply

7   because of the versatility of fraud.  There's so many ways that

8   people can commit fraud, and every time there's a new one, it

9   doesn't really fit into the guidelines themselves.  What you

10  essentially have is a kind of Procrustean bed.  Procrustes was

11  a Greek mythological figure who took slaves and cut them to the

12  size of the bed that he had, not because that fit them, but

13  because it fit the structure that he was trying to deal with.

14  That's what the guidelines are on this, and on many things,

15  frankly.

16        So I do have to decide what the guidelines are.  I'm

17  doing my best to do that.  There's been a challenge to the

18  Probation Office.  I'll put to one side whether or not that was

19  a hyperventilating challenge but a challenge.  The U.S.

20  Attorney's Office says that the Probation Office disregarded

21  their views.  There is no basis for saying that that happened.

22  They considered their views.

23        Now, the Probation Office has their point of view.

24  The reason I have them sitting over there is they are mere

25  witnesses in this court, which brings me to another point.

1   Maybe you can't answer it because you're not the person who can

2   answer these questions, but I noted in that submission with

3   respect to the difference of opinion with the Probation Office

4   that the U.S. Attorney's Office took the position that

5   recommendations made by the Probation Office should be public.

6   Is that the general position now, the new position of the

7   United States Attorney's Office?

8           MS. KEARNEY:  Your Honor, the position of the U.S.

9   Attorney's Office is that private recommendations that neither

10  the government nor defense counsel or the defendant can respond

11  to do not further --

12          THE COURT:  "Can respond to," I'm not sure I

13  understand that qualification.  Is it the position of the

14  United States Attorney's Office now that the Probation Office

15  should not submit private recommendations to the judge?

16          MS. KEARNEY:  Yes.

17          THE COURT:  And that's consistent not just in cases in

18  which they have reason to believe that the Probation Office

19  doesn't agree with them but in every case?

20          MS. KEARNEY:  Correct.

21          THE COURT:  And will be taking that in every case --

22  perhaps you know for the last 20 years I've been taking that

23  position.  Some of my colleagues have not.  Most of them

24  haven't.  But that is now the policy of the United States

25  Attorney's Office?  I just want to be clear about that.  And

1 | that's something you can answer?

2 | MS. KEARNEY:  Yes, Your Honor, I can answer that, and

3 | that is correct.

4 | THE COURT:  All right.  So now we're back to this

5 | issue of evaluating what Probation says, what the government

6 | says and challenge to it.  Put to one side the tone and also

7 | the kind of defensiveness that was evidenced by the Probation

8 | Office, which should understand that they're subject to

9 | challenge like everybody else, and I make the decision or my

10 | colleagues make the decision ultimately.  That's what the

11 | adversarial process is all about.  But we're back down to this

12 | question.  We just can't figure a guideline without stretching

13 | -- an amount with respect to the guideline without stretching

14 | it in some fashion that is wholly speculative.

15 | MS. KEARNEY:  Well, going back to, we discussed

16 | valuing the admission spot, and it's not wholly speculative in

17 | the sense that we know what it was worth to the defendant, what

18 | he was willing to pay for it.

19 | THE COURT:  But let's pause with that, too, because I

20 | want to be sure that I understand for purposes of making an

21 | evaluation that is applicable, generally applicable.  Does the

22 | culpability of a defendant depend upon the amount of money he

23 | paid for the admission slot?

24 | MS. KEARNEY:  Yes.

25 | THE COURT:  How?  So somebody drives a hard bargain

1    and they get say $15,000 for the same service that Mr. Bizzack

2    spent $250,000; that's a difference in culpability?

3              MS. KEARNEY:  Yes, Your Honor.

4              THE COURT:  How?

5              MS. KEARNEY:  Because in every bribery case someone

6    sets the bribe amount.  It's either the person demanding the

7    bribe or the person receiving the bribe.

8              THE COURT:  But the same thing is being sold.  That's

9    what we're talking about here.  We're talking about a slot.

10   And so some people drive a hard bargain; some people don't.

11   But the same thing is being sold.  The same value is being

12   provided.  Once we start valuing in terms of slots, whether we

13   can figure out what the slot is worth in some reasonable way,

14   I'm not sure we can, but it amounts to the same thing.

15             Some victims spend more money.  Some victims spend

16   less, although we can't really say in this case that we have

17   gullible victims.  We have victims who know exactly what they

18   want and they pay for it, and they pay as much as they want or

19   as little as they want, but they pay it.  But I don't

20   understand how culpability is shaped under these sets of

21   circumstances in the way it would be in the stealing from

22   widows and orphans, another form of fraud.

23             MS. KEARNEY:  Well, here the amount represents what

24   the defendant valued that at.  And so he was willing to spend

25   $250,000 to get this guaranteed admissions spot.

1          THE COURT:  But that doesn't establish the value.  It

2     establishes how rich the defendant is or how good a bargainer

3     he is.  It doesn't value the slot.

4          MS. KEARNEY:  But that's the situation in every

5     bribery case.

6          THE COURT:  Not necessarily.

7          MS. KEARNEY:  In addition, here, Your Honor, the going

8     rate at USC was $250,000.  This is not the only defendant

9     who --

10          THE COURT:  Were all the defendants in the USC

11     circumstances paying $250,000?

12          MS. KEARNEY:  The majority were.

13          THE COURT:  So the minority were not, is another way

14     of saying that, which is to say it was not a consistent market?

15          MS. KEARNEY:  There were one or two outliers.

16          THE COURT:  Well, you can call them outliers, but the

17     point is there's no real market for this sort of thing.

18          MS. KEARNEY:  That's correct, Your Honor, which is why

19     we have to look at the evidence that we do have.

20          THE COURT:  We look at culpability.  That's the point.

21     This is a rich person's crime.  That's what it is.  And so then

22     do we make the distinctions between how rich and how foolish

23     they are?  Is that the way we do it?

24          MS. KEARNEY:  No, Your Honor.

25          THE COURT:  Okay.  So we're back down to, you know,

1  how do we characterize this?  I mean, that's what I've been

2  trying to wrestle with you about, and I appreciate your candor

3  to the degree that you're in a position to respond to the

4  questions I've raised, and I understand there are various

5  reasons why you can't answer some of the questions I raise.

6  But I have to tell you I just don't see this as a case that

7  lends itself to any meaningful analysis of gain or of loss, of

8  bribery amount calculated by means of how much money is spent,

9  even if I could, which I don't think I can in this case.

10        This is, as far as I can see, I mean, I've tried to

11  think of a way of characterizing this, but this is a kind of

12  crime of sneaky conspicuous consumption, the kind of thing that

13  rich people can do that poor people can't because they've got

14  the money to do it, to obtain a good -- let's call it a good --

15  that impresses their friends and satisfies the sense of

16  personal self-worth, but it doesn't monetize in that way or at

17  least there has not been -- maybe there will be in other cases.

18  It wasn't presented to Judge Talwani as near as I could find

19  out, and it isn't presented here.

20        So we're left with a guideline like the one that has

21  been offered here, which I adopt as the guideline in this case.

22  I, in short, reject the government's objection to the

23  guidelines.  But I'll say further that on the basis of this,

24  even if we could calculate it in some fashion, it's meaningless

25  because of all the various unknowns and estimates and

1   speculations that are involved.

2       So I think I've dealt with that issue, that is to say

3   the issue of what the guideline is.  I think that resolves any

4   outstanding questions here about objections, unless there's

5   some other specific objections that aren't tied directly into

6   the guideline calculation.

7       MS. KEARNEY:  Not for the government.

8       THE COURT:  Okay.  All right.

9       MS. CORRIGAN:  Not for the defense, Your Honor.

10      THE COURT:  Okay.  So after this long, perhaps painful

11  discussion of what the guidelines are and my view that

12  Probation has done as well as can be done in this area, and I

13  will add that, while I have an obligation to determine these

14  guidelines accurately, I don't believe that my decision on

15  sentencing is going to be, would be affected by the idea that

16  it's a bribe as opposed to a gain as opposed to a loss.  It is

17  to try to capture what is the culpability of somebody who

18  engages in a cheat of the type that only rich people can do.

19  That's what I'm focusing on for myself to the degree that that

20  shapes the views of the parties in making their allocutions

21  apart from the memorandum that they've had.

22      Now let me turn to another dimension of this, because

23  as Judge Talwani said at the end of her memorandum, of course

24  it all depends on 3553.  Even if the guidelines point in some

25  particular direction, it depends on 3553.  And this is an area

1    in which 3553 makes all the difference in the world.  But there

2    is one that I really do want to hear the parties address, and

3    again, it puts to some degree the government in an awkward

4    position, and I don't mean to do it, but I want to be sure that

5    I've had whatever conversation I can have and got the benefit

6    of whatever observations the government can make.  I recognize

7    the government has made a particular position.

8         Now, let's assume this, and the way I'll assume it as

9    follows.  Let's assume that I think it's very important that

10   there be consistency in the sentences that are imposed.  That's

11   what unwarranted disparity is all about.  I don't make my own

12   determinations about unwarranted disparity solely because one

13   of my colleagues has acted in a particular way.

14        On the other hand, as I've said, the protocol that she

15   set up seems to me to be a fairly intelligent one to deal with

16   this kind of matter, and I want to know where you would put in

17   level of culpability this defendant as compared to all of the

18   defendants that she has sentenced, parent defendants that she

19   has sentenced in similar kinds of cases, which I think you

20   would now characterize as bribery rather than a more general

21   kind of fraud.  So that's something that I want you to speak

22   to.

23        But in any event, having framed the discussion to some

24   in some way and recognizing that you're not saying that those

25   were good or bad -- well, you're probably saying that was the

1   wrong decision on the part of Judge Talwani, but in any event

2   assuming that I use that as a kind of template for culpability

3   I'd like to hear you talk about the relative culpability of

4   this defendant under those circumstances as well as any other

5   factors that you want to address.

6          MS. KEARNEY:  Thank you, Your Honor.  I will start

7   right with that comparison.  There were three defendants before

8   Judge Talwani who participated in the athletic recruitment

9   scheme, also called the side door.  They were defendants

10  Sloane, Semprevivo and Huneeus.  And just reviewing those with

11  you, for defendant Sloane, the government recommended a

12  sentence of 12 months based on its calculation of the

13  guidelines.  Defendant Sloane paid the same amount as

14  Mr. Bizzack.  He took additional steps, such as purchasing

15  water polo equipment and had his son pose for photographs that

16  this defendant did not do.

17         THE COURT:  Just so I'm clear about that part of it,

18  the involvement of the son and the involvement in the staging,

19  specific involvement in the staging, the PSR has language that

20  may be subject to misunderstanding, but I want to be sure here.

21  That is to say the son didn't, at his father's direction, send

22  Mr. Singer his transcripts here and nothing else, is that

23  right, in his communication to Mr. Singer?

24         MS. KEARNEY:  The defendant's son was also receiving

25  legitimate counseling services from Mr. Singer.

1           THE COURT:  Were they valuable?

2           MS. KEARNEY:  Were they valuable?

3           THE COURT:  Mr. Singer got $250,000.  Presumably some

4   of that $250,000 was for counseling services.

5           MS. KEARNEY:  They were separate payments.

6           THE COURT:  Separate payments.  They were not part of

7   the $250,000?

8           MS. KEARNEY:  Correct.

9           THE COURT:  Okay.

10          MS. KEARNEY:  And getting back to that, we don't have

11  information that Mr. Bizzack's son was aware or had any

12  involvement beyond sending the transcript, which, even that,

13  it's not clear whether he understood why he was sending his

14  transcript.

15          THE COURT:  Okay.  But the government doesn't contend

16  that he does here, unlike Mr. Sloane's circumstance?

17          MS. KEARNEY:  Correct.

18          THE COURT:  One thing, Ms. Corrigan, for you is

19  paragraph 45 involves an email from Mr. Bizzack to Mr. Singer

20  saying that his son was pounding him to reach out to Mr. Singer

21  to make sure Mr. Singer had everything for the application.

22  The word "pounding" is put in quotation marks.  What does that

23  mean?

24          MS. CORRIGAN:  The "pounding" meant how his son was

25  feeling about the college admission process in general.  He was

1  not just applying to USC.  He applied to other schools.

2       THE COURT:  But the pounding, Ms. Bizzack says the son

3  was pounding him to get in touch with Mr. Singer to make sure

4  he had done everything.

5       MS. CORRIGAN:  Yes.  So I'm sorry.  I thought you said

6  a different word.  On the pounding part, his son is a very

7  task-oriented person.  I think he got it from his father.  And

8  what I can tell the court, although I've never met his son, my

9  understanding from speaking to my client and to his wife is

10  that this young man is very focused, he's very goal-oriented,

11  and he's very much someone who likes to stay on top of his

12  assignments, likes to stay on top of his studies, and I think

13  that that really is what that comes from.  I think perhaps

14  "pounding" is more, a little bit of a Southern California

15  expression, maybe not Northeastern but --

16       THE COURT:  We have more or less the same dictionary,

17  perhaps different dialects.

18       MS. CORRIGAN:  Right.  Essentially it's saying, Hey,

19  we need to make sure we stay on task.  This young man, from my

20  understanding, was very much on top of making sure that he was

21  getting everything done.  He had a lot of obligations at high

22  school.  He had his school, sporting events and other community

23  service that he was engaged in at the time along with this.  I

24  think it's just his natural tendency to be someone who is very

25  much focused in making sure that he does not miss deadlines.

1        THE COURT:  All right.  So in any event, certainly not

2   the defendant, but the government doesn't contend the son

3   was involved.  That's a distinguishing feet.  The other was

4   some direct involvement in actual fabrication of the

5   applications, is that right, between Mr. Sloane and Mr. Bizzack

6   and anything else to distinguish or show that they're more or

7   less the same.

8        MS. KEARNEY:  Mr. Sloane also appeared to walk back

9   his acceptance of responsibility, and we have no indication

10  that Mr. Bizzack has done that.  And in fact, he approached the

11  government.

12       THE COURT:  Right.  And I can pull it out quickly, but

13  you may be able to answer it more quickly.  Judge Talwani

14  imposed what sentence?

15       MS. KEARNEY:  I apologize, Your Honor.  She imposed a

16  sentence of four months.

17       THE COURT:  Okay.

18       MS. KEARNEY:  Semprevivo also participated in the

19  athletic recruitment scheme.  He did that at Georgetown, not

20  USC.  He paid $400,000, also involved his son, and Judge

21  Talwani also gave him four months.

22       THE COURT:  And your recommendation?

23       MS. KEARNEY:  Our recommendation for him was 13

24  months.

25       THE COURT:  Okay.

1          MS. KEARNEY:  And then the last parent who has been

2     sentenced who participated in the athletic recruitment scheme

3     was Mr. Huneeus.  The government recommended 15 months.  He

4     paid $250,000 for the athletic recruitment scheme and then paid

5     an additional $50,000 -- or agreed to pay I should say.  He

6     agreed to pay an additional $50,000 for his daughter to

7     participate in the testing scheme, which we haven't really

8     touched on here.  So we considered him a repeat player in that

9     he participated in two schemes.  His daughter was also

10    involved.  And Judge Talwani sentenced him to five months.

11         THE COURT:  Okay.  But those are the only ones that

12    you can -- or I shouldn't say the only ones, but those are the

13    ones that you consider the comparators here?

14         MS. KEARNEY:  The most comparable of the defendants

15    who have already been sentenced.

16         THE COURT:  Okay.

17         MS. KEARNEY:  This defendant, Your Honor, the harm he

18    caused exceeds the anonymous student who didn't get in because

19    his son had guaranteed admission, and it exceeds the loss of

20    that anonymous student, opportunities that he or she would get

21    from attending an elite, big-name university that his son is

22    now going to have.  This case encompasses --

23         THE COURT:  How does it exceed it?  This was part of

24    the discussion that we were having earlier about, you know,

25    400,000, 250,000, 15,000 for this kind of access, illegal

1   access, but what difference does it -- what is the exceeding

2   part of this, apart from somebody spending more money to get

3   the same good?

4        MS. KEARNEY:  Well, the issue is that for the

5   hardworking student who applied the legitimate way who was

6   denied acceptance, again -- because college admissions is a

7   zero sum game.  For every student who is admitted, someone else

8   is getting denied because there's a finite number of spaces in

9   a class.  So that student who was not admitted now doesn't have

10  the opportunities.

11       THE COURT:  I was focusing -- maybe I misunderstood

12  you, but I was focusing on idea that the defendant's

13  culpability here exceeds responsibility for that circumstance.

14       MS. KEARNEY:  Well --

15       THE COURT:  How does it, is what I'm asking.

16       MS. KEARNEY:  He also corrupted the college admissions

17  system generally and affected a system that millions of

18  Americans apply through every year.

19       THE COURT:  Why isn't that redundant of the same thing

20  that was done by other people?  That is to say, I'm sure you'd

21  say that Mr. Sloane or Mr. Semprevivo, if I've got it right,

22  did the same thing.  They despoiled people's understandings of

23  what merit was or what a fair game would be, but that applies

24  to anybody who does this.  I mean, I'm just trying to find out

25  how I calibrate this defendant's culpability for the actual

1    process of paying money to get something he wasn't entitled to.

2         MS. KEARNEY:  It is the same across defendants who

3    have participated in the athletic recruitment scheme.  I was

4    raising it because I wanted the court to understand the

5    magnitude of the harm here, particularly because the guidelines

6    don't capture that well, as the court acknowledged, and so

7    that's why I was going into it.  Not to compare this defendant

8    to those other defendants who have already been sentenced.

9         THE COURT:  Okay.  Part of that, I assume, is that

10   this has become highly public and consequently exemplary.  Is

11   that -- I mean, is that what you're saying?  If it's not known

12   generally or it's not as extensive as this, then it doesn't

13   quite take away from people's understanding of the legitimacy

14   of the college admission process?  Is that what you're trying

15   to say?  Because what I keep coming back to is it's the same

16   thing whether it's $15,000 or $250,000; it's taking advantage

17   of a privilege that other people don't have, illegally.

18        MS. KEARNEY:  It is, Your Honor.  And, you know, I

19   think across all of these defendants we've seen that they could

20   afford every legitimate advantage, tutors, private schools,

21   private coaches, and they all took that one extra step to get

22   an illegal advantage for their children.

23        One thing that's unique about this defendant compared

24   to the defendants who have already been sentenced is that he

25   had barely known Mr. Singer when he agreed to do this side-door

1   scheme, whereas a lot of other defendants had been working with

2   Mr. Singer for quite a while.  And as their defense counsel had

3   said at sentencing, they were slowly dragged across the line.

4   That doesn't appear to be the case here.  The defendant had

5   only met Mr. Singer a couple of months before.

6           THE COURT:  So what this means is he's more culpable

7   because he went for it like that?

8           MS. KEARNEY:  Yes, Your Honor, that there wasn't a

9   slow wearing-away of where the moral line was.  The defendant

10  essentially crossed it right away.

11          One of the pieces in the consensually recorded call in

12  October of 2018 between Mr. Singer and the defendant, his

13  response there was not to accept responsibility.  His response

14  was that he was going to keep his head down.  He was worried

15  about how it was going to come back on him, how it was going to

16  come back on his son.  He acknowledged that if he went along

17  with the story-straight story that Mr. Singer had proposed --

18  so as a basis for the call, Mr. Singer indicated to a number of

19  the defendants that he was being audited by the IRS and that he

20  was not going to tell the IRS that the defendant's payment was

21  to get his son admitted by Donna Heinel to USC.  And there in

22  that call, when the defendant essentially acknowledged that if

23  he went along with Mr. Singer's story-straight scheme, he would

24  be lying to the IRS.  He in fact referred to it as perjury in

25  the call, and that didn't stop him.  He again, like I said, was

1  going to keep his head down and go along with it.

2  THE COURT:  So let me understand then how I compare

3  that to him coming forward when he wasn't part of the first

4  wave of people that were I guess complained against initially.

5  He was different in that regard.  That is, he came forward

6  after there was public disclosure of Mr. Singer's involvement

7  with other people similarly situated, but during the time

8  period which it was clearly undercover, he made these remarks

9  indicating lack of remorse over what he had done.

10  MS. KEARNEY:  Correct.

11  THE COURT:  Is that it?  But what do I make of his

12  coming forward immediately without, as I understand it, being

13  directly confronted by the government?

14  MS. KEARNEY:  The government's perspective is that he

15  deserves some credit for that, and that's why our

16  recommendation was 50 percent below the low end of how we

17  calculated the guidelines.

18  At the same time, the credit can be tempered somewhat

19  by the fact that, before he knew it was public, he was willing

20  to just keep his head down and go along with it and that it was

21  only when he saw that 50 people were being arrested and he was

22  aware he was under investigation that he came forward.

23  THE COURT:  How was he aware he was under

24  investigation at that point, at that precise point?

25  MS. KEARNEY:  Your Honor, that I took from the

1    defendant's sentencing memo.

2            THE COURT:  Okay.  Then I'll ask them.  But so far as

3    the government knows, he was not confronted at any point before

4    he came in; is that right or not?

5            MS. KEARNEY:  That's correct.

6            THE COURT:  Okay.

7            MS. KEARNEY:  But he did have that story-straight call

8    and could have put it together based on that.  I believe I've

9    summarized what makes this defendant comparable to the

10   defendants who have already been sentenced as well as what sets

11   him apart.  I was going to go into other 3553(a) factors,

12   unless the court --

13           THE COURT:  Well, you should, anything you don't think

14   has been touched on here.  I'm not trying to cut off your

15   discussion.  I had, as you saw, very focused issues that I

16   wanted to address, but if there are other aspects of it that

17   you think are salient here, I'd like to hear them.

18           MS. KEARNEY:  There's just one other piece that I want

19   to address which is related to the request here for Probation

20   and the discussion in the defendant's sentencing memo that

21   there's no need for general deterrence here because other

22   defendants have already been sentenced to prison.

23           First, on Probation, that's not sufficient to satisfy

24   the 3553(a) factors here.

25           THE COURT:  If I can cut you short by saying it's a

1    jail case for me.  So talking about Probation isn't a winner.

2    I'll hear what they have to say, but this is a case in which

3    someone goes to jail.  The question is how long.

4         MS. KEARNEY:  Okay.  And then I will, beyond that,

5    just rest on our papers.

6         THE COURT:  All right.  Thank you.

7         So Ms. Corrigan, so let me understand this issue of

8    his awareness.  His awareness occurred when he saw the other

9    people getting arrested?

10        MS. CORRIGAN:  That is correct, Your Honor.

11        THE COURT:  Okay.

12        MS. CORRIGAN:  And it's not until after, actually, the

13   initial phone call that was made by his California counsel to

14   the government that he learned subsequent to that that there

15   was a subpoena served on one of his entities.

16        THE COURT:  But it was after the group of defendants

17   had been identified?

18        MS. CORRIGAN:  That is correct, Your Honor.  Once it

19   became public, he reached out to counsel in California.

20        THE COURT:  Mm-hmm.  Go ahead, on matters that you

21   want me to focus on.  You've heard what I'm interested in.

22        MS. CORRIGAN:  Yes.  If I might, I'd like just to

23   address the categories that the court laid out.  The cheating

24   part, this is what this is about.  This case is about cheating,

25   and we're not trying to escape that, and my client has never

1  tried to escape that.  In fact --

2          THE COURT:  Well, he thought maybe it was perjury.

3          MS. CORRIGAN:  Correct.  And in that call there's that

4  statement, but when we look at what actually happens, he does

5  not commit perjury.  He does not commit any kind of tax fraud

6  or evasion or false tax reporting.

7          THE COURT:  But he's thinking about it, and that's the

8  -- and verbalizing that's what he wants to do.  That's how he's

9  going to handle it.  He's going to keep his head down.  He's

10 going to -- perjury, he can do that standing on his head, I

11 guess.  You know, his expressions of intent here of how he's

12 going to deal with it, not realized, but how he's going to deal

13 with it are insights into his sense of the seriousness of the

14 offense and how he's going to respond to it.

15         MS. CORRIGAN:  Correct.  And I think that the court

16 also -- that conversation was not very lengthy.  It was several

17 minutes.  There is not a discussion of that perjury, just so

18 the court is well aware of that.  The word "perjury" is in that

19 call.  I've heard it.  It's there.  But there is no extended

20 conversation on it, and there's no further conversation about

21 it.

22         But what I can tell the court is that the conduct that

23 my client has shown throughout, despite that word hanging in

24 that call, has been contrary to that.  And I think the court

25 has also seen through all the letters that have been submitted

1   to the court that this is aberrational.  And my guess is in

2   many of these parents' situations, this is aberrational

3   conduct.  And so I'm not -- this is an area where everyone,

4   from what I can tell in the case, they're well off.  My client

5   is well off because of his hard work.

6          THE COURT:  By definition, you've got to pay somebody

7   a lot of money to get this service.  That's why I say it's a

8   rich person's crime.

9          MS. CORRIGAN:  Correct.  And so I just want to make

10  sure the court is aware that we don't contest that issue.  It's

11  there.  It's part of the features of this case.  But I think

12  that when the court looks at -- and I think the court also used

13  the word "sneaky," so I just wanted to address the words the

14  court used.  Yes, this whole thing is sneaky, but part of what

15  he did which was also sneaky, he's completely kept his son out

16  of it.  I intercepted that letter.  He did things, we all agree

17  that's why we're here, that what he did was wrong.  So I'm not

18  contesting that it's sneaky.  But also I want to be very clear

19  the court is aware that my client took steps to make sure that

20  his son never became involved or aware of the initial letter.

21  I don't think that the court has questions on that.

22          On the staging issue and that sort of thing, the

23  government is correct.  My client did not engage in the

24  additional conduct, or he was not, as Ms. Kearney has said, is

25  not a repeat player here.  He is an isolated incident.  It's

1  one child.  It's one school.  It's a payment that's broken up

2  into a series of payments, but essentially it's $250,000.

3  There's nothing more; there's nothing less.

4      The cornerstones of why we're here and what my client

5  has done and which differentiates him from any other parent in

6  this case is his call to action and that he knew what he did

7  was wrong.  He's owned it.  He has owned it from the moment

8  that he met with Mr. Goldman and myself, initially with

9  Mr. Goldman.  He owned it with Mr. Rosen and his colleagues.

10  Ms. Kearney was not present at that meeting for different

11  reasons, but there were a slew of agents and members of the

12  U.S. Attorney's Office who came out to Los Angeles and met with

13  us.  He did not hesitate.  He did not hedge.  He did not at any

14  time sit there and think, "Hmm, maybe I won't tell them this."

15  He was completely transparent.

16      Now, mind you, we had not even heard that call at that

17  point.  So we didn't know that there was a recording.  We kind

18  of knew that there was probably something out there based on

19  some initial discussions with the government.  But he did what

20  he needed to do.  And luckily the government came out to us

21  because at the time, my client had had major back surgery, so

22  he had some issues of being able to travel easily.  But that

23  being said, that meeting was scheduled very quickly.

24      Subsequent to that and in conjunction with that,

25  because we kind of had two different tracks going with similar

1    goals, we voluntarily met with the investigators at USC.  That

2    sets us apart, sets him apart.  He wanted to do that.  He

3    wanted them to know what really happened.  He saved the

4    resources --

5            THE COURT:  Am I correct that USC had its own

6    investigation going independently of what the government was

7    doing at this time; they were aware of something going on in

8    their admissions process?

9            MS. CORRIGAN:  Yes, Your Honor.  And we met with two

10   -- a former detective from Costa Mesa Police Department.  His

11   name is Mr. Manly, and his partner Mr. Perry.  We met with them

12   for a very lengthy meeting.  And in fact, they asked us for

13   some documents, which we ended up providing.  Mr. Bizzack went

14   and found them and we provided them.

15           But in that meeting also, it was open questions.  We

16   had the lawyers there, but it was a very transparent

17   discussion.  He answered each and every question.  There was a

18   lot of information that he was not aware of, for example, the

19   photo that was put into the profile.  Never seen that before.

20   In fact, nobody had seen that before.  That was of something

21   that Singer, Janke, it appears from our understanding those are

22   the two people that made that happen.  That was a picture that

23   came out of the blue.  It's not his son.

24           The information that was -- but I guess the bottom

25   line here is that what I think is very clear and very different

1    and what makes my client extremely different from everybody

2    here is his call to action.  He didn't just use words.  He came

3    and he stepped forward, and he was very direct with his counsel

4    about, "This is what I want to have happen.  I am going

5    forward.  I'm going to talk to the government.  I'm going to

6    talk to USC."  And USC has done a very thorough -- from what I

7    can tell, a very thorough investigation into each of the

8    children.  Obviously we don't have any information of the other

9    children.  But based on what we experienced with USC, they've

10   been extremely thorough in what they have done to weigh out

11   what happened here.

12        Luckily that investigation has borne positive fruit

13   for the Bizzack family.  But what I can tell the court is this

14   is a man who he has failed here, right?  That's why we're here.

15   Sentencing is a study of human failure, right?  People are here

16   because they fail.  This is a time in his life that he did

17   fail.  He has owned that from the moment that he caught wind of

18   the other people being arrested.  He could have easily have sat

19   back and said, "You know what?  These guys seem pretty busy.

20   The government seems pretty busy.  They have over 50 people

21   they're dealing with right now that we know about.  Why don't

22   we sit back, see what happens, see if they knock on my door."

23   He didn't wait for that.  He took the risk.

24        THE COURT:  Well, I understand the argument.  You'll

25   understand my response, which is to say it's not altogether

1  compelling that he did the right thing after he did the wrong

2  thing.  Now, it may distinguish him from other people, but you

3  know, that's what he's supposed to do.

4          MS. CORRIGAN:  Right, and he did it.

5          THE COURT:  If he's demonstrating real remorse.

6          MS. CORRIGAN:  Correct.  And I think, obviously we

7  wouldn't be here if he hadn't done something wrong.  I mean, we

8  just wouldn't be here.  But what he has done is tried to reset,

9  tried to right this ship because this thing needs to be

10 righted.  And he has lived with extreme shame over this.  He

11 has caused a huge fracture within his family.  They're

12 supporting him, but he understands that trust, that betrayal

13 has been very profound, not just to his son and his wife, his

14 daughter but to his extended family.  His parents, you saw the

15 letter from them, his business colleagues.  He voluntarily

16 resigned from all of his positions because he did not want the

17 collateral damage to hit other people.  He wanted to do as much

18 as he could to make sure that he owned it.  He knows he's going

19 to be punished by this court.  He understands that there is

20 going to be a price to pay.  There has already been a huge

21 price to pay in this for him.

22         But what I just -- I think that what the court has

23 heard from the government and has seen at the government's

24 first paragraphs in its sentencing position as well as our

25 sentencing position and information from the Probation Officer

1   that he is different in that he has come forward, and he came

2   forward in a very committed, very direct manner.  It wasn't

3   piecemeal.  It was all in, and it was all transparent.

4            THE COURT:  So if you want to, maybe you are going to,

5   but I would find it helpful for you to make the direct

6   comparisons of other people who have been sentenced in this

7   case, both in light of the government's recommendations but

8   also in light of what Judge Talwani did.  You provided a very

9   helpful list of the other sentences in this case.

10           MS. CORRIGAN:  Correct.

11           THE COURT:  But I want to get more focused on who is a

12  comparator.  And the government has given me their sense of who

13  the comparators were that seems more or less consistent with my

14  reading of it, but I want to be sure I haven't missed somebody.

15           MS. CORRIGAN:  So I would agree with the government

16  that -- well, as the court knows, there are I'll call it two

17  different types of schemes here.  My client is involved with

18  the one that thus far we have seen the sentences come down on

19  Sloane, Semprevivo and Huneeus.  And in those cases I think

20  that the government -- the PSR has a very good line item of the

21  aggravating factors that the other defendants have that my

22  client does not have, and Ms. Kearney went through those.  I

23  don't know if the court wants me to repeat them.

24           THE COURT:  If there's something that hasn't been

25  touched on as yet.  I just want to be sure that I've got some

1   sense of what the related cases are that are not just related

2   in the sense they're indicted in this setting but actually

3   related cases.

4         MS. CORRIGAN:  Correct.  And the one thing I would

5   just point out just on Semprevivo, in case the court has not

6   noticed, one of the things they did which is different from

7   what my client did is they sued Georgetown.  My client went to

8   USC.  And essentially, we didn't literally knock on their door

9   but called them and said, "We want to come in," and they let us

10   in.  So that is a distinguishing factor.  I think ultimately

11   the other parts of it, like in the Sloane situation, we've got

12   the lies to the high school guidance counselor.  We don't have

13   that here.  We don't have doctored up pictures, as the court

14   knows, from my client or anyone in this family.  They did not

15   -- my client did not -- there's nothing that would boastful at

16   all.  Semprevivo, my understanding is that he did boast about

17   athletic credentials.  And he, from what the government

18   indicated, also I think she used the phrase stepped back a

19   little bit on acceptance.  We don't have that.

20         So in terms of those three defendants, we are very

21   different from them in the approach.  The numbers, 250 is the

22   same.  But the scheme in terms of the special factors, if you

23   want to call them that, the aggravating factors, we don't have

24   those features.  In fact, we have the mitigating factor on the

25   other side, the cooperation, the assistance and the

1   transparency.

2          So when we look at the government's recommendations, I

3   don't know if you want me to go through those.

4          THE COURT:  No.  I'm just asking is there something

5   that you think is particularly telling and in comparison here

6   of both the government's recommendation and the sentence that

7   Judge Talwani imposed.

8          MS. CORRIGAN:  I do.  So if we look at those -- I

9   don't think there's a mathematical formula here that would take

10  the government's nine-month recommendation in this case, which

11  is obviously very much lower than the 12-month and 15-month

12  recommendations on defendants.  But if we did just do the

13  simple math, then it would dictate a much lower sentence than

14  the four months.

15         THE COURT:  If it isn't clear by now, my view about

16  the guidelines is they're a place to start.

17         MS. CORRIGAN:  Right.

18         THE COURT:  They're as good for whatever they're good

19  for, but I'm not a slave to them.  And in fact, I view them as

20  not a very good mechanism for organizing sentencing, except

21  it's better than all the other ones, because it forces a judge

22  to think carefully and I think rigorously about what's really

23  at issue.  But frequently, and this is one of those cases, they

24  don't give the direction that you'd want.

25         Similarly, doing a different kind of mathematics, not

1    additive mathematics, which is what the guidelines are, but

2    some sort of divisional or proportional, doesn't make any

3    difference to me.  I'm really trying to figure out what's the

4    proper place to put this fellow.  It's otherwise a fear of

5    judging is really what this is all about, and that's something

6    that I don't fear quite as much as others, I guess.

7         MS. CORRIGAN:  Right.  And I think that I agree with

8    the court's views on the guidelines.  And so that's why we drop

9    down to the other 3553(a) factors.  3553(a) does direct the

10   court to calculate the guidelines, which, obviously that

11   discussion has been had.  But then we start to look at the

12   general deterrence, which I think is one of the issues here,

13   right?  Then we look at -- specific deterrence I don't think is

14   a big factor here.  My client doesn't have any background.  He

15   doesn't appear to be someone who is going to recidivate.  He

16   doesn't have drug problems.  He doesn't have substance abuse

17   problems.  He doesn't have any of that stuff.

18        But when we look -- and here there's no restitution

19   being asked for, so we don't have that factor.  So it's a

20   general deterrence and the unwarranted sentencing disparities

21   that might occur.  And when we look at -- I think when we look

22   at the general deterrence issue, yes, we have a lot of people

23   that are, I'll call it financially fortunate, involved in this

24   case.  But the general deterrence here -- and I think that the

25   -- I look back at our sentencing position.  We are not taking

1    the position that because other people got sentences that our

2    client should get probation.  That's not the argument.  I'll

3    just move off of the probation issue because I know the court

4    is not moving in that direction but for a lower sentence than

5    any other defendant that's thus for been sentenced, and I'll

6    call them the three other people in our part of the scheme.

7         When we look at that, the general deterrence has

8    really been addressed here because what this should be doing is

9    sending a message out to other parents, other people who might

10   think about doing this that, if you do the right thing

11   ultimately, after you've made a mistake but do the right thing,

12   right, send the right message that you can, although you've

13   done wrong, you can do the right thing in the end.  And that is

14   come forward, be transparent, accept responsibility, be

15   accountable and own it.

16        There is a lot of money out from what the government

17   -- in looking at the charges and all the media here, there's

18   about 26 million -- I think $26 million or so.  There's a lot

19   of money out there that's not accounted for which tells me --

20   and I'm not asking the government to tell me who the other

21   people are.  There are a lot of other people there.  I think

22   that what my client's actions do is perhaps encourage other

23   people who know they're in the same predicament who have done

24   wrong to come forward.

25        THE COURT:  I understand that kind of argument in

1    general deterrence, but essentially it's that I should take

2    into consideration, which I do, will, I do in other cases, the

3    idea that a message is given, that's what general deterrence is

4    about, that there can be a discount if you do the right thing.

5    That's not to say what the level is that it should be.  That's

6    the conundrum.  I think I understand that.

7            MS. CORRIGAN:  But even so, the general deterrence

8    here when we think about it in the scheme of things is that we

9    have a lot of adults here in this case, my client in particular

10   because we're here today, a gentleman who has done a lot of

11   good in his life.  The letters --

12           THE COURT:  But that's not why he's here.

13           MS. CORRIGAN:  No.  I understand that.  But my point

14   being is that he is now a convicted felon.  He's a convicted

15   felon.

16           THE COURT:  That's true of every convicted felon.  I

17   understand I think the argument that it falls more heavily on

18   people in white collar, but I have to tell you --

19           MS. CORRIGAN:  Oh, no, I don't, that's not where I'm

20   going.

21           THE COURT:  I'm glad you're not saying it because I

22   don't believe it.

23           MS. CORRIGAN:  And I find actually -- if I had made

24   that, it's a completely inappropriate discussion.  I'm a CJA

25   lawyer.  I totally understand that argument because I make it

1    with regularity.  But my point being is I think there are a lot

2    of people out there who would know that you're going to be a

3    convicted felon, and you're going to jail.  You're going to

4    prison.  You don't go to jail in Federal Court, but you're

5    going to prison.  You're going to sit and think about what

6    you've done here.  You're going to have a period of time where

7    you're going to be incarcerated.  You're going to be like every

8    other person.  You're going to wear the same clothes.  You're

9    going to do everything because that's the way it should be,

10   right?  There's no special place for people that have money.

11        But if we think about these kind of cases where it's

12   people of means, or however you want to couch it, privilege,

13   that once they see this case unfold, whether it's just my

14   client or anybody else, there is, I would like to think that

15   other people are going to be generally deterred from doing this

16   kind of conduct, whether it's in a high school setting or

17   whether it's in a college setting or anywhere else in their

18   business lives, that this kind of stuff is going to be --

19   they're going to be held accountable, and this is what we're

20   here for.

21        THE COURT:  Not to -- it may go beyond what you've

22   been talking about, but the best general deterrence is

23   certainty and immediacy, but that's not what the criminal

24   justice system delivers.  It takes a while.  And so what we've

25   got left is time in jail.

1          MS. CORRIGAN:  Right.

2          THE COURT:  And the question is how much time in jail

3    is sufficient to dissuade those who might otherwise think about

4    it, to do it, proportionate to what the crime is.  And so you

5    have identified the fishbone in my throat on this case.  That

6    is the other people who think that life is a series of

7    encounters with maitre d's who, you give them a little bit of

8    money and you get in the side door.  That's what I'm concerned

9    about here.  That's the way of I think of this case, crudely

10   stated.  And that doesn't lend itself to any -- I mean, the

11   guidelines try to provide some measure.  The government has

12   done I think a creditable job and a consistent job in thinking

13   about what their recommendations are going to be in terms of

14   relative culpability, but it's a judgment call.

15         MS. CORRIGAN:  Correct.

16         THE COURT:  And that part of it, I'm not sure that it

17   can be fully articulated.  I'm not trying to dissuade you from

18   trying to articulate it, but I just have to say that.

19         MS. CORRIGAN:  Right.  And I think it is difficult,

20   but nevertheless, I think that the signal of general

21   deterrence, signal out -- I'll just call it out to the streets,

22   right, whether we call it out to the streets or out in the

23   headlines tomorrow, the public is going to know about it,

24   whether it's a quiet message out to them or whoever it is.

25   This case obviously is different because there's loud messages

1    day in and day out on this case in the papers.  But ultimately,

2    I think anybody after this case who thinks about entering into

3    a scheme like this, if they don't think twice about it based on

4    what they've seen come out of these cases out of these

5    courtrooms, whether it's your courtroom or Judge Talwani or

6    Judge Zobel, eventually Judge Gorton, I don't know what they're

7    thinking.

8            It should be general deterrence.  This should stop

9    every single person who thinks that they're going to get some

10   kind of leverage or some kind of super duper benefit to get

11   into the side door.  The timeout signal needs to be sent,

12   right?  Everybody needs to just set pause and say, you know

13   what?  No.  We're just going to let kids go to college wherever

14   they deserve to go to college.  They don't need to go to a

15   particular college.  They don't need to do this whole side door

16   thing.

17           I think these cases have been sending that message,

18   and I do understand that the court is going to impose a

19   sentence that involves imprisonment on my client.  What I would

20   ask the court to do, and I think the court has already figured

21   this out, that the court consider sentencing Mr. Bizzack to far

22   less time than Sloane, Semprevivo or Huneeus because their

23   actions have aggravating factors that his does not.  They're

24   all the same in terms of the payment and what they did, but the

25   actions, post-offense conduct by Mr. Bizzack are starkly

1  different from those that you have or that Judge Talwani has

2  had before her, and Judge Zobel.  The numbers bear it out.  The

3  aggravating factors that are listed in the PSR bear that out.

4  And, you know, I don't want to just keep beating the same drum

5  but I think that's what this really boils down to is that he,

6  although he did wrong, he has done the right thing in the end

7  by stepping up to the plate, showing his son that you own it,

8  right?

9       This has been an incredible lesson for everyone

10 involved in his family, his community, his business community.

11 He has made it very clear to people.  He has been transparent

12 with his employees, his business partners, his family, his

13 extended family.  He has told them "I messed up.  I made the

14 biggest, biggest error ever in my life, and I have involved my

15 son in it to his detriment."  Luckily his son appears to be

16 quite a strong young man, to his credit.  But he has done

17 something here that, his proactive approach, if he sat back and

18 just remained silent, his son would continue to suffer from

19 this, his community would continue to suffer from it.  USC

20 probably would continue to suffer from it, right?

21       He stopped the bleeding when he could.  Should he have

22 done this?  No.  Could he have stopped it at the phone call?

23 Perhaps.  Could he have stopped it at an earlier stage?  Okay.

24 But he didn't.  I'm not trying to be flippant about it, but the

25 fact of the matter is he didn't.  That's why we're here.  He

1   didn't exit.  He did not exit that conspiracy.  He stuck with

2   it.  Did he feel good about it?  From what he tells me no, but

3   nevertheless, once it came time to step up, he stood up and he

4   owned it.  And he is showing the court what his ultimate core

5   values are.  He's showing the court that he is resetting his

6   life, reevaluating his life and going back to those core values

7   in that person that is described in every single one of those

8   letters that is in the court's record that's attached to our

9   sentencing brief.

10          Those letters are consistent.  They're from people

11  from all different parts of his life.  They didn't get together

12  and write them.  There's an amazing consistency in those

13  letters and the stories they tell, and it tells of a person

14  who, from an early stage when he was -- you know, moved after

15  he -- I think the court is aware he left school and moved to

16  Hawaii.  He had a tough time in Hawaii, yet he helped Vicky.

17  And I'm going to be sensitive, not using last names.  Then he

18  moves back to California.  He ends up helping these two elderly

19  people regularly.  He didn't have to do that.

20          I think what that does is it shows the court the true

21  core of who this person is.  Mind you, he's probably written a

22  ton of checks to charities but he's actually done things,

23  right, not just writing checks.  He's doing things.  He's doing

24  errands.  He's fetching groceries, helping with appointments to

25  two elderly people who survived the Holocaust.  He didn't need

1    to do that, but he did it for an extended period of time.  He's

2    helped people all the way along.

3          And now what he's done as he's stepped away from work,

4    he's feeding people and distributing food at the local food

5    bank, and it's been, from talking to him, an extremely humbling

6    experience, an experience that has brought him back to his

7    roots.  And he lost his way, whether we call -- I know some of

8    the letters call it moral compass, maybe a phrase a little bit

9    the government has used.  But for whatever we want to call it,

10   he left his core, and he's gotten back there.

11         And I can tell the court, too, just in terms -- I'm

12   not trying to violate any privileges here or anything like that

13   but whether the court imposes some community service or not, I

14   want you to know that he's indicated that he intends to

15   continue to work at the local food bank because he's realized

16   that in his own backyard, there are people in need and he can

17   help, not just by writing a check but actually going to them

18   and seeing them eye to eye, giving these people a pat on the

19   back, a meal, a kind word.  That's who this person is about.

20         And unfortunately, we have a period of time in his

21   life over the course of several months that he messed up.  He

22   messed up.  He did.  He violated the law.  He did wrong.  And

23   the court -- I think in measuring his life, now in his late

24   50s, and we have a short period of time in his life where he

25   made disastrous decisions which have left him here.  And the

1    court I think should know, and I think the court has picked up
2    from the PSR, that he's also been engaging in therapy to try to
3    figure out how he let himself get there, how he let himself
4    drop down to the level of committing a crime.  Because he
5    grapples with that day in and day out.  This thing doesn't
6    leave him.  He thinks about it daily.  Every time he looks in
7    the eyes of his son, he -- it's in the pit of his stomach, it's
8    in the pit of his heart.
9            So with that, I want to just ask the court to consider
10   -- I understand the court's going to impose a sentence here of
11   incarceration, but what I'd like to do is ask the court to
12   consider not by way of mathematical machinations here with the
13   other defendants, but because of the distinctions that we've
14   drawn out here, that he be sentenced to far less than the four
15   months that was imposed on Mr. Sloane, Mr. Semprevivo, I may be
16   mispronouncing that, and the five months imposed on Huneeus
17   because he does stand here where he is very distinctly
18   different from those three people.  He did wrong, but he's
19   distinctly different from them.
20           I think if we also look at the government's
21   recommendation, the recommendation for Mr. Bizzack is far lower
22   than what they originally recommended, and I'd ask the court to
23   consider sentencing him to no more than a month in custody.  I
24   think a month, although that may seem short to some people, it
25   is a very significant period of time, and it will be a very

```
 1    significant period of time of reflection and a complete loss of
 2    liberty, and then release him on supervised release, and that
 3    will also continue to limit his liberty.  It will continue to
 4    limit his ability to do what he wants and make sure that if he
 5    messes up, he'll be right back here and we'll be here on a
 6    supervised release violation.  I don't think we'll have that.
 7         But I think that what I'm asking the court to do here
 8    comports with the dictates of 3553(a) and with the case law
 9    that goes along with that.  I know the court is well aware of
10    its duties.  And I just, I think that the information that the
11    court has in the PSR is quite profound here.  And I just want
12    to thank the court for its time and also, quite frankly, for
13    the government stepping up and being very transparent about my
14    client's transparency.
15         THE COURT:  Thank you.  So Mr. Bizzack, this is an
16    opportunity for you to speak to me directly if there's
17    something that you want to say.
18         THE DEFENDANT:  Yes.  Would you like me to stand?
19         THE COURT:  Whatever you're comfortable with.
20         THE DEFENDANT:  So thank you, Your Honor.  And the
21    first thing I'd like to do is I'd like to thank the court.  I'd
22    also like to thank the U.S. Attorney's Office as well as
23    Probation and Pretrial, who is not here, as well as the USC
24    investigating team.  You know, through this incredibly
25    difficult situation that I've put myself in, this team of
```

1   individuals has been incredibly professional and have, you

2   know, treated my family and me with incredible dignity.  So

3   thank you.

4        I'd like to apologize.  And I'd like to apologize

5   first to all of the students at USC, The present, the past and

6   the future, and to the USC administration and to the teachers

7   and to the admissions office.  I know my actions impacted all

8   of them, and it wasn't fair.  I want to apologize to my

9   community, to my neighborhood, to my friends, and to all of my

10  business partners and colleagues and employees.

11        I disappointed a lot of people, and what I did did not

12  set the example of what our companies represent, friendships or

13  neighborhoods.  It was wrong.  I want to apologize to my

14  family, my extended family, my aunts, my uncles, nieces and

15  nephews and cousins, my brothers and sisters, my 84-year-old

16  parents, my in-laws, and what I put my wife and my daughter

17  through and of course my son.  I spent my life guiding him,

18  protecting him and teaching him, and all this led to a reckless

19  act that I did that's had a profound impact on him.  He's a

20  smart, honest young man who didn't want this, didn't deserve it

21  but has to live with it.  So I apologize.

22        What I did was wrong.  This is the worst set of

23  decisions that I've made in my entire life.  I'm humiliated,

24  ashamed of my actions.  Over the last six or seven months going

25  through this, I've have had incredible regret and sorrow and

1    understand the collateral damage that I've impacted so many

2    people, and it's been devastating for my family.

3           As you heard, my commitment from day one was to take

4    complete responsibility.  That doesn't right the wrong, but I

5    wanted to make sure at least my son got another lesson that

6    when you do something as terrible as this, that you stand up as

7    a man and own it.

8           I didn't blame others.  I won't blame others for my

9    actions, nor did I want to force the government to commit more

10   resources and spend more money on a prosecution but rather come

11   forward.  I met with USC, and the goal was clearly to make sure

12   that they had every piece of information they needed to help

13   them understand this.  And when I engaged with them and anyone

14   I talk to about this, it's with full transparency because at

15   the end of the day, that's the future for me.

16          As is stated, I resigned from all of my operating

17   roles and my executive board positions, and I'm going to make

18   sure that you know that I'm here in this court to take

19   responsibility for my actions.  I understand that you will be

20   sentencing me today, and I accept it.  That's a part of owning

21   this.

22          This has been a huge wake-up call for me, causing me

23   to have a complete timeout and reset on my life.  As you can

24   imagine, I'm a very busy executive, flying all over the world,

25   running multiple companies and not grounded, not having my feet

1    on the ground.  So I've really engaged in a lot of different

2    tools to help really go after this.  And in a reflective way,

3    through, as you heard, therapy, but also really trying to

4    understand what the future is going to be and how to be

5    relevant, especially after making such a serious set of

6    decisions.

7            I want to make sure that I'm the not the man of 2018,

8    of that summer who made that terrible set of decisions.  As you

9    heard, I've been volunteering, and I've done a lot with my

10   head, if you will, doing a lot of things to help our businesses

11   culturally drive really good things in the community but really

12   with my hands not as much.  And it's been incredibly grounding

13   to know just miles from my house the basic needs of people.

14   And I'm not sure what's going to happen with other people

15   around this case.  I can only tell you what's going to happen

16   with me.  And that is, when I look eye to eye into people and

17   I'm handing them the most basic thing, food, it's pretty

18   powerful.  And at 59, it's a new day for me on that.  And I

19   didn't even understand it, didn't recognize it.  And it's a

20   turning point.  It's a turning point for my life to be so

21   fortunate to be married for 30-some years and to start with

22   literally nothing and to be in a place where we are today and

23   to understand full circle how important it is, the basic needs

24   for people.

25            So I just want to make sure that you know and that the

1    court, everyone here knows that I've owned this.  I have made

2    this mistake.  I own the responsibility of what has happened

3    here.  It was completely reckless and wrong, and I continue

4    after this sentencing and after the other things that we'll be

5    going through to pivot my life.  And it's just the way it's got

6    to be, and it's the way I want it to be.  And I want it for my

7    son and my wife and for my community and for my employees,

8    everybody, especially for the university.

9         So again, I apologize, and I thank Your Honor for the

10   time today to talk to you and to the court.  Thank you.

11        THE COURT:  Thank you.  So we've had an extended

12   discussion about a variety of things that arise in criminal

13   sentences but arise here because of the unique character of the

14   offense charged and series of offenses charged.

15        I've felt, as I tried to indicate it, a responsibility

16   to apply some intellectual rigor to the guidelines.  It is

17   sometimes the case that cases that gather a lot of publicity

18   have a hydraulic pressure on judgment that's unrelated to a

19   careful analysis of the underlying violations.  And the

20   guidelines, while I've indicated I'm not altogether satisfied

21   with them, but then I'm not altogether satisfied with much of

22   anything, the guidelines provide a mechanism to be sure that

23   you've tapped all the drums, but you've got to tap them right.

24   That's why I've spent some time trying to figure out how do you

25   monetize this case?  There may be a mechanism.  There may be

1    evidence that can be adduced, but it wasn't adduced here,

2    particularly related to bribery, which seems to me to be a way

3    of understanding this aspect of the sprawling set of violations

4    but forcing it into what I've described as a Procrustean bed,

5    searching for some mechanism to describe it.  It doesn't do

6    that.

7            So I go back to the characterization that I made

8    before.  It's a sneaky crime of conspicuous consumption.  Now,

9    what does that mean?  Well, it means something horizontally and

10   something vertically, and it has to do with class.  It has to

11   do with divergence of opportunities, divergence of privilege, a

12   matter that is so critically important to our current discourse

13   in this country, the sense that some people are getting

14   benefits that other people aren't, and it's not on the basis of

15   merit or any system of merit that anybody can understand.  And

16   the more it happens, the more serious it becomes.

17           So when I think of it vertically, I think of people

18   who couldn't even aspire to spend $100 to get services to get

19   them in the back door, who don't have enough money to give to

20   the maitre d' to get in.  And that's fundamentally corrosive to

21   our society.  So, do I think this is a serious crime?  You bet

22   I think this is a serious crime.  Then that's got gets, or

23   tries to, and that's wrong, and it has to be dealt with in a

24   meaningful fashion directly.

25           Now, it may be clear but I'll make it clear that I

1    don't necessarily mean that the way to decide that is to say,

2    Well, if 14 days is tough, then 28 is better, and you keep

3    escalating.  No, I don't think that.  What I do think is that

4    looking at this as anything other than a serious crime is

5    blinking reality.  But that's the horizontal level.  When I say

6    conspicuous consumption, of course I'm referring to Thorstein

7    Veblen, and that focuses horizontal, that is, among rich

8    people, how do they spend their resources to obtain goods that

9    will impress each other, how do they socialize their kids to

10   think that there are only a couple of schools worth going to

11   when this country is filled with terrific colleges.  But some

12   -- I'm not turning this into -- over on the government, but the

13   government referred to the branding problems that USC has now

14   as a result of this.  Well, that frankly is a matter of

15   indifference to me.  If branding is what this is about, then go

16   to the Federal Trade Commission.  That's not what it's about.

17        What it's about is the idea that, even among rich

18   people, some people are going to get sneaky ways to get

19   benefits, and that may reflect the difference between old money

20   and arriviste money and a whole series of things that Veblen

21   talked about that are part of our culture and are corrosive

22   because it keeps us focused on the idea of class and its

23   privileges without thinking about we're all in it together and

24   everybody ought to get a fair shake.  There was no fair shake

25   here.  So do I think it's a serious offense?  Yes, I do.

1    Then I will look at the nature and characteristics of

2    the defendant.  You know, it's easy for me to say and of course

3    it's a way to tone down the language, not that it's been

4    overstated here, that it's not the good works that the

5    defendant did that brings him here.  It's something else.  But

6    I would be missing a significant aspect of this case if I

7    didn't recognize the good works, which suffuse the letters.

8    The letters are not made up or done from templates.  They talk

9    about specific circumstances in which the defendant has reached

10   out and not just into his pocketbook to provide for other

11   people.

12        This is, it seems to me, a good man.  I'm satisfied

13   about that part of it.  And I recognize, as he's said, and

14   counsel, that once it was clear that he was in the crosshairs,

15   that he came forward and dealt directly with the people who

16   needed information and did so without engaging in the kinds of

17   prevarication and self-justification that are sometimes

18   understandable when people face having done something horrible

19   but chose to do the right thing as he could, having done the

20   wrong thing before.

21        The case lends itself to -- I shouldn't call them

22   hackneyed expressions, but they come out, owning it, moral

23   compass.  They are bumper stickers, which tell us a little bit

24   but don't get to the bottom of it.  And I've tried, as I've

25   indicated, to get to the bottom of this as best I can.  And

1    coming to the bottom of it, I'm of the view that this is a

2    person who is a good person who has done a very bad thing that

3    affects society more generally but affects the kid who thought

4    that it was a fair set of circumstances in selection for a

5    college that that kid wants to go to.

6          Now, one can say that there are all kinds of

7    privileges and affirmative actions and selection processes and

8    stuff, legacies, that affect all of this, but those are at

9    least transparent.  And while schools aren't necessarily so

10   candid about them or maybe even try not to be straightforward,

11   they exist.  But what doesn't exist or shouldn't exist and

12   what's not acceptable is the idea that you can pay somebody off

13   to get in there, and that's what the defendant was doing.

14         Now, I look at this bumper sticker like moral compass

15   and stuff, and I think that the writer in me wants not to

16   embrace it, but there is a way of thinking about this.  What is

17   it that happened here?  You want to say lost moral compass?

18   Yeah.  I think a better way to think about it is for a period

19   of time, but it was significant, the defendant's moral compass

20   was demagnetized, that in a misbegotten effort to assist his

21   son to get into what both of them believed to be prestigious

22   schools, he took the sneaky way.  But from all that appears, it

23   is a contained period of time.

24         We've been talking about the idea that it was siloed

25   in themes and variations, and it was here as far as I can

1    figure out.  He did it.  He didn't engage anybody else in his
2    family in this exercise.  No big surprise that other members of
3    his family with strong moral character are appalled by it.  He
4    knows that he's got to do whatever he can to make it up to
5    them, including his son, his daughter and his wife and extended
6    family, because this is an individual whose goodness, I don't
7    hesitate to say, extended into his businesses as well.

8         But he did it.  So then I turn to specific deterrence.
9    That's the concept of what does it take to keep this man from
10   doing something like this again.  Well, I don't think he's
11   going to be doing this again.  Not just that he's going to try
12   to get somebody into USC by cheating.  I mean more generally
13   that he's going to keep himself involved in cheating or stay
14   involved in cheating or continue cheating.  I don't think
15   that's going to happen here.

16        And then I turn to general deterrence.  And as I said
17   to Ms. Corrigan, this is the fishbone in my throat among the
18   various factors of section 3553.  Section 3553, as I am sure
19   with distressing frequency for lawyers who appear before me for
20   sentencing, I think of as a set of incommensurables.  They
21   don't have the same weights and balances, or at least you can't
22   make comparisons.  And so what I'm doing is attempting to find
23   a tolerable accommodation of incommensurables.  Tolerable, that
24   is trying to find someplace to locate a sentence that serves
25   all the purposes of 3553.

1          I start with the seriousness of the offense.  That's a

2    jail time case.  How much jail, we'll get to in a minute.

3    Character of the defendant, still a jail time case but

4    substantially diminished because of the way in which he

5    responded.  Specific deterrence, not jail.  Don't need jail to

6    do that.  And then general deterrence.  Because overall, this

7    accommodation of incommensurables is meant to result in a

8    sentence that is sufficient but no greater than is necessary to

9    serve the larger purposes of sentencing.  And on general

10   deterrence, it's this:  The people who are involved in this

11   case, present company excepted, seem to me from afar to be

12   people who are quite capable of analysis of risk and return.

13   They're people who are out there, haven't been charged but may

14   well be dealing with this sort of thing.  Certainly the

15   government's investigation uncovered a sprawling activity that

16   I think most people had no idea was out there in both sneaky

17   and privileged access to ways to get into colleges that they

18   want to and thereby deprive others equally worthy of getting

19   into a particular slot.  But I have a feeling that there are

20   people out there who say, "Oh, they're not going to catch me.

21   I'll be a lot more careful about this.  I'll vet the William

22   Singers -- Rick Singer -- excuse me -- of the world before I do

23   that."

24          Now, that's something that goes to something I said to

25   Ms. Corrigan, which is the best deterrence is swift and certain

punishment.  Not length of punishment but swift and certain
punishment, but we don't have that.  It's not just that we
don't have enough resources to do it.  It's also that we have a
system that is absolutely appropriate that provides due process
but takes a while and imposes tremendous burdens on the
government of proof, all to the good, that's what it means to
be under our Constitution, but nevertheless we're left with
time in jail as a way of measuring it.

And now I keep thinking, and this applies particularly
to this case of the old New Yorker cartoon from the 1930s.  Two
elderly gentlemen sitting in a men's club, and one turns to the
other and says, "You know, money is life's report card."  And
that's the way the people who are involved in this thought of
it.  "We got money.  We'll buy what we want.  We don't care
whether or not we're depriving somebody else equally worthy of
their opportunity to have a fair consideration."

But the flip side of it is, there could be two
gentlemen in the club saying, "You know, jail time, an amount
of jail time is life's report card," and it's not.  It is a
method of ensuring that the various factors of 3553 are met.

So I look at this and say to myself, where do you put
this?  What do you need to do?  And it's not that I'm saying,
Well, you know, this is really very embarrassing for people of
substance, very embarrassing for people who made their lives
ones of example, or tried to, and they've paid enough.  That is

1    not part of my consideration.  But I use as a touchstone, you

2    know, what would I do in a similar case involving someone who

3    is disadvantaged.  Of course there isn't a similar case

4    involving someone who is disadvantaged.  This is a rich

5    person's crime by definition.  But it's a way of thinking about

6    it.  I hope that if there were a fair comparison with the crime

7    that I impose a similar sentence for this.

8           One thing I do believe and I share is the observation

9    that was made by Ms. Corrigan, that general deterrence is not

10   just amount of time in jail as the report card.  It's also, the

11   report card can include you get a discount if you stand up,

12   accept responsibility, try to help out, irrespective of whether

13   under the guidelines there are things like acceptance of

14   responsibility or assistance or any of the pretexts that are

15   used to face the proposition that there are aspects of the

16   criminal justice system which I reject that are meant to

17   encourage people or perhaps more accurately discourage people

18   from exercising their constitutional rights, including the

19   constitutional right to go to trial.

20          But if somebody stands up, tells the story, doesn't

21   get substantial assistance, gets a form of acceptance of

22   responsibility, I think about it not in the guidelines way but

23   in a way of saying to other people, "You get caught, talk.

24   Tell the truth, because it's going to be better."  This is for

25   people who are intensely involved in risk/benefit analysis.

1          So is there a matrix for general deterrence?  No, of

2    course not.  You do the best you can.  You judge, you exercise

3    judgment.  I look at jail, and I think -- not that I'd send

4    somebody to jail as I say for vocational training or to get

5    some more education.  Certainly that's not applicable here.

6    But I look at jail to ask myself what does that do here in this

7    case involving this defendant for purposes of the defendant's

8    rehabilitation.  I think it has a role.  I think the way in

9    which Ms. Corrigan talked about it, that is, someone having to

10   sit down in circumstances in which they don't control

11   themselves and think more carefully than they have already, and

12   it's clear that the defendant has already thought about his

13   circumstances.  It serves that purpose.  How long?  Not in this

14   case a long time, I don't think.

15          And then I look at comparisons.  Now, what are

16   comparisons?  It goes back to what are the sentencing

17   guidelines about?  What is it that the Sentencing Reform Act of

18   1984, which few in the room were around for, but I was, both as

19   a defense counsel and as a prosecutor and as a judge.  I was on

20   both sides of that.  And as I frequently say, in the old

21   courthouse, it was not at all unusual to go into a courtroom,

22   let's just say courtroom 1, for a crime for which someone

23   receives a sentence of 20 years in prison and to go into

24   another courtroom, let's just say courtroom 2, and find that

25   you're getting a sentence of six months for the same thing for

1   someone who has got the same background.  Profoundly corrosive.

2   Probably as corrosive as anything that can happen in the

3   criminal justice system to have disparate sentences.  So the

4   Sentencing Reform Act, the sentencing guidelines were meant

5   address that.  It's very hard, as this case indicates, to

6   develop guidelines that adequately capture some new form of

7   fraud.  New form in the sense that it hasn't been focused in

8   some way.

9       I've looked at the cases that the government has

10  suggested as alternative ways.  I don't think anybody has done

11  an evaluation of this case any better than Judge Talwani.  I

12  believe that she's carefully considered all of the factors.

13  And so while I would act disparately if I thought that it was

14  important to act disparately I'm not going to act disparately

15  from her general structure, which seems to me to be carefully

16  thought out and exercised with principle.

17      Now, I said it before, I'll say it again.  I also

18  think the government's recommendations are presented in a

19  principled way.  They're not and haven't been knee-jerk.

20  They've attempted to deal with, as they think appropriate, the

21  differences among the defendants.  It's simply that I think

22  it's in this defendant's case and in the cases that Judge

23  Talwani dealt with as I understand them, and I try to

24  understand them by reading carefully the docket in Abbott.

25  That seems to me to set the proper kind of range.  And so I can

1   properly look to those cases to say, "Where does this belong in

2   that setting?  What would be a case that's consistent with the

3   way in which that unfolded," which I hope I would have the

4   foresight to develop in the way she did.

5          Now, of course disparate sentences are supposed to be

6   national.  You try to do the best you can to understand what it

7   is nationally.  That's why you have the guidelines.  But of

8   course the guidelines, as I've said, do not hold up on the

9   basis of the evidence that's presented to me here in any way

10  that I can find them to be reliable and in any event the

11  Sentencing Commission has not faced this.  Other courts have

12  dealt with it, but they seem to have dealt with it in ways that

13  don't really meet this kind of case and are, with all respect,

14  unanalyzed at least in the public setting.

15         But analyzing this is as we've done or I've tried to

16  this afternoon with assistance of counsel, which I very much

17  appreciate, where I put this is two months' incarceration.

18  That seems to me to be the point at which this defendant falls

19  for the seriousness of the offense that he was involved in.

20         Now, I want to emphasize something that I believe very

21  strongly.  I'm not really so influenced by how much money

22  people spent because that's not the core of this.  The core of

23  it is the use of resources other people don't have to get a

24  place.  And so if somebody was able to negotiate with

25  Mr. Singer to get a better deal, they got a better deal.  If

1    somebody was ready to spend or throw money at it, they threw

2    money at it.  But the core of it is, and the core of the

3    seriousness of the offense is this treatment disparately of

4    resources that people have generated by a misbegotten view of

5    what prestige means in colleges and the reinforcement of it

6    that is class-based among rich people and others.

7         I don't think that it's necessary under the

8    circumstances to impose the range of conditions that I might

9    otherwise impose here.  The defendant does not have drug

10   problems that would generate drug testing, so I'm waiving the

11   drug testing requirements that might otherwise be applicable.

12   I am imposing a period of three years of supervised release.

13   I'm a member of the trust-and-verify generation.  I trust the

14   defendant.  On the other hand, if this turns out wrong, he's

15   going to be back before me and we're going to have another

16   discussion.  And it's a discussion that doesn't provide quite

17   the approach that I've provided here.

18        I am of the view that I must impose a fine.  I'm going

19   to go beyond the guidelines on this and impose a fine of

20   $250,000.  The defendant's financial circumstances of course

21   are shaped by assets that are a little difficult to value, but

22   they're substantial.  And so you spend $250,000 to cheat, ex

23   ante, the fine is $250,000 for cheating ex post.

24        There is a special assessment that's mandatory of

25   $100.  Restitution hasn't been sought, in part I think because

1   of the view among the various participants who might think

2   about restitution that it's really hard to value this in a

3   meaningful way, so it's not part of the case.

4          It's too easy to say this is about money.  It's about

5   status and class and a whole series of other things.  But maybe

6   the elderly gentleman in the men's club had part of it right.

7   Money is life's report card, and that fine is meant to provide

8   a report card for the seriousness of the offense that the

9   defendant had, which the parties know, but I'll restate is well

10  above the guidelines because I'm varying from the guidelines.

11  I just don't think the guidelines capture this at all, not a

12  bit.

13         Now, what other conditions am I imposing under these

14  circumstances?  Well, I'm going to require the defendant to

15  engage in some form of I'll call it broadly mental health

16  treatment.  That doesn't really capture it.  The defendant is

17  dealing with therapy now.  It seems to be appropriate.  I leave

18  it to the Probation Office to fashion that or refashion it or

19  reformulate it as they think necessary, but I think that the

20  therapy should continue, and I've put it under the general

21  rubric of mental health.

22         I'm always uncomfortable with imposing as a condition

23  that people do community service.  That makes community service

24  sound like it's a penalty for most people, and I think for the

25  defendant here, it's not a penalty.  It's something that has

1   been and will continue to be part of his life.  Nevertheless,

2   to emphasize that this is a crime that involves people less

3   fortunate than he, I'm going to impose a period of 300 hours

4   per year of community service to be served with the

5   underprivileged, hands on, not in some executive position but

6   hands on with people whose lives have not been as privileged or

7   successful as the defendant has made his life.

8        The defendant is going to be paying the costs of these

9   programs, that is, what I call mental health treatment but

10  therapy.  He'll continue to pay for it himself.  He's got the

11  resources to do it that.  And similarly he's going to be paying

12  for any additional programs that might be imposed under these

13  circumstances.  But ultimately, he also has to face the IRS.  I

14  have no idea how the IRS is going to treat this.  I don't think

15  anybody really does.  I see it, but it's through a looking

16  glass quite dim.

17       There are 501(c)(3) organizations to which somebody

18  contributes.  They probably were not properly 501(c)(3)

19  organizations, at least in which the ways in which they were

20  dealt with, but that's for another day, except this, that

21  during the period of supervised release, the defendant must

22  cooperate fully with the examination and collection division of

23  the IRS, provide to the examination division all financial

24  information necessary to determine his financial -- prior tax

25  liabilities, provide that information on all financial

1   information to the collection division necessary to determine

2   his ability to pay, file accurate and complete tax returns for

3   all those years for which returns were not filed and for which

4   inaccurate returns were filed and to be filed during the period

5   of supervised release and make a good faith effort to pay all

6   delinquent and additional taxes and interest.

7           The balance of this, together with the balance of the

8   fine, must be paid before the completion of the period of

9   supervised release.  It's due and owing now, and interest will

10  run from today.  And to the degree it hasn't been paid or

11  there's some claim that it can't be paid, then it will be

12  imposed according to a schedule that I will ultimately sign off

13  on but Probation will develop the information for.  In any

14  event, so long as it hasn't been paid, the defendant is

15  prohibited from incurring any new credit charges or opening any

16  additional lines of credit without the approval of the

17  Probation Office while any financial obligations remain

18  outstanding.

19          You must provide the Probation Office also with access

20  to any requested financial information with the understanding

21  that it must be, or will be, can be provided to the United

22  States Attorney's Office, their financial litigation unit, if

23  that's what they still call it, but in any event the people who

24  collect things, and they will presumably use that information

25  to collect until collection is completed.

1        I'm not going to impose home confinement or home

2   detention or monitoring, that sort of thing.  That isn't

3   applicable here.  In fact, the better thing is to get the

4   defendant out in the community as quickly as possible once he

5   has paid his incarcerative dimension to the sentence that I'm

6   imposing.

7        I believe I've touched all of the conditions that

8   might be considered here.  If the parties have anything else

9   that you'd like me to speak to, I'd hear it.  Ms. Victoria?

10       U.S. PROBATION:  Your Honor, no other conditions.  I'm

11   not sure if I heard you say the $100 special assessment.

12       THE COURT:  I think I did, but I sometimes think I say

13   things that I didn't say.  But I'll say that now.  There's a

14   $100 special assessment that's due and owing.

15       Anything else?  The question of surrender is a

16   different issue that I'll take up later, but I just want to

17   deal with the judgment and commitment order here.  Anything

18   further?

19       MS. KEARNEY:  No, Your Honor.

20       MS. CORRIGAN:  The only comment I do have, Your Honor

21   -- excuse me.  I know the court made a comment about not being

22   able to enter any credits in situations.  I do want to make

23   sure that the court is aware that my client is intending to

24   return home this evening, and he will be flying, so there

25   probably will be some credit card charges.  I'm sure that's not

1   what the court was meaning.  I just want to be very transparent

2   on that so there isn't any issue.

3           THE COURT:  I don't treat that, I don't think

4   Probation treats reasonable living expenses as being part of

5   that unless reasonable living expenses turn out to be something

6   that none of us could aspire to.

7           MS. CORRIGAN:  Right.  I just wanted to be sure that

8   you were okay with that.  And then as to the fine, he will be,

9   as soon as we receive the J and C, we'll be making arrangements

10  to make that happen.

11          THE COURT:  Okay.  In any event, it's, as you can see,

12  part of this process.

13          Mr. Bizzack, this is about you, as you know.  I've

14  tried to be as clear as I can about why I'm doing what I'm

15  doing, why I've imposed the sentence that I've imposed.  It's

16  also to tell the parties and other people, because we are

17  talking about general deterrence, what's involved and how it is

18  that I get to the point that I get to.

19          We started with a discussion about the alleged victim

20  in the case not wanting to have its reasons known.  An

21  institution, frankly, doesn't have the kind of privacy

22  interests that others do, and certainly no privacy interests

23  were shown here.  And that's the touchstone, that people

24  understand why a judge does what the judge does, not because

25  it's dictated by some agreement the parties entered into, not

1  because it's dictated because we've got guidelines that don't

2  fit but everybody tries to stretch or strain or cut to make

3  them fit, but because there's an exercise of judgment.  So

4  people have to understand what it is that the judge did, what

5  he was thinking about, and they can make their own

6  determinations.  It is the reason why I took out of the plea

7  agreement here -- you noticed it -- the waiver of the right of

8  appeal.  If I got it wrong, somebody can choose to appeal,

9  including you in this case.  That's what the system is all

10 about, transparency in all of this.

11      But now, as I said, it really is up to you.  You

12 indicated and I believe you, I told you I believed you, that

13 you are tending to the things that are important and they are

14 important.  If you don't, of course you're back here.  But that

15 seems unlikely.  More likely is that you will attend to those

16 things in your way, in ways that serve the larger purposes of

17 your life both before and after this and in the ways that don't

18 necessarily include what you did that brought you here.

19      If you do, you're going to be better off, obviously.

20 Your family is going to be better off, all of that.  And

21 society will be better off by someone acknowledging that it is

22 improper to accept the special privileges which you fought for.

23 I mean, it's not as if somebody gave you a silver spoon.  You

24 worked hard.  You developed businesses.  You made a lot of

25 money.  But you don't get to spend that money the way you did

1    here.

2         So for all of those reasons, I expect that I'm not

3    going to see you again.  I expect that you're going to deal

4    with this as an adult in the way that you did after it was

5    clear that you were in the crosshairs and that we can all move

6    on with our lives not having to worry about you in particular

7    but also in a society that understands the seriousness of this

8    kind of activity even if it can't be monetized in some

9    particularized way.  As I've indicated, I don't think it can,

10   at least on the record that's been presented to me in this

11   case.  Maybe the government will develop their understanding

12   and refine it even more and develop the evidence even more in

13   other cases as they come up.  Those are other cases.  I'm just

14   dealing with you.  And dealing with you, I'm hopeful.  So good

15   luck.

16         THE DEFENDANT:  Thank you, Your Honor.

17         THE COURT:  If there's nothing further, we will be in

18   recess.  I'm sorry.  I did not deal with self-reporting.

19         MS. CORRIGAN:  Thank you, Your Honor.

20         THE COURT:  What are you asking for?  I assume the

21   government doesn't object to it.

22         MS. CORRIGAN:  We did speak with them earlier.  We are

23   requesting the week of January 3.  January 3, if that's

24   acceptable to the court.

25         THE COURT:  Yes, it is.

1          MS. CORRIGAN:  And also, I understand it would just be

2    a recommendation but that my client be housed by the Bureau of

3    Prisons in the California area and obviously to a very minimal

4    security --

5          THE COURT:  Well, first I will make the -- delay the

6    reporting until January 3.  With respect to the recommendation,

7    I'll make a recommendation.  Everybody should understand it's a

8    recommendation.  The Bureau of Prisons is an entity of its own,

9    and it does whatever it feels like doing.  I will say that it

10   should be as close as possible -- that is in California -- as

11   close as possible to where he lives.  They make their

12   determinations with respect to security.  They make their

13   determinations of location having to do with a variety of

14   different factors that I'm not necessarily privy to.

15         MS. CORRIGAN:  Understood.

16         THE COURT:  I'm not always happy with their

17   recommendations.  In fact, I think many times that their

18   recommendations are wrong-headed, bureaucratic, foolish, but

19   they're the ones who make the decision.  I will simply make

20   that recommendation that he be housed in a facility that is as

21   close as possible to his home consistent with his security

22   needs.

23         MS. CORRIGAN:  And one last thing, Your Honor.  In the

24   absence of a designation by the Bureau of Prisons by January 3,

25   which I don't think will happen, but in the event that there's

1    an absence of designation, I request that my client be ordered

2    to appear at the United States District Court U.S. Marshals

3    Office which is located in Santa Ana, California.  It's a

4    Central District of California --

5              THE COURT:  Ronald Reagan Courthouse.

6              MS. CORRIGAN:  Yes.  At 411 West Fourth Street --

7              THE COURT:  I'm not going to do that.  I leave it to

8    the government or the parties to bring it up to my attention.

9    But the surrender I have in mind is the surrender as close as

10   possible to where he lives.  And that, from what you say, is in

11   the Central District, not the Southern District.

12             MS. CORRIGAN:  I'm sorry, maybe I misstated.  What I'm

13   asking for in the event that there is no designation by the

14   surrender date, because he would then have to go to a marshals

15   office to surrender, that he could just do it at the Santa Ana

16   courthouse.

17             THE COURT:  I'm not making that, except to say that he

18   can self-report, and to the degree that there's need to

19   self-report, someplace other than the facility would be the

20   United States Marshals Service as near as possible.  I don't

21   think that's going to happen.  Whatever the Bureau of Prisons

22   decides to do by designation will be done by January 3.

23             MS. CORRIGAN:  I agree.  I'm just cautious on that.

24             THE COURT:  There's nothing wrong with that, except

25   that it's premature.  If something happens, then the parties

1    will get back to me.  Okay.  Anything else?

2              MS. KEARNEY:  No, Your Honor.

3              THE COURT:  Thank you.

4              Okay.  We'll be in recess.

5              (Adjourned, 5:37 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 4th day of November, 2019.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter