Etsy

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2


3


4                                      )
    UNITED STATES OF AMERICA,          )
5                                      )
            Plaintiff,                 )
6                                      )   Criminal Action
    v.                                 )   No. 1:19-cr-10079-RWZ
7                                      )
    JOHN VANDEMOER,                    )
8                                      )
            Defendant.                 )
9                                      )


10


11              BEFORE THE HONORABLE RYA W. ZOBEL
                   UNITED STATES DISTRICT JUDGE
12


13

                            SENTENCING
14                   **(SEALED SIDEBAR REMOVED)**


15


16                        June 12, 2019
                          2:02 p.m.
17


18
               John J. Moakley United States Courthouse
19                     Courtroom No. 12
                       One Courthouse Way
20                 Boston, Massachusetts 02210


21


22
                    Linda Walsh, RPR, CRR
23                  Official Court Reporter
             John J. Moakley United States Courthouse
24              One Courthouse Way, Room 5205
                 Boston, Massachusetts 02210
25                  lwalshsteno@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Eric S. Rosen
4             AUSA Justin D. O'Connell
              AUSA Kristen A. Kearney
5             AUSA Leslie Wright
          One Courthouse Way
6         Boston, Massachusetts 02210
          617-748-3412
7         eric.rosen@usdoj.gov

8

     On Behalf of the Defendant:
9
          NIXON PEABODY LLP
10        By: Robert A. Fisher, Esq.
              Scott Seitz, Esq.
11        100 Summer Street
          Boston, Massachusetts 02110
12        617-345-1000
          rfisher@nixonpeabody.com
13

14

15

16              Proceedings reported and produced
                 by computer-aided stenography
17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise, please.
 3            THE COURT:  Good afternoon.  Please be seated.
 4            THE CLERK:  This is United States versus John
 5   Vandemoer.  It's Criminal 19-10079.
 6            Could I ask counsel to please identify themselves for
 7   the record.
 8            MR. ROSEN:  Good afternoon, Your Honor.  Eric Rosen,
 9   Leslie Wright, Justin O'Connell, and Kristen Kearney.
10            THE COURT:  Hold it.  Mr. Rosen and?
11            MR. ROSEN:  Leslie Wright.
12            THE COURT:  Okay.  And for the Defendant, Mr. Fisher.
13            MR. FISHER:  Good afternoon, Your Honor.  Rob Fisher
14   for Mr. Vandemoer.  And I'm here with Scott Seitz.
15            THE COURT:  I'm sorry.  Your co-counsel?
16            MR. FISHER:  He's my associate, correct.
17            THE COURT:  What's his name?
18            MR. FISHER:  Scott Seitz.
19            THE COURT:  Scott.  I don't have an appearance for
20   him.
21            MR. SEITZ:  Correct.
22            THE COURT:  How do you spell your last name?
23            MR. SEITZ:  I'm on the record, but Seitz, S-e-i-t-z.
24            THE COURT:  I'm sorry?
25            MR. SEITZ:  S-e-i-t-z.
```

 1         THE COURT:  Okay.  May I see counsel and Mr. Vandemoer

 2    at the sidebar, please.

 3         (At sidebar.)

 4                         * * * * *

 5              (SEALED SIDEBAR REMOVED)

 6                         * * * * *

 7         (End of sidebar.)

 8         THE COURT:  I think the first order of business is to

 9    consider the presentence report and the parties' objections

10    thereto, which are voluminous and complicated, and I think -- I

11    have reviewed them, and I have reviewed the presentence report,

12    but I would be pleased to hear counsel tell me about any

13    particular ones that they feel strongly about or that require

14    particular elucidation beyond what is in the papers.

15         MR. ROSEN:  Well, I don't think we need to go much

16    beyond what's in the papers.  The two that are important to the

17    Government obviously are the ones flagged I think in both our

18    objections to the presentence report as well as the Sentencing

19    Guidelines:  The 2B1.1 versus 2B4.1 issue as well as the loss

20    calculation under 2B1.1.  I think with respect -- I'll just

21    sort of briefly summarize the Government's position, which is

22    that of course --

23         THE COURT:  That is true.

24         MR. ROSEN:  Sorry?

25         THE COURT:  That is true.

 1          MR. ROSEN:  That the -- under the Sentencing

 2    Guidelines, of course, the 1346 statute, the honest services

 3    fraud is not contained within the appendix, and as such, we

 4    must use the most analogous guideline.  2B4.1, the Government

 5    believes, is the most analogous guideline.  This is a case

 6    involving bribery, and when a defendant is convicted of

 7    bribery, honest services fraud, the Government believes that

 8    the correct guideline to apply is the bribery guideline, which

 9    in this case of course is 2B4.1.  I think under 2B4.1, first of

10    all, it's called the commercial bribery and kickbacks

11    guideline, Application Note 1 specifically states that this

12    guideline covers commercial bribery offenses and kickbacks that

13    do not --

14          THE COURT:  Are you suggesting that what happened here

15    was commercial bribery?

16          MR. ROSEN:  Absolutely.  Stanford is a commercial

17    institution.  It is a massive educational institution.  It is,

18    I believe, a nonprofit.

19          THE COURT:  But the institution wasn't the one that

20    was doing anything.  In fact, the institution is here in the

21    position of not a Defendant but an aggrieved person --

22          MR. ROSEN:  Right, exactly.

23          THE COURT:  -- an aggrieved institution.

24          MR. ROSEN:  And Defendant was an employee of that

25    commercial institution, Stanford University, and he committed a

1   crime by depriving them of his honest services, and that's

2   exactly what 2B4.1 does.  It states that an employee of the

3   commercial institution by receiving bribes does deprive the

4   victim, here in this case Stanford, of its honest services.  So

5   it fits right in there specifically.  I think the -- you know,

6   I read the PSR.  I don't agree with their assessment of what a

7   commercial institution is.  I do note that Stanford publicly,

8   you know, states how many employees it has, over, I believe,

9   about 13,000.  It even talks about the technology licensing

10  that it has.  It says that in 2017 and '18 it received more

11  than $41 million or approximately $41 million in royalty

12  revenue from 813 technologies.  It's a nonprofit, but it's a

13  clearly commercial institution, and I think there's no

14  real -- and the guidelines, you know, I think point that out,

15  stating that the guidelines 2B4.1 applies to violations of

16  various Federal bribery statutes that do not involve government

17  officials, which is exactly --

18          THE COURT:  But the charge here is racketeering,

19  right, racketeering conspiracy?  And the underlying charges of

20  four counts of I believe -- I have forgotten -- four counts of

21  fraud and one of money laundering.  So where does the bribery

22  come in?

23          MR. ROSEN:  The bribery is in the specific

24  racketeering provision that involves honest services fraud.

25  It's -- if you look at Paragraph 18 of what he pled guilty to

1   and 18B, Title 18 United States Code Sections 1341 and 1346

2   relating to honest services mail fraud, and then Predicate Act

3   D, Title 18 United States Code Section 1343 and 1346 relating

4   to honest services mail fraud, I do know that the governing

5   case here is *Skilling versus United States,* and in that case

6   the Supreme Court said in 2010 in order to be convicted of

7   honest services fraud, you either have to be involved in

8   bribery or kickbacks.  So before 2010, you could possibly

9   violate honest services fraud without committing a bribery

10  offense, but after 2010 you can't.  That's the nexus of the

11  charge.  So it's clearly a federal bribery statute mandating

12  application of 2B4.1.

13          The information that the Government filed and which

14  the defendant pled guilty to clearly indicates that the nub of

15  Defendant's conduct was that of bribery.  Indeed, the fraud

16  would not have happened but for the ability to gain money for

17  the Stanford sailing program.  That's set forth in Paragraphs

18  8A and 8B, the manner and means of a racketeering conspiracy,

19  and it's important to note those where it says the Defendant

20  committed the racketeering conspiracy by designating applicants

21  as purported recruits for competitive college --

22          THE COURT:  You are reading the information?

23          MR. ROSEN:  In the information to which he pled

24  guilty -- for college athletic teams in exchange for bribes and

25  then concealing the nature and source of the bribe payments by

1    funneling the payments through the KWF charitable accounts, the

2    Key Worldwide Foundation accounts.  So under the manner and

3    means of the entire racketeering conspiracy, both prongs of

4    that focus on the bribery offense.  Paragraphs 9, 12, 14 and 15

5    also include references to bribes and payments that Vandemoer's

6    sailing program received.  This cannot be anything other than a

7    commercial bribery, commercial bribery case.  I understand the

8    PSRs --

9         THE COURT:  You called them bribes but nothing -- I

10   mean, it's not clear to me what makes them a bribe.

11   Essentially one payment, two payments.

12        MR. ROSEN:  Well, multiple payments and the agreement

13   to make payments.  But a bribe is simply a quid pro quo in

14   exchange of one thing for the other with the intent to defraud.

15   He defrauded Stanford by not telling them that he was doing

16   this of which they would have objected and ultimately did fire

17   him for, and also by recruiting people who were not true

18   competitive sailors to the team in exchange for these payments.

19   The nub of this is he wanted the money for the sailing program,

20   and he went about it in a criminal way that was contrary to

21   Stanford's values and ethics, as they say in their victim

22   impact statement.  This is a bribery case.  All these cases are

23   essentially bribery cases.

24        THE COURT:  They are not charged as briberies.

25        MR. ROSEN:  What?

1        THE COURT:  They are not charged as briberies.  They

2   are charged with RICO here with underlying conduct.

3        MR. ROSEN:  Your Honor, RICO is simply a crime that

4   consists of predicate acts as defined under the statute of

5   which two of those -- two out of the five predicate acts are

6   honest services bribery which, as I stated before, *Skilling*

7   specifically defines as a bribery offense.  So it has to

8   involve bribery.  This is a bribery crime.  The nub of this is

9   the exchange of payments for a pink envelope recruitment spot

10  is a bribery offense.  That's what --

11       THE COURT:  If you have five predicate acts but not

12  all of them charge bribery, nonetheless the sentence has to be

13  determined under the bribery guideline?

14       MR. ROSEN:  No.  You have to calculate -- under RICO

15  you have to calculate each one specifically.  So you calculate

16  the regular fraud and then you have to calculate the honest

17  services fraud as well as the money -- as well as the money

18  laundering.  I do know -- it's not sort of dividing them up,

19  but calculating each one of them as predicate acts separately

20  which is what the statute calls for.

21       We can group some of them, but the grouping has to be

22  accurate, Your Honor.  And the accuracy here is determined by

23  2B4.1, and that's what the Government says and that's always --

24  Your Honor, respectfully that's what the case law says.  The

25  Government cited to five separate circuit courts that have

1    determined that when you have a bribery offense 2B4.1 applies.

2    I think more -- and a lot of those are pre-*Skilling*.  So in

3    pre-*Skilling* you sort of have to determine whether the bribery

4    guidelines apply or whether the wire fraud guidelines apply to

5    2B1.1.  Post-*Skilling* you don't really have to do that analysis

6    anymore because *Skilling* has determined that it's only a

7    bribery offense.

8          So if you look at the recent District Court cases,

9    cases cited like *United States versus Kelly* in the Southern

10   District of New York in 2018, cases like *United States versus*

11   *Tanner*, the Court determined, you know, as an honest services

12   bribery case that in the honest services fraud case that 2B4.1

13   would apply, and there's another case that I found just last

14   night, *United States versus Xin Fan*, X-i-n F-a-n, from the

15   Northern District of Ohio, that was the same thing.

16         The point I'm trying to make with the case law is

17   there's nothing going the other way.  This isn't really a, I

18   think, a dispute anymore.  I think *Skilling* pretty much puts

19   the nail in the coffin that when you have a bribery offense,

20   where the Defendant is convicted of an offense as an honest

21   services Federal bribery case, 2B4.1 applies, and I think

22   that's clear in our response.

23         I think the statement that it's not commercial is

24   belied by all the facts, it's belied by public statements from

25   Stanford's website, it's belied by the fact that this is the

1  largest international university that accepts tuition from

2  students to teach them and also creates its own products, as I

3  just read, the $41 million in licensing fees, employing more

4  than 10,000 employees in the Northern District of California

5  primarily, and there's nothing going the other way.  So I think

6  in terms of the 2B4.1 versus 2B1.1 distinction, there really is

7  no distinction in this case, and the Court has to analyze those

8  predicates separately, Your Honor.

9         THE COURT:  Mr. Fisher?

10        MR. FISHER:  Your Honor, my response to that is

11 multiple-fold, I guess.  You know, the Government stands here

12 and tells you that it's clear that it's 2B4.1, but in their own

13 plea agreement that they executed with them, they chose 2B1.1.

14        THE COURT:  Well, that is a problem for them.

15        MR. FISHER:  Correct.  Another problem for them is

16 they say it as if it's so clear that nobody can miss it, and

17 yet we found a case that -- and I have great respect for AUSA

18 Rosen; I've known him a long time -- but a case that he had in

19 this courtroom in front of you, it was an honest services fraud

20 case, and it was sentenced under 2B1.1, not 2B4.1, and the

21 individual got a few months of probation.  They were asking for

22 13 months of probation.  The name escapes me at the moment.

23        But, again, we've also been sort of painted into a

24 corner because this has come up very recently, this issue about

25 2B1.1 versus 2B4.1.  They filed their sentencing memorandum,

1   and it -- frankly, it deals less with my client, Mr. Vandemoer,

2   and much more with this issue, this as 2B1.1 versus 2B4.1

3   issue.  We didn't deal with it because we didn't have an

4   objection with Probation's analysis.  We signed a plea

5   agreement that said 2B1.1.  They knew what kind of case it was

6   for months before we did.

7        The timeline -- I think we had 24, 36 hours to decide

8   if we were going to take that plea agreement with my client

9   after having met him 48 hours before then.  They had months to

10  analyze these issues.  We had hours.  So we signed the plea

11  agreement thinking there potentially was some loss.  When we

12  saw the analysis by Probation, that there was in fact no loss

13  by the institution, which I think is confirmed by in fact the

14  institution, they then switched this 2B4.1, saying, well, no,

15  it's not a fraud case.  This is a bribery case.

16       But this has been, in the press and otherwise, sold as

17  a fraud case.  In fact, when I was debating this with my

18  colleagues in my office, I said, I don't understand where the

19  bribery charge is here.  It seems like they allege mail fraud,

20  wire fraud, racketeering, there's money laundering.  Why didn't

21  they just charge the bribe.  It's not to a Government official,

22  I guess, but then they fall back on commercial bribery

23  post-*Skilling*.  But of course post-*Skilling* it seems like every

24  single honest services fraud case would have to be 2B4.1, but

25  that isn't how they're being charged or being found by

1  Probation or by Court.

2          So, again, this is a complicated issue.  I'm not

3  trying to say it's clearcut, but it apparently was clearcut for

4  the government.  And, frankly, when they were having press

5  conferences about this case, the U.S. Attorney himself, I

6  believe in an NPR interview, said how is this case any

7  different than rich parents who donate money to a school to buy

8  a building or a park or whatnot, how is it any different than

9  that, what's happening here?  And he said, well, the difference

10  is fraud.  The universities are being defrauded.  Nothing about

11  bribes.

12          And, frankly, you know, I think this other issue we

13  are having, it's probably unfortunate, I think, that the first

14  Defendant to be dealing with this guideline issue is

15  Mr. Vandemoer, because I'm sure, as the Court knows and

16  probation knows and the Government knows, he is a unique

17  individual in what is a unique and unprecedented case.  It is

18  unusual given the fact that he is charged with racketeering,

19  and I have tried over the past few weeks to find another

20  racketeering case where the person charged with racketeering

21  gave the bribe to the victim.  I can't find anybody that can

22  find a case similar to that.

23          And the fact that no students actually got in, they

24  were not defrauded in any way.  No students went to Stanford

25  because of him.  In fact, none even applied.  Their pink

1    envelopes were never sent back in.  So Stanford was never in

2    the position where they had to say here, here's an admission

3    slot and some other student who really deserved it didn't get

4    in.  That didn't happen here.  So we have some unusual facts

5    bumping up against what is some disagreement with 2B1.1 and

6    2B4.1 post-*Skilling.*

7          I agree, this is not a clearcut issue by any means,

8    but what we're saying is we should uphold the plea agreement,

9    which says 2B1.1.  That's what we relied upon and that's what

10    Probation relied upon and their analysis after spending much

11    more time on this than we were able to when we signed this plea

12    agreement, well, there is no loss.  And only after that

13    determination was made did we hear from the Government, oh, now

14    it's 2B4.1, and we want to analyze this under the bribery

15    guidelines.

16          So before I conclude, I would like to say, though,

17    however you determine this issue, whether you agree with

18    Probation's analysis or the plea agreement or the Government or

19    us, I think it has to be clear at the end of this hearing that

20    whatever sentence you do give my client would have been the

21    sentence regardless of wherever the guideline calculations are.

22          Now, again, we have not had the opportunity to brief

23    this.

24          THE COURT:  It appears the Government's view as well

25    because the Government, regardless of its view about whether

1    it's 2B1.1 or 2B4.1, has changed its mind about the

2    recommendation, and the recommendation has nothing whatever to

3    do with whatever the result would be whether -- whatever it is.

4         MR. FISHER:  I agree, Your Honor.  And, again, that's

5    why I say it's unfortunate that my -- John is the first one to

6    go through this because I really don't think this is about him,

7    right?  I think we all know this is about the cases that come

8    after this and whether the loss is going to be applied to 2B1.1

9    for any other plea agreements that may be floating around out

10   there.  Because this is the first we had heard about 2B4.1 was

11   the objection to the PSR.

12        Again, we filed our sentencing memo.  I wanted to

13   focus this hearing on John.  And in fact, in the days leading

14   up to this, spending time with him, his wife, his parents, I

15   have been bracing everybody by saying the first half of this

16   hearing is going to be about -- it's going to sound like we're

17   doing our taxes up here and not talking about how John's life

18   has been affected or what he did.  And that is what it has

19   turned into.

20        Because the sentencing memos were filed Friday, we did

21   not have an opportunity to file a memo in response to the

22   guidelines arguments, but again, I agree with the Court, it

23   doesn't affect us so much because of the fact they're

24   recommending 13 months and the guidelines under any calculation

25   are going to be higher.

1          THE COURT:  Thank you.

2          Anything else?

3          MR. ROSEN:  Just very briefly, the Government has

4    conceded that it made a mistake in the plea agreement.

5    Obviously it was a very -- there was a lot going on at that

6    particular time when this was made in a very short time frame.

7    It doesn't do anything against the fact that the Court has to

8    correctly calculate the guidelines.  That's simply what we're

9    asking for here.  And I agree, this isn't, although it's not

10   determinative of the actual sentence that he'll most likely

11   receive, it is still critically important, both in this case

12   and cases going forward, that the correct guideline, 2B4.1, is

13   used for the bribery portion and that the loss is correctly

14   determined as to, what we believe, the gain for the Defendant

15   for the regular --

16          THE COURT:  You are saying the loss to the institution

17   is the same as the gain to the Defendant?

18          MR. ROSEN:  Well, I think in the situation under

19   the -- what I consider to be the regular fraud statutes, mail

20   and wire fraud, not the honest services portion, you have to

21   look at the intended gain, sorry, intended loss or actual loss.

22   And in this we believe that, you know, obviously pursuant to

23   the plea agreement, the parties have agreed that the loss here

24   is essentially equivalent to the gain that the Defendant

25   received, which is $610,000.

1          THE COURT:  Okay.  Well, I must say, I'm not persuaded

2     by the notion that these five separate predicate acts, two of

3     which are the honest services accusations, should -- that they

4     should run this decision between 1.1 and 4.1, and I think

5     Probation's argument about the loss persuades me that 2B1.1 is

6     the appropriate and correct guideline to count in this

7     particular calculation.  So to the extent that there's an

8     objection to Probation's calculation there, it is overruled.

9     Then there are lots more.  Although this one goes on for a

10    while.  That one -- I'm sorry.  I skipped over Objection Number

11    1 because that had been already corrected by -- that had to do

12    with the other sentencing -- the place in which the other cases

13    are in the sentencing scheme; that is, not what the sentence

14    should be but where they are procedurally with respect to

15    sentencing.

16          And then Objection Number 2 was the victim impact

17    objection, and we now have a letter from Stanford that says

18    "Ouch.  Shouldn't have happened," but it does not tell us

19    anything about any losses that it has, particularly not in

20    dollar amounts.  So I'm not sure what to do with that other

21    than the fact that they are aggrieved, but there is no amount

22    given by the university.

23          That takes us to Objection Number 4, the offense level

24    computation, and that ultimately goes back to 2B1.1 versus

25    2B4.1 so it is overruled.

1          Objection Number 5 -- no, I'm sorry.  Objection Number

2     4, Probation agrees with the Government, and there follows from

3     that agreement also with respect to Objections 5, 6 and 7.  So

4     those have been addressed.

5          And Objection Number 4 -- Number 8 is similar.

6          Objection Number 9 pertaining to fines and special

7     assessment guidelines provision is overruled.  I believe that

8     the total offense level now is 18, is it not, not 21?

9          MR. ROSEN:  Yes, Your Honor.  Under your calculation,

10     to which the Government objects, it would be 18.

11          THE COURT:  So that objection is overruled because I

12     overruled the earlier one.  Similarly, 10 -- well, similarly

13     10 -- 10 has to do with restitution.  It is overruled because

14     Stanford isn't looking for any restitution.  It may tell us

15     that it hurts, but it's not looking for any money.

16          Then we come to the Defendant's objections.  Number 1,

17     that Probation has amended the report to reflect the objection.

18          Number 2 deals with any allegedly material benefit to

19     Mr. Vandemoer.  I note it but it's overruled.  I think

20     Probation is correct on that one.

21          Similarly on Objection Number 3 where Mr. Vandemoer

22     objects to part -- the phrase partly due to the fact that she

23     had fabricated sailing credentials having to be -- this being

24     one of the students who never did get there.

25          Objection Number 4, Probation has responded to that,

1  so I need not rule on it because it has accepted your

2  suggestion.

3         And Objection Number 5 objects to Probation's language

4  that the Defendant abused his position of trust by certain

5  methods, that is overruled because I think there was an abuse

6  of trust.

7         And Number 6, Mr. Vandemoer objects on the grounds

8  that the paragraph 108 is temporarily unclear and contains old

9  information, but I think that has been corrected by Probation

10  so I need not rule on that.

11         Objection Number 7 has -- also deals with an issue

12  that Probation has addressed and done.

13         And that is all the objections.  So where we end up is

14  with a -- now I have to find it again -- with a total offense

15  level of 18, and the Criminal History Category of I, and that,

16  I believe, yields a guideline range of 27 to 33 months.

17         Are there any other objections to the presentence

18  report or any other comments about that?

19         MR. FISHER:  Not on behalf of the Defendant, Your

20  Honor.

21         MR. ROSEN:  Judge, if I could go back to Objection 3

22  from the Government.  I just want to make sure the record is

23  clear.  The parties agree that there was a loss here between I

24  believe $550,000 to $1.5 million.

25         THE COURT:  What's the loss?

1          MR. ROSEN:  The loss here is Stanford suffered, you

2     know, significant pecuniary loss, and I laid that out in our

3     sentencing memo.

4          THE COURT:  No.  I was looking at Stanford's own

5     letter, assuming it hasn't disappeared.  Here it is.  I mean,

6     Stanford says they had some significant out-of-pocket costs, no

7     amount, as well as time and diversion from its core academic

8     activities, no dollar amount.  They acknowledged that no

9     applicant was admitted -- no applicant involved in this scheme

10    was admitted so I'm not exactly sure what that would amount to,

11    and therefore, they didn't incur any expenses in having a

12    student that then had to be dismissed.

13         And then they say that although the Defendant's

14    conduct resulted in donations to the Stanford program, they

15    think they are so tainted that they want to give it away.  So

16    what are the losses?

17         MR. ROSEN:  Well, first of all, in the honest services

18    context, it's the loss of Defendant's salary.  The Defendant

19    was employed as an employee of Stanford.  He was paid for that

20    job, and instead he took bribes.  So on a very visceral

21    level --

22         THE COURT:  You mean the salary paid to Mr. Vandemoer?

23         MR. ROSEN:  Well, I'm talking about the pecuniary

24    losses.  Under the Sentencing Guidelines, it's actual versus

25    intended loss.  So under the actual pecuniary loss suffered by

1   Stanford, the Defendant has a duty of honest services to

2   Stanford, and he violated --

3           THE COURT:  You are going to back to your 2B1.1 and

4   2B4.1.

5           MR. ROSEN:  Well, respectfully, Your Honor, I'm not.

6   I'm just trying to state the pecuniary --

7           THE COURT:  You are not talking about loss to be

8   repaid?

9           MR. ROSEN:  I'm talking about loss that Stanford

10  suffered -- the guidelines are very clear.  You have actual

11  loss, you have intended loss, and when the amount is difficult

12  to calculate, use the gain gotten by the Defendant.  The

13  parties had agreed that the -- both the actual and the intended

14  loss were essentially difficult to calculate, so as a result --

15          THE COURT:  The gain to whom?

16          MR. ROSEN:  The gain to the Defendant, which in this

17  case --

18          THE COURT:  What's the gain to the Defendant?

19          MR. ROSEN:  $610,000 into his sailing program.

20          THE COURT:  It's not his gain.  He gave it to the

21  university.

22          MR. ROSEN:  It absolutely is his gain.  He benefited

23  significantly by allowing it to boost his program, buying new

24  boats.  It was absolutely for his intended benefit.  It didn't

25  go directly into his pocket, but it certainly went to his

1   benefit.  The university acknowledges that by giving away the

2   tainted funds.  They don't want it.  The -- Judge, I think

3   the --

4           THE COURT:  Did they give away the boats, too?

5           MR. ROSEN:  I don't know what's happened with the

6   boats, Your Honor.  But I think the point on a very simple

7   level of what or how, you know, whether Stanford suffered

8   actual or intended loss is simply the salary issue, to which

9   Defendant pled guilty, is the honest services fraud, in which

10  the parties agree.  So it's difficult to calculate, I admit.

11  It's very hard.  So the Sentencing Guidelines mandate that if

12  you can't properly calculate the loss, you have to look at the

13  gain, and the gain here was $610,000.  There are other issues

14  of intended loss, and so the issue that --

15          THE COURT:  What difference does this make to any

16  guideline calculation at this point since we are past 2B1.1?

17          MR. ROSEN:  We have to calculate the predicate acts

18  correctly, Your Honor, and the predicate acts are wire fraud

19  and, you know, and -- both wire and mail fraud.  So we have to

20  calculate those correctly.  So it might not matter in terms of

21  the total offense level at the very end, but under the

22  Sentencing Guidelines, I believe 2E, you have to calculate the

23  predicate acts, and the fraud is a significant predicate act.

24          And so I just want to make sure the record is clear

25  that by everyone's admission, there is a loss to Stanford with

1    it, at the very least, the salary, and because that's very

2    difficult to calculate as to terms in percentage-wise, we have

3    to look at the gain.

4         THE COURT:  I don't think either Probation or the

5    Defendant or I suggested that there was not fraud, both regular

6    fraud and honest services fraud.

7         MR. ROSEN:  And I agree, but the issue is not whether

8    there is fraud.  The issue is how do you calculate that under

9    the guidelines under 2B1.1.  We have to look at the -- either

10   the loss level, which is hard -- which is hard to determine for

11   the reasons that I've set forth or if it is hard to determine,

12   you have to look at the gain.  Gain here is a much better proxy

13   because gain is the amount that he took in and sold the spots

14   for.

15        The other objection that the Government has is simply

16   in terms of, you know, A, I don't think Stanford's letter was

17   meant to be the be-all and end-all of the guidelines analysis.

18   They were just simply writing a letter to show how they've been

19   impacted.  But there was certainly the intent to get those

20   students into Stanford.  That was the intent with Rick Singer

21   and was the intent of John Vandemoer.

22        So the fact that they didn't show up and the fact that

23   tuition wasn't spent on them specifically, that should be

24   irrelevant to the Court's analysis of determining loss.  The

25   second issue is this, and I cited a case law about -- in the

1  brief is simply about selling at the price of a spot.  He took

2  a spot, and he sold it.  The price was $500,000.

3          If Stanford had auctioned that spot off for much more,

4  offered it off to the general public, clearly the price would

5  have been more significant, and that's important because it

6  shows the loss to Stanford.  The loss, as other cases have

7  determined that I cited in the sentencing memo, showed that in

8  analyzing the loss of Stanford, you look at the amount that

9  someone paid and the amount that Stanford would have paid had

10 they sold that to the general public.

11         And obviously, had the scheme succeeded, had they been

12 admitted, the quality of the students would have gone down and

13 would have reduced the perceived value of the Stanford

14 education, yet another loss.  So, Judge, I respectfully

15 disagree that there are a lot of losses, a lot of pecuniary

16 losses.  They are hard to calculate.  And so both parties agree

17 in crafting the plea agreement that gain was the appropriate

18 proxy for that -- for the loss.  So I respectfully --

19         THE COURT:  Whose gain?

20         MR. ROSEN:  The gain to the Stanford sailing program

21 as accounts controlled and benefited to Mr. Vandemoer.  Where

22 he chose to put the money is irrelevant.

23         THE COURT:  I don't find the gain to the sailing

24 program.  I have somewhat difficulty understanding the dollar

25 value of the gain to him.

1          MR. ROSEN:  The gain to the Defendant -- he had the

2     power to direct the bribes to wherever he wanted to direct

3     them.  He chose not to direct them to himself.

4          THE COURT:  So it's a psychological gain?

5          MR. ROSEN:  It's not a psychological -- he had the

6     ability to spend that money and he did spend it.  He bought

7     boats with it.  Where he chooses to --

8          THE COURT:  So there is a gain to him for spending it

9     for Stanford's sailing program, and there's a gain to Stanford

10    sailing program because they got it?

11         MR. ROSEN:  He was a coach of the sailing program,

12    Your Honor.  He directly benefited from having new boats and

13    salaries he could pay assistant coaches for.  We agree --

14         THE COURT:  I'm not disagreeing that he may have

15    benefited.  He certainly benefited psychologically by improving

16    his program.  I just have difficulty understanding how his

17    getting let's say $10 and then giving that to Stanford is a

18    gain to him of $10 and -- unless, of course, he takes tax

19    deductions for that, which is clearly not an issue here, at

20    least not in this case.

21         MR. ROSEN:  Right, no.

22         THE COURT:  But ultimately the gain was Stanford's,

23    not his.  The monetary gain was Stanford's, not the

24    Defendant's.

25         MR. ROSEN:  Well, I think, Your Honor, respectfully I

1    disagree, but I think more importantly under the guidelines the
2    Court -- it specifically states that in gain, the court shall
3    use the gain that resulted from the offense as an alternative
4    measure of loss but only if there is loss that can reasonably
5    be determined -- that cannot be reasonably determined.  So the
6    guideline specifically states you don't look at the gain to the
7    Defendant himself personally; rather, the gain from the
8    offense; and it's undisputed by everyone involved that the gain
9    from the offense was --

10          THE COURT:  And what difference does that make?

11          MR. ROSEN:  It makes -- Judge, respectfully, we have
12   to calculate the predicate acts correctly, and the predicate
13   acts here, it adds a significant amount to the guidelines.  It
14   adds 14 to the level of a level of 21, and you would --

15          THE COURT:  So are you now challenging the guideline
16   result that I gave earlier?

17          MR. ROSEN:  I'm -- I didn't quite understand, Your
18   Honor, respectfully, the -- how the guideline calculation was
19   derived with the -- I want to make sure our objection was heard
20   and that there was a determination for the record.

21          THE COURT:  It was based on the presentence report.

22          MR. ROSEN:  And we objected to that.

23          THE COURT:  And I overruled the objection.

24          MR. ROSEN:  But I wanted to make sure that the record
25   was clear, Your Honor, respectfully, that in terms of how you

 1    actually derived -- that there is a -- that there was loss to

 2    Stanford, which wasn't -- which doesn't seem to be debated by

 3    any other parties, and that there was gain that resulted from

 4    that, and it seemed to be missing from the analysis of exactly

 5    why the Court disagrees with that.  And I just want to make

 6    sure the record is clear on that.  If that's your final

 7    decision, I accept that, but I think I have put forth at least

 8    four or five ways Stanford suffered pecuniary loss, which isn't

 9    debated by any of the parties.

10         I respectfully ask, Your Honor, to go back and at

11    least for that one, the fraud calculation under 2B1.1, I

12    respectfully ask that we reconsider the Court's objection

13    because it's very important for the Defendant.  It changes the

14    guideline by one point -- or one or two points, and it's also

15    important for the other cases.

16         THE COURT:  What are you saying is the correct

17    guideline calculation?

18         MR. ROSEN:  The correct guideline as agreed to in the

19    parties' plea agreement is 20, not 18, Your Honor.

20         THE COURT:  But you have aggregated the plea

21    agreement.  I mean, I don't understand how you can stick to the

22    20 while you're suggesting at the same time that the wrong

23    portions of the guidelines were used.

24         MR. ROSEN:  Judge, we're not abrogating the plea

25    agreement.  We strongly stick by the plea agreement.

1          THE COURT:  No, but the calculation.  The calculation

2     of 20 was based on one set of guideline rules but now you want

3     another set of guideline rules.

4          MR. ROSEN:  Judge, respectfully, that's not accurate.

5     The predicate act has to be calculated individually.  What

6     happened when we were calculating the predicate -- when we were

7     calculating the guidelines initially, we didn't calculate the

8     predicate acts for the honest services properly.  But we did

9     calculate the predicate acts to be -- for the regular fraud,

10    the wire and mail fraud properly.  Under the RICO guidelines,

11    you have to look at each predicate act as a separate crime and

12    calculate it separately.  That's all I'm asking to do now.  I'm

13    asking simply to enforce the plea agreement as it stands and

14    to --

15         THE COURT:  But you told me it was not correct?

16         MR. ROSEN:  In certain respects, and the other

17    respects it was correct.

18         THE COURT:  So what?  I mean, so you have one correct

19    piece for a calculation, and then you say that another piece is

20    wrong and --

21         MR. ROSEN:  Yes.

22         THE COURT:  -- how do they get together?

23         MR. ROSEN:  Well, they get together --

24         THE COURT:  You can make one charge of RICO conspiracy

25    through the five predicate acts, and now you are telling me

1    that certain of the predicate acts should be calculated by 1.1

2    and certain other ones by 4.1 and then we end up with two

3    different guideline calculations for two different predicate

4    acts, and what do we do with that?

5            MR. ROSEN:  You take the higher one.  I believe that's

6    set forth in --

7            THE COURT:  But that would not be in accordance with

8    the plea agreement.

9            MR. ROSEN:  It absolutely is in accordance with the

10   plea agreement.  The error in the plea agreement was that we --

11           THE COURT:  But it says to do it on the basis of 1.1.

12   I mean, it's an inconsistent plea agreement, inconsistent

13   calculation.  It uses 1.1 and ends up with 4.1.

14           MR. ROSEN:  Judge, the only inconsistency there is

15   that we didn't properly characterize the honest services

16   portions, the predicate acts as separate, and that it should

17   have gone over to 2B4.1.  It doesn't mean we are abrogating it

18   as to the regular fraud.  2B1.1 is the controlling guideline

19   for RICO, and that says when there is more than one underlying

20   offense, treat each underlying offense as if contained in a

21   separate count of conviction, and then to determine whether the

22   result is in the greater offense level, and it says use

23   whatever subsection results in the greater offense level.  So

24   we're not abrogating the plea agreement.  We're simply trying

25   to apply 2B1.1, the underlying RICO guideline, correctly here.

1  It's a difficult task admittedly.

2         We messed up back in March when we were crafting the

3  plea agreement.  We are not abrogating it.  We're certainly not

4  walking away, and we are actually recommending a sentence much

5  less than what's called for in the plea agreement.  We are

6  asking to calculate the guideline correctly.

7         THE COURT:  I mean, given that the recommendation is

8  less, I don't know what we are fighting about other than for

9  your other cases.

10        MR. ROSEN:  Judge, I think -- well, respectfully, Your

11  Honor, I think the First Circuit says you have to calculate

12  correctly.  It's not an academic exercise.  We're not trying to

13  make it an academic exercise.  All we're asking for is that --

14  I've set forth now three or four ways Stanford suffered

15  pecuniary harm.  I've set forth ways in which it's very

16  difficult to calculate, and that the gain under the guidelines

17  of the offense, not to the Defendant but of the offense total,

18  is $610,000.  That's all we're asking for is just to calculate

19  that correctly.

20        THE COURT:  Okay.

21        MR. FISHER:  Your Honor, if I may add, I think we can

22  get there quickly -- I think if the Court agrees that Probation

23  got the calculation right, that there was in fact no loss.  I

24  know the Government now in their sentencing memo did lay out

25  four or five reasons why they think that Stanford lost money.

```
 1    I think none of them are good reasons that Stanford lost
 2    anything.
 3            In fact, in Stanford's own letter that they wrote,
 4    they claimed a benefit that they are trying to unload of
 5    $770,000.  So if we're going to say that John Vandemoer had an
 6    intent to defraud the university for something of value, I
 7    think that's mistaken because if no students got in, first of
 8    all, but if any did get in, these were not scholarships.  They
 9    were not sailing scholarships at Stanford.  All of these kids
10    would have been paying full freight.  In the salary argument
11    they raised, there's case law right on point.  We would have to
12    have a full hearing, and the Court would have to determine what
13    portion of his salary was not earned by him.  And there's no
14    allegation anywhere that he wasn't earning his salary as the
15    head sailing coach.
16            So I think for us to get where the Court needs to be
17    based on your prior ruling would be that Probation's
18    calculations are right.  There is no loss because even though
19    the plea agreement -- there can be an agreement that binds the
20    Government and binds us potentially.  It does not bind you.  So
21    I think that's how we get to where we need to be, and the
22    guideline could be 18.  And then -- I know we've been here
23    awhile -- then we can get on to talking about Mr. Vandemoer and
24    everything he's been doing for the past, you know, however many
25    months.
```

1      Again, I had a concern this hearing was going to turn

2  into this argument about 2B1.1, 2B4.1, because it wasn't

3  foreseen.  And I know it's complicated.  I'm not blaming the

4  Government it happened, but it really doesn't affect my client.

5  So I think if the Court found that there is no loss to

6  Stanford, because I have not seen -- other than the sentencing

7  memo, I haven't seen any evidence that they've lost something

8  of pecuniary value.  It's certainly not in their letter, and I

9  have seen no documents to support it.  There are theories, but

10  I think none of them have basis in fact.  So I think the

11  fastest way for us to get to what does Mr. Vandemoer deserve at

12  the end of the day is if the Court agrees with Probation, which

13  now in hindsight, we do, the Defendant, because of course now

14  there's been plenty of months in between the scurry to get this

15  agreement signed before the indictments came down and became

16  public, I think with hindsight being 20/20, they make a very

17  compelling, solid foundation point, that there is in fact no

18  loss to the university.

19      THE COURT:  I accept the calculation by the Probation

20  officer with all of the details that she has given us.  I do

21  not find any loss by -- that I can in any way calculate by

22  Stanford or based on the letter that Stanford has sent and will

23  not do any further -- I will make no further attempt to try to

24  figure out what loss there might be or what gain there might

25  have been.  So your objection to that ruling is noted.

1         And we end up with the same calculation that I said

2    previously, a total offense level of 18, Criminal History

3    Category I, and the guideline range of 27 to 33 months.

4         And I will now hear the Government's recommendation.

5         MR. ROSEN:  Thank you.

6         May I get some water, Your Honor?

7         THE COURT:  I'm sorry?

8         MR. ROSEN:  May I just get some water?

9         THE COURT:  Of course.

10        MR. ROSEN:  Judge, on March 12th of 2019, 50

11   individuals were charged by complaint, indictment and

12   information.  Defendant John Vandemoer, the former sailing

13   coach at Stanford, was the first coach to plead guilty, the

14   first to be sentenced, as we know.  The sentence you impose

15   today, Your Honor, will set the tone for these cases going

16   forward.  The Government strongly believes that a sentence of

17   imprisonment here will send a powerful message to the

18   Defendant, to the other defendants in this case, and to those

19   considering using bribery and fraud to secure college

20   admissions at elite universities for children, students and

21   clients.

22        The message is simple, but it does need to be said.

23   If you pay or receive bribes, if you lie and cheat and if you

24   engage in a scheme that ultimately results in the theft of

25   college admissions spots from someone who deserves it, you will

1  be criminally prosecuted, and you will go to prison.

2        The sentencing factors set forth in Title 18 United

3  States Code Section 3553 commands us in fashioning a sentence

4  to examine the need for the sentence imposed.  And why is the

5  sentence of imprisonment needed here?  It is needed because

6  this case goes far beyond John Vandemoer and the $610,000 he

7  agreed to accept.  Rather, the damage that the college

8  admissions scheme inflicted, as outlined in numerous

9  indictments, complaints and information, was significant and

10  far-reaching.

11        As Stanford noted in its victim impact letter,

12  Defendant's actions together with Singer undermined public

13  confidence in the college admissions system and reflected

14  negatively on Stanford and its hardworking honor student

15  applicants.  Thousands of news articles have been written about

16  the various schemes and players here, charged and uncharged,

17  many interesting and illuminating, but for the purposes of

18  sentencing, what is striking is how many articles focus on how

19  the cheating and bribery scandal negatively impact the

20  perception current high school students and college students

21  have about the whole college admissions process.

22        The *New York Times* invited students to comment about

23  how the college admissions scandal impacted their lives.  The

24  comments were then published by this newspaper on March 21,

25  2019.  Many of the comments demonstrated exactly why this Court

1    needs to send a powerful message to would-be cheaters that such

2    criminal conduct will not be tolerated.

3        Emily from Carlisle, Pennsylvania, writes, "While I'm

4    not surprised, I am appalled this has been going on for years

5    that parents and people of money feel the entitlement that they

6    do.  Thousands of students across the country, myself included,

7    work tirelessly in several jobs, are heavily active in their

8    communities, and maintain high and real grades of scores just

9    to have a sliver of a chance to be accepted to our dream

10   school, and to be able to afford it without an enormous amount

11   of student debt."

12       Anya from Philadelphia, "Families travel to the United

13   States in hope for better opportunities for them and their

14   children.  Students work long hard hours to bring up their

15   grades and prepare for tests, yet many of these students don't

16   get into the schools of their choice.  It's horrible to think

17   that these innocent people lost their chance to someone who

18   didn't go into this school fairly."

19       Dalton from South Carolina, "When I look at this I

20   feel really bad.  Students like me work really hard for our

21   future, while some kids who don't try at all are given the

22   opportunity to go to the top colleges without putting in an

23   ounce of sweat.  I stress ever day thinking about getting into

24   college, and knowing that it could be taken away because of

25   people like this is terrifying."

1      Izzy from Vermont, "As a high school student beginning

2  the college admissions process, these dishonorable acts

3  dishearten my confidence and leave me regarding every sleepless

4  night and study session as meaningless, able to be signed away

5  by a simple paycheck."

6      And one final thought from Thomas from North Carolina.

7  "I have a very strong opinion on this that can be boiled down

8  to three simple words:  It's not fair.  Students work hard to

9  get into college.  They constantly push to achieve their

10  dreams.  They sacrifice time, sleep and even their passions

11  just to get where they want to go.  Sometimes they don't get

12  in.  It's sad, but it happens, and it often means that the

13  person who did get in worked harder, and that the person who

14  didn't get in might need to work harder.  That's fair.  What

15  isn't fair is a hardworking student not getting into the school

16  of their dreams because they weren't born with deep pockets.

17  That's unfair."

18      I echo the words of Thomas from North Carolina.  This

19  is unfair.  This is totally unfair.  The system is rigged.  It

20  is broken.  It is crying out for reform and change.  If we fail

21  to take these crimes seriously, if we give just a slap on the

22  wrist instead of real punishment, if we minimize Defendant's

23  conduct or shrug off this case as just a few bad apples, we are

24  shortchanging not only the criminal justice system but all

25  those kids in high school who are working hard every day in an

1   effort to improve their own lives and get into the best school

2   they can honestly and through hard work.  Those kids just want

3   this Court to acknowledge that when they apply to college and

4   pay the application fee that they get a fair shake, a chance

5   based on merit and honest assessment of one's own credentials

6   for admittance to that university.  These kids deserve that,

7   our society needs that, the 3553(a) factors in stating that we

8   need to look at the seriousness of the offense in imposing

9   sentence mandates that.  The danger in this case and the

10  related cases is not in overpunishment but rather in failing to

11  send a message that this cheating and bribery is taken

12  seriously.

13         I do not dispute the premise of Defendant's sentencing

14  memorandum, which is that Defendant is a good person.  I do not

15  dispute that the Defendant loves his family and his children,

16  the Defendant loved his employment at Stanford.  For all

17  intents and purposes, Defendant appears to be a great sailing

18  coach.

19         As Your Honor knows, good people sometimes do bad

20  things, and Defendant's good work should be taken into account

21  at sentencing as the 3553(a) factors command us to do.  And the

22  Government in recommending a sentence not only far below the

23  guideline level but far below what we're entitled to recommend

24  in the plea agreement has taken that into account.  But the

25  factors also state that this Court afford adequate deterrence

1  to criminal conduct, not just for Defendant himself but for
2  others.
3       Imagine if you are a parent willing to pay a bribe to
4  get your son or daughter into school, if you're only going to
5  be given probation, why not take that risk.  Imagine if you are
6  a coach and you see that John Vandemoer only gets probation for
7  $610,000 in bribes, well, you might tell yourself if the courts
8  don't really care, maybe it's more of a gray area than a bribe.
9  And then imagine if you're a kid who reads in the newspaper
10 about how some smalltime drug dealers go to jail, as many
11 should, but that the wealthy and powerful get off.  Is this a
12 message we want to be sending, that the rules apply to some but
13 not to all?
14       In determining what sentence to impose, Your Honor, we
15 often look to what similarly situated defendants have received.
16 It is difficult to find sentencing comparisons in this case, we
17 tried, in reflecting a particular conduct.  And Defendant in
18 his memo highlights a few, such as the *Desper* case before this
19 Court where the Defendant, I think, was trying to sell a fake
20 Vermeer painting on craigslist for $100 million, a painting
21 that he did not have, and the scheme obviously could not work.
22 And other cases are in there, like the Vernell Burris case,
23 which involves cooperation, which is not an issue here.
24       More applicable are the recent cases in the Southern
25 District of New York involving bribery of college basketball

1    coaches, associates and high school students.  In those cases

2    Emmanuel Richardson at the University of Arizona received three

3    months' incarceration for $20,000 worth of bribes.  Tony Bland

4    of the University of Southern California, he took $4,100 in

5    bribes, received probation.  In a $100,000 bribery scheme

6    involving high school athletes, James Gatto of Adidas received

7    nine months of incarceration, Merl Code of Adidas received six

8    months, Christian Dawkins received six months of incarceration,

9    and of course the bribe amounts in those cases were much lower

10   than that of Defendant, who has admitting accepting or agreeing

11   to accept $610,000.  Finding comparisons is of course more of

12   an art than a science, but even so, Defendant's conduct calls

13   for a sentence of imprisonment.

14         Judge, this is a serious case involving serious

15   consequences, not only for the Defendant, who lost his job and

16   who has been criminally convicted, but for Stanford, the other

17   universities, for the parents who paid bribes and engaged in

18   other fraud in order to gain entrance to those elite

19   universities, and most importantly, for the students and

20   parents who play by the rules and who submitted honest and

21   accurate applications to those very colleges.

22         Probation here would not only be a slap on the wrist

23   for the Defendant, but a signal to the honest and hardworking

24   students who have worked so hard and are entitled to a fair

25   shake that those who have the power to make change and send a

1  message are reluctant to do so.

2          For these reasons and the reasons set forth in our

3  sentencing memo, the Government respectfully requests 13 months

4  of imprisonment, which is sufficient but not greater than

5  necessary to achieve a just result.

6          THE COURT:  What else?

7          Just 13 months imprisonment?  No supervised release,

8  no -- nothing else?

9          MR. ROSEN:  Sorry.  One year of supervised release.

10          THE COURT:  I'm sorry?

11          MR. ROSEN:  One year of supervised release, Your

12  Honor.

13          THE COURT:  No special assessment?

14          MR. ROSEN:  Sorry.  The $100 special assessment.

15          THE COURT:  And no fine?

16          MR. ROSEN:  A fine -- I think he can afford it, a fine

17  at the low end of the guidelines, Your Honor.

18          THE COURT:  What's that?

19          MR. ROSEN:  Let me check my book.  It would be

20  $10,000.

21          THE COURT:  Mr. Fisher?

22          MR. FISHER:  Your Honor, as my brother just

23  highlighted in other cases where coaches and cases that are

24  somewhat similar to this took bribes, they profited personally.

25  As I said multiple times today, as Your Honor noted at my

1  client's change of plea months ago, he did not benefit from

2  these bribes.  They didn't go to him.  They went to Stanford.

3  This is a gentleman with his heart in the right place.

4        Stanford, even in their letter, admit that no students

5  that were part of this conspiracy, the conspiracy for

6  Mr. Vandemoer in Stanford, got in.  No student spots were taken

7  by unqualified sailors or applicants and someone else didn't

8  get in, okay?

9        What you have here is somebody who has been punished

10  enormously, and jail is not going to do anything more than

11  punish his own family.  He has -- when I first met him, he had

12  a great job at Stanford.  He was making good money.  He lived

13  in housing at Stanford.  He has two young kids.  He had a car

14  stipend.  He was living his dream.  He gave everything to those

15  students on that sailing team.

16        Once this indictment dropped and he pled guilty a

17  couple of months ago before you, he lost his job, he lost his

18  housing.  Him and his kids had to move to another home that

19  they're living in thanks to friends of the family.  They lost

20  their health insurance.  They lost their car stipend.  This man

21  has been absolutely crushed.  And given the media attention

22  surrounding this case, and not just because of Mr. Vandemoer,

23  because of the celebrities involved here, as Mr. Rosen said, 50

24  other individuals, and I would like to note of all those

25  individuals, everybody but Mr. Vandemoer gained something.

1    Even the parents who may have paid $15,000 so their son or

2    daughter's ACT test could be changed, they gained something.

3    He got nothing.

4         He gave every single dime to his sailors, to Stanford,

5    and they still have the money.  He could have pocketed that.

6    He didn't.  Every other example Mr. Rosen gave, people pocketed

7    the money, and that, I suggest, makes it a much different

8    crime.  Again, we have not been able to find someone who pled

9    guilty or was convicted of racketeering and gave all of the

10   proceeds of the crime to the victim.  That's what he did here.

11   And in exchange for it, the other side of the quid pro quo, no

12   students actually got in.  It was an inchoate crime, and yet he

13   has been absolutely crushed because of this.

14        So let the media report today, let it be heard wide

15   and loud that if you do do something like this in the future,

16   you will lose everything.  And I would point you to the

17   conclusion of the Government's sentencing memorandum.  They say

18   a term of incarceration, if needed, to show that such crimes

19   when uncovered will yield concrete sanctions and to assure that

20   others in comparable positions of trust think twice before

21   engaging in this kind of conduct.

22        Your Honor, I think it's pretty clear after the press

23   this case has gotten that every college coach in the country,

24   or frankly, every person that works in a college in the country

25   understands the gravity of this situation.  But what you will

1   have if you send Mr. Vandemoer to prison for 13 months or six

2   months or whatnot, he will end up, I'm pretty confident,

3   serving more time than potentially some of the parents who paid

4   a bribe to either Mr. Singer, that went to a school, or

5   influenced the SAT or the ACT that colleges may have relied on.

6   Their guidelines could be three to six, and I can assure you

7   that many of them, from the celebrities, the multi-millionaires

8   that are involved in this case did not lose their housing, did

9   not lose their health insurance, are not worried about their

10  car breaking down because they lost their car stipend.  In

11  fact, Mr. Vandemoer's wife -- their car did break down on her

12  flight to come out here to be with him for this sentencing.

13          And as we highlight in our sentencing memo, he's a dad

14  of two very young children, a three-year-old and a

15  16-month-old.  Those are the folks who are going to suffer if

16  he goes to prison.  And as the Government can see, this really

17  is not about specific deterrence.  John Vandemoer is not going

18  to reoffend.  This gentleman has lived a wonderful life.  He

19  was a great son to his parents, a great college student, who's

20  been an impeccable coach.  Friends and family and ex-sailors

21  love him.  My e-mail is filled now with -- and we submitted

22  many, many letters, Your Honor, and I hope you were able to get

23  these and read them.  They are phenomenal.  There are so many

24  more people that reached out to me and still reach out to me

25  even today, what can we do.  We feel horrible for John.  He has

 1    lost so much, and we want to do everything we can to help him

 2    rebuild his life.

 3           And I think what's very telling about my client is how

 4    he has reacted to all of this.  He had about 24 to 36 hours to

 5    make a decision that has changed his life, a decision to sign

 6    that plea agreement.  We spent a very long day at my office

 7    here in Boston.  Not once did he complain about the effect this

 8    was going to have on him.  He was worried about the effect it

 9    was going to have on his wife, on his two small children, his

10    parents who are here today, his family, and also the sailors on

11    his team.  After we signed the agreement he said, "Rob, when is

12    this going to become public?  Because my team, the sailors have

13    an important regatta coming up this weekend, and I would feel

14    horrible for them if they find out about this before that

15    regatta."  And that was the last regatta that he coached.

16           This was a life-altering event for him.  He was about

17    to lose everything he worked for and have the media chase him

18    around and be written about by all the major newspapers.  TV

19    calls us.  Everybody knows about this case.  Everybody he's

20    ever met have reached out to him and knows what he has done.

21           Another main concern is now when his kids get older

22    and they Google his name and what they're going to learn about

23    this.  And it's so important to him that they learn the truth,

24    that he did in fact do something wrong.  He admitted it.  We

25    pled the first day that the story broke, Your Honor, right

1    after the cooperator.  He learned his lesson.  He accepted

2    responsibility.  But he wants them to understand the true role

3    he played, that he did not pocket $770,000 or $610,000, that

4    that went to his program, because his program was one of the

5    most important things in his life but for his kids and his wife

6    and his family.  And I think that's reflected in these letters

7    here, Your Honor.

8            And one letter I want to draw your attention to is by

9    Harold Robinson.  He was Mr. Vandemoer's rabbi.  He's also a

10   rear admiral in the Navy, and I think he captured what happened

11   to John here when he says "John's failure to grasp" --

12           THE COURT:  I'm sorry.  Which number is that?

13           MR. FISHER:  I'm sorry.  It's Page 20.

14           THE COURT:  I'm sorry?

15           MR. FISHER:  It's Page 20.  And it's from Harold

16   Robinson.  And he says essentially "John's failure to grasp

17   that his loyalty to the sailing program was excessive,

18   misdirected, and through it he failed his students, his family

19   and himself."  Although he also goes on to say in all that time

20   that he had worked at -- as a Jewish chaplain at a Federal

21   penitentiary, he said "All the time I worked with them, no

22   inmate displayed the authentic remorse, the clear understanding

23   of personal error, and the need to return to the high ethical

24   and moral standards resident in his character as displayed by

25   John."

1          And he goes on to say that he has never ever asked for

2    leniency to anybody from any court or civilian or military

3    authority, and he's taking extraordinary exception for John

4    because he understands the human he really is.

5          And John, since this has happened, since he has been

6    crushed, his life has been essentially turned upside down for

7    him and his family, some people curl up in a ball or either

8    turn to drinking or go into a state of depression.  John is

9    working on getting his MBA.  Every time I call him he has some

10   event scheduled where he is tutoring young sailors and working

11   at different regattas on the weekend.  He is doing anything and

12   everything he can to rebuild his life.  He started the day

13   after he signed the plea agreement, and he's been working

14   extremely hard on that.  So you have a gentleman here today who

15   has taken all the right steps.

16         Before this happened he lived an exemplary life, and

17   that's noted in all these letters from people who have known

18   him for years, lawyers, doctors, rabbis.  In fact, the last

19   letter, Your Honor -- the second-to-last letter on Page 33 and

20   34 is written by an Olympian, Udi Gal, an Israeli Olympian who

21   knew John, and respected him greatly.  And he says here "I can

22   say without a doubt that our community, the sailing community,

23   will lose out tremendously if John is no longer a part of it,"

24   and he then said, "Over the past few months dozens, if not

25   hundreds of families, parents, people from the sailing

1    community, young sailors, adult sailors are reaching out to me

2    offering their help, ensuring their concern and support.  While

3    I knew that John was very well regarded, I am astounding by the

4    sheer amount of support and concern I have seen coming from a

5    diverse group of people," and I think that's reflected in these

6    letters.

7           Your Honor, he admits he made a mistake.  He took

8    ownership of it, he was remorseful, and he has paid a very,

9    very severe price.  The collateral consequences are enormous,

10   and if you send him to jail, I don't think that's going to be

11   punishing him.  When he gets out, he'll start over again, get

12   back to his MBA, he'll teach, he'll do what he needs to do to

13   support his kids.  That will hurt his wife and his two young

14   children, and frankly, society at a large.  We will pay to put

15   him in a Federal penitentiary instead of him working to rebuild

16   his life.  And frankly, I think he's shown the world in this

17   case that he made a mistake, he regrets it horribly, and he's

18   paying a price for it, but the only price to be paid isn't just

19   incarceration.  That's not a one size fits all, particularly in

20   this case where he has now lost everything else.

21          Sometimes there's no other way to punish people.  They

22   may be a danger to the community and need a specific deterrent

23   to teach them a lesson.  Even the Government agrees that's

24   really not the case here.  This is a unique situation with an

25   individual who has learned his lesson and will do everything he

1    can to get back to society and his family.  And with that, we

2    ask for a one-year term of probation with any other, I guess,

3    requirements from Probation.  There's no drinking or drug use

4    involved, so -- I know the Government says he has the ability

5    to pay a fine, but I can assure you finances are extremely

6    tight.  His wife is now the sole breadwinner.  They lost their

7    housing, lost their car stipend, lost their health insurance,

8    so things are very tough for them right now, and I would ask

9    the court not to impose a fine.  Thank you.

10           THE COURT:  Mr. Vandemoer, do you wish to say

11   anything?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Please do.

14           THE DEFENDANT:  Thank you.

15           Your Honor, the last three months has given me a lot

16   of time to reflect on my mistake and who I am.  I have learned

17   many things through this reflection and know two things to be

18   true.  I spent my life trying to be a good moral person, but

19   here I made a terrible mistake, and my mistake impacted the

20   ones I care about the most in ways I could not imagine.  I

21   would like to take the time to apologize to the ones I have

22   hurt.

23           First the Government and the Court, I took up your

24   precious time and resources.  For that I am sorry.

25           Next, Stanford, an amazing school with incredible

1   people.  The students, alumni, staff and faculty do not deserve

2   to be looked at under the cloud that I have brought over them.

3   I am truly sorry for bringing you into this mess.  You do not

4   deserve it.

5         To the current sailing team, to the coaching staff, to

6   the team's alumni, and the collegiate sailing community, I am

7   devastated that this has impacted you all.  I'm devastated that

8   the program and the sport would be looked at poorly because of

9   my actions.  You had no part in it and you did not deserve it.

10  I have spent my career stressing that some things, namely

11  integrity and your reputation, are more important than winning.

12  In this manner I completely failed to live up to that standard.

13  I want to thank you all for your support and forgiveness these

14  last three months and will be eternally sorry to you all.

15        Most importantly to my family and friends, I'm sorry

16  to have dragged you into this.  My friends, I am sorry that you

17  had to question who I am and how you will act around me, but I

18  thank you for standing by me and seeing me for who I am and not

19  only for my mistake.

20        My sister, Jennifer, who has been an amazing source of

21  support that always reminds me of who I am.  I love you and I'm

22  truly sorry.

23        My father, I dragged your good name into the scandal.

24  That will haunt me forever.  You have stood by me and reminded

25  me to keep my head high.  I love you and I am truly sorry.

1          My mother, who will never let me forget my passion and

2    fire to be a better person, to be a father, to be a husband.  I

3    love you, and I'm truly sorry.

4          My wife, Molly, has shown unbelievable courage and

5    bravery through all of this.  You are a true role model for our

6    children and for me.  I love you, and I am truly sorry.

7          My children, Nicholas and Nora, are too young to

8    understand this yet, but it won't be long.  Some day soon I'll

9    have to explain to them that their dad is certainly not perfect

10   and that he makes mistakes.  I hope they will in time also see

11   someone who takes responsibility for his mistakes and tries to

12   handle it with grace and honor.  I love you, and I'm truly

13   sorry.

14         In the last three months I've been fired, put my

15   family's financial security in jeopardy and caused us to lose

16   our housing.  My career that I have worked passionately for 20

17   years is gone, and my freedom is in jeopardy, endangering my

18   ability to be there for my kids.

19         I deserve all of this.  I caused it, and for that I am

20   deeply ashamed.

21         Finally, Your Honor, I want to tell you how I intend

22   to live from this point forward.  First, I will never again

23   lose sight of my values and who I am as a friend, son, brother,

24   husband and father.

25         Second, I will not curl up and feel sorry for myself.

1   I made a mistake.  I am accepting responsibility, and I am

2   bound and determined to move forward with my life in a way that

3   honors the love and support that I have gotten over the last

4   three months from my family, my friends and my sailors.  Thank

5   you for your time.

6

7          THE COURT:  The RICO statute was passed sometime I

8   think in the late '70s, '80s to combat the Cosa Nostra, and now

9   it's being used in this particular context, which it's a heavy

10  statute.

11         I have read the transcripts of telephone calls by

12  Mr. Singer to Mr. Vandemoer.  And although there's no question

13  that Mr. Vandemoer participated in this, Mr. Singer pushed, he

14  really pushed, and Mr. Vandemoer sort of responded by saying,

15  yes, yes.  That clearly was a mistake.  I have no doubt that he

16  knew what he was doing was probably wrong and he saw the

17  benefit to his program.

18         From what I know about the other cases, which is not

19  very much, and there appears to be a general agreement,

20  certainly among probation officers who are handling

21  collectively all of these cases, that Mr. Vandemoer is probably

22  the least culpable of all of the defendants in this group of

23  cases.  I have not heard of anybody who is less culpable.

24  Certainly the parents are in a different position.  The other

25  coaches benefited for themselves.  They took money for

1    themselves.  He did not do that.  All the money that he got

2    went directly to the sailing program, and the initial payment,

3    as I understand it, was by him carefully suggested to be paid

4    in such a way that there was no suggestion that he would get

5    any of it, that it was to the program, it was paid to him for

6    the program.  So the fact that he, as best as I understand, was

7    the least culpable of all of the coaches certainly has

8    something to say about what the sentence should be.

9         It is -- the Government agrees that he did not

10   personally gain any money from this.  That he may have gained

11   some benefit from running a successful program that had a large

12   infusion of money is unquestionably true, but I don't know

13   what -- I mean, it's an advantage to him for sure, but I don't

14   think it's the kind of advantage that a coach got who actually

15   took the money and spent it on himself.

16        I do not understand that Mr. Vandemoer initiated this

17   entire process.  It came to him through Mr. Singer, who then,

18   as I said before, continued to push.  Everybody in his position

19   suffers large losses.  It's just a given.  And the loss is not

20   just yours.  It is of course your family's as well.

21        I have read the letters of support, all 27 of them,

22   and I must say, they are an extraordinary group of letters.

23   The usual letters are perfunctory, one paragraph long, and

24   that's it.  These are thoughtful letters, every last one of

25   them, thoughtful letters that speak of the person that they

1  know, whom they love, and whom they totally support.  That is

2  highly unusual in this setting.

3          I do -- I am aware that these are serious offenses,

4  and I am aware of all the factors that I should take into

5  account including deterrence, and having in mind what other

6  defendants -- that there are other defendants, that whatever I

7  do may have a consequence with respect to other defendants, but

8  I find it hard in this case to suggest that Mr. Vandemoer

9  should go to jail for more than a year.

10         I also am aware of what has happened with respect to

11  another group of cases in this court of the state police

12  officers who really violated their trust and who took the money

13  for themselves and did terrible things to the department for

14  which they worked.

15         Sentencing is a difficult task.  It is virtually

16  impossible, even for one judge who does it on a number of

17  occasions, to be consistent.  I cannot claim to be consistent

18  because I just don't know how to be consistent.  I try to be as

19  responsive to a particular situation as I can be.  However, I

20  don't profess to be perfect in any of this.

21         I think it's important to have a punishment because

22  it's too easy to do this kind of thing.  Money offenses are

23  easy to do, and it is important for those who do them to

24  understand that there are consequences.  Nonetheless, I think

25  jail is not one of them in this case.

1          I sentence you to a term of imprisonment of one day

2     deemed served, a period of supervised release of two years, the

3     first six months of which shall be served in home confinement

4     with electronic monitoring.  You shall pay a fine of $10,000 in

5     such installments and at such times as directed by the

6     Probation Office, and you shall pay a special assessment of

7     $100, of which I have no discretion.  The period of supervised

8     release is governed by a number of conditions including the

9     statutory conditions and the mandatory conditions and a special

10    condition that you not incur any credit -- new credit accounts

11    and that you provide Probation with any financial information

12    that it seeks from you so long as the fine is not paid.

13          What did I leave out?

14          U.S. PROBATION:  Just, Your Honor, with the home

15    detention and electronic monitoring, that he be required to pay

16    the costs of that.

17          THE COURT:  Yes, yes.  You need to pay for that as

18    well.  That's it?

19          U.S. PROBATION:  Yes, Your Honor.

20          THE COURT:  That is the sentence of the Court.  You

21    shall now report to your Probation Office, and I assume that at

22    some point it will need to be transferred to wherever

23    Mr. Vandemoer now lives, but at the moment he is subject to

24    probation -- supervision by the probation department in Boston.

25          MR. FISHER:  Your Honor, can I just make one thing

 1    clear?  I brought this up earlier.

 2              THE COURT:  I'm sorry?

 3              MR. FISHER:  Can I make one thing clear?  And I

 4    brought this up earlier in the hearing.  Can you make it clear

 5    on the record that that would have been the sentence he would

 6    have received under --

 7              THE COURT:  I'm sorry.  I don't understand.

 8              MR. FISHER:  Can you make it clear that that would be

 9    the sentence he would receive under any calculation of the

10    guidelines?  I know we had a debate about the guidelines.

11              THE COURT:  It is the sentence I imposed.

12              MR. FISHER:  Okay.

13              THE COURT:  I understand -- we discussed the

14    guidelines.  I think I made a ruling as to what they were, and

15    this is the sentence I imposed.  It is a varying sentence, a

16    variation from the guidelines.  Not a departure.  A variation.

17              MR. FISHER:  Okay.  Thank you, Your Honor.

18              THE COURT:  Anything else?

19              MR. ROSEN:  Nothing from the Government, Your Honor.

20              MR. FISHER:  Thank you.  Court is in recess.  No.

21    Well, we're just briefly in recess.

22              (Adjourned, 3:19 p.m.)

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3             I, Linda Walsh, Registered Professional Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that the foregoing transcript is a true and correct

 7   transcript of the stenographically reported proceedings held in

 8   the above-entitled matter to the best of my skill and ability.

 9             Dated this 13th day of June, 2019.

10

11

12             /s/ Linda Walsh_____

13             Linda Walsh, RPR, CRR

14             Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```