## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    v.

ROBERT ZANGRILLO,

       Defendant.

Case No. 19-cr-10080
Leave to File Granted on April 2, 2020

## ROBERT ZANGRILLO'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS COUNTS ONE AND FOUR INSOFAR AT THEY ALLEGE CHEATING IN ONLINE COURSES

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

RELEVANT BACKGROUND .............................................................................................3

ARGUMENT .........................................................................................................................8

I.      COUNTS ONE AND FOUR OF THE INDICTMENT ARE DUPLICITOUS .................9

II.     THE CLASS-TAKING SCHEME IS NOT A FEDERAL CRIME ................................11

        A.      Having a Tutor Assist With Online Classes Does Not Qualify As A Wire
                Fraud, Where The Object of the Fraud Is Admission To College. ........................11

        B.      Cheating in Online Classes Is Immaterial. ............................................................17

        C.      Boston University Was Not Defrauded Due To The Alleged Class-Taking
                Scheme. ...................................................................................................................18

CONCLUSION .....................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Carpenter v. United States*,
  484 U.S. 19 (1987) ........................................................................................ 19

*In the Matter of Seth Asher Nadler*,
  No. Xii-2015-0034E (SJC NJ Nov. 8, 2019)........................................................ 15

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
  904 F.2d 786 (1st Cir. 1990)........................................................................... 12

*McNally v. United States*,
  483 U.S. 350 (1987) .............................................................................. 10, 12

*Skilling v. United States*,
  561 U.S. 358 (2010) ..................................................................................... 12

*United States v. Cassiere*,
  4 F.3d 1006 (1st Cir. 1993).......................................................................... 20

*United States v. Czubinski*,
  106 F.3d 1069 (1st Cir. 1997)....................................................................... 19

*United States v. Frost*,
  125 F.3d 346 (6th Cir. 1997) .................................................................. 13, 14

*United States v. Goldberg*,
  913 F. Supp. 629 (D. Mass. 1996)............................................................... 9, 10

*United States v. Gray*,
  96 F.3d 769 (5th Cir. 1996) ................................................................... 13, 14

*United States v. Munoz-Franco*,
  986 F. Supp. 70 (D.P.R. 1997) ................................................................ 9, 10

*United States v. Ngige*,
  780 F.3d 497 (1st Cir. 2015)............................................................................ 9

*United States v. Trainor*,
  477 F.3d 24 (1st Cir. 2007).............................................................................. 9

*United States v. Troy*,
  618 F.3d 27 (1st Cir. 2010)............................................................................. 9

*United States v. Weed*,
  873 F.3d 68 (1st Cir. 2017)...................................................................................... 17

*United States v. Zangrillo*,
  No. CR 19-10080-NMG, 2020 WL 1027815 (D. Mass. Mar. 3, 2020) ............................ 17

## STATUTES

18 U.S.C. § 1341 ........................................................................................................... 3

18 U.S.C. § 1346 ........................................................................................................... 3

18 U.S.C. § 1349 ........................................................................................................... 3

## OTHER AUTHORITIES

Fed. R. Crim. P. 12 .................................................................................................... 8, 9

Defendant Robert Zangrillo respectfully submits this memorandum of law in support of his motion to dismiss Counts One and Four of the Fourth Superseding Indictment insofar as those counts allege a scheme to cheat on online classes.  By separate motion, Mr. Zangrillo also moves to strike the class-taking allegations or, in the alternative, to sever Counts One and Four, and to sever his trial from those of his co-defendants.   Mr. Zangrillo also joins in the motions of his co-defendants to the extent applicable to him.

## INTRODUCTION

The Government does not allege that Robert Zangrillo's daughter was admitted to college as a fake college athlete.  Nor does it allege that she received the benefit of William Singer's assistance in falsifying her ACT or SAT scores.  Instead, the Government makes two entirely separate kinds of allegations against Mr. Zangrillo, which also are entirely different from the Government's allegations against any of the other defendants.

First, the Government alleges that five months *after* being admitted to Boston University ("BU") on her own merit, Mr. Zangrillo's daughter's online high school sent a transcript to BU that included grades from classes that Singer's employees helped her complete.  It is not clear what, if anything, BU did with that transcript since she already had been admitted.  In any event, Mr. Zangrillo's daughter decided not to attend BU.  Along the same lines, the Government also alleges that Mr. Zangrillo's daughter received assistance from Singer's tutors in additional classes, the grades of which were included in her transcript and sent to the University of Southern California ("USC").

Second, the Government alleges that Mr. Zangrillo paid a bribe to ensure his daughter's admission to USC, even though she was accepted as a "VIP" – a University-wide designation reserved for donors, legacy students, or any other applicant whom a department or front office

1

employee like the University President wanted to designate for special consideration. Even though Mr. Zangrillo's daughter unquestionably was *not* admitted as a purported athletic recruit, the Government alleges that her application included information about false athletic credentials – information that Singer's staff, and not Mr. Zangrillo or his daughter, inserted into her application. Therefore, the Government alleges Mr. Zangrillo is guilty because he supposedly *thought* his daughter was being put forward as a student-athlete, even though she was not.

In this motion, Mr. Zangrillo respectfully seeks an order dismissing the charges in Count One and Count Four to the extent they are based on the class-taking allegations. First, those counts must be dismissed because they are duplicitous, charging Mr. Zangrillo with wire fraud on both a property theory (in connection with the class-taking allegations) and an honest services theory (in connection with the alleged bribery) concerning totally different conduct involving different times and different victims. Because those counts allege two entirely separate (and logically incompatible) offenses, there is a grave risk that a jury could convict Mr. Zangrillo without having reached a unanimous verdict on either the class-taking or bribery theories.

Counts One and Four also must be dismissed because, as alleged, the class-taking scheme fails to state a claim that constitutes a criminal offense. Under any reading of the statute and case law, having a tutor help with an online class does not qualify as a wire fraud where the object of the fraud is admission to college. On the government's theory, any act of academic dishonesty that makes its way indirectly to a college admissions office – one student looking at another's paper during a test, or cribbing from *Cliff's Notes* on a book report that affects a high school grade – is a federal wire fraud. But that is not the law, and the Government has never advanced such a theory before.

Aside from the infirmities in the Government's theory raised in other motions, in which Mr. Zangrillo joins, the Indictment also insufficiently alleges that BU was "defrauded" by the alleged high school cheating, which is fatal to Count Four.  BU could not have been defrauded because it made the decision to admit Mr. Zangrillo's daughter (*i.e.* offer her an admissions spot, the alleged property obtained via fraud) *before* the Indictment alleges that the high school cheating began.

Any one of these infirmities is more than enough to dismiss the class-taking allegations charged in Count One and Count Four.  Taken together, however, they demonstrate the deeper problems with the Government's case against Mr. Zangrillo, both factually and as charged.

## RELEVANT BACKGROUND

Count One of the Indictment charges a conspiracy to commit (a) mail fraud and honest services mail fraud, and (b) wire fraud and honest services wire fraud, all in violation of 18 U.S.C. § 1349.  *See* Fourth Superseding Indictment ("FSI"), ECF No. 732 ¶ 370.  Count Four charges Mr. Zangrillo with substantive wire fraud and honest services wire fraud, in violation of 18 U.S.C. §§ 1341 and 1346, in connection with an August 24, 2017 e-mail in which Mr. Zangrillo's daughter's high school transcript was sent from her high school directly to Boston University.  *Id.* ¶¶ 375-376; *see also id.* ¶ 262 (describing the August 24, 2017 e-mail).[1]

---

[1]     Mr. Zangrillo is charged with an additional count of substantive wire fraud, Count Ten, relating to a January 3, 2019 telephone call that he allegedly had with Rick Singer.  *See* FSI ¶ 376.  That phone call, both as alleged in the Indictment and as revealed in discovery, does not touch upon the class-taking scheme, and so is not the subject of this motion.  *See, e.g., id.* ¶ 275 (describing the January 3rd call).  For the reasons given in other motions filed by the defendants, however, Count Ten likewise should be dismissed.  Similarly, Mr. Zangrillo is also charged with conspiracy to commit federal programs bribery and money laundering conspiracy, both of which relate to his donation to USC and therefore the bribery theory.  FSI ¶¶ 305-06 (federal programs bribery over acts), ¶¶ 349-50 (money laundering over acts).  Those counts, as well, should be dismissed for the reasons given in the defendants' joint motions.

In each count, the Indictment alleges that Mr. Zangrillo engaged in (or conspired to engage in) a scheme to defraud involving (1) obtaining money or property in the form of "ACT, SAT and other standardized tests and test scores, and admission to the Universities," and also (2) depriving "variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks." *Id.* ¶ 376 (substantive count); *see also id.* ¶ 370 (alleging identical language as the objects of the Count One conspiracy).

The Alleged Class-Taking Scheme

Alone among all of the defendants, the Indictment alleges that Mr. Zangrillo committed a federal crime when he paid for Singer's employees to help his daughter with certain of her online classes. In particular, the Indictment alleges that Mr. Zangrillo "agreed with Singer to pay for a third party to complete online high school courses for his daughter, with the understanding that credits earned in those classes would be submitted to colleges on his daughter's behalf, either as part of her college application or to serve as proof of her high school graduation." *Id.* ¶ 253.

Mr. Zangrillo's daughter was admitted to BU in or about March 2017, for the fall 2017 term. *Id.* ¶ 254. The Indictment does not allege that any of the grades submitted to BU were for classes taken by Singer's employees, nor does it allege that her acceptance to BU was tainted in any other way, such as through the athletic-recruiting or ACT/SAT schemes alleged against the other defendants. Indeed, it would have been impossible for Mr. Zangrillo's daughter's admission to have relied upon classes taken by Singer's employees. According to documents produced by the Government, Mr. Zangrillo's daughter applied to Boston University on December 31, 2016, (*see* Ex. A), whereas the high school class scheme did not allegedly begin until the following year, *see* FSI ¶ 253. Likewise, the Government has not produced a single

invoice from The Key showing that Mr. Zangrillo's daughter received any help in her online high school courses prior to March 2017. The grades she submitted to BU with her college application were her own; Mr. Zangrillo's daughter *earned* her acceptance to BU.

The Indictment does allege that sometime in the spring of 2017, after she already was admitted to BU, Mr. Zangrillo's daughter "partially completed" some online high school courses and then received help from Singer's tutors to finish the work. *Id.* ¶ 255. It is undisputed that Mr. Zangrillo's daughter did some of the course work herself. For example, the Government produced documents showing that on May 28, 2017, Rick Singer sent Mikaela Sanford an e-mail updating her on the progress that Mr. Zangrillo's daughter was making in two of her online classes. (*See* Ex. B & C.)

Then, on June 14, 2017, after the semester was well under way, Sanford sent an e-mail to another tutor from The Key – identified in the Indictment as CC-1 – with course login information in order to assist Mr. Zangrillo's daughter with her coursework. FSI ¶ 256. According to the tutor, Mr. Zangrillo's daughter had completed "approximately 70%" of at least one of the classes before the tutor began helping her. (*See* Ex. D.)[2]

The Indictment alleges that in or about June 2017, The Key employees assisted Mr. Zangrillo's daughter with a variety of her online high school courses. FSI ¶¶ 256. As relevant to BU, the Indictment alleges that The Key employees helped Mr. Zangrillo's daughter with four courses, for which Mr. Zangrillo was subsequently billed. *Id.* ¶ 257.[3] Those invoices show that Mr. Zangrillo was charged for tutoring associated with 12% of his daughter's Psychology course,

---

[2]      CC-1 also told the Government that she never communicated with Mr. Zangrillo. *Id.*

[3]      Aside from the BU transcript that forms the basis for Count Four, the Indictment also alleges that Mr. Zangrillo's daughter sent a transcript that reflected grades that were obtained with the assistance of tutors to the University of Southern California ("USC"). FSI ¶¶ 270-271. Count Four, however, does not pertain to USC.

37% of her AP English course, 69% of her AP Statistics course, and 59% of her American Government course.  (*See* Ex. E.)  That is, it is undisputed that, at the very least, Mr. Zangrillo's daughter completed 88% of her Psychology course entirely on her own, 63% of her AP English class entirely on her own, and 31% and 41% of her AP Statistics and American Government classes, respectively, without the assistance of a tutor.  *Id.*

A few weeks later, on July 28, 2017, Sanford e-mailed Mr. Zangrillo's daughter's high school, asking it to send her transcript to BU.  FSI ¶ 259.  Sanford sent a follow up request on August 23, 2017.  *Id.* ¶ 261.  The next day, the high school sent the transcript directly to BU.  *Id.* ¶ 262.  The Indictment does not allege that Mr. Zangrillo knew that Sanford requested the high school send his daughter's transcript to BU, nor was Mr. Zangrillo copied on or otherwise contemporaneously made aware of the August 23rd e-mail.  Nonetheless, this e-mail – in which Mr. Zangrillo's daughter's high school sent her transcript directly to BU, without Mr. Zangrillo's knowledge and more than five months after his daughter had been admitted – is the basis for Count Four of the Indictment.

Mr. Zangrillo's daughter never actually attended BU, *id.* ¶ 254, and the Indictment does not allege that BU did anything in response to receiving his daughter's transcript on or about August 23, 2017.  In fact, Mr. Zangrillo's daughter never seriously contemplated moving to Boston to attend BU.  As the Government's own documents prove, Mr. Zangrillo's daughter— who suffers from a serious medical condition that made it difficult (if not impossible) for her to live far away from home—put a deposit down and applied for residential housing at the University of Colorado at Boulder (where her mother lives) as early as April 30, 2017 – four months before the Count Four e-mail.  (Ex. F.)

Simply put, the undisputed facts are that Mr. Zangrillo's daughter was admitted to BU on her own merit, she never accepted admission there, and did not deprive BU of the opportunity to enroll other students.  Nonetheless, on the basis of an e-mail sent from her high school to BU, at the request of one of Singer's employees and without Mr. Zangrillo's knowledge, the Indictment charges Mr. Zangrillo with substantive wire fraud.

The Indictment also alleges that in or about June 2018, The Key employees assisted Mr. Zangrillo's daughter with additional online courses, the grades from which "were submitted to USC on behalf of Zangrillo's daughter."  FSI ¶¶ 268, 271.  The Indictment does not allege who submitted the transcript to USC or when it was submitted.  Again, the Indictment does not allege that Mr. Zangrillo knew the transcript was being sent to USC.

Thus, together with the BU allegations, the Indictment charges Mr. Zangrillo with aiding and abetting his daughter's cheating on some online classes.  Notably, however, the Indictment does *not* allege that the online schools in which the alleged cheating occurred were victimized: There is no allegation that the online schools were deprived of either their property or the honest services of their employees.  This is in notable contrast to the ACT/SAT-taking scheme alleged in the Indictment, which is charged as a wire fraud under both a property theory ("ACT, SAT and other standardized tests and test scores") and an honest services theory (for depriving "ACT, Inc. [and] the College Board . . . of their right to honest and faithful services of their tests administrators . . . through bribes and kickbacks").  FSI ¶ 370 (conspiracy count); *id.* ¶ 376 (substantive counts).

<u>The Alleged Bribery Scheme</u>

The Court is familiar with the general contours of the Indictment's bribery scheme, which is discussed at length in various of the other pending motions.  But the Government has admitted

that Mr. Zangrillo is differently-situated than *all* of the other defendants.  Whereas all of the other defendants allegedly paid to have their children falsely admitted to college as athletic recruits, Mr. Zangrillo's daughter was never put forward as a purported athletic recruit.  Rather, both the Government and USC agree that Mr. Zangrillo's daughter was admitted as a "VIP" student, consistent with a university-wide practice sanctioned and utilized by the entire school hierarchy including USC's President, Vice Presidents, Provost, and most deans.  *See* ECF Nos. 532-1 at 3, n.1; 951. [4]

According to the Indictment, USC received $50,000 from Mr. Zangrillo, which was documented in the same manner as all ordinary donor gifts.  FSI ¶ 273; *see also* Exs. H, I, & J. If there were any doubt about this, USC sent Mr. Zangrillo a conventional form letter thanking him for his donation.  (Ex. K.)   Notwithstanding these facts, the Government has characterized this payment as a bribe to "facilitate his daughter's transfer to USC."  FSI ¶ 265.

## ARGUMENT

Defendants have the right to raise by pretrial motion any defect in the indictment if the "basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  For purposes of considering a motion to dismiss an indictment, courts take the allegations in the indictment as true and ask "whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense."

---

[4]     The Indictment implies that Mr. Zangrillo's daughter was falsely presented to USC as a rowing recruit as part of the bribery scheme.  FSI ¶ 267.  Again, the Government's own documents belie its insinuation.  When Singer asked Donna Heinel, his USC contact, whether Mr. Zangrillo's daughter was admitted as an athletic recruit, Heinel responded "no. I didn't get her through subculture."  Ex. G.  Heinel explained that Mr. Zangrillo's daughter was "not presented as an athlete."  *Id.*  Instead, she was flagged as a "VIP" and admitted "through the transfer process," as USC's own documents establish was routine for many students whose parents donated money to the school.  *Id.*

*United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015). "An indictment that tracks the language of the underlying statute generally suffices to meet this standard; provided, however, that the excerpted statutory language sets out all of the elements of the offense without material uncertainty." *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010).

Here, Counts One and Four of the Fourth Superseding Indictment are defective and must be dismissed because they are duplicitous, charging two or more separate offenses in the same count. Fed. R. Crim. P. 12(b)(3)(B)(i). Counts One and Four are also is defective insofar as they allege the class-taking scheme because the facts alleged in the Indictment, even if true, fail to establish the necessary elements under the wire fraud statute. The Indictment thus "fail[s] to state an offense" and should be dismissed as a matter of law. Fed. R. Crim. P. 12(b)(3)(B)(v).

## I.  COUNTS ONE AND FOUR OF THE INDICTMENT ARE DUPLICITOUS

An indictment is duplicitous if it charges "two or more distinct offenses in a single count." *United States v. Trainor*, 477 F.3d 24, 31 (1st Cir. 2007). Duplicitous charges are problematic "only if two offenses are alleged in the same count, not two means of violating the same provision." *United States v. Goldberg*, 913 F. Supp. 629, 636 (D. Mass. 1996). The primary "vice of duplicity is that a jury may find [a] defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense." *Trainor*, 477 F.3d at 32, n.16. Confusion "as to the basis of the verdict" may also "subject a defendant to double jeopardy." *United States v. Munoz-Franco*, 986 F. Supp. 70, 71 (D.P.R. 1997).

Here, the Indictment would seem to charge Mr. Zangrillo with (1) wire fraud and conspiracy to commit wire fraud in connection with the class-taking allegations, and (2) honest services fraud and conspiracy to commit honest services fraud in connection with the college

bribery scheme. Thus, Counts One and Four each allege two entirely separate and logically incompatible offenses as to Mr. Zangrillo.

There is a real risk that a jury could convict Mr. Zangrillo without having reached a unanimous verdict on either the class-taking offense or the honest services bribery offense. Some jurors could find Mr. Zangrillo guilty of helping his daughter cheat on her online classes, but not the bribery scheme, while other jurors could find him guilty of the bribery scheme but not the class-taking scheme. The result would be 12 guilty votes but no unanimity. This is precisely what the doctrine of duplicity guards against. *See, e.g.*, *Munoz-Franco*, 986 F. Supp. at 72 (dismissing a duplicitous count where "[t]he conspiratorial acts charged to the first set of conspirators are not connected . . . to the scheme charged against the second set of co-conspirators," which was a "totally different factual scenario.").[5]

The risk is especially grave here because the two offenses charged together are fundamentally incompatible. The class-taking offense alleges that Mr. Zangrillo somehow caused his daughter's transcript to be sent to BU and USC. BU, however, did not know it had received an allegedly misleading transcript, and Singer is not alleged to have worked with any corrupt BU officials to facilitate Mr. Zangrillo's daughter's admission. Therefore, there was no deprivation of BU's right to the honest services of its administrators. On the other hand, the

---

[5]    In *Goldberg*, the court explained that an indictment that includes the citations to both the wire fraud statute and the honest services wire fraud statute in a single count is not duplicitous. 913 F. Supp. at 636. According to the court, "[b]ecause § 1346 merely explains the theory of honest services fraud, it is not a distinct factual offense for which the jury could punish Goldberg." *Id.* The court went on to explain that under *McNally v. United States,* 483 U.S. 350, 358–59 (1987), "reference in the indictment to § 1341 and § 1343 without reference to § 1346 might not be sufficient to state an offense." *Id.*

*Goldberg* is readily distinguishable from this case because the Indictment here actually charges two distinct and logically incompatible theories of wire fraud in the same count:  the class-taking wire fraud and the honest services bribery fraud.  In *Goldberg*, the court stated that the wire fraud charge "merely explains the theory of honest services fraud, it is not a distinct factual offense for which the jury could punish Goldberg." *Id.*

honest services bribery scheme alleges that Mr. Zangrillo bribed USC officials to gain admission for his daughter, thereby depriving USC of its right to the honest services of its employees. Thus, whether the transcripts were accurate or not would have no bearing on USC's admission decision since the Government alleges admission was procured by the alleged quid pro quo bribe.

Because there is a real risk that some jurors could convict Mr. Zangrillo for committing (or conspiring to commit) the class-taking wire fraud while other jurors could convict him based on the entirely separate honest services fraud, Counts One and Four are duplicitous and must be dismissed.

## II.     THE CLASS-TAKING SCHEME IS NOT A FEDERAL CRIME

In addition to being duplicitous, Count One and Count Four should be dismissed to the extent they allege a class-taking scheme for the independent reason that having a tutor assist a student with her classes – even if by effectively helping her cheat on her online classes – is not a wire fraud.

### A.     Having a Tutor Assist With Online Classes Does Not Qualify As A Wire Fraud, Where The Object of the Fraud Is Admission To College.

This case may mark the first time that the Government has charged a person with wire fraud where the underlying conduct was academic dishonesty and the object of the fraud was not to harm the school at which the person cheated, but where the object was allegedly to burnish that person's credentials and increase the likelihood that she would get some other position.  As unprecedented as that case would be, this one is at least two steps removed:  First, Mr. Zangrillo's daughter did not even matriculate as a student at BU, and second, Mr. Zangrillo himself is alleged only to have paid for Singer's help, not to have engaged in the academic dishonesty himself.

While cheating in a class is of course bad behavior that should not be rewarded, "not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud." *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990). The wire fraud statute simply does not cover every act of dishonesty. This is especially true where, as here, the extent of alleged cheating is minimal and the charge would set an unprecedented and vague standard for what constitutes wire fraud going forward.

As explained at greater length in all defendants' joint motion to dismiss, ECF No. 1042 at 23, the Supreme Court has repeatedly warned against overly broad interpretations of the mail and wire fraud statutes for this very reason. *See, e.g.*, *McNally v. Untied States*, 483 U.S. 350, 360 (1987) (declining to "construe the [wire fraud] statute in a manner that leaves its outer boundaries ambiguous"); *Skilling v. United States,* 561 U.S. 358, 368, 408 (2010) (declining to construe honest services statute beyond its "core meaning" in order to avoid " a vagueness shoal": "Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine.").

As explained in that joint motion, a college admissions slot is not a form of property traditionally recognized at common law, and therefore cannot serve as the basis for a federal wire fraud charge. As novel as the government's overarching legal theory is, the class-taking allegations are even more far afield from the "core meaning" of the wire fraud statute. Expanding the wire fraud statute to encompass cheating on individual classes – the sort of cheating that goes on every day at every school – plainly leaves its "outer boundaries ambiguous." *McNally*, 483 U.S. at 360.

Simply put, there is no legal or analytical difference between the charged class-taking scheme and a high school student who cheats off of a classmate on a test, or who plagiarizes a term paper by copying off of Wikipedia, and then sends the subsequent grade as part of her transcript to a university.  In the government's view, both are wire frauds punishable by up to 20 years in prison.  Indeed, under the Government's theory, a parent who conducts part of the research and writing for a term paper, or who reviews his child's homework assignments and corrects the mistakes before they are turned in, would be guilty of wire fraud if that conduct resulted in better grades, which were reflected on high school transcripts shared with universities.  Under the Government's theory, every act of dishonesty that has the effect of burnishing a student's academic credentials to prospective colleges constitutes a federal wire fraud.  But Congress never intended the wire fraud statute to reach this far.

Tellingly, in its briefing thus far, the government has only been able to point to two case— *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) and *United States v. Gray*, 96 F.3d 769 (5th Cir. 1996)—to support its wire fraud theory.  But the prosecutors in *Frost* specifically did not prosecute the type of academic dishonesty under the wire fraud statute that grounds the Government's class-taking wire fraud theory here.  In *Frost*, the government alleged that several defendants operated a scheme in which University of Tennessee professors assisted PhD candidates in cheating on their dissertations in order to obtain diplomas in exchange for securing lucrative federal research contracts.  125 F.3d at 353.  Notably, however, the government did not charge the dissertation scheme as a wire fraud.  Rather, the government charged that the PhD candidates and professors deprived the University of Tennessee of its intangible right to the honest services of its professors because the professors assisted the PhD candidates in cheating.

*Id*. at 363.  That case offers no support here, because the class-taking allegations do not involve any corrupt online schools or college officials.

Similarly, in *Gray*, the government alleged that members of the Baylor University men's basketball coaching staff helped student athletes cheat on exams in order to obtain credits required for eligibility and scholarships to play at Baylor, in violation of the mail fraud, wire fraud, and honest services fraud statutes.  96 F.3d at 772.  On appeal, the defendants argued that there was no deprivation of property as required by the mail and wire fraud statutes.  *Id*. at 773.  In affirming the convictions, instead of focusing on the class-taking aspect of the factual allegations, the Fifth Circuit relied on the fact that the defendants "executed a scheme to deprive Baylor of its intangible right of the honest services of its employees."  *Id* at 774.

Unlike in *Frost* and *Gray*, however, Counts One and Four of the Indictment do not allege that Mr. Zangrillo deprived BU and USC (or anyone else) of their intangible right to the honest services of their administrators due to class-taking allegations.  This is because there is no allegation that BU or USC knew about the class-taking scheme and conspired to help Mr. Zangrillo's daughter cheat in her classes.  The Government's only theory of wire fraud in connection with the class-taking scheme is that Mr. Zangrillo's daughter cheated on her online classes and those grades subsequently were sent to BU and USC.

If true, (which, of course, Mr. Zangrillo disputes) the conduct is far from praiseworthy.  But the wire fraud statute does not codify and criminalize academic codes of conduct.  Academic dishonesty is much more appropriately handled by high schools, universities, and professional conduct boards.  The fact that, to date, we have not located a single case that charges garden variety cheating as wire fraud underscores this point.  Even headline-catching examples of academic dishonesty are not charged as a wire fraud.  Rather, institutions (such as high schools,

universities, and professional ethics boards) are set up to monitor and punish this type of cheating.

Recently, for example, the New Jersey Supreme Court issued a one-year suspension for a junior law firm associate who falsified his law school transcript when applying to the law firm Williams & Connolly.  *See In the Matter of Seth Asher Nadler*, No. Xii-2015-0034E (SJC NJ Nov. 8, 2019).  Under the Government's theory, this could have been charged as wire fraud, and the junior associate should have faced up to twenty years in prison.  More appropriately, however, the New Jersey State Bar Disciplinary Review Board and the District Ethics Committee handled the matter and suspended the attorney for one year.

Likewise, under the government's theory, when the former Dean of Massachusetts Institute of Technology Marliee Jones was discovered to have fabricated her educational credentials when applying to M.I.T., the government should have prosecuted her for wire fraud. Instead, she was forced to step down from her position as dean, facing significant personal and professional repercussions.  *See* Tamar Lewin, "Dean at M.I.T. Resigns, Ending a 28-Year Lie," The New York Times, Apr. 27, 2007, *available at* https://www.nytimes.com/2007/04/27/us/27mit.html.  It is entirely unclear what could distinguish the junior associate's misrepresentation to Williams & Connolly or the former Dean's misrepresentation to M.I.T. – or the numerous other people who have suffered professional and reputational, but not penal, consequences as a result of falsifying their credentials[6] – from the

---

[6]   *E.g.,* Daniel Lippman, "State Department Staffer resigns after allegations she inflated her resume," Politico, Nov. 18, 2019, *available at* https://www.politico.com/news/2019/11/18/state-department-chang-resigns-resume-071385; Matt Lombardi, "4 Coaches That Lied On Their Resumes And Got Caught," Aug. 12, 2012, *available at* https://thespun.com/news/4-coaches-that-lied-on-their-resumes-and-got-caught.

allegation that Mr. Zangrillo's daughter cheated on her online high school classes and submitted the grades to BU (after she was already admitted, no less).

How does the Government distinguish the hundreds (if not thousands) of cases of academic dishonesty every year?  For example, is it the Government's position that the 125 Harvard undergraduate students who were accused of participating in a massive scheme to cheat on their 2012 take-home exam should have been criminally prosecuted?  *See* Richard Perez-Pena and Jess Bidgood, "Harvard Says 125 Students May Have Cheated on a Final Exam," The New York          Times,          August          30,          2012,          *available          at* https://www.nytimes.com/2012/08/31/education/harvard-says-125-students-may-have-cheated-on-exam.html.  What about the 66 high school students who were accused of participating in a cheating ring at New York's Stuyvesant High School.  *See* Vivian Yee, "Stuyvesant Students Describe the How and Why of Cheating," The New York Times, Sept. 25, 2012, *available at* https://www.nytimes.com/2012/09/26/education/stuyvesant-high-school-students-describe-rationale-for-cheating.html.  Neither case resulted in wire fraud changes, although under the Government's theory, they could have.  Instead, academic integrity boards investigated and handed down appropriate punishments, such as suspensions and expulsions.

The Government's class-taking theory simply stretches the wire fraud statute beyond its comprehensible boundaries.  It is entirely unclear, under the Government's theory, what type of academic dishonesty is a federal crime and what type is appropriately punished by educational institutions and ethics boards.  Even if the charged conduct could conceivably be viewed as a wire fraud, principles of lenity, vagueness, and the like counsel strongly against sustaining the charges here.  ECF No. 1042 at 25.  For this reason, Counts One and Four of the Indictment, to the extent they allege a class-taking scheme, should be dismissed as to Mr. Zangrillo.

**B.      Cheating in Online Classes Is Immaterial.**

Counts One and Four also fail because the Government cannot possibly establish that the alleged conduct—the fact that a tutor assisted Mr. Zangrillo's daughter in completing some online courses—was material to BU's or USC's admission decisions.  "To prove that Zangrillo engaged in a scheme with the intent to defraud, that is, to obtain property by means of fraudulent pretenses . . . the government must prove that the fraudulent pretenses were material, that is, that they had a natural tendency to influence or be capable of influencing the decision of the decision maker in question."  *United States v. Zangrillo*, No. CR 19-10080-NMG, 2020 WL 1027815, at *4 (D. Mass. Mar. 3, 2020).  As described in the securities context, for a misstatement or omission to be material, it must be "so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question."  *United States v. Weed*, 873 F.3d 68, 73 (1st Cir. 2017).

Here, the Government's chain of logic with respect to materiality is simply too attenuated.  With respect to the BU class-taking allegations, the Government alleges that the cheating affected Mr. Zangrillo's daughter's grades, which affected her transcript, which was sent to BU after she already was admitted, but somehow retroactively affected BU's admissions decision anyway.  The class cheating is simply too far removed from the admissions decision to establish materiality.  Put differently, if the object of the wire fraud was to obtain an admissions slot to BU, Mr. Zangrillo's daughter had already obtained it long before the cheating began.  Her alleged after-the-fact cheating on some high school classes cannot somehow retrospectively turn her acceptance into a wire fraud.

Nor can the government show that any of the individual grades in the classes were material to BU's decision.  In particular, we are not aware of the Government having produced any evidence from the BU's admissions department that would show how the university dealt

with the transcripts sent by Mr. Zangrillo's daughter and whether particular courses or course grades were important to its deliberations, if it even had any such deliberations.  This is especially relevant in light of the fact that BU made its actual admissions decision based on transcripts that the government does not allege included classes taken by tutors.

With respect to USC, the Government's materiality logic makes even less sense.  On the one hand, the Government will argue that the fact Mr. Zangrillo's daughter received help in some online classes was material to USC's admissions decision.  On the other hand, the Government will argue that Mr. Zangrillo's daughter's admission to USC was a foregone conclusion because of the alleged quid pro quo bribery.   The Government cannot have it both ways.   Because it would be impossible to show that the grades were material to USC's admissions decision, while at the same time arguing that Mr. Zangrillo's daughter was only admitted to USC because of a bribe, the Government cannot establish the requisite materiality requirement sufficient to state a federal wire fraud claim.

### C.   Boston University Was Not Defrauded Due To The Alleged Class-Taking Scheme.

Count Four should be dismissed for the additional reason that BU specifically was not defrauded by the class-taking scheme because Mr. Zangrillo's daughter was admitted to BU *before* that scheme is alleged to have begun.  As set out in the Indictment, there were no misrepresentations made to BU that resulted in the university offering an admissions slot to Mr. Zangrillo's daughter, nor did any corrupt BU official assist in securing her admission. Therefore, BU was not a victim of the alleged scheme.

As the Supreme Court has noted, the words "to defraud" in the mail fraud statute have the "common understanding" of " 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or

overreaching.'" *Carpenter v. United States*, 484 U.S. 19, 27 (1987).  A "necessary step toward satisfying the 'scheme to defraud' element in this context is showing that the defendant intended to 'deprive' another of their protected right."  *United States v. Czubinski*, 106 F.3d 1069, 1074 (1st Cir. 1997).

In this case, BU was not defrauded because Mr. Zangrillo's daughter applied and was admitted *before* the Indictment alleges that the class cheating began.  As the Government's own documents prove, Mr. Zangrillo's daughter applied to BU on December 31, 2016.  (*See* Ex. A.) BU admitted her in March of 2017.  FSI ¶ 254.  Under the Government's theory, the property— admission to a university—was obtained at that very moment, when BU admitted Mr. Zangrillo's daughter.  The Indictment, however, does not allege that Mr. Zangrillo's daughter engaged in the class-taking scheme until sometime later in the spring of 2017, *after* she already was admitted.  FSI ¶ 255.  In fact, as set forth in the Indictment, the transcript incorporating grades from high school classes that the government claims Mr. Zangrillo's daughter cheated on was not sent to BU until August of 2017, five months after the fact (and four months after she had put a deposit down at a different college).  FSI ¶¶ 262, 376.

It follows that the cheating could not have deprived BU of any property by "trick, deceit, chicane or overreaching" because the alleged property—the admissions slot—was obtained entirely lawfully, based on Mr. Zangrillo's daughter's own merit, long before the so-called scheme occurred.  It cannot be disputed that BU made its admission decision based on accurate information; the Government does not allege there was any bribery in connection with the decision or that Mr. Zangrillo's daughter's application contained a misstatement.

There are, of course, cases in which the fraudulent "scheme" continues after the initial deprivation of property, such as when a defendant engages in so-called "lulling" behavior to

19

prevent a victim from going to the authorities, or when he covers up his initial fraud. But those cases all involves situations in which the defendant obtained property from his victim through fraudulent means, and then *continued* the scheme afterwards. As the Supreme Court explained in the analogous mail fraud context:

> To find a violation of the mail fraud statute, 18 U.S.C. § 1341, the charged "mailings" must be for the purpose of executing the scheme. Mailings occurring after receipt of the goods *obtained by fraud* are within the statute if they were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.

*United States v. Lane*, 474 U.S. 438, 451-52 (1986) (quotation marks and citations omitted). Here, the "goods" – according to the government, an admissions slot at BU – were not "obtained by fraud," but was earned honestly by Mr. Zangrillo's daughter. As a result, the later allegedly dishonest conduct cannot constitute a wire fraud.[7]

## CONCLUSION

For the foregoing reasons, this Court should dismiss Counts One and Four of the Indictment as against Mr. Zangrillo to the extent they allege a class-taking scheme. At minimum, the Court should use a special verdict form and appropriate jury instructions to ensure unanimity by the jury.

---

[7]     For the same reason, the Indictment fails to state a claim that Mr. Zangrillo aided and abetted the Count Four wire fraud. To support a conviction of aiding and abetting, the government must prove that the "defendant associated [himself] with the underlying venture, participated in it as something [he] wished to bring about, and sought by [his] actions to make it succeed." *United States v. Cassiere*, 4 F.3d 1006, 1011 (1st Cir. 1993). Taking the facts in the Indictment as true, the absolute earliest that Mr. Zangrillo could have known about the high school cheating was July 18, 2017, when The Key sent a "course completion" invoice. FSI ¶ 257. But BU had already made its admission decision by then, without considering grades arising from the class cheating. Thus, the Indictment fails to allege the "necessary step" that Mr. Zangrillo intended to deprive BU of anything.

Dated:  April 1, 2020

Respectfully,

*/s/ Martin F. Weinberg*
Martin G. Weinberg, Esq. (BBO # 519480)
20 Park Plaza, Suite 1000
Boston, MA  02116
Tel: (617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
Sara K. Winik (*pro hac vice pending*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel: (212) 446-2300
mlschwartz@bsfllp.com
swinik@bsfllp.com

*Counsel for Robert Zangrillo*

21

## <u>LOCAL RULE 7.1(a)(2) CERTIFICATION</u>

Undersigned counsel certifies that he conferred with counsel for the Government in an attempt to resolve or narrow the issues raised in this Motion.  The Government opposes this Motion.

/s/ Martin G. Weinberg
Martin G. Weinberg

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed with the Clerk of the United States District Court for the District of Massachusetts via the CM/ECF system, which will notify all participants in the case who are registered CM/ECF users; these are identified on the Notice of Electronic Filing.  Paper copies will be sent to those identified as non-registered participants.

/s/ Martin G. Weinberg
Martin G. Weinberg