UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG-19 |
| | ) | |
| (19) ROBERT ZANGRILLO, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
ROBERT ZANGRILLO'S MOTIONS TO DISMISS COUNTS ONE AND FOUR
(DKT. 1043), AND TO STRIKE THE CLASS-TAKING ALLEGATIONS OR,
IN THE ALTERNATIVE, TO SEVER COUNTS ONE AND FOUR,
AND TO SEVER HIS TRIAL (DKT. 1045)**

Defendant Robert Zangrillo moves to dismiss or sever Counts One and Four of the Fourth

Superseding Indictment ("FSI" or "the indictment") to the extent they allege the submission of

fraudulent transcripts in an effort to gain admission for his daughter to college, or to strike those

allegations from the indictment.  In addition, he moves to sever his trial from each of his co-

defendants.  His motions are without merit and should be denied.

**RELEVANT BACKGROUND**

The indictment charges Zangrillo with conspiracy to commit wire and mail fraud, and

honest services wire and mail fraud (Count One) as well as one substantive count of wire and

honest services wire fraud (Count Four).[1]  The fraud scheme charged in Count One and Count

Four is the same.  The goal of that scheme was "to use bribery and other forms of fraud to facilitate

[the defendants'] children's admission to select colleges and universities in the District of

Massachusetts and elsewhere."  FSI ¶ 64.  The indictment alleges that the defendants engaged in

---

[1] Zangrillo is also charged with conspiracy to commit federal programs bribery (Count Two), money laundering conspiracy (Count Three), and a second substantive count of wire and honest services wire fraud (Count Ten).  His motions do not seek relief with respect to those counts.

the scheme through various means, including, among other things, "[h]aving a third party take classes in place of the defendants' children, with the understanding that grades earned in those classes would be submitted as part of the students' college applications," *id.* ¶ 66(e), and "[b]ribing athletic coaches and university administrators to designate students as purported athletic recruits— with little or no regard for their athletic abilities and, in some cases, even though they did not play the sport they were purportedly recruited to play—and as members of other favored admissions categories, in violation of the coaches' and administrators' duties of honest services to their employers," *id.* ¶ 66(f).[2]

The indictment alleges that beginning in or about 2017 Zangrillo agreed with William "Rick" Singer to pay third parties to complete online high school and college courses for his daughter, with the "understanding that credits earned in those classes would be submitted to colleges on his daughter's behalf, either as part of her college applications or to serve as proof of her high school graduation." *Id.* ¶ 253. Beginning in 2018, Zangrillo further agreed with Singer to pay $250,000 to facilitate his daughter's transfer to USC as a purported crew recruit. *Id.* ¶ 265.

Zangrillo's daughter was provisionally admitted to Boston University ("BU") in March 2017. *Id.* ¶ 254. At or about that time, she was enrolled in five online high school classes, "all of which, once completed, would fulfill credits she needed to graduate." *Id.* ¶ 255. Zangrillo's

---

[2] The facts described in Zangrillo's brief as "undisputed" are not set forth accurately. *Compare, e.g.*, Dkt 1056 at 5 ("[T]he Indictment alleges that The Key employees *helped* Mr. Zangrillo's daughter with four courses . . . .") (emphasis added), *with* FSI ¶ 253 (ZANGRILLO agreed with Singer *to pay for a third party to complete* online high school courses for his daughter . . . .") (emphasis added). Rather than address each inaccuracy or omission, the government sets forth herein the facts as alleged in the indictment, which must be taken as true when a defendant seeks dismissal. *See United States v. Ngige,* 780 F.3d 497, 502 (1st Cir. 2015) ("When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true, mindful that the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the offense.") (internal quotations and citations omitted).

daughter never completed four of those classes. *Id*. ¶¶ 255-56. Instead, Zangrillo paid two of Singer's associates to do so. *Id*. ¶ 256-58.

On July 28, 2017, after Singer's associates completed the classes, one of them—Mikaela Sanford—arranged for Zangrillo's daughter's transcript to be sent to BU. *Id*. ¶ 259. That same day, a member of the high school counseling department emailed Zangrillo's daughter "that she needed to complete a course, Fitness Fundamentals, to fulfill her graduation requirements." *Id*. ¶ 260. Sanford completed the course for her, and thereafter again requested that the high school send the transcript "with proof of graduation" to BU. *Id*. ¶ 261. The high school emailed the transcript—reflecting credits earned by Sanford and the other co-conspirator—to BU. *Id*. ¶ 262. Thereafter, Zangrillo paid Singer's company $2,500 for "Course Completion by Mikaela Sanford—Fitness Fundamentals 2." *Id*. ¶ 263-64.

In 2018, Zangrillo again engaged Singer to have Sanford take online courses on his daughter's behalf, this time so the grades could be submitted as part of her application to transfer from community college to the University of Southern California ("USC"). *Id*. ¶¶ 253, 266, & 268-71. The application, which was submitted to USC in February 2018, also contained falsified athletic credentials. *Id*. ¶ 266. In a call with Sanford, his daughter, and Singer in June 2018, Zangrillo directed Sanford—who had started taking a college art history course and had also taken other online college courses for Zangrillo's daughter—to finish the art history course and take a biology course for her. *Id*. ¶ 268. During the same call, Singer explained, in sum and substance, that he had asked members of the USC athletics department to facilitate Zangrillo's daughter's

admission "as though she's been sculling and rowing," and that the crew coach had agreed to designate her as a purported crew recruit, provided that "you guys help us." *Id*. ¶ 267.

Transcripts reflecting the courses Sanford took were submitted to USC as part of Zangrillo's daughter's application. *Id*. ¶ 271. In September 2018, after USC mailed Zangrillo's daughter an acceptance letter, Zangrillo wired $200,000 to Singer's sham charity, the Key Worldwide Foundation ("KWF"), and caused a check in the amount of $50,000 to be issued to "USC Women's Athletics." *Id*. ¶¶ 272-73.

In October 2018, after Singer began cooperating with the government's investigation, Singer called Zangrillo to tell him that KWF was being audited, and that he would not tell the IRS that the "monies went to go pay Donna Heinel for USC to get [Zangrillo's daughter] in." *Id*. ¶ 274. Zangrillo asked Singer what he should tell the IRS about the payment, "just so I know so we have the story straight." *Id*. Singer replied that Zangrillo should tell the IRS that the money— *both* for Singer's associates to take classes for Zangrillo's daughter *and* for the false recruitment—was for "our programs that handle underserved kids." *Id*. Zangrillo replied: "Okay, great, perfect." *Id*.

## ARGUMENT

Zangrillo contends that Count One and Count Four should be dismissed as duplicitous and for failure to state a criminal offense insofar as they relate to the false class-taking. Those arguments are without merit. Count One and Count Four each charge only one federal crime: conspiracy (Count One) and wire fraud (Count Four). That the alleged fraud scheme involved more than one "manner and means" does not make the charge duplicitous, and neither does the fact that the wire fraud is alleged on both property and honest services fraud theories. The remainder of Zangrillo's claims—that the cheating was really "tutoring," that the alleged fraud is "new and novel," that BU was not actually defrauded, and that the fraudulent transcripts were not

material—are factual arguments that cannot form the basis of a motion to dismiss.  Zangrillo's alternative requests that the Court strike or sever parts of Count One and Count Four, and sever his trial from his co-conspirators, are without merit for many of the same reasons.

## I.    COUNT ONE AND COUNT FOUR ARE NOT DUPLICITIOUS

Zangrillo argues that Count One and Count Four should be dismissed as duplicitous because they allege wire fraud on a property and honest services theory in the same count, and because they allege that the defendants used multiple means to carry out that offense.  *See* Dkt. 1056 at 9-11.  But it is black-letter law that a single fraud scheme may be achieved by various means, and that a fraud may be alleged on both a property and honest-services fraud theory.  Zangrillo's contentions are simply incorrect as a matter of law.

### A.    Applicable Law

Designed to ensure adequate notice and jury unanimity, the doctrine of duplicity prohibits the joining of two or more distinct offenses in a single count.  *United States v. Prieto,* 812 F.3d 6, 11 (1st Cir. 2016) ("This rule is born out of two concerns.  One concern is that a criminal defendant facing such an indictment might not know which charge to prepare to defend against.  A second concern is that a jury could find a defendant guilty without actually reaching unanimity.") (citations omitted).

An indictment is duplicitous only if two *offenses*, not two *means* of committing one offense, are alleged in the same count.  *See United States v. Verrecchia,* 196 F.3d 294, 297 (1st Cir. 1999) (claims of duplicity are assessed by identifying the "unit of prosecution" for the charged offense); *see also Braverman v. United States*, 317 U.S. 49, 54 (1942) ("[t]he conspiracy is the crime, and that is one, however diverse its objects") (internal quotations and citations omitted); *United States v. Luongo,* 11 F.3d 7, 9 (1st Cir. 1993) (each use of the wires constitutes a separate offense under 18 U.S.C. § 1343).  A single count of conspiracy may charge multiple means of

committing the offense, provided it charges only one overarching criminal agreement.  *See e.g.,*

*United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015) ("[I]t is often possible . . . to divide a

single [ ] conspiracy into subagreements," but "this does not necessarily mean that more than one

conspiracy exists . . . .  [T]he key is to determine whether the different sub-groups are acting in

furtherance of one overarching plan.") (internal quotations and citations omitted); *United States v.*

*Acevedo Vila*, 588 F. Supp. 2d 194, 201 (D.P.R. 2008) (holding that a "defendants' duplicity

challenge turns on whether the Indictment properly alleges that all of the conspirators joined in a

common agreement to achieve the conspiracy's unlawful objectives."); *see also United States v.*

*Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The fact that a conspiracy can be divided into

distinctive sub-groups does not mean that there is more than one conspiracy.  As long as the

different sub-groups are committing acts in furtherance of one overall plan, the jury can still find

a single, continuing conspiracy.").  Likewise, a single count of wire fraud may charge multiple

means and multiple theories of committing the offense provided that it charges only one use of the

wires.  *See, e.g.*, *Prieto,* 812 F.3d at 11-12 (finding no duplicity in a mail fraud count that included

multiple means—"including lying to homeowners, straws, and lenders"—designed to achieve a

single objective—"pocketing cash paid out by the lenders"—because the "acts comprise a

continuing course of conduct that constitutes a single offense.") (internal quotations and citations

omitted); *United States v. Zeidman*, 540 F.2d 314, 318 (7th Cir. 1976) (finding no duplicity where

mail fraud scheme involved fraudulent debt collection service that victimized both creditors and

debtors since "[s]chemes to defraud by mail often are multi-faceted and therefore the means used

in committing the offense may be joined without duplicity."); *United States v. Crummer*, 151 F.2d

958, 964 (10th Cir. 1945) ("The [mail fraud] scheme, as laid [out] in the indictment, involved a

multiplicity of ways and means of action and procedure, but it was a single scheme.  And setting

out the numerous ways and means of action and procedure included in the scheme for its accomplishment did not render the indictment duplicitous."); *see also United States v. Goldberg*, 913 F. Supp. 629, 635-36 (D. Mass. 1996) (scheme to obtain money by fraudulent representations and to deprive a victim of the right to honest services was not duplicitous because it contained only one alleged use of the mail).

### B.     Count One and Count Four Each Charge One Offense

Count One of the indictment alleges that Zangrillo and his co-conspirators engaged in a single conspiratorial agreement to use various means—including test cheating, the submission of falsified academic and athletic records, and bribery—to secure the fraudulent admission of their children to college.  FSI ¶ 66.  Count Four is a substantive wire fraud count alleging the same fraud scheme committed through the same means.  Alleging multiple means or multiple theories of committing a single offense is not duplicitous.  It is specifically allowed by the Federal Rules of Criminal Procedure.  *See* FED. R. CRIM. P. 7(c)(1) ("It may be alleged in a single count . . . *that the defendant committed it by one or more specified means*.") (emphasis added); *see also Goldberg*, 913 F. Supp. at 636 ("To claim that such specificity [*i.e.*, including honest services as an alternative theory in a wire fraud count] invalidates the indictment is to stand the transitional safeguards against vague indictments on their head.").  Count One and Count Four are unexceptional in this regard.

Tellingly, Zangrillo's sole support for his duplicity claim comes from *United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997), a District of Puerto Rico case that itself does not cite *any* authority to support its view and has been roundly criticized.  *See, e.g., United States v. Ohle*, 678 F. Supp. 2d 215, 222 & n.5 (S.D.N.Y. 2010) (rejecting *Munoz-Franco* as incompatible with the "the strong preference for juries to determine the question of whether multiple or single conspiracies exist and how this preference affects the pleading requirements").  As one court

explained in declining to dismiss as duplicitous a conspiracy count that contained only "boilerplate allegations of a single conspiracy" and a description of overt acts that was divided into two distinct sets, "the Court of Appeals has repeatedly cautioned that the determination whether a conspiracy is single or multiple is an issue of fact 'singularly' well suited to determination by a jury," even in instances where the pleadings on their face appear "more consistent with two conspiracies than one." *United States v. Gabriel*, 920 F. Supp. 498, 504 (S.D.N.Y. 1996).

Zangrillo's contention that a jury could convict him without reaching a unanimous verdict on either the property theory or the honest services theory is likewise unavailing.[3]   There is no requirement that a jury be unanimous as to the *manner* in which a charged offense is executed. *See United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) ("A jury, faced with divergent factual theories in support of the same ultimate issue, may decide unanimously, as is the case here, that the government has proven a scheme to defraud even if they may not be unanimous as to the precise manner in which it occurred.") (internal quotations and citations omitted).   Moreover, even if there were such a requirement, it could be safeguarded with jury instructions and a special verdict form.[4]   *See United States v. Newell*, 658 F.3d 1, 23 (1st Cir. 2011) (holding that a jury instruction requiring unanimity cures duplicity).

---

[3] Zangrillo's suggestion that the property and honest services theories are "fundamentally incompatible" is wrong.  The various means Zangrillo used to facilitate his fraud—cheating in online classes, faking his daughter's athletic credentials, and bribery—were aimed at the same end: securing her admission to college.  The evidence at trial will show that they were not simply compatible, but reinforcing.

[4] Dismissal is in any event not ordinarily the remedy for duplicity.  *See* 1A CHARLES ALLEN WRIGHT AND ANDREW D. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE § 145 (4th ed. 2008). Instead, the government can decouple the charges or select the single charge on which it intends to proceed.  *Id*.; *see also United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013).

## II.    COUNT ONE AND COUNT FOUR ALLEGE FEDERAL CRIMES

Zangrillo next argues that (1) submitting fraudulent coursework and grades is a "new and novel" claim that is not properly charged as wire fraud; (2) his daughter's fraudulent academic records were not material to the victim universities; and (3) BU was not defrauded.  But those arguments fail because, even if the factual basis for the charge were "novel"—which it is not— that would not be a valid reason to dismiss a properly pled wire fraud charge.  And, indeed, Zangrillo's arguments must be rejected because they challenge the facts of the government's case rather than the facial validity of the indictment against him.  That is not proper on a motion to dismiss.  *See Ngige*, 780 F.3d at 502 ("The problem with [defendant]'s argument is that it fails to attack the facial validity of the indictment and instead challenges the government's substantive case."); *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) ("courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations").  Zangrillo's arguments are also without merit for the reasons set forth below.

### A.    Admission to the Universities Is "Property," and Submitting Fraudulent Academic Transcripts Can Form the Basis of a Wire Fraud Charge

Zangrillo's contention that the charge against him is "novel," because submitting fraudulent grades is "far afield from the 'core meaning' of the wire fraud statute," *see* Dkt. 1056 at 12, is untrue, as the attached chart makes clear.  *See* Exhibit A (chart of representative cases in which academic cheating was charged as means of committing mail and/or wire fraud).[5]  It is also irrelevant in the context of a motion to dismiss.

---

[5] In *United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011), three students participated in a scheme to access their university's internet-based grading system to change grades for themselves and friends who were applying to graduate school.  *Id*. at 1183.  The students were charged with conspiracy to commit wire fraud.  On appeal, one of the students argued that the district court erred in allowing the government to present "a legally impermissible fraud theory, where the principal object of the conspiracy—to change students' grades—was non-financial and not a scheme to obtain money."  Appellee Brief at *1, *available at* 2010 WL 5621783.  The

The indictment charges Zangrillo with engaging in a scheme to secure admission to college for his daughter through bribery and fraud. The submission of fraudulent academic transcripts was one means by which Zangrillo sought to execute that fraud. Zangrillo's attempt to minimize what he did by comparing it to using Cliff's Notes is a frivolous attempt at nullification that would be improper before a jury, much less on a motion to dismiss. Hiring someone to impersonate your daughter, and thereby generating a false academic personae to use in gaining admission to college, is not the same as using Cliff's Notes. In any event, whether Zangrillo committed fraud by "new and novel" means or not is irrelevant. The indictment properly charges him with using those means as part of a scheme to deprive a university of a cognizable property interest.

In this regard, Zangrillo also argues that Count One and Count Four should be dismissed because admission to college is not a cognizable form of property. In making this argument, he relies on the same arguments as those set forth in the defendants' joint motion to dismiss. *See* Dkt. 1042 at 23-25. But as set forth more fully in the government's forthcoming opposition to that motion—which the government incorporates by reference—the right to determine which applicants to admit to a limited number of slots *is* a property interest held by a university, and has been recognized as such. *See, e.g., United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997) (holding that a university has "a property right in its unissued degrees"). Zangrillo attempts to distinguish the Sixth Circuit's decision in *Frost* on the basis that it involved honest services fraud rather than traditional mail and wire fraud. But the Sixth Circuit made no such distinction, concluding that "[a] professor . . . owes a fiduciary duty to *protect the property* of his employer

---

Eleventh Circuit affirmed the student's conviction, which was based on falsifying grades on transcripts. 648 F.3d at 1191-92. The court reasoned that, "[a]lthough changing grades was the manner in which the scheme was carried out," the victim university had been deprived of "money or property," including lost tuition from the unearned hours credited students and "an intangible property interest in the integrity of its grading system." *Id.*

university," and framing the relevant inquiry as whether "the University had a *property right* in a degree which it has not issued yet."  *Id*. at 367; *see also id*. at 369 ("Despite the literal terms of §1346, we . . . have construed the intangible right to honest services in the private sector as ultimately dependent upon the property rights of the victim.").

Zangrillo's further contention that BU was not *actually* defrauded of its property because his daughter did not ultimately attend that university is beside the point.  Zangrillo is charged with engaging in a *scheme* to defraud.  The government alleges, and the evidence will prove, that it was foreseeable to him that a wire would be sent in furtherance of that scheme.  More is not required. The ultimate success of the scheme—whether Zangrillo's daughter was admitted, and whether she chose to retain the fruits of the fraud by actually attending BU—is irrelevant.  *See United States v. Carrington*, 96 F.3d 1, 7 (1st Cir. 1996) ("The crime of wire fraud does not require that the defendant's object be attained.  It only requires that the defendant devise a scheme to defraud and then transmit a wire communication for the purpose of executing the scheme.").

### B.    The Materiality of the Fraudulent Transcripts Is a Jury Question

Zangrillo's next argument—that the fraudulent transcripts were not material to BU and USC—is likewise improper in the context of a motion to dismiss.  As an initial matter, the question is not whether the fraudulent transcripts *did* influence BU and USC, but whether they *could have*. *See, e.g.*, *United States v. DeNunzio*, 14-cr-10284-NMG, 2015 WL 5305226, at *6 (D. Mass. Sept. 9, 2015) (Gorton, J.) ("Materiality is determined by analyzing whether a statement was capable of influencing a decision, not whether it did, in fact, influence a decision.").[6]  That is an issue for the jury.  At this stage, all that is relevant is whether the indictment sufficiently alleges the charged

---

[6] Zangrillo's contention that his daughter had been admitted to BU by the time the false transcripts were submitted is also misleading.  As the indictment alleges, the transcripts were submitted to BU as proof that his daughter had obtained sufficient credits to matriculate.  *See* FSI ¶ 261.  It is difficult to imagine a fact more material to a university's admission decision.

crime, not whether the government will ultimately be able to prove its case at trial.  *See Guerrier*, 669 F.3d at 4.

The indictment properly alleges materiality:  that Zangrillo schemed to defraud the universities "by means of *material* false and fraudulent pretenses, representations, and promises," including by having a third party take classes for his daughter with the understanding that those records would be submitted as part of her college applications.  *See, e.g.*, ¶¶ FSI 66(e), 253-64, 268-71, 370, & 376 (alleging that the universities were unaware that Zangrillo paid third parties to complete courses on his daughter's behalf so that her application would falsely represent that she fulfilled her high school graduation requirements and earned college credits to transfer schools). "Because the Court must consider those allegations as true for purposes of the instant motion to dismiss, the ultimate determination of the materiality of defendant['s] purported misrepresentation is for the jury to determine after hearing all of the evidence during trial."  *DeNunzio*, 2015 WL 5305226, at *5; *see also United States v. Sharp*, 749 F.3d 1267, 1280 (10th Cir. 2014) (materiality is a "question of fact for the jury to decide") (internal quotations and citations omitted).[7]  For these reasons, Zangrillo's arguments are without merit.

### C.    The Indictment Alleges That BU Was Defrauded

Zangrillo's final argument—that Count Four should be dismissed because his daughter was admitted to BU in March 2017 and the fraudulent transcripts were not submitted "until sometime later in the spring"—is misguided.  For purposes of wire fraud, the defendant must use a wire communication "for the purpose, or in furtherance, of executing the scheme to defraud."  *United*

---

[7] Zangrillo's sole support for the claim that the issue of materiality should be decided as a matter of law comes from *United States v. Weed*, 873 F.3d 68 (1st Cir. 2017), a case in which the First Circuit held that "the materiality issue is peculiarly one for the trier of fact."  *Id.* at 73 (internal quotations and citations omitted).

States v. Hebshie, 549 F.3d 30, 36 (1st Cir. 2008) (interpreting analogous mail fraud statute). Courts construe the "in furtherance" requirement broadly, *see id.* at 36, and it is black-letter law that communications may further a scheme even when they are sent *after* the defendants have obtained the money or property that is its object. *See, e.g., United States v. Galloway*, 664 F.2d 161, 163 n.3 (7th Cir. 1981) ("The fact that [the defendant] received his money before these mailings does not change our conclusion, for a fraudulent scheme may depend on a mailing even after the defrauders have received the sought-after money or documents.") (internal quotations and citations omitted); *see also United States v. O'Brien*, 994 F. Supp. 2d 167, 180 (D. Mass. 2014) (communications sent after a scheme reached fruition were "in furtherance" of mail fraud scheme).

Ultimately, "the issue is not one purely of sequence." *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000); *see also United States v. Potter*, 463 F.3d 9, 17 (1st Cir. 2006) ("In our view, the [wire fraud] statute requires not strict sequence of exclusive phases[.]"). The "relevant question at all times," is whether a wire "is part of the execution of the scheme as conceived by the perpetrator at the time," *Schmuck v. United States*, 489 U.S. 705, 715 (1989), not whether the defendant, prior to the wiring, has "obtained all the money [or property he] expected to get," *United States v. Sampson*, 371 U.S. 75, 79 (1962).

Here, the indictment alleges that BU's admission of Zangrillo's daughter was contingent on the submission of transcripts demonstrating that she had fulfilled certain course requirements. *See, e.g.,* FSI ¶¶ 260-61. It is those courses that Zangrillo paid Singer to have Sanford and another conspirator take in his daughter's stead. *See, e.g.*, FSI ¶ 256. And the indictment alleges that Zangrillo's fraud continued into the summer of 2017, when the fraudulent transcripts were sent to BU via interstate wire as "proof of graduation." *See, e.g.,* FSI ¶¶ 261-62 & 376. That wire was,

accordingly, "in furtherance" of the scheme, because it was provided as "proof" that Zangrillo's daughter had satisfied the requirements for admission to the university.

For all these reasons, Zangrillo's motion to dismiss (Dkt. 1043) should be denied.

## III. THERE IS NO BASIS TO STRIKE OR SEVER ANY PORTION OF COUNT ONE AND COUNT FOUR, OR TO SEVER ZANGRILLO'S TRIAL FROM HIS CO-CONSPIRATORS

Zangrillo argues in the alternative that the Court should strike the indictment's allegations that he engaged in fraud by submitting fraudulent academic transcripts. That claim—premised almost entirely on the arguments Zangrillo made for dismissal—should be denied for the same reasons. Likewise, his contention that he should receive his own trial despite being charged with conspiracy fails for the reasons set forth below and in the government's forthcoming response to the defendants' joint motion to dismiss, which the government incorporates by reference.

### A. The Allegations Regarding the Submission of Fraudulent Academic Transcripts Are Not Surplusage and Should Not be Stricken

Zangrillo contends that any allegations related to the submission of fraudulent academic transcripts should be stricken from the indictment as "surplusage" because they cannot form the basis of a valid wire fraud charge. That contention is untrue, for all the reasons set forth above.

In any event, the indictment charges a single conspiracy to fraudulently gain admission to universities through various means—including the submission of fraudulent academic transcripts. *See* ¶¶ FSI 66(a)-66(j). The indictment further alleges facts regarding the submission of such transcripts as overt acts in furtherance of the conspiracy. *See* ¶¶ FSI 253-64, & 268-71. These allegations are, by definition, not "surplusage," and there is no basis to strike them. *See, e.g.*, *United States v. Gambale*, 610 F. Supp. 1515, 1543 (D. Mass. 1985) (denying motion to strike language that related to elements of the charged offense even if potentially prejudicial); *see also United States v. Sawyer,* 878 F. Supp. 279, 294 (D. Mass. 1995) (Gorton, J.), *aff'd*, 85. F.3d 713

(1st Cir. 1996) ("[A] motion to strike surplusage is granted only if the allegations are inflammatory, prejudicial, and irrelevant to the crime charged . . . .  Because the standard is so exacting, alleged surplusage is rarely stricken.") (internal quotation and citations).

### B.     Allegations Regarding the Submission of Fraudulent Academic Transcripts Are Properly Joined Under Rule 8(a)

Zangrillo's argument that the allegations regarding fraudulent transcripts are improperly joined in Count One and Count Four also fails.

Rule 8(a) deals with the joinder of two or more offenses by a single defendant.[8]  *See* FED. R. CRIM. P. 8(a).  "[O]bvious considerations of judicial economy support trying all related counts against the same defendants at one time." *United States v. Alosa*, 14 F.3d 693, 695 (1st Cir. 1994).  Accordingly, "Rule 8(a)'s joinder provision is generously construed in favor of joinder." *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996) (citations omitted).  "Rule 8(a) permits joinder of multiple offenses in one of three situations; if the offenses are (1) of the same or similar character, (2) based on the same act or transaction, or (3) connected with or constitute parts of a common scheme or plan." *United States v. Liberatore*, 16-cr-10211-ADB, 2017 WL 2294283, at *1 (D. Mass. May 25, 2017) (internal quotations and citations omitted); *see also United States v. DeLeon*, 07-10277-NMG, 2008 WL 4610292, at *2 (D. Mass. Oct. 16, 2008) (Gorton, J.) ("In

---

[8] Rule 8(a) involves the joinder of multiple offenses, while Rule 8(b) involves the joinder of multiple defendants.  Different standards apply to each.  *See, e.g., United States v. Rivera-Hernandez*, 18-cr-605, 2020 WL 858613, at *6-7 (D.P.R. Feb. 20, 2020) ("For starters, Rule 8(a) provides for joinder where offenses charged . . . are of the same or similar character.  Rule 8(b) does not contain that language.") (internal quotations and citations omitted).  Zangrillo contends that courts usually apply Rule 8(b) to questions involving joinder of counts in cases with multiple defendants.  *See* Dkt 1046 at 7.  Many courts have challenged this view.  *See, e.g., Frost*, 125 F.3d at 389 (challenging view that Rule (b) governs joinder of offenses in multi-defendant cases); *United States v. Southwest Bus Sales, Inc.*, 20 F.3d 1449, 1454 (8th Cir.1994) (same); *United States v. Eufrasio*, 935 F.2d 553, 570 n. 20 (3d Cir.1991) (same).  As detailed above, however, Zangrillo's joinder arguments are meritless under the standards of either Rule 8(a) or Rule 8(b).

determining whether counts are properly combined for trial, the First Circuit Court of Appeals has held that appropriate factors to consider include 1) whether the charges are brought under the same statute, 2) whether they involve similar victims, locations or modes of operation, and 3) the time frame in which the charged conduct occurred.") (citation omitted).

Zangrillo contends that submitting fraudulent academic transcripts constitutes "an entirely distinct scheme" from the bribery allegations, "involving different people, different conduct, different witnesses, different time periods, different victims, and ultimately different evidence." Dkt. 1046 at 9. But the indictment charges that *both* were among the means Zangrillo and his co-defendants employed as part of their pursuit of a single conspiracy and scheme to defraud. Rule 8(a) is, accordingly, not applicable and the cases to which Zangrillo cites are inapposite.[9]

### C. Allegations Regarding the Submission of Fraudulent Academic Transcripts Should Not Be Severed Under Rule 14

Even if they are properly joined, Zangrillo argues that the allegations regarding fraudulent academic transcripts should be severed from Count One and Count Four and tried separately. That contention is also without merit.

A defendant may seek severance under Rule 14 on the basis that he will suffer "severe and compelling prejudice" if he is tried on all offenses in a single trial. *United States v. Babich*, 16-cr-10343-ADB, 2019 WL 163102, at *2 (D. Mass. Jan. 10, 2019). The required showing is a stringent one. *See, e.g., United States v. Tejeda*, 481 F.3d 44, 55 (1st Cir. 2007) ("prejudice means more than just a better chance of acquittal at a separate trial.") (internal quotation and citation omitted);

---

[9] Zangrillo relies on *United States v. Buchanan*, 930 F. Supp. 657 (D. Mass. 1996), in which certain counts were severed from an indictment. *Buchanan*, however, involved two different fraud schemes, charged in separate counts of an indictment—not a claim that one of the means by which the defendants engaged in a single conspiracy was improperly joined. Zangrillo's attempt to shoehorn a claim that the government has pled multiple conspiracies (or multiple fraud schemes) into a joinder argument should be rejected.

*United States v. Hart*, 09-cr-10005-PBS, 2010 WL 583653, at *1 (D. Mass. Feb. 11, 2010) ("defendant must demonstrate prejudice so pervasive that it would be likely to effect a miscarriage of justice") (internal quotation and citation omitted). "Garden variety prejudice . . . will not, in and of itself, warrant severance." *United States v. Richardson*, 515 F.3d 74, 81 (1st Cir. 2008). The First Circuit has identified three types of prejudice that may result from trying a defendant for multiple offenses during the same trial:

> (1) the defendant may become embarrassed or confounded in presenting separate defenses [for multiple offenses]; (2) proof that defendant is guilty of one offense may be used to convict him of a second offense, even though such proof would be inadmissible in a second trial for the second offense; and (3) a defendant may wish to testify in his own behalf on one of the offenses but not another, forcing him to choose the unwanted alternative of testifying as to both or testifying as to neither.

*United States v. Scivola*, 766 F.2d 37, 41-42 (1st Cir. 1985) (internal citations omitted).

Zangrillo contends that evidence concerning his alleged bribery would be inadmissible in a separate trial concerning the submission of fraudulent transcripts. But his argument is premised on a straw man. The indictment does not allege two separate offenses, one charging bribery and the other charging fraud based on the submission of fraudulent transcripts. It alleges *one fraud scheme and one conspiracy* involving both. Accordingly, the question whether evidence of one would be admissible in a trial of the other is misplaced. And even if that were not the case, Zangrillo's contention that such evidence would be inadmissible pursuant to FED. R. EVID. 404(b) is untrue because it is well-settled that evidence of acts "intrinsic to the crime for which the defendant is on trial" is admissible without regard for that rule. *See, e.g., United States v. Roszkowski*, 700 F.3d 50, 56 (1st Cir. 2012) (evidence that defendant discharged a firearm was properly admissible as intrinsic to a charge that he was a felon in possession of a firearm because it "comprise[d] part and parcel of the core events undergirding the crime for which he was charged," and thus did not implicate 404(b)). Here, evidence of the bribery is related and intrinsic

to the submission of fraudulent academic transcripts (and fraudulent athletic credentials) because both were used as means to the same end:  to gain admission to college under false pretenses.  *See, e.g.*, FSI ¶¶ 267-68 (discussing a June 11, 2018 telephone call between Zangrillo, his daughter, Singer, and Sanford in which they discuss Sanford taking online classes on behalf of Zangrillo's daughter *and* bribing the crew coach to facilitate Zangrillo's daughter's admission to college as if she had been "sculling and rowing" for years).  And evidence of the bribery would, in any event, be admissible pursuant to Rule 404(b) to show, among other things, knowledge, intent, absence of mistake, and as proof that the alleged conduct was part of a common plan or scheme.  *See, e.g., United States v. DeCicco*, 370 F.3d 206, 210-11 (1st Cir. 2004) ("evidence may be admissible . . . even if it may be construed as propensity evidence, if it is used to show any of the other elements set out in" Rule 404(b), including a "common plan or scheme").

### D.    Zangrillo Should Not Be Severed From His Co-Defendants

Zangrillo also argues that he should be severed from his co-conspirators based on the risk of spillover prejudice.  Despite the fact that the Court has already divided his co-conspirators into two groups for trial—and, in so doing, grouped them by the similarity of their conduct—Zangrillo contends that the "allegations and evidence related to the scheme to admit students as athletic recruits has no bearing on the government's case against [him]."  Dkt. 1046 at 2.  That is untrue.

"[T]he general rule is that [defendants who were] indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources[.]"  *United States v. Rodriguez-Reyes*, 714 F.3d 1, 17 (1st Cir. 2013) (internal quotation and citation omitted); *United States v. DeCologero*, 530 F.3d 36, 52 (1st Cir. 2008) (same); *see also United States v. DeNunzio*, 14-cr-10284, 2015 WL 2226251, at *2-3 (D. Mass. May 12, 2015) (Gorton, J.) ("Demonstrating unfair prejudice sufficient to require severance of coconspirators' trials is a difficult battle for a defendant to win. . . .  In fact, severance will rarely, if ever, be required in the context of a

conspiracy case.") (internal citations and quotation marks omitted).  Where, as here, a defendant is charged with conspiracy, "severance will rarely, if ever, be required due to evidentiary spillover."  *DeCologero*, 530 F.3d at 54 (internal quotation and citations omitted); *see also United States v. O'Bryant*, 998 F.2d 21, 26 (1st Cir. 1993) ("Where evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect.") (citations omitted).

Zangrillo's contention that the athletic recruitment allegations have "no bearing" on the case against him is based on the fact that, *unbeknownst to Zangrillo*, his daughter was actually admitted to USC as a "VIP" applicant, rather than as an athletic recruit.  But the indictment charges Zangrillo and his co-defendants with participating in a single conspiracy to commit fraud and bribery.  And it alleges that Zangrillo—*just like every one of his co-conspirators set for trial in October 2020*—intended for his child to be admitted to USC as a fake athlete, in exchange for money.  *Compare* FSI ¶ 265 (alleging that Zangrillo agreed to pay a bribe to facilitate his daughter's application to USC as a purported athletic recruit), *with id.* ¶¶ 114, 123, 144, 225 and 245 (similar allegations against co-defendants Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, John Wilson and Homayoun Zadeh).  That is what Zangrillo agreed to, paid for, and believed occurred.[10]

To convict Zangrillo of conspiracy, the government must prove the existence of an illicit agreement among Zangrillo and at least one of his co-conspirators to engage in the charged scheme.  Accordingly, "virtually all of the evidence relating to the other conspirators [is] also directly relevant to, and, therefore, independently admissible in, the prosecution's case against"

---

[10] Zangrillo's conduct is covered by the indictment either way, because it alleges that bribes were used to facilitate students' admission as fake athletes *and* "as members of other favored admissions categories."  FSI ¶ 66(f).

Zangrillo.  *United States v. Flores-Rivera*, 56 F.3d 319, 325-26 (1st Cir. 1995) (citation omitted); *see also United States v. Saunders,* 553 F.3d 81, 85 (1st Cir. 2009) (affirming denial of severance, even when defendants had varying roles in the conspiracy, since "the nature of proving a conspiracy charge" means "virtually all the evidence relating to the other conspirators is also directly relevant to, and, therefore, independently admissible" against all conspirators) (internal quotation and citation omitted).  This includes (but is not limited to) all the evidence about USC's admissions process, *and* the evidence concerning Singer and his business.  Moreover, even if some evidence concerning Zangrillo's co-defendants were inadmissible against him, "carefully crafted jury instructions can safeguard against the potential for prejudicial spillover." *Babich*, 2019 WL 163102, at *3; *see also, e.g., United States v. Smolar*, 557 F.2d 13, 21 (1st Cir. 1977) (potential for prejudice in complex conspiracy trial is minimized where trial gives appropriate limiting instructions and impresses upon jury its duty to assess guilt of each defendant individually).  There is, accordingly, no reason to sever Zangrillo's trial from that of his co-conspirators.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that Zangrillo's motions be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Justin D. O'Connell*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
KARIN M. BELL
STEPHEN E. FRANK
Dated:  April 30, 2020                          Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated:  April 30, 2020                           /s/ Justin D. O'Connell_____
                                                 Justin D. O'Connell