**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DAVID SIDOO, et al.,<br><br>Defendants. | Case No. 19-cr-10080-NMG<br><br>*Leave to File Granted on 4/17/20*<br>*Leave to File 7-Page Brief*<br>*Granted on 4/30/20* |

**DEFENDANTS' RESPONSE TO THE GOVERNMENT'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT WITH PREJUDICE OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF EVIDENCE BASED ON GOVERNMENTAL MISCONDUCT AND FOR DISCOVERY AND AN <u>EVIDENTIARY HEARING (ECF NO. 971)</u>**

<u>**ORAL ARGUMENT REQUESTED**</u>

The Government denies any wrongdoing, but its admissions show the opposite. Agents fabricated evidence of Defendants' criminal intent. AUSAs learned about the misconduct but did nothing. And ever since Singer's notes came to light, the Government has offered only shifting excuses and conclusory denials—not candor. The Court should not stand for this.

1. Until its sur-reply, the Government conspicuously avoided addressing the substance of Singer's misconduct allegations. Now we know why: The Government does not dispute Singer's allegations in any relevant respect. Specifically:

- The Government concedes Singer repeatedly characterized Defendants' payments as lawful *donations* to university *programs*, because that is what he had always believed and told his clients. *See* Sur-Reply at 3, Exs. A at 2-3, B at 2, C at 2, D at 1-2.[1]
- The Government concedes it instructed Singer to recharacterize those payments as bribes going to insiders—instead of as donations to university programs—on recorded calls designed to create evidence of wrongdoing. *See id.*
- The Government concedes its agents were "loud and abrasive" with Singer on numerous occasions when he "pushed back . . . and said to the agents that is not what he said to parents." Sur-Reply at 3 & n.3 (agent "raised her voice 'somewhat'"), Exs. A at 3 ("stern conversations"), B at 3 ("tense conversations").
- The Government concedes the goal of this recharacterization was to "make sure" that the consensual phone calls would be inculpatory and show Defendants "understood" their payments would induce insiders to betray their fiduciary duties. Sur-Reply at 3, Ex. C at 2.

All this is consistent with what Singer wrote in his personal notes and what Defendants have said all along: The Government browbeat Singer into recharacterizing the nature of the payments on recorded calls, and in doing so manufactured evidence of criminal intent.

2. The Government's primary defense is that directing Singer to change his description of the donations was permissible because *any* "quid pro quo" payment is a bribe, whether made to a university or into a coach's pocket. Sur-Reply at 3. According to the Government, because there is no "legal distinction" between quid pro quo donations to a university program and quid pro quo payments to a corrupt insider, it was acceptable for agents to force Singer to adopt the latter

---

[1] Indeed, the Government now discloses *new* exculpatory evidence: Singer "never considered what he was doing was a bribe" and "didn't think it was a crime." *Id.*, Ex. D at 1-2.

characterization on the recorded calls so that his clients would not dispute that description—even though they had never heard it before and even though Singer had previously told them the donations were legitimate. *See id.*

That argument is wrong on the law and the facts. On the law, it is incorrect that there is no distinction between *donations to universities* and *payments to coaches*. As Magistrate Judge Kelley has written, it is an "open question" whether "a donation to the school that does not directly enrich the employee *can even constitute a bribe*." *United States v. Zangrillo*, 2020 WL 1027815, at *4 n.8 (D. Mass. Mar. 3, 2020) (emphasis added). And a quid pro quo exchange does not automatically turn every donation into a bribe. U.S. Attorney Lelling has himself acknowledged that "donating a building so that a school is more likely to take your son or daughter" does *not* constitute fraud.[2] Indeed, it is undisputed that USC regularly solicits donations in exchange for benefits and special treatment—including in the admissions context.[3] The distinction between lawful donations and unlawful bribes is *not* whether they involve a quid pro quo exchange for special benefits. Rather, it is whether the donor understood the exchange to be either (1) part of a university-sanctioned fundraising scheme, *or* (2) a rogue effort to induce corrupt insiders to betray their universities. It was false and improper for agents to tell Singer that "a quid pro quo . . . is the same as bribery." Sur-Reply, Ex. D at 2.[4]

---

[2] Editorial Board, *Turns Out There's a Proper Way to Buy Your Kid a College Slot*, N.Y. TIMES, (Mar. 12, 2019), https://www.nytimes.com/2019/03/12/opinion/editorials/college-bribery-scandal-admissions.html.

[3] *See, e.g.*, Defs' Reply, ECF No. 807 at 14-15; 2/28/20 Hr'g Tr., Ex. 1 at 14 (Judge Kelley: "I'll just tell you from other material I've seen ex parte in the case, it is a viable assertion that U.S.C. had a practice of its admissions, of its athletics department admitting kids in exchange for donations who were—as athletic walk-ons."); 9/18/19 Hr'g Tr., Ex. 2 at 42 (counsel for USC stating there would be "nothing improper" with a parent "str[iking] a deal with Singer and Heinel to pay $50,000 to put his daughter through [admissions] as a VIP candidate").

[4] The Government made these misrepresentations while it was trying to get Singer to cooperate and plead guilty. But plea bargaining process requires "meticulous standards" by the Government, and obligates the Government to "avoid misrepresentations." *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973); *see also Walker v. Johnston*, 312 U.S. 275, 286 (1941).

Here, Singer's insistent characterization of the payments as donations to university programs is strong evidence of the former—and thus highly exculpatory. That description informed Defendants that their money would benefit university programs as part of a sanctioned fundraising initiative—just like the other ways USC intertwines fundraising and admissions.

Remarkably, the Government itself acknowledges that Singer's characterization undermines its case that Defendants made the payments with criminal intent. The Government admits it pressured Singer to adopt the incriminatory payment-to-an-insider formulation to "*make sure*" the consensual phone calls would show that his clients "*understood* that their money would be used to induce a university insider to commit fraud." Sur-Reply at 3-4 (emphasis added). In other words, Singer's original description of the payments as *donations* did not establish ("make sure") that the client actually knew ("understood") that the payments were bribes.

The Government's explanation makes no sense. If the donation/bribe distinction is irrelevant, then there would have been no reason to pressure Singer to change his characterization to something he considered a lie. If the distinction does matter, then the Government's efforts to trick the parents into going along with the inculpatory characterization constitute fabricating evidence. The Government's concessions reveal that what really happened here was an effort to create "facts" to backfill its erroneous legal theory of bribery.[5]

3. The Government then attempts to argue that Singer's allegations of improper pressure relate only to Singer's clients who had not yet made a payment to a university, and thus that the notes are unrelated to calls he made to Defendants just a few weeks later. The Government asserts

---

[5] The Government also misleadingly downplays the donation/bribe distinction by arguing it has "not alleged" that "the parents understood Heinel to be personally pocketing money." *Id.* at 7. In fact, the indictments expressly allege that the relevant conspiracies included "enriching Singer *and the recipients of the bribes*." ECF No. 732 ¶ 65 (emphasis added); *id.* ¶ 280 (similar); ECF No. 610 ¶ 58 (similar); *id.* ¶ 246 ("enriching Singer and *the recipients of the bribes personally*" (emphasis added)). The Government carefully omits that key allegation in its recap of the charges. Sur-Reply at 2-3.

3

that while the *earlier* calls may have been manufactured (albeit for permissible purposes), the *later* calls had "nothing to do" with its instruction that Singer stop characterizing the payments as legitimate donations. Sur-Reply at 5-7.

That distinction is absurd. Singer's allegations of government misconduct were written *entirely* in the past tense—he wrote that the agents were pressuring him to "tell a fib and not restate what I **told** my clients as to where there [sic] money **was** going -to the program not the coach and that ***it was a donation*** and they want it to be a payment." 10/2/18 Singer Note, Ex. 3 (emphasis added). It is undisputed that *before* the improper government pressure, Singer characterized the payments to Defendants as donations to university programs, but *after* that he alluded to them as payments to university insiders. *See* Defs' Br. at 8-12 (citing calls with Defendants Wilson, Abdelaziz, Loughlin, Zangrillo, and McGlashan). Clearly his notes are referencing the government's pressure to get him to change "what [he] told" his past clients, the Defendants in this case.

Relatedly, the Government claims it had evidence that Defendants knew their payments were going to corrupt insiders before the consensual recordings. *See* Sur-Reply at 6. Not so. At most, the Government's cited evidence shows Defendants knew their payments were going to universities. But Singer had told them the payments were legitimate donations that would bolster their children's chances of admission. To support its contention that it had a "good faith belief" that Defendants *knew* their payments to USC were benefitting a corrupt insider, the Government cites emails to Defendants Giannulli and Zangrillo in which Singer (1) directs Defendants to send their checks, made payable to legitimate USC accounts, to Heinel's attention, and (2) forwards emails from Heinel confirming USC's admission of their children. But the Government provides no evidence that Defendants actually knew that Heinel (or anyone else) was betraying USC, let alone evidence of Defendants' knowledge that their donations would somehow benefit her personally. The Government's argument here is also a deliberate attempt to mislead the Court: the

4

Government insinuates that the "audit" calls Singer made to Defendants were about the donations they had made to USC or its programs; in fact, those calls never mentioned those donations, and instead only referenced donations made to Singer's Key Worldwide Foundation ("KWF"), which had no connection to any of the cited evidence regarding Donna Heinel.  Moreover, Singer *specifically told* the Government that Defendants did not know that KWF donations would go to USC.  *See, e.g.*, 12/6/19 FD-1023, Ex. 4 at 2 (stating that Singer "did not specifically discuss the money going to USC out of the $200,000" with Loughlin or Giannulli).  Accordingly, the Government had no basis, certainly not a "good faith basis," to force Singer to say the deliberately untrue statements he made on the tainted consensual phone calls.

4. The Government's sur-reply is inadequate in other respects too.  For example, the Government again offers no credible explanation for withholding Singer's notes.  Although it previously said AUSAs Rosen and O'Connell believed the notes were privileged, Rosen's sworn statement ignores that assertion and provides a brand-new explanation (and O'Connell is nowhere to be found).  *See* Sur-Reply, Ex. C ¶ 9.  Moreover, the Government has now oddly recanted its admission and *denies* violating *Brady*, even though (1) its own taint AUSA concluded that the notes were undisclosed *Brady* material, *see* 3/11/20 Email, Ex. 5 at 1; (2) AUSA Rosen told the Court that the Government "absolutely" should have disclosed the notes earlier, 2/27/20 Conf. Tr., Ex. 6 at 19; and (3) the Government's opposition confessed error on this issue, *see* Opp. at 1, 21, 32.  The Government also fails to address (let alone justify) the Government's prior misrepresentations to the Court about its *Brady* compliance.  *See* Defs' Reply at 8.

The Government also fails to explain its improper conduct as to Defendant Wilson.  The Government concedes that Singer originally told Wilson that his "side door" payment "would go to an athletic program, not a coach," Sur-Reply at 3, 5 (and his donation went to a USC team).  As late as September 28, 2018, the Government let Singer make an unrecorded video call from an FBI office—during which he reassured Wilson that "side door" donations were university approved,

5

even for applicants who would not be college athletes. Defs' Br. at 8. From that day forward, however, Singer succumbed to Government pressure and injected his calls to Wilson with ambiguous and deceitful references to actual bribery—*i.e.*, paying a "coach." *See id.* at 8-9 & n.1; Sur-Reply at 3, 5. The Government's sur-reply ignores the unrebutted sworn evidence that Singer was actively reassuring Wilson that his payments were legitimate on the September 28 *unrecorded* call (made from FBI premises) at the same time the Government was instructing him to use alternative, misleading language on *recorded* calls. *See* Defs' Br. at 8-9. It also ignores the Government's omission of the September 28 call from its interview reports, which euphemistically refer to a "break" when Singer made the call, and Singer's free reign to delete texts related to that call. The Government fails to explain this chain of events, which was perfectly designed to generate false inculpatory recordings for trial.

5. The Court should hold the Government to account for its misconduct. The conceded facts establish that the Government fabricated evidence by pressuring Singer to generate false inculpatory statements in order to establish evidence of criminal intent. The Government then lied about it to Defendants and the Court. This outrageous conduct "passes beyond the line of tolerable human imperfection and falls into the realm of fundamental unfairness." *United States v. Pollock*, 417 F. Supp. 1332, 1349 (D. Mass. 1976); *see also Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."). That warrants dismissal.

At a very minimum, the Court should suppress the consensual recordings and order discovery and an evidentiary hearing. The Government has now conceded that, before his cooperation, Singer told Defendants their payments were lawful donations going to the universities. *See* Sur-Reply at 2-3. And it has abandoned its theory "that the parents understood Heinel to be personally pocketing the money." *Id.* at 7. The consensual calls where Singer

describes payments going to Heinel or coaches thus have no place in a fair trial. The Government can try its case with whatever untainted evidence it possesses.

An evidentiary hearing is essential to get to the bottom of what happened and to obtain Singer's unvarnished account of the facts. Although the Government submitted sworn statements from its prosecutors and agents, it provided Singer's story through a hearsay report drafted by an agent on April 23, 2020—without a declaration from Singer himself. And although the report confirms the key facts in his October 2 note, it embeds those facts within carefully worded denials and disclaimers that suspiciously echo the Government's self-serving spin. *See, e.g.*, *id.*, Ex. D at 3 ("SINGER noted that the agents didn't do anything wrong.").

At a hearing, the Court can hear sworn testimony from Singer himself—not filtered through a report—about the events underlying his October 2 notes, the Government's theory that its pressure tactics did not influence his calls with Defendants, and whether the Government spoke to him about the notes on other occasions not memorialized in last week's 302 Report. The Court can explore the circumstances of Singer's unrecorded September 28 call to Wilson—in which Singer reaffirmed the legitimacy of the payments to USC—and its relationship to the Government's insistence that Singer characterize those same payments in deceptive and falsely inculpatory terms on the *recorded* calls it now wants to use with the jury. The Court can also hear directly from the agents, who claim they "do not recall" the October 2 call, yet somehow are certain that Singer's description of that call is different from what occurred. *See id.*, Exs. A at 2-3, B at 2-4. A hearing would also help the Court get to the bottom of the Government's other misconduct, including AUSA Rosen and O'Connell's repeated misrepresentations to the Court and Defendants about their unawareness of any exculpatory evidence.

## CONCLUSION

For the foregoing reasons, the Court should either dismiss the indictment or suppress the consensual recordings and order an evidentiary hearing into Singer's allegations of misconduct.

Dated:  May 1, 2020                                  Respectfully submitted,

/s/ William J. Trach

| | |
|---|---|
| Sean M. Berkowitz (*admitted pro hac vice*) | William J. Trach (BBO #661401) |
| LATHAM & WATKINS LLP | LATHAM & WATKINS LLP |
| 330 North Wabash Avenue | 200 Clarendon Street |
| Suite 2800 | Boston, MA 02116 |
| Chicago, IL 60611 | Phone: 617.948.6000 |
| Phone: 312.777.7700 | Fax: 617.948.6001 |
| sean.berkowitz@lw.com | william.trach@lw.com |
| | |
| Perry J. Viscounty (*admitted pro hac vice*) | Roman Martinez (*admitted pro hac vice*) |
| LATHAM & WATKINS LLP | LATHAM & WATKINS LLP |
| 650 Town Center Drive | 555 Eleventh Street, NW |
| 20th Floor | Suite 1000 |
| Costa Mesa, CA 92626 | Washington, DC 20004 |
| Phone: 714.540.1235 | Phone: 202.637.2200 |
| perry.viscounty@lw.com | roman.martinez@lw.com |

*Counsel for Mossimo Giannulli and Lori Loughlin*

| | |
|---|---|
| George W. Vien (BBO #547411) | David C. Scheper (*admitted pro hac vice*) |
| Joshua N. Ruby (BBO #679113) | SCHEPER KIM & HARRIS LLP |
| DONNELLY, CONROY & GELHAAR, LLP | 601 West Fifth Street, 12th Floor |
| 260 Franklin Street, Suite 1600 | Los Angeles, CA 90071 |
| Boston, MA 02110 | Phone: 213.613.4655 |
| Phone: 617.720.2880 | Fax: 213.613.4656 |
| Fax: 617.720.3554 | dscheper@scheperkim.com |
| gwv@dcglaw.com | |
| jnr@dcglaw.com | *Counsel for Lori Loughlin* |

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

*/s/ David S. Schumacher*
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

*/s/ David E. Meier*
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
dmeier@toddweld.com

*/s/ Stephen H. Sutro*
Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*

/*s/ Reuben Camper Cahn*
Reuben Camper Cahn (*pro hac vice*)
Jennifer L. Keller (*pro hac vice*)
Chase A. Scolnick (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*

*/s/ R. Robert Popeo*
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

9

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

/s/ Michael K. Loucks
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

/s/ Martin G. Weinberg
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail: mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

*/s/ Tracy A. Miner*
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377
Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

11

## **CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed with the Court through the CM/ECF system, that notice will be sent electronically to all registered participants as identified on the notice of electronic filing, and that paper copies will be sent to those identified as non-registered participants.

*/s/ William J. Trach*
William J. Trach