# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4
      * * * * * * * * * * * * *   19CR10080-NMG
 5   UNITED STATES OF AMERICA*
                             *
 6   VS.                     *   SEPTEMBER 18, 2019
                             *   2:23 P.M.
 7   ROBERT ZANGRILLO        *
                             *
 8    * * * * * * * * * * * * *   BOSTON, MA

 9

10          BEFORE THE HONORABLE M. PAGE KELLEY

11                   MAGISTRATE JUDGE

12                   (Motion Hearing)

13

14   APPEARANCES:

15
     FOR THE GOVERNMENT:    ERIC S. ROSEN, AUSA;
16                          KRISTEN A. KEARNEY, AUSA
                            JUSTIN D. O'CONNELL, AUSA
17                          United States Attorney's Office
                            1 Courthouse Way
18                          Suite 9200
                            Boston, MA 02210
19
     FOR THE DEFENDANT:     MARTIN G. WEINBERG, ESQ.
20                          Martin G. Weinberg, PC
                            20 Park Plaza
21                          Suite 1000
                            Boston, MA 02116
22
                            MICHAEL PABIAN, ESQ.
23                          Michael Pabian Law Office, LLC
                            20 Park Plaza
24                          Suite 1000
                            Boston, MA  02116
25
```

<u>**APPEARANCES**</u> (Cont'd):

FOR THE MOVANT:          DOUGLAS FUCHS, ESQ.
                        Gibson, Dunn & Crutcher LLP
                        333 South Grand Avenue
                        Los Angeles, CA  90071

                        ANTHONY E. FULLER, ESQ.
                        Hogan Lovells US LLP
                        125 High Street
                        Suite 2010
                        Boston, MA  02110


Court Reporter:         Debra D. Lajoie, RPR-FCRR-CRI-RMR
                        One Courthouse Way
                        Boston, MA  02210


                Proceeding reported and produced
                  by computer-aided stenography

1    18 SEPTEMBER 2019 -- 2:23 P.M.

2            THE CLERK:  Today is Wednesday, September 18th,

3    2019, and we are on the record in Criminal Case

4    No. 19-10080, the United States v. Robert Zangrillo,

5    the Honorable M. Page Kelley presiding.

6            Will counsel please identify themselves for

7    record.

8            MR. FUCHS:  Yes.  Good afternoon, Your Honor.

9            Doug Fuchs from Gibson, Dunn & Crutcher on

10   behalf of third party University of Southern

11   California.  And with me at counsel table is

12   Anthony Fuller who I'm sure you know well.

13           THE COURT:  Yes.  Good afternoon.

14           MR. WEINBERG:  Good afternoon, Your Honor.

15   Martin Weinberg with Michael Pabian who filed a notice

16   of appearance today as my co-counsel on behalf of

17   Defendant, Robert Zangrillo.

18           THE COURT:  Okay.  And good afternoon to you.

19           We're starting a few minutes early, but I was

20   just standing out there and you're just sitting in

21   here, so I thought we might as well get going.

22           So I did ask the Government to join us because I

23   noticed in the pleadings there are some representations

24   about the Government's position on certain matters, and

25   I didn't know if we might want them to chime in or not.

1    So that's why they're sitting there.

2         So we're here for oral argument on No. 532 on

3    the docket, which is USC's motion to quash Defendant

4    Zangrillo's subpoena.  And this matter has its origins

5    in No. 432, which was Defendant Zangrillo's motion for

6    a Rule 17(c) subpoena.  That was filed under seal, but

7    I think it was subsequently unsealed, at least some --

8    I think it's still redacted, parts of it, on the

9    docket in which Defendant set out parts of his defense,

10   but that should be on the docket now.  So I allowed

11   that motion, and USC moved to quash, and then the

12   parties have filed several responsive and opposing

13   pleadings since that time.

14        And one thing I want to make clear before I hear

15   argument is that I allowed the Defendant's motion for a

16   subpoena, but I did so with the understanding that USC

17   would have the opportunity to confer with Mr. Weinberg

18   and to file a motion to quash if they were not able to

19   reach an agreement, and both of those things were

20   obviously done.  So that's why we're here.  But I don't

21   think there is a presumption that, because I originally

22   allowed the subpoena, that I'm not open to USC's

23   arguments.  There was some suggestion of that I think

24   in the pleadings.

25        So okay.  I think I would first really like to

1    hear from you, Mr. Weinberg.

2         MR. WEINBERG:  Thank you.

3         THE COURT:  And then we'll let USC respond.

4         MR. WEINBERG:  Do you mind if I argue from

5    there?

6         THE COURT:  Not at all.

7         MR. WEINBERG:  Thank you.  My eyes no longer see

8    my notes at this height.

9         THE COURT:  I know how that is.

10        MR. WEINBERG:  There is three parts to the

11   argument, Your Honor:  One part is relevance, which is

12   the relationship between the requested documents and

13   the different theories of defense; a second is

14   specificity, which is the principal position of USC

15   that I want to address and rebut; and third is whether

16   or not the representations that have been made by USC,

17   whether through the Brunold affidavits or through their

18   pleadings, are sufficient as contrasted to, for

19   instance, a certification of the keeper of records that

20   they had conducted an appropriate search of the

21   electronic database or the USC business records and

22   there are no such documents.

23        Let me start briefly there because it was

24   addressed at some length in our sur-reply yesterday, so

25   I'm not going to repeat all of the different

1      representations in the sur-reply.  But USC has

2      essentially argued to the Court that, because the

3      Government has made certain allegations, meaning that

4      Mr. Zangrillo conspired to bribe Donna Heinel who was

5      one of the principal USC employees that was separately

6      charged by the Government and was a person who worked

7      with the heads of the Athletic Department, and many of

8      the exhibits that we've provided to Your Honor either

9      were spreadsheets kept by her, transmissions made

10     by her on behalf of the head of Athletics who was

11     Pat Haden during many of the relevant years, to the

12     Admissions Department, that her relationship to

13     Mr. Zangrillo somehow distinguishes his donation to USC

14     and somehow provides USC with a compelling bases to say

15     that none of the documents are relevant.

16          The test of course for 17(c) is not, What does

17     the Government allege?  You know, we don't have to have

18     a defense that accepts the allegations, and documents

19     that are subpoenaed don't have to even categorically

20     dispute all of the allegations in an indictment.  They

21     have to be material to a defense, and there are

22     multiple defenses here to which these documents are

23     material.

24          And I think I'll start there so that Your Honor

25     has a full sense -- I know the Government's here, but I

1    feel at this point, even despite some of the ex parte

2    proffers that were made in order to generate this

3    litigation, I need for the Court to understand the

4    different defenses because they directly correlate to

5    the documents.  The documents clearly are admissible,

6    so when you go to the *Nixon* test of relevance,

7    admissibility and specificity, these are business

8    records or records or documents that would be

9    meaningfully relevant because they exist.  One defense

10   to the case --

11        THE COURT:  Excuse me.  When you say

12   meaningfully relevant because they exist, are you

13   talking about an exception to the hearsay rule?

14        MR. WEINBERG:  Yes, that they are not even

15   offered for the truth of a certain statement, like, Is

16   this man a prospective donor, or, Did this man pledge

17   to donate $100,000 if his kid was admitted?  The fact

18   that there's a document containing so many references

19   to donations makes that document non-hearsay but

20   relevant and admissible to support a defense.

21        THE COURT:  Okay.

22        MR. WEINBERG:  But the one defense that I think

23   is compelling in terms of the Court's analysis of the

24   documents is the prong of 18 USC 1349, the conspiracy

25   count that's charged in Count I, and that it

1    constitutes the overriding part of the allegations of

2    fraud.  There are two prongs:  One is that there was an

3    underlying fraud that deprived USC of money or

4    property.  These documents are highly relevant to show

5    that USC did not consider itself a victim denied of

6    money or property by Mr. Zangrillo; instead, they

7    received a donation that enriched the school, that

8    provided the school with money.  There is no losing of

9    money or property by USC.  The donation by

10   Mr. Zangrillo and the donations made by so many other

11   parents of so many prospective students, either before

12   or right after the admission of their student, is the

13   antithesis of a victim of a fraud.

14        But more than that, the Government charges that

15   these payments caused the deprivation of honest

16   services, and you know, what that means essentially is

17   that Mr. Zangrillo was being charged as an aider an

18   abetter, as a -- since he's not employed by USC, the

19   allegation is he's causing an employee of USC to

20   compromise her loyalty to her employer by providing,

21   through Mr. Sing er, a donation to USC that ends up

22   with Ms. Heinel being corrupted and, therefore, USC

23   being denied the honest services of its employee.

24        And, therefore, to the extent that the documents

25   that I'm seeking, and we've provided Your Honor with

1    certain documents, Exhibits 1 through 12, essentially

2    show that Ms. Heinel was working with the Athletic

3    Department, that she was passing on VIP lists from her

4    immediate employer who was Pat Haden who was the

5    Athletic Director for many of the years that these

6    lists were being passed to Admissions, that she was

7    acting in a manner that was consistent with the

8    direction of her immediate supervisor, Pat Haden.

9         And the law, and it comes ironically from

10   *US v. Skilling*, which is the Fifth Circuit case that

11   led to the Supreme Court case that narrowed honest

12   services to bribes or kickbacks, but the Fifth Circuit

13   dealt with the private conflict of interest or causing

14   the breach of honest services by an employee to an

15   employer.  And the case, it's at 554 Fed. 3d 529, and

16   it endorsed an earlier opinion of the Fifth Circuit --

17   and these were *Enron* cases -- and it held that, When an

18   employer creates a goal and aligns the employee's

19   interests with the employer's interests in achieving

20   that goal.  And here the goal, I submit, is raising

21   donations, is increasing the Development Office, it's

22   using the admissions process to enrich the school --

23   and the statistics that we provided Your Honor in the

24   earlier exhibits demonstrate that, as to the Athletic

25   Department, and we have five years of data, shows

1    admissions of their selected Pat's list, this VIP list,

2    somewhere between 69 and over 80 percent of the

3    applicants on Pat Haden's VIP list, which goes through

4    Heinel to Admissions, get admitted.

5          THE COURT:  Do you think that you can separate

6    out the athletic advantage from the donor advantage?

7          MR. WEINBERG:  Those lists contain references to

8    donors in many occasions.  In other words, the lists

9    were not athletes, they were not walk-on great athletes

10    that were going to play football for USC or, you know,

11    drive its track and field.  Many of the notes on

12    Exhibit 1 where there's 221 VIPs, special-interest

13    students, who's got an application that goes to

14    Admissions, they list in one of their -- first of all,

15    they list who's sponsoring them, which individual,

16    despite the Government claim that Admissions doesn't

17    know who sponsored them, which I consider to be fairly

18    implausible, given that we have letters from Admissions

19    back to Athletics saying whether they were admitted or

20    denied.  How do you know if they're -- how do you send

21    those letters unless you know who the sponsors are?

22    And you have other emails showing multiple parties are

23    interested in this applicant, and we've referenced that

24    in our submissions.

25          THE COURT:  But all of the lists you have are

1    from Athletics.

2          MR. WEINBERG:  Yes, and that's a corollary of

3    what we received from the Government that received from

4    USC, and I'm not -- I don't know the scope of the

5    subpoena to USC, but I know Mr. Rosen and his team I'm

6    sure gave me the documents they received from USC that

7    were relevant to Rule 16.  And if my statements today

8    about Mr. Zangrillo's defense broaden their view of

9    relevance, I'm sure that I will get them from the

10   Government as *Brady* material or as Rule 16 material.

11   But I'm of the view that they don't have -- they

12   certainly didn't give to me -- that they don't have

13   additional documents from other departments, and so --

14         THE COURT:  So you're saying -- so just to make

15   sure I'm following everything you're saying, you're

16   saying that this goes to the honest services count --

17         MR. WEINBERG:  Yes, Your Honor.

18         THE COURT:  -- of the fraud --

19         MR. WEINBERG:  Yes.

20         THE COURT:  -- allegations?

21         MR. WEINBERG:  Because even if the *Enron* cases

22   say that the employer's objective was unethical,

23   improper, illegal, if the employer is, through

24   management, directing the employee -- there it was

25   *Enron*, Andrew Fastow, who was their CFO, and then there

1     was people at a lower level in the *Brown* case, and

2     there was Mr. Skilling trying to take advantage of the

3     lower -- the first case who's unsuccessful because of

4     course he was the CEO.

5          But even if the purpose is illegal, even if

6     USC's practices are illegal -- and I don't believe they

7     are. I want to make that clear. I'm not here to argue

8     that USC's, you know, donation practice, their

9     Development Office, their desire to induce donations

10     and their providing the prospective applicants with a

11     four or five or six or seven times better shot of

12     getting in than they would if their parent couldn't

13     make a donation.

14          It's unfortunately the way American colleges

15     work. We have the *Harvard* case where the Admissions

16     Director got on the stand and testified the average

17     applicant to Harvard gets in 4 percent of the time, one

18     out of 25. If your parent is an alumni and you're a

19     legacy, it's 35 percent, and that's without a

20     consideration of donations, which I'm sure if they

21     superimposed on the parent as an alumni, would drive

22     the 35 percent, you know, sky high.

23         THE COURT: So Donna Heinel, we know that

24     Donna Heinel tagged Ms. Zangrillo.

25         MR. WEINBERG: As a VIP, not through a false

1    athletic profile.  She presented Ms. Zangrillo, with

2    others, as a VIP that Athletics was pushing.

3         THE COURT:  She presented him with others,

4    meaning with other students, not she and others tagged

5    Mr. Zangrillo's --

6         MR. WEINBERG:  Right.  She, Donna Heinel, and

7    the Athletic Department tagged Ms. Amber Zangrillo,

8    who's the third of Mr. Zangrillo's daughters, with a

9    tag VIP, and she was presented to Athletics as a

10   transfer student with a VIP tag.  And Exhibit 6 to

11   the original 17(c) subpoena has the email where

12   Donna Heinel is saying, No, I didn't present her as an

13   athlete; I presented her as a VIP, and she got in.

14        THE COURT:  So if you can show that across

15   departments at USC --

16        MR. WEINBERG:  Yes.

17        THE COURT:  -- others presented students as VIPs

18   with similar donation amounts who were then admitted,

19   that is helpful to you in your defense.

20        MR. WEINBERG:  In three or four ways.  One, it

21   detoxifies donations, it negates or counters the

22   Government's case that Athletics was some kind of a

23   toxic silo that operated as an outlier to USC.  It

24   demonstrates that --

25        THE COURT:  Excuse me.

1      So, for example, if the Government were then to

2   say, Oh, it was only because Donna Heinel tagged her

3   that she got this special attention, whether it was

4   from Athletics or a donation, you could say, No.  Other

5   people in other departments did a similar thing.  But

6   aren't there too many other characteristics of a

7   student that are taken into account other than just the

8   donation?

9      MR. WEINBERG:  Sure.  And if I was arguing that

10   a donation guaranteed admission, then I would be out of

11   luck because there are denials, not many, but there are

12   denials in the spreadsheets that USC originally denied

13   possessing in their Admissions Department.

14      THE COURT:  But how are you -- what, are you

15   going to hire an expert to say --

16      MR. WEINBERG:  Yes.

17      THE COURT:  -- the scores are similar, the

18   extracurriculars are similar, the donations are

19   similar, et cetera, et cetera?  I mean, if they're

20   saying a donation is just one part of a holistic

21   consideration of the student, even if you get these

22   donated -- this information about who else in other

23   departments donated things, how are you going to use

24   that to show that your student is the same?

25      MR. WEINBERG:  Well, that question requires me

1    to identify the different defenses.  That answer would

2    be highly important.

3         First of all, it would detoxify the donation.

4    Government charges it's a bribe; I charge that it's a

5    regular donation that parents make, and the

6    spreadsheets in the Athletic Department show pledges,

7    future donations.  They even show this parent's

8    expected to make a donation even though there's been no

9    pledge or promise.

10        I'm convinced reasonably that this is not just

11   Athletics to Admissions like some, you know, little

12   partnership; that this cuts across the other

13   departments.  We have some evidence it cuts across the

14   Marshall School of Business because we have Exhibit 13.

15   We know the President is saying, I have a special

16   interest in certain students.  And the purpose of the

17   subpoena is to essentially detoxify donations and show

18   that they're a regular way that parents act in behalf

19   of their students to inflate the chances, not to give

20   them a guarantee --

21        THE COURT:  And also to get it away from the

22   Athletics Department alone?

23        MR. WEINBERG:  Yes.  It gives me the -- and, you

24   know, the more this is a University-wide practice, the

25   less the school's a victim, the less likelihood it is

1    that a donation would be conceived of as a bribe, and

2    the less likely that a jury would find that Ms. Heinel,

3    by dealing with Mr. Zangrillo through Mr. Singer, is

4    breaching her duties to the University.  If I could

5    establish that she's working through Athletics, that

6    goes part way.  If I can establish Athletics is

7    consistent with the Marshall School of Business or the

8    History Department, that all goes to show the normalcy,

9    that this is the normal practice of this corporation,

10   this University.

11        Third, it goes to Mr. Zangrillo's state of mind.

12   And I could provide the Court in camera or ex parte a

13   document which reflects his awareness of the VIP

14   program, his express awareness that students get in as

15   VIP-tagged before his donation, before he dealt with

16   trying to help his daughter Amber get into school.

17        And so this all goes to circumstantially prove

18   his good-faith defense, that he was not acting

19   believing that he was a criminal trying to defraud USC,

20   prong one of their fraud charge, or that he was causing

21   Singer to cause Heinel to breach her services to USC;

22   he was acting in good faith believing that what Singer

23   was selling him, which is Heinel was helping, you know,

24   get students into school, was real.

25        The statistics that Your Honor asked about are

1    also important because it's one thing if 11 percent of

2    the undergraduates get in, in their requests for

3    admission.  When -- Mr. Brunold originally filed an

4    affidavit saying, Across the board, less than

5    50 percent of special-interest-tagged students get in.

6    He has now supplemented his affidavit when he looks at

7    my exhibits and now says, I was only thinking about the

8    fall semester.

9          Well, that's only really a material change if

10   you're worried that the under 50 percent is really over

11   50 percent when you add the spring to the fall.  And

12   these charts show a lot of these VIPs get admitted and

13   deferred to the spring term.

14         So let's assume 55 percent.  I don't know the

15   statistics.  That's why we need the documents.  But the

16   case law's clear, if you have a reasonable basis to

17   believe the information is contained in the documents,

18   that a subpoena is allowed.  I don't need to know the

19   code of the document; I need to make a principled

20   presentation that there is a likelihood that other

21   departments than just Athletics are advancing VIPs, are

22   getting their responses to their VIPs and that USC

23   knows who gets in from the VIP list.

24         And it may not be on one list, but it's on

25   multiple lists, if not on one list, and that USC knows

1    who made donations.  They even have "proposed donation,

2    pledge donation, future donation, hopeful donation" --

3              THE COURT:  But this is on Ms. Heinel's

4    documents; right?

5              MR. WEINBERG:  This is -- it's on two sets

6    of documents, Your Honor:  One is a document

7    attached to the original 17(c).  There's two

8    documents there, when Your Honor goes back and looks at

9    it.  One is Exhibit 2, which says, VIP Transfer

10   Document -- Spreadsheet.  And that is a document that

11   we have the email for.  It's Exhibit 2 of 4 -- I guess

12   it's 422 would be the original --

13             THE COURT:  So that's from someone to Donna?

14             MR. WEINBERG:  Yes, that's from Brunold, if I

15   recall correctly.

16             THE COURT:  I think it says Robinson, but --

17             MR. WEINBERG:  It's from Tim Brunold to

18   Kirk Brennan, "Transfer VIP Spreadsheet."  And

19   that's --

20             THE COURT:  This is attached to your original --

21             MR. WEINBERG:  Yes, the 422.  I can give the

22   Court another copy of that if it's not readily

23   available.

24             THE COURT:  Okay.  Anyway, go on.

25             MR. WEINBERG:  And Exhibit 4 to that same

1    document, Your Honor, is the donor sheets; in other

2    words, it's USC's documents that are redacted but

3    contain the name Robert Zangrillo and the $50,000

4    donation and state that he's the student of a father --

5    he's the father of a student who's attending, which

6    that's a document that comes from the Development

7    Office.

8         And it is inconceivable that the Development

9    Office doesn't have a document or database for all the

10   other donors or potential donors whose kids were

11   admitted to the school.  How do they know they were

12   admitted?  They learn through Admissions.  They keep a

13   list.  It's a Development Office, and Exhibit 4

14   demonstrates incontrovertibly that USC, despite all of

15   their denials in their paperwork, have documents that

16   demonstrate, Who are the students that got in from the

17   VIP list?  Who are the parents that are donating money?

18   Who are the parents that we want to go to, to get

19   money?

20        And the Government -- you know, the USC says,

21   Well, you have no reason to believe that we have such

22   documents.  That's very different -- it makes me -- you

23   know, they're a corporation.  They have an IT

24   Department, they have a server, USC.edu.  It's a major

25   company in Los Angeles.  When I have a client who's an

1    executive and I ask a corporate -- the general counsel,

2    I need the emails to my client, it takes about 12 hours

3    or 24 hours for a delivery, a FedEx, to come to me with

4    all my client's emails.

5         This is not hard, in other words.  They could --

6    instead of saying, There's no reason to believe, they

7    could easily conduct searches of the server, start with

8    "Tim Brunold," the Admissions Director; "VIP, special

9    interest," and you will predictably generate documents

10   that match the subpoena.  Mr. Brunold says now, again,

11   in his second affidavit, that he has no recollection or

12   never had a VIP -- University VIP spreadsheet.  And

13   then he says, But if I did have it, it's no longer in

14   existence.  And this is on I think Paragraph 4 of his

15   affidavit.

16        But when Your Honor looks at Exhibit 3 that we

17   presented in our opposition, he's saying, "I've just

18   gone back through today's Subco. docket and

19   cross-referenced it with my University-wide VIP

20   spreadsheet."  He talks about someone being approved

21   for the spring by the President in this single-page

22   document that we got from the Government.  "The

23   following are on my VIP spreadsheet as 'wait for

24   Subco.'  I haven't cross-referenced them.  Please

25   report the decision back so I can update the VIP

1    spreadsheet."

2          That's his words contemporaneous in March of

3    2016.  If there's a University-wide VIP spreadsheet,

4    that answers by itself most of the requests in the

5    17(c) subpoena.

6          THE COURT:  So, obviously, you know what USC

7    says about that email.

8          MR. WEINBERG:  It's staggering to me that a

9    university, three years ago, has an Admissions Officer

10   saying three times in a single email, I'm referring to

11   a VIP spreadsheet, and it's either something he

12   intended to create -- that's not consistent with the

13   language of the email.  It's something that, if I ever

14   had, I don't have anymore?  Universities don't destroy

15   spreadsheets.

16         This is three years ago.  The VIP transfer

17   spreadsheet referred to in Exhibit 2 of I think

18   Docket 422, the original 17(c) request, is from

19   July 20, 2018.  I have no reason to believe that USC is

20   busy destroying VIP or special interest spreadsheets.

21   I have no reason to believe that they don't embrace a

22   program that raises millions and millions of dollars.

23         But they'd certainly keep these spreadsheets to

24   indicate who gets in, who doesn't get in, who the

25   donors are, who are not the donors.  And Development I

1    know has information from these spreadsheets because

2    they have their own spreadsheet, which is Exhibit 4 to

3    the original 17(c) subpoena.

4         Universities don't destroy documents, or they

5    shouldn't destroy documents, and I have no reason to

6    believe they do.  But it is implausible that these

7    kinds of documents are not on the USC server today, and

8    I have no certification from a responsible keeper of

9    records that an IT USC has searched the server,

10   searched the archives, searched the "delete" box and

11   that they have no documents that directly relate to the

12   emails.

13        And, again, I got a subset of Mr. Brunold's

14   emails, to the extent they were late, to Athletics.

15   And I'm not blaming the Government.  That's what they

16   subpoenaed.  That's their case, which is why my only

17   avenue to broaden my receipt of documents is through

18   the vehicle of 17(c), and that's why we're here,

19   Your Honor.

20        THE COURT:  So, going back to your defenses,

21   what about materiality?

22        MR. WEINBERG:  The materiality argument,

23   Your Honor, is that, if I was to get a University VIP

24   spreadsheet or lists from each of the departments to

25   Admissions and then their responses, as they made to

1     Pat Haden and Donna Heinel year after year, these five

2     Exhibits, Nos. 7, 8, 9, 10 and 11, to our opposition,

3     that send back to them a statement, This is who's

4     admitted, this is who's admitted for the spring, this

5     is who's denied, if I was able, through either of those

6     documents, which are the documents going back to the

7     sponsors and the other departments, we can do the

8     statistics.  We have an expert.  We would have that

9     expert, you know, look at the documents.

10         I'm not asking USC to do a statistical analysis

11     for me unless they have it, I'm not asking them to

12     compile things, I'm not asking them to make things up;

13     I'm asking them to push buttons and download documents

14     that are directly relevant and material to the defense.

15         Your Honor asked about materiality.  It's

16     really close to relevance.  If I was able to show that

17     Donna Heinel's practices as to Zangrillo, labeling

18     someone VIP, getting a $50,000 donation, was consistent

19     with what was done by 15 other departments and that

20     they sent their lists in, she sends her list in, then

21     I'd show this can't be a breach of honest services.

22     The entire University endorses what she did for

23     Ms. Zangrillo.

24         And maybe she did other things, Your Honor.  I'm

25     not here to prosecute her or to detoxify the

1    Government's case against her.  You know, she may have

2    done things with people that she promoted as athletes

3    that weren't athletes.  But I'm here to represent

4    Mr. Zangrillo, and that's not what she did for him.

5         I'm not here to in any way endorse Mr. Singer.

6    He was a toxifying force in this case.  There wouldn't

7    be a case without Singer inducing these parents to do

8    things that they didn't otherwise want to do.  If

9    Singer was the Government, everyone would have an

10   entrapment defense.  I've heard his audios.  He's

11   manipulative, he's persuasive, and he takes parents

12   from helping them through legitimate means and walks

13   them slowly and persuasively -- it's the definition of

14   private entrapment, which is not a defense -- you know,

15   to get things to do that they don't intend to do.

16        So Singer was involved.  Mr. Zangrillo hired

17   Singer.  But in this case, Ms. Heinel did what USC

18   wanted her to do, she labeled someone a VIP.  Why?  Her

19   father was wealthy.  What did her father do?  He made a

20   donation to the school.  That's not a crime.

21        THE COURT:  So there is a footnote in USC's

22   brief saying, "No one is disputing that Mr. Zangrillo's

23   daughter was admitted in a legitimate fashion."

24        MR. WEINBERG:  Yes, but I need more than a

25   single statement to show a jury; I need to be able to

1  show them documents that being admitted as a VIP is not

2  evidence of a crime, that, Look at all these people who

3  were admitted VIP.  I need a number.  USC says they

4  have no number.  Give me the documents, I'll add them

5  up, like we did with Exhibit 1, 221 athletic

6  applicants.

7       I need to know that, of those VIPs, how many of

8  them like Mr. Zangrillo gave a donation after or before

9  their kid was accepted so that I can detoxify the

10 notion that the Government allegation of a bribe is an

11 element of the --

12       THE COURT:  Why do you care if someone gave a

13 donation after they were accepted?  Don't you really

14 care whether there is some indication that they had

15 promised a donation?

16       MR. WEINBERG:  Well, I think in this case, if

17 Mr. Singer promised a donation, that will be part of

18 the Government proof, that part of the Government proof

19 will be that there was a donation from Mr. Zangrillo,

20 that he made a $50,000 donation, and although --

21       THE COURT:  Prior to admission?

22       MR. WEINBERG:  After admission.

23       THE COURT:  Oh, after admission?  I didn't

24 understand that.

25       MR. WEINBERG:  And the USC says, I bet that only

1    Ms. Heinel knew that he made that donation, like it's

2    some covert bribe that she kept for herself or she put

3    it into a program.  I have provided them with a

4    document showing the USC financial record showing

5    Mr. Zangrillo's donation, and I can provide it to the

6    Court.

7          Mr. Pabian, would you give it to the Clerk,

8    please, the USC document.

9          MR. PABIAN:  Yes.

10         THE COURT:  Does the USC know what you're

11   showing me?

12         MR. FUCHS:  Yes.  Yes, Your Honor, although we

13   did discuss having this filed under seal.

14         MR. WEINBERG:  I have no objection.

15         THE COURT:  Certainly we'll do that.

16         MR. WEINBERG:  No objection.

17         And then Your Honor has Exhibit 4 from the

18   initial pleading, which shows Mr. Zangrillo's --

19         THE COURT:  So just tell me what this shows.

20         MR. WEINBERG:  This shows Mr. Zangrillo's

21   $50,000 donation that was -- went to Athletics and was

22   used to support the USC volleyball team.  And his

23   daughter wasn't a volleyball player.  It was a

24   donation, and I think what the evidence shows in this

25   case is that people like Ms. Heinel and others at other

1    schools and Mr. Singer, you know, used this

2    information -- said, you know, We're in Los Angeles,

3    some of our coaches can't afford rent, the

4    volleyball -- you know, the athletic place, the

5    locations are falling apart, Can you -- you know, can

6    you give a donation?  And Singer used that information,

7    and he funneled people to Ms. Heinel.

8         But the moneys largely, you know, footnote

9    largely, went from Singer to Heinel or a parent to USC

10   into an Athletic Department that wasn't USC football at

11   the coliseum; it was one of these under-funded

12   programs, and this shows Mr. Zangrillo was responsible

13   for a huge percent of the funds that year for the

14   volleyball program.  And I'm sure there is exhibits

15   that show that other parents' donations went to these

16   less-funded programs at the school.

17        THE COURT:  So if he makes a donation after his

18   daughter is admitted, did he pledge the money before

19   his daughter was admitted?

20        MR. WEINBERG:  My guess is, Your Honor, that

21   Mr. Singer will testify or that the Government will

22   contend without his testimony that, based on other

23   evidence if they elect not to call Mr. Singer, that

24   Mr. Singer said to Ms. Heinel, just like he would have

25   said with other candidates that he was pushing into

1    Athletics to get VIP tags or to make them athletes when

2    they weren't.  I don't know the facts about all the

3    other cases, but I know this one.  I'm sure Singer was

4    pushing Ms. Heinel that Mr. Zangrillo will make a

5    donation, he will get money to the school.

6         THE COURT:  So was that ever communicated to the

7    Admissions Office before his daughter was admitted?

8         MR. WEINBERG:  I don't have the documents.  I

9    have documents that date from 2012 to 2015, but I don't

10   have a 2018 spreadsheet that would show exactly what

11   Ms. Heinel, through the Athletic Department, was

12   telling Admissions about Ms. Zangrillo.  I do know that

13   when you're tagged VIP, it radically increases your

14   chances for admission, and Mr. Zangrillo knew that.

15        THE COURT:  So why are you -- but now I'm --

16   knowing that the donation was made after she was

17   admitted, why are you comparing her to people who had

18   promised money in order to get admitted?

19        MR. WEINBERG:  Because I think that the evidence

20   will be that Mr. Singer, on Mr. Zangrillo's behalf, as

21   his agent, if you will, as his conduit, as his

22   intermediary, made a promise, If Amber Zangrillo gets

23   admitted, Mr. Zangrillo, who's a wealthy man, like so

24   many of my other clients -- he vouched for his clients.

25   There's even audios where he says to a client, "I

1    vouched for you.  I have to pay for you.  If you don't

2    pay me, I'm out."

3          So I believe the Government will be able to

4    prove that Singer tells Heinel at USC, Zangrillo will

5    make a donation if the kid gets in.  So I think they

6    have both the before, the pledge through Singer who was

7    reliable to them, or at least reliable to Heinel, he

8    came through, he, you know, provided donations to the

9    Athletics Department, and Mr. Zangrillo made a donation

10   after the fact.

11         THE COURT:  Do you have any evidence that Heinel

12   communicated the potential donation to Admissions?

13         MR. WEINBERG:  Only the -- and this is precisely

14   why I need the documents, Your Honor, which is that

15   circumstantial evidence demonstrates that Admissions

16   routinely, regularly, explicitly got information about

17   Athletics' VIPs regarding future donor, past donor,

18   grandmothers of donor, grand --

19         THE COURT:  Your sentence is so long.  Just say

20   a shorter sentence so I can follow what you're saying.

21         MR. WEINBERG:  Circumstantial evidence is what I

22   have because of the limits of what I've received.  I'm

23   asking for more.  Athletic --

24         THE COURT:  But you -- it just seems to me a

25   good foundation for what you're asking for would be to

1    first establish that somehow Admissions knew that your

2    client was going to make a donation and that's how his

3    daughter got in.

4         MR. WEINBERG:  And the foundation I have,

5    Your Honor, is, since I lack an audio of Heinel's

6    conversations with Brunold and the documents I have are

7    a subset of the documents that I represent I believe

8    exist on the USC server, is I've given documents to the

9    Court, Exhibits 1 through 5 are spreadsheets, 1, 2, 4,

10   5, that show donations, even though, if we trusted

11   Mr. Brunold's affidavits, he never knew any prospective

12   student was a donor.  We've got Pat Haden's VIP lists,

13   and they said why Haden was recommending them.  We then

14   have --

15        THE COURT:  So what's the timing of the

16   spreadsheets you have versus the timing of the

17   spreadsheets you would need?

18        MR. WEINBERG:  We have a comprehensive

19   spreadsheet 2012 to 2015, and we have the documents, if

20   I can just see, for --

21        THE COURT:  When did Ms. Zangrillo apply?

22        MR. WEINBERG:  '18.

23        We have Exhibit 5, which is 2015, and Exhibit 6

24   is 2016, and these are all spreadsheets with the

25   listing -- and 7 is later in 2016.  So, you know, '17

1   and '18, you know, we don't have. So I think that,

2   you know, given the explicitness of Donna Heinel and

3   Pat Haden's listing of donors and donations in these

4   spreadsheets, and given some of the emails where they

5   talk about, This guy's a donor, this guy's going to be

6   a donor, and given the continued interest of the

7   Development Office, they would want to know about who's

8   the potential donor so when the kid gets in, they can

9   call them up.

10         THE COURT: Yeah, okay.

11         MR. WEINBERG: And Exhibit 4, again, to the

12   original subpoena lists the database, it's an excise

13   from the database of the Advancement Office that has --

14   the Development Office that lists all of the donors,

15   and that's the list, "Zangrillo, father of prospective

16   student."

17         And I suggest just that document, which is one

18   of the specific requests we make in the subpoena, would

19   give us what we need, which is it would give us a total

20   of the donors who are fathers or daughters or

21   grandfathers of students because there's a column for

22   students and a column for donations, and to combine

23   that with the lists of the special student -- the

24   special-interest students who were admitted, we can

25   easily do the percentage of those that were admitted in

1    correlation to a donation that came before or after.

2            THE COURT:  Okay.  Okay.  So do you want to wrap

3    up, and then I'm going to let USC --

4            MR. WEINBERG:  Thank you, Your Honor.

5            The wrap-up is essentially that the cases don't

6    require that all the information you require be in a

7    single document.  They don't require that I know the

8    codes or the exact names, although we know the names of

9    some; they require a reasonable presentation through

10   the exhibits that we gave the Court that we have a

11   reason to believe that USC's statements that, There's

12   no reason to believe we have these documents, are

13   untrustworthy and unreliable.  They're a major

14   corporation.  They can do a search.

15           It's up to Your Honor whether to require a

16   search of 22 department heads for lists of their VIPs

17   or whether to start, for instance, with Mr. Brunold.

18   And if he is treating the other departments like he

19   treats Athletics, he's got emails, and he's got lists,

20   and they're not just from Athletics going to him, which

21   lists the tagged students or the students they asked to

22   tag, and he communicates results.

23           Why would he only communicate results to

24   Pat Haden and Donna Heinel when he's got other

25   departments he represents as the Dean of Admissions,

1    and he's got emails to Development to let them know

2    which students got in because Development is the group

3    that follows up by talking to the parents about

4    donations.  Exhibit 13 is a perfect example.  You have

5    Athletics and Development talking about a parent who's

6    pledged 1 to  3 million -- or they think he'll give 1

7    to 3 million if their kid gets in, and they're talking

8    about dividing it between Marshall and Athletics.

9         So I belive we've met the triple requirements of

10   relevance, admissibility, specificity, and we ask the

11   Court to grant the 17(c) subpoena and order USC to do

12   more than just say they have no reason to believe the

13   documents exist.

14        Thank you.

15        THE COURT:  Thank you.

16        Yes, Mr. Fuchs.

17        MR. FUCHS:  Thank you, Your Honor.

18        And, Your Honor, I welcome any questions you

19   might have because this is a complicated fact pattern,

20   and I think I can help straighten out some of the

21   confusion that's been created here in connection with

22   Defendant Zangrillo's papers and the argument today.

23        Your Honor, as you know, *US v. Nixon* is the

24   controlling authority with regard to Rule 17 subpoenas,

25   and *Nixon* makes clear, Your Honor, that Rule 17

1    subpoenas are not designed to be discovery devices or

2    investigatory tools, and yet that's exactly what

3    Defendant Zangrillo is doing here.  He's using his

4    subpoena to USC as a means of conducting a massive --

5    and I don't say that lightly -- a massive investigation

6    of USC's use of special-interest tags over a four- to

7    five-year period.

8          Your Honor, Defendant -- Mr. Weinberg and

9    Defendant Zangrillo said that USC's primary argument is

10    specificity.  Your Honor, USC's primary arguments are

11    that the special-interest process, the use of

12    special-interest tags, is totally irrelevant to the

13    charges in this case and the conduct that was charged

14    by the Government.  USC's other primary argument is

15    that it would be a massive burden to try to unearth the

16    information that Defendant Zangrillo has requested.

17          And I'd like to -- after I address -- I'd first

18    like to address the difference between Donna Heinel's

19    scheme and the special-interest process because they're

20    completely different and unrelated.  And, secondly,

21    Your Honor, I would like to go to the subpoena itself.

22    That's the document that you have been asked to

23    evaluate and to quash, and I want to go through those

24    requests, as written, not as they've somehow morphed

25    into this amorphous request.

1      THE COURT:  Well, they can be rewritten.  I

2  mean, the fact that the subpoena may be inartfully

3  worded or he didn't say "documents showing" doesn't

4  mean that it's not proper.  I mean, I think --

5      MR. FUCHS:  But I think we should focus on what

6  has been requested, whether it's in that document or in

7  the opposition, because I think that will demonstrate

8  the burden, Your Honor.

9      THE COURT:  Well, I think one of the things

10  about the subpoena on its face is I don't think -- I

11  think it's obvious that Mr. Weinberg did not really

12  understand your process, so he made requests sort of in

13  the dark for things that I do think are relevant to his

14  case, but he doesn't know until he confers with you

15  whether it is burdensome or whether the documents

16  exist.  So I agree with you the subpoena has problems,

17  but I don't think it's fatal to his whole request,

18  so --

19      MR. FUCHS:  And, Your Honor, I'll try to explain

20  the process a bit here by explaining the difference

21  between Heinel's scheme, which was rooted in the

22  Athletic Subcommittee process, versus the VIP process,

23  totally different and untainted by scandal, not charged

24  by the Government in any of its cases.  And then I'll

25  try to explain why it would be such an incredible

1   burden to unearth what it is that Defendant Zangrillo

2   wants.

3        First, Your Honor, Donna Heinel's scheme was to

4   take students, applicants, who were not athletes and

5   package them as athletes so that they could be

6   considered for admission by a group within USC's

7   Admission Department that vetted all student athletes,

8   whether it was a scholarship athlete or, in the case of

9   all of Singer's clients that he pushed through Heinel,

10  walk-on athletes.  In return for being packaged as a

11  fake athlete, the parents of the applicant would make a

12  donation to the Athletic Department, to a fund that

13  either Donna Heinel controlled or to another team

14  within the Athletics Department.

15       Donna Heinel, in turn, entered into some kind of

16  consulting arrangement with Rick Singer where she was

17  paid $20,000 a month over a six- or eight-month period

18  at a minimum.  That was the scheme.  The scheme had

19  nothing to do with labeling someone as a

20  special-interest candidate.

21       And the reason for that, Your Honor, was that

22  Donna Heinel knew that, if she packaged someone as an

23  athlete that Admissions assumed was an athlete who was

24  desired by one of the teams, she had an extremely high

25  chance of getting that student admitted to USC, a

1    nearly a hundred percent chance.

2         In contrast, the special-interest process offers

3    none of that security.

4         THE COURT:  Is the special-interest practice the

5    same as the VIP?

6         MR. FUCHS:  Yes.  And there is no -- well, the

7    special interest -- tagging students with a

8    special-interest tag really means applying one of

9    several different types of tags that collectively are

10   thought to be special interest.  USC has lots of tags,

11   Your Honor.  USC not only has special-interest tags; it

12   has tags for Roxy applicants, it has tags for

13   first-generation students.  These are all ways of

14   distinguishing particular students in a particular way.

15        THE COURT:  So what is the designation -- what

16   does the designation VIP signify?

17        MR. FUCHS:  The way a special-interest tag, or

18   VIP tag, to use your term, Your Honor, works is anyone

19   from 22 colleges throughout USC and other departments

20   within USC can apply a special-interest tag, and they

21   can do it for any number of different reasons.

22        THE COURT:  So I think you said that, but what

23   specifically does VIP signify?

24        MR. FUCHS:  Well, there is no, quote, unquote,

25   VIP tag.  There are six different tags that, as a

1  collective group, are thought to be special-interest

2  tags.

3      THE COURT:  So why do you see VIP, VIP, VIP?

4      MR. FUCHS:  It's shorthand as a way of referring

5  to six different tags, which include, for instance, a

6  Dean's tag, from any one of 22 colleges throughout USC.

7      THE COURT:  So is there any tag specifically for

8  donors?

9      MR. FUCHS:  No.

10     THE COURT:  And when you just say VIP, then a

11  person looking at that list wouldn't know what the

12  reason was that the person had been designated VIP?

13     MR. FUCHS:  Correct.  Your Honor, Ms. Heinel

14  happened to maintain her -- I'll step back and say that

15  not only did Ms. Heinel have this alleged scheme by the

16  Government going where she would put people through

17  Subco. as fake athletes in return for donations to a

18  fund she controlled or other sports teams at USC, but

19  she also was the person who maintained the

20  special-interest or VIP list within Athletics.

21     She would collect information from other people

22  in the Athletics Department, and she would then pass

23  that on to Mr. Brunold, as reflected in the documents

24  that have been attached to the opposition, all of which

25  were produced by USC and all of which relate to the

1    Athletics Department.  There's not a single document

2    that was attached to the opposition which relates to

3    anything other than Donna Heinel and her lists and the

4    Athletics Department.

5         THE COURT:  So when Mr. Zangrillo's daughter was

6    referred to Admissions by Donna Heinel, she was not

7    referred as an athlete?

8         MR. FUCHS:  Yeah.  What ended up -- as alleged

9    by the Government, what ended up happening was this,

10   and I think it's supported by what's on the wiretap

11   conversations:  The arrangement with Mr. Zangrillo,

12   which is really all that matters here, the conduct and

13   deal that he cut, was no different than any other deal

14   that is at issue in this case.

15        He -- his daughter had applied for admission for

16   the first time in 2017.  She had been denied on her

17   merits.  She hired Singer to help get her in through

18   his side door.  Singer's side door was to package

19   people as fake athletes and have them submitted by

20   Heinel to Subco., nothing to do with special interest,

21   to Subco. for admission.  That was the deal here.  That

22   was the plan here.

23        THE COURT:  And what is Subco.?

24        MR. FUCHS:  Subco. is the Subcommittee of the

25   Admissions Department that evaluates all student

1 athletes for admission to USC, whether it be a

2 scholarship athlete or a walk-on.  Every single one of

3 Singer's clients went through Subco., with the

4 exception -- although that was charged -- with the

5 exception of Amber Zangrillo, but that was a quirk,

6 according to the Government, that --

7    THE COURT:  Well, so --

8    MR. FUCHS:  Yes.

9    THE COURT:  -- how about according to you?

10 Like, how did she get through?

11    MR. FUCHS:  Well --

12    THE COURT:  This is what he's trying to figure

13 out because, according to the Government, it really

14 doesn't matter.  The Constitution gives him a right to

15 obtain information to put on in his defense.  I mean,

16 17(c) is protecting a really fundamental Constitutional

17 right that a Defendant has to compulsory process.  So

18 according to the Government doesn't really matter;

19 it's, What information does your institution have?

20    MR. FUCHS:  Our institution has the following

21 information with regard to Amber Zangrillo, Your Honor:

22 That Heinel cut a deal to have her presented as a fake

23 women's rower.

24    THE COURT:  But she in fact was not then

25 presented as a fake women's --

1    MR. FUCHS:  She was not.  But that was not known

2    to Mr. Singer or Mr. Zangrillo.

3    THE COURT:  So how did -- what did USC do with

4    regard to her application?

5    MR. FUCHS:  It considered her -- Ms. Heinel

6    lobbied the Admissions Office, after having cut the

7    deal with Mr. Zangrillo and Rick Singer, to have her

8    admitted as a transfer student with an application that

9    listed her as a crew athlete and with an application

10   that had other false statements, including the classes

11   that had been taken for her by one of Singer's

12   employees.

13   And she was ultimately admitted not as an

14   athlete but based on the work that Heinel did.  Heinel

15   made the executive decision, without talking to Singer,

16   without talking to Zangrillo, that she would not put

17   her through as an athlete.  The deal that was cut, the

18   conduct that has been charged, the conspiracy alleged

19   has to do with the deal that was cut, not how she

20   ultimately was admitted, and --

21   THE COURT:  So if the process by which she was

22   admitted was the same, as the Defendant is saying here,

23   as the process that many legitimate students went

24   through to get admitted and if the cheating was not

25   material to her admission and if what Donna Heinel was

1    doing in this specific case, not in other cases, was

2    the same as what other legitimate department heads were

3    doing to push their candidates, then I think that is

4    relevant to his defense.

5          MR. FUCHS: But, Your Honor, none of that was

6    happening here. The only thing that caused her to

7    spring into action on behalf of Mr. Zangrillo and

8    Mr. Singer was the deal, as cut. USC does not sanction

9    or somehow -- did not somehow authorize her to falsely

10    represent students as athletes. They never would have

11    done that, they never did do that. The --

12          THE COURT: Did she do that in this case if they

13    didn't admit her as an athlete?

14          MR. FUCHS: No, she didn't ultimately present

15    her through the Subcommittee. But, Your Honor, it's

16    the conduct charged as part of the conspiracy which is

17    the relevant conduct here.

18          If what had happened in this case was that

19    Mr. Zangrillo had struck a deal with Singer and Heinel

20    to pay $50,000 to put his daughter through as a VIP

21    candidate, we wouldn't be here, the case would not have

22    been charged because there's nothing improper with

23    putting someone through as a special-interest candidate

24    because everyone knows the student is a

25    special-interest candidate. There's a flag on their

1    application.

2          What's problematic here, Your Honor, is both the

3    cheating, taking the -- having classes taken by someone

4    else and the deal that's part of the conspiracy that's

5    been charged to present her as a fake athlete.  That's

6    where the crime occurred, when they cut that deal.

7          How she ultimately was admitted is not part of

8    the crime charged here and, therefore, isn't relevant

9    and certainly shouldn't lead to a wholesale exploration

10   of the application of special-interest tags, which

11   happen for any number of reasons across the entire

12   University and are the same as all the other tags that

13   are applied and are used in one way other another at

14   every university in the country.

15         That type of wholesale discovery totally

16   unrelated to the charges, Your Honor, is not material,

17   will not advance the defense.  And not only that, it's

18   widely burdensome to USC, and maybe I should shift to

19   talk about that, Your Honor.

20         THE COURT:  Yes, tell me about the burdensome

21   part.

22         MR. FUCHS:  Your Honor, when we started with our

23   motion to quash, we responded to Mr. Zangrillo's

24   request by making clear that we don't have any document

25   that is responsive to Request A that says, "The number

1    of prospective students, including transfer students,

2    designated as VIP, special interest and/or University

3    advancement from January 1, 2015, through February 28,

4    2019."

5          THE COURT:  So let me make this clear:  You're

6    not saying we don't have one single document?  Because

7    I think what Defendant has been saying is, Well, I mean

8    documents sufficient to show.  So if he had worded

9    that, Documents sufficient to show, would you have it?

10   I know you don't have one document.

11         MR. FUCHS:  Yeah.  We didn't track, Your Honor,

12   the number of special-interest students who are tagged

13   in a particular year.  We then don't have, on top of

14   that, because this is all cumulative, this subpoena, we

15   don't then have on top of that all of the reasons --

16   who was their sponsor, why they were tagged --

17         THE COURT:  Sure.

18         MR. FUCHS:  -- what department.  We don't have

19   that.  We also don't have the donation history for each

20   of those people.

21         THE COURT:  So it's a little hard to believe

22   that your Development Department doesn't keep a list of

23   donors.

24         MR. FUCHS:  We do have that, Your Honor.  But

25   let me explain what would have to happen here to give

1    him what he wants.  He wants -- he has said he does not

2    want us to compile the information for him, he doesn't

3    want us to go create a chart listing all of the

4    special-interest --

5              THE COURT:  Let's say, for example, you had the

6    Heinel list from each year, if Donna Heinel is sending

7    the Director of Admissions, Here's our list from each

8    year --

9              MR. FUCHS:  Yes.

10             THE COURT:  -- how about that?

11             MR. FUCHS:  We've produced Donna Heinel's entire

12   email box to the Government.  That was in connection

13   with a search warrant.  In addition, we've -- that was

14   250,000 documents, approximately.

15             THE COURT:  So she never emailed the Director of

16   Admissions about Mr. Zangrillo's daughter?

17             MR. FUCHS:  Your Honor, I have not looked

18   through every one of those documents to be able to

19   answer that question, but what I do know is we've

20   produced her entire email box, and it's been made

21   available to the defense, so they already have all of

22   that.

23             In fact, every document attached, which they're

24   making their case about the special-interest process,

25   came from USC.  They have plenty, if they're going to

1     make that argument, if it's going to somehow be deemed

2     relevant and that information is going to be deemed

3     admissible, to do all of that already.

4          What they now want us to do is go to the rest of

5     the University to uncover anywhere else in the

6     University any email where someone within the

7     University designated an applicant as a

8     special-interest applicant.  That, Your Honor, would

9     require us to collect --

10         THE COURT:  You don't even need to go there.  I

11    understand that's too much.  But what about, as

12    Mr. Weinberg suggested, emails to the Director of

13    Admissions from department heads saying, Here's our VIP

14    people?

15         MR. FUCHS:  We don't -- as part of our internal

16    investigation, Your Honor, we tracked the Government's

17    investigation, which went into the whole Subco. fraud.

18    We did not look into the special-interest process

19    because it had nothing to do with the Government's

20    investigation.  So we have never collected documents

21    from anywhere outside of Admissions and outside of

22    Athletics.

23         THE COURT:  So I also kind of agree with

24    Mr. Weinberg that to say, We've never collected these

25    before, therefore, they don't exist, is -- I mean, you

1  could look for them; right?  I mean, that's what most

2  people do when they get document requests is they see

3  if they have them.

4       MR. FUCHS:  But, Your Honor, it's not as simple

5  as pushing a button and searching from a central

6  location.  We would need to go and restore inboxes --

7  email boxes for dozens of people throughout the

8  University, run search -- process that, run search

9  terms, review the resulting hits for potentially dozens

10  of custodians at a cost of hundreds of thousands of

11  dollars, if not more, to USC.  So it really isn't as

12  simple as pushing a button and searching some kind of

13  magical central repository because it just doesn't

14  exist, it doesn't work that way, at USC.

15       Your Honor, in addition to the issue of

16  searching for stray emails where someone may have

17  designated someone special -- by the way, that's not

18  the preferred approach to designate a special-interest

19  candidate.  The preferred approach is the people who

20  have the ability to tag someone would go into the

21  system itself, the student information system, and just

22  apply the tag.  So any notion that you're going to get

23  a remotely reliable or complete list from searching for

24  emails wide and far where someone designates someone as

25  special interest is simply not true.

1          And in addition, Your Honor, there is no

2    financial information located -- there's no reason to

3    believe that's going to be financial information

4    located alongside the initial designation.  Admissions

5    doesn't maintain any information concerning the amount

6    of money someone might have donated in the past, might

7    be donating in the future.

8          THE COURT:  So was Donna Heinel the only person

9    who ever communicated with the Director of Admissions

10   the amount of money that people were planning on

11   giving?

12         MR. FUCHS:  Well, I don't know the answer to

13   that, Your Honor, but all I do know is that what

14   Mr. Brunold has said in his declaration, which is that

15   he did -- all he wanted from people was to, first, go

16   into the system, apply the special-interest tag.  If

17   you're not going to do that, all I need is the name of

18   the person so that I can apply the tag.

19         He didn't want the sponsor who has designated

20   them.  He didn't want any other information about the

21   rationale as to why they were being tagged, for

22   instance, they were a friend of someone at the

23   University.

24         THE COURT:  So Donna Heinel was just including

25   all that stuff for fun and he was completely

1  uninterested in how much -- if someone was a million

2  dollar donor or --

3      MR. FUCHS:  Your Honor, no.  Obviously, I don't

4  think she was providing it for fun, but I do think what

5  was going on was that Ms. Heinel, who was the central

6  repository for special-interest tags within the

7  Athletics Department, was fielding requests from a

8  variety of her colleagues within the Athletics

9  Department.

10     THE COURT:  So it's not just her who thinks that

11 information is relevant to the Admissions Department;

12 it's everyone in Athletics who's communicating with

13 her.

14     MR. FUCHS:  Well, people within Athletics were

15 providing their basis for why they might have been

16 designating someone -- or wanted someone to be

17 designated special interest.

18     THE COURT:  And then she refers that to the

19 Director of Admissions who is totally uninterested in

20 any of that information.  He just wants the person's

21 name?  He doesn't care why they're being referred in

22 this list?

23     MR. FUCHS:  He doesn't enter any of that

24 information.  He doesn't consider any of that

25 information in connection with admissions decisions.

1    His staff doesn't.  His staff is, in fact, told to

2    ignore the special-interest tags in their first read of

3    applications, Your Honor.

4             THE COURT:  The special-interest tags or the

5    donations?  No one cares about the donations in

6    Admissions?

7             MR. FUCHS:  No one factors in the dona -- no one

8    knows -- Mr. Brunold did get from Donna Heinel

9    information, which in some instances reflected donation

10   or donation potential from particular people who were

11   being tagged, and there are other reasons why those

12   people were being tagged.

13            He did not factor that in to the ultimate

14   admissions decision when he and his staff reviewed

15   those applications.  He didn't go back to the Heinel

16   spreadsheet and say, Okay, let me see why this person

17   has a tag and, Okay, they're a family member, they're a

18   donor, in making admissions decisions, nor did he take

19   that information from those columns and input it into

20   the student information system.

21            THE COURT:  So someone is tagged --

22            MR. FUCHS:  Yes.

23            THE COURT:  -- they send the Director of

24   Admissions a very detailed list about why they're

25   tagged, and then the Director of Admissions just

1    considers all the tagged people without any detail?

2          MR. FUCHS:  Correct.  Yes, that's right.

3          THE COURT:  Even though the reason they're

4    tagged is that they're giving money to the institution?

5          MR. FUCHS:  That may be a reason why they were

6    tagged.

7          THE COURT:  Well, I mean, the list that --

8          MR. FUCHS:  Yeah.

9          THE COURT:  It's basically that's fine; right?

10         MR. FUCHS:  I'm not disputing the fact that the

11   people in Athletics value that.  Their job in many of

12   those cases was to raise money for Athletics.  There is

13   a development arm within the Athletics Department

14   designed to raise money.  But Mr. Brunold did not value

15   that information in making admissions decisions.

16         THE COURT:  Well, he did value the information

17   because that's the reason they were tagged, and he's

18   admitting the tagged people at a higher rate; right?

19   He's not ignoring the tags.

20         MR. FUCHS:  The tags -- the people --

21         THE COURT:  What's the purpose of tagging

22   someone?

23         MR. FUCHS:  The purpose of tagging someone is to

24   know that there is some special interest or,

25   alternatively, that they're Roxy or first generation,

1    some unique attribute about a particular student, yes.

2          THE COURT: Including that they're giving money?

3          MR. FUCHS: In those instances where that's why

4    they were tagged, he didn't value that, but that is in

5    fact why they were proposed as a special-interest

6    candidate to Admissions to begin with.

7          THE COURT: Okay. Well, we're just -- it's just

8    semantics. If that's why they were tagged, then he

9    must have valued if then he gives them a special look.

10    But okay.

11          MR. FUCHS: But, Your Honor --

12          THE COURT: Can you just explain -- I'll give

13    you a chance, but can you just explain the email where

14    he says -- the Director of Admissions says, "I have

15    just gone back through today's Subcommittee docket and

16    cross-referenced it with my University-wide VIP

17    spreadsheet"?

18          MR. FUCHS: Yes.

19          THE COURT: And then we get him swearing that

20    there is no such thing as that.

21          MR. FUCHS: Your Honor, that's not what he swore

22    to, but I will explain.

23          THE COURT: Okay.

24          MR. FUCHS: Mr. Brunold had access, of course,

25    to the student information system. He could print out

1  documents, spreadsheets, reflecting any one of the many

2  different types of information contained in that

3  student information system.  And he would from time to

4  time either create an electronic document or,

5  alternatively, a hard copy document which contained a

6  number of different fields concerning special-interest

7  students.  That's what he was referring to.

8        However, he did not maintain copies of those

9  documents after a particular admissions year was done.

10  He had no reason to do it because anything that

11  ultimately was decided with regard to any

12  special-interest student or anyone else who had a tag

13  was entered into the system, so he didn't need a record

14  somehow of a spreadsheet that had been printed out or

15  created electronically in some particular moment in

16  time.  So he didn't maintain them, and he doesn't any

17  longer have those.

18        THE COURT:  And they're nowhere in the system?

19        MR. FUCHS:  Correct, Your Honor.

20        Now, USC -- and we discussed this in our opening

21  brief.  USC has the ability to create a list of all of

22  the people who have been designated as VIP over the

23  50-month period in question.  It also has the ability

24  to determine which of those people was admitted.

25        However, as we made clear in our opening brief,

1   in our motion, the case law does not require us to

2   compile information, and the Defendant has said we

3   don't have to compile that information.  Instead, where

4   we have now landed is in -- is sort of backing in to

5   that information by searching the entire University for

6   indications of someone having been designated special

7   interest.  And that, Your Honor, is where the

8   overwhelming burden lies.

9        In addition, Your Honor, I want to mention that

10  just because someone may have designated someone

11  special interest doesn't mean that they're the sponsor

12  of that person.  People have the administrative task of

13  forwarding emails or entering tags.  That doesn't mean

14  they're the sponsor, nor does it give any indication

15  whatsoever as to what department they were in, what

16  their title was, who the actual sponsor or the reason

17  why they designated.  So we're going to go looking all

18  around the University for these one-off emails where

19  someone may have designated.  It's not going to get to

20  the information that's being requested in Request B.

21       And then when you turn to Requests C and D, what

22  would end up having to happen here, Your Honor, is

23  that, because Admissions doesn't maintain any

24  information about donations, because there's no reason

25  to believe other people around the University were

1    sending in information that accurately describes how

2    much money someone may have given over time, we would

3    have to go to the University Advancement Database,

4    which they have now requested en masse, they just want

5    the entire database, which is, Your Honor, a

6    nonstarter, and we would then have to run searches for

7    each person's name who was designated special interest

8    in that database and try to match it to some donation

9    that may have been made.  That, Your Honor, is a

10   massive undertaking.

11          And I just want to add a couple of other things

12   to explain our burden.  We cannot turn over records,

13   educational records.  FERPA prevents us from doing

14   that. So we would have to give notice -- if we're going

15   to turn over the names of students who have nothing to

16   do with this, whose parents may have made donations,

17   they may have been designated special interest, they

18   may have been designated special interest for other

19   reasons, have nothing to do with this fraud, there's

20   nothing improper about the fact they were tagged,

21   there's nothing untoward about their donations, we

22   would have to give every one of those people notice

23   that we're about to disclose the fact that they are

24   going -- their record is going to be produced in this

25   litigation.

1              And there are a lot of people over this

2     five-year period who would be implicated by that.  We

3     would have to give notices to hundreds of people.  We

4     would then have to field all of their questions and

5     comments in response.  That would only add to the

6     burden of already having to go and try to retrieve

7     mailboxes, restore them, search them and review the

8     resulting hits, whatever those might be.  So that's a

9     massive undertaking.

10             And then when you turn to the Advancement

11    Database, there's personal protected information in

12    that database.  Of course, it's the highly -- most

13    highly sensitive information, including all the

14    donations made by any donor at USC.  Turning over that

15    information to have the Defendant rummage around in it

16    looking to match up donations to names would also

17    implicate privacy rights, trade secret rights, all

18    kinds of other complications.  And, Your Honor, most of

19    the information in that database, that Advancement

20    Database, that reflects all the donations, totally

21    irrelevant to this matter.

22             I mean, we don't believe, obviously, that

23    information about donations in connection with people

24    tagged special interest is relevant, but most of the

25    information in that Advancement Database has nothing to

1  do with people who have been tagged special interest

2  and made donations; it reflects the hundred thousand

3  more donations made every year at USC, all of which

4  would, I mean, according to the request, have to be

5  somehow made available to the Defendant.  So that adds,

6  Your Honor, to the burden.

7  THE COURT:  Okay.  So let me ask you, there are

8  some kind of suggestions in the materials that you have

9  offered to provide communications specifically

10  regarding Mr. Zangrillo's daughter to Defendant.  And

11  here's -- I don't know how much you -- do you have much

12  more to say?  Are you done?

13  MR. FUCHS:  No.  I'm happy to answer your

14  questions, Your Honor.

15  THE COURT:  Sure.  So one of the things I would

16  like to do is get the ex parte communications that you

17  spoke of.

18  And, actually, Mr. Weinberg, I'd like you to

19  file a supplemental memorandum under seal explaining,

20  as you did here today, how the materials relate to your

21  defense.  And you can file it however you wish, but if

22  you want to file it ex parte and under seal, you may.

23  MR. WEINBERG:  Thank you.

24  THE COURT:  And whatever you can provide to USC,

25  you should, even if it's under seal.  And I think we

1　　could also -- if you feel strongly about it, you could

2　　ask for a protective order, since it has to do with

3　　your defense.  I don't know what to do about that,

4　　but -- I wonder if you should just issue a limited

5　　subpoena at this time for the information that you can

6　　negotiate they should give you.

7　　　　　And I would urge USC to consider expanding your

8　　offer to additional documents that reflect any

9　　communications or reviews of the application by anyone

10　　outside of the Athletic Department as well.

11　　　　　You want me to say that again?

12　　　　　MR. FULLER:  Yes.  I was talking to him.  Sorry.

13　　　　　THE COURT:  That's no problem.

14　　　　　THE COURT:  So I would urge you to consider

15　　expanding your offer to include communications about

16　　her admissions -- her admittance to the University not

17　　just with people in the Athletic Department but with

18　　other people who had something to do with her being

19　　admitted as well.

20　　　　　MR. FUCHS:  And, Your Honor, I just want to be

21　　clear, of course I'll talk to Defendant Zangrillo's

22　　counsel about that.  I just want to make clear, we have

23　　offered to produce not only communications about

24　　Amber Zangrillo that we have in the Athletics

25　　custodians whose documents we've restored but also in

1    the Admissions as well, and there's really no reason to

2    believe -- and I'm happy to hear from defense counsel

3    why there would be -- but no reason to believe anyone

4    else had any involvement in her admission.  So that's

5    the most logical place to go, and we were willing to do

6    that.

7              THE COURT:  Anyone else other that Donna Heinel?

8              MR. FUCHS:  Well, we're willing to search --

9    Donna Heinel was in Athletics, and we're willing to

10   search many, many custodians within Athletics and then

11   many custodians within Admissions.

12             THE COURT:  So, I mean, you can issue another

13   subpoena if you want to, or if you can just reach an

14   agreement on that and just go ahead and get him that

15   information, which I think he is entitled to if he

16   issues a subpoena for it, or you can have him issue

17   another subpoena if you require him to do that.  But

18   let's reach some agreement on that and get that going

19   anyway and get that material to Mr. Weinberg.

20             It may be, Mr. Weinberg, after you review that

21   material, you don't need such wide-ranging other

22   evidence to prove up what you want to.  And I don't

23   know what it's going to show, but why don't -- yes.

24             MR. WEINBERG:  Could I have about two minutes

25   just to make a --

1      THE COURT: Yes.

2      MR. WEINBERG: -- short, short rebuttal? I know

3  Your Honor is --

4      THE COURT: Yes, but let me just -- you go right

5  ahead and take the podium, but let's get that done.

6      And then, also, I do think on the next round, if

7  Mr. Weinberg continues to press his request, that we

8  will need some certification that the documents that

9  don't exist don't exist, that someone looked for them

10  and didn't find them, or I think your representations

11  about the burdensomeness of things would be fine. But

12  just, also, getting up and saying it would cost

13  hundreds of thousands of dollars to do this is really

14  not sufficient if it's an otherwise reasonable request

15  but it's just going to be too burdensome for you.

16      MR. FUCHS: Yeah, Your Honor. I'm happy to

17  discuss and meet and confer and also follow your

18  instruction. I mean, I do want to say, Your Honor --

19  and I think the meet-and-confer process will be

20  productive. It's a little difficult to really know

21  what's being requested here because the requests have

22  changed and aren't clear.

23      THE COURT: Okay. Yes.

24      MR. WEINBERG: Just a couple of points, you

25  know, not a full reply, but I want to at least touch

1    base on a few things before the hearing ends.

2          One is USC counsel says, So USC can print out a

3    VIP spreadsheet, in reference to 2016 email Exhibit 3

4    where it's apparent that the Admissions Director has a

5    spreadsheet, whether it's on his computer or whether

6    it's -- USC says I don't want it.  I've managed to say

7    I don't want them to do anything that looks to them

8    like something beyond producing a document.

9          Well, punching a server with certain search

10   terms is what companies do every day, they do

11   electronic searches, and if the Admissions Director, on

12   March 12, 2016, could press his computer and have a VIP

13   University-wide spreadsheet to consult when he was

14   doing his admissions decisions, the 2018 or '19 one has

15   to be available, the 2016 one is acquirable, and it's

16   not a great expense.  It's something that the

17   Admissions Department has access to today --

18          THE COURT:  So I'm hearing them say it is not

19   available, in fact, but --

20          MR. WEINBERG:  But that's just implausible when

21   you read -- maybe the March 12 -- and Brunold is very

22   careful.  He says, The database -- the VIP spreadsheet,

23   if it existed, the March 12 one, I didn't maintain it,

24   but he's not saying, I can't press my computer in my

25   Admissions Department and push "print" and have a VIP

1  spreadsheet, just like I could have had on March 12,

2  2016.

3  　　　　MR. FUCHS:  Your Honor, if I could just respond

4  to that?

5  　　　　MR. WEINBERG:  May I just finish a few things?

6  　　　　THE COURT:  Yeah, let him finish.  It's all

7  right.  I'll give you a chance.

8  　　　　MR. WEINBERG:  Second, this is not a conspiracy

9  about, you know, phony athletic profiles.  Yes,

10  Mr. Singer, on his own, developed profiles.  He had

11  access to the applications.  He wrote into the

12  applications.

13  　　　　This is a conspiracy, if at all, where the goal

14  was for Singer to give USC money.  For Amber Zangrillo,

15  the money was in exchange for VIP help by Singer

16  through Heinel for VIP.  Mr. Zangrillo didn't pay

17  Heinel's extra money she was getting from Singer.  That

18  was between her and Singer.  He made a donation, and

19  that's why I need to detoxify the donation, just

20  because of the Government allegations.

21  　　　　Third is that I have an example here, which is

22  that Exhibit 4 from the original subpoena -- and, Mike,

23  can you give it to the Clerk? -- because there's one

24  category in it that would make it easy.  I don't want

25  their entire data -- their Development Office database.

1     This is Exhibit 4, Your Honor, but I just -- for your

2     convenience.  I don't want the database.  They could

3     print out the parent of a student that would

4     demonstrate the relationship between their donor

5     database and the students and demonstrate how common it

6     is for donors to -- for parents to make donations for

7     people that are students, like Mr. Zangrillo.

8          I don't need the vast majority of Trojan

9     families that every year give money, you know, for the

10    football team.  I'm not looking to invade privacy,

11    although I would say their educational privacy rules

12    don't cover, you know, donor donations; they cover

13    student files.  I'm not seeking student files.

14         In terms of searches, we can start -- if the

15    Government -- I'm betting USC got for Tim Brunold what

16    they did for the United States Government, they got a

17    search warrant, or they can do it by subpoena, they can

18    do it by a Court order and simply download Brunold's

19    emails for a certain period of time, just like they did

20    for the Government.

21         And I'm not asking for all his emails, I'm not

22    asking -- I'm asking for a very subset of emails that

23    would show VIP, special interest, et cetera, and would,

24    I contend, have what I need to legitimize and normalize

25    the VIP status, its relation to promises of donations,

1     and it would allow me to integrate Mr. Zangrillo's

2     facts into the USC norm.

3          THE COURT:  So what -- I'm just curious.  Why

4     can't you just say that Donna -- the Donna Heinel chart

5     that you have shows that people, through their personal

6     connections and/or their donations, are tagged as VIP,

7     it goes to the Admissions Office, and those people get

8     preferential treatment?  And I think that that's very

9     clear.

10         MR. WEINBERG:  I can't accept -- the Government

11    is toxifying, if I can use that word, the Athletics

12    admissions process.  They have called Heinel a

13    conspirator, they're claiming that --

14         THE COURT:  But those other people are not

15    charged in this case.

16         MR. WEINBERG:  Not charged, and it gives me part

17    of the argument.  But the bigger argument would be that

18    the same spreadsheet came to Admissions and had the

19    same effect when it was generated by the Marshall

20    School of Business.  Then the Government wouldn't be

21    able to say, See, Heinel corrupted the Athletics

22    Department for Mr. Singer.

23         THE COURT:  So when you get these in at trial,

24    you'll do these as business records, and your witness

25    will be the keeper of the records?

1          MR. WEINBERG:  Yes.

2          THE COURT:  And then you'll just use the records

3     in and of themselves?

4          MR. WEINBERG:  I will argue that Mr. Zangrillo,

5     looking at the world like a lot of parents, had an

6     educational expert, in this case, Mr. Singer, and that

7     he knew of the VIP program, knew of the special

8     interest program, knew the Development Office supported

9     it, knew the President supported it, and he made a

10    donation.  And I will give Your Honor ex parte a

11    document that I represent is relevant to the

12    information that's consistent with what Mr. Zangrillo

13    knew.

14         THE COURT:  Okay.  Then should we file this?

15         MR. WEINBERG:  Ex parte, please.

16         THE COURT:  All right.  I'll deal with that.

17         MR. WEINBERG:  I will narratively lay out the

18    importance of this document and --

19         THE COURT:  Well, I think you -- you may want to

20    do that in a filing.

21         MR. WEINBERG:  Yes.

22         THE COURT:  Would you like to do that?

23         MR. WEINBERG:  Yes, Your Honor, in an ex parte

24    filing.

25         And, finally, I want to give -- we gave

1     Your Honor Exhibit 2 and the original, the VIP transfer

2     spreadsheet, which is an Admissions Department

3     spreadsheet.  We've been able, in a very odd format, to

4     get some of the spreadsheet, but we don't have a real

5     spreadsheet, and what the Government's saying, Brunold

6     didn't want to know about donors and this was not

7     information he wanted and not information he kept and

8     not information he considered.  We've made some red

9     lines around this Admissions Department document that I

10    would submit under seal and give the Government -- give

11    the USC a copy and ask for it to be submitted under

12    seal, consistent with my agreement with Mr. Fuller.

13          Thank you, Your Honor.

14          THE COURT:  Thank you.

15          Okay.  Yes, sir, Mr. Fuchs.

16          MR. FUCHS:  Thank you, Your Honor.

17          You know, I think Your Honor understands what's

18    going on with the spreadsheets.  USC has a database.

19    It can create spreadsheets.  Mr. Brunold accessed the

20    data in the database to create a spreadsheet back in

21    time.  He didn't retain that spreadsheet.  USC can now

22    create a spreadsheet.  We have no idea what Mr. Brunold

23    's spreadsheets looked like, but what I can I assure

24    Your Honor is, because the SIS -- this system doesn't

25    contain information about donations, there was no

1      information in that spreadsheet about donations.

2            Now, what we don't want to do, Your Honor, just

3      to be clear, we don't want to print out a list by name

4      of every person who was designated special interest and

5      then turn over the actual names of people because then

6      we'd have to -- that would implicate FERPA.  We'd have

7      to go through a humongous notification process, and it

8      would eject these poor people who have nothing to do

9      with this case into the case.

10           Mr. Weinberg asked for the number of -- see,

11     that's really what he's after, he wants to know the

12     following things:  The number of people who were

13     designated special interest, how many of those people

14     got in and then, of those people, how many made $50,000

15     donations in the one year before and the one year after

16     admission.

17           We can -- I'll talk with him.  We might -- I

18     have not gotten permission from my client.  We may be

19     able to provide anonymized data just to be done with

20     this, anonymized data concerning that percentage.  The

21     problem, Your Honor, comes in then going to the

22     Advancement Database .  He says he hasn't requested the

23     Advancement Database.  He said in no uncertain terms a

24     way to solve for C or D would be, Just give me the

25     entire Advancement Database.  That's what he said in

1     his opposition.  And in E, he says, I want a copy of

2     the University Advancement Database.

3           We're not going to give him the whole University

4     Advancement Database for any number of different

5     reasons.  I don't understand what he's saying he wants

6     us to do now with regard to the donation piece of this

7     exercise because having to match a special interest --

8     person tagged special interest with their family's

9     donation history is also a monumental exercise.

10          If he wants to give us -- tell us, Just look for

11     five people and their donations, maybe.  I don't know.

12     I'll talk with him.  But we're still at a place where

13     the burden is absolutely overwhelming based on the

14     actual written requests.  Your Honor --

15          THE COURT:  Okay.  Can I say another thing?  I

16     mean, he does have the right to subpoena someone to

17     trial, and it may be a witness from USC could testify

18     to information sufficient for what he's interested in

19     or -- I mean, I don't know.  That's another thing you

20     could talk to each other about.

21          MR. WEINBERG:  And I intend to talk to

22     Mr. Fuchs.  The document I just handed to the Court,

23     and perhaps if we can mark, and I've given it to USC.

24     It's a demonstration of how donation information is on

25     Mr. Brunold's VIP transfer spreadsheet.  I know that

1      Mr. Fuchs doesn't know that or he wouldn't have made

2      the argument that Admissions doesn't know what the

3      donations are.  This is --

4            THE COURT:  Okay.  And this that you filed under

5      seal that begins, "Entire list" --

6            MR. WEINBERG:  Yes, that was the --

7            THE COURT:  -- what is this?

8            MR. WEINBERG:  Well, we just handed -- and I

9      handed -- we'll deal with the one that's now marked.

10           THE COURT:  I've got two.

11           MR. WEINBERG:  One of them's clean, and one we

12     just, as an example, put the red box around so that you

13     can see the kind of information.

14           THE COURT:  Oh, I see the red box.

15           MR. WEINBERG:  And this, again, is a spreadsheet

16     that was sent by Mr. Brunold labeled "VIP Transfer."

17           THE COURT:  Okay.  All right.  So I think we're

18     going to stop now.

19           MR. FUCHS:  Your Honor, I just have one proposal

20     because Mr. Weinberg made a representation that the

21     money was exchanged for VIP status, and there's not a

22     shred of evidence -- there's not an allegation that

23     supports that, there's not a shred of evidence that

24     supports that.  I think it would be helpful to hear

25     from the Government about why the VIP process has

1    nothing to do with their case, as charged.

2         MR. ROSEN:  I'll be brief.  I know we want to

3    get out of here.

4         Judge, Mr. Fuchs is exactly right.  The VIP

5    process has absolutely nothing to do with this case

6    because he's been charged with conspiracy to commit

7    wire fraud and mail fraud, and that relies solely on

8    his intent and his good faith.  He had no --

9    Mr. Zangrillo had no idea at all his daughter,

10   Amber Zangrillo, was getting tagged as a VIP applicant.

11        The only thing that he believed was that there

12   was phony crew credentials being made up and put on the

13   application, and by the way, that's on the application.

14   The very first activity is that      Amber Zangrillo

15   spent 44 hours a week doing crew at  the LA Rowing

16   Club, which is patently false.  And then he was never

17   told at all during the case that Amber Zangrillo was

18   admitted as a VIP or anything like that or a special

19   interest.

20        I think -- and we haven't heard any evidence to

21   the contrary -- that the only time Mr. Zangrillo

22   actually learned about that was after his arrest when

23   he figured it out, and now he's trying to back-door and

24   cobble together a defense of good faith based on

25   information and emails he was not on, he had no

1    knowledge of, and there's nothing showing any

2    communications between himself, Rick Singer,

3    Donna Heinel or anyone else showing that this is how he

4    thought she was going to get in.

5        There's been a lot of time spent on the USC

6    admissions process and everything like that.  There's

7    been no time spent on his state of mind.  All we've

8    seen is one email or one document that's been provided

9    solely to the Court, not to the Government, despite our

10   request for Rule 16(b) discovery, that they claim he

11   was aware, aware generally of the VIP process,

12   nothing to say he was aware of it in the context of

13   Amber Zangrillo's admission.

14       The entirety of Amber Zangrillo's admission was

15   a complete fraud.  There were classes that

16   Mr. Zangrillo was paying Michaela Sanford from The Key

17   Worldwide to take and then put and submit it to USC so

18   that she could go to Europe.  He wanted Rick Singer to

19   fix an F.

20       Mr. Weinberg brought up about how some parents

21   were brought in kicking and screaming into this.  Not

22   Mr. Zangrillo.  Mr. Zangrillo encouraged, aided,

23   abetted and paid for that fraud on multiple, multiple

24   occasions.  Even after he was admitted into -- even

25   after Ms. Amber Zangrillo was admitted into USC,

1    Mr. Zangrillo, in an October 25th, 2018, call admitted

2    he had no idea why the $200,000 payment to KWF, The Key

3    Worldwide Foundation was made.  He said -- he's asking

4    Rick to come up with a story for why that payment was

5    made.  He says, "Rick, what was the Amber payment for,

6    just so I know we have the story straight?"

7         This isn't a guy acting in good faith about the

8    VIP program; he's getting his story straight to lie to

9    the IRS about the $200,000 funneled through the -- for

10   the charity.  They talked about the $50,000 to USC.

11   What about the $200,000 that he paid out to Rick

12   Singer?  Where was that going?  We'd have to believe

13   that USC, one of the largest research institutions

14   on the planet, set up some secret agreement with

15   Rick Singer and his fake charity to funnel donations

16   through that charity that served underserved kids in

17   order to legitimize anything good faith about

18   Zangrillo's actions.

19        It's ridiculous.  This is a complete side show,

20   completely unrelated to the issues at hand, and we

21   intend fully, if any of the documents are gotten, to

22   file a motion in limine to admit.

23        The sole question is:  Did Mr. Zangrillo know

24   about that?  And there's been -- know about this

25   process of getting in?  And there's been absolutely no

1   shred of evidence suggesting that, for Amber Zangrillo,

2   he did.

3        MR. WEINBERG:  Mr. Zangrillo will demonstrate to

4   a jury that he had a good-faith basis to know of the

5   VIP program, to know the President of USC knew of the

6   VIP program.  The document I provided Your Honor is one

7   of several that will support Mr. Zangrillo's good

8   faith.

9        Mr. Singer charged him money that Mr. Zangrillo

10  fully understood would go to USC, but it was paid on

11  the date or several days before the Government flipped

12  Mr. Singer.  So Singer kept the money rather than

13  donating it to USC.

14       The evidence from the audiotapes will

15  demonstrate Mr. Singer, the Government's pivotal

16  witness, to be mendacious, to be extortive, to lie to

17  parents, to fill out applications like the one that

18  Mr. Rosen just read.  Mr. Zangrillo or his daughter

19  didn't fill out that application.

20       Mr. Zangrillo didn't need Mr. Singer to fill out

21  an application that contained anything about rowing.

22  He had plenty of recommendations from responsible

23  credible people in the USC family, and we'll make that

24  presentation ex parte, Your Honor.  She was admitted as

25  a VIP, not as a rower, and I don't think this is the

1    time, in a 17(c) subpoena between USC and myself, for

2    the Government to try to diminish the Sixth Amendment

3    right of Mr. Zangrillo.

4           THE COURT:  Sure.  So, Mr. Rosen, Mr. Zangrillo

5    still gets to put on his defense.  I know you feel very

6    passionately about your case, but he's still entitled

7    to subpoena -- he's still entitled to compulsory

8    process to subpoena things that are relevant to his

9    defense.  So you're -- and I hear you, but I think this

10   is enough for this afternoon.

11          MR. WEINBERG:  Thank you, Your Honor.

12          THE COURT:  So the way we're going to leave this

13   now is the parties -- USC and Mr. Zangrillo's counsel

14   will confer and see what kind of agreement you can

15   reach.  If you want him to issue another subpoena,

16   that's fine, for some limited information.

17          And I'll let you file something.  You can file

18   something else, if you wish.  I'm not going to decide

19   the bigger motion in the next week, at least -- I'll

20   say at least for two weeks.

21          And I don't know if you want to revise your

22   subpoena.  I know there have been some changes, and

23   Mr. Fuchs was right about that.  You may want to redo

24   that --

25          MR. WEINBERG:  Thank you.

1    THE COURT:  -- after you confer and see what

2    kind of information you can agree on.

3    MR. FUCHS:  And Your Honor, thank you.  You

4    know, perhaps -- a slight revision in the plan perhaps.

5    I'll confer with him.  If we can reach an agreement, it

6    moots the motion and maybe prevents you from doing a

7    lot of work and maybe even some additional briefing.

8    I'll talk with him about it, and maybe we can

9    inform the Court whether we're going to be able to come

10   to some agreement based on all of the changes in the --

11   THE COURT:  Why don't you take ten days to

12   confer and let the Court know what your plan is.  And

13   forget what I said and -- strike that, and we'll just

14   let you see what you can work out.

15   MR. WEINBERG:  Thank you, Your Honor.

16   MR. FUCHS:  Thank you, Your Honor.

17   THE COURT:  Okay.  Thank you very much.

18   THE CLERK:  Court's in recess.

19   (Adjourned, 4:10 p.m.)

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Debra D. Lajoie

9/23/19