UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
UNITED STATES OF AMERICA )
)
v. )
)   CRIMINAL NO. 19-10080
)   Leave to File Granted on May 13, 2020
DAVID SIDOO, et al )
Defendants )
)
_____)

**DEFENDANTS' REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO THEIR MOTION TO SUPPRESS TITLE III INTERCEPTIONS OR ALTERNATIVELY FOR A *FRANKS* HEARING**

Now come the Defendants Robert Zangrillo, Amy Colburn, John Wilson, Elisabeth Kimmel, Marci Palatella, I-Hsin Chen, and William McGlashan, Jr., by and through undersigned counsel, and respectfully submit this Reply to the Government's Response in Opposition to their Motion to Suppress Title III Interceptions or Alternatively for a *Franks* Hearing.  *See* Dkt. 1138 at 11-16.[1]  The government's response is notable for the points it does not dispute:  (1) that neither Rick Singer nor his phone entered this jurisdiction during the period of interception until Singer was summoned by a government cooperator with just seven days remaining before the expiration of the fourth and final Title III Order; (2) that Singer was alleged to have participated in no calls to or from this district, other than a single call initiated by the government through a cooperator; (3)  that no target or subject of the investigation resided in Massachusetts; and (4)

_____
[1] Defendants will file a separate brief addressing the government's contention that the Title III affidavits established the requisite necessity for the wiretap Orders.

1

that no overt act in furtherance of Singer's alleged scheme occurred in this state prior to or during the approximately four-month wiretap period (June-September 2018) beyond a handful of meetings and calls, as well as a bank transfer, each arranged by the government.

The government nonetheless insists that, for purposes of determining the existence of the requisite "territorial jurisdiction" under Title III, the interceptions of Singer's phone occurred in Massachusetts. This contention is based almost entirely upon an uncritical acceptance of a line of decisions from other circuits. But, as the government neglects to even mention in its Response, the validity of the so-called "listening post" theory is an open question in this jurisdiction.[2] The out-of-circuit cases cited by the government constitute non-binding authority, to be followed only so far as their persuasive power warrants. *See, e.g.*, *Sullivan v. City of Augusta*, 511 F.3d 16, 42 (1st Cir. 2007) ("Plaintiffs have cited several circuit and district court cases in support of their contrary position, but these, of course, are not binding upon us . . . ."); *Lewis v. United States*, 637 F. Supp. 2d 71, 72-73 (D. Mass. 2009) (Gorton, J.) (rejecting defendant's argument on a separate issue based on Second Circuit precedent). The notion that the government can select amongst ninety-four federal districts as the appropriate venue to

---

[2] The government inaccurately represents that the Supreme Court in *Dahda* "concluded" that the location of the government's listening post within a judicial district was sufficient to create territorial jurisdiction. Dkt. 1138 at 12. The *Dahda* Court's opinion, in fact, makes clear that the defendants had conceded the issue. *See Dahda v. United States*, 138 S. Ct. 1491, 1495 (2018) ("The Government here adds (without the Dahdas' disagreement) that an intercept takes place *either* where the tapped telephone is located *or* where the Government's 'listening post' is located."). Because the validity of the listening post theory was not disputed in *Dahda*, the Court had no occasion to rule on it. *See, e.g.*, *United States v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 855 (1996) (opining that "[i]t would be inappropriate for us to reexamine in this case, without the benefit of the parties' briefing," an issue that the government had "chosen not to challenge").

2

establish a listening post where it records wire communications that occur and were anticipated to occur exclusively out of the district, without regard to whether there is an appropriate nexus between the selection of the site of the listening post and the known or foreseeable locations of the persons and phones that are to be intercepted, allows the government unfettered discretion to "forum shop" without regard to the underlying requirements of Title III that (with exceptions not applicable here) only vest a court with "territorial jurisdiction" with the power to order the interception of wire communications.

The Second Circuit's 1992 decision in *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992) appears to have been the genesis of the listening post theory. The Second Circuit set forth two rationales for its holding that territorial jurisdiction existed wherever the government chose to locate its listening post. First, because the statute defined "intercept" to include "the aural or other acquisition of the contents" of a wire communication, "the interception must . . . be considered to occur at the place where the redirected contents are first heard." *Id.* at 135-36. Second, the *Rodriguez* majority believed the listening post theory would advance Title III's goal of protecting privacy because, "[i]f all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided." *Id.* at 136. Each of the subsequent decisions cited by the government on this issue relied heavily upon one or both of *Rodriguez*'s twin rationales.

But *Rodriguez* was not a unanimous decision and, in his concurring opinion, Judge Meskill convincingly articulated the flaws in the majority's reasoning. As Judge Meskill made clear, the word "aural" was included in the statutory definition of "intercept" "principally to

3

place devices such as pen registers and trap and tracing mechanisms (which do not capture the

sounds of a conversation) outside the scope of Title III." *Id.* at 144 (Meskill, J., concurring)

(citing legislative history).  That some courts have seized upon this definition "to mean that the

territorial jurisdiction requirement of section 2518(3)," which (like many other statutory

provisions) uses the term "interception," "applied to the place where the communications were

first heard was at most an unintended artifact of the structure of the statute." *Id.* (citation

omitted).  Addressing the majority's policy justification, which was offered with no empirical

support, Judge Meskill noted that, to the contrary, "judges may be more hesitant to authorize

excessive interceptions within their territorial jurisdiction, in their own back yard so to speak,

than in some distant, perhaps unfamiliar, part of the country." *Id.* at 145.  As Judge Meskill

concluded, the government's "unilateral decision . . . as to where to set up [its] listening post"

should not "grant authority to a judge in any jurisdiction to authorize a phone tap in any other

jurisdiction." *Id.* at 144.

      The defendants respectfully submit that Judge Meskill's analysis is far more persuasive

than the *Rodriguez* majority's.  With respect to statutory language, the "acquisition" of the

contents of a communication occurs where the communication is initially diverted by law

enforcement.  *See id.* at 144; Black's Law Dictionary (8th ed. 2004) (defining "acquisition" to

mean "[t]he gaining of possession or control over something").  The communications do not

"become acquired anew each time they are transformed into a different medium." *Rodriguez*,

968 F.2d at 144 (Meskill, J., concurring).  And the definition does not require that the acquisition

be aural; rather, it acknowledges that an interception may involve the "aural ***or other*** acquisition

of the contents" of a communication.  18 U.S.C. § 2510(4) (emphasis added).  Here, the contents

of Singer's calls were not acquired by the government, aurally or otherwise, in Massachusetts.

They were, rather, acquired in California, where the communications themselves occurred.  The

fact that the government chose to review the communications in Massachusetts should not affect

territorial jurisdiction.  Turning to policy, Title III's goal of protecting privacy is not advanced

by an interpretation of the statute that permits "any federal district court, circuit court of appeals

or appropriate state court [to] authorize a wiretap any place in the country."  *Rodriguez*, 968 F.2d

at 144 (Meskill, J., concurring).  Such a rule plainly encourages forum shopping.  *See United

States v. Jackson*, 207 F.3d 910, 914 (7th Cir. 2000) ("[T]he potential for abuse is undeniable.").

While the government suggests that these concerns "are no longer relevant in the age of cellular

phones," Dkt. 1138 at 13, this case proves the opposite.  Singer, as well as the majority of his

alleged co-conspirators, resided in California.  Singer's phone never entered Massachusetts until

the very end of the approximately four-month interception period, and his only identified call to

or from that state was placed by a government cooperator, likely in an attempt to manufacture

venue.  In these circumstances, the government's tactical decision to seek authorization for a

wiretap from this Court squarely implicates the danger of forum shopping identified by Judge

Meskill.

    The government's citations to cases dealing with the issue of manufactured venue are

clearly inapt.  Title III expressly requires that "interception" occur "within the territorial

jurisdiction" of the authorizing Court.  18 U.S.C. § 2518(3).  Because the sole call reflected in

the affidavits made to or from Massachusetts, occurring in April 2018 before the first Title III

application, was initiated by the government, there was simply no reason to expect future interceptions in Massachusetts. The manufactured venue cases also acknowledge that, "to the extent that prosecutorial forum shopping is a concern in a given case, it is more appropriately handled at the trial level by a transfer to a more reasonable forum under Federal Rule of Criminal Procedure 21." *United States v. Valenzuela*, 849 F.3d 477, 488 (1st Cir. 2017) (citation omitted). In the context of Title III territorial jurisdiction, defendants have no similar alternative recourse. Concerns about prosecutorial overreach must be addressed now, if at all.

The government also provides no developed response to the defendants' argument that a *Franks* hearing is required regarding misleading statements and omissions on the issue of territorial jurisdiction. Just as the Fourth Amendment presumes that the government's presentation to support a finding of probable cause must be "a *truthful* showing," *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) (citation omitted), so too does Title III's requirement of territorial jurisdiction demand that the facts presented to the issuing judge be accurate. If *Franks* did not apply in this context, the government would be free to flout the statutory limitation with little consequence. Here, the government simply responds that, because its unilateral decision to setup a listening post in Massachusetts conferred territorial jurisdiction, "there was *no* omission." Dkt. 1138 at 14. But this legal conclusion, which the defendants disagree with for all of the reasons set forth above, does nothing to change the fact that the Title III affidavits contained a number of misleading omissions regarding the connection between Singer's alleged scheme and this jurisdiction (or lack thereof).

*Even assuming arguendo that the government is correct regarding the listening post*

6

theory and the Court possessed the legal authority to authorize the interceptions, the Court was nonetheless not required to do so*. *See* 18 U.S.C. § 2518(3) ("Upon such application the judge *may* enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting . . . ." (emphasis added)); *United States v. Alvarez-Gonzalez*, No. 12-CR-00242, 2013 WL 12196764, at *1 (D. Colo. Oct. 23, 2013) ("The judge to whom the application for a wiretap is submitted has considerable discretion to grant or deny the application."). Before making this decision, the Court was entitled to complete and accurate information that would have permitted it to consider, among other things, whether the Central District of California would have been a more appropriate venue for the government to seek authorization.

As laid out in the defendants' initial motion, *see* Dkt. 1015 at 14-15, each of the four affidavits in this case represented that, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Recklessly omitted was the fact that all of the overt acts occurring in Massachusetts were government-initiated.  This omission was important because, given that the government was responsible for all overt acts occurring in Massachusetts, there was no reason to believe that any communications would be intercepted in Massachusetts going forward that could not be consensually taped by one of the consenting participants. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████  The government neglected to mention that, even after about three months of monitoring, there

7

was no evidence that Singer's phone had ever been used inside the jurisdiction.

The government affidavits also contained misleading omissions of information that would have undermined the parents' purported complicity in Singer's scheme.  As an initial matter, the government incorrectly frames the issue as whether, absent such omissions, "the affidavits presented sufficient evidence to find probable cause that the wiretap of Singers' phone and email would reveal evidence of his scheme."  Dkt. 1138 at 15.  Of course, even at the time the first affidavit was executed, the government had a wealth of evidence regarding Singer's fraud, including a cooperating witness, multiple recorded calls, emails, and bank records.  ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████  The government repeatedly claimed that continued interception was needed, in part, to obtain evidence against the parents working with Singer.  ████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

8

████████████████████ Accordingly, the government cannot now claim that its misrepresentations regarding the parents are irrelevant simply because it had enough evidence to prosecute Singer at the outset.  Indeed, the government continues to cite its desire to investigate and prosecute the parents in opposing the defendants' argument that the Title III affidavits failed to establish the requisite necessity for interception.  *See* Dkt. 1138 at 19-20.

In its Response, the government represents that, prior to the June 11, 2018 call intercepted pursuant to the first Title III Order, it possessed no "evidence that Zangrillo *knew* his daughter was being presented as a fake rower and that his payments to USC and Singer were bribes."  Dkt. 1138 at 7.  The government claims that Mr. Zangrillo's after-the-fact understanding of his daughter's application, which was submitted to USC more than four months prior to the call, is dispositive and negates any possible defense predicated upon the undisputed fact that Mr. Zangrillo's daughter was actually admitted as part of the university's regular and legitimate VIP admission process and not as an athlete or a purported athlete.  The government is wrong as a matter of law.  Federal courts apply a bilateral theory of conspiracy, under which "at least two people commit the act of agreeing" or "no one does."  *United States v. Harris*, 733 F.2d 994, 1005 (2d Cir. 1984).  Accordingly, even assuming *arguendo* that Mr. Zangrillo believed his daughter would be admitted as a rower, a conspiracy conviction requires proof that he and at least one other individual agreed to pursue this objective.  In fact, the very email relied upon by the government actually undercuts the existence of any such agreement.  On August 28, 2017, Heinel emailed Singer listing various prospective students and their associated sports.  Mr. Zangrillo's daughter was the only one of the eleven students in the email with no sport listed next to her name.  *See* Email attached hereto as Exhibit 1.  Singer responded, "█████████

Zangrillo- transfer."[3]  The government, however, did not disclose in its affidavits that Mr.

Zangrillo's daughter was indisputably admitted through USC's annual VIP process and not as an

athlete nor otherwise through USC's "Subco" program.  This omission was both reckless and

material under *Franks*.  The circumstances of Mr. Zangrillo's daughter's admission, coupled

with the other omitted evidence indicative of the parents' lack of culpability, *see* Dkt. 1015 at 15-

18, would have suggested that there was no probable cause to believe that the parents who

enlisted Singer's services were implicated in his suspected bribery of coaches.

       For the foregoing reasons, as well as those set forth in their initial motion, the defendants

respectfully request that the Court suppress the contents of any conversations intercepted pursuant to

the four Title III Orders issued in this case, as well as any evidence derived therefrom.


                                Respectfully Submitted,
                                ROBERT ZANGRILLO
                                By His Attorneys,

                                **/s/ Martin G. Weinberg**
                                Martin G. Weinberg, Esq.
                                Mass. Bar No. 519480
                                20 Park Plaza, Suite 1000
                                Boston, MA 02116
                                (617) 227-3700
                                owlmgw@att.net

                                Matthew L. Schwartz

---

[3] This characterization is entirely consistent with Heinel's subsequent explanation to Singer that Mr. Zangrillo's daughter "was not presented as an athlete we just advocated for her with Tim [Brunold, USC Dean of Admissions] and Kirk [Brennan, USC Director of Admissions] as a transfer.  She went over on our VIP list for transfers."  Email attached hereto as Exhibit 2.

Boies Schiller Flexner
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 303-3646
mlschwartz@bsfllp.com


AMY COLBURN
By Her Attorneys,

**/s/ David S. Schumacher**
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com


JOHN WILSON
By His Attorneys,

**/s/ Michael Kendall**
Michael Kendall (BBO # 544866)

11

Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

ELISABETH KIMMEL
By Her Attorneys,

**/s/ R. Robert Popeo**
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

MARCI PALATELLA
By Her Attorneys,

**/s/ Michael K. Loucks**
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &

12

FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com


I-HSIN CHEN
By His Attorney,

**/s/ Reuben Camper Cahn**
Reuben Camper Cahn (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel. (949) 476-8700
rcahn@kelleranderle.com


WILLIAM McGLASHAN, Jr.
By His Attorneys,

**/s/ Jack W. Pirozzolo**
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)
jhueston@hueston.com

13

Case 1:19-cr-10080-NMG   Document 1183   Filed 05/13/20   Page 14 of 14


Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

Dated: May 12, 2020

### CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, May 12, 2020, a copy of the foregoing document has been served via hand-delivery on counsel for the government.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

14