**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> ROBERT ZANGRILLO, <br><br> Defendant. | Case No. 19-cr-10080 |

**ROBERT ZANGRILLO'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS COUNTS ONE AND FOUR INSOFAR AT THEY ALLEGE CHEATING ON ONLINE COURSES**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ...................................................................................................................1

I.      COUNTS ONE AND FOUR OF THE INDICTMENT ARE DUPLICITOUS ...................1

II.     THE CLASS-TAKING SCHEME IS NOT A FEDERAL CRIME ...................................6

         A.      Having A Tutor Assist With Online Classes Does Not Qualify As A Wire
                Fraud, Where The Object Of The Fraud Is Admission To College. ........................6

         B.      The Class-Taking Conduct Was Immaterial To Any Admissions Decision,
                And In Any Event Boston University Was Not Defrauded. ...................................8

CONCLUSION ............................................................................................................10

Robert Zangrillo respectfully submits this reply memorandum of law in further support of his motion to dismiss Counts One and Four of the Fourth Superseding Indictment.

**ARGUMENT**

**I.      COUNTS ONE AND FOUR OF THE INDICTMENT ARE DUPLICITOUS**

Counts One and Four are duplicitous because they each charge two entirely different schemes in a single count, creating a substantial risk that Mr. Zangrillo could be convicted without the jury unanimously concluding that he committed the same crime.

In response, the government argues that the class-taking scheme and the bribery scheme are merely different means to achieve the single goal of securing admission to college.  But this argument confuses the *aim* of an offense with the offense itself.  For example, a defendant who wishes to steal money from a bank could engage in a complex check-kiting scheme, or she could stage an armed robbery.  Both offenses share the same goal—to wrongfully obtain money from the bank—but it would be patently improper to charge both offenses in one count.  A similar problem would occur if a defendant targeted the bank in separate schemes to defraud—for example, the check-kiting scheme, but also by hacking into the bank's computers to make unauthorized transfers.  If both offenses were charged in a single wire fraud count, it would run the risk that jurors could fail to reach a unanimous verdict on either offense yet still convict because, say, five jurors believed the defendant engaged in the check-kiting and the other seven believed she made the unauthorized transfers.  This is exactly the result that the doctrine of duplicity is meant to guard against.

The class-taking scheme and the bribery scheme alleged in the Indictment present an analogous situation: they are not merely different means to engage in the same offense, but rather entirely separate offenses, even if the government alleges that they shared the same goal.

Where a defendant challenges as duplicitous an indictment which purports to charge a single scheme, courts consider whether the acts "were performed by the same parties and have a sufficiently close nexus with one another that they are fairly characterized as one scheme." *United States v. Zeidman,* 540 F.2d 314, 317 (7th Cir. 1976).  This tracks the factors that the First Circuit has considered when determining whether a single conspiracy is alleged, which include "the times when the relevant activities transpired; the locations at which the activities occurred; the identities of the persons involved; the coconspirators' ends; the means used to achieve those ends; and the similarities (or differences) in the evidence used to prove the two conspiracies." *United States v. David*, 940 F.2d 722, 734 (1st Cir. 1991).[1]

In this case, it is undisputed that the class-taking scheme and the honest services bribery scheme involve different locations, different people, and different direct evidence.  According to the government, the class-taking scheme allegedly involved Mr. Zangrillo conspiring with Rick Singer and two tutors to complete online classes on behalf of Mr. Zangrillo's daughter.  The grades in those classes were then, according to the Indictment, submitted to schools that had no knowledge of how those grades were obtained.  The honest services bribery scheme, on the other hand, allegedly involved Mr. Zangrillo conspiring with Singer and USC's Senior Associate Athletic Director Donna Heinel to pay a donation to USC in order to ensure Mr. Zangrillo's daughter's admission to USC.  Besides the fact that Singer was involved in both schemes, the schemes differ in time period, actors, and actions, and thus do not share a sufficiently close nexus to be considered one offense.  Moreover, the goal of the class-taking scheme could not possibly have been identical

---

[1]     With respect to the conspiracy count (Count One), the government has charged both schemes as a single *object* of the conspiracy.  FSI ¶ 65.  Thus, while it is true that a conspiracy may have multiple objects, that is not how the government chose to structure its Indictment in this case with respect to the two wire fraud schemes.

to the goal of the bribery scheme—to "secure the fraudulent admission to college," as the government claims—since the government acknowledges that, at least with respect to BU, Mr. Zangrillo's daughter *already was admitted* to college before the alleged cheating took place. *See* FSI ¶¶ 254, 256.

The government's cases do not require a different result. Those cases stand for the general proposition that "[s]chemes to defraud are often, by their nature, complex" and thus may include "multi-faceted patterns of criminal activity." *United States v. Prieto*, 812 F.3d 6, 12 (1st Cir. 2016). No doubt. But the government still must establish that each count of the indictment charges a single offense; it is not sufficient to simply observe that frauds are "complex." Not a single one of the cases cited by the government support joining different schemes into a single, multi-faceted fraud charge. Rather, they support the proposition that similar conduct undertaken as part of a single scheme can be charged as one offense. *See, e.g.*, *United States v. Holt*, 777 F.3d 1234, 1264 (11th Cir. 2015) (single drug conspiracy existed despite sub-agreements to sell drugs); *United States v. LaPlante*, 714 F.3d 641, 642 (1st Cir. 2013) (multiple false statements to lenders part of a single mortgage fraud); *United States v. Crummer*, 151 F.2d 958, 963 (10th Cir. 1945) (count not duplicitous that included several false statements made in furtherance of a bond scheme).

The analogy to this case, for example, would be if the Indictment charged Mr. Zangrillo in a single count with paying Singer for numerous of his daughter's classes—such a count would permissibly charge multiple acts of dishonesty that were part of a common scheme in a single count. An Indictment could also permissibly (as a matter of duplicity, at least) charge Mr. Zangrillo with submitting a transcript containing grades procured through the class-taking scheme to multiple colleges. But in this case, the Indictment charges Mr. Zangrillo in a single count with engaging in entirely different schemes. And, as set out in Mr. Zangrillo's opening brief, (ECF

3

1044 at 9-11), the two charged schemes are inconsistent with one another. While the government disputes this and asserts without elaboration that the two schemes were "reinforcing," (ECF 1137 at 8, n.3), it cannot argue that the class-taking and bribery were both necessary "predicate steps" to achieve the goal of getting Mr. Zangrillo's daughter into college, such that "but for" those predicate steps, the fraud would not have succeeded—which is the defining characteristic of what makes conduct merge into a single offense. *See, e.g., Prieto*, 812 F.3d at 11 (finding that lying to homeowners, straw buyers, and lenders was all part of single mortgage fraud because each was an indispensable part of the scheme: the fraud "would not have been achieved *but for the predicate steps* of deceiving the homeowners and the straws who could lose homes or assume liabilities as a byproduct of Prieto's setting up the surprisingly gullible lenders." (emphasis added)).

Courts routinely reject as duplicitous the exact type of over-broad characterization of offenses that the government advances here. In *United States v. Witasick*, No. 4:07-CR-00030, 2008 WL 1924023, at *1 (W.D. Va. Apr. 28, 2008), for example, the government charged the defendant with separate counts of tax evasion, perjury on his tax returns, and failure to file taxes, all occurring between 1999 and 2001. In addition to these substantive counts, the indictment charged all of these offenses as a "general conspiracy" on the theory that there was "one broad conspiracy with the overarching goal of personal enrichment." *Id*. The court rejected this argument and dismissed the conspiracy count as duplicitous because there was "insufficient grounds to group together unrelated acts which occurred at largely different times." *Id*. The court found this true notwithstanding the fact that each substantive count could be characterized as part of an overarching scheme to defraud the IRS and achieve "personal enrichment."

Similarly, in *United States v. Simmons*, No. 13-cv-20184, 2013 WL 5933679, at *5 (E.D. Mich. Nov. 4, 2013), the defendant was charged with one count of witness tampering "based upon

4

several different actions that [the defendant] allegedly took, over the course of several weeks."

Even though the different acts shared the same goal of intimidating a witness, the court dismissed

the count as duplicitous, holding that "[s]uch separate actions by [the defendant] . . . are not mere

multiple factual predicates but rather are entirely separate offenses." *Id*. at *6.  The court explained

how the "vice of duplicity" could prejudice the defendant if the case proceeded to trial: "Because

there is just one count that the jury would return a verdict on, there would be no way of knowing

which of the alleged actions the jury found that [the defendant] committed.  And worse yet, there

would be no way to know if, in fact, the jury *unanimously* agreed on *any one* of those different

actions." *Id*.

The same is true if Mr. Zangrillo proceeds to trial on Counts One and Four.  Since both

Counts allege two entirely separate offenses, there is a significant risk that a jury could convict

Mr. Zangrillo without having reached a unanimous verdict.  "For example, if Count [Four] of [the]

indictment charges a defendant with having committed two offenses, A [class-taking] and B

[bribery], a conviction would be possible even if Jurors 1–6 found only that the defendant

committed offense A, and jurors 7–12 found only that the defendant committed offense B." *United*

*States v. Valerio*, 48 F.3d 58, 63, n.2 (1st Cir. 1995).

The government acknowledges the very real threat of such a verdict, (ECF 1137 at 8), but

argues that the Court should be unconcerned because there is no requirement that the jury be

unanimous as to the *manner* in which a charged offense is executed.  But that logic is circular.

Because the government cannot show that the class-taking scheme and the honest services bribery

scheme are mere "means" of executing the charged offense as opposed to two separate offenses,

Counts One and Four must be dismissed as duplicitous.[2]

If the Court does not dismiss Counts One and Four, the Court should at the very least—as the government acknowledges is an appropriate remedy for duplicity (ECF 1137 at 8 n.4)—require the government to affirmatively elect which offense it chooses to go forward with before trial begins. *United States v. Luthra*, 15-cr-30032, 2017 WL 11447192, at *2 (D. Mass. Sept. 26, 2017).

## II.   THE CLASS-TAKING SCHEME IS NOT A FEDERAL CRIME

### A.   Having A Tutor Assist With Online Classes Does Not Qualify As A Wire Fraud, Where The Object Of The Fraud Is Admission To College.

Duplicity aside, the alleged class-taking conduct is simply not a federal crime.  Far from establishing otherwise, the government's brief and accompanying chart of "representative cases" only serve to highlight the unprecedented nature of its prosecution of Mr. Zangrillo.  Not a single one of the cases that the government cites purports to have the object of the scheme be a college admission slot.  As the attached chart shows, the object of the schemes in each of those cases was to obtain money in some form or fashion—in the form of grants, tuition benefits, scholarship money, and the like.  *See* Zangrillo Exhibit 1.[3]  Every single one of the cases that the government cites advances a traditional theory of property, even though the cases may arise in the academic

---

[2]      Count Four is especially problematic because it charges a substantive wire fraud involving a single wire—the e-mail containing Mr. Zangrillo's daughter's transcript to BU—but still purports to include both offenses.  A jury would likely be confused into believing that the bribery allegations are somehow relevant to the Count Four wire fraud due to that count's duplicity.

[3]      The only exception is *United States v. Littlefair*, No. 19-CR-10465 (D. Mass. 2019), which is part of this same so-called "Varsity Blues" prosecution.  To state the obvious, the government cannot point to this case as precedent for the charges in this case.  The only other case cited by the government that even comes close to this one is *United States v. Cross*, Nos. 05-CR-10197 & 05-CR-10232 (D. Kan. 2005).  But those cases involved two (separately-charged) schemes, one to obtain money in the form of Federal Work Study pay for no-show jobs, and the other to deprive a university of the honest services of a potential NCAA basketball player by fraudulently obtained college credits.  College credits and resulting NCAA eligibility fit more comfortably into traditional wire fraud concepts than the conduct alleged in this case.  In any event, the defendants in *Cross* all pleaded guilty without ever testing the sufficiency of the government's theory.

6

context.  *Id.*  This is not surprising because it is well established that the wire fraud statute "prohibits only deceptive 'schemes to deprive [victims of] money or property,'" *Kelly v. United States*, No. 18-1059, — U.S. —, 2020 WL 2200833, at *4 (Sup. Ct. May 7, 2020) (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)), which must not "stray from traditional concepts of property," *Cleveland v. United* States, 531 U.S. 12, 24 (2000).

The case against Mr. Zangrillo, on the other hand, does not rely on a traditional concept of property.  The type of academic dishonesty alleged in the Indictment, while not praiseworthy, does not involve the requisite deprivation of property sufficient to state a claim under the wire fraud statute.  No scholarship fund, university, government, or individual has been affected with respect to its property rights because Mr. Zangrillo's daughter received assistance in her online classes.  This stands in stark contrast to every case in the government's chart, where institutions lost money as a result of the fraud.[4]  As the Supreme Court reiterated again last week in *Kelly v. United States*, the wire fraud statute does not criminalize "all acts of dishonesty," even in cases where the "deception, corruption, [and] abuse of power" is clear.  2020 WL 2200833, at *2, 4.  This is because "not every corrupt act  . . . is a federal crime."  *Id*. at 7.  There must be some limiting principle.

The government fails to offer any such principle.  While the class-taking charge pushes the

---

[4]  The government highlights *United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011), claiming that academic dishonesty routinely is charged as wire fraud.  The cheating allegations in *Barrington* could not be more different from this case.  In *Barrington*, college students illegally installed software on university computers to capture university administrators' usernames and passwords so they could access the university's grading system and inflate 650 grades and change students' residencies to in-state.  *Id*. at 1184.  The Eleventh Circuit affirmed the wire fraud conviction, but specifically noted that its decision was based on the fact that the university "undeniably had a property right in tuition generated by class hours a student registers for, as well as the higher tuition paid by non-resident students."  *Id*. at 1191-92.  That is, the grade-inflation and change of residence cost the university money in the form of lost tuition.

wire fraud statute far beyond its "core meaning," the government does not even attempt to explain what differentiates the allegations here from every other case of academic dishonesty in which a student cheats, or receives outside assistance, in order to get better grades so as to increase his or her collegiate or job prospects— it just asserts without explanation that they are "not the same." (ECF 1137 at 10). Just last month, BU announced that it was investigating whether students who were forced to take classes at home due to COVID-19 cheated on quizzes by obtaining assistance from online tutors.[5] Does the government plan on indicting those students, or is this a question of academic discipline to be handled by BU? To the extent the government sees a difference between basing a wire fraud change on the class-taking allegations and charging current BU students studying at home due to COVID-19 with wire fraud, it fails to articulate a single difference.

The government also claims that it is "irrelevant" that its theory of fraud is "new and novel." *Id.* But the vague, unprecedented, and expansive nature of the government's theory is precisely why the Supreme Court warns against overbroad interpretations of the mail and wire fraud statutes and has repeatedly declined to "construe the statute in a manner that leaves its outer boundaries ambiguous." *McNally*, 483 U.S. at 360. Because the application of the wire fraud statute here gives rise to issues of lenity and vagueness, Counts One and Four of the Indictment, to the extent they allege a class-taking scheme, should be dismissed as to Mr. Zangrillo.

**B.      The Class-Taking Conduct Was Immaterial To Any Admissions Decision, And In Any Event Boston University Was Not Defrauded.**

In an attempt to kick the can down the road, the government misstates the materiality standard, claiming that the Court may not analyze the issue on a motion to dismiss. As the First Circuit has made clear, however, materiality "presents a mixed question of law and fact." *United*

---

[5]      Deirdre Fernades, "*BU Investigating Whether Students Cheated On Online Exams*," Boston Globe, Apr. 29, 2020, available at https://www.bostonglobe.com/2020/04/29/metro/bu-investigating-whether-students-cheated-online-exams/.

*States v. Weed*, 873 F.3d 68, 73 (1st Cir. 2017).  While materiality often is determined by a jury, "where the relevant misstatements are so obviously important or unimportant . . . that reasonable minds cannot differ on the question," courts may resolve the question "as a matter of law" on a motion to dismiss.  *Id.* (internal citations omitted).[6]

Here, the government's materiality argument fails as a matter of law.  With respect to the BU allegations, reasonable minds cannot differ that the alleged misstatements were immaterial to BU's admission decision because Mr. Zangrillo's daughter had already been admitted before the alleged cheating occurred.  BU could not have been defrauded of an admissions slot because it is undisputed that Mr. Zangrillo's daughter was offered admission to BU before any allegedly fraudulent conduct began.  In response, the government argues that communications that come after a defendant obtains money or property may be "in furtherance of" a scheme.  (ECF 1137 at 13).  That is true, but the government's own cases establish that the money or property must have itself been originally acquired as part of the fraud; if so, then after-the-fact communications may be in furtherance of it.  Here, however, BU's admissions decision was untainted by fraud.

The government's only other argument is that, even if the class-taking was not material to the admissions decision, it was material to BU's decision to allow Mr. Zangrillo's daughter to "matriculate" in the fall.  (*Id.* at 11).  This argument conflates an admissions slot—the property that is allegedly the object of the scheme—with the ability to matriculate at a university, something entirely different and uncharged.  Many things must occur before a student can matriculate at a university, such as passing a physical examination, providing proof of vaccinations, paying the

---

[6]      Several courts in this Circuit have dismissed claims as immaterial on a motion to dismiss. *See, e.g.*, *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41 (D. Mass. 2016), *aff'd,* 857 F.3d 34 (1st Cir. 2017), and *aff'd*, 857 F.3d 34 (1st Cir. 2017); *Gerneth v. Chiasma, Inc.*, No. 16-CV-11082, 2018 WL 935418, at *3 (D. Mass. Feb. 15, 2018).

first tuition installment, and graduating high school. If any one of those things does not occur, the university may not allow the student to begin classes, but that has nothing to do with whether she was *admitted* to the university—which is the only thing the Indictment charges.

The defendant also contends that the alleged cheating was not legally material to USC's admissions decision, under the government's own theory. The entire premise of the bribery claim is that Mr. Zangrillo's daughter's admission to USC was essentially guaranteed because of the alleged quid pro quo. The government argues that—notwithstanding the fact his daughter was actually admitted through the USC-sanctioned VIP program—Mr. Zangrillo and Singer conspired to present his daughter as a crew recruit so that she could be guaranteed admission through athletics. On that theory, however, Mr. Zangrillo and Singer were conspiring to bribe USC officials to admit his daughter irrespective of a course-by-course analysis of her transcript. If her admission was, as the government posits in its theory of prosecution, little more than a foregone conclusion, then the cheating or the individual grades on her transcript could not possibly have been material to USC's admissions decision.

The government's response that the class-taking and the bribery allegations are not incompatible because they were "aimed at the same end," (*id.* at 8, n.3), does no work to explain the obvious tension. Because it would be impossible to show that the grades were material to USC's admissions decision while simultaneously arguing that Mr. Zangrillo's daughter only was admitted to USC because of a bribe, the government will be unable to establish materiality. And in trying to do so, the government will underscore the duplicity problems discussed above.

## CONCLUSION

Accordingly, this Court should dismiss Counts One and Four of the Indictment.

Dated:  May 15, 2020                        Respectfully,

                                            */s/ Martin G. Weinberg*
                                            Martin G. Weinberg, Esq. (BBO # 519480)
                                            20 Park Plaza, Suite 1000
                                            Boston, MA  02116
                                            Tel: (617) 227-3700
                                            owlmgw@att.net

                                            Matthew L. Schwartz (*admitted pro hac vice*)
                                            Sara K. Winik (*admitted pro hac vice*)
                                            BOIES SCHILLER FLEXNER LLP
                                            55 Hudson Yards, 20th Floor
                                            New York, NY 10001
                                            Tel: (212) 446-2300
                                            mlschwartz@bsfllp.com
                                            swinik@bsfllp.com

                                            *Counsel for Robert Zangrillo*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed with the Clerk of the United States District Court for the District of Massachusetts via the CM/ECF system, which will notify all participants in the case who are registered CM/ECF users; these are identified on the Notice of Electronic Filing.

/s/ Martin G. Weinberg
Martin G. Weinberg
