**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

      v.

DAVID SIDOO et al.,

         Defendants.

Case No. 19-cr-10080-NMG

***Leave to File Reply Brief***
***Granted on 5/5/20 (ECF No. 1156)***

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE MONEY LAUNDERING CONSPIRACY (COUNT III)**

## INTRODUCTION

The government's opposition agrees with nearly everything in the defendants' initial memorandum, leaving just one question for the Court to decide: whether the money allegedly transferred from The Key to university officials was "the proceeds of a specified unlawful activity."[1/] In the Fourth Superseding Indictment, ECF No. 732, the government specified neither the alleged money laundering transaction nor the specified unlawful activity ("SUA") that generated the alleged proceeds. But the government clarified much about its money laundering theory in its opposition to the motion to dismiss.[2/] This reply brief responds to arguments made in the government's opposition and to the theories of money laundering articulated there for the first time. The government contends that money sent to the university officials was "proceeds" of an SUA because the money had previously been transferred from the parents of applicants to The Key, and this transfer was a "completed phase" of the fraud scheme (the SUA).

The government is wrong. The elements of money laundering are not satisfied because the money sent from The Key to the university officials was not "proceeds" of an SUA. First, the alleged transfer of money from parents to The Key was not a "completed phase" of an "ongoing" SUA (here, wire fraud and honest services fraud); without a completed phase of an ongoing SUA, there can be no "proceeds." Second, even if the alleged transfer from the parents to The Key was a "completed phase" of the SUA, the money that was paid to the university officials was not

---

[1/]     The government claims there is one overarching fraud scheme in which Singer arranged bribes to be paid by parents to both (a) individuals who worked at certain universities, in exchange for the parents' children's admission to those universities, and (b) individuals affiliated with certain standardized tests, in exchange for improper assistance on the tests. Whether this is one scheme, as the government argues, or many schemes, as the defendants argue, is immaterial to this motion. Regardless of which entity was allegedly bribed by Singer, nearly all of the payments went from the parents to The Key or The Key Worldwide Foundation, and then were transferred to the individual who was allegedly bribed.

[2/]     Government's Response in Opposition to Defendants' Motion to Dismiss the Fourth Superseding Indictment, ECF No. 1170 ("Opp.").

proceeds as it was not "derived from or obtained or retained . . . through" the SUA.  18 U.S.C, §

1956 (c)(9)(defining the term proceeds).

Moreover, the government's clarification in its opposition brief that both the SUA and the

alleged money laundering transaction were just intermediate steps in furtherance of the same

fundamental goal—the paying of a bribe to the university officials[3/]—makes clear that the money

laundering count has a "merger problem."[4/]   A merger problem arises when the government

charges a defendant with both an underlying SUA and money laundering, and both charges are

based on *the same conduct*.  If a money laundering charge has a merger problem, it both runs

counter to Congress' intent to punish the underlying SUA with a more limited sentence and

violates the defendant's Fifth Amendment right to be free from double jeopardy, and it must be

dismissed.   Here, the money laundering charge has a "merger problem" because both the

"completed phase" of the SUA—the transfer of money from the parents to The Key—and the

alleged money laundering transaction—the transfer of money from The Key to the university

officials—are just steps towards carrying out the same fraud—the alleged bribing of the university

---

[3/]      Opp. at 55.

[4/]      A "merger problem" arises when the financial and money laundering offenses are so
closely connected that there is no clear delineation between the underlying financial crime and
the money laundering offense.  The Department of Justice has acknowledged this issue, and
instructs prosecutors to consult with the Criminal Division's Money Laundering and Asset
Recovery Section ("MLARS") prior to the filing of an indictment or a civil or criminal complaint
in order to "ensure the orderly development of the case law and to assist prosecutors in applying
these statutes in a consistent manner."  Dept. of Justice, Justice Manual, §9-105.330 – Money
Laundering (https://www.justice.gov/jm/jm-9-105000-money-laundering).  "Sections 1956 and
1957 both require that the property involved in the money laundering transaction be the proceeds
of specified unlawful activity at the time that the transaction occurs. The statute does not define
when property becomes 'proceeds,' but the context implies that the property will have been
derived from an already completed offense, or a completed phase of an ongoing offense, before
it is laundered. Therefore, as a general rule, neither § 1956 nor § 1957 should be used where the
same financial transaction represents both the money laundering offense and a part of the
specified unlawful activity generating the proceeds being laundered."  *Id*.

officials in exchange for an admissions slot.  Punishing this one fraud scheme as both fraud and money laundering violates the defendants' rights to be free from double jeopardy, and therefore the money laundering count must be dismissed.

## ARGUMENT

I. **The transfer of money from The Key to the university officials was not money laundering because it was not a transaction involving the "proceeds" of a specified unlawful activity.**

The government concedes that the SUA that allegedly generated the proceeds was the same wire fraud scheme at the heart of the Indictment.  Opp. at 54.  The government states, "[t]he defendants are all charged with conspiracy to commit money laundering by agreeing to conduct financial transactions involving the proceeds of specified unlawful activity—here, mail and wire fraud and honest services mail and wire fraud—knowing that the transactions were designed, at least in part, to conceal the nature and source of the proceeds."  *Id.*

One component of the alleged fraud scheme was a conspiracy between the parents of applicants to certain universities and William "Rick" Singer ("Singer"), to pay certain university officials allegedly to present their otherwise unqualified children falsely as athletes, in order to gain admission to the schools.[5]  ¶¶ 66(f), 66(g).[6]  Each of these schemes required the parent to

---

[5]    The defendants argue in other motions that the Indictment alleges several separate schemes, each involving one parent or set of parents and Singer.  Whether the Indictment alleges separate schemes each involving a parent and Singer, in which the parent paid money to The Key or The KWF and Singer sent an alleged bribe to a university official or standardized test official (as the defendants argue), or whether the Indictment alleges one overarching scheme in which the several different parents paid money to The Key or The KWF and Singer sent the alleged bribe to the university official or standardized test official (as the government argues), is immaterial to this motion.  The point is that each scheme alleges the same sequence: a payment from the parent to The Key or The KWF; a payment from The Key or The KWF to a third party (either a university official or a standardized test official); and some alleged nefarious act by the third party (either a misrepresentation of the applicant as an athlete or the manipulation of the applicant's standardized test score).

[6]    Citations in the form of "¶--" refer to the paragraphs of the Indictment.

pay money to Singer, which was accomplished by sending the money to one of two entities controlled by Singer, either The Key or The KWF.  ¶¶ 19-20; *see e.g.*, ¶¶ 88-89, 102, 120, 130 (The KWF), 139, 236 (The Key).  Singer would then contact his person inside the university (e.g., Donna Heinel at USC, Gordon Ernst at Georgetown) who would help shepherd the child's application through the admissions process by falsely representing the child as an athlete.  ¶ 66(f); *see e.g.*, ¶¶ 118, 126-128, 159, 220, 233, 247.  Singer would pay the inside person with money from The Key (or The KWF) in exchange for the child being granted admission to the university (the admissions slot).[7]  ¶ 66(f); *see e.g.*, ¶¶ 121, 129, 175, 237, 248.  The government has argued in other motions that an object of the conspiracy was to obtain an admissions slot—not money.[8]  Opp. at 30-31 ("[T]he defendants obtained admissions slots . . .  representing that they were sufficiently qualified for those slots when they were not.  In doing so, they deprived the universities of their right to control access to their valuable assets—a property interest that the mail and wire fraud statutes protect.").  Therefore, with respect to any one defendant, the government alleges there is one fraud scheme that involves both (1) a "completed phase" of an "ongoing" SUA sufficient to generate proceeds, and (2) the financial transaction in "proceeds" that is money laundering.

---

[7]     The SAT/ACT schemes were similar, except that instead of gaining admission directly to a university, the parents would obtain a higher test score for their child.  *See e.g.*, ¶¶ 68-96.

[8]     The defendants maintain their argument, advanced in the other motions to dismiss, that the admissions slot is not "property" for the purposes of the wire fraud statute.  Nevertheless, the admissions slot was the ***only*** thing that the government even alleges was obtained as a result of the wire fraud.

**A.     The transfer from the parents to The Key or The KWF was not a "completed phase" of the "ongoing" specified unlawful activity.**

The government concedes that money laundering can occur only after a "completed phase" of an "ongoing" SUA.[9/]  Opp. at 54.  Although the First Circuit has not explicitly defined "completed phase of an ongoing offense," the holdings of the relevant First Circuit cases (and the holdings of other circuit courts that have adopted the "completed phase" requirement) suggest that a "completed phase" of a crime occurs only when all of the elements of that crime are met, even if the crime is still ongoing.   Under that definition of "completed phase," the money laundering charge fails.  The transfer of money between conspirators is not sufficient to satisfy the elements of wire fraud (the alleged SUA).[10/]

The First Circuit adopted the "completed phase of an ongoing offense" requirement in *United States v. Richard*, 234 F.3d 763, 770 (1st Cir. 2000).  There, the government accused the defendant of money laundering, with bankruptcy fraud as the SUA.  *Id.* at 769.  The defendant argued that he could not be guilty of money laundering because he did not engage in a transaction involving proceeds of the bankruptcy fraud.  *Id.*  He argued that there was no transaction involving

---

[9/]     The importance of the SUA requirement is supported by the other subsections of the money laundering statute.   The international money laundering subsection of the money laundering statute, for instance, does not require a transaction in "proceeds."  *See* 18 U.S.C. § 1956(a)(2).  The lack of the "proceeds" requirement—and therefore lack of the need to prove an SUA to generate those proceeds—shows that Congress knows how to relieve the government of its burden of proving an SUA when it specifically intends to criminalize that conduct.  *See id.* Therefore, where Congress includes a transaction in "proceeds" as an element of money laundering—as it has in the promotional and concealment theories—there is clear evidence of Congress' intent to require the government to prove an SUA.  *See* 18 U.S.C. § 1956(a)(1)

[10/]     As stated in the opening brief, while the charge here is *conspiracy* to commit money laundering, rather than money laundering, the conspiracy charge still requires the government to allege that the defendant agreed to engage in a transaction involving proceeds of an SUA. Memorandum in Support of Defendants' Motion to Dismiss the Money Laundering Conspiracy (Count III) at 7; Opp. at 54; *see United States v. Misla-Aldarondo*, 478 F.3d 52, 68 (1st Cir. 2007).

proceeds of bankruptcy fraud because, at the time of the alleged money laundering transaction, the bankruptcy fraud was *still ongoing* and therefore not complete. *Id.* The court rejected this argument, holding that where the SUA is an ongoing crime, it need not be compete in the sense that it is no longer being committed, but, rather, as long as there is a "completed phase" of the SUA, there can be "proceeds." *Id.* at 770. The court stated, "proceeds are derived from an already completed offense, *or a completed phase of an ongoing offense*." *Id.* (emphasis in original). The court did not explicitly define what it meant for there to be a "completed phase" of the SUA, but, in that case, the defendant's conduct satisfied all of the elements of the SUA, even though the defendant was continuing to commit the SUA. *Id.* Furthermore, the court's emphasis that the "completed phase" had to be of an ***"ongoing"*** offense suggests that only offenses whose elements have been fully satisfied and are continuing could qualify under the completed phase rule as SUAs that generated proceeds. *See id.*

Similarly, in *United States v. Castellini*, 293 F.3d 35, 48 (1st Cir. 2004), the First Circuit again held that an ongoing bankruptcy fraud could satisfy the "completed phase of an ongoing offense" requirement for a money laundering offense. The court held that even though the defendant was still engaged in the bankruptcy fraud at the time of the money laundering transaction, there had been a "completed phase" of the bankruptcy fraud sufficient to generate proceeds. *Id.* Once again, the defendant's conduct satisfied all of the elements of bankruptcy fraud, and the court concluded that there was a "completed phase" of the ongoing bankruptcy fraud, by the time of the money laundering transaction. *Id.*

Here, it is clear that the transfer of money from the parents to The Key was not a "completed phase" of the "ongoing" SUA—the wire fraud offense—because it did not satisfy all of the elements of wire fraud. The transfer from the parents to The Key did not meet the elements

of wire fraud because the transfer was not a bribe until it reached the individual who was being improperly influenced. *See United States v. Chartock*, 2007 U.S. Dist Lexis 25247, *20-21 (E.D. Pa. 2007) ("Here, the honest services fraud offenses were completed when Charock offered a bribe to Mariano with the intent to influence his official actions. The first bribe payment is an example of a direct bribe payment without any subsequent money laundering."); *see also McEvoy Travel Bureau v. Heritage Travel*, 904 F.2d 786 (1st Cir. 1990) ("not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud.").

Because all of the elements of the SUA (wire fraud/ honest services fraud) were not complete before the alleged money laundering transaction (the wiring of the money from The Key to the university officials), there was no "completed phase" of an SUA before the alleged money laundering transaction. Therefore there were no proceeds and no money laundering violation.

### B.     The money sent from The Key to the university officials was not "derived from or obtained or retained . . . through" the SUA.

Even if this Court agrees with the government and finds that the wiring of money from the parents to The Key was a "completed phase" of an "ongoing" SUA, it should still dismiss the money laundering count because the money transferred from The Key to the university officials was not "derived from or obtained or retained . . . through" the SUA.[11]

Money laundering does not merely require that the defendant commit an SUA and then engage in a financial transaction. The subsequent financial transaction must be related to the SUA. The money laundering statute sets this requirement out in its definition of "proceeds." The

---

[11]     As stated above, the government only clarified that the alleged fraud scheme to obtain the admissions slot was both the SUA and the money laundering transaction in its opposition brief. This theory also fails.

statute provides, "the term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9).  In other words, "proceeds" are the "gross receipts" of the SUA. *United States v. Rivera-Izquierdo*, 850 F.3d 38, 42 n.2 (1st Cir. 2017) (§ 1956(c)(9) of the money laundering statute "make[s] clear that the proceeds of specified unlawful activity include the ***gross receipts*** of the illegal activity, not just the profits from the illegal activity" (emphasis added)); *see id*.

Here, the relationship of money to the alleged fraud is atypical.  Rather than being the object of the fraud, the money was the means by which the parents allegedly attained the object of the alleged fraud—the admissions slot.  Thus, the only object that was possibly "derived from," "obtained . . . through," or "retained . . . through" the wire fraud was the admissions slot. Furthermore, the Indictment does not allege some sort of transaction in the admissions slot. Instead, the Indictment alleges that the money paid to university officials was the money laundering transaction.  But because this money was not derived from the fraud—it was the means by which the defendants achieved the fraud—it was not "proceeds" of an SUA, and a subsequent transaction involving this money was not money laundering.

By contrast, courts have upheld money laundering convictions in cases where the defendant engaged in a financial transaction involving money that is the "gross receipts" of the fraud (where fraud is the SUA).  *See e.g., United States v. Misla-Aldarondo*, 478 F.3d 52, 68 (1st Cir. 2007).  In *Misla-Aldarondo*, the government charged the defendant with conspiracy to commit money laundering and extortion, with extortion as the SUA.  *Id.*  The court upheld the money laundering charge because the defendant undertook steps to conceal the money ***obtained as a result of the extortion***.  *Id.*

8

Here, the money that was paid from The Key to the university administrators was not obtained by the defendants as a result of the fraud. The ***admissions slot*** was obtained as a result of the fraud. The ***admissions slot*** is the alleged "proceeds" of the fraud. And, obviously, the admissions slot was not laundered.

This argument—that money used to carry out a crime is not "proceeds" of a crime unless it was the "gross receipts" of a crime—is supported by both (i) the promotional money laundering subsection of the money laundering statute and (ii) the forfeiture statute.

The promotional money laundering subsection of the money laundering statute makes clear that a financial transaction in which the defendant spends money to further (or "promote") some criminal activity is not money laundering unless the money involved in the transaction is "proceeds" of some prior criminal activity. *See* 18 U.S.C. 1956(a)(1)(A)(i). In other words, promotional money laundering is the use of the proceeds—i.e. "gross receipts"—of a SUA to further carry out a crime. The fact that the "proceeds" requirement exists even for promotional money laundering means that Congress did not intend to classify financial transactions in otherwise "clean" money that were used to carry out a crime as money laundering. Congress could have chosen to criminalize the use of any money to facilitate carrying out a crime, but explicitly chose not to by requiring that the money be "proceeds" of an SUA.

The First Circuit has reversed convictions for promotional money laundering charges where the financial transaction did not involve "proceeds" of an SUA and upheld convictions for promotional money laundering where the financial transaction did involve "proceeds" of an SUA. For example, in *United States v. Carucci*, 364 F.3d 339, 346 (1st Cir. 2004), the First Circuit reversed the defendant's promotional money laundering conviction because, while there was evidence that the defendant engaged in at least one SUA prior to the alleged money laundering

transaction, there was no evidence linking the money used in the alleged money laundering transaction to the money derived from the SUA.  Because the financial transaction that promoted the new crime did not involve "proceeds" of an SUA, it was not a money laundering transaction. *Id.*  By contrast, in *United States v. Cedeno-Perez*, 579 F.3d 54, 59 (1st Cir. 2009), the First Circuit affirmed a defendant's conviction for promotional money laundering because "a rational jury could have concluded . . . that Cedeno knew that the money came from some form of unlawful activity."  There, the court noted, "[t]he district court held correctly that the government had to prove the mental state for *either* 'promotional' or 'concealment' money laundering to obtain a conviction on the indictment."  *Id.* at 59-60 (emphasis in the original).  There, because the money used in the financial transaction that promoted further wrongdoing was itself "proceeds" of an SUA, the financial transaction was money laundering.  *Id.*

Moreover, when interpreting the forfeiture statute, courts have distinguished between the "proceeds" of an SUA and all property "involved" in money laundering, finding that the latter category is much broader than the former.  In *United States v. Bokhari*, No. 3:14-30044-MGM, 2015 U.S. Dist. Lexis 97594, *21 (D. Mass. July 27, 2015), the court held that the forfeiture statute allows the government to seize all property "involved" in money laundering, and defined property "involved" in money laundering more broadly as the "proceeds" of the SUA.  The court noted, "[t]he [forfeiture] statute directs forfeiture of 'all property 'involved in' the crime, which can include clean or legitimate property that is commingled with tainted property derived from illicit sources."  *Id.* (citing *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012)).  The court also noted, "[p]roperty 'involved' in money laundering includes 'the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and ***any property used to facilitate the laundering offense***."  *Id.* (emphasis added).  This shows a clear

distinction between money used to facilitate a money laundering offense—which is ***not*** proceeds—and money that is the receipts of the SUA—which is proceeds.  In *Bokhari*, the court held that tobacco products owned by a business that the defendant used for money laundering were subject to forfeiture because they were "involved in" the money laundering—they were the clean property with which the "dirty" funds were commingled—even though they were not proceeds of the SUA.  *Id.*

The statutory definition of "proceeds" contained in 18 U.S.C. § 1956(c)(9), the promotional money laundering section of the money laundering statute, and the forfeiture statute all make clear that not all of the money sent or received by a defendant who is engaged in a SUA is "proceeds" of the SUA.  Here, the money sent from The Key to the university officials was not "proceeds" of the fraud because the money was not the "gross receipts" of the fraud—the receipts of the fraud were the admissions slots and the admissions slots alone, and these were not laundered.

### C.     The money laundering count has a "merger problem."

Here, the government clarified in its opposition that both (i) the completed phase of the SUA that allegedly generated the "proceeds" to be laundered and (ii) the financial transaction that allegedly laundered the proceeds, were part of the same crime—the underlying fraud.  Therefore, this money laundering charge runs headlong into the same "merger problem" that the Supreme Court addressed in *United States v. Santos*, 553 U.S. 507, 516 (2008).  A "merger problem" arises when the same conduct is punishable as both money laundering and a separate crime.  *Id.* at 515. The issue is that money laundering is punishable by a far longer prison sentence than many of the underlying SUAs.  If a defendant who commits a certain specified unlawful activity—punishable by a certain prison sentence—can also be prosecuted for money laundering—which is punishable

by a significantly longer prison sentence than many of the underlying SUAs—this second, greater punishment for the same crime runs counter to both Congress' intent to punish the underlying crime with a particular sentence and the double jeopardy clause of the Fifth Amendment. *United States v. Kratt*, 579 F.3d 558, 561 (6th Cir. 2009).[12] Describing Justice Stevens' concurrence in *Santos*, the Sixth Circuit in *Kratt* explained that the merger problem "radically increases" the sentence for the underlying crime and leads "to a 'perverse result' that 'Congress could not have intended.'" *Id.* at 562 (quoting *Santos*, 553 U.S. at 528 (Stevens, J., concurring)); *see United States v. Foley*, 783 F.3d 7, (1st Cir. 2015) ("[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy") (quoting *Santos*, 553 U.S. at 528 (Stevens, J., concurring)).

In *Santos*, the Supreme Court attempted to avoid the merger problem by defining "proceeds" as "profits." 553 U.S. at 516. The Court stated that a defendant could only be liable for money laundering if, first, he committed an SUA that generated profits, and then if he engaged in a separate financial transaction with those profits. *Id.* Immediately after *Santos*, Congress amended the money laundering statute to include explicitly within the definition of "proceeds" the gross receipts of an SUA, rather than merely profits.[13] But while Congress may have effectively overturned the Supreme Court's definition of "proceeds" as "profits," it did not resolve the problem that led the Court to use the "profits" definition of "proceeds" in the first place. The

---

[12]   *See Kratt*, 579 F.3d at 561 ("[N]early every violation of a number of predicate offenses listed in § 1956(f)(3), it turns out, also violate the money-laundering statute, and money laundering sometimes radically increases the statutory maximum sentence compared to the merged offense. [F]or example, operating an illegal lottery ha[s] a statutory maximum of five years, while a § 1956 conviction raise[s] the statutory maximum to 20 years.").

[13]   123 Stat. 1617, P.L. 111-21 (May 20, 2009) (amending 18 U.S.C. § 1956 by adding section (c)(9), which defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts such activity"); *see United States v. Lyons*, 740 F.3d 702, 727 (1st Cir. 2014).

underlying problem was, and remains, that two statutes should not create different crimes for the same behavior.

Here, both the fraud charge (which is the SUA) and the money laundering charge attempt to punish the same behavior—the bribing of the university officials to get the defendants' children into college.  The Indictment does not allege that the parents laundered the admissions slot in any financial transaction.  Therefore, each parent is charged with one scheme, one goal of the one scheme (to obtain the admissions slot), and no subsequent money laundering transaction.  To punish this one act as both fraud and money laundering would create a "merger problem" and violate the defendants' right to be free from double jeopardy.

## CONCLUSION

For the reasons discussed herein and in their opening brief, the defendants respectfully request that this Court dismiss Count III of the Indictment, for Money Laundering Conspiracy.

DATED: May 27, 2020                              Respectfully submitted,

                                                 /s/ Cory S. Flashner
                                                 Cory S. Flashner (BBO # 629205)
                                                 R. Robert Popeo (BBO # 403360)
                                                 Mark E. Robinson (BBO # 423080)
                                                 Eóin P. Beirne (BBO # 660885)
                                                 MINTZ, LEVIN, COHN, FERRIS,
                                                 GLOVSKY AND POPEO, P.C.
                                                 One Financial Center
                                                 Boston, MA 02111
                                                 (617) 348-1605 (telephone)
                                                 (617) 542-2241 (fax)
                                                 rpopeo@mintz.com
                                                 csflashner@mintz.com
                                                 mrobinson@mintz.com
                                                 ebeirne@mintz.com
                                                 *Counsel for Elisabeth Kimmel*

/s/ Brian T. Kelly
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

/s/ David S. Schumacher
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

/s/ David E. Meier
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA  02110
(617) 720-2626
dmeier@toddweld.com

/s/ Stephen H. Sutro
Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*

/s/ Reuben Camper Cahn
Reuben Camper Cahn (*pro hac vice*)
Jennifer L. Keller (*pro hac vice*)
Chase A. Scolnick (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel: (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

/s/ Tracy A. Miner
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377
Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

/s/ Michael K. Loucks
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

/s/ Martin G. Weinberg
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail:  mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was filed electronically on May 27, 2020, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

/s/ Cory S. Flashner
Cory S. Flashner

16